Alan M. Lieberman
Cheryl J. Scarboro
J. Lee Buck, II
Martin L. Zerwitz

SECURITIES AND EXCHANGE COMMISSION
100 F Street N.E.
Washington, DC 20549-4030
Tel: (202) 551-4474



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | No. 10 Civ. _____ |
| - against - | COMPLAINT |
| SAMUEL E. WYLY, CHARLES J. WYLY, JR., MICHAEL C. FRENCH and LOUIS J. SCHAUFELE III, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Samuel E. Wyly ("Sam Wyly"), Charles J. Wyly, Jr. ("Charles Wyly") (jointly, the "Wylys"), Michael C. French ("French") and Louis J. Schaufele III ("Schaufele"), (collectively, "Defendants"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.     Defendants Sam Wyly and Charles Wyly engaged in a 13-year fraudulent scheme to hold and trade tens of millions of securities of public companies while they were members of the boards of directors of those companies, without disclosing their ownership and their trading of those securities. The Wylys' scheme defrauded the investing public by materially misrepresenting the Wylys' ownership and trading of the

securities at issue while enabling the Wylys to realize hundreds of millions of dollars of unlawful gain and other material benefits in violation of the federal securities laws governing the ownership and trading of securities by corporate insiders.

2.     The public companies involved in the Wylys' scheme to defraud were Michaels Stores, Inc. ("Michaels"), Sterling Software, Inc. ("Sterling Software"), Sterling Commerce, Inc. ("Sterling Commerce"), and Scottish Annuity & Life Holdings Ltd. (now known as Scottish Re Group Limited) ("Scottish Re") (hereinafter collectively referred to as "the Issuers"). The shares of the Issuers were traded on the New York Stock Exchange throughout the period of the Wylys' scheme.

3.     The apparatus of the fraud was an elaborate sham system of trusts and subsidiary companies located in the Isle of Man and the Cayman Islands (collectively hereinafter the "Offshore System") created by and at the direction of the Wylys. The Offshore System enabled the Wylys to hide their ownership and control of the Issuers' securities (hereinafter "Issuer Securities") through trust agreements that purported to vest complete discretion and control in the offshore trustees. In actual fact and practice, the Wylys never relinquished their control over the Issuer Securities and continued throughout the relevant time period to vote and trade these securities at their sole discretion.

4.     Through their use of the Offshore System, the Wylys were able to sell without disclosing their beneficial ownership over $750 million worth of Issuer Securities, and to commit an insider trading violation resulting in unlawful gain of over $31.7 million. The Wylys' attorney, French, and their stockbroker, Schaufele, substantially assisted the Wylys' fraudulent scheme, each reaping financial rewards for

doing so. Each also committed primary violations of the antifraud provisions of the securities laws.

5.      The Wylys and French knew or were reckless in not knowing their obligations under the federal securities laws as public company directors and greater-than-5% beneficial owners, to report their Issuer Securities holdings and trading on Schedules 13D and Forms 4, public documents filed with the Commission. The Wylys and French also knew or were reckless in not knowing that the investing public routinely used such disclosures to, among other things, gauge the sentiment of public companies' insiders and large shareholders about those companies' financial condition and prospects, thereby relying on them in making investment decisions. Despite their knowledge, the Wylys and French systematically and falsely created the impression that the Wylys' holdings and trading of Issuer Securities were limited to the fraction that they held and traded domestically. By depriving existing shareholders and potential investors of information deemed material by the federal securities laws, the Wylys were able to sell, in large-block trades alone, more than 14 million shares of Issuer Securities over many years, realizing gains in excess of $550 million. The sales generating most of these gains were made pursuant to materially false or misleading Commission filings.

6.      The Wylys further exploited their illegal non-disclosure of their offshore Issuer Securities to make a massive and bullish transaction in Sterling Software in October 1999 based upon the material and non-public information that they, the Chairman and Vice-chairman of Sterling Software, had jointly decided to sell the company. This transaction yielded ill-gotten gains of over $31.7 million when Sterling Software's sale was ultimately announced to the public less than four months later.

7.     Throughout the course of their scheme, the Wylys, French and Schaufele engaged in fraud, deception and material misrepresentation to conceal their actions. These acts included:  (i) the making of hundreds of false and materially misleading statements to the Issuers, the Issuers' attorneys, investors, the Commission, and, in the case of Schaufele, to brokerage firm intermediaries, (ii) the establishment and operation of an offshore "Wyly family office" in the Cayman Islands as a conduit and repository for communications and records "which should not be seen in the USA," and (iii) the allocation of the Wylys' offshore holdings of Issuer Securities among different, and often newly created, offshore entities, all under the Wylys' control, solely to avoid making required Commission filings.

8.     French utilized his roles as the Wylys' lawyer and fellow director on three of the four Issuers' boards to cover the Wylys' scheme with a false cloak of legality that was essential both to its concealment and its execution.  French's assistance to the Wylys' scheme continued during his tenure as Scottish Re's Chairman, when the Wylys, who had left Scottish Re's board, continued covertly to hold more than 5% of its outstanding stock.  French also established offshore entities of his own, which he used to control and to trade Issuer Securities without disclosing his ownership or trading as required by law.

9.     For his part, Schaufele used his position as the Wylys' stockbroker to conceal from and affirmatively misrepresent to his brokerage firm superiors the Wylys' control over the Issuer Securities held in their Offshore System.  Schaufele also directly committed an insider trading violation by trading in Sterling Software common stock through his wife's accounts based upon non-public material information he learned

through his employment at Lehman Brothers, i.e. the Wylys' intent to make a massive,

bullish and undisclosed transaction in Sterling Software offshore.

10.     By the conduct described herein:

    a.  the Wylys each violated Sections 5(a), 5(c) and 17(a) of the Securities

Act of 1933 ("Securities Act") and Sections 10(b), 13(d), 14(a) and 16(a)

of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules

10b-5, 13d-1, 13d-2, 14a-3, 14a-9, 16a-2 and 16a-3 thereunder, and

aided and abetted (1) violations of Exchange Act Sections 13(a) and

14(a) and Rules 13a-1, 14a-3 and 14a-9 thereunder by Michaels, Sterling

Software, Sterling Commerce and Scottish Re; and (2) violations of

Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 thereunder by

certain of their Isle of Man trustees;

    b.  French violated Securities Act Section 17(a) and Exchange Act Sections

10(b), 13(d), 14(a) and 16(a), and Rules 10b-5, 13d-1, 13d-2, 14a-3, 14a-

9, 16a-2 and 16a-3 thereunder, and aided and abetted (1) violations of

Exchange Act Sections 10(b), 13(d), 14(a) and 16(a) and Rules 10b-5,

13d-1, 13d-2, 14a-3 and 14a-9 by Sam Wyly and Charles Wyly; (2)

violations of Exchange Act Sections 13(a) and 14(a) and Rules 13a-1,

14a-3 and 14a-9 thereunder by Michaels, Sterling Software, Sterling

Commerce, and Scottish Re; and (3) violations of Exchange Act Section

13(d) and Rules 13d-1 and 13d-2 thereunder by certain Isle of Man

trustees; and

c.   Schaufele violated Exchange Act Section 10(b) and Rule 10b-5

thereunder, and aided and abetted violations of Exchange Act Section

10(b) and Rule 10b-5 thereunder by the Wylys.

Each defendant will continue to violate the foregoing statutes and rules unless restrained or

enjoined by this Court.

11.   The Commission seeks injunctive relief, disgorgement of ill-gotten gains,

prejudgment interest, civil penalties and other appropriate and necessary equitable relief

from all defendants.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action pursuant to Securities Act

Sections 20(d)(1) and 22(a) [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Exchange Act

Sections 21(d), 21(e), 21A and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

13.   Each defendant, directly or indirectly, made use of the means and

instrumentalities of interstate commerce, of the mails or of the facilities of a national

securities exchange, in connection with the acts, practices and courses of business alleged

herein, certain of which occurred within the Southern District of New York.

14.   Venue in this district is proper under Section 22(a) of the Securities Act

[15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a

substantial portion of the conduct alleged herein occurred within the Southern District of

New York.

## THE DEFENDANTS

15.   **Sam Wyly**, 75, a resident of Dallas, Texas, served as Michaels' Chairman

from 1984 to 2001, and as its Vice-Chairman from 2001 until its acquisition by a

consortium of private equity firms in 2006; as Sterling Software's Chairman from 1981 until its acquisition by Computer Associates in 2000; as Sterling Commerce's Executive Committee Chairman, and as a Member of its Board of Directors, from December 1995 until its acquisition by SBC Communications in 2000; and as Scottish Re's Chairman from October 1998 until March 2000. Since 1979, he has been permanently enjoined from violating, among other provisions, the antifraud provisions of the Securities Act and the Exchange Act charged herein. See *SEC v. Samuel E. Wyly et al.*, Civ. Action No. 79-3275, Lit. Rel. No. 8943 (D.D.C., Dec. 6, 1979).

16.     **Charles Wyly**, 76, a resident of Dallas, Texas, served as Michaels' Vice-Chairman from 1984 to 2001 and as its Chairman from 2001 through 2006; as Sterling Software's Vice-Chairman from 1984 until 2000; as a Director of Sterling Commerce and a member of its Executive Committee from December 1995 until 2000; and as a director of Scottish Re from October 1998 until November 2000.

17.     **French**, 67, a resident of Dallas, Texas, served as a director of Scottish Re from May 1998 until May 2007, as its CEO from May 1998 to January 2005, and as its Chairman from March 2000 through March 2006. He also served, along with the Wylys, as a director of Michaels and Sterling Software from 1992 until 2000. French was a partner in the law firm of Jackson & Walker LLP from 1976 through 1992, at which time he left the firm to work directly for the Wylys. French also served as a protector of the Isle of Man trusts established by the Wylys from 1992 through January 2001—and continued to assist the Wylys with respect to their Offshore System periodically thereafter. He is presently employed as a consultant at Challenger Capital Group, Ltd., a financial services company registered with FINRA.

18.     **Schaufele**, 55, a resident of Dallas, Texas, served for over fifteen years as the registered representative for various accounts established by the Wylys and French, including the securities accounts of the Wylys' and French's offshore entities.  Prior to joining the Dallas office of Bank of America in 2002, Schaufele had worked at the Dallas offices of Lehman Brothers and First Boston.  He is presently employed by J.P. Morgan Securities, Inc.

### THE ISSUERS

19.     **Michaels** is a corporation headquartered in Irving, Texas that sells arts and crafts supplies and products in retail stores throughout the United States and Canada. Prior to being acquired by private equity firms for $6 billion in 2006, Michaels' common stock was registered with the Commission pursuant to Exchange Act Section 12(b), and was traded on the New York Stock Exchange.  The Wylys purchased Michaels in 1983 and, after taking in public in 1984, built it into the nation's largest arts and crafts retailer.

20.     **Sterling Software** was a corporation headquartered in Dallas, Texas that developed and supplied systems management, business intelligence and application development software products and services.  It was acquired by Computer Associates International, Inc. in March 2000 for approximately $4 billion worth of Computer Associates stock.  Until its acquisition, Sterling Software's common stock was registered with the Commission pursuant to Exchange Act Section 12(b), and was traded on the New York Stock Exchange.  The Wylys founded Sterling Software in 1981 and built it into one of the country's largest business software and services companies.

21.     **Sterling Commerce** was a corporation headquartered in Dallas, Texas that developed, marketed and provided software products and services that enabled businesses

to engage in E-Business communications.   It was acquired by SBC Communications, Inc. in March 2000 for $4 billion.  Until its acquisition, Sterling Commerce's stock was registered with the Commission pursuant to Exchange Act Section 12(b), and was traded on the New York Stock Exchange.  Sterling Commerce was spun off from Sterling Software in 1996.

22.    **Scottish Re** is a holding company organized under the laws of the Cayman Islands with its principal executive office in Bermuda.  It is engaged in the reinsurance of life insurance, annuities and annuity-type products written by life insurance companies and other financial institutions located in the United States and abroad.  At all relevant times, Scottish Re's common stock was registered with the Commission pursuant to Exchange Act Section 12(b), and was traded on the New York Stock Exchange.  In 2008, it was delisted from the NYSE and deregistered under Exchange Act Sections 12(b) and 12(g), and has since been quoted on the Pink Sheets.  Scottish Re was established by French and the Wylys in the mid-1990s and was taken public in 1998.

## FACTS

### THE WYLYS CREATE AND FUND THEIR OFFSHORE SYSTEM WITH TENS OF MILLIONS OF ISSUER SECURITIES

23.    Between March 1992 and January 1996, in the Isle of Man, a self-governing British crown dependency located between Scotland and Northern Ireland in the Irish Sea, Sam Wyly established ten (10) trusts and Charles Wyly established seven (7) trusts (collectively the "Offshore Trusts"), naming many of them for places or events of personal significance.  Among the Offshore Trusts' names, for example, were Louisiana towns and schools associated with the Wylys' youth, including Lake Providence, where the Wylys were born, Delhi, where the Wylys attended high school,

and Tallulah, the Wylys' football rival high school.  The beneficiaries of each of the

Offshore Trusts were Sam or Charles Wyly, their respective family members, or both.

24.    Initially, the Wylys selected a single Isle of Man-based trust management

company to serve as their Offshore Trusts' trustee.  Between 1992 and 2004, however,

the Wylys selected numerous additional Isle of Man-based trust management companies

to serve as their Offshore Trusts' trustees (the "Offshore Trustees").  Employees of the

various respective Offshore Trustees served as directors of more than thirty (30) Isle of

Man-based shell companies that were wholly-owned by the various respective Offshore

Trusts ("Offshore Companies").  Like the Offshore Trusts, many of the Offshore

Companies were given names of personal significance to the Wylys, including East

Carroll, the Louisiana Parish where the Wylys grew up, and Tensas, the bayou site of the

Wylys' boyhood home.  These Offshore Companies, along with the Offshore Trusts,

comprised the Wylys' Offshore System.

25.    Commencing with the initial establishment of their Offshore System and

continuing, at various times, over the next seven years, the Wylys transferred to their

Offshore System millions of stock options and warrants in Michaels, Sterling Software

and Sterling Commerce that they had first received from those Issuers as director

compensation.  These transfers, which provided the bulk of the funding for their Offshore

System, included the following:

       a.  In April 1992, the Wylys transferred options and warrants for 960,000

           Michaels shares and 1,983,588 Sterling Software shares to ten of their

           Offshore Companies, whose ownership was divided among two of

           their Offshore Trusts;

10

b.   In December 1992, the Wylys transferred options for an additional 1 million Sterling Software shares to three of their Offshore Companies, each owned by a different Offshore Trust;

c.   In December 1995, the Wylys transferred options for 1.35 million Michaels shares and 1.65 million Sterling Software shares to five of their Offshore Trusts;

d.   In January 1996, the Wylys transferred options for another 1 million Sterling Software shares to two of their Offshore Trusts;

e.   In March 1996, the Wylys transferred options for 4.6 million Sterling Commerce shares to two of their Offshore Trusts; and

f.   In September 1999, the Wylys sold options for 2.625 million Sterling Software shares and 712,500 Sterling Commerce shares from their domestic holdings to four of their Offshore Companies owned by four different Offshore Trusts,.

26.    The Wylys also arranged for their Offshore System to acquire stock options, warrants and common stock in Michaels and Scottish Re in private placement transactions directly with those Issuers. These private placements included the following:

a.   On March 29, 1996, Michaels entered into private stock purchase agreements with three Offshore Companies through which the Offshore Companies acquired 2 million restricted shares of Michaels for $25 million;

b.   On December 23, 1996, Michaels entered into option agreements with two Offshore Companies through which the Offshore Companies

11

acquired, for $1 million, options to purchase 2 million Michaels shares at $10.50 per share;

c.   In June 1998 and October 1998, before Scottish Re's initial public offering, two Offshore Trusts and two Offshore Companies entered into multiple private transactions with Scottish Re through which they ultimately acquired 1.65 million Class A warrants and 937,220 common shares of Scottish Re.

27.     The Wylys' Offshore System obtained additional millions of shares of Sterling Commerce in October 1996, when Sterling Commerce was spun-off from Sterling Software. All Sterling Software shareholders received 1.5926 shares of Sterling Commerce as a dividend for each Sterling Software share owned. As a result of this dividend payment, the Wylys' Offshore System acquired nearly 3 million additional shares of Sterling Commerce.

28.     The Offshore System's Issuer Securities were held in U.S. brokerage accounts in the names of the Offshore Companies. The Wylys selected the stockbroker and the firm where these Issuer Securities were held. Over the relevant period, these firms were C.S. First Boston, Lehman Brothers, Bank of America Securities and Bear Stearns. The accounts at C.S. First Boston, Lehman Brothers and Bank of America Securities were all serviced by Schaufele, the Wylys' longtime broker, who also served as broker for their domestic holdings. Virtually all of the Wylys' offshore Issuer Securities transactions were executed through Schaufele or persons under his direction and control.

## THE WYLYS WERE THE BENEFICIAL OWNERS OF THE ISSUER SECURITIES HELD BY THEIR OFFSHORE SYSTEM

### The Wylys Appointed Trusted Loyalists to Serve as "Protectors"

29.     Although the language of the trust agreements governing the Wylys' Offshore Trusts purported to confer upon the Offshore Trustees broad and exclusive authority to manage the trust assets, this authority was illusory.  Under the trust agreements, trust Protectors were granted the right "to remove, appoint or replace any Trustee with or without cause at any time," as well as the right to add or remove trust beneficiaries.  In practice, the Offshore Trusts were controlled by these Protectors, who were Wyly-appointed loyalists whose livelihoods were dependent on the Wylys and whose function was to ensure that the Wylys' instructions for the Offshore Trusts were executed.

30.     In March 1992, when the Offshore Trusts were created, the Wylys appointed two individuals to serve as the Protectors:  their lawyer, French, and their longtime family office CFO (the "Wyly Family CFO").  In late 1995, the Wylys hired a Cayman Islands-based accountant (the "Cayman Accountant") to assist the Protectors in administering the Wylys' Offshore System.  The Cayman Accountant's responsibilities increased over the years, and by 1998, had risen to equal those of a Protector.  In January 2001, the Wylys formally replaced French as a Protector with the Cayman Accountant, and in November 2004, the Wyly Family CFO (who had ceased serving as  CFO of the Wylys' Family Office in 1999) also stepped down as a Protector, leaving the Cayman Accountant as the Offshore Trusts' sole protector.  During their terms as Protectors, French, the Wyly Family CFO and the Cayman Accountant derived most, if not all, of

their compensation either directly from entities owned or run by the Wylys, or from work performed for such entities.

31.     The Wylys employed a protocol for effecting transactions in their Offshore System.  One or both of the Wylys conveyed instructions to the Protectors for transactions to be executed in their Offshore System.  The Protectors, in turn, conveyed the instructions to the appropriate Offshore Trustee, who then implemented them by signing the necessary documentation, or, in the case of Issuer Securities transactions, by faxing the necessary trading instructions to Schaufele or his assistants; or, in the case of structured Issuer Securities transactions, by executing and returning the relevant portion of transaction documents that the Wylys had first negotiated through Schaufele.

32.     The Protectors' role was to convey the Wylys' instructions to the Offshore Trustees and ensure that the instructions were followed.  To accomplish this, the Protectors were in regular communication with the Offshore Trustees.  Between 1992 and early 2005, the Protectors issued thousands of instructions to the Offshore Trustees, several hundred of which directed Issuer Securities transactions.

33.     The Protectors never initiated, devised or independently decided what Issuer Securities transactions to present to the Offshore Trustees, and never failed to convey the Wylys' Issuer Securities instructions to the Offshore Trustees.  Moreover, the Protectors conveyed to the Offshore Trustees instructions for only such Issuer Securities transactions as were directed by Sam Wyly or Charles Wyly.

**The Offshore Trustees Implemented the Wylys' Instructions**

34.     Pursuant to the Defendants' scheme to conceal the Wylys' control over the Offshore System, the Protectors termed their instructions to the Offshore Trustees as

"recommendations," thereby implying that the Offshore Trustees could exercise discretion by declining to implement them. Like the Protectors, however, the Offshore Trustees never initiated, devised or independently decided what transactions, in Issuer Securities or otherwise, were to be executed by the Offshore System. And just as the Protectors never failed to convey the Wylys' instructions to the Offshore Trustees, the Offshore Trustees never failed, in turn, to implement those instructions.

35.     Despite the fact that the Protectors made thousands of "recommendations" for transactions to the Offshore Trustees from 1992 through at least early 2005, many relating to transactions worth tens of millions of dollars, the Offshore Trustees never deviated from executing such "recommendations." When a "recommendation" came to the Offshore Trustees from the Protectors, they understood it was coming from the Wylys themselves, and, if it was a transaction permitted by the Trust documents, which it effectively always was, it was implemented.

36.     The Wylys' instructions, delivered to the Offshore Trustees by the Protectors, frequently left nothing to the Offshore Trustees' judgment or discretion. In many Issuer Securities sales instructions, for example, the Offshore Trustees simply were told by the Protectors which Offshore Company or Offshore Companies were to sell stock, the total number of shares to sell, the maximum number of shares to be sold per day, the minimum price at which the shares could be sold, which broker to use, and how the proceeds were to be invested or applied. Instructions also occasionally required immediate action by the Offshore Trustees, affording them no time for any meaningful review or assessment prior to implementation. Such immediate action items included

large-block sales of Issuer stock, investments in hedge funds, and wire transfers of cash to other Wyly-run entities.

37.     The Wylys excluded the Offshore Trustees from negotiations of large Issuer Securities transactions entered into by the Offshore Companies.  In every case, such transactions were first agreed upon by the Wylys and the terms were then negotiated between the brokerage house (most typically Lehman Brothers acting through Schaufele) and the Wylys (frequently represented by other Wyly family members, the Protectors, or both).  As many of these transactions involved multiple Offshore Companies administered by different Offshore Trustees, each Offshore Trustee received only the finalized transaction documents concerning its portion of the overall transaction, whereas the Wylys, by contrast, knew and approved of the entire transaction in advance.

38.     With regard to voting of Issuer Securities held offshore, the Offshore Trustees always voted the shares consistent with the Wylys' expectations.  On the few occasions where the Wylys' wishes were not obvious from the proxy materials, the Offshore Trustees asked one of the Protectors for guidance on how they were to vote the Issuer Securities proxies.  On such occasions, the Protector asked the Wylys how they wanted the Issuer Securities voted and relayed the answer to the Offshore Trustees, who always complied.

39.     On several occasions, the Wylys or others deviated from the protocol for communications with the Offshore Trustees, by bypassing the Protectors, the Offshore Trustee, or both.  For example:

    a.  In September 1992, Sam Wyly directly contacted one of the Offshore
        Trustees and placed an order to sell Michaels stock "now that the price

has hit $29.50." A limit order was placed to sell 100,000 shares at
$28.50 or better; however, because Michaels' share price dropped
soon thereafter, the offshore system was able to sell just 37,000 shares
at or above that limit price.

b. In July 1993, a principal of the same Offshore Trustee notified French
that "[f]requently, the first we know of a deal is when we read that the
broker has settled [the transaction] . . . We presume that the
unorthodox deals are being placed by the Settlor [Sam Wyly]."
Instead of insisting that such behavior cease, however, the principal
asked only that Sam Wyly indemnify the Offshore Trustee from any
liabilities arising from his conduct and that, in the future, the Wyly
Family Office notify the Offshore Trustee of such trades at the time
Sam Wyly placed them with the broker.

c. In November 1995, Sam Wyly spoke directly to Schaufele and offered
to let Schaufele's firm, Lehman Brothers, cancel a transaction Lehman
had recently entered into with the Wylys' Offshore System since Sam
Wyly "didn't want to hurt Lehman."

d. In 2001, the then-CFO of the Wylys' family office contacted
Schaufele's assistant at Lehman Brothers and, following Charles
Wyly's directions, directly placed an order to sell 100,000 shares of
Michaels at $42 or better on behalf of one of Charles' Offshore
Companies. Lehman sold 82,500 of the shares prior to receiving any

instructions from the Offshore Trustee.  The Offshore Trustee never

complained about the then-Wyly Family CFO's actions.

**The Wylys Closely Monitored the Assets in their Offshore System**

40.      The Wylys and the Protectors spent considerable time and effort closely

monitoring the assets and activities of their Offshore System.  The Protectors held semi-

annual meetings with the Offshore Trustees, usually in the Isle of Man, to review the

Offshore Trustees' records, among other things.  The Wylys also had the Cayman

Accountant maintain, in the Cayman Islands, a comprehensive set of books and records

concerning the Wylys' holdings and activities in each of the Offshore Trusts and

Offshore Companies.

41.      The Cayman Accountant, who was hired to establish an entity in the

Cayman Islands to, among other responsibilities, keep the books and records concerning

the Wylys' Offshore System outside the United States, used those books and records to

prepare detailed monthly financial reports for both Sam Wyly and Charles Wyly (the

"Monthly Offshore Reports").  These Monthly Offshore Reports consolidated the

respective assets and liabilities that Sam Wyly and Charles Wyly each held in the

Offshore System, and also broke out the assets and liabilities, within Sam's and Charles'

respective portions of the Offshore System, by Offshore Trust and Offshore Trustee.

When combined with similar reports the Wylys received regarding their domestic assets

and liabilities, the Monthly Offshore Reports provided the Wylys a complete picture of

their net worth.  The Wylys used these reports to decide, among other things, which

portions of the assets they controlled would be tapped to generate funding for

transactions into which they desired to enter.

**The Wylys Controlled and Enjoyed the Benefits of their Offshore System's Assets**

42.     The Wylys' transfer of millions of Issuer Securities to their Offshore System did not prevent or limit the Wylys from enjoying the benefits of those assets in the United States. Once the Issuer Securities held in their Offshore System were, at the Wylys' direction, sold, or used as collateral for various loan transactions, the Wylys freely availed themselves of the resulting proceeds. The Wylys directed the Offshore Trustees to invest a total of approximately $300 million of the proceeds in three funds, two of which were hedge funds that Sam Wyly created (Maverick Fund and Ranger Fund), and the third of which was a private investment fund Charles Wyly created (First Dallas). The Wylys additionally directed the Offshore Trustees to invest nearly $200 million in Green Mountain Energy Company, a clean energy company that Sam Wyly acquired in 1998 and attempted to take public in 1999.

43.     The Wylys used the proceeds from their offshore stock sales to purchase tens of millions of dollars worth of art, collectibles and jewelry. All of the items purchased by the Offshore System were personally selected by either Sam Wyly or Charles Wyly (or their wives) and kept at Wyly family members' homes or businesses, or worn on their persons, in the United States. After the items were purchased, the Protectors forwarded the bills or invoices to the designated Offshore Trustee, along with a "recommendation" for payment, which was always followed.

44.     The Wylys spent nearly $100 million of the proceeds from their offshore stock sales to purchase real estate in the United States for use by Wyly family members as residences, vacation homes and Wyly-run business ventures. Wyly family members selected the purchased properties, oversaw the properties' construction and renovations,

and exclusively used the properties once the work was completed. After the properties were chosen, the Protectors directed the Offshore Trustees to have the Offshore System provide the funds necessary to purchase the properties. The properties purchased using offshore funds include two ranches in Aspen, Colorado used by Sam Wyly's and Charles Wyly's families respectively; two condominiums located in downtown Aspen, Colorado, one of which is used by an art gallery that is part-owned by one of Sam Wyly's daughters; and a 100-acre horse farm outside Dallas, Texas formerly run as a business venture by one of Charles Wyly's daughters.

45.   The Wylys used offshore cash to cover charitable commitments each had made. In 1996, for example, Sam Wyly pledged to donate $10 million to his business school alma mater over five years in connection with the construction of a new building on campus, which was subsequently built and named for him. Although Sam Wyly made the initial $2 million portion of this donation from domestic sources, he caused the remaining $8 million to be paid from the Offshore System. Similarly, Charles Wyly used cash from his Offshore System to fund a five-year, $2.5 million charitable-donation commitment he had made to a church in the United States. Because distributions from the Offshore Trusts could be made only to Trust beneficiaries, the Wylys first had the Protectors add their selected charities as beneficiaries prior to making these, and other, charitable donations from their Offshore System.

46.   The Wylys transferred a total of approximately $120 million of the proceeds from their offshore Issuer Securities sales into their own U.S. bank accounts and U.S. bank accounts of other Wyly-related entities. Although these transfers were characterized as loans, their repayment terms allowed the Wylys to pay only the interest

annually and to defer paying back any principal on many of the loans for up to 15 years. To obscure the source of these transfers, the Wylys structured the loans so that they would pass through a Cayman Islands entity established solely for the purpose of entering into back-to-back loans with the Wylys' Offshore System and the Wylys and other Wyly-related entities.

### THE WYLYS FAILED TO DISCLOSE IN THEIR SEC FILINGS THEIR BENEFICIAL OWNERSHIP OF THE ISSUER SECURITIES HELD IN THE OFFSHORE SYSTEM

47.     As beneficial owners of greater than 5% of each of the Issuers' outstanding shares, the Wylys were legally required to report their total securities holdings for each Issuer and all material changes thereto on Schedule 13Ds filed with the SEC pursuant to Exchange Act Section 13(d).  They were also required, during the period they served as directors for each of the Issuers, to report all their trading of Issuer Securities, regardless of amount, on Forms 3, 4 and 5 filed with the SEC pursuant to Exchange Act Section 16(a).

48.     Despite maintaining their beneficial ownership over the Issuer Securities held in their Offshore System, the Wylys purposefully omitted those securities from their Schedule 13D and Section 16 filings.  Between April 1992, when the initial transfer of Issuer Securities offshore occurred, and April 2005—when, after learning of the SEC investigation, the Wylys first disclosed their (by then largely historical) offshore Michaels securities holdings, in an amended Schedule 13D filing, as holdings which "may be deemed" beneficially owned by them—the Wylys failed to include their offshore securities in any of the more than thirty (30) Schedules 13D or 13G, or the more than one-hundred (100) Forms 3, 4 and 5, they filed with the SEC.  The Wylys also failed to file at least forty (40) Schedule 13Ds and at least seventy (70) Form 4s disclosing the

hundreds of Issuer Securities transactions in their Offshore System that should have been filed had the Wylys reported their ownership and trading of such securities in accordance with law.

49.     The Wylys' 13D filing delinquencies as to Scottish Re went unaddressed until December 26, 2006—when the Wylys filed a 13D amendment acknowledging that they "may be deemed" to have been greater-than-5% holders of Scottish Re, and that this never-before-reported status had continued through late October 2004. The Wylys have never addressed their 13D filing delinquencies with respect to their prior holdings in either Sterling Software or Sterling Commerce.

50.     None of the Commission filings made by the Wylys ever informed the investing public that the Wylys maintained (or even shared) investment and voting power over the Issuer Securities held by their Offshore System. Although the Wylys did make sporadic and limited disclosures in their Schedule 13Ds and Form 4s about their transfer of securities to trusts, the information the Wylys provided in those filings was grossly insufficient to enable the SEC or the investing public to determine: (i) that the Wylys, in fact, never relinquished control over the "transferred" Issuer Securities, and thus (ii) the full extent of the Wylys' continuing ownership of the Issuers' securities, or (iii) the massive amounts of trading that the Wylys were in fact continuing to conduct in Issuer Securities offshore—including prodigious amounts of selling of the very Issuer Securities they had ostensibly "transferred" to "independent" trusts.

51.     In many of their SEC filings, the Wylys affirmatively concealed their control over the offshore Issuer Securities by, for example, falsely "expressly disclaim[ing] beneficial ownership" of the transferred securities and falsely representing

that they did not "have or share investment control" over the recipient Offshore Trusts. And, on the few occasions where the Wylys were unable to avoid having an Offshore Trustee file a Schedule 13D, the Wylys had the Offshore Trustee make the materially false and misleading statement in those SEC filings that the Offshore Trustee, alone, held "sole dispositive power and voting power" over the Issuer Securities in question.

52.     The Wylys also caused the Issuers on whose boards they sat to report falsely, in the Issuers' annual SEC filings, the total number of each respective Issuer's securities the Wylys beneficially owned, as well as the existence and extent of the Wylys' Form 4 filing delinquencies.  As the Wylys well knew, each Issuer's annual reports, on Form 10-K, and proxy filings, on Schedule 14A, were required to include (1) a beneficial ownership table accurately reflecting the total number of shares beneficially owned by each of its directors and greater-than-5% shareholders and (2) disclosure of any delinquencies in its officers' and directors' Form 4 filings.  By providing each of the Issuers, in response to periodic D&O Questionnaires and year-end Form 5 certifications, false and materially misleading information about the number of shares they beneficially owned as well as the existence and extent of their Form 4 filing delinquencies, the Wylys caused the Issuers to incorporate that false information, either directly or by reference, in nearly every single Form 10-K and Schedule 14A the Issuers filed between 1992 and 2005. And although the Issuers included occasional footnote references, in their annual proxy filings' beneficial ownership tables, about the Issuer Securities the Wylys had recently transferred offshore, these footnotes were materially misleading in that they referred to the recipient Offshore Trusts as "independent," or they repeated the Wylys' false disavowal of beneficial ownership over those Offshore Trusts' holdings.

23

53.    Attached as an Appendix are charts listing the principal false and materially misleading SEC filings made or caused to be made by the Wylys.

54.    By failing to claim and report their beneficial ownership over their offshore Issuer Securities, the Wylys materially underreported their true ownership percentages in all four of the Issuers.  For example, in a Schedule 13D they filed on January 5, 1996, the Wylys claimed they beneficially owned 1,495,238 shares of common stock, or 5.6%, of Sterling Software's outstanding common stock.  Had the Wylys included the shares held by their Offshore System, which they also controlled, they would have disclosed beneficially owning nearly 6 million shares of Sterling Software, which comprised over 22% of the company's outstanding common stock.  Such dramatic discrepancies between the Wylys' actual and reported ownership of Issuer Securities were common during the course of their scheme—with their beneficial ownership reaching as high as 36.7% for Michaels, 33.7% for Sterling Software, and 16.1% for both Sterling Commerce and Scottish Re.  Their reported ownership, by contrast, was frequently just half, a third, or even a fourth of what they actually held.

**THE WYLYS ALLOCATED THE ISSUER SECURITIES HELD IN THEIR OFFSHORE SYSTEM AMONG VARIOUS TRUSTS IN ORDER TO EVADE THE SEC'S DISCLOSURE REQUIREMENTS**

55.    The Wylys' evasion of the 13D requirements went beyond failing to report their own connection to their offshore Issuer Securities transactions and holdings.  To further prevent the detection of their scheme, the Wylys created multiple Offshore Trusts and employed multiple Offshore Trustees, and then purposefully allocated their offshore Issuer Securities holdings among the different Offshore Trusts and Offshore Trustees, to ensure that no single trustee nominally held more than 5% of an Issuer's outstanding stock.  Because the Wylys applied the fraudulent fiction that each of their Offshore

Trustees was the exclusive beneficial owner of the Issuer Securities that the Wylys nominally lodged with it, the Wylys' allocations significantly reduced, and ultimately eliminated outright, any Schedule 13D disclosures of the Wylys' offshore Issuer Securities holdings and transactions—even by components of their Offshore System.

56.     Although their Offshore System as a whole held significant percentages of each of the Issuer's outstanding shares, the Wylys and the Protectors—including French—strived to ensure that no single Offshore Trust or Offshore Trustee held greater than 5% of the outstanding shares of each of the Issuers and, except in a few circumstances, accomplished just that.  By actively monitoring and managing each Offshore Trust's Issuer Securities holdings, the Wylys and the Protectors took steps to ensure that the Offshore Trusts and Trustees stayed below the reporting thresholds.  These steps included:  (1) allocating the Wylys' offshore Issuer Securities among numerous Offshore Trusts managed by numerous different trustees; (2) shuffling the administration of Offshore Trusts from one Offshore Trustee to another; and (3) structuring offshore transactions involving large amounts of Issuer Securities by dividing the Issuer Securities among different Offshore Companies administered by different Offshore Trustees.  These machinations were all performed solely to enable the Wylys to circumvent SEC reporting requirements and avoid public disclosure of their Offshore System's Issuer Securities holdings and trading.

57.     In March 1995, for example, Sam Wyly instructed French to create a new Offshore Trust with a newly retained Offshore Trustee.  Sam Wyly then had 350,000 Sterling Software shares transferred from one of his pre-existing Offshore Trusts ("Trust A") to the newly established Offshore Trust ("Trust B") "for no consideration."  This

transfer reduced the Sterling Software holdings administered by Trust A's Offshore

Trustee below 5% of Sterling Software's outstanding shares; at French's direction, Trust

A's Offshore Trustee then filed a final Schedule 13D terminating its reporting. Weeks

later, the Wylys finalized a significant financing transaction, called a collar transaction,

between six of their Offshore Companies and Lehman Brothers involving a total of

900,000 Sterling Software shares (including 200,000 of the transferred shares). Because

neither Trust A's nor Trust B's respective Offshore Trustee nominally held greater than

5% of Sterling Software's outstanding shares at the time of execution, the transaction

remained undisclosed.

58.     In late 1995, in another example of the Wylys' deceptive offshore

allocations, the Wylys significantly expanded their Offshore System by creating five new

Offshore Trusts administered by three new Offshore Trustees. Soon thereafter, the

Wylys transferred offshore 2.65 million Sterling Software options, 1.35 million Michaels

options, and 4.6 million Sterling Commerce Options, and also caused components of

their Offshore System to enter into a private placement transaction involving 2 million

Michaels shares. The Wylys carefully allocated these securities—which respectively

comprised well over 5% of each respective Issuer's then-outstanding securities—among

multiple Offshore Trusts administered by both newly hired and pre-existing Offshore

Trustees, so that none of the Offshore Trustees' holdings exceeded 5% of any Issuer's

shares. By relying upon the false and fraudulent rationale that each Offshore Trustee was

the sole holder of such securities' voting and investment power, the Wylys ensured that

none of the Offshore Trustees made any Schedule 13D disclosures. And because no

Schedule 13D disclosure was made initially, no subsequent 13D disclosures concerning

the frequent material changes in the Wylys' offshore Issuer Securities holdings were made, either.

59.     The Wylys' and French's purpose in all this activity was to avoid required SEC disclosures. When French and the Wyly Family CFO interviewed potential offshore trustees in the Fall of 1995, they stated that the Wylys were seeking additional trustees in order to avoid having any single trustee "controlling a proportion of . . . Sterling Software ... which would bring it within the SEC reporting requirements," and "to ensure that another [Wyly] trust did not hold more than 5% of the equity of Sterling Software, which is an event which requires a report to be made to the S.E.C. in the USA."

**THE WYLYS KNEW THE NONDISCLOSURE OF
THEIR OFFSHORE ISSUER SECURITIES HOLDINGS AND
TRANSACTIONS WAS IN VIOLATION OF LAW**

60.     Before the Wylys launched their Offshore System, they commissioned French, then a lawyer in private practice at the Jackson & Walker law firm in Dallas, to research the Section 13(d) and Section 16(a) implications of their intended transfer of Issuer Securities to an Offshore System. French oversaw the legal research performed by an associate at his firm, which resulted in a detailed memorandum that he provided to the Wylys. The memorandum raised numerous warning flags that both the Wylys and French proceeded to disregard. These warning flags concerned circumstances that, if they arose in the operation of the Offshore System, could or would trigger SEC reporting obligations by the Wylys, and included the following:

a.  *First*, the Wylys' having the "ability to control or *influence* the voting or disposition of securities" held in any offshore trusts created by them—since "any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting or investment power

27

will be exercised" could confer beneficial ownership status (emphasis in original);

b.  *Second*, such circumstances as the Wylys' giving of specific details concerning how transactions were to be handled, and trustees' consistent adherence to the Wylys' wishes;

c.  *Third*, the trusts' engaging in acts "provid[ing] circumstantial evidence of group activity," such as the making of significant stock transactions at parallel points in time;

d.  *Fourth*, "consultation" between the trustees and the Wylys, beyond any initial "letter of wishes"—as, for example, to confirm the Wylys wanted a particular transaction to be entered into; and

e.  *Fifth*, creating or using a trust "as part of a plan or scheme to evade the reporting requirements of Section 13(d)."

61.    The Wylys' Offshore System was, as the Wylys and French well knew, thereafter operated in a way that defied each one of the five warnings described above. Through their intimate familiarity with how the Offshore System actually operated, the Wylys and French knew: *first*, that it afforded arrangements that, "as a factual matter," conferred on the Wylys "significant ability to affect how voting or investment power" over the Issuer Securities would be exercised; *second*, that it consistently included the Wylys' "giving of specific details concerning how transactions were to be handled, and trustees' consistent adherence to [their] wishes"; *third*, that it often included the trusts' making significant Issuer Securities transactions "at parallel points in time"—all orchestrated by the Wylys—thereby denoting "group activity" with them; *fourth*, that it

also included "consultation" between the trustees and the Wylys to confirm that particular transactions were indeed their wish; and *fifth*, that it also involved the creation and use of trusts "as part of a plan or scheme to evade the reporting requirements of Section 13(d)."

62.     The Wylys and French were also regularly reminded of their holding and trading reporting obligations as public company directors by the Issuers' annual D&O Questionnaires and compliance materials.  These materials included the statement that "a person *beneficially owns* a security if such person, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares (i) voting power, which includes the power to vote, or to direct the voting of, such security; and/or (ii) investment power, which includes the power to dispose, or to direct the disposition of, such security." (emphasis in original)   These materials also included frequent reminders that Section 16 reporting obligations were individual in nature, and that "the ultimate responsibility to file Forms 3, 4 and 5 rests with the Insiders" of each Issuer.

63.     Moreover, by the time the fraudulent scheme detailed herein commenced in early 1992, Sam Wyly and Charles Wyly each had over twenty years' experience as public company directors and Schedule 13D and Form 4 filers; and Michael French had over twenty years' experience as a federal securities lawyer.  They were each thus on abundant notice of the relevant SEC reporting obligations.

64.     Despite their knowledge of the relevant legal obligations, the Wylys never publicly disclosed their beneficial ownership of, or trading in, the offshore Issuer Securities.  Rather, with French's active participation, they committed and directed acts of concealment to ensure that activities they knew to be contrary to law would not come to light.  For example, the Wylys hired the Cayman Accountant in the Cayman Islands to

"act as the focus of communications and maintain records etc. which should not be seen in the USA." Then, in order to minimize the risk of "any potential claim that control is being exercised in the USA" over their Offshore System, the Wylys' further attenuated the communications protocol for operation of their Offshore System by instructing the Protectors—French and the Wyly Family CFO at the time—to begin routing their "recommendations" to the Offshore Trustees through the Cayman Accountant.

65.     For his part, French instructed an Offshore Trustee on at least one occasion—on July 10, 1995—to "dispose of this fax after reading" where the fax in question had been transmitted by French and contained detailed instructions regarding, among other things, the creation of new Offshore Trusts in furtherance of structuring an offshore Issuer Securities transaction so as to avoid SEC reporting requirements.

### THE WYLYS USED FALSE REGISTRATION STATEMENTS AND FALSE FORMS 144 AND 144(K) TO SELL SECRETLY MILLIONS OF SHARES OF ISSUER SECURITIES OFFSHORE

66.     Virtually all of the Issuer Securities held in the Wylys' offshore system were initially restricted securities, as they were either unregistered stock options granted to the Wylys originally as director compensation, or were obtained through private placement transactions with the Issuers. Such securities could lawfully be sold only if they were subsequently registered, or if they were sold in transactions exempt from the registration requirements of Securities Act Section 5. Although the Wylys' Offshore System purportedly relied on both these methods to sell hundreds of millions of dollars worth of Issuer Securities, they did so fraudulently in that the registration materials and the Forms 144 and 144(k) they caused to be filed were false and materially misleading.

**The Wylys Filed False Registration Statements**

67.     Between April 1992 and January 2003, the Wylys caused Michaels,
Sterling Software, Sterling Commerce and, through French, Scottish Re, to file at least
eleven Form S-3 registration statements and/or prospectus supplements registering for
sale millions of Issuer Securities held by the Wylys' Offshore System, including the
following:

      a.   On April 22, 1992, Sterling Software filed supplements to three earlier
filed prospectuses registering for resale the 1,983,588 shares the
Wylys had just transferred to six Offshore Companies;

      b.   On May 18, 1992 Michaels filed a Form S-3 registration statement
registering for resale the 960,000 shares the Wylys had just transferred
to four Offshore Companies;

      c.   On December 1, 1994, Sterling Software filed a Form S-3 registration
statement registering for resale 1,000,000 shares held by three
Offshore Companies;

      d.   On, February 16, 1996, Sterling Software filed a Form S-3 registration
statement registering for resale 1,575,000 shares held by five Offshore
Trusts;

      e.   On October 11, 1996, Sterling Commerce filed a Form S-3 registration
statement registering for resale 4.6 million shares held by two
Offshore Trusts;

    f.   On June 17, 1997, Michaels filed a Form S-3 registration statement registering for resale 180,000 shares held by three Offshore Companies;

    g.   On September 3, 1999, Michaels filed supplements to two earlier filed prospectuses registering for resale 1,490,000 shares held by four Offshore Companies; and

    h.   On January 31, 2003, Scottish Re filed a Form S-3 registration statement (which it amended on March 12, 2003) registering for resale 1,650,000 shares held by two Offshore Companies.

68.    Each of these registration statements or prospectus supplements named, as "Selling Shareholders," either the Offshore Trust or Offshore Company that held the securities being registered. All of them failed, however, to provide required disclosures concerning the material relationships between the respective "Selling Shareholders" and the relevant Issuer, and were therefore materially false and misleading. Pursuant to Item 507 of Regulation S-K, these registration materials were required to disclose "the nature of any position, office or other material relationship which the selling security holder has had within the past three years with the registrant or any of its ... affiliates." Many of these filings simply stated, falsely, that there was no such relationship. The remainder disclosed that the "Selling Shareholder" was either a trust or was owned by a trust of which Sam Wyly or Charles Wyly and certain family members were beneficiaries, but omitted the material information—the inclusion of which was necessary both to comply with Item 507 and to make the statement not misleading—that the Selling Shareholder was an affiliate of the Issuer, because it was, in fact, controlled by the Wylys.

69.     The Wylys made use of the foregoing false registration statements to effect offshore Issuer Securities sales generating profits in excess of $400 million.

### The Wylys Filed False Forms 144 with the Commission And False Forms 144(k) with Lehman Brothers

70.     The Wylys also sold several million shares of Michaels stock in unregistered transactions by instructing the Offshore Trustees to sell the stock pursuant to Securities Act Rule 144, which provides an exception from the registration requirements for securities sales, including sales by affiliates, if certain requirements—such as accurate public information, volume limitations, holding periods, manner of sale and the filing of Forms 144—are met. In order to have the exception apply, the unregistered sales must comply with all of Rule 144's requirements.

71.     Between June and December 1997, the Wylys, with Schaufele's assistance, had their Offshore System file Forms 144 with the Commission concerning the sale of 1.8 million Michaels shares. Like the registration statements used to register the Wylys' offshore Issuer Securities, all of these Forms 144 were false and materially misleading because they failed to disclose that the selling Offshore Companies were controlled by the Wylys and thus, affiliates of Michaels. Moreover, Charles Wyly's sale of 200,000 Michaels shares through Elegance Limited, one of his offshore companies, which resulted in profits in excess of $4.5 million, also failed to comply with Rule 144's holding period, in that these Michaels shares were sold less than one year after having been acquired directly from Michaels in a private placement.

72.     Beginning in April 1998, the Wylys, acting upon Schaufele's suggestion, also directed their Offshore Trustees to have the restrictions removed on the remaining 2.2 million of unregistered Michaels shares that the Wylys held offshore pursuant to the

then-existing Securities Act Rule 144(k). This action was then taken through filing of false Forms 144(k) with Schaufele's then-firm, Lehman Brothers, despite the fact that the offshore entities in question were not entitled to avail themselves of the provisions of Rule 144(k) because they were controlled by the Wylys, and thus affiliates of Michaels. Like the registration statements used to register the Wylys' offshore Issuer Securities and the Forms 144, the Forms 144(k) were false and materially misleading because they stated that the offshore entities (i) were not affiliates of Michaels; (ii) were "not acting in concert with any other person in selling the securities," and (iii) were not "engaged in a plan with anyone else to dispose of the securities."

73. Because the Forms 144 and 144(k) the Wylys employed to sell their offshore securities were false and materially misleading, the unregistered sales of Michaels made pursuant to those forms failed to comply with Rule 144's safe harbor provisions. As a result, the unregistered sales made in reliance on these filings—which, through the end of 2004, had generated profits in excess of $65 million—violated Section 5 of the Securities Act.

**The Wylys Secretly Sold Millions of Issuer Securities in Large Blocks Offshore**

74. Through the use of fraudulent registration statements and fraudulent Forms 144 and 144(k), the Wylys were able to sell millions of Issuer Securities held in their Offshore System, generating profits in excess of $465 million. Such sales—none of which were disclosed in a Wyly Form 4 filing—included:

      a. 733,000 Michaels shares (through four Offshore Companies) over a 3-month period between May 18 and August 13, 1992;

b.  227,000 Michaels shares (through three Offshore Companies) over a

5-week period between September 30 and November 4, 1992;

c.  532,000 Sterling Software shares (through three Offshore Companies)

over a 6-week period between November 4 and December 14, 1992;

d.  Over 400,000 Sterling Software shares (through six Offshore

Companies) over a 2-week period between January 11 and January 25,

1996;

e.  Over 2.5 million Sterling Software shares (through nine Offshore

Companies) over a 3-month period between March 1 and June 6, 1996;

f.  Over 650,000 Sterling Commerce shares (through three Offshore

Companies) over 3-week period between June 11 and July 3, 1997;

g.  1.2 million Michaels shares (through two Offshore Companies) over a

2-week period between June 16 and July 1, 1997;

h.  600,000 Michaels shares (through two Offshore Companies) over an

8-week period between October 22 and December 15, 1997;

i.  1 million Sterling Software shares (through seven Offshore

Companies) over a 2-week period between March 17 and March 28,

1998;

j.  Just under 2 million Sterling Commerce shares (through a total of nine

offshore entities) over a 2½-month period between March 20 and June

8, 1998;

k.  400,000 Sterling Commerce shares (through two Offshore Companies)

over a 1-month period between December 1 and December 31, 1998;

l.  942,000 Sterling Software shares and over 660,000 Sterling

Commerce shares (through three Offshore Companies) over 2 days on

February 8-9, 1999;

m.  Over 600,000 Michaels shares (through a single Offshore Company)

over a 4-week period between January 11 and February 7, 2000;

n.  270,000 shares of Scottish Re (through two Offshore Companies) over

a 2-week period between May 30, and June 11, 2001;

o.  Over 1.3 million Michaels shares (through five Offshore Companies)

over a 2-month period between September 6 and November 9, 2001;

and

p.  709,220 shares of Scottish Re (through two offshore entities) over a 2-

week period between December 14 and 24, 2001.

75.    The large-block sales of Issuer Securities listed in the preceding paragraph

total more than 14 million shares.  Approximately 90% of these sales were made without

any accompanying SEC disclosure.  Because a few of the Wylys' Offshore Trusts,

however, were Schedule 13D filers for brief periods, 10%, or roughly 1.5 million shares,

of these sales—consisting of a portion (385,000 shares) of the Michaels sales identified in

subparagraph (a) above, the Sterling Software sales identified in subparagraph (c) above,

and a portion (532,000 shares) of the Michaels sales identified in subparagraph (h)

above—were mentioned in Schedule 13Ds filed in the name of the relevant Offshore

Trustees.  Even those limited disclosures, however, all falsely stated—as directed by the

Wylys and French—that the filing Trustee, alone, had "sole dispositive power" as to

those shares, when in truth and in fact, the Wylys held, or at a minimum also held, dispositive power over such shares.

76.     As high level insiders of the Issuers, the Wylys and French were aware of the negative impact that sales by them of Issuer Securities—including the above detailed large-block sales—would potentially have on the Issuers' share prices if they were disclosed in accordance with law.  In effecting these sales offshore, the Wylys and French were motivated by a desire both to avoid such declines and to eliminate any risk thereof. On March 24, 1995, for example, French wrote to Sam Wyly that filing of "insider sales reports … seem to set everybody off" and that selling offshore without making such filings would facilitate "pull[ing] some gains out … without attracting any attention." In September 2001, Sam Wyly elected to forgo an onshore collar transaction in Issuer Securities and instead attempted the same transaction offshore, in order to avoid any bearish signal to the market; and Charles Wyly, in September 2003, took a similar action for the same stated reason.

### THE WYLYS AND SCHAUFELE TRADE ON THE BASIS OF MATERIAL NONPUBLIC INFORMATION

77.     The Wylys also used their Offshore System to commit illegal insider trading.  In October 1999, after having agreed to put Sterling Software on the selling block, the Wylys had their Offshore System enter into a bullish offshore transaction in the form of a security-based swap agreement with Lehman Brothers that economically replicated the purchase of two million shares of Sterling Software for approximately $20.36 per share.  Based on Sterling Software's closing price of $36.25 on February 14, 2000—the date that Sterling Software's agreement to be acquired by Computer

Associates was announced—the Wylys' illegal imputed profits from this transaction totaled approximately $31.7 million.

78.    In late September 1999, Sam Wyly instructed the Wyly Family CFO to determine the cost of purchasing from Lehman Brothers up to 4 million Sterling Software call options at the company's current trading price, with expiration dates of between 12 and 24 months in the future.  On September 28, 1999, Schaufele provided the Wyly Family CFO with the requested pricing information, but recommended that the Wylys consider a swap agreement as an alternative because it would be easier to unwind than call options.  Sam Wyly concurred and, between September 30 and October 6, 1999, he had his son Evan, who at the time was a fellow board member of three of the Issuers, including Sterling Software, negotiate the terms of the transaction with Schaufele. During this time, Charles Wyly agreed to participate for one-third of the transaction.

79.    In order to minimize the borrowing costs imposed by Lehman's credit department, the Wylys followed Schaufele's advice and agreed to limit the initial size of the transaction to 1.5 million shares with an 18-month term, and to later seek to increase its size.  The transaction was structured so as to be exercisable, or capable of being "unwound," immediately, as well as any time prior to expiration of its 18-month term— but with a 20-basis point "early termination fee" if the transaction were unwound within its first six months.  Ultimately, the Wylys were able to add only an additional 500,000 shares to the transaction, with slightly higher margin requirements, since Lehman— which was fully hedging its side of the transaction by purchasing Sterling Software common stock on the open market—was unwilling to take on more than that level of "exposure to one name."  The Wylys attempted to increase the size of the swap still more

by having one of their Offshore Trustees provide Lehman with letters of credit from a suitable financial institution; however, despite repeated attempts, the Offshore Trustee was unable to find an offshore financial institution willing to issue the letters of credit.

80.   The Wylys knew contemporaneously that Lehman was hedging its side of the transaction by buying two million shares of Sterling Software common stock on the open market. Indeed, the transaction documents called for the Wyly offshore entities participating in the transaction to pay a fee of 6 cents per share—or a total of $120,000—based on Lehman's hedging purchases of Sterling Software common stock.

81.   Because Lehman took care to buy the two million shares comprising its hedge without affecting Sterling Software's stock price, the transaction took fifteen trading days and nearly three weeks—until October 29, 1999—to complete. During this period, the Wylys received daily spreadsheets, prepared by Lehman and provided to them through Schaufele via the Cayman Accountant or the Wyly Family CFO, disclosing: (i) how many shares Lehman had purchased, (ii) the shares' average execution price, (iii) the shares' percentage of Sterling Software's trading volume, (iv) the volume weighted average price ("VWAP") of the total shares traded, (v) the deviation of Lehman's purchases from the VWAP, (vi) the amount of upfront collateral the Wylys' Offshore System would need to provide for Lehman's purchases, (vii) the cumulative number of shares Lehman had purchased toward its hedge, and (viii) the remaining number of shares Lehman still needed to purchase to complete its hedge. On one such daily spreadsheet, Evan Wyly handwrote a note to his father Sam that it "looks like [Lehman] is doing a great job buying a big % of the volume without moving the price."

82.   All of Lehman's hedging purchases of Sterling Software common stock were transacted in Manhattan.

83.   For the first 1.5 million-share tranche of the transaction, the percentages of the total Sterling Software ("SSW") trading volume that Lehman's purchases comprised, reflected on the spreadsheets Schaufele provided contemporaneously to the Wylys, were as follows:

| Trade Date | SSW Shares Purchased | % of SSW's Volume |
|---|---|---|
| 10/08/1999 | 53,000 | 48.27% |
| 10/11/1999 | 40,000 | 20.82% |
| 10/12/1999 | 221,000 | 62.50% |
| 10/13/1999 | 240,600 | 70.95% |
| 10/14/1999 | 60,000 | 27.93% |
| 10/15/1999 | 780,400 | 83.64% |
| 10/18/1999 | 42,500 | 13.42% |
| 10/19/1999 | 52,500 | 12.63% |
| 10/20/1999 | 10,000 | 5.78% |

These spreadsheets also reflected that, over all nine of their trading days, these purchases accounted for fully 49.21% of Sterling Software's trading volume.

84.   For the transaction's final, 500,000-share tranche, the percentages of Sterling Software's total trading volume that Lehman's purchases comprised, reflected on the spreadsheets Schaufele provided contemporaneously to the Wylys, were as follows:

40

| Trade Date | SSW Shares Purchased | % of SSW's Volume |
|---|---|---|
| 10/20/1999 | 10,000 | 8.33% |
| 10/21/1999 | 152,500 | 19.66% |
| 10/25/1999 | 64,300 | 25.91% |
| 10/26/1999 | 117,700 | 39.82% |
| 10/27/1999 | 75,600 | 31.02% |
| 10/28/1999 | 44,500 | 33.51% |
| 10/29/1999 | 35,400 | 9.83% |

These spreadsheets also reflected that, over all seven of their trading days, these purchases accounted for fully 22.98% of Sterling Software's trading volume.

85.    As the Wylys knew contemporaneously, the average execution price of Lehman's market purchases of the 2 million Sterling Software shares established the "notional price" for the swap agreement, which was $20.4273 per share for the first 1.5 million shares, and $20.1624 for the remaining 500,000. This notional price was then used to determine the exact amount of upfront collateral the Wylys needed to have their Offshore System pay Lehman for the 2 million shares, as well as the amount that Lehman (or that the Wylys' Offshore System, if Sterling Software's stock price were to fall over the term of the swap) would have to pay when the swap agreement was ultimately unwound.

86.    In total, five Offshore Companies (three associated with Sam Wyly and two associated with Charles Wyly) purchased the right to receive any gains from, and the risk of paying any losses on, two million Sterling Software shares at the "notional" prices. The Wylys had their Offshore System pay Lehman approximately $13 million in

41

collateral and borrow from Lehman with interest the transaction's remaining approximate $27 million cost during the term of the swap. The transaction made economic sense for the Wylys only if they believed Sterling Software's share price would increase enough to cover their transaction and borrowing costs before the swap was unwound or expired eighteen months later.

87.     Before the transaction closed, Lehman required the Offshore Companies each to affirm that they did not possess any material, non-public information concerning Sterling Software. The Wylys, acting through the Protectors, instructed the Offshore Companies to so affirm, and each did so. Lehman did not require such affirmations from the Wylys themselves because Lehman was unaware of what Schaufele well knew, namely, that this transaction was, in fact, conceived and fully orchestrated by the Wylys themselves.

88.     Until the time of this transaction, the Wylys had never used their Offshore System to engage in such a massive, bullish transaction in any Issuer Security. The vast majority of their offshore Issuer Securities transactions had been sales; and all but one of their offshore structured transactions in Issuer Securities had been neutral collars—hedged on both the upside and the downside, and thus neither bullish nor bearish—which they had used for borrowing purposes. As to the lone prior exception, that bullish structured transaction had taken place over four years earlier, and was one-eighth the size of the transaction the Wylys vigorously sought—and one-fourth the size of the transaction the Wylys were ultimately able to effect—here.

89.     At the time the Wylys entered into the equity swap, they were in possession of material, non-public information concerning Sterling Software.

Specifically, the Wylys were aware that they—as Chairman and Vice-Chairman of Sterling Software—had agreed and resolved that the sale of Sterling Software to an external buyer should be pursued. In particular, shortly after his attempt to take Green Mountain Energy public in June 1999 was aborted, Sam Wyly personally decided that both Sterling Software and Sterling Commerce should be sold to external buyers. Sam Wyly had then obtained the concurrence of his brother, Charles Wyly, who also agreed with Sam Wyly that, although both companies should be sold, the sale of Sterling Commerce should proceed first.

90.    By late September 1999, when Sam Wyly first had the Wyly Family CFO inquire about purchasing 4 million Sterling Software call options offshore, the Wylys knew that—consistent with their summer decision—the sale of Sterling Commerce was already underway. In particular, Sterling Commerce had by that time already retained Goldman Sachs as its advisor and Goldman had already compiled a list of potential acquirers. The Wylys had every reason to be confident that similar efforts in furtherance of the sale of Sterling Software would soon begin, given that they comprised two-thirds of Sterling Software's executive committee and, along with other family members and French, comprised half of Sterling Software's board of directors.

91.    On October 18, 1999—eleven days before Lehman's trading to hedge the transaction and establish its notional price was complete—Morgan Stanley furnished Sam Wyly with an analysis, which it entitled, "Operation Windfall," specifically identifying Computer Associates as a potential acquirer for Sterling Software; and on October 22, 1999, five days before Lehman's trading to hedge the transaction and establish its

notional price was complete, Sterling Software amended its employment agreements to provide for enhanced payouts to the Wylys in the event of a change in control.

92.     On or about November 7, 1999, French and the Wyly Family CFO attended their bi-annual meetings with each of the Wylys' Offshore Trustees in the Isle of Man. At a meeting with one of the Offshore Trustees not involved with the just completed swap transaction, French informed the trustee "in confidence" that "within the next year it is possible that the companies Sterling Commerce and Sterling Software might be disposed of by the family."

93.     The Wylys' confidence that Sterling Software would be sold during the term of their swap transaction was well founded. From November 15 to 17, 1999, Sterling Software's senior managers met and formally agreed to pursue the sale of the company, thereby joining in the consensus that the Wylys had previously reached. Immediately following that meeting, Sterling Software's CEO contacted Goldman Sachs to report that Sterling Software was "ready to get serious" about selling itself.

94.     In late November, Sam Wyly summoned several Morgan Stanley investment bankers whom he knew to have previously represented Computer Associates, to his Dallas office for a meeting, during which he indicated his interest in selling Sterling Software. Although the Morgan Stanley meeting did not occur until late November, it had been initially proposed in mid-October 1999. This meeting had the predictable and intended result of Morgan Stanley's notifying Computer Associates ("CA") management of Sam Wyly's receptiveness to a potential acquisition. This, in turn, led to an overture by Sanjay Kumar, CA's then president and COO, to Sam Wyly.

Again acting on his own, Sam Wyly then invited Kumar to his Dallas home, where the two met on January 18, 2000, and discussed CA's acquiring Sterling Software.

95.     At the time they transacted in the $2 million-share equity swap with Lehman in connection with purchases of Sterling Software common stock as detailed above, the Wylys knew that the information they then possessed about the sale of Sterling Software was material and non-public. The Wylys also knew, or recklessly disregarded the fact, that by engaging in this transaction on the basis of such information, as they did, they were breaching fiduciary duties they owed to Sterling Software and its shareholders as Chairman and Vice-Chairman of Sterling Software's Board of Directors. While under a legal duty to either disclose or abstain from transacting in connection with Sterling Software securities, the Wylys did not disclose or cause to be disclosed the material, non-public information they possessed to the sellers of the Sterling Software common stock that was integral to the transaction in which they engaged.

96.     On February 14, 2000, CA announced that it had reached an agreement to acquire Sterling Software in a stock swap valued at approximately $4 billion. Sterling Software's stock price closed on that date at $36.25. Based on that day's closing price, the Wylys' imputed profits from their two-million-share swap transaction exceeded $31.77 million.

97.     On Friday, October 1, 1999, days after learning of Sam Wyly's intentions, and while knowing that Sam Wyly was continuing to take steps in furtherance of those intentions, Schaufele purchased a total of 4,000 shares of Sterling Software at $20.359 per share, for a total investment of more than $80,000. Rather than purchase the

securities in his own brokerage account, Schaufele divided the purchases among four different brokerage accounts all held in his wife's name.

98.     Schaufele's trading based on his knowledge of what his clients, the Wylys, were doing violated several Lehman policies in place at the time of Schaufele's trading. These policies included Lehman's (i) confidential information policy, which stated that "employees must never use the Firm's . . . proprietary information for their own or any other person's financial benefit," (ii) its insider trading policy, which stated that "employees . . . are not permitted to buy or sell any security . . . if the employee is in possession of 'material' non-public information relating to the security, the issuer or the transaction," (iii) its conflicts of interest policy, which stated that "no employee may obtain any personal benefits from the Firm's dealings with others" unless approved by the Firm, and (iv) its misuse of property policy, which stated that "employees are not permitted to take or make use of, steal, or knowingly misappropriate the property of the Firm ... for the employee's own use [or] the use of another."

99.     At the time he purchased $80,000 worth of Sterling Software common stock through accounts in his wife's name, Schaufele knew that the information he then possessed about the Wylys' pending Sterling Software transaction was material and non-public.  Schaufele also knew, or recklessly disregarded the fact, that his trading on the basis of such information was in violation of the duties he owed to his employer, Lehman Brothers.

100.     When Computer Associates' acquisition of Sterling Software was announced four months later, Schaufele's illegal imputed profits from this trading, based on Sterling Software's $36.25 closing price on February 14, 2000, totaled $63,564.

## FRENCH ESTABLISHED HIS OWN OFFSHORE SYSTEM

101.     In addition to substantially participating in the Wylys' fraudulent scheme, French committed his own violations of the antifraud and reporting provisions of the securities laws through his own undisclosed offshore Issuer Securities holdings and trading. Between July 1995 and September 2000, French transferred 45,000 Michaels options, 170,000 Sterling Software options and 266,667 Scottish Re options to two Isle of Man trusts he established for himself and his family. Further, French caused Scottish Re to issue 152,000 Scottish Re shares and 200,000 warrants to one of his Isle of Man Trusts and had one of his Isle of Man subsidiary companies purchase 75,000 Scottish Re shares in the open market.

102.     French never relinquished investment and voting power over the Issuer Securities held by his own Isle of Man trusts and companies. French made the decisions when to exercise his offshore options and when to sell the resulting shares and communicated those decisions to the Isle of Man trustees. The trustees for French's offshore trusts and companies never initiated any investment decisions regarding the securities they nominally held and never failed to follow French's directions. Despite his ongoing control, French failed to include his offshore securities holdings or transactions on any Form 4 filings and falsely represented to Michaels and Sterling Software (i) that the securities of each Issuer that he held offshore were "no longer beneficially owned" by him, and (ii) that he had no Form 4 delinquencies. As a result of French's direct misrepresentations, Michaels and Sterling Software failed to include French's offshore holdings in the beneficial ownership tables, failed to disclose the existence and extent of French's Form 4 delinquencies, in their annual proxies and Form 10-Ks, and failed to

disclose French's control over his own offshore entities in registration statements which included securities held by those entities.

103.   French committed similar violations with respect to his offshore holdings and transactions in Scottish Re securities.  As the CEO of Scottish Re, French arranged for his offshore entities to purchase through private placement transactions large blocks of pre-IPO Scottish Re securities.  French then caused Scottish Re to state falsely in its registration statements that he (and the Wylys) had "no power to vote or dispose, or direct the voting or disposition of the" Scottish Re securities held by their respective offshore entities.  French failed to file Form 4s disclosing his offshore securities transactions, and falsely stated, in the Form 4 he filed disclosing his transfer of additional Scottish Re securities to his offshore trust, that he "does not have or share investment control in the family trust."  Lastly, French also failed to file a Schedule 13D disclosing that his total Scottish Re securities holdings exceeded 5% of the company's outstanding shares.

### FRENCH PROVIDED THE WYLYS WITH
### FRAUDULENT COVER FOR THEIR SCHEME

104.   French knowingly made numerous false representations about the Wylys' Offshore System to the General Counsels of Sterling Software and Michaels Stores, and to their, and Scottish Re's, outside counsel, and through him, to the Commission.  The theme of all these misrepresentations was that the Wylys did not control the offshore entities; that they were totally independent from the Wylys; and that the offshore entities, alone, possessed the voting and investment power over the Issuer Securities they held.  All of these representations—as French well knew at the time he made them—were false.

105.   In the first few years of the Wylys' scheme, French exploited his unique roles as counsel to the Wylys, as primary outside counsel for both Michaels and Sterling

Software, and as a director of both companies to enable the Wylys' scheme to succeed.
Sitting in these capacities, he misled both companies' General Counsels into believing
that French's firm, Jackson & Walker, had fully examined the issue of whether the Wylys
beneficially owned the Issuer Securities held by the offshore entities, and had concluded
that they did not. In truth, no one at Jackson & Walker, other than French himself, knew
all the actual facts and circumstances surrounding the Wylys' control over the Offshore
Trustees and the Offshore Companies necessary to have reached any conclusions about
the Wylys' beneficial ownership.

106.    In late 1995, French terminated his relationship with Jackson & Walker
and entered into a consulting agreement with the law firm of Jones Day, which
compensated French based on the business he brought to the firm. Michaels and Sterling
Software followed French and changed their primary outside law firm from Jackson &
Walker to Jones Day. The Wylys also moved the bulk of their families' legal work from
Jackson & Walker to Jones Day. As a result of the change, Jones Day became
responsible for preparing and filing all of Michaels' and Sterling Software's SEC filings,
including their Form 10-Ks and their proxy statements, as well as the Wylys' Schedule
13D filings. Jones Day also served as the outside counsel for both Sterling Commerce
and Scottish Re through both companies' initial public offerings.

107.    Shortly after Jones Day began representing Michaels, Sterling Software
and the Wylys, French misrepresented to the Jones Day senior partner primarily
responsible for the new accounts that the Offshore System was independent of the Wylys
and, therefore, the Issuer Securities held within the Offshore System were not
beneficially owned by the Wylys. In particular, French told the Jones Day senior partner

that the Offshore Trusts' deeds expressly gave complete discretion over their securities'

voting and investment power to the Offshore Trustees.  When asked if the actual "facts

and circumstances" surrounding the operation of the Offshore System were consistent

with the Trust deed language French cited, French responded, knowing his response to be

false at the time, that they were.  As a result of French's misrepresentation, the senior

Jones Day partner instructed his colleagues that the Issuer Securities held by the Offshore

System were not beneficially owned by the Wylys and the issue should be considered

settled.

108.    Two years later, in August 1998, French again affirmatively and

knowingly misled the same Jones Day partner about the independence of the Offshore

Trustees.  At the time, Jones Day was preparing the filings for the initial public offering

of Scottish Re, and needed to respond to questions raised by the SEC's Division of

Corporation Finance about Scottish Re's S-1 registration statement.  The Jones Day

partner asked French if, consistent with French's earlier representation, the Offshore

Trusts named in Scottish Re's filing were also independent of French and the Wylys.

French again falsely represented that neither he nor the Wylys beneficially owned the

Scottish Re securities held by any of the Offshore Trusts mentioned in Scottish Re's

registration statement.  Relying on French's false representations, the Jones Day partner

responded to the SEC's Comment Letter inquiring about two of the Offshore Trusts (both

of which were Wyly-related Offshore Trusts), that the Offshore Trustees had "[s]ole

voting control and sole investment power" over the Scottish Re securities held in those

trusts.  French was copied on this letter.

109.    Even after French stepped down as a Protector of the Wylys' Offshore

System, he continued to assist the Wylys to conceal their ownership of the securities in

their Offshore System. As the CEO and Chairman of the Board of Scottish Re, French

concealed the Wylys' beneficial ownership of greater than 5% of Scottish Re's

outstanding securities held in their Offshore System by having Scottish Re file multiple

Form 10-K and proxy filings between 2001 and 2004 with beneficial ownership tables

that failed to include the Wylys' significant offshore holdings. French also complied

with the Wylys' request to register for resale 1.65 million Scottish Re shares held by two

of the Wylys' Offshore Companies by including the securities in Scottish Re's January

2003 Form S-3 registration statement without disclosing the Wylys' beneficial ownership

of the shares. (An amendment to the S-3 filed in March 2003 did note that the Offshore

Companies were owned by irrevocable trusts of which the Wylys were beneficiaries, but

repeated the Wylys' false disclaimer of beneficial ownership of the shares).

110.    French realized substantial financial benefits for his fraudulent assistance

to the Wylys. During his eight years as Protector, French was guaranteed compensation

by the Wylys of at least $1.5 million per year from Wyly-related sources, including the

Issuers. In furtherance of this commitment, Sterling Software alone paid French monthly

consulting fees totaling $1.23 million between 1994 and 2000; and the Wylys caused

their Offshore System to pay French directly at least $400,000. Even apart from the

foregoing, the Wylys also, among other things, (i) provided millions of dollars in capital

that helped French establish Scottish Re and take it public, thereby greatly enhancing his

personal wealth; and (ii) gave French a share—which the Wylys and French ultimately

valued at approximately $16 million—in a hedge fund they established.

### SCHAUFELE CONCEALED THE WYLYS' CONTROL OVER THEIR
### OFFSHORE SYSTEM FROM HIS BROKERAGE FIRM SUPERIORS

111.    Despite knowing of the Wylys' control over their Offshore System, Schaufele repeatedly misrepresented to his brokerage firm superiors that the offshore entities were not affiliates of the Issuers and were independent of the Wylys. Despite knowing that no transaction in Issuer Securities in the Offshore System proceeded without the Wylys' advance initiation or approval, Schaufele repeatedly, and falsely, represented to his brokerage firm superiors that such was not the case.

112.    During the course of the Wylys' scheme, Schaufele routinely communicated directly with the Wylys and their family office employees about actual and potential Offshore System Issuer Securities transactions. These communications included presenting ideas for, and negotiating the terms of, structured Issuer Securities transactions involving the Offshore Companies. When Schaufele received an order for an Issuer Securities transaction from one of the Offshore Trustees that he had not previously discussed with the Protectors or the Wylys, his practice was to call the Wyly family office to confirm that the transaction in question was indeed the Wylys' wish before executing it.

113.    Despite his knowledge of the foregoing facts and practices, Schaufele repeatedly misrepresented to his brokerage firm employers that he did "not talk offshore business with the family" and that the Offshore System was completely independent of the Wylys and thus, the Wylys' Offshore Companies were not affiliates of the Issuers.

114.    In early 2002, after Lehman Brothers had, in Schaufele's words, come to view all the Wyly entities, both domestic and offshore, as "linked," and "chose to treat [them] as affiliates" of the Issuers, Schaufele left Lehman and moved to Bank of

America. The Wylys moved their onshore and offshore accounts with Schaufele to Bank

of America after he promised them that "should the offshore accounts come [to Bank of

America], they would come as independent new entities, which I would work to

maintain. Again I just wanted you to know that I am aware of the situation and will work

accordingly."

115.    In 2004, when Bank of America demanded to know the identity of the

offshore entities' beneficial owners in order to comply with the anti-money laundering

provisions of the PATRIOT Act, Schaufele upheld his promise and worked to keep the

Wylys' control over their Offshore System concealed. He first tried to dissuade the bank

from obtaining the information, then tried to move the accounts to the bank's prime

broker division, which he believed would not request the beneficial ownership

information, and lastly contrived excuses as to why the Offshore Trusts could not provide

the information. Schaufele's efforts were ultimately unsuccessful, and in November

2004, after the Wylys refused to allow the Offshore Trustees to provide the beneficial

ownership information being requested, Bank of America informed the Offshore Trustees

that it was closing the Offshore Companies' accounts. The Wylys then arranged to, and

did, transfer the remaining securities and cash balances to a financial institution offshore.

116.    Schaufele realized substantial financial benefit for his assistance to the

Wylys' fraudulent scheme, including over $1.5 million in commissions and other

transaction-based compensation from offshore Issuer Securities transactions, including

structured transactions, which he effected for the Wylys.

### THE COMMISSION'S ACTION IS TIMELY

117.    Commencing at various dates, each Defendant has entered into an

agreement with the Commission tolling any statute of limitations applicable to the

conduct and claims alleged herein, including any sanctions or relief that may be imposed.

The Wylys' tolling agreement has been in place continuously since February 1, 2006;

French's tolling agreement has been in place continuously since August 1, 2009, and

Schaufele's tolling agreement has been in place continuously since October 29, 2009.

118.    The Commission proceeded with due diligence during the limitations

period, and did not receive inquiry notice of any of the Defendants' frauds alleged herein

until November 16, 2004, when Bank of America reported to the Commission's

Enforcement staff that it had terminated securities accounts held in the name of numerous

Isle of Man entities because those entities refused to disclose information regarding their

beneficial ownership.

119.    The Commission exercised due diligence in investigating the Defendants'

fraud after receiving inquiry notice of it.  In light of the necessity to, among other things,

obtain documents and witness accounts from scores of persons and entities, including in

foreign jurisdictions with stringent financial secrecy laws, and in light of the complexity

of the sham offshore structure the Defendants created and concealed, the number and

complexity of Issuer Securities transactions they executed therein, the number of years

they operated it, and the more than one-million pages of documents involved, the

Commission did not discover, and in the exercise of due diligence, could not have

discovered, the facts underlying any of the Defendants' frauds alleged herein until several

years after its receipt of inquiry notice.