# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
|  | : |
|  | : |
|  | : |
|  | : |
| Plaintiff, | :     No.  10-CV-5760-SAS |
|  | : |
| v. | : |
|  | : |
| SAMUEL WYLY, CHARLES J. WYLY, JR., | : |
| MICHAEL C. FRENCH, AND | : |
| LOUIS J. SCHAUFELE III | : |
|  | : |
|  | : |
| Defendants. | : |
|  | : |

## SECURITIES AND EXCHANGE COMMISSION'S
## MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS

Alan M.Lieberman (AL-6517)
John D. Worland, Jr. (JDW-1962)
Martin Zerwitz (MZ-9765)
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4030
(202) 551-4474 (T)
(202) 772-9245 (F)

December 13, 2010

**TABLE OF CONTENTS**

Table of Authorities………...………….…………….………………………………….....iii

PRELIMINARY STATEMENT………...........……………………………………...…….1

I.   BACKGROUND.................................................................................................4

     A. The Commission's Investigation....................................................................4

     B. The Offshore System Scheme.........................................................................4

     C. The Insider Trading Schemes.........................................................................7

     D. The Motions to Dismiss the Complaint.........................................................8

II.   ARGUMENT…………………………………………………………….....9

     A. Legal Standards...............................………………………………………9

        1.  The legal standard governing Rule 12(b)(6) motions.............................9

        2. Pleading fraud with particularity under Rule 9(b)...................................10

     B. The Complaint Adequately Alleges Fraud By the Wylys...............………………10

        1. The Complaint alleges with specificity the false statements attributable to the Wylys...............................................................................…11

        2. The Complaint adequately alleges facts giving rise to an inference of the Wylys' scienter...........................................................................14

     C. The Complaint Adequately Alleges Fraud By French………………………….....17

        1. The Complaint alleges with particularity French's participation in the fraud scheme...................................................................………...18

        2. The Complaint alleges facts giving rise to an inference of French's scienter.......21

     D. The Complaint Adequately Alleges That Schaufele and French Aided and Abetted the Fraud...................................................................22

        1.  Schaufele Had Knowledge of the Wylys' Scheme..............................................23

        2. Schaufele Substantially Assisted the Scheme.......................................24

i

3.   French Had Knowledge of the Scheme and Substantially Assisted It..................26

E.   The Wylys' and Schaufele's Motions to Dismiss the Insider Trading Claims Are
Without Merit and Should Be Denied........................................................................26

1.   The Complaint adequately alleges an insider trading claim arising from the
Wylys' securities-based swap agreement...............................................27

a.   The Wylys' fraudulent breach of their fiduciary duties was "in
connection with the purchase or sale of any security"...........................27

i.   The Wylys' fraud was "in connection with" the purchase of
securities because the swap agreement required the
purchase of common stock............................................................28

ii.   The particular swap agreements at issue here satisfy the
definition of "securities" at the time of the swap transaction........34

b.   The information in the Wylys' possession was material..........................37

2.   The Complaint alleges a viable insider trading claim arising from Schaufele's
trading in Sterling Software stock in his wife's brokerage accounts....................44

a.   Schaufele had material non-public information.........................................45

b.   Schaufele's conduct was deceptive...........................................................49

F.   There Is No Basis To Dismiss Any Part of the Complaint on Statute of Limitations
Grounds....................................................................................................................50

1.   The Discovery Rule Applies to the Commission's Claims......................................51

2.   The Complaint Was Filed Within Five Years of the "Discovery" Date, As
Subsequently Extended By Tolling Agreements.....................................................56

3.   Section 21A is Not a Statute of Repose Exempted From the Discovery Rule........59

4.   Proper Remedial Relief Does Not Constitute a Penalty Within The
Meaning Of 28  U.S.C. § 2462................................................................................62

5.   The Fraudulent Concealment and Continuing Violation Doctrines
Apply to the Non-Fraud Claims..............................................................................64

CONCLUSION..................................................................................................................65

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*3M Company v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994)..................................54

*Aaron v. SEC*, 446 U.S. 680 (1980)...............................................................14

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)............................17

*Backhaus v. Streamedia Comms., Inc.,* No. 01 CIV.4889, 2002 WL 1870272
    (S.D.N.Y. Aug. 14, 2002) ..........................................................................58

*Bailey v. Glover*, 88 U.S. 342 (1874)...............................................................52

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)..............................................38, 43

*Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007) ................................9, 10

*In the Matter of BT Securities Corp., Release Nos. 33-7124, 34-35136*, 1994 WL
    710743 (Dec. 22, 1994) ..........................................................................37

*Caiola v. Citibank, N.A.*, 137 F. Supp. 2d 362 (S.D.N.Y. 2001), *rev'd,* 295 F.3d
    312 (2d Cir. 2002).............................................................................30, 36

*Caiola v. Citibank, 295* F.3d 312 (2d Cir. 2002) ..................................30, 34, 36

*Dabney v. Levy*, 191 F.2d 201 (2d Cir. 1951) ..................................................13

*Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476 (S.D.N.Y. 2005)...................13

*In re Employees Solutions Sec. Litig., Number* CIV 97545PHXRGS, 1998 WL
    1031506 (D. Ariz. Sept. 22, 1998).......................................................15, 22

*Exploration Co. v. United States*, 247 U.S. 435 (1918).........................52, 53, 61

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ............37, 44, 49

*FEC v. Williams*, 104 F.3d 237 (D.C. Cir. 1994) .............................................54

*In re General Motors Class E Stock Buyout Sec. Litigation*, 694 F. Supp. 1119
    (D. Del. 1988) ..........................................................................................43

*In re Global Crossing, Ltd. Sec. Litigation*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)..........18

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)............................................................37

*Hartford Fire Insurance v. Federated Department Stores, Inc.*, 723 F. Supp. 976
(S.D.N.Y. 1989) ............................................................................................................41, 43

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................65

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946)...........................................52, 53, 54, 55, 61

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697 (2d Cir.
1994) ................................................................................................................................60

*Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996) ................................................................63

*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005) ....................25

*Kottler v. Deutsch Bank AG*, 607 F. Supp. 2d 447 (SDNY 2009) ........................14, 24, 26

*Lehman Brothers Com. Corp. v. Minmetals International Non-Ferrous Metals
Trading Co.*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001)......................................................36

*List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir. 1965)....................................................43

*L.L. Capital Partners v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174
(S.D.N.Y. 1996)..............................................................................................................43

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148
(2d Cir. 2003) .............................................................................................................57, 58

*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) ..........................................52, 53, 55, 56

*Merrill Lynch, Pierce, Fenner & Smith, Inc v. Dabit*, 547 U.S. 71 (2006) .......................30

*Migliori v. Boeing North Am., Inc.*, 114 F. Supp. 2d 976, 983 (C.D. Cal. 2000) ...............55

*In the Matter of Gary S. Missner*, Release Nos., 33-7304, 34-37301, 1996 WL 316296
(June 11, 1996)...............................................................................................................37

*In re NYSE Specialists Securities Litigation*, 503 F.3d 89 (2d Cir. 2007)..........................9

*New York v. Niagara Mohawk Power Co.*, 263 F. Supp. 2d 650, 660 (W.D.N.Y.
2003) ................................................................................................................................54

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243
(S.D.N.Y. 1993) ..............................................................................................................58

*Ouaknine v. MacFalane*, 897 F.2d 75 (2d Cir. 1990).........................................................10

*P. Stolz Family Partnership v. Daum*, 355 F.3d 92 (2d Cir. 2004) ......................59, 60, 61

*Panfil v. ACC Corp.*, 768 F. Supp. 54, 55, 58 (W.D.N.Y. 1991) ...............................43, 47

*Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270 (S.D. Ohio 1996).........36

*Raytheon Co. v. Indigo Sys. Corp.*, 653 F. Supp. 2d 677 (E.D. Tex. 2009) .......................58

*Rich v. Shrader*, No. 09-CV-0652-MMA, 2010 WL 3717373 (S.D. Cal. Sept. 17, 2010) ...................................................................................................................................43

*Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979) ..............................58

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010)..............................................................30

*Ryan v. Gifford*, 918 A.2d 341, 360 (Del.  Ch. 2007) .......................................................58

*SEC v. Asset Management Corp.*, 456 F. Supp. 998 (S.D. Ind. 1978).................................63

*SEC v. Berry*, 2008 WL 2002537 (N.D.Cal. 2008) ............................................................63

*SEC v. Bilzerian*, 814 F Supp 116 (D.D.C.); aff'd 29 F3 689 (D.C. Cin.1994) ...............65

*SEC v. Buntrock*, 2004 U.S. Dist. LEXIS 9495 (N.D.Ill May 25, 2004)...........................54

*SEC v. Collins & Aikman Corporation*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ..................................................9, 10, 12, 13, 14, 17, 19, 21, 22, 25, 37

*SEC v. Cuban*, 620 F.3d 551 (Sept. 10, 2010) ...................................................................49

*SEC v. Downe*, 1994 WL 67826 (S.D.N.Y. 1994)..............................................................63

*SEC v. Drescher*, No. 99 CIV 1418, 1999 WL 946864 (S.D.N.Y. 1999) ...........................................................................38, 39, 40, 46, 48

*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008)..........................................................17

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008)  ............................................24, 26

*SEC v. First City Financial Corp.*, 688 F. Supp. 705 (D.D.C. 1988)...............................15

*SEC v. First Jersey Sec., Inc.*, 890 F. Supp. 1185 (S.D.N.Y. 1995) ..................................10

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ...............................10, 14, 18

*SEC v. Fraser*, 2010 U.S. Dist. LEXIS 7038 (D.Ariz Jan. 28, 2010)...............................54

*SEC v. Franco*, 253 F. Supp. 2d 720 (S.D.N.Y. 2003) ..............................................28, 30

*SEC v. Gabelli*, 2010 WL 27613 (S.D.N.Y. March 17, 2010) ...............................53,54,64

*SEC v. Gaspar*, No. 83 Civ. 3037, 1985 WL 20698 (S.D.N.Y. Apr. 16, 1985)...............30

*SEC v. Gaspar*, 1985 WL 521 (S.D.N.Y. 1985).................................................................39

*SEC v. Geon*, 531 F.2d 39 (2d Cir. 1976)............................................10, 38, 39, 41, 43, 46

*SEC v. Gold*, No. 05-CV-4713 JSMLO, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ..........................................................................................................................22

*SEC v. Johnson*, 530 F. Supp. 2d 296 (D.D.C. 2008) ......................................................24

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007).......................................................64

*SEC v. Jones*, 2006 WL 1084276 (S.D.N.Y. 2006)..........................................................64

*SEC v. Kearns*, 691 F. Supp. 2d 601 (D.N.J. 2010).........................................................54

*SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009) ..................................................................53

*SEC v. Lee,* 720 F. Supp. 2d 305 (S.D.N.Y. 2010)....................................................16, 17

*SEC v. Lorin*, 869 F. Supp. 1117 (S.D.N.Y. 1994)...........................................................63

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ................................38, 39, 41, 42, 44, 46, 47

*SEC v. McAskey*, 56 F. Supp. 2d 323 (S.D.N.Y. 1999) ...................................................63

*SEC v. McNulty*, 137 F.2d 732 (2d Cir. 1998) .................................................................19

*SEC v. Miller*, 2006 U.S. Dist. LEXIS 56413 (N.D.Ga. July 31, 2006).....................19, 54

*SEC v. Mozillo*, 2010 U.S. Dist. LEXIS 98203 (C.D. Cal. Sept. 16, 2010) .....................48

*SEC v. Power*, 525 F. Supp. 2d 415 (S.D.N.Y. 2007) ......................................................12

*SEC v. Rana Research*, 8 F.3d 1358 ................................................................................32

*SEC v. R.G. Reynolds Enter., Inc.,* 952 F.2D 1125 (9th Cir. 1991) ...................................32

*SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993) ....................................................................63

*SEC v. Rorech,* 673 F. Supp. 2d 217 (S.D.N.Y. 2009)......................................................35

*SEC v. Rorech,* 720 F. Supp. 2d 367 (S.D.N.Y. 2010)..........................................37, 44, 49

*SEC v. Savoy Industrial, Inc.,* 587 F.2d 1149 (2d Cir. 1978) .......................................42, 46

*SEC v. Schiffer*, 1998 WL 226101 (S.D.N.Y. 1998) ........................................................63

*SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974)..........................................................33, 46

*SEC v. Suterwalla*, No. 06-cv 1446DMS (LSP) ....................................................31, 32, 34

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)..........................................33

*SEC v. Toomey*, 866 F. Supp. 719 (S.D.N.Y. 1992)........................................................63
*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006) ................................................24

*SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 112 (2d Cir. 1998) ............................................19

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946) ........................................................35

*SEC v. Zandford*, 535 U.S. 813 (2002) ...............................................................29, 32, 34

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d. Cir. 1974) ....................................................................................................31, 38, 39

*Sherwood v. Sutton*, 5 Mason 143, 21 Fed.Cas. 1303 (C.C.D.N.H. 1828) ......................52

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...................10, 12, 14, 21

*Spear, Leeds & Kellogg v. Public Service Co. of N. H.*, 700 F. Supp. 791 (S.D.N.Y. 1988)..................................................................................................21

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, (S.D.N.Y. 2005) ....................................................................................................35

*Stoneridge Investment Partners, LLC., v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)..................................................................................................18

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1972) ...........................30

*Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir. 1988) ......................................47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...........................16, 17

*Texas v. Allan Const. Co., Inc.*, 851 F.2d 1526 (5th Cir. 1988) ...........................................55

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) ......................................................................52

*In re Union Carbide Consumer Prod. Bus. Sec. Litig.*, 676 F. Supp. 458
    (S.D.N.Y. 1987) .................................................................................................................25

*United Housing Foundation v. Forman*, 421 U.S. 837 (1975) ...........................................34

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)...........................................36, 39

*United States v. Carpenter*, 484 U.S. 19 (1987) ..............................................................15

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008).....................................................18

*United States v. Newman*, 664 F.2d 12 (2d Cir. 1981) ......................................................30

*United States v. O'Hagan*, 521 U.S. 642 (1997).................................................28, 44, 50

*United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) .............................................48

*United States v. Uzzell*, 648 F. Supp. 1362, 1366-68 (D.D.C. 1986) ..............................62

*Wright v. Ernst & Young*, 152 F.3d 169 (2d Cir. 1998).....................................................12

*Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009) ....................................................55

## FEDERAL RULES AND STATUTES

15 U.S.C. § 78j(b) ..............................................................................22, 26, 27, 28, 29

15 U.S.C. § 77m..................................................................................................................48

15 U.S.C. § 78m(d) ........................................................................................................4, 19

15 U.S.C. § 78n(a) ................................................................................................................4

15 U.S.C. § 78p(a) .........................................................................................................4, 19

15 U.S.C. § 78u-1 ...........................................................................................................9, 52

15 U.S.C. §§ 78u-4 ............................................................................................................17

17 C.F.R. § 240.10b-5.........................................................................................................16

17 C.F.R. § 240.16a-3 ................................................................................................11

26 Stat. 1909 ..............................................................................................................49

28 U.S.C. §2462 ......................................................................................................9, 51

Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114
    Stat. 2763 (2000) ..............................................................................................36

2 Corman, *Limitation of Actions* §§1.1, 11.1.1 (1991) ..............................................56,59

Fed. R. Civ. P. 8(a)(2) ..............................................................................................9

Fed. R. Civ. P. 9(b) ........................................................................................10, 12, 22

Fed. R. Civ. P. 12(b)(6)........................................................................................9, 22

Securities Act of 1993............................................................................................ passim

Securities Exchange Act of 1934 ........................................................................... passim

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | No.  10-CV-5760-SAS |
| | : | |
| **v.** | : | |
| | : | |
| **SAMUEL WYLY, CHARLES J. WYLY, JR., MICHAEL C. FRENCH, AND LOUIS J. SCHAUFELE III** | : | **MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS** |
| | : | |
| **Defendants.** | : | |

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum of law in opposition to the motions to dismiss of defendants Samuel Wyly and Charles J. Wyly, Jr. (collectively, the "Wylys"), Michael C. French ("French"), and Louis J. Schaufele III ("Schaufele") (collectively, the "Defendants").  For the reasons set forth below, the motions should be denied.

The SEC's Complaint in this action alleges more than a decade of deceptive acts and practices that circumvented and violated the federal securities laws.  The Wylys created a labyrinth of offshore trusts and subsidiary entities designed to hide from the investing public, and others, their ownership of and trading activity in the shares of public companies they controlled. The Wylys installed surrogates – family loyalists, employees and professionals beholden to the Wyly brothers – to interact with the offshore entities and ensure that the Wylys' instructions

regarding the disposition of millions of shares of stock they had transferred to the offshore entities were carried out while preserving the Wylys' anonymity.

The Commission's fraud claims in this action are based on Defendants' long-running scheme to use the offshore system of entities to conceal the Wylys' stock holdings and trading activities. That scheme included material misrepresentations in and omissions from required public filings regarding the Wylys' ownership and control of stock held in the offshore trusts. Those material misrepresentations and omissions – which also infected the public companies' periodic filings, registration statements and other required forms and schedules – violated the provisions of the securities laws requiring truthful and accurate disclosure to the investing public of material information about securities ownership and trading activity by corporate insiders and substantial shareholders in order to enable investors to make informed decisions.

The scheme to defraud perpetrated by the Wylys involved the participation of an attorney and a stockbroker, both of whom were essential to its success. Attorney French wore different hats in the Wylys' business empire: lawyer, trust protector, fellow board member, and business associate. He assisted in establishing the offshore trusts and retaining the trustees, and he served as an important interface between the Wylys and the trusts, thereby ensuring that the Wylys' instructions were executed. Schaufele, who served for decades as the Wylys' stockbroker, repeatedly misled his brokerage employers regarding the nature, beneficial ownership and control of the Wylys' offshore entities. Because all of these defendants knowingly and with reckless disregard for the truth executed a scheme to defraud involving numerous deceptive acts and practices, both of commission and omission, their conduct violated the antifraud provisions of the federal securities laws.

In the midst of this offshore trust scheme, the Wylys further enriched themselves by engaging in insider trading.  The insider trading scheme carried out by the Wylys involved an atypical structure.  While serving as Chairman and Vice Chairman of Sterling Software, Inc. ("Sterling Software"), the Wylys traded on material nonpublic information.  But instead of trading directly in Sterling Software stock, the Wylys took advantage of inside information by causing their offshore trusts to enter into a securities-based swap agreement with Lehman Brothers ("Lehman") that gave the Wylys the benefit of any increase in the value of the Sterling Software stock while concealing their involvement in the stock trades.  The Wylys made over $30 million on this covert transaction.  Similarly, Schaufele acted on his inside knowledge of the Wylys' trading activity, purchasing a total of 4,000 shares of Sterling Software stock in four separate accounts owned in his wife's name and thereby earning himself $63,000 in illicit profits.

In sum, the Commission's Complaint sets forth detailed allegations supporting the multiple claims against each of the defendants.  These claims are legally sound and timely filed. Each of the arguments made by Defendants in support of their motions to dismiss is without merit.  First, with regard to the insider trading claim against the Wylys, the nonpublic information regarding the sale of Sterling Software was material, and the misuse of that information for the personal benefit of the Wylys was "in connection with" the purchase of Sterling Software stock that occurred under the plain terms of the swap agreement.  *See infra* at 26-44.  Second, the applicable five-year statutes of limitations are, under more than a century of Supreme Court precedent, subject to a "discovery rule," and the claims here were brought within the required five years of the Commission's discovery of the unlawful conduct at issue.  *See infra* at 50-65.  Third, Defendants' arguments that the Complaint fails to plead facts stating a claim, or fails to do so with the requisite particularity, are belied by the detailed allegations set

forth in the 78-page Complaint.  *See infra* at 10-26.  Accordingly, Defendants' motions to dismiss the Complaint for lack of specificity and legal insufficiency should be denied.

## I.   BACKGROUND

### A.  The Commission's Investigation.

On or about November 16, 2004, Bank of America reported for the first time to the Commission's Enforcement staff that the Wylys' offshore accounts at that institution had been terminated for failure to disclose information regarding their relationship to a web of offshore entities.  (Compl. ¶118).  In response, the Commission conducted a thorough investigation.  (*Id.* ¶119).  During the course of that investigation, the Wylys executed a tolling agreement with the Commission that remained in place from February 1, 2006, through July 2010.  (*Id.* ¶117).  Similarly, French and Schaufele signed tolling agreements dated August 1, 2009, and October 29, 2009, respectively, both of which continued through July 2010.  (*Id.* ¶117).  The Complaint in this matter was filed against Defendants on July 29, 2010.

### B.  The Offshore System Scheme.

The Complaint chronicles an elaborate and sophisticated 13-year fraud scheme (running from 1992 through at least 2005) perpetrated by the Wylys and their associates to hide the Wylys' ownership and trading of hundreds of millions of dollars worth of securities of public companies (the "Issuers"[1]) on whose boards of directors they sat.  (*Id.* ¶¶1-2, 23-27)  By establishing, controlling and concealing a maze-like system of trusts and subsidiary companies in

---

[1] The Issuers were Michaels Stores, Inc. ("Michaels"), Sterling Software, Inc. ("Sterling Software"), Sterling Commerce, Inc. ("Sterling Commerce"), and Scottish Annuity & Life Holdings Ltd. ("Scottish Re").  Sam Wyly served at various times relevant to the Complaint as Chairman and Vice Chairman of Michaels, Chairman of Sterling Software, Executive Committee Chairman and board member of Sterling Commerce, and Chairman of Scottish Re.  (Compl. ¶15) Charles held similar, though not identical, positions at each of the Issuers.  (*Id.* ¶16)

the Isle of Man and the Cayman Islands (the "Offshore System"), the Wylys traded tens of millions of shares of securities of the Issuers without disclosing those transactions or the full extent of their securities holdings in those companies to the public, in violation of the federal securities laws governing trading by corporate insiders and significant shareholders.[2]  (*Id.* ¶¶3, 28-39)  The Wylys, as founders, board members, executives and significant shareholders of these companies, were quintessential insiders who, in violation of their fiduciary duties to the Issuers and their shareholders, used their power and control to realize hundreds of millions of dollars of undisclosed gain.  (*Id.* ¶¶1, 15-16, 74-76)

At various times during the course of their 13-year fraud scheme, the Wylys controlled more than twice as many shares in certain of the Issuers as they disclosed publicly.  (*Id.* ¶54)  They exercised virtually the same control over the shares in the Offshore System as the shares they held domestically, which included directing the voting and disposition of shares in the four Issuers held in the offshore trusts.  (*Id.* ¶¶3, 29-46)  The offshore trusts were mere paper facades used by the Wylys to hide their beneficial ownership and trading of the Issuers' shares they held in their Offshore System and to evade the disclosure requirements of the securities laws.  (*Id.*)  Through their conduct, the Wylys deprived the markets and investors of information reflective of potential shifts or changes in corporate outlook important to investment decisions.  (*Id.* ¶¶5, 47-54)  As to all of this conduct, the Wylys were aware contemporaneously that they were acting unlawfully.  (*See id.* ¶¶5, 60-62)

Because all of the Wylys' offshore Issuer stock sales went unreported, all were also made in violation of the insider-transaction reporting provisions, the beneficial-ownership reporting

---

[2] Sections 13(d) and 16(a) of the Exchange Act, 15 U.S.C. §§ 78m(d), 78p(a).

provisions, or both.[3]  (*Id.* ¶¶48-51)  These unlawful nondisclosures enabled the Wylys freely to sell millions of shares of the Issuers' stock while avoiding the adverse market reaction and decrease in value often attending the required public disclosure of such trading by insiders.  (*Id.* ¶76)  The Wylys also used their Offshore System to sell millions of shares of stock in violation of the registration requirements of the federal securities laws.  (*Id.* ¶¶66-74)

The Wylys' co-defendants, French and Schaufele, each had his role to play in this scheme and were highly incentivized to do the Wylys' bidding.  French and Schaufele were not arm's length professional advisors to the Wylys.  Both profited handsomely from their more than decade-long relationship with the Wylys and enjoyed professional and financial advantage because of their service to them.  (*Id.* ¶¶110, 116)  French's involvement with the Wylys went well beyond acting as their lawyer.  He served on the boards of three of the Issuers and as a "trust protector" of the Offshore System.  (*Id.* ¶17)  He parlayed his relationship with the Wylys into lucrative consulting agreements with the Issuers and a law firm.  (*Id.* ¶¶106, 110)  Perhaps most significant was the material benefit conferred on him by the Wylys when they bankrolled and co-founded Scottish Re.  French served as Chairman and CEO of Scottish Re and greatly increased his personal wealth as a result of the Wylys' financial support of Scottish Re.  (*Id.* ¶110)

French provided cover to the Wylys' scheme that was essential both to its concealment and its continuation.  (*Id.* ¶¶104-109)  In his role as a "trust protector," he coordinated with the trusts to communicate the Wylys' investment and voting instructions, which without exception were carried out by the trustees.  (*Id.* ¶¶30-35)  Despite having intimate knowledge of the Wylys' control over their Offshore System, French repeatedly (and falsely) told the Issuers and their

---

[3] *See supra* note 2.

counsel that the Offshore System was "totally independent" of the Wylys.  (*Id.* ¶¶105, 107-108)
While participating in the Wylys' fraud, French also established offshore entities of his own,
which he used, like the Wylys, to control and trade Issuer securities without disclosing that
ownership or trading in accordance with law.  (*Id.* ¶¶101-103)  French, too, was richly
compensated for his work for the Wylys, receiving an annual salary of $1.5 million over the
course of eight years and receiving a $16 million share in a hedge fund established by the Wylys.
(*Id.* ¶110)

For his part, Schaufele, who served as stockbroker for virtually all of the Wylys'
securities accounts both onshore and offshore, aided and abetted the Wylys' scheme by making
fraudulent misrepresentations to his brokerage firm superiors and in-house attorneys, which were
vital to the scheme's operation and continuation.  (*Id.* ¶¶111-115)

### C.  The Insider Trading Schemes.

The Wylys also used their Offshore System to engage in a multi-million dollar insider
trading violation.[4]  (*Id.* ¶¶77-96)  In October 1999, the Wylys, having decided to sell Sterling
Software to an external buyer, instructed their Offshore System to enter into securities-based
swap agreements with Lehman involving two million shares of Sterling Software stock.  (*Id.*
¶77).  Four months later, when the sale of Sterling Software was publicly announced, the Wyly
brothers made illegal profits exceeding $31.7 million.  (*Id.*)

Schaufele also directly committed an insider trading violation when, on October 1, 1999,
he purchased a total of 4,000 shares of Sterling Software across four different accounts in his
wife's name while in possession of the material, non-public information that Sam Wyly (then
Sterling Software's Chairman) was entering into an unprecedented, large, and bullish offshore

---

[4] The Wylys' insider trading scheme was also part of the Offshore System scheme
detailed above.  *See supra* at 4-7.

transaction in Sterling Software stock.  (*Id.* ¶¶97-99)  Schaufele's illegal profits from this trading

totaled approximately $63,000.  (*Id.* ¶100)

### D. The Motions to Dismiss the Complaint.

The Complaint sets forth thirteen Claims against Defendants.  None of the defendants has

moved to dismiss any of Claims Five through Thirteen.  Defendants' motions are instead

directed toward Claims One through Four of the Complaint.  The First Claim asserts primary

violations by the Wylys and French of Section 10(b) of the Exchange Act[5] perpetrated through

the use of the Offshore System; the Fourth Claim asserts primary violations of Section 17(a) of

the Securities Act[6] for essentially the same conduct.  The Second Claim relates to the insider

trading charges against the Wylys and Schaufele, also under Section 10(b) of the Exchange Act.

The Third Claim charges French and Schaufele with aiding and abetting[7] the Wylys in the fraud

scheme set forth in the First Claim.

Defendants move to dismiss the specified charges for failure to state a claim upon which

relief can be granted and for failure to plead fraud with particularity.  Specifically, the Wylys

move to dismiss the insider trading claim, arguing that their October 1999 securities-based swap

agreement with Lehman was not a "security" covered by the antifraud provisions of the federal

securities laws, and that they did not possess material nonpublic information when the

transaction was executed.  Defendants have all moved to dismiss the Commission's claims for

penalties, contending that the recovery of civil penalties is time-barred under Section 21A of the

---

[5] 15 U.S.C. § 78j(b).

[6] 15 U.S.C. § 77q.

[7] Section 20(e) of the Exchange Act authorizes aiding and abetting claims by the
Commission.  15 U.S.C. § 78t(e).

8

Exchange Act[8] and 28 U.S.C. § 2462.  Schaufele has moved to dismiss the claims that he aided

and abetted the Wylys' fraudulent scheme and that he committed insider trading based on his

October 1999 purchases of Sterling Software in his wife's accounts.  Finally, the Wylys moved

to dismiss for failure to plead with the particularity required by Federal Rule of Civil Procedure

9(b) either the nature of the Wylys' involvement with the false filings at issue or the facts

evidencing their scienter.  Similarly, French moved to dismiss on the ground that the Complaint

fails adequately to allege that he acted with scienter or that he aided and abetted the false filings.

## II.   ARGUMENT

### A.  Legal Standards.

#### 1.   The legal standard governing Rule 12(b)(6) motions.

When filing a complaint, Federal Rule of Civil Procedure 8(a)(2) requires "a short and

plain statement of the claim showing that the pleader is entitled to relief" sufficient to provide

"fair notice" of the claim and "the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  On a motion to dismiss, the court must "accept as true all of the

factual allegations contained in the complaint" and "draw all inferences in the light most

favorable" to the Commission.  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.

2007); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007).  Detailed

factual allegations are not required in a complaint; rather, to survive a motion to dismiss under

Federal Rule of Civil Procedure 12(b)(6), a complaint need only contain enough facts "to raise a

right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also SEC v. Collins &*

*Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007).

---

[8] 15 U.S.C. §78u-1.

### 2. Pleading fraud with particularity under Rule 9(b).

Federal Rule of Civil Procedure 9(b) provides that "the circumstances constituting fraud . . . shall be stated with particularity."  Interpreting this provision, the courts have held that a complaint that rests on false or misleading public statements must identify the statements at issue, when they were issued, by whom they were issued, and why they were false or misleading. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (identifying the factual details required to satisfy Rule 9(b)).  In contrast, Rule 9(b) makes clear that "intent, knowledge, and other condition of mind may be averred generally," and thus allegations of scienter are not subject to the particularity requirement of Rule 9(b).  *Ouaknine v. MacFalane*, 897 F.2d 75, 81 (2d Cir. 1990) ("Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud.").

### B. The Complaint Adequately Alleges Fraud By the Wylys.

The Wylys move to dismiss the First and Fourth Claims[9] of the Complaint pursuant to Rule 12(b)(6) and Rule 9(b).  Notably, the Wylys do ***not*** contend that the Complaint fails adequately to allege false statements, the materiality of those statements, or that those statements were made in connection with the purchase or sale of securities.  *See SEC v. First Jersey Sec., Inc.*, 890 F. Supp. 1185, 1209 (S.D.N.Y. 1995) (listing the three elements of a Section 10(b) fraud claim), *aff'd in part and rev'd in part*, 101 F.3d 1450 (2d Cir. 1996); *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).  Rather, the Wylys argue that the Complaint fails specifically to allege "when or how the Wylys directed others to file false statements," Wylys Mem. at 21,

---

[9] As noted above, the First Claim alleges a violation of Section 10(b) based on the Offshore System scheme.  The Fourth Claim alleges a violation of Section 17(a) based on the same conduct.  As this Court has noted, the elements of those two provisions are "essentially the same."  *Collins & Aikman*, 524 F. Supp. 2d at 490.  Accordingly, the Commission's arguments with response to each of those claims apply equally to the other.

and generally to allege that the Wylys acted with scienter, *id.* at 23.  These arguments are both

without merit.

> ### 1.  The Complaint alleges with specificity the false statements attributable to the Wylys.

The Complaint includes a detailed Appendix that identifies literally dozens of false

securities filings, each of which falls broadly into one of three groups.  The false filings

identified in the Complaint are: (a) filings of one or both of the Wylys personally (such as

Schedules 13Ds,[10] Schedule 13Gs,[11] or Form 4s[12]) that understate their shareholdings and stock

trading; (b) corporate filings (such as Form 10-Ks, proxies, or registration statements) that also

understate the Wylys' (and/or French's) shareholdings in the particular corporation making the

filing; and (c) filings by offshore trustees falsely claiming they have sole dispositive power over

their shares.  (Compl. at pp. 71-78).  The Wylys admit in their motion that the Complaint

---

[10] Schedule 13D is a disclosure report required under Section 13(d) of the Exchange Act to be filed by any person who "is directly or indirectly the beneficial owner of more than five percent" of the stock of any class of a public company's outstanding stock.  17 C.F.R. § 240.13d-1.  Persons required to file Schedule 13Ds are also required, upon "any material increase or decrease" in the number of shares they beneficially own, to file amended Schedule 13Ds "disclosing that change."  *Id.* § 240.13d-2.  Schedule 13Ds and amended Schedule 13Ds require disclosure of background information about the beneficial owners of the stock, the source and amount of the funds used to make their purchases, the purpose of the transaction (including any plans or proposals that would result in an extraordinary corporate transaction), the number of shares beneficially owned, and any agreements concerning the issuer's security.  *Id.* § 240.13d-101.

[11] Schedule 13G is a short-form version of Schedule 13D which may be filed by a person who "has acquired [] securities in the ordinary course of his business and not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect".  17 C.F.R. § 240.13d-1.  Like Schedule 13D filers, Schedule 13G filers are also required to file amended Schedule 13Gs when "there are any changes in the information reported in the previous [Section 13(d)] filing."  *Id.* § 240.13d-2.

[12] Form 4 is a disclosure report required under Exchange Act Section 16(a) to be filed by every public company officer, director and greater than 10% shareholder reporting any changes to their beneficial ownership of their company's securities.  17 C.F.R. § 240.16a-3.

specifically identifies 29 filings by the Wylys that the Commission has alleged were false.  *See*
Wylys Mem. at 21.  In other words, at least in the case of those 29 filings, the Wylys do not
dispute that the SEC has alleged the requisite who, what, when, and why that Rule 9(b) requires.
*See Shields*, 25 F.3d at 1128 (identifying the factual details required to satisfy Rule 9(b)).  That
concession alone is sufficient reason to deny the Wylys' motion to dismiss for failure to plead
fraud with particularity.

Despite the admitted particularity of the Complaint, the Wylys nevertheless contend that
the Complaint falls short of the requirements of Rule 9(b) in that it fails to allege "when or how
the Wylys allegedly directed others to file the false statements" set forth in the remaining 94
false filings identified in the Complaint's Appendix.  *See* Wylys Mem. at 21.  This argument
fails for two reasons.

<u>First</u>, the law in this Circuit makes clear that, in an SEC enforcement action, the
Commission need not allege that the defendant personally made the false statement at issue; "the
SEC need only allege that the defendant was sufficiently responsible for the statement – in effect
caused the statement to be made."  *Collins & Aikman*, 524 F. Supp. 2d at 490 (internal quotations
omitted); *SEC v. Power*, 525 F. Supp. 2d 415, 420 (S.D.N.Y. 2007) (same).[13]  Here, the
Complaint expressly alleges that the Wylys "caused" the numerous false corporate filings
identified in the Appendix to be submitted to the SEC.  (Compl. ¶¶52, 53, 58, 67).[14]  The

_____

[13] In a private securities action in the Circuit, an allegation that the defendant caused a
false statement to be made would be insufficient to state a claim.  *See Wright v. Ernst & Young,
LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (discussing the "bright line" test, which requires that the
defendant "actually make a false or misleading statement in order to be held liable under Section
10(b)").  But because this is an SEC enforcement action, that line of case law is inapplicable
here.

[14] The Wylys represent in their motion that the Complaint alleges that they "directed"
certain false filings.  *See* Wylys Mem. at 21.  Actually, the Complaint alleges that the Wylys

Complaint goes on to explain how the Wylys caused these false corporate filings, alleging specifically that the Wylys knew that the Issuers were required to make corporate filings detailing the beneficial ownership of the Issuers' stock, and, with this knowledge, that the Wylys falsely responded to questionnaires from the Issuers regarding their beneficial stock ownership, which false responses were then incorporated into the Issuers' filings.  (*Id.* ¶52)  In addition, the Complaint alleges that the Wylys allocated their offshore stock among the entities in the Offshore System so that no one offshore entity held more than 5% of an issuer's stock and, as a result, the entities of the Offshore System failed to file required disclosures.  (*Id.* ¶¶55-59)  Still further, the Complaint alleges that the Wylys caused those offshore entities to file disclosures falsely claiming that they had "sole dispositive power" over the shares they held.  (*Id.* ¶51)  These allegations are more than sufficient to explain how the Wylys "caused" the false filings and thus to satisfy the requirements of Rule 9(b).

Second, the group pleading doctrine also provides a basis for upholding the sufficiency of the allegations here.  The group pleading doctrine "permits plaintiffs 'to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) (internal quotations omitted).  The numerous filings set forth in the Appendix to the Complaint (such as Form 10-Ks, prospectuses, and proxy statements) are the very type of documents explicitly identified in the *Dresner* opinion as subject to the presumption afforded by the group pleading doctrine.  *See id.*  In addition, the Complaint alleges,

_____

"caused" certain false filings, which is the very allegation that this Court's *Collins & Aikman* decision recognizes is sufficient to state a claim.  *See* 524 F. Supp. 2d at 490 (holding that "the SEC need only allege that the defendant . . . caused the statement to be made" (internal quotation marks omitted)).

as the group pleading doctrine requires, that the Wylys were directly involved in the everyday business of the Issuers making those filings.  (Compl. ¶¶15-16)  The Complaint also alleges the Wylys' involvement in the everyday business of the Offshore System entities.  (*Id.* ¶¶23-24, 28-39)  Accordingly, the elements of the group pleading doctrine are alleged here.  This is a more than sufficient alternative basis to deny the Wylys' motion to dismiss for supposed lack of particularity.[15]

### 2. The Complaint adequately alleges facts giving rise to an inference of the Wylys' scienter.

The Wylys further contend that the First, Second, and Fourth Claims (which allege causes of action under Sections 10(b) and 17(a)) should be dismissed for failure to plead the requisite scienter element with sufficient particularity.  Wylys Mem. at 22-24.  This argument should be rejected.

Scienter is an element of a cause of action under Section 10(b) and Section 17(a)(1).[16] *See First Jersey Sec.*, 101 F.3d at 1467.  In this Circuit, the SEC must plead sufficient facts to "give rise to a 'strong inference'" that a defendant acted with this requisite state of mind.  *Collins & Aikman*, 524 F. Supp. 2d at 488; *see also Kalnit v. Eichler*, 264 F.3d 131, 137-38 (2d Cir. 2001).  This "strong inference" can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields*, 25 F.3d at 1128; *see also Collins & Aikman*, 524 F. Supp. 2d at 488 (same).  Such conscious

---

[15] Alternatively, even were the Wylys not personally responsible for false filings here, the Section 10(b) charge set out in the First Claim would nonetheless be viable against them under a "scheme liability" theory.  *See infra* at 18-19.

[16] A cause of action under Section 17(a)(2) and (3) does not require an allegation of scienter.  *Aaron v. SEC*, 446 U.S. 680, 697 (1980).  Accordingly, even in the absence of an allegation of scienter, the Fourth Claim would nonetheless be legally sufficient.

misbehavior can be shown through allegations that offshore entities were used to conceal a defendant's activities.  *See In re Employees Solutions Sec. Litig.*, No. CIV 97545PHXRGS, 1998 WL 1031506, at *4 (D. Ariz. Sept. 22, 1998).

Consistent with these pleading requirements, the Commission has alleged facts sufficient to show both motive and opportunity to commit fraud and evidence of conscious misbehavior or recklessness by the Wylys.  With respect to motive and opportunity, the Complaint alleges that the Wylys' scheme "enabled [them] to realize hundreds of millions of dollars of unlawful gain and other material benefits," as well as avoid and eliminate the risk of any "negative impact that sales by them of Issuer Securities . . . would potentially have on the Issuers' share prices if they were disclosed in accordance with law."  (Compl. ¶¶1, 76)

As for conscious misbehavior, the Complaint adequately alleges that the Wylys held and sold shares "through complicated offshore entities in ways that seem calculated to conceal [the Wylys'] involvement."  *In re Employees Solutions Sec. Litig.*, 1998 WL 1031506, at *4.  For example, the Complaint alleges that the Wylys employed trusted surrogates as Protectors "to convey [their] instructions to the Offshore Trustees and ensure that the instructions were followed," which they were without fail (Compl. ¶¶29, 32, 35); that the Wylys treated the Offshore Trustees, who according to the trust agreements had "exclusive authority to manage the trusts assets," as mere functionaries to carry out the Wylys' wishes (*id.* ¶¶29, 34-38); and that the Wylys also "purposefully allocated" their offshore securities "among the different Offshore Trusts and Offshore Trustees to ensure that no single trustee nominally held more than 5% of an Issuer's outstanding stock." (*id.* ¶¶55-59)  The purpose of the Wylys' activity, examples of which are described in ample detail in Complaint paragraphs 56-59, was clear: "to further

prevent the detection of their scheme" by "significantly reduc[ing], and ultimately eliminat[ing] outright any Schedule 13D disclosures" of the offshore securities holdings."  (*Id.* ¶55)

The Complaint further alleges that the Wylys, prior to implementing their fraudulent scheme, had "knowledge of the relevant legal obligations" regarding beneficial ownership reporting from their "over 20 years experience as public company directors and Schedule 13D and Form 4 filers" and from their receipt of a legal memo from French that specifically addressed the reporting implications of their offshore securities holdings.  (*Id.* ¶60, 63)  Despite this knowledge, the Wylys never publicly disclosed their beneficial ownership of, or trading in, the offshore Issuer securities" (*id.* ¶64), but rather "affirmatively concealed their control over the Offshore Issuer securities by, for example, falsely expressly disclaiming beneficial ownership of the transferred securities and falsely representing that they did not have or share investment control over the recipient Offshore Trusts" (*id.* ¶51).  These factual allegations bespeak knowing and deliberate misconduct.

Despite these allegations, the Wylys propose an additional hurdle for the SEC to clear in order to sustain its claims.  They argue that to state a fraud claim, the "inference" arising from the Commission's allegations must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Wylys Mem. at 22 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).  As precedent for applying the *Tellabs*' pleading standard to the Commission's enforcement actions, the Wylys cite the single decision in *SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010). Wylys Mem. at 22 n.53.  In that decision, the court applied the more stringent *Tellabs*' pleading requirement without any analysis of the *Tellabs* opinion, the

context in which it arose (a private action under the PSLRA[17]), or other decisions in this district and circuit that have addressed the issue.  *See Lee*, 720 F. Supp. 2d at 321.

In *Collins & Aikman*, this Court declined to address the issue whether the *Tellabs*' standard applies to SEC enforcement actions, finding it unnecessary to the resolution of the motion to dismiss in that case.  *See* 524 F. Supp. 2d at 488.  Judge Preska, however, had the opportunity to reach this issue in *SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008).  In that case, after reviewing precedent in this circuit pre-dating *Tellabs*, analyzing the *Tellabs* opinion, the PSLRA and the legislative history, and distinguishing other relevant decisions in this district, Judge Preska held that the "'strong inference' standard [does not apply] to all pleadings governed by Rule 9(b)," *id.* at 502, and, in particular, does not "apply . . . to SEC enforcement actions," *id.* at 501.

Defendants do not distinguish Judge Preska's analysis of the issue, nor even cite to her decision in *Dunn*, electing instead to rely on the *Lee* court's uncritical invocation of *Tellabs*.  The Commission respectfully submits that Judge Preska's opinion in *Dunn* is correct, and the *Tellabs* heightened scienter standard does not apply to SEC enforcement actions.  However, as in *Collins & Aikman*, this Court need not reach the issue because the Complaint "has pled scienter even under this heightened standard."  524 F. Supp. 2d at 488.

### C.  The Complaint Adequately Alleges Fraud By French.

French moves to dismiss the First and Fourth Claims against him for failure to plead fraud with the particularity required by Rule 9(b) and for failure adequately to plead scienter. French Mem. at 14-15.  In so doing, French seems to misunderstand the Commission's legal theory.  To be clear, the First Claim charges French with primary liability on three different

---

[17] Private Securities Litigation Reform Act of 1995.  15 U.S.C. §§ 78u-4 *et seq.* ("PSLRA")

theories.  First, French is alleged to have been a participant in the Wylys' Offshore System

scheme.  In addition, French is alleged to have been a primary participant in his own scheme

involving Issuer securities held in his own offshore system.  Finally, French is alleged to have

caused misrepresentations with respect to the Issuers' corporate filings and failed to file and

caused material omissions from his own personally-required beneficial ownership filings.

(Compl. ¶¶101-103) The Complaint alleges both French's scheme liability as well as his

responsibility for the particular false filings at issue.

> **1.  The Complaint alleges with particularity French's participation in the fraud scheme.**

Rule 10b-5, enacted pursuant to Section 10(b), sets forth two alternative bases for

securities fraud liability.  In addition to prohibiting the "mak[ing] [of] any untrue

statement[s]," Rule 10b-5 also prohibits engaging in a "scheme to defraud" or a "course of

business which operates . . . as a fraud."  17 C.F.R. § 240.10b-5; *see also Stoneridge Inv.*

*Partners, LLC., v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008) (noting that Rule 10b-5 is

not limited to "a specific oral or written statement," because "[c]onduct can itself be deceptive");

*United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) (same); *In re Global Crossing, Ltd.*

*Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("Claims for engaging in a fraudulent

scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct

elements."); *SEC v. Kearns*, 691 F. Supp. 2d 601, 617 (D.N.J. 2010) ("Liability under Section

10(b) and Rule 10b-5 attaches not only to misleading statements to the public, but to deceptive

practices.").  With regard to the latter theory of Rule 10b-5 liability, known as the "scheme

liability" theory, the courts have explained that "[p]rimary liability may be imposed 'not only

on persons who made fraudulent misrepresentations but also on those who had knowledge of

the fraud and assisted in its perpetration," *First Jersey Sec.*, 101 F.3d at 1471, or otherwise

"participated in the fraudulent scheme," *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) (internal quotations omitted).  Assistance or participation sufficient to give rise to scheme liability under Rule 10b-5 must take "the form of actions or statements that were independently deceptive or fraudulent." *Collins & Aikman*, 524 F. Supp. 2d at 486.

French's conduct, as alleged in the Complaint, falls well within the scope of the scheme liability theory.  French was directly involved in creating the Offshore System with the Wylys and took steps to ensure that no single trustee controlled more than 5% of the shares of an Issuer so as to evade SEC disclosure requirements.  (Compl. ¶¶57, 58)  French also served as a "protector" of the Isle of Man trusts established by the Wylys from 1992 through January 2001. (*Id.* ¶13)  French knew, or was reckless in not knowing,[18] that the Wylys' involvement in the Offshore System constituted ownership and control requiring disclosure under Sections 13(d) and 16(a) of the Exchange Act.[19]  (*Id.* ¶60)  French knew by virtue of his roles as lawyer, trust protector, business associate and board member that the manner in which the Wylys operated the Offshore System required them to disclose their trading activity and holdings and that, in furtherance of the scheme, the Wylys had failed to do so.  (*Id.* ¶¶60-64)  French also lied to in-house and outside counsel to the Issuers in furtherance of the scheme.  (*Id.* ¶¶104-108)

Furthermore, French created his own Offshore System so that he too could trade in Issuers' shares without disclosing his activity as required by Sections 13(d) and 16(a) of the Exchange Act.  (*Id.* ¶¶101-103)  Between July 1995 and September 2000, French transferred 45,000 Michaels options, 170,000 Sterling Software options, and 266,667 Scottish Re options to two Isle of Man trusts he established for himself and his family.  (*Id.* ¶101)  Further, French

---

[18] Recklessness satisfies the knowledge element of a Rule 10b-5 claim.  *SEC v. McNulty*, 137 F.2d 732, 741 (2d Cir. 1998).

[19] 15 U.S.C. §§ 78m(d), 78p(a).

caused Scottish Re to issue 152,000 Scottish Re shares and 200,000 warrants to one of his Isle of Man Trusts and had one of his Isle of Man subsidiary companies purchase 75,000 Scottish Re shares in the open market.  (*Id.* ¶101)  Like the Wylys, French never relinquished investment and voting power over the Issuers' securities held by his own Isle of Man trusts and companies.  (*Id.* ¶102)  French made the decisions when to exercise his offshore options and when to sell the resulting shares, and he communicated those decisions to the Isle of Man trustees.  (*Id.* ¶102) The trustees for French's offshore trusts and companies never initiated any investment decisions regarding the securities they nominally held and never failed to follow French's directions.  (*Id.* ¶102)

Despite his ongoing control, French failed to include his offshore securities holdings or transactions on any of his Form 4 filings, and falsely represented to both Michaels and Sterling Software that the securities of each Issuer that he held offshore were "no longer beneficially owned" by him and that he had no Form 4 delinquencies.  (*Id.* ¶102)  As a result of French's direct misrepresentations, Michaels and Sterling Software failed to include French's offshore holdings in the beneficial ownership tables contained in corporate filings, failed to disclose the existence and extent of French's Form 4 delinquencies in their annual proxies and Form 10-Ks, and failed to disclose French's control over his own offshore entities in registration statements which included securities held by those entities.  (*Id.* ¶102)

French committed similar violations with respect to his offshore holdings and transactions in Scottish Re securities.  (*Id.* ¶103)  As the CEO of Scottish Re, French arranged for his offshore entities to purchase through private placement transactions large blocks of pre-IPO Scottish Re securities.  (*Id.* ¶103)  French then caused Scottish Re to state falsely in its registration statements that he (and the Wylys) had "no power to vote or dispose, or direct the

voting or disposition of the" Scottish Re securities held by the offshore entities.  (*Id.* ¶103)

French failed to file Form 4s disclosing his offshore securities transactions and falsely stated in

the Form 4 he filed disclosing his transfer of additional Scottish Re securities to his offshore

trust, that he "does not have or share investment control in the family trust."  (*Id.* ¶103)  French

also failed to file a Schedule 13D disclosing that his total Scottish Re securities holdings

exceeded 5% of the company's outstanding shares.  (*Id.* ¶103)

In short, French was actively involved in the workings of the Offshore System, and he

personally engaged in fraudulent and deceptive corporate filings.  The Complaint, including the

Appendix detail, provide "fair and reasonable notice to [French] of the claim and the grounds

upon which it is based."  *Spear, Leeds & Kellogg v. Pub. Serv. Co. of N.H.*, 700 F. Supp. 791,

793 (S.D.N.Y. 1988).    No more is required to allege a defendant's scheme liability.

### 2.   The Complaint alleges facts giving rise to an inference of French's scienter.

French also argues that the Complaint fails adequately to plead his scienter.  French

Mem. at 15.  This argument merits little response.

As noted above, scienter can be pled either by "alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness."  *Collins & Aikman*, 524 F.

Supp. 2d at 488 (internal citation omitted); *Shields*, 25 F.3d at 1128 (same).  Perhaps the most

damning evidence here of French's scienter is his involvement, as an attorney, in the preparation

of a legal memo that "raised numerous warning flags" regarding the legality of the Offshore

System, which French subsequently "disregard[ed]."  (Compl. ¶60).  Indeed, the Complaint

alleges that, faced with this legal analysis, French subsequently communicated by facsimile with

one of the Wylys' offshore trustees but directed that trustee to "dispose of this fax after reading."

(*Id.* ¶65)  Still further, the Complaint details an instance in which an offshore trustee explicitly advised French of the "unorthodox deals" in which the Wylys' were engaged.  (*Id.* ¶39.b)  These alleged facts, taken "collectively" as true at the pleading stage, *Collins & Aikman*, 524 F. Supp. 2d at 483, 487 (internal citations omitted), are sufficient to give rise to a strong inference of scienter on the part of French.  *SEC v. Gold*, No. 05-CV-4713 JSMLO, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006) (holding that scienter can be shown when one "consciously disregards 'red flags'").  And, of course, the use of the complicated web of offshore entities further evidences scienter.  *See In re Employees Solutions Sec. Litig.*, 1998 WL 1031506 at *4.

### D.  The Complaint Adequately Alleges That Schaufele and French Aided and Abetted the Fraud.

Schaufele and French have moved to dismiss the Third Claim of the Complaint in which the SEC alleges that they aided and abetted the Wylys' violation of Section 10(b) through the Offshore System scheme.  Schaefele Mem. at 4-11; French Mem. at 15.[20]  An aiding and abetting claim requires allegations of the defendant's "knowledge" and "substantial assistance" of the primary violator's fraud.  *Collins & Aikman*, 524 F. Supp. 2d  at 491.  Schaufele and French mischaracterize both the applicable law and the factual allegations in the Complaint to support their argument that the SEC has failed to allege those elements of the aiding and abetting claim against them.  They are wrong.  As discussed below, the Complaint's allegations against them are more than sufficient to satisfy the Rule 12(b)(6) and Rule 9(b) pleading requirements.

---

[20] Schaufele and French also both argue that the Complaint fails adequately to allege that they aided and abetted the Wylys' insider trading scheme as alleged in the Second Claim. Schaufele Mem. at 12-13, French Mem. at 15.  In fact, the Commission is making no such allegation against either of them.

### 1. Schaufele Had Knowledge of the Wylys' Scheme.

The rhetoric in Schaufele's motion is badly out of step with the facts in the Complaint. Far from merely amounting to a series of "over 100 false public filings," Schaufele Mem. at 9, the Wylys' violation that Schaufele aided and abetted was a massive scheme to control and trade, secretly and offshore, millions of shares of the Issuers' securities over more than 12 years. (Compl. ¶1)  The Complaint alleges that Schaufele knew that each and every transaction in the Issuers' securities in the Offshore System, including the 1999 swap transaction, was, in fact, specifically authorized by the Wylys themselves in advance and, indeed, would not have been performed absent their specific initiation or advance authorization.  (*Id.* ¶111)  Schaufele pitched ideas for Offshore System transactions and negotiated their terms directly with the Wylys or their surrogates (*id.* ¶¶31, 37, 71, 72, 78 & 112); routinely called the Wylys' family office to confirm that particular Offshore System transactions were indeed the Wylys' wish before executing them (*id.* ¶112); executed orders for Offshore System securities transactions based solely on communications from the Wylys or their family office, bypassing the offshore trustees (*id.* ¶39); received an offer from Sam Wyly to "cancel" an Offshore System transaction (*id.* ¶39); provided the Wylys with real-time data for Offshore System transactions as they were being implemented (*id.* ¶¶81, 83, 84); and persuaded the Wylys to move the Offshore System accounts to Bank of America (*id.* ¶114).

Most damning is the fact that Schaufele repeatedly lied to his brokerage firm employers about the foregoing facts.  (*Id.* ¶¶7, 9, 87, 111-13)  For example, Schaufele repeatedly misrepresented to his brokerage firm employers that he did "not talk offshore business with the family" (*id.* ¶113), that it was "not the case" that the Wylys' advance initiation or approval preceded any and all Offshore System transactions in securities of the Issuers (*id.* ¶111), and that

the Offshore System was "completely independent of the Wylys" (*id.* ¶113).  Were Schaufele

confident that the Wylys' operation of their Offshore System was lawful, there would have been

no reason to lie to his employers.  The fact that he lied about the very facts that would have

exposed the scheme gives rise to a sufficient inference of actual knowledge on his part to render

his instant challenge unavailing.  *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464-65

(S.D.N.Y. 2009) (knowledge of fraud could be inferred from alleged aiders and abettors'

creating false paper trails to minimize appearance of their involvement in scheme).

### 2.  Schaufele Substantially Assisted the Scheme.

To satisfy the "substantial assistance" element of aiding and abetting, the aider and

abettor's assistance must be a proximate cause of the primary violation.  *SEC v. Treadway*, 430

F. Supp. 2d 293, 339 (S.D.N.Y. 2006).  "To allege substantial assistance, the complaint must

allege that the aider and abettor's conduct was a substantial causal factor in the perpetuation of

the underlying violation."  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 471 (S.D.N.Y. 2008).  Put

another way, to constitute substantial assistance, "the primary violations must be a 'direct or

reasonably foreseeable result' of the aider and abettor's conduct."  *SEC v. Johnson*, 530 F. Supp.

2d 296, 306 (D.D.C. 2008).  The SEC's Complaint meets these standards.

Schaufele's key and serial misrepresentations to his brokerage firm superiors concerning

the Wylys' control over the securities of the Issuers held in their Offshore System (Compl. ¶¶9,

111-13) were vital to "perpetuation" of the Wylys' scheme.  *Espuelas*, 579 F. Supp. 2d at 471.  A

"direct or reasonably foreseeable result" of Schaufele's conduct was the violation itself, which

consisted of the Wylys' exercise of secret control over their holdings of the Issuers' securities

and effecting of transactions in those securities through continuous operation of their Offshore

System.  Had Schaufele at any point disclosed to his brokerage firms the key facts about which

24

he instead lied to them, the result would have been devastating to the Offshore System's viability as an apparatus of fraud.  The Offshore System's ability to operate and generate ill-gotten gains for the Wylys hinged on maintaining (i) the illusion that the Offshore System's securities holdings and transactions were totally independent of the Wylys, and (ii) the Wylys' constant *de facto* control over its securities holdings and trading.  The allegations in the Complaint reflect that Schaufele's actions served both of these objectives.  By falsely disavowing to his errmployers that he "talk[ed] offshore business" with the Wylys (*id.* ¶113), for example, Schaufele served the former objective.  And by, for instance, making it a practice to confirm with the Wylys that particular offshore transactions were indeed their wish before executing them (*id.* ¶112), he served the latter.[21]

In sum, the Complaint contains allegations that, if taken as true at the pleading stage, are sufficient to support the inference of Schaufele's actual knowledge[22] and substantial participation in the Offshore System scheme.

---

[21]  Schaufele devotes considerable space in his brief to argue the causation question on the merits, Schaufele Mem. at 11-12, which is both unhelpful and irrelevant in the context of a motion to dismiss.  As courts have held repeatedly, the question whether an aiding and abetting defendant's actions in fact satisfied the causal requirement for aiding and abetting liability is properly reserved for the trier of fact.  *See, e.g., JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005) (whether alleged aider and abettor's "actual contribution on any given transaction was sufficient to be a proximate cause of the Banks' losses is ultimately a fact issue to be resolved after a fuller development of the record"); *In re Union Carbide Consumer Prod. Bus. Sec. Litig.*, 676 F. Supp. 458, 465 (S.D.N.Y. 1987) (whether aiding and abetting defendant's activities proximately caused the harm "is of course essentially a question of fact.").

[22]  It is also worth noting, however, that Schaufele fails to recognize that recklessness can satisfy the knowledge requirement where, as here, the defendant breached a fiduciary duty.  *See Collins & Aikman*, 524 F. Supp. 2d at 491 ("In this Circuit, the knowledge prong can be satisfied by proof of recklessness . . . if the alleged aider and abettor breached a fiduciary duty.").  Here, Schaufele owed a fiduciary duty to his brokerage firm employers, a duty that he breached by lying to them.  Accordingly, the knowledge element here is satisfied if the Complaint merely alleges facts sufficient to show recklessness by Schaufele, which it more than does.

### 3. French Had Knowledge and Substantially Assisted the Scheme.

French has also moved to dismiss the Third Claim of the Complaint in which the SEC alleges that he aided and abetted the Wylys' violation of Section 10(b) through the Offshore System scheme. French Mem. at 15. But French's argument in this regard consists of a single sentence. *Id.*

French's role in aiding and abetting the Wylys' scheme was, if anything, greater than Schaufele's. French served on the boards of three of the Issuers and also served as a "trust protector" of the Offshore System. (Compl. ¶17) In his role as a "trust protector," he coordinated with the trusts to communicate the Wylys' investment and voting instructions, which without exception were carried out by the trustees. (*Id.* ¶¶30-35) He was essentially the lawyer of record for the whole scheme. Without French's participation, the scheme could not have operated. The allegations in the Complaint thus show that French's "conduct was a substantial causal factor in the perpetuation of the underlying violation." *Espuelas*, 579 F. Supp. 2d at 471. Moreover, despite having intimate knowledge of the Wylys' control over their Offshore System, French repeatedly (and falsely) told the Issuers and their counsel that the Offshore System was "totally independent" of the Wylys. (*Id.* ¶¶105, 107-108) This clearly satisfies the knowledge requirement. *Kottler*, 607 F. Supp. 2d at 464-65. In essence, French knowingly provided cover to the Wylys' scheme that was essential both to its concealment and its continuation. (*Id.* ¶¶104-109)

### E. The Wylys' and Schaufele's Motions to Dismiss the Insider Trading Claims Are Without Merit and Should Be Denied.

Both the Wylys and Schaufele move to dismiss for legal insufficiency the insider trading claims raised against them in the Second Claim of the Complaint. Wylys Mem. at 6-13; Schaufele Mem. at 13-20. Their contentions are without merit.

1.   **The Complaint adequately alleges an insider trading claim arising from the Wylys' securities-based swap agreement.**

The Second Claim of the Complaint alleges that the Wylys, in violation of their fiduciary duties as corporate directors of Sterling Software used their offshore entities to execute a securities-based swap agreement with Lehman in October 1999 while the Wylys were in possession of and based on material nonpublic information.  (Compl. ¶¶77-97)  The Wylys move to dismiss this Claim as legally insufficient, arguing (a) that they did not directly trade in "securities," as that term was then defined by the Exchange Act, and (b) that the information on which they traded was not material as a matter of law.  Both arguments should be rejected.

a.   **The Wylys' fraudulent breach of their fiduciary duties was "in connection with the purchase or sale of any security."**

The Wylys first contend that the SEC has failed to allege a legally viable Section 10(b) claim for insider trading because, when the conduct at issue here occurred, securities-based swap agreements were not included within the Exchange Act's definition of a "security."  *See* Wylys Mem. at 7.  This argument fails for two reasons.  First, regardless of whether securities-based swap agreements were included in the statutory definition of a "security" at the time, Section 10(b) has long applied to fraudulent schemes undertaken "in connection with" the purchase or sale of securities.  And the Complaint here alleges that the swap agreement expressly required Lehman to purchase shares of common stock.  (Compl. ¶¶80, 85)  Thus, the swap agreement – entered in fraudulent breach of the Wylys' fiduciary duties while in possession of material non-public information – was undertaken "in connection with" the purchase of securities and thus falls easily within the scope of Section 10(b).  Second, while the court need not reach the issue of whether the Wylys' swap was a "security" in 1999, the allegations are sufficient that it was.

**i.   The Wylys' fraud was "in connection with" the purchase of securities because the swap agreement required the purchase of common stock.**

Section 10(b), under which the Second Claim of the Complaint was brought, renders it unlawful to, "directly or indirectly," use "any . . . deceptive device or contrivance" in violation of SEC regulations and "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  In other words, Section 10(b) "proscribes (1) using any deceptive device (2) in connection with the purchase or sale of securities."  *United States v. O'Hagan*, 521 U.S. 642, 651 (1997).

With regard to the deceptive device requirement, the Supreme Court reaffirmed in *O'Hagan* that "a fiduciary's undisclosed, self-serving use of a principal's information . . . , in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information," thus constituting a deceptive device under Section 10(b).  *Id.* at 652.  Stated another way, Section 10(b) acts to "prohibi[t] an insider, who has a fiduciary duty to a corporate entity, from using material non-public information to the insider's advantage in order to make secret profits."  *SEC v. Franco*, 253 F. Supp. 2d 720, 726 (S.D.N.Y. 2003).  The Wylys do not challenge the sufficiency of the Complaint's allegation of such a breach of fiduciary duty.

Rather, they challenge the adequacy of the allegations that this breach was "in connection with" the purchase of securities.  The Wylys contend that their alleged misuse of inside information in violation of their fiduciary duties does not give rise to a claim under Section 10(b) because they did not themselves trade in any Sterling Software securities as a result of that breach, at least as the term "security" was defined in 1999.  *See* Wylys Mem. at 7-8.  This is so, they argue, because they used inside information to engage in a securities-based swap agreement, rather than to purchase Sterling Software stock directly.  *See id.*

28

Fortunately, Section 10(b), which prohibits its violation either "directly or indirectly," has never been interpreted in the unduly restrictive manner the Wylys propose. Regardless of whether the swap-agreement was itself a "security," the Complaint clearly alleges that the securities-based swap agreement provides a sufficient "connection" between the Wylys' breach of their fiduciary duties and Lehman Brothers' contemporaneous and integral purchases of common stock pursuant to the swap agreement. The Wylys' fraud was "in connection with" the purchase of securities because the swap agreement expressly *required* Lehman's purchase of Sterling Software common stock. (Compl. ¶85)

The "in connection with" element of Section 10(b) has been flexibly interpreted by the courts. In *SEC v. Zandford*, 535 U.S. 813 (2002), the Supreme Court held that, to satisfy the "in connection with" requirement, "[i]t is enough that the scheme to defraud and the sale of securities coincide." *Id.* at 822. The Court emphasized that the statute should be construed, "not technically and restrictively, but flexibly to effectuate its remedial purposes," and that Congress sought "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Id.* at 819 (citations omitted). Thus, in *Zanford*, the Supreme Court broadly applied the "in connection with" element in reversing the dismissal of a securities fraud complaint alleging that a broker engaged in a scheme to steal the proceeds in his customers' accounts, by, for example, writing checks to himself from his customers' mutual fund account "knowing that redeeming the check would require the sale of securities." *Id.* at 821. The Supreme Court rejected the contention that the securities sales were merely "incidental" to a fraud to steal the customers' assets. *Id.* at 817.

The Second Circuit recently reiterated that the "in connection with" element of a Section 10(b) claim "is met where a fraudulent scheme and a purchase or sale of securities 'coincide.'"

*Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010).  "The 'coincide' requirement is broad in scope," *id.* at 521, and has been interpreted by the circuit court to extend to conduct that merely "induce[s] securities transactions," *id.* at 522.  Similarly, in *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981), the Second Circuit "construed the phrase 'in connection with' flexibly to include deceptive practices 'touching' the sale of securities, a relationship which has been described as 'very tenuous indeed.'"  *Id.* at 18 (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1972)).  In short, the "in connection with" requirement extends the reach of Section 10(b) to "prohibi[t] an insider, who has a fiduciary duty to a corporate entity, from using material non-public information to the insider's advantage in order to make secret profits," regardless of whether the insider himself trades in a security.  *Franco*, 253 F. Supp. 2d at 726; *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc v. Dabit*, 547 U.S. 71, 85 (2006) (holding that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or someone else").[23]

Of course, a classic instance of a misuse of corporate information that is "in connection with" a purchase or sale of securities is when the fiduciary in possession of the confidential

---

[23] The Wylys' brief on this determinative issue is unsettling.  They cite none of the controlling Supreme Court or Second Circuit law, but only the district court opinion in *Caiola v. Citibank, N.A.*, 137 F. Supp. 2d 362 (S.D.N.Y. 2001).  Wylys Mem. at 8 n. 17.  They fail to mention, however, that the Second Circuit reversed or "rejected" the district court on almost every conclusion in the opinion.  *Caiola v. Citibank, N.A.*, 295 F.3d 312, 315, 323, 324, 325, 326, 328-29 (2d Cir. 2002).  No reported case appears to have cited the district court opinion since its reversal.

Moreover, *Caiola* is inapposite.  It does not deal with the "in connection with" element, but the requirement of "standing" for a private plaintiff to sue for damages:  "In order to have standing to sue for damages under Rule 10b-5, a plaintiff must be a purchaser or seller of securities." 137 F. Supp. 2d at 367-68.  The concept of standing is *inapplicable* to an enforcement action brought by a governmental agency like the SEC.  As the Second Circuit held in *Newman*: "When litigation under this Rule is instituted by the SEC under section 21 . . . the court's concern must be with the scope of the Rule, not plaintiff's standing to sue."  664 F.2d at 17; *accord SEC v. Gaspar*, No. 83 Civ. 3037, 1985 WL 521, at *16 (S.D.N.Y.  Apr. 16, 1985).

information himself purchases or sells securities.  *See O'Hagan*, 521 U.S. at 652 (explaining that

the "in connection with" element of a Section 10(b) claim is met when the fiduciary uses the

confidential information "to purchase or sell securities").  And that is the typical scenario in

which an insider trading claim arises.  But nothing about the language of Section 10(b) or the

case law interpreting that provision restricts an insider trading claim to those situations when the

person breaching the fiduciary duty himself trades in the securities at issue.  The plain language

of the statute requires only that the person breaching the duty of confidentiality do so "in

connection with" the purchase or sale of securities.  *See* 15 U.S.C. § 78j(b).  Thus, for example,

the courts have long recognized that one can be liable for tipping material non-public

information to an outsider who trades thereon even if the tipper himself never trades.  *See*, *e.g.*,

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d. Cir. 1974)

(holding non-trading defendant tippers liable for insider trading based on "their divulging of

confidential material inside information to their customers" who traded on the information);

*Gaspar*, 1985 WL 521, at *17.

   In *SEC v. Suterwalla*, No. 06-cv 1446 DMS (LSP), slip op. (S.D. Cal. Feb. 4, 2008) (copy

attached as Exhibit A hereto), the SEC alleged that a British citizen and former stockbroker

committed insider trading by placing "spread bets" with respect to the stock of a company while

in possession of nonpublic information.  A spread bet is a "derivative financial instrument . . .

that provides its purchaser with the right to profit from changes in the price of the underlying

security."  *Id.* at 2.  The SEC alleged that "[s]pread bet brokers typically hedge their exposure on

the spread bets they sell by purchasing the appropriate amount of underlying security, then

selling that security when the spread bet is sold."  *Id.* at 3.  The SEC further alleged that "because

Suterwalla was a stockbroker who used [to] sell spread bets . . . , he 'knew' that the brokers

would hedge his bets by buying a similar amount of the underlying Petco securities." *Id.* at 5.

The defendant in *Suterwalla* – like the Wylys here – moved to dismiss, contending that "a

'spread bet' is not a transaction that falls within the scope of the [Exchange Act] because it does

not fit the definition of either a 'security' or an 'investment contract.'" *Id.* at 4. The court

rejected this argument, holding that the "in connection element" was satisfied:

> The theory of the SEC's enforcement action is that Suterwalla's bets led to purchases of Petco Call Options to hedge those bets; therefore, Suterwalla's conduct was 'in connection with' the broker's purchase of a security on the American stock exchange. The Court gives weight to the SEC's reasonable interpretation of the transaction and the broad application of the securities statutes and rules to the allegations in the [complaint]. *SEC v. Zanford*, 535 U.S, 813, 819-20 (2002); *SEC v. R.G. Reynolds Enter., Inc.*, 952 F.2d 1125, 1132 n.7 (9th Cir. 1991) . . . .
>
> The Court holds that the [complaint] contains sufficient allegations to satisfy the "in connection with" requirement between Suterwalla's bet in England and the broker's purchase of Petco Call Options to hedge the bet. This is a flexible and broad concept to protect investors. *See Zanford*, 535 U.S. at 819 [quotation omitted]. The Ninth Circuit held that the "in connection with" requirement is met if the fraud alleged "somehow touches upon or has some nexus with any securities transaction[,]" [quoting *SEC v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993)].

*Suterwalla*, slip op. at 4-5.

Similarly in this case, facts sufficient to satisfy the flexible "in connection with" element

are clearly alleged. The Complaint alleges that the Wylys originally were to purchase "up to 4

million Sterling Software call options" (Compl. ¶78), but, on the recommendation of Schaufele,

they chose "a swap agreement as an alternative because it would be easier to unwind than call

options" (*id*). Sam Wyly had his son, a board member of Sterling Software, "negotiate[] the

terms of the transaction with Schaufele." (*Id.*) Charles Wyly agreed to participate for one-third

of the transaction." (*Id.*) As further alleged, "[t]he Wylys knew contemporaneously that

Lehman was hedging its side of the transaction by buying two million shares of Sterling Software common stock on the open market." (*Id.* ¶80) Indeed, "the transaction documents called for the Wyly offshore entities participating in the transaction to pay a fee of 6 cents per share. . . based on Lehman's hedging purchases of Sterling Software common stock." (*Id.*) These stock purchases by Lehman, in fact, accounted for as much as 83% of the daily trading volume in Sterling Software shares at the time. (*Id.* ¶83) And most telling of all, as "the Wylys knew contemporaneously, the average execution price of Lehman's market purchases of the 2 million Sterling Software shares established the 'notional price' for the swap agreement," which price was "used to determine the exact amount of upfront collateral the Wylys needed to have their Offshore System pay Lehman for the 2 million shares." (*Id.* ¶85)[24] A swap agreement like this one – which explicitly required the purchase of stock and even called for the Wylys' offshore entities to pay the transaction costs associated with those purchases – clearly "touches on" and "coincides" with the purchase or sale of securities so as to satisfy the "in connection with" requirement, regardless of whether the Wylys themselves purchased or sold the securities.

Moreover, the Wylys knew on a daily basis every detail of the stock purchases resulting from the swap agreement. As the Complaint alleges:

> During this period, the Wylys received daily spreadsheets, prepared by Lehman and provided to them through Schaufele via the Cayman Accountant or the Wyly Family CFO, disclosing: (i) how many shares Lehman had purchased, (ii) the shares' average execution price, (iii) the shares' percentage of Sterling Software's trading volume, (iv) the volume weighted average price ("VWAP") of the total shares traded, (v) the deviation of Lehman's purchases from the VWAP, (vi) the amount of upfront collateral the Wylys' Offshore System would need to provide for Lehman's purchases, (vii) the cumulative

---

[24] Lehman considered the swap agreement an insider trading risk. Lehman "required the Offshore Companies each to affirm that they did not possess any material, non-public information concerning Sterling Software," not knowing that "this transaction was, in fact, conceived and fully orchestrated by the Wylys themselves." (Compl. ¶87)

number of shares Lehman had purchased toward its hedge, and (viii) the remaining number of shares Lehman still needed to purchase to complete its hedge.

*(Id.* ¶81)  Further, on one such daily spreadsheet, Sam Wyly's son handwrote a note to his father that it "looks like [Lehman] is doing a great job buying a big % of the volume without moving the price."  (*Id.)*

Read in the light most favorable to the SEC, the Complaint alleges that the Wylys entered into a swap agreement knowing that trading in Sterling Software stock would and, in fact, did necessarily take place as a result of the transaction.  Stated another way, this swap transaction not only touched, coincided with, and induced stock trading, but actually went so far as to require it.  Such allegations are squarely within the scope of Section 10(b)'s flexible "in connection with" requirement.  *See*, *e.g.*, *Zandford*, 535 U.S. at 821 (defendant wrote checks to himself on customers' account "knowing that redeeming the check would require the sale of securities");  *Suterwalla*, slip op.  at 5 (defendant who was alleged to engage in insider trading by entering into spread bets "'knew' that the brokers would hedge his bets by buying a similar amount of the underlying Petco securities").  The Wylys' motion to dismiss the insider training claim because they did not themselves trade in Sterling Software stock is premised on an unduly restrictive reading of Section 10(b) that is inconsistent with the courts' expansive interpretation of the "in connection with" requirement and, accordingly, should be denied.

### ii.  The particular swap agreements at issue here satisfy the definition of "securities" at the time of the swap transaction.

While this Court need not reach the issue of whether the Wylys' swap was a "security" at the time of the swap transaction, the Second Circuit has made clear that, in determining whether a particular instrument is a security, "the emphasis should be on economic reality."  *Caiola*, 295 F.3d at 325 (quoting *United Hous. Found. v. Forman*, 421 U.S. 837, 848 (1975)).  "The

definition of security is construed in a 'flexible' manner, so as to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946)).  Accordingly, it is well settled that the determination of what is a "security" is a fact-intensive inquiry "not appropriately resolved on a motion to dismiss."  *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 596-97 & nn. 121, 122 (S.D.N.Y. 2005) (finding that defendants' argument that a Digital Option contract is a security had "some plausibility," but "ultimately turn[ed] on . . . issues of fact"); *SEC v. Rorech*, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009) (same; denying motion for judgment on the pleadings).

Here, the "economic reality" of the swap transaction shows that the Wylys' swap agreement was a "security," even as that term was statutorily defined at the time of the events at issue in 1999.  The transaction was intended and designed "to economically replicate" the purchase of securities.  (Compl. ¶77)  In fact, the Wylys originally intended to purchase call options, but, on Schaufele's recommendation, entered into the swap only because it would be "easier to unwind."  (*Id.* ¶78)  The average execution price of Lehman's market purchases of the 2 million shares established the "notional price" for the swap agreement.  (*Id.* ¶¶85, 91)  The swap agreement transaction documents required the Wylys' offshore entities to pay a fee of 6 cents per share on Lehman's hedging share purchases.  (*Id.* ¶80)  Lehman treated the transaction as an insider trading risk, requiring the offshore entities to affirm that they did not possess material nonpublic information about Sterling Software, not knowing that it was the Wylys who were in fact behind the transaction.  (*Id.* ¶87)  Ultimately, the Wylys swap agreement proved to be a more insidious insider trading vehicle, allowing the Wylys to do indirectly what they did not wish to do directly, so as to better conceal their actions.

The Wylys' claim that the swap agreement was not a security as a matter of law is misguided, eschewing the controlling Second Circuit and Supreme Court law for the rejected district court opinion in *Caiola*.  Wylys Mem. at 7-8 n. 13, 16.  In *Caiola*, the district court held that various synthetic transactions at issue were not securities, relying principally on *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270 (S.D. Ohio 1996).  *See Caiola*, 137 F. Supp. 2d at 369.  In reversing, the Second Circuit found the district court's reliance on *Procter & Gamble* improper.  *Caiola*, 295 F.3d at 326.  The Second Circuit, though not reaching the issue of equity swaps, noted that the *Procter & Gamble* court expressly limited its ruling to the particular swaps in that case (linked to Treasury notes) and stated that other "derivative instruments, because of their structure, *may be* securities."  *Id.* at 326 n.6 (quoting *Procter & Gamble*, 925 F. Supp. at 1283) (emphasis added).  Further, the Second Circuit held that *Procter & Gamble's* interpretation of the definition of "security" in the Exchange Act was "incorrect," and "declined to follow [*Procter & Gamble's*] lead."  *Caiola*, 295 F.3d at 326.[25]

Likewise misguided is the Wylys' claim that the swap agreement was not a "security" because the Commodity Futures Modernization Act of 2000 ("CFMA")[26] later expressly provided that security-based swaps were covered by Section 10(b), while excluding them from the definition of a "security."  Wylys Mem. at 7-8.  The CFMA does not contain any provision establishing that securities-based swap agreements were not considered securities prior to 2000.

---

[25] Notably, besides *Caiola*, the only other cases the Wylys cite are *Procter & Gamble* and another district court opinion, decided before the Second Circuit's reversal in *Caiola*, which simply follows *Procter & Gamble* on interest-rate swaps.  Wyly Mem. at 7 n. 7 (citing *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001)).

[26] In December 2000, Congress enacted the CFMA, Pub. L. No. 106-554, 114 Stat. 2763 (2000), which amended Section 10(b) to cover expressly "any security-based swap agreement," while defining "swap agreements" and excluding them from the statutory definition of a "security."  CFMA §§ 301, 302, 303.

In fact, prior to the CFMA, depending on the circumstances, the SEC considered certain swaps and other synthetic securities to be covered by Section 10(b).[27]

### b.   The information in the Wylys' possession was material.

The Wylys also argue that the Second Claim must be dismissed because, at the time they engaged in the swap agreement, the information in their possession was not "material . . . as a matter of law."  Wylys Mem. at 9.  This argument too must fail.

The Wylys face a high hurdle in moving to dismiss the Complaint, arguing that the nonpublic information they possessed was immaterial as a matter of law.  This Court has noted that "the materiality question is not often amenable to disposition as a matter of law."  *Collins & Aikman*, 524 F. Supp. 2d 488.  The Second Circuit has similarly observed that materiality is only rarely an appropriate basis on which to dismiss a complaint:

> We have held that, when presented with a Rule 12(b)(6) motion, a "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

---

[27] *See, e.g., In the Matter of Gary S. Missner*, Release Nos., 33-7304, 34-37301, 1996 WL 316296 at *4 nn. 4, 5 (June 11, 1996) ("the Commission disagrees with the Court's analysis [in *Procter & Gamble*] and reiterates its position that the Treasury-Linked Swap is a security within the meaning of the federal securities laws"); *In the Matter of BT Securities Corp.*, Release Nos. 33-7124, 34-35136, 1994 WL 710743, at *4-5, 7 (Dec. 22, 1994) ("the Treasury-Linked Swap, the Knock-Out Call Option, and the amendments to these derivatives were securities under the federal securities laws").

The Wylys' citation to the statement in *SEC v. Rorech*, 720 F. Supp. 2d 367, 406 (S.D.N.Y. 2010), that the CFMA "extended section 10(b) and Rule 10b-5's anti-fraud rules to 'security-based swap agreement[s]'" is unhelpful.  Wylys Mem. at 8 n.15.  The *Rorech* court was not presented with and did not decide the issue whether a swap was generally considered a "security" prior to the CFMA, let alone a swap with the characteristics of the one here.

Information is material "'[i]f there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'"  *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).  "To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available."  *Id.* at 52.  As the Second Circuit explained:

> Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (*in banc*).  They include any fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities" *Id.* at 849 (quoting *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965)).

*Mayhew*, 121 F.3d at 52 (emphasis in original).

In general, "[t]he materiality of information regarding a merger will often depend upon 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'"  *SEC v. Drescher*, No. 99 CIV. 1418, 1999 WL 946864, at *5 (S.D.N.Y. Oct. 19, 1999) (quoting *Mayhew*, 121 F.3d at 52 (*quoting Basic*, 485 U.S. at 250)).  However, this general proposition is hardly a rigid formula.  "In the context of a merger, where information can be speculative and tenuous, the materiality standard may be difficult to apply."  *Mayhew*, 121 F.3d at 52.  A determination of materiality is a fact-specific inquiry "and thus is to be determined on a case-by-case basis." *Basic*, 485 U.S. at 224; *see also SEC v. Geon Indus., Inc.*, 531 F.2d 39, 47 (2d Cir. 1976) ("there is 'no specific rule as to when information respecting a merger becomes material,' but . . . each case must be approached on its own facts" (quoting *SEC v. Shapiro*, 494 F.2d 1301, 1306 (2d Cir. 1974))).  "Moreover, because a merger is one of the most important events that can occur for

a small company, information regarding a merger 'can become material at an earlier stage than would be the case as regards lesser transactions.'"  *Mayhew*, 121 F.3d at 52 (quoting *Geon Indus.*, 531 F.2d at 47); *accord Gaspar*, 1985 WL 521, at *14-15..

Courts use a number of factors to evaluate materiality, not only for mergers, but in other contexts as well.  "Information coming from an insider takes on special importance."  *Drescher*, 1999 WL 946864, at *5 (citing *Mayhew*, 121 F.3d at 52 ("where information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information'")).  Further, "a major factor in determining whether information was material is the importance attached to it by those who knew about it."  *Mayhew*, 121 F.3d at 52; *Drescher*, 1999 WL 946864, at *5 (quoting *Mayhew*); *accord Geon Indus.*, 531 F.2d at 48 ("Rauch and Alpert demonstrated the importance they attached to the information by purchasing shares in mid-October"); *Shapiro*, 494 F.2d at 1307 (in assessing the materiality of information where defendants purchased "substantial amounts of [company] stock" after learning a company director responded favorably to merger proposal at a luncheon, the court stated:  "[W]e need not merely speculate as to how a reasonable investor might have received this information.  The behavior of appellant, his partner Shapiro, and others who knew of the merger, all of whom were sophisticated investors, demonstrates empirically that the information was material").

The controlling standards for pleading materiality are clearly satisfied here.  As alleged, "in June 1999 . . . Sam Wyly personally decided that both Sterling Software and Sterling Commerce should be sold to external buyers" and that, as part of this plan, "the sale of Sterling Commerce should proceed first."  (*Id.* ¶89)  Thereafter, Charles Wyly "agreed" on both points.  (*Id.*)  As noted above, the sale of a company is "one of the most important events that can occur" for a company.  *Mayhew*, 121 F.3d at 52.  Further, the Wylys were both insiders, and

"[i]nformation coming from an insider takes on special importance." *Drescher*, 1999 WL 946864, at \*5.  Nor were the Wylys just any insiders.  The Wylys, who served as Chairman and Vice Chairman of the board, could be confident they could effectuate the planned sale, "given that they comprised two-thirds of Sterling Software's executive committee and, along with other family members and French, comprised half of Sterling Software's board of directors."  (Compl. ¶90)

By late September 1999, when the Wylys first inquired of Lehman about an offshore purchase of Sterling Software call options, the plan to sell both Sterling entities was "already underway."  (*Id.*)  Sterling Commerce, which was to be sold first, "had by that time already retained Goldman Sachs as its advisor and Goldman had already compiled a list of potential acquirers."  (*Id.*)  Further, during the period from October 8 through October 29 – when the Wylys received daily reports about Lehman's purchases of the Sterling Software stock pursuant to the Wylys swap agreement – important steps in the plan continued to occur, particularly in the sale of Sterling Software to its ultimate acquirer, Computer Associates ("CA").  On October 18, 1999, eleven days before Lehman's stock trading pursuant to the swap agreement was complete, "Morgan Stanley furnished Sam Wyly with an analysis, which it entitled, 'Operation Windfall,' specifically identifying [CA] as a potential acquirer of Sterling Software."  (*Id.* ¶91)  In "mid-October 1999," a meeting between Sam Wyly and Morgan Stanley investment bankers representing CA was proposed.  (*Id.* ¶94)  This meeting occurred only a few weeks later in Sam Wyly's office, ultimately leading to the announcement that CA was acquiring Sterling Software within a few months.  (*Id.* ¶94)  In other words, the information on which the Wylys traded was no speculative transaction—it happened as planned.

Furthermore, the Wylys themselves demonstrated the importance they attached to the information by acting upon it in short order.  They engaged in a "massive and bullish" transaction in Sterling Software stock "based upon the material and non-public information." (*Id.* ¶¶6, 77)  They had their Offshore System enter into "a security-based swap agreement with Lehman that economically replicated the purchase of two million shares of Sterling Software for approximately $20.36 per share."  (*Id.* ¶77)  This transaction was unique.  The Wylys had "never used their Offshore System to engage in such a massive, bullish transaction in any Issuer Security."  (*Id.* ¶88)  As the Wylys knew, the resulting purchases of Sterling Software stock by Lehman were done quickly, over just 15 trading days, and accounted for a substantial portion of the trading volume.  (*Id.* ¶¶83-84)  Given the importance that the Wylys, as investors, attached to this information, it is hard for them now to protest at the motion to dismiss stage that no reasonable investor could have found it material.  *See Mayhew*, 121 F.3d at 52 ("major factor" in determining materiality of information is "the importance attached to it by those who knew about it"); *Geon Indus.*, 531 F.2d at 48 (individuals "demonstrated the importance they attached to the information by purchasing shares").[28]

In this case, there is an additional circumstance enhancing the significance of the undisclosed facts and thus its materiality.  The Wylys' swap agreement was required to be disclosed in a public Form 4 filing with the Commission, but it, like all the Wylys' other offshore transactions in Issuer Securities, structured and otherwise, was not disclosed.  (*See* Compl. ¶5) *See also* "Ownership Reports and Trading by Officers, Directors and Principal Security

---

[28] Even case law the Wylys cite, Wylys Mem. at 12 n. 24, recognizes the importance of a defendant's trading in evaluating the materiality of the information.  *Hartford Fire Ins. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 987 (S.D.N.Y. 1989) ("The relevance of insider trading for assessing information's significance to a reasonable investor is *self-evident*." (emphasis added)).

Holders," Rel. Nos. 34-37260; 35-26524; IC-21997; 1996 SEC LEXIS 1369 (May 31, 1996) at *73 ("The Commission reiterates that Section 16 consequences arise from an equity swap transaction where either party to the transaction is a Section 16 insider with respect to a security to which the swap agreement relates").  The potential materiality of information about the trading of insiders has been recognized from the very beginnings of the modern financial reporting system in the 1930s.  *See* H.R. Rep. No. 73-1383, at 24 (1934), *reprinted in* 2 Federal Securities Laws:  Legislative History 1933-1982 at 817 (Federal Bar Association, Securities Law Committee, BNA 1989) (The purpose of requiring insider-transaction reporting "is to give investors an idea of the purchases and sales by insiders which may in turn indicate their private opinion as to prospects of the company.")

In recognition of the reality that "[m]aterial facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities," *Mayhew*, 121 F.3d at 52 (citations omitted), and that trading by insiders falls in this category, the financial press and market participants follow the Section 16 reporting of high-level corporate insiders to help inform investment decisions.  Here, had the Wylys' secret offshore swap been reported as required, it would have alerted the marketplace to a "large, rapid aggregation or accumulation of securities" for the benefit of Sterling Software's very highest-level insiders – information the securities laws recognize "might represent a potential shift in corporate control."  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (2d Cir. 1978) (discussing rationale for related Section 13(d) disclosure requirements) (internal quotations omitted).  And a change in control was the very event the Wylys planned.

Nevertheless, the Wylys argue that the information here was not material because it "had not yet ripened into relevant corporate activity."  Wylys Mem. at 9.  This argument should be

rejected as a matter of law and policy.  First the Wylys propose a bright-line rule that a corporate

merger or sale cannot be material as a matter of law absent "any decision by [the company] (such

as a Board resolution)" or "any decision by [the company] (such as retention of investment

bankers)."  *Id.*  But the Supreme Court in *Basic* expressly rejected such bright-line rules,

emphasizing that materiality is intensely fact-specific and must "be determined on a case-by-case

basis."  485 U.S. at 224; *accord Geon Indus.*, 531 F.2d at 47 (holding that "there is no specific

rule as to when information respecting a merger becomes material").  Furthermore, were the

Wylys' bright-line rule approach accepted, this Court would in effect be giving controlling

corporate insiders a free shot at insider trading through the simple expedient of delaying a board

resolution or the retention of investment bankers until moments after their trading.  Surely this

cannot be and should not be the law.[29]

---

[29] The Wylys rely on the 1965 decision of the Second Circuit in *List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir. 1965), involving a private suit by an investor for damages.  *See id.* at 459, 464.  *List* does not concern a motion to dismiss, but review of a judgment after trial.  Thus, the Wylys claim that "[t]he Second Circuit affirmed the district court's conclusion that the company's decision to pursue a merger was immaterial *as a matter of law*," Wylys Mem. at 12 (emphasis added), is misguided.  Rather, the Second Circuit found that the trial court's conclusion "was not clearly erroneous."  *List*, 340 F.2d at 464.  Further, in *List*, the trial court also found that the director who purchased plaintiff's stock later "disposed of part or all of his interest in 3137 of his 4300 shares at an average profit of only about $1 per share," *id.*, and "concluded that plaintiff would have sold his stock even if he had known that [the director] . . . was one of the buyers."  *Id.*

Three other cases the Wylys cite – *L.L. Capital Partners v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174 (S.D.N.Y. 1996) (failure to disclose risks in registration statement); *Hartford Fire Ins.*, 723 F. Supp. at 981-83, 987 (failure to disclose risks in prospectus associated with notes); and *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1121, 1128 (D. Del. 1988) (affirmative misstatements and omissions about termination of relationship with Perot and EDS) – do not involve a claim for insider trading.  Wylys Mem. at 12, n. 24.  The remaining cases cited by the Wylys, Wylys Mem. at 12 nn. 24, 25, are factually inapposite.  *E.g.*, *Panfil v. ACC Corp.*, 768 F. Supp. 54, 55, 58 (W.D.N.Y. 1991) (private plaintiff, who sold his stock in company buy-back plan and was suing for damages, now only claims that defendants "intended to pursue" a merger "without more," having changed his story from the original complaint); *Rich v. Shrader*, No. 09-CV-0652-MMA, 2010 WL 3717373, at *1-3 (S.D. Cal.

In sum, while the Wylys profited handsomely from the secret trading on undisclosed information they knew as insiders, other shareholders who sold as the counterparties to the Lehman trades under the Wylys' swap agreement lost out in a correspondingly significant amount. Had these investors known this information, it "may [have] affect[ed] the[ir] desire . . . to buy, sell, or hold the company's securities." *Mayhew*, 121 F.3d at 52. It certainly caused the Wylys to act. It could hardly be said on this motion to dismiss that the undisclosed facts were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162.

### 2. The Complaint alleges a viable insider trading claim arising from Schaufele's trading in Sterling Software stock in his wife's brokerage accounts.

The Second Claim of the Complaint also alleges an insider trading claim against Schaufele based on his own trading in Sterling Software stock in the brokerage accounts of his wife. Schaufele moves to dismiss this claim, arguing (a) that the nonpublic information in his possession and on which he traded was not material, and (b) that he did not engage in "deception" in trading thereon. [30] Schaufele Mem. at 14. Each argument is without merit.

Schaufele – who for fifteen years had been the Wylys' stockbroker for practically all of their domestic and offshore accounts, who knew the Wylys were corporate insiders of Sterling

---

Sept. 17, 2010) (plaintiff's 531-paragraph complaint was "rambling speculation" that his former partners "cheated him out of a fortune").

[30] Schaufele states that there are three elements the SEC must plead to allege an insider trading claim under the misappropriation theory against him: (1) "that 'the information at issue must be material and nonpublic;'" (2) "that Mr. Schaufele breached a duty of confidentiality in using the information;" and (3) "that he acted with scienter." Schaufele Mem. at 13 (citing *Rorech*, 720 F. Supp. 2d at 409). He then adds another element, "deception through nondisclosure," which he claims comes from *O'Hagan*, 521 U.S. at 649. Schaufele does not challenge scienter with respect to the direct insider trading claim against him, but only the purported claim for aiding and abetting the Wylys' insider trading. Schaufele Mem. at 13. As noted above, the Commission makes no such claim here. *See supra* at note 23.

Software, and who, as alleged, was the Wylys aider and abettor in concealing their stockholdings and transactions through an elaborate web of offshore accounts – learned in late September 1999, that the Wylys wanted to purchase calls for 4 million shares of Sterling Software's stock through Lehman.  During the week after he was contacted, Schaufele provided pricing information, recommended an alternative structure for the transaction, and personally negotiated the deal through Sam Wyly's son.  (Compl. ¶¶18, 28, 78-79, 111-116)

In Schaufele's fifteen years of service for the Wylys, they had never done such a massive, bullish transaction – one which as alleged made no economic sense unless the price of the shares would increase substantially.  While his talks with the Wylys concerning the transaction's terms were well underway, Schaufele purchased 4,000 shares of Sterling Software stock at the then price of $20.359 — not in his own account, but spread out in four different accounts in his wife's name.  He did so violating numerous Lehman policies concerning insider trading, confidential information, conflicts of interest, and misappropriation of firm property.  When Sterling Software was sold a few months later and the stock closed at $36.25, Schaufele's imputed profits on the purchases were $63,564.  (Compl. ¶¶86, 88, 96-100)

    a.    **Schaufele had material non-public information.**

Schaufele traded on the material nonpublic information that insiders at the very highest echelon of Sterling Software—his clients, the Wylys—were engaging in a Sterling Software stock transaction that would be massive, bullish, and unique in the history of their trading.  A bullish investment interest in *four million* shares was what they sought, or, failing that, the maximum that Schaufele's firm would allow.  They had selected their Offshore System as the vehicle for the transaction, which meant, as Schaufele knew, that the transaction would be effected clandestinely, that is, the Wylys' role would be concealed.

To call this information that "may affect the desire of investors to buy, sell, or hold the company's securities," *Mayhew*, 121 F.3d at 52, would be to put it mildly.  "[I]information coming from an insider takes on special importance."  *Drescher*, 1999 WL 946864, at *5 (citing *Mayhew*, 121 F.3d at 52).  This information came from the highest, most powerful insiders in the company.  Most telling is that Schaufele himself demonstrated quite clearly the importance he placed on it by acting immediately to buy the stock.  Schaufele was prohibited by at least four Lehman policies from trading on this information (*id.* ¶98), yet he still did so.  Under controlling Second Circuit law, Schaufele's immediate action in purchasing the stock is "a major factor in determining whether [the] information was material." *See, e.g.*, *Mayhew*, 121 F.3d at 52; *Shapiro*, 494 F.2d at 1307; *Geon Indus.*, 531 F.2d at 48; *Drescher*, 1999 WL 946864, at *5.

Further, Section 16 reporting obligations, as noted above, are rooted in the recognition that transactions in a company's securities by its own insiders can be material.  There can be little doubt that a public disclosure of the transaction that the Wylys were negotiating with Schaufele would, at the very least, have been viewed by the market as reflecting a highly favorable outlook on Sterling Software by its very top insiders, and thus as a significant bullish sign.  It would also have been reasonable for a shareholder knowing this information to conclude that the Wylys were planning a significant favorable corporate event, or that it "might represent a potential shift in corporate control."  *See Savoy Indus.*, 587 F.2d at 1167.   But it was only Schaufele - - not other Sterling Software shareholders - - who was solely and unfairly privy to this information in making his immediate investment decision in Sterling Software stock.

Schaufele contends that his having traded on October 1st, before the Wylys' transaction was finalized, renders the information on which he traded immaterial as a matter of law.  Schaufele Mem. at 14-15.  Schaufele's own actions in immediately trading on the information he

46

knew belies this contention.  Further, Schaufele overlooks the fact that the *pendency* of talks is routinely the context in which persons found liable for insider trading committed their offending trades or tips, *see, e.g., Mayhew, supra*.   Without stating so explicitly, Schaufele also asks the Court to find as a fact that key details of the swap transaction relevant to materiality alleged in the Complaint did not emerge, and could not have emerged, until some unspecified time *after* October 1st.  That is not what the Complaint in fact alleges, and Schaufele also disregards the reasonable inferences to which the Commission's allegations are entitled on a motion to dismiss – particularly where, as here, only Schaufele and the Wylys know what was said between them.[31]

By October 1st, Schaufele was at least three days into his discussions, by which time, it may be reasonably inferred that the Wylys' bullish determination, as well as their  highly material terms concerning the transaction's sizing and date parameters, had become known to him.  The Complaint alleges the Wylys had at the very outset of the discussions – at least three days before October 1st – asked for pricing on call options for *four million* Sterling Software shares.  (Compl, ¶78)  Although the Complaint alleges that the transaction under discussion had, also before October 1st, become an equity swap (*id*.), it also alleges that the Wylys ultimately obtained a swap that was sized as largely as Lehman would allow, and that they vigorously sought to size still larger (*id.* ¶79).

---

[31] Contrary to Schaufele's contention, Schaufele Mem. at 15, this is not the case of a "speculative" and "contingent" transaction which could not take place "until enabling legislation was enacted both in North Carolina and South Carolina," as in *Taylor v. First Union Corp.*, 857 F.2d 240, 244 (4th Cir. 1988), or a private plaintiff suing for damages who now only alleges that defendants "intended to pursue" a merger "without more," having significantly "retreated" from his story in the original complaint, as in *Panfil v. ACC Corp.*, 768 F. Supp. 54, 55, 58 (W.D.N.Y. 1991).

The timing features of the equity swap are equally significant.  The transaction had an 18-month term, but was structured so as to be exercisable, or capable of being unwound, beginning immediately after closing.  (*Id.* ¶79)   The SEC's allegations furnish strong ground to infer that Schaufele knew, by October 1st, that the Wylys desired just such a time horizon for their massive, bullish transaction, that is, exercisable as soon as immediately and as late as 18 months out.  That is because Schaufele had, before the 1st, "suggested the swap … because it would be easier to unwind" (*id.* ¶78) and because Schaufele had, at the outset, been given an outer range of 12 to 24 months by the Wylys. (*Id.*)   That Schaufele elected to trade in Sterling Software common stock is significant - - the stock, unlike listed options, positioned him to profit whether what the Wylys expected to occur was announced later that same month or 18 months out.

Schaufele claims that there was other "bullish news" in the market, such as the company's five million share buy-back program and news that the stock was "vastly undervalued."  Schaufele Mem. at 18.  Schaufele argues that the Wylys' transaction was "wholly consistent with the publicly-available information and adds nothing material to that mix."  *Id.* Schaufele invites precisely the type of factual weighing and analysis inappropriate for the Court to conduct on a motion to dismiss. [32]   That Schaufele presents another view or inference on the issue of materiality is unhelpful.  On a motion to dismiss, "all reasonable inferences must be drawn in favor of the moving party."  *Drescher*, 1999 WL 946856 at *2.  Further, there was nothing to alert the marketplace that the Wylys were *secretly* increasing their stake in the

---

[32] *Cf. SEC v. Mozillo*, No. CV 09-3994-JFW, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010) (rejecting defendants' "total mix" argument on summary judgment motion, noting that such factual issues can "rarely" be decided on such a motion; court further stated:  "in an SEC enforcement action, omissions by corporate insiders are not rendered immaterial as a matter of law simply because the omitted facts were available to the public elsewhere," and "a reasonable investor is not required to . . . 'connect the dots' in a company's various SEC filings").

company by engaging in a massive transaction through their offshore entities.[33]  That is not, as

Schaufele suggests, "an event that is 'fairly obvious' to every market participant."  *S.E.C. v.

Rorech*, 720 F. Supp. 2d 367, 410 (S.D.N.Y. 2010).  Schaufele Mem. at 18.  It can hardly be said

– as it must in order to dismiss the instant insider trading claim – that the information Schaufele

had was "so obviously unimportant to a reasonable investor that reasonable minds could not

differ on the question of [its] importance."  *Ganino*, 228 F.3d at 162.[34]

  **b. Schaufele's conduct was deceptive.**

  Schaufele's additional argument that his conduct was not "deceptive," Schaufele Mem. at

19-20, is both odd and misguided.  Schaufele claims that he did not engage in deception because

Lehman Brothers was aware of all trading in his wife's accounts as well as his own.  *Id.*  Of

course, these are Schaufele's allegations, not the allegations of the SEC.  What the Commission

has alleged is that "Lehman was unaware of what Schaufele well knew, namely, that [the swap]

transaction was, in fact, conceived and fully orchestrated by the Wylys themselves."  (Compl.

¶87)  Similarly, the SEC alleges that Schaufele "concela[ed] from and affirmatively

misrepresent[ed] to [Lehman] the Wylys' control over the Issuer securities held in their Offshore

System" (*Id.* ¶9).  Accepting these allegations as true for purposes of the motion to dismiss, the

Complaint suffices to allege deception.

---

[33] Schaufele's suggestion that he was able to compartmentalize and disregard this material nonpublic information when trading invites skepticism.  *See United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993) ("Unlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain.").

[34] *See also SEC v. Cuban*, 620 F.3d 551, 558 (5th Cir. 2010) (vacating dismissal of insider trading claim and remanding; "Given the paucity of jurisprudence on the question of what constitutes a relationship of 'trust and confidence' and the inherently fact-bound nature of determining whether such a duty exists, we decline to first determine or place our thumb on the scale in the district court's determination of its presence or to now draw the contours of any liability that it might bring. . . .").

What is more, Schaufele's argument misses the point.  Even assuming that Lehman was aware that Schaufele had engaged in stock trades, Lehman was not aware that Schaufele was trading on inside information.  The swap agreement that Lehman arranged was with the Offshore System, not the Wylys, and Schaufele had lied to his employer about the Wylys' connection with the Offshore System.  (Compl. ¶113)  Thus, Lehman was deceived regarding the relevant facts. *See O'Hagan*, 521 U.S. at 655.

## F.  There Is No Basis To Dismiss Any Part of the Complaint on Statute of Limitations Grounds.

Finally, Defendants each move to dismiss all of the Complaint's claims for monetary penalties, arguing that they are barred by the applicable statutes of limitations.  *See* Wylys Mem. at 13-21; Schaufele Mem. at 20-24; French Mem. at 6-13.  Schaufele goes further, arguing that the statute of limitations also precludes the SEC from seeking injunctive relief against him.  Schaufele Mem. at 22-23.  In fact, however, the Commission's Complaint was timely filed, as evidenced by the unchallenged facts and the governing law.

The relevant facts for assessing the statute of limitations arguments made here are as follows:

(1)       The Complaint in this action was filed on July 29, 2010, covering activites dating back to as early as 1992.

(2)       Each defendant signed a tolling agreement (the Wylys in 2006, French and Schaufele in 2009) that was still in effect as of July 29, 2010.  (Compl. ¶117)

(3)       The earliest date that the SEC was even on inquiry notice about these matters was November 16, 2004, when Bank of America reported to staff members of the SEC's Division of Enforcement that the bank had developed suspicions about the beneficial ownership of numerous Isle of Man entities.  (*Id.* ¶118)

(4)     The insider trading defendants (the Wylys and Schaufele) used accounts in the Offshore System or in a relative's name to conduct the insider trading schemes identified in the Complaint.  (*Id.* ¶¶77, 85, 86, 97)

Together, these core facts, accepted as true at the pleading stage, are sufficient under the settled law discussed below to establish that the Commission filed this action within the applicable statute of limitations.

### 1.  The Discovery Rule Applies to the Commission's Claims.

As noted above, Defendants' primary argument is that both the general civil penalty statute and the insider trading penalty statute bar SEC enforcement actions seeking any penalty with respect to conduct that was more than five years in the past at the time the Complaint was filed.  Wylys Mem. at 13-21; French Mem. at 6-13; Schaufele Mem. at 20-23.  This argument is refuted by an uninterrupted line of Supreme Court cases concerning the "discovery rule" that run from early in the nineteenth century through a new case decided just this summer.  None of Defendants' briefs cite to a single one of these controlling precedents, let alone attempt to distinguish them.  Those cases make clear that Defendants' arguments are without merit.

In the absence of a specially-applicable statute of limitations, the general statute of limitations provision found in 28 U.S.C. § 2462 governs a federal cause of action.  Section 2462 provides that:

> Except as otherwise provided by Act of Congress, an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.  This provision governs all but the Second Claim in this case.  With regard to the Second Claim, which alleges insider trading, the specialized statute of limitations in Section

21A of the Exchange Act applies and provides that "[n]o action may be brought under this section more than 5 years after the date of the purchase or sale."  15 U.S.C. § 78u-1(d)(5).

The five year statutes of limitations in both Section 2462 and Section 21A are, however, both subject to a "discovery rule" that "delays accrual of a cause of action until the plaintiff has 'discovered' it."  *Merck & Co. v. Reynolds*, 130 S.Ct. 1784, 1793 (2010).  The Supreme Court repeatedly has held that the "discovery rule" governs when a claim accrues for statute of limitations purposes in cases involving fraud or concealment.  *See id.* at 1793-94; *TRW, Inc. v. Andrews*, 534 U.S. 19 (2001); *Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946); *Exploration Co. v. United States*, 247 U.S. 435, 447 (1918); *Bailey v. Glover*, 88 U.S. 342, 347-48 (1874); *Sherwood v. Sutton*, 5 Mason 143, 21 Fed. Cas. 1303, 1305 (D.N.H. 1828).  The decision most frequently cited for this proposition is *Holmberg*, *supra*.  There, Justice Frankfurter, writing for a unanimous Court, stated unequivocally that, in the case of a fraud claim, the Court had "long ago" adopted the equitable principle that "the bar of the statute [of limitations] does not begin to run until the fraud is discovered."  *Holmberg*, 327 U.S. at 397.  And this is so, the Court explained, even "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."  *Id.*  Most important to the case at bar, the *Holmberg* Court ended by stating that "[t]his equitable doctrine is read into every federal statute of limitation."  *Id.*

The Supreme Court re-examined the "discovery rule" in 2001, and again re-affirmed the core holding of *Holmberg*, namely that "equity tolls the statute of limitations in cases of fraud or concealment."  *TRW, Inc.*, 534 U.S. at 27.  However, the Court made clear that the *Holmberg* rule applies only "in cases of fraud or concealment; it does not establish a general presumption across all contexts."  *Id.*  In an even more recent decision, handed down just this year, the

Supreme Court again discussed the discovery rule and its supporting public policies.  In *Merck & Co. v. Reynolds*, *supra*, which involved a private securities class action, the Court applied the discovery rule, stating:

> The [discovery] rule arose in fraud cases as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a complete and present cause of action.  This Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded.  Otherwise, the law which was designed to prevent fraud could become the means by which it is made successful and secure.

130 S.Ct. at 1793 (citations and quotations omitted).

The Second Circuit has not yet had occasion to address the applicability of the discovery rule to SEC enforcement actions alleging fraud claims.  Indeed, the Seventh Circuit is the only Court of Appeals to address squarely the applicability of the *Holmberg* discovery rule to Section 2462 in the context of an SEC enforcement action.  In *SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009), the Seventh Circuit held:

> A victim of fraud has the full time from the date that the wrong came to light, or would have . . . had diligence been employed.  And the United States is entitled to the benefit of this rule even when it sues to enforce laws that protect the citizenry from fraud, but is not itself a victim. *Exploration Co. v. United States*, 247 U.S. 435, 38 S. Ct. 571, 62 L. Ed. 1200 (1918).

557 F.3d at 739.

Despite this unbroken line of Supreme Court and circuit court cases holding that the discovery rule applies to fraud claims, two lone district court cases in this circuit erroneously have held otherwise.  *SEC v. Gabelli*, No. 08 CV. 3868, 2010 WL 1253603 (S.D.N.Y. Mar. 17, 2010); *SEC v. Jones*, No. 05 Civ. 7044, 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006). Defendants cite the *Gabelli* decision repeatedly.  *See* Wylys Mem. at 15-19; French Mem. at 6-14.  In *Gabelli*, which is currently on appeal to the Second Circuit, the district court held, without

*any* analysis, that "the discovery rule does not apply to § 2462." 2010 WL 1253603, at *5. In support of this holding, the *Gabelli* court simply cited the decision in *3M Company v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994). 2010 WL 1253603, at *5. The *Jones* court similarly cited the *3M* decision. 2006 WL 1084276, at *6. But the *3M* decision is obviously inapposite as it was *not* an action for fraud. *See 3M*, 17 F.3d at 1454-55 (explaining that the EPA's action was for regulatory violations of the Toxic Substances Control Act). Indeed, in a footnote in that decision, the D.C. Circuit specifically noted that the EPA could not make a fraudulent concealment claim on the facts of that case, and admitted that such a showing in another case could invoke the discovery rule in *Holmberg*. *See id.* at 1461 n.15.

Recognizing the unique applicability of the discovery rule to claims for fraud, numerous district courts have rejected the incorrect application of *3M* to fraud cases, and have thus rejected the conclusion of *Gabelli*. For example, in the recently decided case of *SEC v. Kearns*, Civil No. 09-3599, 2010 WL 715467 (D.N.J. Feb. 23, 2010), the court, citing *Koenig*, held that "claims bound by the limitations period in § 2462 but sounding in fraud are equitably tolled until the date of discovery, so long as the SEC pursued its claim with due diligence." *Id.* at *10; *see also SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2010 U.S. Dist. LEXIS 7038, *31-32 (D. Ariz. Jan. 28, 2010) (applying equitable tolling to fraud claim subject to § 2462); *SEC v. Miller*, No. Civ.A.1:04CV1655-JEC, 2006 WL 2189697, at *8 (N.D.Ga. July 31, 2006) (same); *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *12 (N.D. Ill. May 25, 2004) (same).

The Wylys cite a number of other cases purportedly holding that Section 2462 is not subject to the discovery rule. Wylys Mem. at 15. But two of those cases did not involve fraud claims, and thus they are inapplicable. *See New York v. Niagara Mohawk Power Co.*, 263 F. Supp. 2d 650, 660 (W.D.N.Y. 2003) (claim for violation of the Clean Air Act); *FEC v. Williams*, 104

F.3d 237, 240 (D.C. Cir. 1994) (claim for violation of the Federal Election Act).  The other case did not even consider the applicability of the discovery rule given the facts of that case.  *See Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009).

The Wylys and Schaufele also attempt to muddle the issue by alleging that the Complaint fails to allege the elements of "fraudulent concealment," including the element that the "defendants concealed the the cause of action."  Wylys Mem. at 17; Schaufele Mem. at 23.  But the discovery rule is a doctrine distinct from fraudulent concealment.  *See, e.g.*, *Texas v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988); *Raytheon Co. v. Indigo Sys. Corp.*, 653 F. Supp. 2d 677, 684 (E.D. Tex. 2009) ("Although the theories share some similarities, the discovery rule and fraudulent concealment are distinct and serve different policies."); *Migliori v. Boeing North Am., Inc.*, 114 F. Supp. 2d 976, 983 (C.D. Cal. 2000) ("[T]he two doctrines constitute separate bases for tolling the statute of limitations.").  And the discovery rule applies "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it."  *Holmberg*, 327 U.S. at 397..

Accordingly, the overwhelming weight of authority holds that the discovery rule applies to claims that sound in fraud.  Because the First through Fourth Claims all sound in fraud (*see* Compl. ¶¶120-131), the statutes of limitations applicable to those claims, whether Section 2462 or Section 21A, are subject to the discovery rule.

This conclusion is supported by sound policy as well.  As the Supreme Court recognized in *Merck*, the policy underlying application of the discovery rule to fraud cases is grounded in the notion that the  "defendant's deceptive conduct may [have] prevent[ed] a plaintiff from even knowing that he or she has been defrauded."  130 S.Ct. at 1793.   Here, the Complaint alleges a fraud to which massive and systematic deception by the defendants was integral.  The very essence of the Wylys' fraud was to mask their control over large-scale securities holdings and orchestration

of equally large transactions, and to render remote the likelihood that their role would ever come to light. [35]  To borrow the apt phrase of the late Judge Learned Hand, "it would be monstrous" if these defendants were permitted to escape liability for civil penalties because they and their confederates had succeeded in keeping their fraud from detection for so long.  *See Dabney v. Levy*, 191 F.2d 201, 205 (2d Cir. 1951) (L. Hand, J.)  To do so would be to cause "the law which was designed to prevent fraud [to] become the means by which it is made successful and secure."  *Merck*, 130 S.Ct. at 1793 (citations and quotations omitted).

### 2.   The Complaint Was Filed Within Five Years of the "Discovery" Date, As Subsequently Extended By Tolling Agreements.

The date of "discovery," for purposes of the discovery rule, is the earlier of "when the litigant first knows *or with due diligence should know* the facts that will form the basis for an action."  *Merck*, 130 S.Ct. at 1794 (quoting 2 Corman, *Limitation of Actions* § 11.1.1 at 134) (emphasis in original).  This is typically somewhat later than the date of inquiry notice.  *See id.* at 1798 ([T]the discovery of facts that put a plaintiff on 'notice' does not automatically begin the running of the limitations period").

In this case, the Commission was not even placed on inquiry notice of the Wylys' fraud until November 16, 2004, when Bank of America reported to staff members of the SEC's Division of Enforcement that it had terminated securities accounts held in the name of numerous Isle of Man entities because those entities refused to disclose information regarding their

---

[35] *See* Compl. ¶7 (defendants' deceptive acts included "the making of hundreds of false and materially misleading statements to the Issuers, the Issuers' attorneys, investors, the Commission, and, in the case of Schaufele, to brokerage firm intermediaries, (ii) the establishment and operation of an offshore 'Wyly family office' in the Cayman Islands as a conduit and repository for communications and records 'which should not be seen in the USA,' and (iii) the allocation of the Wylys' offshore holdings of Issuer Securities among different, and often newly created, offshore entities, all under the Wylys' control, solely to avoid making required Commission filings").

beneficial ownership.[36]  (Compl. ¶118)  Accepting this allegation as true for purposes of

resolving the motions to dismiss, *see Collins & Aikman*, 524 F. Supp. 2d at 483, the fraud claims

alleged in the First through Fourth Claims of the Complaint did not accrue before November 16,

2004 (at the earliest), and thus the statute of limitations could not run any earlier than five years

from that date, or November 16, 2009.  The Complaint clearly alleges that each of the defendants

executed a tolling agreement with the SEC prior to November 16, 2009, and those tolling

agreements were in effect through the filing of the Complaint on July 29, 2010.  (Compl. ¶117)

Thus, the Complaint alleges facts that, if accepted as true, bring the First through Fourth Claims

within the "discovery rule" and thus within the applicable statute of limitations.

French contends that the very making of the false and misleading SEC filings alleged in

the Complaint somehow put the SEC on notice of the defendants' fraud.  French Mem. at 7-11.

It is well settled, however, that SEC filings would have to disclose a fraud on their face – or at

least present "storm warnings" – before courts deem them on their own sufficient to trigger

inquiry notice.  *See Miller*, 2006 WL 2189697 at *11 (denying summary judgment on statute of

limitations grounds where SEC would have to undertake further analysis of Form 10-Q

disclosures to discover fraud).

Thus, even where, as here, public filings contain statements that later form the basis for

---

[36] To the extent Defendants are arguing that the SEC has not plead its due diligence
before the date of inquiry notice, November 16, 2004, they are flatly wrong.  The Commission
specifically alleges that it questioned, through its Division of Corporate Finance, whether certain
offshore trusts were truly independent of French and the Wylys.  (Compl. ¶108)  French assured
the lawyers responding to the SEC that they were independent, when in fact they were not. (*Id.*)
Thus, the claim that the SEC did not plead its due diligence comes down to a claim that the SEC
should have kept asking for more lies, in pursuit of the fanciful prospect that one of these
defendants might have accidently told the truth at some point.  Indeed, courts have found such
denials or reassuring statements by defendants sufficient to dampen any "storm warnings" that
otherwise may have existed.  *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d
148, 155 (2d Cir. 2003).

fraud claims, the false filing alone are not deemed to have placed the plaintiffs on inquiry notice unless they provided specific information indicating a probability of fraud. *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 433 (2d Cir. 2008); *see also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) (finding that Form 10-K did not constitute notice of fraud because mere identification of certain purported costs "does not necessarily mean those costs are the result of fraud"). Plaintiffs are entitled to rely on the statements in public filings unless there are some other indicia that the statements are false. *Backhaus v. Streamedia Comms., Inc.,* No. 01 CIV.4889, 2002 WL 1870272, at *3 (S.D.N.Y. Aug. 14, 2002) ("Misleading statements in the Prospectus or in other public statements, without an event that would reveal the misleading nature of the statements, are not enough to put investors on inquiry notice."). As one court observed,

> Plaintiff may rely on public filings and accept them as true, and need not assume that directors and officers will falsify such filings. Accordingly, where plaintiff alleges that defendants intentionally falsified public disclosures, defendants may not rely on the statute of limitations as a defense until plaintiff is placed on inquiry notice that such filings were fraudulent.

*Ryan v. Gifford*, 918 A.2d 341, 360 (Del. Ch. 2007) (applying Delaware law).

In any event, a motion to dismiss is not the appropriate juncture for resolving this question. *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003). "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case-similar to the type of inferences that must be drawn in determining intent and good faith." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979). Such fact-specific inquiries ordinarily are not suitable for summary disposition. *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)

("Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.").

### 3.   Section 21A is Not a Statute of Repose Exempted From the Discovery Rule.

The Wylys assert that the insider trading statute of limitations found in Section 21A, which governs the Second Claim, is instead a "statute of repose" to which the discovery rule does not apply.  Wylys Mem. at 13.  As the Second Circuit has explained, "'[s]tatutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses. . . , the various forms of tolling, and the potential application of the discovery rule.'"  *P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004) (quoting Corman, *Limitation of Actions* § 1.1, at 4-5 (1991)).  By contrast, "'statutes of repose affect the availability of an underlying right: That right is no longer available on the expiration of the specified period of time.'"  *Id.* (quoting Corman, *Limitation of Actions* § 1.1, at 4-5 (1991)).  In other words, a statute of repose "defines the right involved in terms of the time allowed to bring suit."  *Id.*  Thus, in order to avoid the application of the discovery rule, the Wylys, joined by Schaufele, ask this Court to interpret Section 21A as a statute of repose.  Notably, the Wylys do not cite a single authority holding that Section 21A is a statute of repose.  *See* Wylys Mem. at 14.  Their argument instead rests on a misreading of Section 21A and two cases, both of which actually support the Commission's position.

Section 21A does not purport to "define the right" to bring an enforcement action for insider trading.  That right is found in Section 21(d), which authorizes the Commission to bring actions to obtain injunctive or other equitable relief (including disgorgement) for securities laws violations.  15 U.S.C. § 78u(d)(1), (5).  Section 21A itself makes this clear, providing that it should "not be construed to bar or limit in any manner any action by the Commission . . . under

any other provision of this title." *Id.* §78u-1(d)(5).  It is hard to see how, as the Wylys contend, that a provision such as Section 21A that expressly *refrains* from defining the right to bring an enforcement action for insider trading could be construed to be a statute of repose.  In other words, far from "defining the right" to bring an enforcement action for insider trading, Section 21A simply places a statute of limitations on any action to obtain one particular remedy (a three-times penalty) in such an action.  In that respect, Section 21A is indistinguishable from statute of limitations provision Section 2462, which also places a limitation on any action seeking a civil penalty.  *See* 28 U.S.C. § 2462 (referring to "an action . . . for . . . any civil fine, penalty, or forfeiture").

The two cases cited by the Wylys in support of their "statute of repose" argument, Wylys Mem. at 14 n. 29, do not, in fact, support their position.  The cases cited by the Wylys – *P. Stolz Family P'ship v. Daum*, 355 F.3d 92 (2d Cir. 2004), and *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697 (2d Cir. 1994) – both interpret Section 13 of the Securities Act.[37] The Wylys purport to quote Section 13, but in fact conveniently and misleadingly ellipse their quotation in order to make it appear similar to Section 21A.  *See* Wylys Mem. at 14 n.29.  Read in its entirety, Section 13 could not be more different from Section 21A.

Section 13 provides:

No action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) unless brought ***within one year*** after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(a)(1), unless brought within one year after the violation upon which it is based.  ***In no event*** shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) ***more than three years*** after the security was bona fide offered to the public, or under section 12(a)(2) more than three years after the sale.

---

[37] 15 U.S.C. § 77m.

15 U.S.C. § 77m (emphasis added).  In other words, Section 13 creates a two-pronged time bar, one prong of which (the one-year period) expressly applies the discovery rule while the other prong (the three-year provision) does not.  Given this wording, it would make no sense to read the discovery rule into the three-year prong of Section 13's limitation, and thus the Second Circuit held that Section 13 was a statute of repose placing an absolute limit on the time within which a suit can be brought.  *See P. Stolz Family P'ship*, 355 F.3d at 102-06.  Read properly, then, both of these cases stand for the unexceptional proposition that Congress can limit application of the discovery rule, even in fraud cases, if it expressly chooses to do so through two-pronged language.

In contrast to Section 13, Section 21A is a single-pronged statute that suggests no restriction on the application of the discovery rule.  Thus, there is no indication that Congress intended in Section 21A to override the long-standing rule of *Holmberg* that the discovery rule "is read into every federal statute." 327 U.S. at 397.  To the contrary, the language of Section 21A is strikingly similar to that of another federal statute the Supreme Court has read to be a statute of limitations (subject to the discovery rule), rather than a statute of repose.  In *Exploration Co. v. United States*, *supra*, the United States brought suit to cancel deed and land patents "alleged to be in secret trust for the Exploration Company, a foreign corporation, for whose benefit it is alleged the frauds were committed." 247 U.S. at 435.  Because the United States' suit was brought more than eight years after the dates of the patents, the defendant responded that the claims were time-barred.  *See id.*  The limitations provision in that case stated: "[S]uits by the United States to vacate and annul any patent . . . shall only be brought within six years after the date of the issuance of such patents." *Id.* at 445 (quoting Act of March 3, 1891, c. 561, 26 Stat. 1909)).  The Court treated this provision as a "statute of limitations," *id.* at 446, and

applied the discovery rule, stating that "the cause of action did not accrue until the discovery of the fraud," *id.* at 447.  In other words, despite the fact that the single-pronged limitations provision in that case provided that suits "shall only be brought within six years after the date of the issuance of such patents," *id.* at 445, the Court interpreted the provision to be a statute of limitations subject to the discovery rule that the Court later stated in *Holmberg* "is read into every federal statute of limitation," 327 U.S. at 397.

The single-pronged limitations provision of Section 21A – which states that "[n]o action may be brought under this section more than 5 years after the date of the purchase or sale" – is essentially identical to the single-pronged limitations provision at issue in *Exploration Co.*  Thus, like the provision in *Exploration Co.*, Section 21A is also a statute of limitations subject to the discovery rule. [38]  In short, the Wylys' argument that Section 21A is a statute of repose exempted from the discovery rule is entirely without merit.

#### 4.   Proper Remedial Relief Does Not Constitute a Penalty Within the Meaning of 28 U.S.C. § 2462.

Schaufele attempts to extend the already meritless statute of limitations argument even further, contending that Section 2462's statute of limitations should apply not only to monetary penalties, but also to injunctive relief.  Schaufele Mem. at 22-23.  This argument can be addressed in short order.

By its terms, the limitations provision of Section 2462 applies only to a "suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture."  28 U.S.C. § 2462.  Courts have repeatedly held that "[n]o statute of limitations applies to the SEC's claims for

---

[38] *See also United States v. Uzzell*, 648 F. Supp. 1362, 1366-68 (D.D.C. 1986) (holding the False Claims Act's then single-pronged statute of limitations, 31 U.S.C. § 3731, which required the bringing of suit "within 6 years from the date the violation is committed," was a statute of limitations subject to equitable tolling principles).

equitable remedies." *SEC v. McAskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999).  More specifically, courts have routinely refused to apply Section 2462 to Commission enforcement actions seeking injunctive relief.  Recognizing that "[t]he entire purpose and thrust of a [Commission] enforcement action is to expeditiously safeguard the public interest by enjoining securities violations," the Ninth Circuit and various other district courts have rejected arguments that injunctive relief is a penalty subject to Section 2462.  *SEC v. Rind*, 991 F.2d 1486, 1491-92 (9th Cir. 1993) (citing *SEC v. Asset Management Corp.*, 456 F. Supp. 998, 1000 (S.D. Ind. 1978)); *SEC v. Berry*, 580 F. Supp. 2d 911, 919 (N.D. Cal., 2008). (N.D.Cal. 2008); *SEC v. Downe*, No. 92 CIV. 4092, 1994 WL 67826, at *1 (S.D.N.Y. Mar. 3, 1994); *SEC v. Lorin*, 869 F. Supp. 1117, 1129-1130 (S.D.N.Y. 1994); *cf. SEC v. Schiffer*, No. 97 Civ. 5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998) (officer and director bar is remedial and not subject to 28 U.S.C. § 2462); *SEC v. Toomey*, 866 F. Supp. 719, 724 (S.D.N.Y. 1992) (disgorgement claim not subject to statute of limitations).  Thus, it should be clear that Schaufele's motion to dismiss the Commission's claim so far as it seeks injunctive relief is without merit.

Schaufele, however, relies on *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996), and *SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007), to argue that injunctive relief can be punitive when there is little chance that the violations will recur.  Schaufele Mem. at 22-23.  As an initial matter, Schaufele's reliance on those opinions is somewhat odd in that neither was decided at the motion to dismiss stage.  *See Johnson*, 87 F.3d at 486 (defendant appealed challenging a "supervisory suspension" imposed after an ALJ evidentiary hearing); *Jones*, 476 F. Supp. 2d at

376 (deciding, in response to a motion for summary judgment, that the statute of limitations applied to the particular injunction at issue).[39]

In any event, neither case held that injunctive relief is punitive as a matter of law and thus subject to the Section 2462 statute of limitations. At most, *Jones* held "that the limitations period in § 2462 applies to civil penalties and equitable relief that seeks to punish, but does not apply to equitable relief which seeks to remedy a past wrong or protect the public from future harm." 476 F. Supp. 2d at 381. Because the *Jones* court determined at the summary judgment stage that "the Commission has not offered facts that suggest" the injunctive relief would be remedial rather than punitive, the court found the claim for injunctive relief to be punitive and thus subject to the Section 2462 statute of limitations. *Id.* at 385. Even assuming *arguendo* that the *Jones* court correctly applied Section 2462 to claims for injunctive relief, nothing about that holding suggests that a motion to dismiss should be granted as Schaufele requests, thereby holding that the injunctive relief sought here is time-barred as a matter of law.

### 5. The Fraudulent Concealment and Continuing Violation Doctrines Apply to the Non-Fraud Claims.

Though not entirely clear, it appears that the Wylys also argue that the penalties as to the non-fraud claims (Claims Five through Thirteen) should be dismissed as time-barred. *See* Wylys Mem. at 16-21. As to tolling of the statute of limitations pursuant to the fraudulent concealment doctrine, the Wylys contend, again in reliance on the questionable decision in *Gabelli*, that the Commission must allege acts of concealment beyond the alleged misconduct alleged to give rise to the underlying violations." *Id.* at 17. But even assuming *arguendo* the validity of *Gabelli*, the

---

[39] Indeed, the court in *Jones* had previously declined to dismiss the case on statute of limitations grounds at the motion to dismiss phase. *SEC v. Jones*, No. 05 Civ. 7044, 2006 WL 1084276, at *6 (S.D.N.Y. Apr. 25, 2006).

64

Complaint sets forth numerous acts of fraudulent concealment (*e.g.*, Comp. ¶¶7, 51, 54-56, 64, 75) that are, by definition, beyond the scope of the conduct needed to allege non-fraud claims.[40]

## **CONCLUSION**

For the forgoing reasons, the Commission respectfully submits that the Defendants' motions to dismiss should be denied in their entirety.

Dated:  December 13, 2010            Respectfully submitted,

                                          s/Alan M. Lieberman
                                          Alan M.Lieberman (AL-6517)
                                          John D. Worland, Jr. (JDW-1962)
                                          Martin Zerwitz (MZ-9765)
                                          Counsel for Plaintiff
                                          Securities and Exchange Commission
                                          100 F Street, N.E.
                                          Washington, DC 20549-4030
                                          (202) 551-4474 (T)
                                          (202) 772-9245 (F)

---

[40] Federal courts also recognize the doctrine of a "continuing violation" in assessing statute of limitations issues.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). The Courts treat failures to file required 13Ds and Form 4s as *continuing* violations, not ceasing until the required filing is made; *see Litzler v. CC Investments, L.D.C.*, 362 F.3d 203, 205 (2d Cir. 2004) (holding that statute of limitations is equitably tolled "when a covered party fails to comply with Section 16(a)"); *Rosen v. Brookhaven Capital Management Co*., 179 F. Supp. 2d 330, 337 (S.D.N.Y. 2002) (defendants cannot assert statute of limitations defense to Section 16(b) claim when defendants never filed corrective Form 4s); *cf. SEC v. Bilzerian*, 814 F. Supp. 116, 123 (D.D.C.) (finding defendant in violation of Section 13(d) during the entire time he was required to file but did not), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994); and have held that issuers have a continuing "duty to correct" materially misleading disclosures in issuer filings. *Blackman v. Polaroid Corp.*, 910 F.2d 10, 16-17 (1st Cir. 1990) ("obviously, if a disclosure is in fact misleading when made, and the speaker thereafter learns of this, there is a duty to correct it"). Here, no defendant made or caused to be made any corrective filing whatsoever until fewer than five years from the filing of this action: the Wylys, for example, made no corrective 13D filing for Michaels until March 2005, no corrective filing for Scottish Re until December 2006, and never made any corrective filings for the two Sterlings; while French, for his part, made no corrective filings whatsoever.  (Compl. ¶¶48, 49 & 103).

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 13, 2010, I have caused a copy of the foregoing Plaintiff's

Memorandum in Opposition to Motions to Dismiss to be served by electronic mail, based upon

agreement regarding manner of service, on the following:

| | |
|---|---|
| **<u>VIA ELECTRONIC MAIL</u>**<br>William A. Brewer<br>Michael Smith<br>Bickel & Brewer<br>1717 Main Street, Suite 4800<br>Dallas, TX 75201<br><br>Martin Pollner<br>Loeb & Loeb<br>345 Park Avenue<br>New York, NY 10154<br><br>**Counsel for Defendants Samuel E. Wyly and Charles J. Wyly, Jr.** | **<u>VIA ELECTRONIC MAIL</u>**<br>Danny S. Ashby<br>Robert E. Davis<br>Barrett R. Howell<br>Casey P. Kaplan<br>K&L Gates, LLP<br>1717 Main Street<br>Suite 2800<br>Dallas, TX 75201<br><br>**Counsel for Defendant Michael C. French** |
| **<u>VIA ELECTRONIC MAIL</u>**<br><br>Martin J. Auerbach<br>1540 Broadway, Suite 1604<br>New York, NY 10036<br><br>Laura Neish, Esq<br>Zuckerman Spader<br>1540 Broadway, Suite 1604<br>New York, NY 10036-4039<br><br>Luke Madole, Esq.<br>Carrington, Coleman, Sloman & Blumenthal, L.L.P.<br>901 Main Street, Suite 5500<br>Dallas, TX  75202<br><br>**Counsel for Defendant Louis J. Schaufele, III.** | |

s/Alan M. Lieberman<br>
Alan M. Lieberman<br>
Counsel for Plaintiff