**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/11

-------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

            **Plaintiff,**

            **- against -**

SAMUEL WYLY, CHARLES J. WYLY,
JR., MICHAEL C. FRENCH, AND
LOUIS J. SCHAUFELE III,

            **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 5760 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

On July 29, 2010, following a six-year investigation into matters spanning almost two decades, the Securities and Exchange Commission ("SEC") filed this suit alleging thirteen Claims for securities violations by billionaire brothers Samuel Wyly and Charles J. Wyly (together, the "Wylys"), their attorney Michael C. French ("French"), and their stockbroker Louis J. Schaufele III ("Schaufele"). The gist of the fraud alleged is that, from 1992 through at least 2005, the Wylys hid their ownership of and trading activity in the shares of four

1

public companies[1] on whose boards of directors they sat[2] by creating a labyrinth of offshore trusts and subsidiary entities in the Isle of Man and the Cayman Islands (the "Offshore System"); transferring hundreds of millions of shares of the Issuers' stock to those entities; and installing surrogates to carry out their wishes regarding the disposition of the stock – all while preserving their anonymity and evading federal securities laws governing trading by corporate insiders and significant shareholders.[3]   Attorney French and stockbroker Schaufele were allegedly essential to the success of this scheme, which also included a singular instance of insider trading by the Wylys and Schaufele in 1999.   The SEC seeks penalties, injunctive

---

[1]   These companies were Michaels Stores, Inc. ("Michaels"), Sterling Software, Inc. ("Sterling Software"), Sterling Commerce, Inc. ("Sterling Commerce"), and Scottish Annuity & Life Holdings Ltd. (now known as Scottish Re Group Limited) ("Scottish Re") (hereinafter collectively referred to as "the Issuers").  *See* Complaint ("Compl.") ¶ 2.

[2]   *See id.* ¶¶ 1-2, 23-27.  Sam Wyly served at various times relevant to the Complaint as Chairman and Vice Chairman of Michaels, Chairman of Sterling Software, Executive Committee Chairman and Board member of Sterling Commerce, and Chairman of Scottish Re.  *See id.* ¶ 15.  Charles held similar, though not identical, positions at each of the Issuers.  *See id.* ¶ 16.  The Wylys were not only board members of these companies, but also founders, executives, and significant shareholders – "quintessential insiders" who, in violation of their fiduciary duties to the Issuers and their shareholders, used their power and control to realize hundreds of millions of dollars of undisclosed gain.  *See id.* ¶¶ 1, 15-16, 74-76.

[3]   *See* sections 13(d) and 16(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78m(d), 78p(a).

2

relief, and disgorgement of roughly $550 million in gains and prejudgment interest.

Defendants now move to dismiss Claims One through Four of the Complaint, which allege that, through the use of the Offshore System, the Wylys and French committed primary violations of section 10(b) of the Exchange Act (Claim One) and section 17(a) of the Securities Act of 1933 (the "Securities Act") (Claim Four); that French and Schaufele aided and abetted the fraud alleged in Claim One under section 10(b) (Claim Three); and that the Wylys and Schauefe engaged in insider trading, also in violation of section 10(b) of the Exchange Act (Claim Two). The most interesting and complicated questions raised by the defendants' motions, however, have nothing to do with the substance of the federal securities laws' antifraud provisions; rather, they concern the applicability and interpretation of various limitations periods purportedly governing the SEC's claims for monetary penalties for both their fraud claims (Claims One through Four) and their non-fraud claims (Claims Five through Thirteen). I first address these threshold questions before turning to the defendants' more substantive arguments.

## II.   BACKGROUND[4]

### A.   False Filings

---

[4]      All facts are drawn from the Complaint and presumed to be true.

The Complaint identifies dozens of false securities filings which serve as the foundation for the defendants' alleged fraudulent scheme.[5]  Those filings fall broadly into three groups: (1) filings of one or both of the Wylys personally (such as Schedule 13Ds, Schedule 13Gs, or Form 4s (described below)) that understate their shareholdings and stock trading; (2) corporate filings by the Issuers (such as Form 10-Ks, proxies, or registration statements) that also understate the Wylys' (and/or French's) shareholdings in the particular Issuer making the filing; and (3) filings by "Offshore Trustees" (see below) falsely claiming they have sole dispositive power over their shares.[6]

Schedule 13D is a disclosure report required under section 13(d) of the Exchange Act to be filed by any person who "is directly or indirectly the beneficial owner of more than five percent" of the stock of any class of a public company's outstanding stock.[7]  A person beneficially owns a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares (i) voting power, which includes the power to vote, or to direct the voting of, such security; and/or (ii) investment power,

---

[5]     *See* Appendix ("SEC App.") to SEC's Memorandum in Opposition to Defendants' Motions to Dismiss ("SEC Opp.").

[6]     *See* Compl. ¶¶ 71-78; SEC App.

[7]     17 C.F.R. § 240.13d-1.

which includes the power to dispose, or to direct the disposition of, such security.[8]

Form 4 is a disclosure report required under Exchange Act section 16(a) to be filed by every public company officer, director and greater-than-ten-percent shareholder reporting any changes to their beneficial ownership of their company's securities.[9]

### B.    The Offshore System Scheme

The Complaint alleges that between March 1992 and January 1996, in the Isle of Man, a self-governing British crown dependency located between Scotland and Northern Ireland in the Irish Sea, the Wylys established seventeen trusts, the beneficiaries of which were Sam or Charles Wyly, their respective family members, or both.[10]  Initially, they selected a single Isle of Man-based trust

---

[8]     *See id.* § 240.13d-3.  Persons required to file Schedule 13Ds are also required, upon "any material increase or decrease" in the number of shares they beneficially own, to file amended Schedule 13Ds "disclosing that change."  *Id.* § 240.13d-2.  Schedule 13G is a short-form version of Schedule 13D which may be filed by a person who "has acquired [] securities in the ordinary course of his business and not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect."  *Id.* § 240.13d-1.  Like Schedule 13D filers, Schedule 13G filers are required to file amended Schedule 13Gs when "there are any changes in the information reported in the previous [section 13(d)] filing."  *Id.* § 240.13d-2.

[9]     *See id.* § 240.16a-3.

[10]    *See* Compl. ¶ 23.

management company to serve as their Offshore Trusts' trustee, but between 1992 and 2004 selected numerous additional "Offshore Trustees."[11]  Employees of the various Offshore Trustees served as directors of more than thirty Isle of Man-based shell companies that were wholly-owned by the various respective Offshore Trusts ("Offshore Companies").[12]  The Offshore Companies, along with the Offshore Trusts, together comprised the Wylys' "Offshore System."[13]

The trust agreements governing the Wylys' Offshore Trusts purported to confer upon the Offshore Trustees broad and exclusive authority to manage trust assets, but in practice the Offshore Trusts were controlled by trust "Protectors,"[14] Wyly-appointed loyalists who did the Wylys' bidding.[15]  Thus, the offshore trusts were paper facades used by the Wylys to hide their beneficial ownership of and trading in the Issuers' shares they held in their Offshore System and to evade the federal securities laws' insider-transaction reporting provisions,

---

[11]     *See id.* ¶ 24.

[12]     *See id.*

[13]     *See id.*

[14]     In March 1992, when the Offshore Trusts were created, the Wylys appointed two individuals to serve as the Protectors: their lawyer, French, and their longtime family office chief financial officer (the "Wyly Family CFO").  *See id.* ¶ 30.

[15]     *See id.* ¶ 29.

beneficial-ownership reporting provisions, or both.[16]  At various times during the course of their thirteen-year scheme, the Wylys allegedly controlled more than twice as many shares in certain of the Issuers as they disclosed publicly,[17] which included directing the voting and disposition of shares in the four Issuers held in the offshore trusts.[18]  Through their conduct, the Wylys – with awareness of its unlawfulness[19] – allegedly deprived the markets and investors of information reflective of potential shifts or changes in corporate outlook important to investment decisions.[20]  These unlawful nondisclosures also enabled the Wylys freely to sell millions of shares of the Issuers' stock while avoiding the adverse market reaction and decrease in value often attending the required public disclosure of such trading by insiders.[21]

### 1.    French

French, who acted as the Wylys' lawyer, also served on the boards of

---

[16]    *See id.* ¶¶ 48-51.

[17]    *See id.* ¶ 54.

[18]    *See id.* ¶¶ 3, 29-46.

[19]    *See id.* ¶¶ 5, 60-62.

[20]    *See id.* ¶¶ 5, 47-54.

[21]    *See id.* ¶ 76.

three of the Issuers and as a trust Protector of the Offshore System.[22]  French

provided cover to the Wylys' scheme that was essential both to its concealment

and its continuation.[23]  In his role as a trust Protector, he coordinated with the

trusts to communicate the Wylys' investment and voting instructions, which

without exception were carried out by the Offshore Trustees.[24]  Despite having

intimate knowledge of the Wylys' control over their Offshore System, French

repeatedly (and falsely) told the Issuers and their counsel that the Offshore System

was "independent of the Wylys."[25]  While participating in the Wylys' fraud, French

also established offshore entities of his own, which he, like the Wylys, used to

control and trade Issuer securities without disclosing that ownership or trading.[26]

French received an annual salary of 1.5 million dollars over the course of eight

years and a sixteen million dollar share in a hedge fund established by the Wylys.[27]

### 2.      Schaufele

Schaufele served for over fifteen years as the registered representative

---

[22]      *See id.* ¶ 17.

[23]      *See id.* ¶¶ 104-109.

[24]      *See id.* ¶¶ 30-35.

[25]      *Id.* ¶ 107.  *Accord id.* ¶¶ 105, 108.

[26]      *See id.* ¶¶ 101-103.

[27]      *See id.* ¶ 110.

for various accounts established by the Wylys, including those of the Wylys'
offshore entities,[28] and helped carry out the Wylys' "protocol" for effecting certain
transactions in the Offshore System: conveying instructions to the trust Protectors
who in turn conveyed the instructions to the appropriate Offshore Trustee, who
then faxed the necessary trading instructions to Schaufele or his assistants.[29]
Schaufele made misrepresentations to his brokerage firm superiors and in-house
attorneys about the Wylys' relationship to and control over the offshore entities (of
which he had full knowledge), which were allegedly vital to the scheme's
operation and continuation.[30]

### C.    1999 Insider Trading Violations

Around June 1999, Sam Wyly personally decided that both Sterling
Software and Sterling Commerce should be sold.[31]  He obtained Charles Wyly's
concurrence, and the two agreed that the sale of Sterling Commerce should
proceed first.[32]  At that time, the Wylys comprised two-thirds of Sterling
Software's executive committee and, along with other family members and French,

---

[28]     *See id.* ¶ 18.

[29]     *See id.* ¶ 32.

[30]     *See id.* ¶¶ 111-115.

[31]     *See id.* ¶ 89.

[32]     *See id.*

comprised half of Sterling Software's Board of Directors.[33]

In late September 1999 – when the plan to sell both Sterling entities was "already underway"[34] and when Goldman Sachs had already been retained by Sterling Commerce as an advisor (and had compiled a list of potential acquirors)[35] – Sam Wyly instructed the Wyly Family CFO to determine the cost of purchasing from Lehman Brothers up to four million Sterling Software call options at the company's current trading price, with expiration dates of between twelve and twenty-four months in the future.[36]

On September 28, 1999, Schaufele provided the Wyly Family CFO with the requested pricing information, but recommended that the Wylys consider a swap agreement[37] as an alternative because it would be easier to unwind than call options.[38]  Sam Wyly concurred and, between September 30 and October 6, 1999,

---

[33]     *See id.*

[34]     *Id.*

[35]     *See id.*

[36]     *See id.* ¶ 78.

[37]     Under the swap agreement as ultimately consummated, five Offshore Companies – three associated with Sam Wyly and two associated with Charles Wyly – purchased the right to receive any gains from, and the risk of paying any losses on, two million Sterling Software shares.  *See id.* ¶ 85.

[38]     *See id.*

he directed his son Evan – at the time a fellow board member of three of the

Issuers, including Sterling Software – to negotiate the terms of the transaction with

Schaufele.[39]  Charles Wyly agreed to participate for one-third of the transaction.[40]

In order to minimize the borrowing costs imposed by Lehman's credit

department, the Wylys followed Schaufele's advice and agreed to limit the initial

size of the transaction to 1.5 million shares with an eighteen-month term, and to

later seek to increase its size.[41]  The transaction documents called for the Wyly

offshore entities participating in the transaction to pay a fee of six cents per share

(for a total of $120,000) based on Lehman's hedging purchases of Sterling

Software common stock.[42]

On October 1, 1999, days after learning of Sam Wyly's trading

_____

[39]      *See id.*

[40]      *See id.*

[41]      *See id.* ¶ 79.  Ultimately, they were able to add only an additional
500,000 shares to the transaction since Lehman – which was fully hedging its side
of the transaction by purchasing Sterling Software common stock on the open
market – was unwilling to take on more than that level of "exposure to one name."
*Id.*  Nevertheless, the Wylys (unsuccessfully) attempted to increase the size of the
swap still more by having one of their Offshore Trustees provide Lehman with
letters of credit from a suitable financial institution, which Schaufele knew.  *See id.*

[42]      *See id.* ¶ 80.  The transaction took fifteen trading days to complete,
during which period the Wylys received daily spreadsheets, prepared by Lehman
and provided to them through Schaufele via trust Protectors, disclosing the
progress of Lehman's hedging activities.  *See id.* ¶ 81.

intentions, Schaufele purchased four thousand shares of Sterling Software at $20.359 per share, for a total investment of more than $80,000.[43]  He divided the purchases among four different brokerage accounts all held in his wife's name.[44]

On October 18, 1999, eleven days before Lehman's trading to hedge the transaction and establish its notional price was complete, Morgan Stanley furnished Sam Wyly with an analysis entitled "Operation Windfall" specifically identifying Computer Associates as a potential acquiror for Sterling Software; and on October 22, 1999, five days before Lehman's trading to hedge the transaction and establish its notional price was complete, Sterling Software amended its employment agreements to provide for enhanced payouts to the Wylys in the event of a change in control.[45]

Following the swap's execution, from November 15 to 17, 1999, Sterling Software's senior managers met and formally agreed to pursue the sale of the company.[46]  In late November, Sam Wyly summoned several Morgan Stanley investment bankers to his Dallas office to indicate his interest in selling Sterling

_____

[43]      *See id.* ¶ 97.

[44]      *See id.*

[45]      *See id.* ¶ 91.

[46]      *See id.* ¶ 93.

Software, after which Morgan Stanley notified Computer Associates, whose then-president and Chief Operating Officer made an "overture" to Sam Wyly.[47]  The two met on January 18, 2000, in Sam Wyly's Dallas home to discuss the acquisition,[48] and on February 14, 2000, Computer Associates announced that it had reached an agreement to acquire Sterling Software in a stock swap valued at approximately four billion dollars.[49]  Based on that day's closing price of Sterling Software, the Wylys' imputed profits from their two-million-share swap transaction exceeded $31.77 million,[50] and Schaufele's imputed profits totaled $63,564.[51]  In March of 2000, both Sterling Software and Sterling Commerce were formally acquired.[52]

### C.    The Commission's Investigation

On November 16, 2004, Bank of America reported to the Commission's Enforcement staff that the Wylys' offshore accounts at that institution – where Schaufele had moved from Lehman Brothers along with the

---

[47]     *See id.* ¶ 94.

[48]     *See id.*

[49]     *See id.* ¶ 96.

[50]     *See id.*

[51]     *See id.* ¶ 100.

[52]     *See id.* ¶¶ 20, 21.

Wylys' accounts in 2002[53] – had been terminated for failure to disclose information regarding their relationship to a web of offshore entities.[54]  In response, the Commission commenced an investigation, during the course of which the Wylys executed a tolling agreement that remained in place from February 1, 2006, through July 2010.[55]  French and Schaufele signed tolling agreements dated August 1, 2009, and October 29, 2009, respectively, both of which continued through July 2010.[56]  The Complaint was filed against Defendants on July 29, 2010.

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[57] and "draw all reasonable inferences in [the] plaintiff[s'] favor."[58] However, the court need not accord "[l]egal conclusions, deductions or opinions

---

[53]     *See id.* ¶ 114.

[54]     *See id.* ¶ 118.

[55]     *See id.* ¶ 117.

[56]     *See id.*

[57]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[58]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

couched as factual allegations . . . a presumption of truthfulness."[59]  To survive a

Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a

standard of "plausibility."[60]  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."[61]

### B.     Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) provides that "the circumstances

constituting fraud . . . shall be stated with particularity."  To satisfy the particularity

requirement, a complaint must: "'(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent.'"[62]

However, "intent, knowledge, and other conditions of mind may be averred

generally."[63]

---

[59]     *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)
(quotation marks omitted).

[60]     *Twombly*, 550 U.S. at 564.

[61]     *Ashcroft v. Iqbal*, 556 U.S. ---, ---, 129 S. Ct. 1937, 1949 (2009)
(quotation marks omitted).

[62]     *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)
(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

[63]     Fed. R. Civ. P. 9(b).

15

## IV.   THE SEC'S CLAIMS FOR CIVIL MONETARY PENALTIES[64]

### A.   Applicable Law

#### 1.   Section 21(d)(3) of the Exchange Act

Section 21(d)(3) of the Exchange Act authorizes the SEC to seek civil monetary penalties "[w]henever it shall appear to the Commission that any person has violated any provision of" the Exchange Act "other than by committing a violation subject to a penalty pursuant to [section 21A[65] for insider trading]."[66] Section 21(d)(3) does not contain a statute of limitations.  Therefore, the catch-all five-year statute of limitations of 28 U.S.C. § 2462 ("catch-all statute of limitations") governs punitive relief sought by the SEC under section 21(d)(3).[67]

---

[64]    This Part also pertains to the injunctive relief sought by the SEC against Schaufele, to the extent such relief is, as he argues, "at its core, a legal penalty dressed in the language of equity."  Schaufele's Memorandum of Law in Support of Motion to Dismiss ("Schaufele Mem.") at 3.  Because I find that none of the SEC's claims are time-barred, I need not determine whether the injunctive relief sought is punitive in nature.

[65]    15 U.S.C. § 78u-1.

[66]    *Id.* § 78u(d)(3)(A).  The Complaint does not seek civil penalties in connection with any of the alleged violations of the Securities Act.

[67]    Although two circuits have published opinions suggesting that *no* statute of limitations applies to civil enforcement actions brought by the SEC, the SEC does not appear to dispute the applicability of the catch-all statute of limitations to its request for civil penalties.  *See SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004); *SEC v. Diversified Corp. Consulting Group*, 378 F.3d 1219 (11th Cir. 2004); *SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993).

16

That section provides that

> [e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

## 2.     Section 21A of the Exchange Act

Section 21A authorizes the SEC to seek treble civil penalties specifically for violations of the Exchange Act that constitute insider trading, as defined in section 21A.[68]  Unlike section 21(d)(3) of the Exchange Act, section 21A contains an express, five-year "Statute of limitations," providing that

> [n]o action may be brought under this section more than 5 years after the date of the purchase or sale. This section shall not be construed to bar or limit in any manner any action by the Commission or the Attorney General under any other provision of this chapter, nor shall it bar or limit in any manner any action to recover penalties, or to seek any other order regarding penalties, imposed in an action commenced within 5 years of such transaction.

## 3.     The Discovery Rule

The "'discovery rule' of federal common law" is "[t]he rule that postpones the beginning of the limitations period [the "accrual" date] from the date when the plaintiff is wronged to the date when he discovers he has been injured."[69]

---

[68]    *See* 15 U.S.C. § 78u-1(a)(1).

[69]    *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990).

The discovery rule applies "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part."[70]  In such cases, "the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."[71]  This equitable doctrine is "read into statutes of limitations in federal-question cases . . . in the absence of a contrary directive from Congress"[72] "in cases of fraud or concealment."[73]  As the Supreme Court recently explained in a private securities fraud class action,

> The [discovery] rule arose in fraud cases as an exception to the general limitations rule that a cause of action accrues once a plaintiff has a complete and present cause of action.  This Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded.  Otherwise, "the law which was designed to prevent fraud" could

---

[70]     *Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946).

[71]     *Id.* (quotation marks omitted) (citing *Bailey v. Glover*, 88 U.S. 342, 347-48 (1874); *Exploration Co. v. United States*, 247 U.S. 435, 447 (1918); *Sherwood v. Sutton*, 5 Mason 143, 21 Fed. Cas. 1303, 1305 (D.N.H. 1828)).

[72]     *Cada*, 920 F.2d at 450.  *Accord Holmberg*, 327 U.S. at 397 ("This equitable doctrine is read into every federal statute of limitation.").

[73]     *TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001) (explaining that *Holmberg* applies only "in cases of fraud or concealment; it does not establish a general presumption across all contexts").

18

become "the means by which it is made successful and secure."[74]

The date of "discovery," for purposes of the discovery rule, is the earlier of "when the litigant first knows *or with due diligence should know* the facts that will form the basis for an action."[75]  The Second Circuit recently clarified, in a private securities fraud case, that under *Merck v. Reynolds*,

> a fact is not deemed "discovered" until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint.  In other words, the reasonably diligent plaintiff has not "discovered" one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.[76]

In section 10(b) actions, scienter is a fact subject to discovery.[77]

### 4.     Fraudulent Concealment

Fraudulent concealment is a doctrine of equitable estoppel that

"comes into play if the defendant takes active steps to prevent the plaintiff from

---

[74]     *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1793 (2010) (quoting *Bailey*, 88 U.S. at 349).

[75]     *Id.* at 1794 (quotation marks and citation omitted) (emphasis in original) ("'discovery' . . . encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known.").

[76]     *City of Pontiac Gen. Employees' Retirement Sys. v. MBIA, Inc.*, ---F.3d ----, No. 09-4609-cv, 2011 WL 677404, at *4 (2d Cir. Feb. 28, 2011).

[77]     *See Merck*, 130 S. Ct. at 1798.

suing in time, as by promising not to plead the statute of limitations."[78]  Rather

than postpone the date of accrual (like the discovery rule), tolling doctrines such as

fraudulent concealment "stop the statute of limitations from running even if the

accrual date has passed."[79]

        To invoke fraudulent concealment, a plaintiff must allege that: (1)

defendant concealed the cause of action; (2) plaintiff did not discover the cause of

---

[78]    *Cada*, 920 F.2d at 450-51 (citing *Holmberg*, 327 U.S. at 396-97).

> Equitable estoppel in the limitations setting is sometimes called fraudulent concealment, *but must not be confused with efforts by a defendant in a fraud case to conceal the fraud.*  To the extent that such efforts succeed, they postpone the date of accrual by preventing the plaintiff from discovering that he is a victim of a fraud.  *They are thus within the domain of the discovery rule.* Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant – above and beyond the wrongdoing upon which the plaintiff's claim is founded – to prevent the plaintiff from suing in time.

*Id.* at 451 (citations omitted) (emphasis added).

[79]    *Id.* at 450.  *Accord id.* at 451 ("Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule – governing . . . accrual – on the other."); *Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988); *Raytheon Co. v. Indigo Sys. Corp.*, 653 F. Supp. 2d 677, 684 (E.D. Tex. 2009) ("Although the theories share some similarities, the discovery rule and fraudulent concealment are distinct and serve different policies."); *Migliori v. Boeing North Am., Inc.*, 114 F. Supp. 2d 976, 983 (C.D. Cal. 2000).

action until some point within five years of commencing the action; and (3) plaintiff's continuing ignorance was not attributable to lack of diligence on its part.[80]  "[A] plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment . . . must meet the particularity standard of Rule 9(b)."[81]

      To establish the first element, a plaintiff must allege that: (1) defendant took affirmative steps to prevent or frustrate discovery of the alleged violation by depriving plaintiff of the information it needed to pursue its claims in a timely fashion; or (2) the alleged wrong was self-concealing.[82]

      "[T]he case law regarding the third prong [of fraudulent concealment] is not entirely consistent."[83]  It has been characterized (1) as requiring a showing that the plaintiff's ignorance of the claim "was not the result of lack of diligence"[84] and also (2) as a requirement that a plaintiff show "due diligence in pursuing

---

[80]    *See SEC v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007) (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)); *SEC v. Power*, 525 F. Supp. 2d 415, 424 (S.D.N.Y. 2007); *Donoghue v. American Skiing Co.*, 155 F. Supp. 2d 70, 74-75, 76 (S.D.N.Y. 2001).

[81]    *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513-14 (S.D.N.Y. 2004).

[82]    *See Power*, 525 F. Supp. 2d at 424-25 (citing *SEC v. Jones*, No. 05 Civ. 7044, 2006 WL 1084276, at *6 (S.D.N.Y. Apr. 25, 2006) ("*Jones I*")).

[83]    *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009).

[84]    *Hendrickson Bros.*, 840 F.2d at 1083.

discovery of the claim."[85]  With respect to the first formulation, some courts have

found allegations that due diligence would not have uncovered the violations

sufficient.[86]  Under the second formulation, however, "[g]eneral assertions of

ignorance and due diligence without more specific explanation . . . will not satisfy

the[ ] pleading requirements;"[87] due diligence is not adequately pled if plaintiffs

"did not allege in the [Complaint] that they exercised due diligence" or if they

"make no allegation of any specific inquiries of [defendants], [or] detail when such

inquiries were made, to whom, regarding what, and with what response."[88]

---

[85]     *National Group for Comm'ns and Computers Ltd. v. Lucent Techs.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006).  *Accord In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (same).

[86]     *See, e.g.*, *Power*, 525 F. Supp. 2d at 426 (allegation of affirmative acts to conceal the violation satisfies diligence requirement); *In re Magnetic Audiotape Antitrust Litig.*, No. 99 Civ. 1580, 2002 WL 975678, at *2-3 (S.D.N.Y. May 9, 2002); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("Plaintiffs . . . could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants").

[87]     *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2003 WL 1990262, at *2 (S.D.N.Y. Apr. 29, 2003) (alteration in original) (quoting *Philip Morris v. Heinrich*, No. 95 Civ. 0328, 1996 WL 363156, at *12 (S.D.N.Y. June 28, 1996)).  *Accord SEC v. Fraser*, No. CV-09-00443, 2009 WL 2450508, at *16 (D. Ariz. Aug. 11, 2009) ("The SEC has also failed to allege any facts regarding the third element of fraudulent concealment: that the SEC acted with due diligence until discovering the fraudulent concealment.").

[88]     *Merrill Lynch*, 154 F.3d at 60.  *Accord Hinds County,* 620 F. Supp. 2d at 521-22 (court "[could not] find that a brief reference to 'reasonable diligence,'

B.      Discussion

1.      Section 21(d)(3) of the Exchange Act

Defendants argue that all of the SEC's claims for civil monetary

penalties under section 21(d)(3) that "first accrued" prior to five years before the

effective date of defendants' tolling agreements are barred by the catch-all statute

of limitations to which, they argue, the discovery rule does not apply.  Moreover,

"to the extent" the doctrine of fraudulent concealment is "available," the SEC has

not adequately pled it.[89]  Meanwhile, the SEC contends that the doctrine of

fraudulent concealment is inapplicable to its fraud claims, which are instead

governed by the discovery rule.  Under that theory, according to the SEC, it need

only plead that it did not "discover" (and with diligence could not have discovered)

defendants' fraud until November 16, 2004 – the earliest date that it was "even on

inquiry notice about these matters."[90]

The Second Circuit has not yet addressed whether the discovery rule

applies to SEC enforcement actions seeking penalties for fraud claims, though it

_____

coupled with general allegations of secrecy and deception directed towards the first
prong of fraudulent concealment, satisfie[d] the [plaintiff's] burden under Rule
9(b) to plead the third prong of fraudulent concealment with particularity.").

[89]      Wylys' Memorandum of Law in Support of Motion to Dismiss
("Wylys Mem.") at 16.

[90]      SEC Opp. at 50.

23

will soon.[91]  However, there does not appear to be a genuine dispute between the

parties that, even if the discovery rule is inapplicable, the doctrine of fraudulent

concealment applies.[92]  Nor does the case law on which defendants rely for the

proposition that the discovery rule is inapplicable to section 2462 foreclose the

applicability of the doctrine of fraudulent concealment.[93]  Therefore, because I find

that the SEC has adequately pled fraudulent concealment, and because the parties

---

[91]     Two district courts in the Southern District of New York have held
that the discovery rule does not apply to section 2462, *see SEC v. Gabelli*, No. 08
Civ. 3868, 2010 WL 1253603 (S.D.N.Y. Mar. 17, 2010), *Jones I*, 2006 WL
1084276, and the question is now pending before the Second Circuit in *Gabelli*'s
appeal.

[92]     *See, e.g.*, French's Memorandum of Law in Support of Motion to
Dismiss ("French Mem.") at 6 ("The SEC's claims for punitive relief . . . survive
dismissal only if the Complaint adequately pleads that the applicable five-year
limitations period was tolled based on fraudulent concealment.").

[93]     *See, e.g.*, *Federal Election Comm'n v. Williams*, 104 F.3d 237, 240
(9th Cir. 1996) (rejecting "the application of the discovery rule to the running of
limitations periods under § 2462" but "compelled" to find that "section 2462 is
subject to equitable tolling"); *3M Co. v. Browner*, 17 F.3d 1453, 1461 n.15 (D.C.
Cir. 1994) (rejecting application of the discovery rule to section 2462 in a non-
fraud action brought by the Environmental Protection Agency, but noting the
possibility that "in future cases" the EPA "could invoke the fraudulent
concealment doctrine to toll the statute of limitations"); *Gabelli*, 2010 WL
1253603, at *5-7 (determining that the SEC had failed to plead fraudulent
concealment after concluding that the discovery rule did not apply to section
2462); *Jones I*, 2006 WL 1084276, at *6 (rejecting application of the discovery
rule to section 2462 but "recogniz[ing] the possible applicability of the fraudulent
concealment doctrine to toll the statute of limitations").

appear to be in agreement that the SEC faces a higher pleading bar for fraudulent

concealment than for the discovery rule,[94] I need not address whether the discovery

rule applies to section 2462 in SEC actions for fraud.[95]

---

[94]    *See* Transcript of Oral Argument held on March 21, 2011 ("Tr.") at 86 (under the "discovery rule," "the burden is on the defense to plead and prove . . . that [the SEC] did or should have discovered the fraud earlier") (Martens, counsel for SEC) (citing *Smith v. Duff and Phelps, Inc.,* 5 F.3d 488, 492 (11th Cir. 1993) ("The defendants bear the burdens of production and persuasion on [the] question [of when plaintiff discovered, or, in the exercise of reasonable diligence, should have discovered, the alleged fraud].")). *Cf. Fraser*, 2009 WL 2450508, at *16 ("[F]raudulent concealment must be 'affirmatively pleaded and proved' to toll the statute of limitations.").

        This does not appear to be the case in other Circuits. For example, the Seventh Circuit determined that it "need not decide when a 'claim accrues' for the purpose of [section] 2462 generally" because "[w]hether a court says that a claim for fraud accrues only on its discovery . . . or instead says that the claim accrues with the wrong, but that the statute of limitations is tolled until the fraud's discovery, *is unimportant in practice*." *SEC v. Koenig*, 557 F.3d 736, 739 (7th Cir. 2009) (Easterbrook, J.) (emphasis added) ("Either way, a victim of fraud has the full time from the date that the wrong came to light, or would have done had diligence been employed."). *Accord SEC v. Kearns*, 691 F. Supp. 2d 601, 610 (D.N.J. 2010) (describing the same dueling arguments presented by the SEC and defendants in this case as a mere "pedantic exchange" and concluding that "regardless of whether the term accrual or tolling is applied, the SEC is entitled to protection under *Bailey*.").

[95]    *Accord* Tr. at 87 ("There is a huge difference in theory [between fraudulent concealment and the discovery rule] but not in practice, because here [the SEC has] pled enough to get fraudulent concealment.") (Martens, counsel for SEC).

        It is this Court's view, however, that the doctrine most applicable to the SEC's fraud claims is the discovery rule. Defendants are not "equitably estopped" from invoking the statute of limitations because the SEC has not alleged that they took active steps to prevent the SEC from suing in time by, for example, promising not to plead a statute of limitations defense. Rather, the SEC has alleged

I note, however, the confusion in the case law in this area.  District courts addressing this question – and cited by the SEC for the proposition that the discovery rule applies to section 2462 – have required plaintiffs to plead fraudulent concealment with no discussion of the discovery rule,[96] applied the discovery rule with no discussion of fraudulent concealment,[97] or conflated the two doctrines.[98] Even the "foundational" cases upon which the SEC relies for the proposition that "[t]he Supreme Court repeatedly has held that the 'discovery rule' governs when a claim accrues for statute of limitations purposes in cases involving fraud or concealment"[99] are not so clear; as counsel for French explained at oral argument,

---

"efforts by [defendants] in a fraud case to conceal the fraud" – facts that are precisely "within the domain of the discovery rule" (postponing *accrual*) and that are "not to be confused with" fraudulent concealment.  *Cada*, 920 F.2d at 451.

[96]     *See Fraser*, 2009 WL 2450508, at *16.

[97]     *See SEC v. Miller*, No. 1:04CV1655, 2006 WL 2189697, at *11 (N.D. Ga. July 31, 2006).

[98]     *See SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *12 (N.D. Ill. May 25, 2004) (describing its holding that a "discovery of violation" rule "should be extended to claims for civil penalties in securities fraud actions governed by the five-year statute of limitations in [s]ection 2462" as "consistent with" the concept that "accrual of the statute of limitations could be affected by the 'fraudulent concealment doctrine.'").  *Accord Williams*, 104 F.3d at 240 (rejecting "the application of the discovery rule to the running of limitations periods under [section] 2462" but "compelled by *Holmberg*" to find that "section 2462 is subject to equitable tolling").

[99]     SEC Opp. at 52 (citing *Merck*, *TRW, Holmberg, Exploration Co.,* and *Bailey*).

26

at least one Second Circuit case describes *Holmberg*, *Bailey*, and *Exploration Company* as "fraudulent concealment" cases despite the absence of those words in any of the opinions.[100]  Moreover, the statutes at issue in "*Merck* and *TRW* . . . expressly incorporate[d] the discovery rule in the statute of limitations . . . being construed by the Court,"[101] somewhat obscuring their applicability to cases where, as here, a court is asked to read a discovery rule *into* a federal statute.

One final note: defendants are also arguing that the SEC's claims for penalties as to the non-fraud violations should be dismissed as time-barred.[102]  For these claims, the SEC contends that the fraudulent concealment doctrine tolls the

---

[100]      *See* Tr. at 76 (Ashby, counsel for French) (presumably referring to *Atlantic City Elec. Co. v. General Elec. Co.*, 312 F.2d 236, 239 (2d Cir. 1962) ("The intendment of the relevant decisions of the Supreme Court starting with [*Bailey*], is that all federal limitation statutes are subject to the *doctrine of fraudulent concealment* . . . .") (explaining that *Exploration Co.* and *Holmberg* further entrenched "the doctrine of fraudulent concealment and its application to federal statutes")).  *See also Hendrickson Bros.*, 840 F.2d at 1083 ("As described by the Supreme Court more than a century ago, the purpose of the *fraudulent-concealment doctrine* is to prevent a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'") (citing *Bailey*, 88 U.S. at 349) (emphasis added).

[101]      Tr. at 76 (Ashby, counsel for French).

[102]      *See* Wylys Mem. at 16-21; Tr. at 63 (Collins, counsel for Wylys).

statute of limitations for its claims for penalties under section 21(d)(3).[103]  Because

I find that the SEC has pled fraudulent concealment with respect to its fraud claims

– for which the collection of non-fraud reporting violations forms the basis –

defendants' motion to dismiss the non-fraud claims is also denied.

> a.  **The SEC Has Adequately Pled Acts of Concealment by Defendants**

The SEC alleges that the Wylys engaged in numerous deceptive acts

to conceal their control over the offshore entities, which in turn frustrated the

SEC's ability to discover their violations.[104]  Those deceptive acts included

> (i) the making of hundreds of false and materially misleading statements to the Issuers, the Issuers' attorneys, investors, the Commission, and, in the case of Schaufele, to brokerage firm intermediaries, (ii) the establishment and operation of an offshore "Wyly family office" in the Cayman Islands as a conduit and repository for the communications and records "which should not be seen in the USA," and (iii) the allocation of the Wylys' offshore holdings of Issuer Securities among different, and often newly created, offshore entities, all under the Wylys' control,

---

[103]    *See* SEC Opp. at 64.  The SEC also argues that the continuing violations doctrine applies to toll the statute of limitations.  However, because I find that the SEC has adequately alleged fraudulent concealment, I need not reach that question.

[104]    *See* Tr. at 88 (cataloguing dozens of allegations in the Complaint showing that defendants "did things beyond [the false Schedule 13(d)s and Form 4s] to conceal" the false statements within those filings) (Martens, counsel for SEC).

solely to avoid making required Commission filings.[105]

Moreover, the Wylys' sporadic "disclosures" to the SEC disclaiming beneficial

ownership of millions of Issuer shares do not "flatly refute any notion that

[defendants] prevented or frustrated the SEC's discovery of its belatedly asserted

claims."[106]  If anything, such (false) disclaimers constituted additional acts of

concealment, because they were affirmative misrepresentations as to the Wylys'

control over the trading and holding of securities in the Offshore System.

The Wylys argue that the SEC fails to allege conduct "beyond the

alleged misconduct alleged to give rise to the underlying violations" and that it has

not alleged that the violations were self-concealing.[107]  *First*, with respect to the

reporting-based violations (the non-fraud claims), defendants are simply wrong;

the SEC has alleged dozens of acts of concealment beyond the making of false and

---

[105]     Compl. ¶ 7.  *See also id.* ¶¶ 51, 54-56, 64, 75; Tr. at 89-90 (defendants "could have used trusts to try to distance themselves, but they didn't just use trusts; they used foreign trusts.  We would argue that that additional step of placing these things offshore was designed to conceal it, to make it difficult to have to run it through the Caymans and the Isle of Man and to use the Wyly family office and to use his accountant, and to use trust protectors.  All of those things were beyond just making false statements.") (Martens, counsel for SEC).

[106]     French Mem. at 7.  A court may consider documents outside the pleadings on a motion to dismiss if they are integral to the pleadings or subject to judicial notice.  *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[107]     Wylys Mem. at 18.

materially misleading statements, as noted above.  *Second*, "[w]here a plaintiff raises fraud-based claims, the allegations supporting the merits of those claims are often very similar to the allegations that support fraudulent concealment.  This similarity does not prevent a plaintiff from pleading equitable tolling."[108] Defendants cite *Gabelli* for the proposition that fraudulent concealment "does not apply 'where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying causes of action.'"[109]  However, the case upon which the *Gabelli* court relied for that proposition concerned (not surprisingly) equitable *estoppel* under New York law, which, as discussed earlier, tolls the statute of limitations when one party "induces the opposing party to postpone bringing suit on a known cause of action"[110] by, for

---

[108]     *Fraser*, 2009 WL 2450508, at *16 (where alleged wrongdoing involved both a scheme to defraud investors and misrepresentations that were allegedly designed to conceal the scheme from the SEC and the general public).  *Accord* Tr. at 94 ("[I]t would be odd to say that [the Wylys] engage[d] in a fraud [and] that the fraud include[d] within it the notion of concealment and, yet, that doesn't toll the statute of limitations.") (Martens, counsel for SEC).  This is precisely the type of analytical bewilderment engendered by attempts to analyze "efforts by a defendant in a fraud case to conceal the fraud" ("within the domain of the discovery rule") with traditional "fraudulent concealment" – a doctrine of equitable estoppel.  *Cada*, 920 F.2d at 451.

[109]     *Gabelli*, 2010 WL 1253603, at *7 (quoting *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006)).

[110]     *Abercrombie*, 438 F. Supp. 2d at 265 (emphasis added).

example, promising not to plead the statute of limitations.[111]  It makes sense to require a party pleading equitable estoppel to plead affirmative acts of concealment separate from any underlying fraud.  The SEC, however, is not pleading equitable estoppel.

> **b.    The SEC Has Alleged that It Did Not Discover Its Claims Until November 16, 2004**

The SEC has alleged that it was not even placed on inquiry notice of any of the defendants' alleged frauds until November 16, 2004, when Bank of America reported to staff members of the SEC's Division of Enforcement that it had terminated securities accounts held in the name of numerous Isle of Man entities because those entities refused to disclose information regarding their beneficial ownership.[112]  The Complaint also alleges that each of the defendants executed a tolling agreement with the SEC prior to November 16, 2009, and that those tolling agreements were in effect through the filing of the Complaint on July 29, 2010.[113]

Defendants suggest that the very making of the allegedly false and misleading SEC filings placed the SEC on notice of the defendants' fraud before

---

[111]     *See Cada*, 920 F.2d at 450-51.

[112]     *See* Compl. ¶ 118.

[113]     *See id.* ¶ 117.

November 16, 2004, and therefore on notice of their underlying reporting violations.[114]  Indeed, as early as 1994, numerous SEC filings disclosed that the Wylys and French disclaimed beneficial ownership of millions of shares of Issuer stock and stock options that had been transferred to multiple irrevocable trusts established by the Wylys and French.[115]  To offer just one example (of literally dozens) of such disclaimers, Michaels disclosed in 1996 that French disclaimed beneficial ownership of 45,000 Michaels stock options "owned by an independent irrevocable trust of which Mr. French and certain of his family members are beneficiaries."[116]  "Against the backdrop of these public filings," defendants argue, "the SEC cannot plausibly claim that [defendants] frustrated or prevented discovery of the information necessary to bring its claims within the limitations period."[117]

However, defendants' argument wholly overlooks that it was the Wylys' *control of* the offshore trusts that the SEC claims it was prevented from discovering throughout the limitations period – control that led it ultimately to

---

[114]     *See* French Mem. at 7-11.

[115]     *See* Appendix of Exhibits in Support of French's Motion to Dismiss ("French App.").

[116]     French App. Ex. 2 at App. 24A.

[117]     French Mem. at 9-10.

32

discover the violations for which it brings suit today.  In fact, one of the

"disclaimers" to which French points as evidence that the SEC was not "prevented

from discovering the nature of its claims against Mr. French within the applicable

limitations period" expressly denies such control.[118]  And the "fact" of the Wylys'

control over the offshore trusts is integral to the SEC's allegations of scienter, a

"fact"[119] that a reasonably diligent plaintiff is not deemed to have "discovered"

"until he can plead that fact with sufficient detail and particularity to survive a

12(b)(6) motion to dismiss."[120]

    Moreover, defendants' argument is highly fact-based and ill-suited for

a motion to dismiss.[121]  SEC filings must disclose a fraud on their face – or at least

---

[118]    *See id.* at 11 (explaining that "Mr. French even disclosed in January
2003 that due to a 'revision to the trust instrument [Mr. French] is deemed to have
beneficial ownership of' 200,000 Scottish Re warrant shares and 266,667 Scottish
Re stock options owned by a family trust created for his benefit and '*controlled by
an independent trustee*,' but that Mr. French still 'expressly disclaims beneficial
ownership' of the securities held by the trust.") (quoting App. Ex. 6 at App.
64A-66A) (emphasis added) (original emphasis removed).

[119]    *Merck*, 130 S. Ct. at 1794 (emphasis added).

[120]    *City of Pontiac*, 2011 WL 677404, at *4 (setting forth the standard for
a private plaintiff under the discovery rule).

[121]    *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir.
1979) ("Issues of due diligence and constructive knowledge depend on inferences
drawn from the facts of each particular case – similar to the type of inferences that
must be drawn in determining intent and good faith."); *Nivram Corp. v. Harcourt
Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993) ("Inquiry notice

present "storm warnings" – before courts will deem them sufficient to trigger

inquiry notice.[122]  Thus, even where public filings contain statements that later

form the basis for fraud claims, the false filings alone are not deemed to have

placed plaintiffs on inquiry notice unless they provided specific information

indicating a probability of fraud.[123]  Plaintiffs are entitled to rely on the statements

in public filings unless there are some other indicia that the statements are false.[124]

### c.   The SEC Has Adequately Alleged Due Diligence

The Wylys argue that the SEC "alleges nothing more than the

conclusory statement that it 'proceeded with due diligence during the limitations

---

exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.").

[122]   *See Miller*, 2006 WL 2189697, at *11 (denying summary judgment on statute of limitations grounds where SEC would have to undertake further analysis of Form 10-Q disclosures to discover fraud; but conceding that "[i]n certain situations, a court may decide, as a matter of law, when a federal securities fraud action accrued").

[123]   *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 433 (2d Cir. 2008).  *See also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) (finding that Form 10-K did not constitute notice of fraud because mere identification of certain purported costs "does not necessarily mean those costs are the result of fraud").

[124]   *See Backhaus v. Streamedia Comms., Inc.*, No. 01 Civ 4889, 2002 WL 1870272, at *3 (S.D.N.Y. Aug. 14, 2002) ("Misleading statements in the Prospectus or in other public statements, without an event that would reveal the misleading nature of the statements, are not enough to put investors on inquiry notice.").

period' (Compl. ¶ 118)" and that it "does not plead any facts regarding any of the steps it purportedly took during the limitations period to exercise diligence to discover the alleged fraud."[125]  Of course, this argument assumes – notwithstanding the language of many courts in this Circuit – that it is insufficient for a plaintiff to allege that its ignorance of a claim "was not the result of lack of diligence"[126] or that due diligence would not have uncovered the violations because of "the affirmative, deceptive practices and techniques of secrecy employed by Defendants."[127]  In cases of *equitable estoppel*, I am inclined to agree with the *Hinds County* court (and, presumably, defendants) that "[t]his standard is problematic because it allows the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong."[128]  On the other hand, if fraud is so meticulously concealed that a plaintiff could not possibly have thought even to inquire about it, how could a plaintiff do anything *but* regurgitate the first

---

[125]     Wylys Mem. at 18-19 (citing *Gabelli*, 2010 WL 1253603, at *7 (SEC's allegation that it "could not have discovered that wrongdoing earlier" failed to satisfy the requirement of alleging how it had engaged in due diligence)).

[126]     *Hendrickson Bros.*, 840 F.2d at 1083.

[127]     *Nine West Shoes*, 80 F. Supp. 2d at 193.

[128]     *Hinds County*, 620 F. Supp. 2d at 521.

prong of fraudulent concealment?[129]  Again, the inconsistency with which courts have applied the "due diligence" prong may stem in part from their attempt to fit a square peg (claims to which the discovery rule applies) into a round hole (the doctrine of fraudulent concealment).

This Court need not resolve the issue, however, because the SEC has satisfied both formulations of "due diligence" as articulated by courts in this district.  In addition to pleading multiple acts of concealment,[130] the SEC has alleged at least one "specific inquir[y]" it made of defendants, including "when [it was] made, to whom, regarding what, and with what response."[131]  In particular, in August, 1998, the SEC's Division of Corporate Finance questioned whether the offshore trusts were truly independent of French and the Wylys.[132]  In response, French assured the lawyers responding to the SEC that they were.[133]  Thus,

---

[129]     Similarly, if the SEC had alleged that the wrongs here were "inherently self-concealing" – an alternative basis for pleading the first prong of fraudulent concealment, *Power*, 525 F. Supp. 2d at 425 (quotation marks omitted) – how could there be any affirmative acts of due diligence to plead?

[130]     *See supra* Part IV.B.1.a.

[131]     *Merrill Lynch*, 154 F.3d at 60.

[132]     *See* Compl. ¶ 108.

[133]     *See id.*  Thus, French's assertion that "even if the SEC legitimately could claim it needed additional information to discover the nature of its claims in a timely fashion, all it had to do was ask" is directly contradicted by the Complaint's detailed factual allegations.  French Mem. at 12.

36

crediting the SEC's allegations that the Wylys *did* in fact control the offshore

trusts, the Complaint adequately alleges that it exercised due diligence throughout

the limitations period.[134]

One final note: at oral argument, counsel for Schaufele urged this

Court to consider the possibility that, even if section 2462 is subject to equitable

tolling under the doctrine of fraudulent concealment, the SEC should not

necessarily be afforded the full five-year limitations period to bring suit.[135]  In

*Cada*, Judge Posner entertained such a possibility, reasoning that "the statute of

limitations is not automatically delayed by the time it takes to obtain [the

information necessary to bring suit]," holding instead that "a plaintiff who invokes

equitable tolling to suspend the statute of limitations must bring suit within a

reasonable time after he has obtained, or by due diligence could have obtained, the

necessary information."[136]  On a more fully developed factual record, this argument

---

[134]     *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d
148, 155 (2d Cir. 2003) (denials or reassuring statements by defendants are
insufficient to dampen any "storm warnings" that otherwise may have existed).

[135]     *See* Tr. at 107 ("Do we reset to zero and go for five years, or do we
look at some shorter period of time requiring act of diligence? . . . .  You get some
reasonable period.  And here, where we are talking about something that's nineteen
years old, maybe five years is too long.") (Auerbach, counsel for Schaufele) (citing
*Cada*, 920 F.2d at 453).

[136]     *Cada*, 920 F.2d at 453.

may be ripe for consideration.[137]

## 2. Section 21A of the Exchange Act (Civil Penalties for Insider Trading)

The SEC seeks penalties for the Wylys' and French's alleged 1999

insider trading violations under section 21A, a statute which allows for treble

damages.  The Wylys argue that section 21A's five-year "Statute of limitations" is

an "explicit statute of repose" that "runs from 'the date of the purchase or sale,'

without qualification," and therefore "does not permit equitable tolling."[138]  The

SEC argues that, because section 21A suggests no restriction on the application of

the discovery rule, "there is no indication that Congress intended in [s]ection 21A

to override the long-standing rule of *Holmberg* that the discovery rule 'is read into

---

[137]    *See SEC v. Alexander*, 248 F.R.D. 108, 120 (E.D.N.Y. 2007) (opining that "there are significant reasons for finding that a discovery rule governs the accrual of the limitation period contained in [s]ection 2462" but declining to "reach the question" on a motion to dismiss because "it is the most prudent course for the parties to conduct fact discovery on issues that arise in applying both discovery and violation rules, as well as equitable tolling on the basis of fraudulent concealment.").

[138]    Wylys Mem. at 13-14.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004) ("'[S]tatutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses . . . , the various forms of tolling, and the potential application of the discovery rule.  In contrast, statutes of repose affect the availability of the underlying right:  That right is no longer available on the expiration of the specified period of time.'") (quoting Calvin W. Corman, *Limitation of Actions*, § 1.1, at 4-5 (1991)).

every federal statute.'"[139]  Whether section 21A is a statute of repose, or a statute of

limitations subject to the discovery rule (or the doctrine of fraudulent

concealment), appears to be a matter of first impression.

### a.        Section 21A Is Not a Statute of Repose

In holding that section 13 of the Securities Act[140] contained a three-

year statute of repose, the Second Circuit in *P. Stolz Family Partnership v. Daum*

devoted considerable discussion to the differences between statutes of repose and

---

[139]    SEC Opp. at 61 (quoting *Holmberg*, 327 U.S. at 397).

[140]    15 U.S.C. § 77m (limiting private actions for incorrect statements and material omissions in the course of selling securities).  The fact that the Second Circuit in *P. Stolz* declined to read the discovery rule into the three-year limitations period contained in section 13 does not, as defendants urge, support their argument that section 21A, too, is a statute of repose.  Section 13 creates a two-pronged time bar, one prong of which (the one-year period) expressly applies the discovery rule while the other prong (the three-year provision) does not.  Given the wording of section 13, it would make no sense to read the discovery rule into the three-year prong of section 13's limitation.  In contrast, section 21A is a single-pronged statute that on its face suggests no restriction on the application of the discovery rule.

Moreover, "Congress chose one year after discovery, and a cap of two additional years on tolling principles [in section 13], in order to curtail the extent to which the securities laws permit recoveries based on the wisdom given by hindsight." *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990).  But section 21A "uses for inside trading cases a measure of damages that the passage of time does not affect" – namely the insider's profit gained or loss avoided.  *Id.* (discussing section 21A's private analog, section 20A (discussed further below)).  "This sum is fixed within days after the trading, sometimes within hours.  [In contrast to actions under section 13], [n]o one has a free put or call of securities; no one can use delay in bringing suit to speculate on the firm's future prosperity." *Id.*

statutes of limitation.  *First*, "[i]n general, a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period."[141]  Thus, "unlike a statute of limitations, *a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit.*"[142]  Section 21A's five-year statute of limitations is clearly a limitation on one of several "remedies" the SEC may seek for insider trading; it does not prevent the SEC from bringing suit for injunctive and other equitable relief under section 21(d) no matter how much time has elapsed since the violation occurred.  Indeed, section 21A itself provides that it should "not be construed to bar or limit in any manner any action by the Commission . . . under any provision of this title."[143]  And although section 21A in a sense "defines the right" to bring suit for a particular type of relief (treble

---

[141]     355 F.3d at 102.

[142]     *Id.* (emphasis added).  *Accord id.* ("'[The statute of repose] does not bar a cause of action; its effect, rather, is to prevent what might otherwise be a cause of action, from ever arising . . . .  The injured party [injured after the repose period has passed] literally has [n]o cause of action.  The harm that has been done is *Damnum absque injuria* – a wrong for which the law affords no redress.'") (quoting *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 199 (1972)).

[143]     15 U.S.C. § 78u-1(d)(5).

penalties) and for a particular type of behavior that violates the Exchange Act,[144] such behavior would be actionable under the federal securities laws even without section 21A.

      *Second*, when discussing the purported inequities of statutes of repose – such as the opportunity they afford defendants to "secur[e] a sort of immunity to continue illicit [behavior] without civil liability" – the *P. Stolz* court explained that plaintiffs' "remedial results may best be furthered, without losing one of the principal benefits of a statute of repose – to provide an easily ascertainable and certain date for the quieting of litigation – by lengthening the period before repose takes effect."[145]  As an example, the court cited the Sarbanes Oxley Act, "which extend[ed] the effective date of the statute of repose from three years to five years."[146]  Section 20A of the Exchange Act, which provides "express private rights of action for those who traded securities contemporaneously with, and on the

---

[144]    Section 21A applies only when a person has violated the Exchange Act in one of two particular ways – (1) "*by* purchasing or selling a security . . . while in possession of material, nonpublic information" in a transaction on or through the facilities of a national securities exchange, or (2) "*by* communicating such information in connection with" such a transaction.  *Id.* § 78u-1(a)(1) (emphasis added).

[145]    *P. Stolz*, 355 F.3d at 104 (citing Pub.L. No. 107-204, § 804(a), 116 Stat. 745, 801 (July 30, 2002)).

[146]    *Id.*

opposite side of, a transaction from the insider trader,"[147] also provides a five-year

limitations period.  Moreover, the Supreme Court has described section 20A as "a

statute of repose"[148] and, to this Court's knowledge, no court has ever applied the

discovery rule or equitable tolling doctrines to it.[149]   In fact, consistent with *P.

Stolz*'s reasoning that Congress might lengthen a period of repose to counteract its

seemingly inequitable effects, the Supreme Court in 1991 characterized section

20A's five-year limitations period as providing "enhanced protection"[150] to private

litigants injured by insider trading – compared to the two- and three-year statutes

of repose that applied to nearly every other private right of action under the

Securities Act and the Exchange Act at that time.  Similarly, the Second Circuit has

opined that "Congress perhaps specified a five-year limitations period in [section

20A] in recognition of the [difficulties of ferreting out evidence sufficient to

---

[147]     H.Rep. No. 100-910, 100th Cong., 2d Sess.1988 ("Insider Trading and
Securities Fraud Enforcement Act ("ITSFEA") House Report"), at 38.

[148]     *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S.
350, 354 (1991).

[149]     *But see Short*, 908 F.2d at 1391 (opining that "[Securities Act section]
13 . . . is a statute of repose, while [section] 20A [of the Exchange Act] appears to
be a statute of limitations.").

[150]     *Lampf*, 501 U.S. at 361.

prosecute insider trading cases].”[151]

However, if section 20A is a statute of repose, it complicates this

Court's analysis somewhat; for, aside from the caveat that section 21A should not

be construed to bar or limit any other action by the SEC under the Exchange Act,

sections 21A and 20A contain nearly identical five-year limitation periods,

suggesting section 21A, too, is a statute of repose:

> Section 20A (private right of action): “No action may be brought under this section more than 5 years after the date of the *last transaction that is the subject of the violation.*”[152]

> Section 21A (SEC action): “No action may be brought under this section more than 5 years after the date of the *purchase or sale*.”[153]

Moreover, as with section 20A, no court has ever held that section 21A is anything

but a statute of repose.[154]   And the SEC concedes that it has not always taken the

---

[151]      *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 363 (2d Cir. 1990) (citing ITSFEA House Report at 15) (“Plainly Congress felt that unique measures were necessary to curb insider trading, and we are not persuaded that the five-year limitations period specified for that type of action, which has not been designated for any other type of securities claim, was one that Congress meant to apply generally.”).  *Id.* at 363.

[152]      15 U.S.C. § 78t-1(b)(4) (emphasis added).

[153]      *Id.* § 78u-1(d)(5) (emphasis added)

[154]      *See, e.g.*, *SEC v. Willis*, 777 F. Supp. 1165, 1174 (S.D.N.Y. 1991) (“[T]he SEC's action for civil penalties under [section 21A] is untimely with respect to the alleged unlawful trades executed [more than five years before the

position, as it does in this action, that section 21A[155] (or section 20A, for that

matter[156]) is subject to the discovery rule.

> Nevertheless, this Court now holds that section 21A is not a statute of

repose.  *First*, even if section 20A is a statute of repose, "Congress itself has

cautioned that the same words may take on a different coloration in different

sections of the securities laws."[157]  Thus, "[w]hatever [the language of section 21A]

may mean in the [] context[] [of section 20A], only [] one narrow question is

presented here."[158]  *Second*, section 20A applies to private litigants' actions for

---

filing of the Complaint]. . . ."); *Buntrock*, 2004 WL 1179423, at *13 ("[A]ny request for penalties with respect to trades made [more than 5 years after the date of the purchase or sale] will not be entertained.").

[155]   *See, e.g.*, SEC's Memorandum of Law in Opposition to Defendants' Motions to Dismiss, *Buntrock*, No. 02 C 2180 (N.D. Ill.), filed on October 16, 2002 [Docket No. 50] ("Congress specified clearly that the start date for running the five-year period is the date of the trade.  Hence, no penalties attach for insider trading that took place more than five years before the filing of the Complaint.").

[156]   *See, e.g.*, *Lampf*, 501 U.S. at 354 (explaining that the Solicitor General – who appeared on behalf of the SEC – "urge[d] the application of *the 5-year statute of repose* specified in [section] 20A [to private actions under Rule 10b-5] . . . . The 5-year period, it is said, accords with 'Congress's most recent views on the accommodation of competing interests, provides the closest federal analogy, and promises to yield the best practical and policy results in Rule 10b-5 litigation.'"); *Short*, 908 F.2d at 1391 ("The SEC believes that [section 20A] is a statute of repose . . . .").

[157]   *SEC v. National Sec., Inc.*, 393 U.S. 453, 466 (1969).

[158]   *Id.*

insider trading violations, while section 21A applies to the SEC, and "[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."[159]  Indeed, the *P. Stolz* court acknowledged the "touch of hyperbole" in its hypothetical that the statute of repose in section 13 of the Securities Act would "secur[e] a sort of immunity [for a defendant] to continue illicit offers without civil liability," noting that "it is likely that the SEC is not subject to the [section] 13 statute of repose and would be able to bring its own civil enforcement action against such a defendant under [section] 20(b) of the [Securities Act's analog of section 21(d) of the Exchange Act]. Therefore, it is unlikely that an offeror could ever operate with unfettered immunity."[160]  *Third*, this result is consistent with the principle that section 2462 – which applies to SEC actions for civil penalties for violations of every other provision of the Exchange Act – is a statute of limitations to which equitable

---

[159]     *E. I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924). *Accord Badaracco v. Commissioner of Internal Revenue*, 464 U.S. 386, 391 (1984) (quoting *E.I. Du Pont*).

[160]     *P. Soltz*, 355 F.3d at 104 n.6 (citing *Rind*, 991 F.2d at 1491-93); *SEC v. Lorin*, 869 F. Supp. 1117, 1120 (S.D.N.Y. 1994)).  Chief Judge Preska subscribed to powerfully analogous logic in declining to extend the PSLRA "strong inference" formulation ("cogent and at least as compelling") to SEC enforcement actions, "a context not found by Congress to harbor [the abuses of private securities litigation]."  *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008).

principles apply.[161]  It would be an absurd result indeed if the SEC's right to seek

penalties under the Exchange Act were most circumscribed for the one type of

behavior (insider trading) for which Congress has explicitly "[r]ecogniz[ed] []

unique difficulties in identifying evidence"[162] – arguably the epitome of the sort of

self-concealing conduct for which courts often apply the discovery rule.[163]

> **b.    The SEC's Insider Trading Claims Did Not Begin
> Accruing, or the Statute of Limitations Was**

---

[161]    Defendants ascribe significance to the fact that section 21A's statute
of limitations begins to run on "the date of the purchase or sale" whereas, *e.g.*,
section 2462's limitations period does not being to run until "the claim first
*accrued*" (emphasis added).  However, such language is not dispositive.  *See
Exploration Co.*, 247 U.S. at 449-50 (reading the discovery rule into a statute
providing that "suits to vacate and annul patents hereafter issued shall only be
brought within six years after *the date of the issuance of such patents*") (emphasis
added); *United States v. Uzzell*, 648 F. Supp. 1362, 1366-68 (D.D.C. 1986)
(holding the False Claims Act's then single-pronged statute of limitations, 31
U.S.C. § 3731, which required the bringing of suit "within 6 years from the date
the violation is committed," was a statute of limitations subject to equitable tolling
principles).

[162]    *Lampf*, 501 U.S at 361 (citing ITSFEA House Report at 7).

[163]    *See Uzzell*, 648 F. Supp. at 1367 ("The Supreme Court has
emphasized that the proper test to use in determining whether equitable principles
apply to an express statute of limitations is whether tolling the limitation in a given
context is *consonant with the legislative scheme*.") (quotation marks omitted)
(emphasis added).  *See also American Pipe & Const. Co. v. Utah*, 414 U.S. 538,
559 (1974) ("[T]he mere fact that a federal statute providing for substantive
liability also sets a time limitation upon the institution of suit does not restrict the
power of the federal courts to hold that the statute of limitations is tolled under
certain circumstances *not inconsistent with the legislative scheme*.") (emphasis
added).

**Equitably Tolled, Until November 16, 2004**

As with the SEC's other fraud claims under section 10(b), its claims for insider trading are precisely the types of claims to which the discovery rule – rather than the doctrine of fraudulent concealment – apply.  However, the Court is again faced with the dilemma whether the SEC need merely assert that it did not discover the insider trading violation until some time after November 16, 2004 – and could not have discovered it sooner with due diligence – or whether it must plead all three prongs of fraudulent concealment.  Once again, I find the pleadings adequate to support either basis for allowing the SEC's claims to proceed.  In order to bring its insider trading claims against the Wylys and Schaufele, the SEC had to first "discover" the fact of the Wylys' control over the offshore entities that nominally entered into the security-based swap with Lehman Brothers.  Without knowledge of that fact – and the fact that Schaufele *knew* the Wylys controlled the offshore entities and were the real "insiders" behind the transaction – it could not have stated the claim it now brings.  And, as discussed earlier,[164] the SEC has alleged (1) that the Wylys engaged in dozens of acts of concealment to prevent the SEC's discovery of their control over the offshore trusts,[165] while Schaufele

---

[164]     *See supra* Part IV.B.1.

[165]     The Wylys' swap agreement was required to be disclosed in a public Form 4 filing with the Commission, but it, like all the Wylys' other offshore

47

repeatedly misrepresented the independence of the offshore trusts to his employers; (2) that the SEC did not discover the Wylys' relationship to and control over the offshore trusts until November 16, 2004; (3) and both (a) that it could not with due diligence have discovered that information any earlier and (b) that it made at least one specific inquiry in 1999 about the Wylys' beneficial ownership of the offshore entities, an inquiry that was met with French's alleged lies. These allegations are sufficient to plead the application of both the discovery rule and fraudulent concealment, and accordingly defendants' argument that the SEC's claim for penalties under section 21A is time-barred fails.

## V.   THE SEC'S CLAIMS UNDER THE FEDERAL SECURITIES LAWS' ANTIFRAUD PROVISIONS

### A.   Applicable Law

#### 1.   Exchange Act Section 10(b) and Rule 10b-5

Rule 10b-5, enacted pursuant to section 10(b), sets forth alternative bases for securities fraud liability. In addition to prohibiting (1) the "mak[ing] [of] any untrue statement[s]," [166] Rule 10b-5 also forbids (2) the use, "in connection

---

transactions in the Issuer Securities, structured and otherwise, was not disclosed. *See* Compl. ¶ 5; SEC Opp. at 41-42. The Wylys' failure to file a Form 4 filing with the SEC alone constitutes an act of concealment sufficient to satisfy the first prong of fraudulent concealment.

[166]   17 C.F.R. § 240.10b-5 (2000). In actions by the SEC, the SEC "need only allege that the defendant was sufficiently responsible for the statement – in

with the purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates . . . as a fraud or deceit."[167]

### a.   Insider Trading

### i.   Traditional or Classical Theory

"Under the 'traditional' or 'classical theory' of insider trading liability, [section] 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."[168]  Trading on such information qualifies as a "deceptive device" under [section] 10(b) because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained

---

effect caused the statement to be made."  *SEC v. Collins & Aikman*, 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007) (internal quotations omitted).

[167]    17 C.F.R. § 240.10b-5 (2000).  *Accord Stoneridge Inv. Partners, LLC., v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008) (noting that Rule 10b-5 is not limited to "a specific oral or written statement," because "[c]onduct can itself be deceptive"); *Kearns*, 691 F. Supp. 2d at 617 ("Liability under [s]ection 10(b) and Rule 10b-5 attaches not only to misleading statements to the public, but to deceptive practices."); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements.").

[168]    *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

confidential information by reason of their position with that corporation."[169]

Thus, section 10(b) acts to "prohibi[t] an insider, who has a fiduciary duty to a

corporate entity, from using material non-public information to the insider's

advantage in order to make secret profits."[170]

### ii.    Misappropriation Theory

Under the "misappropriation theory" of insider trading, an individual

violates section 10(b) and Rule 10b-5

> when he misappropriates confidential information for securities
> trading purposes, in breach of a duty owed to the source of the
> information.   Under this theory, a fiduciary's undisclosed,
> self-serving use of a principal's information to purchase or sell
> securities, in breach of a duty of loyalty and confidentiality,
> defrauds the principal of the exclusive use of that information.  In
> lieu of premising liability on a fiduciary relationship between
> company insider and purchaser or seller of the company's stock,
> the   misappropriation   theory   premises   liability   on   a
> fiduciary-turned-trader's deception of those who entrusted him
> with access to confidential information. . . . The misappropriation
> theory is . . . designed to protec[t] the integrity of the securities
> markets against abuses by outsiders to a corporation who have
> access  to  confidential  information  that  will  affect  th[e]
> corporation's security price when revealed, but who owe no
> fiduciary or other duty to that corporation's shareholders.[171]

To establish that a defendant is liable for insider trading under the

---

[169]    *Chiarella v. United States*, 445 U.S. 222, 228 (1980).

[170]    *SEC v. Franco*, 253 F. Supp. 2d 720, 726 (S.D.N.Y. 2003).

[171]    *O'Hagan*, 521 U.S. at 652 (quotation marks and citations omitted).

50

misappropriation theory, the SEC must prove (1) that the information at issue was both material and nonpublic; (2) that the defendant breached a duty of confidentiality in sharing the information ("the cornerstone of a misappropriation liability case"[172]); and (3) that the defendant acted with scienter.[173]

### iii.    Materiality

Information is material if "'there is a substantial likelihood that a reasonable shareholder would consider it important' or, in other words, 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available.'"[174]   Materiality "depends on the significance the

---

[172]    *SEC v. Lyon*, 605 F. Supp. 2d 531, 542 (S.D.N.Y. 2009).  *Accord SEC v. Rorech*, 720 F. Supp. 2d 367, 412 (S.D.N.Y. 2010) ("There cannot be liability under section 10(b) and Rule 10b-5 unless the owner of the information that was allegedly misappropriated expected the information to remain confidential.").

[173]    *See Rorech*, 720 F. Supp. 2d at 409 (citing *Lyon*, 605 F. Supp. 2d at 541, 542; *Aaron v. SEC*, 446 U.S. 680, 691 (1980)).

[174]    *SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  *Accord Litwin v. Blackstone Group, L.P.*, --- F.3d ----, No. 09-4426-cv, 2011 WL 447050, at *10 (2d Cir. Feb. 10, 2011) (because "a reasonable investor would almost certainly want to know information . . . that Blackstone reasonably expects will have a material adverse effect on its future revenues," the "alleged misstatements and omissions relating to [that information] were plausibly material"); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

reasonable investor would place on the withheld or misrepresented information."[175]

"The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."[176]

> With respect to "contingent or speculative" information,
>
> materiality will depend at any given time upon a balancing of both indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. . . . [I]n order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels [such as] board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries . . . . To assess the magnitude of the transaction . . . , a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.  No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.[177]

"Furthermore, where there is a question of whether certain information is material, courts often look to the actions of those who were privy to the information in

---

[175]     *Basic*, 485 U.S. at 240.

[176]     *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

[177]     *Basic*, 485 U.S. at 239 (quotation marks and citations omitted). *Accord SEC v. Geon Indus.*, 531 F.2d 39, 47-48 (2d Cir. 1976).

determining materiality."[178]

## B.    Discussion

### 1.    The Complaint Adequately Alleges the Wylys' and French's Liability for Fraud and French's and Schaufele's Liability for Aiding and Abetting the Wylys' Fraud

The SEC charges the Wylys and French with primary violations of

section 10(b) of the Exchange Act and section 17(a) of the Securities Act, and

alleges that French and Schaufele aided and abetted the Wylys' section 10(b)

violation.  For reasons that will be explained at a conference scheduled for April

14, 2011, at 5:00 p.m., the Wylys', French's, and Schaufele's motions to dismiss

these claims are denied.[179]

### 2.    The Complaint Adequately Alleges Insider Trading Against the Wylys and Schaufele

---

[178]    *Rorech*, 720 F. Supp. 2d at 412.  *Accord Basic*, 485 U.S. at 241 n.18 ("[T]rading (and profit making) by insiders can serve as an indication of materiality . . . .") (emphasis omitted); *Rothberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir. 1985) ("The best proof of the materiality of that information is that the . . . experienced investors, found it to be sufficiently material . . . to purchase [the] stock."); *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 851 (2d Cir. 1968) (a "major factor in determining whether [discovery of mineral ore] was a material fact" was "the importance attached to the drilling results by those who knew about it").

[179]    Schaufele and French also argue that the Complaint fails adequately to allege that they aided and abetted the Wylys' insider trading scheme as alleged in the Second Claim.  However, the Commission has clarified that it is making no such allegation against either of them.  *See* SEC Opp. at 22 n.20.  Therefore, I do not consider those arguments by defendants.

The Complaint (Claim Two) alleges that the Wylys, in violation of their fiduciary duties as corporate directors of Sterling Software, used their offshore entities to execute a security-based swap agreement with Lehman in October 1999 while the Wylys were in possession of, and based on, material nonpublic information[180] – namely, that they, as Chairman and Vice-Chairman of Sterling Software, had agreed and resolved that the sale of Sterling Software to an external buyer should be pursued.[181]  It further alleges that Schaufele, in violation of numerous Lehman policies concerning insider trading, confidential information, conflicts of interest, and misappropriation of firm property, purchased Sterling Software stock through brokerage accounts in his wife's name while in possession of the material, nonpublic information that Sterling Software insiders – the Wylys – were about to execute a massive, bullish transaction.[182]

The Wylys move to dismiss Claim Two as legally insufficient, arguing that they did not directly trade in "securities," as that term was then (and is now) defined by the Exchange Act and that the information on which they traded

---

[180]      *See id.* ¶¶ 77-97.

[181]      *See id.* ¶ 89.

[182]      *See id.* ¶¶ 98-99.

was not material as a matter of law.[183]  Schaufele also moves to dismiss, arguing

that the nonpublic information in his possession and on which he traded was not

material and that he did not engage in "deception" in trading thereon.  The

defendants' arguments are without merit.

### a.    The Complaint States a Claim for Insider Trading Against the Wylys

#### i.    The Security-Based Swap Agreement Was "in Connection With" the Purchase or Sale of Securities

The Wylys contend that the SEC has failed to allege a legally viable

section 10(b) claim for insider trading because, when the conduct at issue here

occurred, security-based swap agreements were not included within the Exchange

Act's definition of a "security" and were not otherwise subject to section 10(b) or

Rule 10b-5.[184]  The Wylys' argument is based primarily on the fact that in

December 2000 – more than a year after the swap occurred – Congress enacted the

Commodity Futures Modernization Act of 2000 (the "CFMA"), which amended

section 10(b) to *explicitly* cover security-based swap agreements.[185]  Meanwhile,

---

[183]    The Wylys do not challenge the sufficiency of the Complaint's allegation of a breach of fiduciary duty.

[184]    *See* Wylys Mem. at 7.

[185]    *See* CFMA, Pul. L. No. 106-554, §§ 302, 303, 114 Stat. 2763, 2763A-452 (2000).

Congress simultaneously *excluded* security-based swaps from the definition of a "security" under the Exchange Act.[186]  Thus, the Wylys argue, security-based swap agreements not only do not qualify as "securities" subject to the SEC's rule-making authority, but also were not subject to the antifraud provisions of section 10(b) before the CFMA "'*extend[ed]* the rules promulgated by the SEC under that section to prohibit fraud, manipulation, and insider trading, and judicial precedents decided under section 10(b), to [such instruments].'"[187]

The Wylys' argument fails.  Regardless of whether security-based swap agreements were included in – or are now excluded from – the statutory definition of a "security," section 10(b) and Rule 10b-5 have long applied to fraudulent devices undertaken "in connection with" the purchase or sale of securities.  Although the classic instance of a misuse of corporate information "in connection with" a purchase or sale of securities occurs when the fiduciary in possession of confidential information *herself* purchases or sells securities, to satisfy the "in connection with" requirement, "[i]t is enough that the scheme to

---

[186]   *See id.* § 2, 114 Stat. at 2763A-366.

[187]   Wylys Mem. at 8 (citing *Rorech*, 720 F. Supp. 2d at 404) (emphasis in Wylys Mem.).

defraud and the sale of securities coincide."[188]  Indeed, "[t]he 'coincide'
requirement is broad in scope" and extends to conduct that merely "induce[s]
securities transactions."[189]  Moreover, the plain language of section 10(b) in no
way restricts an insider trading claim to those situations in which the person
breaching the fiduciary duty herself trades in the securities at issue; she need only
breach the duty of confidentiality "in connection with" the purchase or sale of
securities.

     A swap agreement like this one – which explicitly required the
purchase of stock by Lehman and called for the Wylys' offshore entities to pay the

---

[188]    *SEC v. Zandford*, 535 U.S. 813, 821 (2002) (emphasizing that the
statute should be construed "not technically and restrictively, but flexibly to
effectuate its remedial purposes," and that Congress sought "to substitute a
philosophy of full disclosure for the philosophy of caveat emptor and thus to
achieve a high standard of business ethics in the securities industry").  *Id.* at 819
(quotation marks and citations omitted).  *Accord Romano v. Kazacos*, 609 F.3d
512, 513 (2d Cir. 2010).

[189]    *Kazacos*, 609 F.3d at 522.  *Accord United States v. Newman*, 664 F.2d
12, 18 (2d Cir. 1981) (construing the phrase "in connection with" "flexibly to
include deceptive practices 'touching' the sale of securities, a relationship which
has been described as 'very tenuous indeed'") (quoting *Superintendent of Ins. v.
Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1972)).
     In *Zandford*, the Supreme Court broadly applied the "in connection
with" element in reversing the dismissal of a securities fraud complaint alleging
that a broker engaged in a scheme to steal the proceeds in his customers' accounts
by, for example, writing checks to himself from his customers' mutual fund
account "knowing that redeeming the check would require the sale of securities."
535 U.S. at 821 (rejecting the contention that the securities sales were merely
"incidental" to a fraud to steal the customers' assets).

transaction costs associated with those purchases – clearly "touches on" and "coincides" with the purchase or sale of securities so as to satisfy the "in connection with" requirement, regardless of whether the Wylys themselves purchased or sold the securities.  The Wylys "knew . . . that Lehman was hedging its side of the transaction by buying two million shares of Sterling Software common stock on the open market."[190]  Indeed, "the transaction documents called for the Wyly offshore entities participating in the transaction to pay a fee of 6 cents per share . . . based on Lehman's hedging purchases of Sterling Software common stock,"[191] purchases that accounted for as much as eighty-three percent of the daily trading volume in Sterling Software shares at the time.[192]  Moreover, as "the Wylys knew contemporaneously," the average execution price of Lehman's market purchases of the two million Sterling Software shares established the "notional price" for the swap agreement, which determined the amount of upfront collateral the Wylys would need to direct their Offshore System to pay Lehman for the two million shares.[193]  Thus, this swap transaction not only touched, coincided with,

---

[190]     Compl. ¶ 80.

[191]     *Id.*

[192]     *See id.* ¶ 83.

[193]     *See id.* ¶ 85.  According to the Complaint, the Wylys received daily spreadsheets prepared by Lehman, detailing every stock purchase resulting from

and induced stock trading, but also required it.[194]  Although the SEC was not

explicitly authorized to prosecute insider trading involving "security-based swap

agreements" prior to the CFMA, there is no evidence that the SEC lacked authority

to do so before 2000 if such agreements were fraudulent devices used in

connection with the purchase or sale of securities.[195]  For these reasons, the Wylys'

argument that security-based swaps are not "securities" is inapposite.[196]

       In their Reply, the Wylys argue that an essential element of insider

---

the swap agreement.  *Id.* ¶ 81.  On one such daily spreadsheet, Sam Wyly's son
handwrote a note to his father that it "looks like [Lehman] is doing a great job
buying a big % of the volume without moving the price."  *Id.*

[194]    *See SEC v. Suterwalla*, No. 06-cv 1446, slip op. (S.D. Cal. Feb. 4,
2008), Exhibit A to SEC Opp., at 4 (where defendant's broker purchased call
options to hedge defendant's "spread bets," defendant's conduct was "'in
connection with' the broker's purchase of a security on the American stock
exchange," notwithstanding defendant's argument that "spread bets" are not
securities or investment contracts under the Exchange Act).

[195]    The Wylys offer no support for their assertion that "the CFMA
legislative history reveals that Congress believed the SEC did not have authority to
pursue fraud claims in connection with security-based swaps before the CFMA
was enacted."  Wylys' Reply to SEC's Memorandum in Opposition to Defendants'
Motions to Dismiss ("Wylys Reply") at 2-3 (citing *Rorech*, 720 F. Supp. 2d at
406).  *Rorech*'s discussion of the CFMA's legislative history suggests at most that
Congress wished to "*ma[ke] it clear* that the SEC's traditional anti-fraud and
insider trading enforcement authority applied to novel financial instruments."  *Id.*

[196]    Accordingly, I need not decide for the purposes of this motion
whether, as a matter of law – and notwithstanding the CFMA's exclusion of
security-based swaps from the definition of a "security" – such instruments are
securities under the federal securities laws.

trading under the "classical theory" is that a corporate insider "'*trades in the securities of his corporation* on the basis of material, nonpublic information,'"[197] noting that neither *SEC v. Zandford* nor *Romano v. Kazacos* involved claims for insider trading.  However, the purpose of insider trading laws is to "'prevent[] a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders;'"[198] the crux of the violation is a "corporate insider['s] use[] []of undisclosed information for [his] own benefit."[199]  The Wylys are alleged to have done just that:  because they "benefitt[ed] personally through fraudulent use of material, nonpublic information" about Sterling Software's planned sale without "disclos[ing] [that information] prior to trading," they breached their "obligation to place [Sterling Software shareholders'] welfare before their own."[200]   In particular, they placed their welfare ahead of the Sterling Software shareholders who sold on the opposite side of Lehman's hedging purchases, purchases that were a known *requirement* of the swap agreement that constituted their "trading."  If this is a

---

[197]    Wylys Reply at 6 (quoting *O'Hagan*, 521 U.S. at 651-52) (emphasis in Wylys Reply).

[198]    *O'Hagan*, 521 U.S. at 652 (quoting *Chiarella v. United States*, 445 U.S. 222, 228-29 (1980)).

[199]    *Chiarella*, 445 U.S. at 229.

[200]    *Id.* at 230.

novel theory of insider trading, I hold that it is sufficiently "in connection with" the

purchase or sale of securities to be a viable one.[201]

### ii.   The "Information" on Which the Wylys Allegedly Traded Was Not Immaterial

The Wylys argue that, at the time of the swap, the Wylys' alleged

decision that a sale of Sterling Software "should be pursued" was immaterial as a

matter of law, because it had not "ripened into relevant corporate activity."[202]  In

particular, "[t]here had not been any decision by Sterling Software (such as a

Board resolution), any corporate action by Sterling Software (such as the retention

and instruction of investment bankers), or any actual merger negotiations between

Sterling Software and a potential acquiror."[203]  However, the absence of these

factors, enumerated by the Supreme Court in *Basic*, is not dispositive of

---

[201]     By analogy, one can be liable for tipping material nonpublic information to an outsider who trades thereon even if the tipper himself never trades.  *See, e.g.*, *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974) (holding non-trading defendant tippers liable for insider trading based on "their divulging of confidential material information to their customers" who traded on the information); *SEC v. Gaspar*, No. 83 Civ. 3037, 1985 WL 521, *17 (S.D.N.Y. Apr. 16, 1985) ("The fact that [the tipper] himself did not trade on the information is irrelevant.").

[202]     Wylys Mem. at 9.

[203]     *Id.*

materiality, especially on a motion to dismiss.[204]  Other allegations in the

Complaint create the plausible inference that there was a high "indicated

probability that the event [would] occur"[205] – namely, that Sterling Software would

be acquired.  For example, the Wylys were not typical corporate insiders with

generalized desires to sell a company and one or two seats on a board of directors;

they founded Sterling Software in 1981, built it into one of the country's largest

business software and services company, and spun off Sterling Commerce in

1996.[206]  During the period of time leading up to the sale of Sterling Commerce

and Sterling Software, the Wylys served as Chairman and Vice Chairman of the

Board of Sterling Software, comprised two-thirds of its executive committee and,

along with other family members and French, comprised half of its Board of

Directors.  In short, they could be confident that they could effectuate any planned

sale, enhancing the probability that it would occur.

The fact that *Sterling Commerce* – a company the Wylys spun off

---

[204]    *See Basic*, 485 U.S. at 239 (declining to "catalog all such possible factors").  I note, however, that the Complaint does allege a *communication* between Sterling Software and investment bankers prior to the consummation of the swap – namely, the October 18, 1999 communication between Morgan Stanley and Sam Wyly regarding "Operation Windfall."  Compl. ¶ 91.

[205]    *Basic*, 485 U.S. at 239.

[206]    *See* Compl. ¶¶ 20-21.

from Sterling Software and that was ultimately acquired the same month as

Sterling Software – had already retained Goldman Sachs as its advisor also

strengthens the SEC's allegation that the Wylys intended to sell *Sterling Software*,

thereby making its ultimate sale more "probable."  This inference of probability is

bolstered by the fact that, five days before Lehman completed its hedge to establish

the notional price for the swap, Sterling Software amended its employment

agreements to provide for enhanced payouts to the Wylys in the event of a change

in control.[207]  As for the "magnitude" of the transaction – the sale of the company –

"a merger in which [a company] is bought out is the most important event that can

occur in a small corporation's life, to wit, its death."[208]  Thus, this Circuit has

reasoned, "inside information, as regards a merger of this sort, can become

material at an earlier stage than would be the case as regards lesser transactions –

and this even though the mortality rate of mergers in such formative stages is

doubtless high."[209]  In short, "a reasonable investor would almost certainly want to

know information related to" the Wylys' planned sale of Sterling Software,

---

[207]  *See id.* ¶ 91.

[208]  *Geon Indus.*, 531 F.2d at 47-48.

[209]  *Id.*

rendering that information "plausibly material."[210]

Moreover, the SEC's claim is for *insider trading* – the Wylys *themselves* demonstrated the importance they attached to their own intentions to sell the company by acting on that nonpublic information in short order, engaging in a unique, "massive and bullish"[211] transaction in Sterling Software stock that replicated the purchase of two million shares of Sterling Software.[212]   "Given the importance that the Wylys, as investors, attached to this information, it is hard for them now to protest at the motion to dismiss stage that no reasonable investor could have found it material."[213]   Indeed, the very purpose of insider-transaction reporting requirements – requirements the Wylys skillfully avoided by funneling their trades through offshore entities – "is to give investors an idea of the purchases

---

[210]    *Litwin*, 2011 WL 447050, at *10.

[211]    Compl. ¶ 88 (alleging that the Wylys had "never used their Offshore System to engage in such a massive, bullish transaction in any Issuer Security.").

[212]    *See Hartford Fire Ins. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 986 (S.D.N.Y. 1989) ("The relevance of insider trading for assessing information's significance to a reasonable investor is *self-evident*.") (emphasis added).

[213]    SEC Opp. at 41 (citing *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997)) ("major factor" in determining materiality of information is "the importance attached to it by those who knew about it"); *Geon Indus.*, 531 F.2d at 48 (individuals "demonstrated the importance they attached to the information by purchasing shares")).

and sales by insiders *which may in turn indicate their private opinion as to prospects of the company*."[214]  Thus, drawing all reasonable inferences in the SEC's favor and accepting its allegations as true, the Complaint's "allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable.'"[215]

> **b.  The Complaint Alleges a Viable Insider Trading Claim Arising from Schaufele's Trading in Sterling Software Stock in His Wife's Brokerage Accounts**
>
> > **i.  The Complaint Adequately Alleges that Schaufele Traded on Material Nonpublic**

---

[214]     H.R. Rep. No. 73-1383, at 24 (1934), *reprinted in* 2 Federal Securities Laws: Legislative History 1933-1982 at 817 (Federal Bar Association, Securities Law Committee, BNA 1989) (emphasis added).  Had the Wylys' secret offshore swap been reported as required, it would have altered the marketplace to a "large, rapid aggregation or accumulation of securities" for the benefit of Sterling Software's very highest-level insiders – information the securities laws recognize "might represent a potential shift in corporate control."  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (2d Cir. 1978) (discussing rationale for related section 13(d) disclosure requirements) (internal quotations omitted).

In this sense, the identity of the Wylys was *itself* material information; the fact that the *Wylys* entered into a swap agreement economically equivalent to the purchase of two million shares of Sterling Software stock – as opposed to an offshore trust controlled by the Wylys (unbeknownst to investors) – may itself have "affect[ed] [investors'] desire . . . to buy, sell, or hold [Sterling Software's] securities."  *Mayhew*, 121 F.3d at 52.  *Accord infra* Part V.B.2.b.i.

[215]     *Matrixx Initiatives, Inc. v. Siracusano*, --- S. Ct. ----, 2011 WL 977060 (Mar. 22, 2011) (citations omitted) (citing *Bell Atl.*, 550 U.S. at 556 and *Iqbal*, 556 U.S. at ---, 129 S.Ct. at 1949).

## Information

The material nonpublic information on which Schaufele allegedly traded was that the Wylys – insiders at the very highest echelon of Sterling Software – were engaging in a Sterling Software stock transaction that would be massive, bullish, and unique in the history of their trading, and that would be effected clandestinely through their Offshore System.  Schaufele argues that the only information in his possession on October 1, 1999, when he purchased Sterling Software stock, "was that a customer had requested pricing information concerning one type of transaction and negotiations had begun about the possibility of doing a different potential long-term transaction" – information that is "simply too remote and speculative to be the predicate of an insider trading claim" as a matter of law.[216]  Moreover, because the terms of the swap were not agreed upon until October 6, 1999, "there was simply no way for Mr. Schaufele to know if a transaction would take place, much less what the terms of that transaction would be."[217]

Schaufele's argument fails.  The fact that Schaufele traded before the Wylys' transaction was finalized is immaterial where the Wylys allegedly asked

---

[216]    Schaufele Mem. at 15.

[217]    *Id.* at 16 (citing *Rorech*, 720 F. Supp. 2d at 411).

66

for pricing on call options for *four million* Sterling Software shares at least three days before October 1st.[218]  Thus, it may be reasonably inferred that the Wylys' bullish determination, as well as the highly material terms concerning the transaction's sizing and date parameters, were known to Schaufele when he traded. Although the Complaint alleges that the transaction under discussion had become an equity swap before October 1st,[219] it also alleges that the Wylys ultimately obtained a swap that was sized as largely as Lehman would allow – and that they vigorously sought to size still larger.[220]

As discussed earlier,[221] section 16 reporting obligations are rooted in the recognition that transactions in a company's securities by its own insiders can be material; thus, "information coming from an insider takes on special importance."[222]  Here, it is entirely plausible that a reasonable shareholder knowing about the Wylys' planned bullish trade would conclude that a significant favorable

---

[218]     *See* Compl. ¶ 78.

[219]     *See id.*

[220]     *See id.* ¶ 79.

[221]     *See supra* note 213.

[222]     *SEC v. Drescher*, No. 99 CIV. 1418, 1999 WL 946864, at *5 (S.D.N.Y. Oct. 19, 1999) (citing *Mayhew*, 121 F.3d at 52).

corporate event or "shift in corporate control" was planned.[223]  Moreover,

Schaufele demonstrated the importance he placed on the information by acting

immediately to buy the stock,[224] notwithstanding at least four prohibitions on such

trading by his employer.[225]  These allegations raise a plausible inference that the

information on which Schaufele traded was material.

Schaufele also attempts to defeat the insider trading claim by arguing

that the Wylys' transaction was "wholly consistent with [other] publicly-available

information and add[ed] nothing material to that mix," pointing to other "bullish

news" in the market, such as the company's five million share buy-back program

and news that the stock was "vastly undervalued."[226]  *First*, this argument invites

precisely the type of factual weighing and analysis inappropriate for the Court to

conduct on a motion to dismiss.  *Second*, and more importantly, Schaufele's

---

[223]     *See Savoy Indus.*, 587 F.2d at 1167.

[224]     *See, e.g.*, *Mayhew*, 121 F.3d at 52 (immediate action in purchasing the stock is "a major factor in determining whether [the] information was material"); *Geon Indus.*, 531 F.2d at 48; *Shapiro*, 494 F.2d at 1307; *Drescher*, 1999 WL 946864, at *5.

[225]     *See* Compl. ¶ 98.

[226]     Schaufele Mem. at 18 (citing *SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 705 (S.D.N.Y. 2005); *Rorech*, 720 F. Supp. 2d at 410 ("A generalized confirmation of an event that is 'fairly obvious' to every market participant who was knowledgeable about the company . . . is not material information.")).

argument overlooks the crucial fact that the marketplace was wholly ignorant of the fact that it was the *Wylys* who were (secretly) increasing their stake in the company by engaging in a massive transaction through their offshore entities.  It cannot be said that this information was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance."[227]

### ii.   The Complaint Alleges that Schaufele's Conduct was Deceptive

The SEC alleges that, at the time he purchased eighty thousand dollars worth of Sterling Software common stock through accounts in his wife's name, Schaufele "knew, or recklessly disregarded the fact, that his trading on the basis of such information was in violation of the duties he owned to his employer, Lehman Brothers."[228]  In particular, the Complaint alleges that Schaufele violated several Lehman policies in place at the time of Schaufele's trading, including Lehman's (i) confidential information policy ("employees must never use the Firm's . . . proprietary information for their own or any other person's financial benefit"); (ii)

---

[227]      *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

[228]      Compl. ¶ 99.  *See United States v. Carpenter*, 791 F.2d 1024, 1031 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987) (one engages in "misappropriation" for purposes of insider trading laws when he engages in "conduct constituting secreting, stealing, [or] purloining . . . [of] material non-public information in breach of an employer-imposed fiduciary duty of confidentiality.").

its insider trading policy ("employees . . . are not permitted to buy or sell any security . . . if the employee is in possession of 'material' non-public information relating to the security, the issuer or the transaction"); and (iii) its conflicts of interest policy ("no employee may obtain any personal benefits from the Firm's dealings with others" unless approved by the Firm).[229]

Schaufele argues that the SEC has failed to plead "deceptive conduct" because the Complaint "makes no allegation that Mr. Schaufele sought to conceal his trade from Lehman Brothers," pointing to other portions of the Lehman policies cited by the SEC's Complaint that "make clear that the trades by Mr. Schaufele in his wife's accounts . . . were subject to mandatory review to ensure that insider trading was not taking place."[230]  Even assuming this Court can consider those other portions of the Lehman policies "for purposes of completeness"[231] on a motion to dismiss, and even assuming Schaufele expected the trades to be reviewed, the argument fails.  This is because Lehman's knowledge that Schaufele

---

[229]   Compl. ¶ 98.

[230]   Schaufele Mem. at 19-20.  *Accord id.* at 20 ("When Mr. Schaufele purchased Sterling Software stock in his family's Lehman Brothers accounts in October 1999, those trades were not hidden from Lehman Brothers but were as fully subject to supervisory review for insider trading as if they had been done in his own name.").

[231]   *Id.* at 19 (citing *Siebel*, 384 F. Supp. 2d at 70).

traded in Sterling Software stock would not constitute "disclos[ure] to [Lehman] that [Schaufele] plan[ned] to trade on [] nonpublic information."[232]  Put differently, any alleged "disclosure" that Schaufele traded in Sterling Software stock would not have revealed that the Wylys, who were Sterling Software insiders, originated the trade[233] or that the marketplace would remain in ignorance of the Wylys' trade because it was effectuated through the Offshore System, thereby evading reporting requirements.[234]  In no way could Lehman's alleged "mandatory review" of the trades be deemed to cure the breach of his fiduciary duty to his employer "who entrusted him with access to confidential information."[235]  Thus, the Complaint adequately alleges that Lehman was deceived regarding the relevant facts.[236]

---

[232]   *O'Hagan*, 521 U.S. at 655.  *See* Schaufele Mem. at 19 (citing *O'Hagan* for the principle that "[b]ecause the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no [section] 10(b) violation."). 521 U.S. at 655.

[233]   *See* Compl. ¶87 ("Lehman was unaware of what Schaufele well knew, namely, that [the swap] transaction was, in fact, conceived and fully orchestrated by the Wylys themselves.").

[234]   *See id.* ¶ 9 (Schaufele "concela[ed] from and affirmatively misrepresent[ed] to [Lehman] the Wylys' control over the Issuer securities held in their Offshore System.").

[235]   *O'Hagan*, 521 U.S. at 652.

[236]   *See id.* at 655.

## VI.   CONCLUSION

For the aforementioned reasons, and for reasons that will be explained at a conference scheduled for April 14, 2011, at 5:00 p.m., defendants' motions to dismiss the SEC's claims are denied in their entirety.  The Clerk of Court is directed to close these motions (Docket Nos. 25, 28, and 29).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           March 31, 2011

72

**- Appearances -**

**For the SEC:**

Alan M. Lieberman, Esq.
Gregory Nelson Miller, Esq.
Cheryl J. Scarboro, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Samuel E. Wyly and Charles J. Wyly, Jr.:**

William Andrew Brewer, III, Esq.
Michael J. Collins, Esq.
James S. Renard, Esq.
Michael L. Smith, Esq.
Bickel & Brewer
1717 Main Street
Suite 4800
Dallas, Texas 75201
(214) 653-4000

Martin Robert Pollner, Esq.
John Anthony Piskora, Esq.
Loeb & Loeb, LLP
345 Park Avenue
New York, New York 10154
(212) 407-4873

**For Louis J. Schaufele, III:**

Martin Joel Auerbach, Esq.
1345 Avenue of the Americas
19th Floor

New York, New York 10105
(212) 424-9181

Laura Elizabeth Neish, Esq.
Zuckerman Spaeder, LLP
1540 Broadway
Suite 1604
New York, New York 10036
(212) 704-9600

Luke Madole, Esq.
Todd Murray, Esq.
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street
Suite 5500
Dallas, Texas 75202
(214) 855-3000

**For Michael C. French:**

Danny S. Ashby, Esq.
Robert E. Davis, Esq.
Barrett R. Howell, Esq.
Casey P. Kaplan, Esq.
K&L Gates, LLP
1717 Main Street
Suite 2800
Dallas, Texas 75201
(214) 939-5545

Laura A Brevetti, Esq.
K&L Gates, LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900