UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

      v.

SAMUEL E. WYLY, DONALD R. MILLER, JR., in his
Capacity as the Independent Executor of the Will and Estate
of Charles J. Wyly, Jr., MICHAEL C. FRENCH, and LOUIS
J. SCHAUFELE III,

                   Defendants.

: 10 CV 5760 (SAS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ...........................................................................1

II.    STATEMENT OF FACTS ...............................................................................1

III.   ARGUMENT.....................................................................................................2

     A.   The Applicable Summary Judgment Standard .......................................2

     B.   The SEC's Penalty Claims Are Time-Barred .........................................2

          1.   The SEC's claims are subject to five-year statutes of limitation. ...............3

          2.   The SEC's claims for penalties are untimely.................................3

          3.   The fraudulent concealment doctrine is unavailable to save the SEC's untimely claims for civil penalties....................................4

              a.   The *Gabelli* decision precludes application of the fraudulent concealment doctrine in this action. .............5

              b.   Even independent of *Gabelli*, the SEC cannot establish application of the fraudulent concealment doctrine in this case....................................................................9

          4.   The doctrine of fraudulent concealment does not apply to the penalty claims against Schaufele and French. ...........................14

              a.   Any concealment was rendered ineffective—and the statute began running—by the summer of 2004. ...........15

              b.   The SEC did not act diligently after receiving inquiry notice and could have filed suit within the limitations period. ...........................................................................18

          5.   The claim for injunctive relief against Schaufele is time-barred and unwarranted................................................................21

     C.   The SEC's Effort To Disgorge Allegedly Unpaid Federal Income Taxes Is Improper. .........................................................................21

          1.   The SEC lacks the authority to recover allegedly unpaid federal income taxes as that power resides within the exclusive authority of the Secretary of the Treasury. .............................22

          2.   The SEC cannot demonstrate the required causal connection between Defendants' alleged fraud scheme and the alleged avoidance of federal income taxes............................................25

3.      Permitting the SEC to put on a complex, unpleaded and unrelated tax case against the Wylys after a trial on liability would contravene the equitable purposes of disgorgement. ......................26

4.      The SEC's disgorgement claim against French is improper......................27

D.      Summary Judgment Should Be Granted For The Wylys On The Insider Trading Claim Against Them. ..................................................29

E.      Schaufele Is Entitled to Summary Judgment on the Insider Trading Claim Against Him. ..........................................................................33

F.      Summary Judgment Should Be Granted For Defendants On The SEC's Claim For Aiding And Abetting Alleged Trustee Violations Of Exchange Act Section 13(d). ........................................................39

1.      Summary judgment should be granted for the Wylys. .............................40

2.      Summary judgment should also be granted to French regarding filings made by the Trustees after 2000....................................41

G.      There Is No Genuine Factual Issue Regarding The Scienter Element Of The Fraud Claims Against The Wylys and French. ..........................................42

H.      Summary Judgment Should Be Granted To Schaufele On The Aiding And Abetting Claim Against Him. ..........................................................44

IV.     CONCLUSION..................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Woods,*
    2 Cranch 336 (1805) ................................................................ 8

*Arneil v. Ramsey,*
    550 F.2d 774 (2d Cir. 1977) ................................................... 12

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ...................................................... passim

*Blue Planet Software Inc. v. Games Int'l, LLC,*
    331 F. Supp. 2d 273 (S.D.N.Y. 2004) ...................................... 46

*Brown v. Eli Lilly & Co.,*
    654 F.3d 347 (2d Cir. 2011) ..................................................... 2

*Burnett v. N.Y. Cent. R.R. Co.,*
    380 U.S. 424 (1965) ................................................................. 3

*Cada v. Baxter Healthcare Corp.,*
    920 F.2d 446 (7th Cir. 1990) ........................................... 5, 6, 18

*Castellano v. Young & Rubicam, Inc.,*
    257 F.3d 171 (2d Cir. 2001) ................................................... 30

*Corcoran v. N.Y. Power Auth.,*
    202 F.3d 530 (2d Cir. 1999) ................................................... 18

*Cordiano v. Metacon Gun Club, Inc.,*
    575 F.3d 199 (2d Cir. 2009) ..................................................... 2

*Dodds v. Cigna Sec., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ................................................ 12, 17

*Donoghue v. American Skiing Co.,*
    155 F. Supp. 2d 70 (S.D.N.Y. 2001) ....................................... 18

*Elliott Assocs., L.P. v. Covance, Inc.,*
    No. 00 Civ. 4155 SAS, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ................. 37

*ETSI Pipeline Project v. Missouri,*
    484 U.S. 495 (1988) ............................................................... 22

*Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.,*
    607 F.3d 288 (2d Cir. 2010) ..................................................... 2

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 ...................................................................................................23

*Gabelli v. SEC*,
   No. 11-1274, 2013 WL 691002 (U.S. Feb. 27, 2013) ..................................... passim

*Glazer v. Formica Corp.*,
   964 F.2d 149 (2d Cir. 1992)..........................................................................33

*Harris v. Koenig*,
   722 F. Supp. 2d 44 (D.D.C. 2010) ................................................................11

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
   723 F. Supp. 976 (S.D.N.Y. 1989)................................................................29

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
   189 F.3d 971 (9th Cir. 1999) ........................................................................33

*Howard v. SEC*,
   376 F.3d 1136 (D.C. Cir. 2004) ....................................................................45

*In re Adelphia Commc'ns*,
   367 B.R. 84 (S.D.N.Y. 2007)........................................................................26

*In re Merrill Lynch Ltd. P'ships Litig.*,
   154 F.3d 56 (2d Cir. 1998)............................................................................14

*In re Union Carbide Corp. Consumer Products Business Sec. Litig.*,
   666 F. Supp. 547 (S.D.N.Y. 1987)................................................................42

*Jay E. Hayden Foundation v. First Neighbor Bank*,
   610 F.3d 382 (7th Cir. 2010) ....................................................................... passim

*Johnson v. SEC*,
   87 F.3d 484 (D.C. Cir. 1996) ........................................................................21

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)............................................................7, 9, 10, 18

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*,
   921 F. Supp. 1174 (S.D.N.Y. 1996)..............................................................33

*List v. Fashion Park, Inc.*,
   340 F.2d 457 (2d Cir. 1965)..........................................................................32

*Markowski v. SEC*,
   34 F.3d 99 (2d Cir. 1994) ..............................................................................44

*Mayley v. United States*,
   No. 8:11-CV-896-JMC-JDA, 2011 WL 5239725 (D.S.C. Oct. 13, 2011) ..............23

*Merck & Co. v. Reynolds,*
  559 U.S. 633 (2010)..................................................................................6

*Monetta v. SEC,*
  390 F.3d 952 (7th Cir. 2004) ................................................................45

*Morin v. Trupin,*
  711 F. Supp. 97 (S.D.N.Y. 1989).....................................................41, 42

*Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,*
  467 F.3d 73 (2d Cir. 2006)....................................................................28

*Panfil v. ACC Corp.,*
  768 F. Supp. 54 (W.D.N.Y. 1991), *aff'd,* 952 F.2d 394 (2d Cir. 1991) ....................30, 33, 37

*Principal Life Ins. Co. & Subsidiaries v. United States,*
  95 Fed. Cl. 786 (Ct. Cl. 2010)..............................................................24

*Rich v. Shrader,*
  No. 09-CV-0652-MMA, 2010 WL 3717373 (S.D. Cal. Sept. 17, 2010) ...............................33

*Roberts v. Barreras,*
  484 F.3d 1236 (10th Cir. 2007) ...........................................................19

*SEC v. Apuzzo,*
  689 F.3d 204 (2d Cir. 2012)..................................................................40

*SEC v. Cedric Kushner Promotions, Inc.,*
  417 F. Supp. 2d 326 (S.D.N.Y. 2006).....................................................41

*SEC v. Commonwealth Chem. Sec., Inc.,*
  574 F.2d 90 (2d Cir. 1978)....................................................................21

*SEC v. Culpepper,*
  270 F.2d 241 (2d Cir. 1959)..................................................................21

*SEC v. DiBella,*
  587 F.3d 553 (2d Cir. 2009)..................................................................39

*SEC v. Downe,*
  969 F. Supp. 149 (S.D.N.Y. 1997), *aff'd sub nom. SEC v. Warde,* 151 F.3d 42 (2d Cir. 1998)..........................28

*SEC v. Espuelas,*
  579 F. Supp. 2d 461 (S.D.N.Y. 2008)....................................................45

*SEC v. Espuelas,*
  __F. Supp. 2d__, 2012 WL 5288738 (S.D.N.Y. Oct. 26, 2012)....................40, 41

*SEC v. Gabelli,*
    653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, No. 11-1274, 2013 WL 691002
    (U.S. Feb. 27, 2013) .................................................................................................10

*SEC v. Hughes Capital Corp.,*
    124 F.3d 449 (3d Cir. 1997) .....................................................................................27

*SEC v. Jones,*
    476 F. Supp 374 (S.D.N.Y. 2007).................................................................... passim

*SEC v. Kelly,*
    765 F. Supp. 2d 301 (S.D.N.Y. 2011).......................................................................25

*SEC v. Koenig,*
    557 F.3d 736 (7th Cir. 2009) .................................................................................7, 18

*SEC v. Microtune, Inc.,*
    783 F. Supp. 2d 867 (N.D. Tex. 2011), *aff'd sub nom. SEC v. Bartek*, 484 F. App'x
    949 (5th Cir. 2012).................................................................................................18, 19

*SEC v. Monarch Fund,*
    608 F.2d 938 (2d Cir. 1979).......................................................................................37

*SEC v. Monarch Funding Corp.,*
    192 F.3d 295 (2d Cir. 1999).......................................................................................43

*SEC v. Mudd,*
    __F. Supp. 2d__, 2012 WL 3306961 (S.D.N.Y. Aug. 10, 2012) ............................40

*SEC v. Obus,*
    693 F.3d 276 (2d Cir. 2012)..................................................................................42, 44

*SEC v. Patel,*
    61 F.3d 137 (2d Cir. 1995)....................................................................................21, 25

*SEC. v. Patel,*
    CIV. 07-CV-39-SM, 2008 WL 782465 (D.N.H. Mar. 24, 2008) .............................41

*SEC v. Pittsford Capital Income Partners, L.L.C.,*
    No. 06 Civ. 6353 ........................................................................................................27

*SEC v. Power,*
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)..........................................................................7

*SEC v. Rorech,*
    No. 09 Civ. 4329 (JGK), 2010 WL 2595111 (S.D.N.Y. June 25, 2010).............36, 37

*SEC v. Rosenthal,*
    650 F.3d 156 (2d Cir. 2011).........................................................................................3

*SEC v. Shanahan,*
    646 F.3d 536 (8th Cir. 2011) ............................................................40

*SEC v. Siebald,*
    No. 95 Civ. 2081, 1997 WL 605114 (S.D.N.Y. Sept. 30, 1997) .............37

*SEC v. Siebel Sys.,*
    384 F. Supp. 2d 694 (S.D.N.Y. 2005) ...............................................38

*SEC v. Steadman,*
    967 F.2d 636 (D.C. Cir. 1992) ........................................................45

*SEC v. Texas Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968)............................................................37

*SEC v. Treadway,*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) ..............................................41

*SEC v. Universal Express, Inc.,*
    646 F. Supp. 2d 552 (S.D.N.Y. 2009) *aff'd,* 438 F. App'x 23 (2d Cir. 2011).........27

*SEC v. Warde,*
    151 F.3d 42 (2d Cir. 1998)..............................................................28

*SEC v. Woodruff,*
    778 F. Supp. 2d 1073 (D. Colo. 2011)...............................................41

*SEC v. Wyly,*
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ......................................... passim

*SEC v. Wyly,*
    860 F. Supp. 2d 275 (S.D.N.Y. 2012).................................................4

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
    148 F. App'x 66 (2d Cir. 2005) ..................................................43, 44

*Taylor v. First Union Corp. of S. Carolina,*
    857 F.2d 240 (4th Cir. 1988), *cert. denied,* 489 U.S. 1080 (1989)..................33, 36

*Truckers United for Safety v. Mead,*
    251 F.3d 183 (D.D.C. 2001) ...........................................................22

*U.S. ex rel. Lissack v. Sakura Global Capital Mkts., Inc.,*
    377 F.3d 145 (2004).......................................................................24

*United States v. Kubrick,*
    444 U.S. 111 (1979)........................................................................2

*United States v. Letscher,*
    83 F. Supp. 2d 367 (S.D.N.Y. 1999)..................................................24

*United States v. Lovett,*
    328 U.S. 303 (1946) ................................................................................21

*Zalaski v. City of Bridgeport Police Dep't,*
    613 F.3d 336 (2d Cir. 2010) ..................................................................2

*Zerilli-Edelglass v. N.Y.C. Transit Auth.,*
    333 F.3d 74 (2d Cir. 2003) ...............................................................7, 10

**STATUTES AND RULES**

15 U.S.C. § 77s(c) ........................................................................................11

15 U.S.C. § 78m(d) ..................................................................................3, 25

15 U.S.C. §§ 78u(a)-(b) ................................................................................11

15 U.S.C. § 78u(d)(3) ................................................................................3, 4

15 U.S.C. § 78u-1(d)(5) .................................................................................3

15 U.S.C. § 78u-4 ........................................................................................40

15 U.S.C. § 80b-4 ........................................................................................11

15 U.S.C. § 80b-9(b) ....................................................................................11

26 U.S.C. § 269B .........................................................................................26

26 U.S.C. §§ 6201-16 .............................................................................22, 23

26 U.S.C. § 7401 ....................................................................................23, 24

26 U.S.C. § 7801 .........................................................................................23

26 U.S.C. § 7803 .........................................................................................22

17 C.F.R. § 202.5 .........................................................................................11

17 C.F.R. § 240.13d-3(a) ............................................................................225

31 C.F.R. § 103.19 .......................................................................................16

Fed. R. Civ. P. 56 ..........................................................................................1

Section 17(a) ...............................................................................................42

Rule 10b-5 ..............................................................................29, 34, 42, 44

Rule 13d-1 ..................................................................................................39

Rule 13d-2..................................................................................................................39

Rule 13d-3(a) ...........................................................................................................25

Rule 144 ...................................................................................................................49

**OTHER AUTHORITIES**

*Johnson Prods. Co., Inc.*, SEC No-Action Letter, 1973 WL 8530 (Sept. 28, 1973)....................49

*Hoedeman & Christy, P.A.*, SEC No-Action Letter, 1991 WL 206750 (Oct. 10, 1991)...............49

*Riordan & Mckinize*, SEC No-Action Letter, 2000 WL 554599 (May 5, 2000)...........................49

*Ownership Reports & Trading by Officers, Directors & Principal Security Holders*, Exchange Act Release No. 28869, § II.B.1. n.43 (Feb. 8, 1991) ............................................13

Arnold S. Jacobs, *Disclaiming Beneficial Ownership*, Disclosure & Remedies Under the Securities Laws § 4:118 (2013) ...........................................................................................14

Defendants Samuel E. Wyly ("Sam Wyly"); Donald R. Miller, Jr., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr. ("Charles Wyly"); Michael C. French ("French"); and Louis J. Schaufele III ("Schaufele") respectfully submit this Memorandum Of Law In Support Of Their Consolidated Motion For Partial Summary Judgment Pursuant To Fed. R. Civ. P. 56.

## I.

## PRELIMINARY STATEMENT

Defendants move for summary judgment based on the following grounds:  (1) the SEC's claims for civil penalties and injunctive relief are time-barred; (2) the SEC's novel attempt to disgorge allegedly unpaid federal income taxes is improper; (3) summary judgment should be granted for the Wylys on the SEC's insider trading claim because the transaction in question was not made based on material non-public information; (4) summary judgment should be granted on the insider trading claim against Schaufele; (5) there is no genuine dispute of material fact regarding the aiding and abetting claims against the Wylys and French; (6) there is no genuine dispute regarding the lack of the requisite scienter needed to support the fraud claims against the Wylys and French; and (7) there is no genuine dispute of material fact regarding the aiding and abetting fraud claim against Schaufele.

## II.

## STATEMENT OF FACTS

The facts relevant to the disposition of this motion are set forth in the accompanying Statement Of Undisputed Material Facts Pursuant To Local Civil Rule 56.1 In Support Of Defendants' Consolidated Motion For Partial Summary Judgment ("Defs. R. 56.1") and in Defendant Louis J. Schaufele III's Statement Of Undisputed Material Facts Pursuant To Local

Civil Rule 56.1 In Support Of Sections Of Defendants' Consolidated Motion For Summary Judgment ("Schaufele R. 56.1").

**III.**

**ARGUMENT**

**A.**   <u>The Applicable Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), "and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

**B.**   <u>The SEC's Penalty Claims Are Time-Barred</u>

Statutes of limitations "represent a pervasive legislative judgment that it is unjust" for a defendant to be required to wait to defend herself beyond a specified period, and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (internal quotation marks omitted). They are designed to ensure fairness to defendants and to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories

have faded, and witnesses have disappeared." *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965).  The foregoing factors are particularly relevant in this case, where a lapse of now more than twenty years has resulted in a complete lack of memory of particular events by virtually every witness deposed, and where several key witnesses are now deceased, including lawyers, senior trustee personnel, and a principal defendant who was never deposed. *See* Defs. R. 56.1 ¶¶ 9-11.

Summary judgment should be granted for Defendants on nearly all the SEC's claims for penalties because they are barred by applicable statutes of limitation and the SEC cannot establish that equitable tolling is warranted.

### 1.    The SEC's claims are subject to five-year statutes of limitation.

The SEC has brought claims for penalties pursuant to Section 21(d)(3) of the Exchange Act ("Section 21(d)(3)") based on allegedly fraudulent SEC filings.  It also seeks penalties for alleged insider trading pursuant to Section 21A of the Exchange Act ("Section 21A").  It is undisputed that SEC claims for civil penalties pursuant to Section 21(d)(3) must be brought within five years of the time the securities fraud or violation occurs. *See Gabelli v. SEC*, No. 11-1274, 2013 WL 691002, at *1 (U.S. Feb. 27, 2013). SEC claims for civil penalties based on insider trading, which can only be sought pursuant to Section 21A, must be asserted within five years from the date on which parties become bound to the transaction underlying the insider trading claim. *See* 15 U.S.C. § 78u-1(d)(5); *SEC v. Rosenthal*, 650 F.3d 156, 159-62 (2d Cir. 2011).

### 2.    The SEC's claims for penalties are untimely.

The SEC entered into tolling agreements with the Wylys, French and Schaufele, that became effective February 1, 2006, July 29, 2009, and October 29, 2009, respectively. *See* Defs. R. 56.1 ¶¶ 12-14.  Accordingly, summary judgment should be granted on all claims for penalties

pursuant to Section 21(d)(3) concerning any conduct predating February 1, 2001, as to Sam Wyly,[1] July 29, 2004, as to French, and October 29, 2004, as to Schaufele - five years before the effective dates of their respective tolling agreements. *See id.* Since the last alleged violation in the Complaint occurred on May 6, 2004, all the penalty claims against Schaufele and French are therefore time-barred. *See* Defs. R. 56.1 ¶ 17.

As for penalties pursuant to Section 21A, the SEC's only insider trading claim against the Wylys is based on contractual swap agreements entered into by foreign corporations in October 1999, nearly eleven years before the Complaint was filed, and almost seven years before the Wylys' tolling agreements. *See* Compl. ¶ 77; Defs. R. 56.1 ¶ 12. The SEC's claim against Schaufele is based on trades alleged to have occurred on October 1, 1999, more than ten years before his tolling agreement. *See* Defs. R. 56.1 ¶ 14. Because the transactions on which the SEC bases its claims for civil insider trading penalties occurred more than five years before the SEC commenced this action, these claims against Sam Wyly and Schaufele are all time-barred by the limitations period set forth in Section 21A.

### 3.   The fraudulent concealment doctrine is unavailable to save the SEC's untimely claims for civil penalties.

In an attempt to rescue its time-barred claims, the SEC seeks to invoke equitable tolling based on the doctrine of fraudulent concealment. *See* Defs. R. 56.1 ¶ 80. Equitable tolling on that basis, however, is unavailable for two reasons. *First*, the Supreme Court's recent decision in *Gabelli* forecloses equitable tolling in SEC enforcement actions based on the fraudulent concealment doctrine, particularly based on the facts of this case. *Second*, the SEC cannot establish application of the fraudulent concealment doctrine on the merits because Defendants did not actively conceal material facts from the SEC, nothing prevent the SEC from timely

---

[1] The SEC abandoned its penalty claims against Charles Wyly following his death on August 7, 2011. *See SEC v. Wyly*, 860 F. Supp. 2d 275, 276 (S.D.N.Y. 2012).

4

discovering the alleged facts that it believes supports its claims, and the SEC cannot establish that it was reasonably diligent in pursuing facts underlying its claims.

<strong>a.    The <em>Gabelli</em> decision precludes application of the fraudulent concealment doctrine in this action.</strong>

In *Gabelli,* the Supreme Court held that the fraud discovery rule does not apply to SEC enforcement actions. *See Gabelli*, 2013 WL 691002, at *8. The reasoning and stated rationale for the Supreme Court's decision also eliminates the SEC's ability to seek equitable tolling based on the fraudulent concealment doctrine where, as here, the circumstances of the alleged concealment fall within the domain of the discovery rule.

Unlike the fraud discovery rule, which delays an action from accruing until harm is discovered, the fraudulent concealment doctrine is "a doctrine of equitable estoppel that 'comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations.' . . . [T]olling doctrines such as fraudulent concealment 'stop the statute of limitations from running even if the accrual date has passed.'" *SEC v. Wyly*, 788 F. Supp. 2d 92, 103 (S.D.N.Y. 2011) ("*Wyly I*") (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990)). The SEC has not identified any inequitable conduct by Defendants that prevented it from filing a timely suit. Indeed, this Court previously recognized correctly that the SEC "is not pleading equitable estoppel." *Id.* at 109. This remains true today. Consequently, fraudulent concealment, as a doctrine of "equitable estoppel," has no application to this action. *Id.*

Instead, in this action the term "fraudulent concealment" has been invoked by the SEC, and applied by the Court during a period of uncertainty regarding applicability of the discovery rule in SEC enforcement actions, to encompass the concept of equitable tolling based on "efforts by a defendant in a fraud case to conceal the fraud," thereby preventing a plaintiff from discovering the fraud. *Id.* at 104 n.78 (citing *Cada*, 920 F.2d at 450-51). The SEC's theory of

5

fraudulent concealment, therefore, comes precisely "within the domain of the discovery rule." *Id.* at 106 n.95 (finding "fraudulent concealment" had been adequately alleged by the SEC, but stating that "the doctrine most applicable to the SEC's fraud claims is the discovery rule."). Because *Gabelli* rejected application of the discovery rule in SEC enforcement actions, that decision also eliminates application of equitable tolling based on "fraudulent concealment" as that concept has been invoked and applied to the SEC's theory in the present action.[2]

The *Gabelli* decision squarely precludes equitable tolling in enforcement actions on grounds that an alleged fraud is concealed from the SEC. The Court explicitly stated that "[s]elf-concealing" fraud was insufficient to trigger equitable tolling in government enforcement actions despite the fact that acts of fraud are inherently "deceptive" and thus "may prevent a plaintiff from even *knowing* that he or she has been defrauded." *Gabelli*, 2013 WL 691002, at *5-6. (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)) ("There are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties . . . When the injury is *self-concealing*, private parties may be unaware they have been harmed . . . The same conclusion does not follow for the Government in the context of enforcement actions for civil penalties.") (emphasis added). Thus, *Gabelli* effectively overrules authorities holding that the fraudulent concealment doctrine applied in government enforcement actions where the fraud was "self-concealing."

Likewise, the *Gabelli* Court's rationale for precluding equitable tolling in the case of "self-concealing" frauds should also apply to preclude tolling in cases where a defendant takes "affirmative steps to prevent or frustrate discovery" of the fraud. *Wyly I*, 788 F. Supp. 2d at 105

---

[2] This is consistent with Judge Posner's conclusion in *Cada* that—apart from circumstances to which equitable estoppel would apply—efforts by defendants to conceal a fraud come "within the domain of the discovery rule" and should, therefore, be analyzed based on application of the same principles that govern the discovery rule. *See Cada*, 920 F.2d at 450-51.

(citing *SEC v. Power*, 525 F. Supp. 2d 415, 424-25 (S.D.N.Y. 2007)).  In both situations, the gravamen for finding that equity should toll limitations is that the fraud has been concealed from a plaintiff in such a manner that it has been unable to discover its claim.  The Second Circuit's formulation of the fraudulent concealment doctrine specifically incorporates the concept of claim discovery by requiring plaintiffs seeking to avail themselves of the doctrine to establish, among other factors, that "the concealment *prevented plaintiff's 'discovery* of the nature of the claim within the limitations period.'"  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (quoting *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003)) (emphasis added).  However, in rejecting the discovery rule as means of enlarging the statute of limitations applicable to SEC claims for penalties, the Supreme Court made clear that the SEC's failure or inability to "discover" a claim provides no basis for extending the five-year time limit for the SEC to bring actions for penalties based on securities fraud.  Consequently, any rule that would apply equitable tolling to an SEC enforcement action on grounds that acts of fraudulent concealment prevented the SEC's discovery of the nature of its claim within the limitations period cannot be reconciled with the Supreme Court's holding in *Gabelli*.  As a result, like the discovery rule, equitable tolling based on the doctrine of fraudulent concealment is also unavailable to the SEC in enforcement actions.[3]

     The foregoing conclusions are compelled, not only by the holding of the Supreme Court in *Gabelli*, but also by its underlying reasoning.  In explaining its rationale, the *Gabelli* Court made clear that the equitable doctrines designed to protect private plaintiffs until a concealed claim is discovered are not applicable to the SEC because of at least three fundamental

---

[3] While theoretical distinctions may be drawn between deferring the accrual of a claim of the limitations period and equitably tolling its running, "[w]hether a court says that a claim for fraud accrues only on its discovery . . . or instead says that the claim accrues with the wrong, but that the statute of limitations is tolled until the fraud's discovery, is unimportant in practice." *SEC v. Koenig*, 557 F.3d 736, 739 (7th Cir. 2009).

distinctions between ordinary plaintiffs and government enforcement agencies like the SEC. First, the Court specifically explained that unlike defrauded private plaintiffs who may not know of an injury and who reasonably do not make inquiry, the SEC's central mission is to actively investigate potential violations and root out fraud, and it possesses broad law-enforcement tools that provide it with a unique ability to do so.  Those powers include the ability to: (i) demand to review books and records, (ii) subpoena documents and witnesses, (iii) pay monetary awards to whistleblowers, and (iv) offer cooperation agreements to violators to procure information about others in exchange for more lenient treatment.  *See Gabelli*, 2013 WL 691002, at *6 (internal citations omitted).

Second, the Court recognized that principles of equitable tolling that protect an ordinary plaintiff's ability to seek compensatory relief are not applicable where the SEC is seeking penalties.  *Id*. at *7 ("But this case involves penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers.").  The Court also emphasized "the importance of time limits on penalty actions," quoting Chief Justice Marshall's concern that it "'would be utterly repugnant to the genius of our laws' if actions for penalties could 'be brought at any distance of time.'"  *Id.* (quoting *Adams v. Woods*, 2 Cranch 336, 342 (1805)).

Finally, the Court noted that making determinations about whether the SEC acted diligently presents far greater practical difficulties than in the case of defrauded victims, and it was also particularly problematic that repose for defendants "hinge on speculation about what the Government knew, when it knew it, and when it should have known it."  *Id.*  In discussing how assessing diligence on the part of government agencies "presents particular challenges for the courts," the Court observed that,

> [Government] [a]gencies often have hundreds of employees, dozens of offices, and several levels of leadership. In such a case, when does 'the Government' know of a violation? Who is the relevant actor? Different agencies often have overlapping responsibilities; it is the knowledge of one attributed to all? . . . It is

unclear whether and how courts should consider agency priorities and resource constraints in applying that test to Government enforcement actions. *Id.* at *7 (internal citations omitted).

The reasons supporting the Supreme Court's decision to reject the discovery rule in SEC enforcement actions apply with equal force to the SEC's efforts to extend the statute of limitations pursuant to the "fraudulent concealment" doctrine. Notably, the very same practical challenges and difficulties the Supreme Court identified regarding SEC diligence and knowledge are present in the case of fraudulent concealment where the SEC, as plaintiff, would have the burden of proving how it diligently pursued, but remained ignorant of, its claims during the period for which it seeks equitable tolling. *See Koch*, 699 F.3d at 157.

*Gabelli* also applies with equal force to SEC claims for penalties based on non-fraud claims. Although some of the alleged violations are non-fraud based, the SEC (unlike ordinary plaintiffs) nevertheless seeks penalties for those alleged violations, it possesses the same unique law-enforcement powers that allow it to investigate those allegations just as effectively, and presents identical concerns in the non-fraud context about its state of knowledge and the complications raised by applicable privileges. Accordingly, the practical application and effect of *Gabelli* is that there can be no equitable tolling in SEC enforcement actions.[4]

**b.** **Even independent of *Gabelli*, the SEC cannot establish application of the fraudulent concealment doctrine in this case.**

To establish fraudulent concealment, a plaintiff must prove that: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period;' and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff

---

[4] A defendant might still be equitably estopped from asserting a statute of limitations defense in a case where facts, neither applicable nor present here, demonstrate a defendant has actively prevented the SEC from suing in time.

9

seeks to have tolled." *Koch*, 699 F.3d at 157 (quoting *Zerilli-Edelglass*, 333 F.3d at 81); *see also SEC v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007) (same). The SEC cannot do so.

**(1)  The SEC cannot show Defendants concealed material facts by affirmative steps beyond the alleged wrongful conduct.**

Even if the SEC could invoke the fraudulent concealment doctrine after *Gabelli*, the undisputed facts show that the SEC cannot satisfy its burden of demonstrating the doctrine applies. Tolling based on fraudulent concealment is only appropriate in rare and exceptional circumstances which are not present here. *See Zerilli-Edelglass*, 333 F.3d at 80 (2d Cir. 2003). Even if application of the fraudulent concealment doctrine to government enforcement actions is deemed to survive the Supreme Court's decision in *Gabelli*, it nevertheless applies only where a plaintiff can establish that a defendant "took affirmative steps *beyond the allegedly wrongful activity* itself to conceal [its] activity from the plaintiff." *SEC v. Gabelli*, 653 F.3d 49, 59-60 (2d Cir. 2011), *rev'd on other grounds*, No. 11-1274, 2013 WL 691002 (U.S. Feb. 27, 2013) (emphasis added). Here, however, in relying on the acts identified in connection with Defendants' motion to dismiss, the SEC is relying on the *very same acts* underlying its fraud claim, and not "affirmative steps beyond the wrongfully alleged activity." *Id.*

According to the SEC, the allegedly wrongful activity in this action consists not just of false SEC filings, but of a complex ongoing "fraudulent scheme" that the SEC has labeled the "Offshore System"—the alleged purpose of which, was to violate federal securities laws. *See* Compl. ¶¶ 1, 3, 10. Thus, the acts on which the SEC relies—*i.e.*, the "deceptive acts to conceal [the Wylys'] control over the offshore entities, which in turn frustrated the SEC's ability to discover their violations," s*ee Wyly I*, 788 F. Supp. 2d at 107,—are themselves the "wrongful activity" and do not constitute acts independent of the alleged "fraudulent scheme." Furthermore, the SEC is unable to explain how any such actions hid activity from the SEC throughout the time period when the SEC, concededly, was not actively searching and when it

10

had not asked the Wylys for information.  Because Defendants neither took affirmative steps to prevent or frustrate the SEC's efforts to learn facts, nor deprived the SEC of information it was seeking or needed to timely pursue its fraud claims, the "rare and exceptional circumstances" necessary to invoke the fraudulent concealment doctrine do not exist.  *See Jones*, 476 F. Supp. 2d at 382; *Harris v. Koenig*, 722 F. Supp. 2d 44, 57 (D.D.C. 2010) ("[T]he fraudulent concealment doctrine . . . requires that the defendant engage in active concealment—it must undertake some trick or contrivance to exclude suspicion and prevent inquiry.") (internal quotation marks and citation omitted).

### (2)   The SEC cannot establish that Defendants prevented it from discovering the nature of its claim.

There can be no dispute that the SEC was *not* prohibited or prevented by Defendants from using its investigatory authority to seek copies of trust agreements, documentation surrounding transfers to trust companies, information about trust-related investments and securities sales, or the manner in which the Wylys or others interacted with foreign trust service providers.  *See, e.g.*, *Gabelli*, 2013 WL 691002, at *6-7 (describing the SEC's investigative powers); 15 U.S.C. § 80b-4; 15 U.S.C. § 80b-9(b); 15 U.S.C. § 77s(c); 15 U.S.C. §§ 78u(a)-(b); 17 C.F.R. § 202.5.  Had the SEC done so, it would have learned the core facts underlying its claims just as it apparently did once it finally began to ask.  Significantly, the Internal Revenue Service, prompted by its own review of SEC filings, actually did begin to request and receive this very information from the Wylys nearly a year before the SEC commenced its investigation.  *See* Defs. R. 56.1 ¶¶ 54-55, 64-65.  The SEC, however, did not do so until late 2004.  *See* Defs. R. 56.1 ¶ 78.

### (3)   The SEC also cannot meet its burden to establish that it acted with diligence before its investigation.

11

Even if the Court disagrees that *Gabelli* precludes equitable tolling here, the SEC cannot satisfy its burden of demonstrating it was diligent in seeking to learn facts that would disclose the fraud it now alleges during the time that limitations was running. "Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) (quoting *Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir. 1977)). Here, the SEC cannot meet its burden to show that it exercised reasonable care and diligence in pursuing its claims before late 2004.

The SEC has admitted that, with two exceptions, based solely on limited correspondence obtained from third parties, it "*is not aware* of any questions being raised, prior to November 16, 2004, by any employee of the SEC[.]" *See* Defs. R. 56.1 ¶ 78. Of course, the SEC's professed ignorance is only because it, admittedly, never bothered to investigate its own files or records to determine what diligence by the SEC occurred during the period in question. *See* Defs. R. 56.1 ¶ 79. Furthermore, neither of the two exceptions was an inquiry directed to or made of the Wylys. *See* Defs. R. 56.1 ¶¶ 69-77.

Although the SEC made an isolated query of an SEC Enforcement Division database, *see* Defs. R. 56.1 ¶ 79, it made no other attempt to learn what SEC employees did or did not ask between 1992 and November 2004 about facts now at issue. *See id.* As a result, the SEC itself does not know what its employees did or did not do over the course of more than a dozen years, what they may or may not have learned during that timeframe, or what the SEC did or did not rely on (including its own internal rationale) in making any decision about inquiring or not inquiring about facts now underlying the SEC's claims.[5] Notably, these are the very problems

---

[5] Although the Court admonished the SEC to make inquiry of other SEC divisions and offices and to search the SEC's files and records for applicable information "even at this late date," so that the reasonableness of the SEC's decision making could be properly considered,

the *Gabelli* Court identified in concluding that equitable tolling, based on the discovery rule, is not available to the SEC. The SEC, therefore, cannot establish reasonable diligence.

In addition to the foregoing, the SEC did not exercise diligence to investigate any claim despite knowing of several material facts. For example, there is no dispute that since the mid-1990's the SEC knew, among other things, that the Wylys had established trusts in the Isle of Man, *see* Defs. R. 56.1 ¶ 24, trust beneficiaries included the Wylys or their family members, *see id.*, the Wylys transferred securities to the foreign entities, *see* Defs. R. 56.1 ¶¶ 23, 25, 27-30, entities owned by foreign trusts associated with the Wylys were selling securities in public markets, *see* Defs. R. 56.1 ¶¶ 47-48, Isle of Man corporations were fully owned by the foreign trusts and had acquired securities, *see* Defs. R. 56.1 ¶¶ 28, 30, and that transfers to trust entities caused securities previously reported as beneficially owned by the Wylys to no longer be reported in any SEC filing, *see* Defs. R. 56.1 ¶ 23. All of the foregoing are facts that the SEC now contends support its fraud claims. *See* Hatch-Miller Decl. Ex. 27. Although those facts were not hidden, the SEC did not use diligence to investigate them.

Furthermore, the SEC also made no inquiry despite notice of disclaimers of beneficial ownership made in any Defendant's Section 16 reports regarding securities owned by foreign trusts. *See* Defs. R. 56.1 ¶¶ 24, 38. Disclaimers of beneficial ownership, *even where beneficial ownership is deemed to exist*, are expressly sanctioned by the SEC. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28869, § II.B.1. n.43 (Feb. 8, 1991) ("Rule 16a-1(a)(4) permits a disclaimer of beneficial ownership to accompany any reported transaction or holding, even where beneficial ownership is deemed to exist under the rules."). But the very presence of a disclaimer in an insider report provides notice

---

*see* Hatch-Miller Decl. Ex. 30, the SEC has not provided any additional information or explanation.

to both the SEC and investors that facts and circumstances may exist which put the issue of beneficial ownership in question. The very fact that a reporting person affirmatively disclaims beneficial ownership under applicable rules suggests that the alternative possibility exists—*i.e.*, that in fact they may be, or might be deemed to be, the beneficial owner. At a minimum, the disclaimer is notice that a connection exists between the reporting person and the shares, and that there is a question as to beneficial ownership. As one leading commentator has noted,

> this generous standard is needed to give insiders appropriate latitude to protect themselves by a disclaimer against Section 16(b) liability which they believe should not be visited upon them under a particular set of facts. An insider who does not expressly disclaim beneficial ownership on his Form 3, Form 4, or a Form 5 may be faced with the argument that he admitted his beneficial ownership or is estopped to deny ownership.

Arnold S. Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* § 4:118 Disclaiming Beneficial Ownership. Despite the presence of disclaimers appearing in insider reports for various Defendants, the SEC made no inquiry at the time those filings were made, or after, until its investigation commenced, to learn whether the disclaimer was correct or to request facts or information to determine beneficial ownership. *See* Defs. R. 56.1 ¶ 79.

For all the foregoing reasons, the SEC cannot satisfy its burden of showing that it acted with diligence in pursuing its claims during the period before it commenced its investigation. *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998). For this additional reason alone, the Court should reject the SEC's request for *equitable* tolling.

### 4.   The doctrine of fraudulent concealment does not apply to the penalty claims against Schaufele and French.

The SEC's invocation of the fraudulent concealment doctrine to save its untimely penalty claims against French and Schaufele fails for two additional reasons. First, any concealment had ended more than five years before French and Schaufele signed tolling agreements with the SEC on July 29 and October 29, 2009, respectively. Second, it is undisputable that the SEC had

enough information to file its Complaint <u>three years</u> before it sought tolling agreements from French and Schaufele.

      a.    <u>**Any concealment was rendered ineffective—and the statute began running—by the summer of 2004.**</u>

REDACTED

¶ 57.  BAI's Chief Counsel, Barry Harris, attended all of the meetings and took an active role in attempting to resolve the issue.  *See* Defs. R. 56.1 ¶ 58.

According to the minutes of the June 11 Risk Committee meeting, Chief Counsel Harris presented a proposal that had been developed with input from senior management, including the

REDACTED

On June 15, 2004, Harris reported to Bank of America Private Bank Regional President Tim Maloney, BAI's Director of Compliance Susan Hechtlinger, and others, that NFS was not satisfied with the bank's proposal.  *See* Defs. R. 56.1 ¶ 62.  In his report, Harris explained that NFS was concerned about not only the identity of the beneficiaries, but also the very securities

REDACTED

"made available . . . to appropriate law enforcement agencies" including the SEC.  Defs. R. 56.1

16

¶ 66.  Thus, by the summer of 2004, the SEC should have known, and with the exercise of

minimal diligence would have known, of the very concerns about the offshore accounts that give

rise to its claim.

The SEC's apparent failure to make any inquiries that would have revealed serious

securities law concerns about the offshore trusts is particularly significant given the undisputed

fact that the SEC was conducting an examination of BAI at the moment it was debating how to

address the concerns that had been raised about the "Wyly offshore accounts." *See* Defs. R. 56.1

¶¶ 49-53.  There is no allegation defendants did anything to prevent the SEC from simply

requesting the Risk Committee's agendas or asking about any compliance concerns being

discussed by BAI management.  Had the SEC done so, it would have immediately learned what

it now claims it could not uncover until November 2004.

Contemporaneous investigations by other law enforcement entities further demonstrate

that if there had ever been effective concealment of ownership and control issues concerning the

REDACTED

an attorney for the Wylys observed in October 2004, "the balance of" the more than 150

information requests the IRS had served were "on transfers pulled from SEC filings." Defs. R.

56.1 ¶ 65.  In addition, on October 5 and 14, 2004, more than five years before Schaufele's

tolling agreement, the Manhattan DA's Office served nine subpoenas on the Bank of America

demanding detailed information about 38 of the offshore accounts. *See* Defs. R. 56.1 ¶ 68.

In light of these undisputed facts, the SEC cannot hope to prove that its causes of action

were concealed by mid-2004.  After fraudulent concealment ceases to be operational, the statute

of limitations begins to run again.  *See Dodd*, 12 F.3d at 352 (where fraudulent concealment

17

applies, the statute of limitations is "tolled for the period of concealment"); *Donoghue v. American Skiing Co.,* 155 F. Supp. 2d 70, 74 (S.D.N.Y. 2001) ("The limitations period is tolled only 'until the claim is (or should be) known to the plaintiff, or until the improper concealment has ceased.'"). The statute was therefore running by the time of the last alleged violation in May (and certainly October) of 2004 and it expired no more than five years later—prior to the execution of French's and Schaufele's tolling agreements.

### b. The SEC did not act diligently after receiving inquiry notice and could have filed suit within the limitations period.

There is also no equitable reason for the court to grant the SEC additional time to bring penalty claims against French and Schaufele because it is undisputable that the SEC not only had notice of its claims, but also had sufficient factual information to file its Complaint, well before the end of the limitations period in May 2009.[6]

Because the purpose of the fraudulent concealment doctrine is to aid a plaintiff who has been prevented from suing in time, *see Wyly I,* 788 F. Supp. 2d at 104, the Second Circuit has repeatedly held that a plaintiff who invokes the fraudulent concealment doctrine must show that "the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period," *Koch,* 699 F.3d at 157 (citing *Corcoran v. N.Y. Power Auth.,* 202 F.3d 530, 543 (2d Cir. 1999)). When the plaintiff discovers the claim well before the end of the limitations period, "there is no reason to deprive the defendant of the protection of the statute of limitations." *Cada,* 920 F.2d at 452-53;[7] *see also SEC v. Microtune, Inc.,* 783 F. Supp. 2d 867, 881 (N.D. Tex.

---

[6] The SEC's cause of action for fraud accrued at the latest on May 6, 2004, the date of the last allegedly false filing. *See* Compl. ¶ 73; *Jones,* 476 F. Supp. 2d at 381. The limitations period therefore ran on May 6, 2009.

[7] Subsequent to its decision in *Cada,* the Seventh Circuit decided *SEC v. Koenig,* 557 F.3d 736 (7th Cir. 2009), which applied the discovery rule to grant the SEC five years from the date of discovery to bring an action. The Supreme Court's decision in *Gabelli* confirms that the approach taken in *Cada,* and more recently, in *Hayden* is correct: equitable tolling requires

2011), *aff'd sub nom. SEC v. Bartek*, 484 F. App'x 949 (5th Cir. 2012) ("[I]f a plaintiff discovers his claims within the limitations period, especially if he still has two years or more remaining in which to file his complaint. . . . [t]here is obviously a lesser need, if any to toll his claims."); *Roberts v. Barreras*, 484 F.3d 1236, 1242 (10th Cir. 2007).

Since "fraudulent concealment allows the court to toll the statute of limitations under principles of equity" the SEC must also demonstrate that it acted diligently to file suit once it had notice of the claim. *Microtune*, 783 F. Supp. 2d at 878-79. "To litigate a claim so long after the events giving rise to it is bound to be difficult because of lost evidence and faded memories, and the difficulty would be needlessly augmented had the plaintiff no duty of alacrity once the facts that the defendants had improperly concealed are at last in the open." *Jay E. Hayden Foundation v. First Neighbor Bank*, 610 F.3d 382, 387 (7th Cir. 2010) (affirming dismissal of suit as time barred).

In *Microtune*, the court dismissed a securities fraud complaint where the SEC filed suit five years after it received inquiry notice of the fraud, because a more diligent investigation "would have . . . allowed the SEC to bring a complaint against [defendant] much earlier[.]" 783 F. Supp. 2d at 881. In *Hayden*, the Seventh Circuit ruled the complaint was untimely where "the plaintiffs knew so much that they did not need three more years to complete their pre-complaint investigation and file suit." 610 F.3d at 388.

The SEC cannot dispute that by August 2006 at the latest, it was in possession of sufficient investigative material to file its Complaint. The publicly-available and highly detailed 405 page report by the U.S. Senate Permanent Subcommittee on Investigations (the "PSI Report") laid out a complete blueprint of the SEC's claims, including detailed descriptions of:

---

diligence and alacrity once a cause of action is identified and does not restart the limitations period.

the terms of the trust agreements, *see* Defs. R. 56.1 ¶ 82; the Wylys' transfer of assets to foreign entities, *see* Defs. R. 56.1 ¶ 83; investment recommendations being made by trust protectors to trustees and the trustees' compliance with these recommendations, *see* Defs. R. 56.1 ¶ 82; the swap transaction in October 1999, *see* Defs. R. 56.1 ¶ 84; SEC filings related to the trusts, *see* Defs. R. 56.1 ¶ 83; and the role of Schaufele, French and other outside professionals in the operation of the trusts. *See* Defs. R. 56.1 ¶ 85. As the court in *Hayden* observed, the test is not whether plaintiff has all the evidence it needs to win its case before it files its complaint – discovery provides an opportunity to obtain that – the test is whether plaintiff had sufficient facts to plead claims that would withstand a motion to dismiss. *See Hayden*, 610 F.3d at 386. After August 2006, the SEC had enough information to plead its claims and did not require an additional four years of pre-complaint investigation.

While the Complaint invokes factors like the need to gather evidence from "foreign jurisdictions with stringent financial secrecy laws" to excuse its tardy suit, in fact, the SEC received extensive cooperation from the Isle of Man's Attorney General, and by the end of 2006 had received thousands of pages of documents and taken testimony from all Isle of Man witnesses it would interview. In 2007, it took additional investigative testimony and received thousands of additional documents from subpoenaed witnesses. By the end of 2008, the Commission had conducted all of its investigative interviews, *see* Neish Decl. Ex. 7, and had also received hundreds of thousands pages of subpoenaed documents.

Nothing but its own lack of diligence prevented the SEC from filing suit or seeking tolling agreements from French and Schaufele well before the end of the limitations period on May 6, 2009. Accordingly, the doctrine of fraudulent concealment does not apply to the SEC's penalty claims against French and Schaufele, and these claims are time-barred.

5.      **The claim for injunctive relief against Schaufele is time-barred and unwarranted.**

The injunctive relief claim against Schaufele is a penalty and is likewise time-barred under § 2462.  The statutory term "penalty" includes equitable relief that "seeks to punish." *Jones*, 476 F. Supp. 2d at 381; *see also Johnson v. SEC*, 87 F.3d 484, 488-89 (D.C. Cir. 1996) (concluding that censure and suspension were penalties under § 2462).  In *Jones*, the court held that the collateral consequences of "an injunction preventing future violations of the securities laws" would be to stigmatize and significantly impair the defendant's ability to pursue his vocation. 476 F. Supp. 2d at 385 (citing *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978)); *see also Bartek*, 484 F. App'x at 957 (holding that permanent injunction and officer and director ban were punitive and therefore time-barred under § 2462).

Here, as in *Jones*, the injunction sought by the SEC is punitive.  The SEC has explicitly stated that if an injunction is entered against Schaufele, the SEC will initiate administrative proceeding to permanently bar Schaufele from his profession.  Denying a man the ability to perform his life-long profession is clearly punitive. *See, e.g., United States v. Lovett*, 328 U.S. 303, 316 (1946).

Moreover, the proposed injunction is not a proper request for injunctive relief.  The Complaint alleges conduct by Schaufele ending in 2004 at the latest and does not allege any facts indicating a current "cognizable danger of recurrent violation." *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959).   To show likelihood of recurrence, the Second Circuit requires the SEC to "go beyond mere facts of past violations." *Jones*, 476 F. Supp. 2d at 383-84; *see also SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995); *Culpepper*, 270 F.2d at 250.  The SEC cannot do so here.

C.      **The SEC's Effort To Disgorge Allegedly Unpaid Federal Income Taxes Is Improper.**

Pursuant to Paragraph V of the Prayer for Relief in the Complaint, the only measure of disgorgement that the SEC has ever proposed in this case is the amount of federal income taxes

that the SEC mistakenly believes the Wylys avoided by transferring stock options to offshore corporations owned by the offshore trusts and failing to disclose the extent of their supposed control over the options after the transfers.[8]   Defendants, however, are not aware of any prior case in which a court has permitted the SEC to use disgorgement as a means to recover allegedly unpaid federal income taxes.

1.   **The SEC lacks the authority to recover allegedly unpaid federal income taxes as that power resides within the exclusive authority of the Secretary of the Treasury.**

No federal government agency has ever before sought the disgorgement remedy that the SEC seeks here, and for good reason.  Congress granted exclusive authority over federal income tax matters to the Secretary of the Treasury (the "Secretary") and requires the Secretary to comply with specific procedures when assessing and collecting such taxes.  *See* 26 U.S.C. §§ 6201-16.  The agency through which the Secretary exercises its exclusive authority is the Internal Revenue Service.  *See id.* § 7803(a).  Permitting the SEC to recover allegedly unpaid federal income taxes through a disgorgement remedy in a securities fraud case would impermissibly undermine this important statutory scheme, which, among other things, ensures that complex federal income tax matters are always handled by the government's tax experts. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 ("Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'") (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)); *see also Truckers United for Safety v. Mead*, 251 F.3d 183, 189-90 (D.D.C. 2001)

---

[8] *See* Defs. R. 56.1 ¶ 88. The SEC has never suggested that French personally avoided federal income tax liability through his participation in the alleged offshore trust fraud scheme. Rather, the SEC seeks to hold French jointly and severally liable for the federal income taxes that it claims the Wylys avoided through participation in the scheme.

(holding that the United States Department of Transportation Inspector General acted outside the scope of his statutory authority by conducting investigations into matters under the exclusive jurisdiction of the Federal Highway Administration).

Congress granted the Secretary exclusive authority to assess taxes "imposed by [Title 26], or accruing under any former internal revenue law, which have not been duly paid[.]" 26 U.S.C. § 6201(a); *see also id.* § 7801(a)(1) ("Except as otherwise expressly provided by law, the administration and enforcement of this title *shall* be performed by or under the supervision of the Secretary of the Treasury.") (emphasis added); *Mayley v. United States*, No. 8:11-CV-896-JMC-JDA, 2011 WL 5239725 (D.S.C. Oct. 13, 2011) ("Congress has lawfully delegated the power to tax to the IRS, giving the IRS the authority and the affirmative duty to assess and enforce taxes."), *report and recommendation adopted*, No. 8:11-CV-00896-JMC, 2011 WL 5314214 (D.S.C. Nov. 1, 2011). Such assessment may be made only "by recording the liability of the taxpayer in the office of the Secretary in accordance with the rules or regulations prescribed by the Secretary." *Id.* § 6203. When the Secretary determines a federal income tax deficiency, he is required to "send notice of such deficiency to the taxpayer by certified mail or registered mail." *Id.* § 6212(a). Within 90 days after such notice is mailed, "the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency." 26 U.S.C. § 6213(a). With few exceptions, "no assessment of a deficiency . . . and no levy or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of [this] 90-day . . . period[.]" *Id.*

The Secretary's exclusive grant of authority over federal income tax matters is not limited to assessment. The Secretary also has exclusive authority to "collect the taxes imposed by the internal revenue laws." *Id.* § 6301. *See also id.* § 7401 ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the

Secretary authorizes or sanctions the proceedings and the Attorney General or his delegates directs that the action be commenced."). When federal income tax collection attempts fail, a civil action to recover unpaid taxes may only be commenced by a representative of the Attorney General—typically by the Tax Division of the United States Department of Justice with the Secretary's prior authorization. *Id.* § 7401. There are no exceptions to this statutory rule. *See U.S. ex rel. Lissack v. Sakura Global Capital Mkts., Inc.*, 377 F.3d 145 (2004) (stating that the IRS has exclusive jurisdiction over tax matters pursuant to § 7401 of the Tax Code); *United States v. Letscher*, 83 F. Supp. 2d 367, 379 (S.D.N.Y. 1999) (holding that in order for a governmental entity, other than the Secretary of the Treasury, to institute a tax action, the Secretary of the Treasury must specifically authorize such suit).

The Secretary has never attempted to assess the federal income taxes that the SEC here claims Sam and Charles Wyly failed to pay. *See* Defs. R. 56.1 ¶ 89. Because the Secretary has not assessed any taxes against these Defendants, they do not owe the federal income taxes that the SEC accuses them of failing to pay. That fact alone bars all federal government agencies— including the IRS as well as the SEC—from attempting to collect such taxes. *See Principal Life Ins. Co. & Subsidiaries v. United States*, 95 Fed. Cl. 786, 806 (Ct. Cl. 2010) ("[T]he failure to assess a tax timely impacts the ability of the IRS to pursue the unpaid amount[.]"). Moreover, even assuming that the Secretary had assessed such taxes against the Wylys, the SEC would still lack the necessary statutory authority to prosecute a civil action aimed at collecting assessed taxes from the Wylys. *See* 26 U.S.C. § 7401 ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegates directs that the action be commenced.").

2.   **The SEC cannot demonstrate the required causal connection between Defendants' alleged fraud scheme and the alleged avoidance of federal income taxes.**

To establish its entitlement to disgorgement, the SEC must show a causal connection between Defendants' alleged fraud scheme and the ill-gotten gains that it seeks to disgorge. *See Patel*, 61 F.3d at 139. The SEC cannot meet that burden. *See SEC v. Kelly*, 765 F. Supp. 2d 301, 325-26 (S.D.N.Y. 2011); *Jones*, 476 F. Supp. 2d. at 386.

The claims at issue here are premised on the SEC's supposition that if the Wylys had disclosed in their SEC filings that they were beneficial owners of securities held by the offshore corporations, they would have been required to recognize income and pay federal income taxes when the offshore corporations transacted in the Issuer securities. That supposition is not only without <u>any</u> evidentiary support, it is irrelevant in this proceeding. As discussed below, proving beneficial ownership for purposes of the securities laws is not co-extensive with proving tax liability.

Section 13(d) of the Securities Exchange Act of 1934 requires any person who acquires "beneficial ownership" of more than five percent of a class of registered securities to file a statement with the SEC. *See* 15 U.S.C. § 78m(d)(1).[9] The SEC claims that the Wylys were the beneficial owners of securities held by the offshore corporations because they shared *de facto* investment power with the trustees of the offshore trusts. *De facto* investment power over a security, however, is not a factor that the Secretary and the IRS consider in determining federal income tax liability. Indeed, there is no analogous provision of the Internal Revenue Code

---

[9] The term "beneficial ownership" is defined in SEC Rule 13d-3(a), which provides that "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares (1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

providing that the beneficial owner of a security incurs federal income tax liability when the record owner sells that security. To the contrary, while the term "beneficial ownership" appears in various places in the Code, *see, e.g.*, 26 U.S.C. § 269B(c)(2), it nowhere appears with regard to ownership of securities or the taxation of securities sales.

In short, the SEC cannot demonstrate that the Wylys avoided incurring federal income tax liability without diving into tax theories far afield from the standards governing the claims against Defendants set forth in the Complaint.

### 3.   <u>Permitting the SEC to put on a complex, unpleaded and unrelated tax case against the Wylys after a trial on liability would contravene the equitable purposes of disgorgement.</u>

The SEC may only obtain disgorgement where granting such a remedy would be equitable. *See, e.g., In re Adelphia Commc'ns*, 367 B.R. 84, 96 (S.D.N.Y. 2007) (denying a claim for disgorgement where granting such a remedy would have resulted in inequity). Here, the SEC cannot establish that the Wylys owe federal income taxes on the offshore corporations' securities transactions without relying on unpleaded allegations regarding entirely unrelated tax statutes and regulations. Requiring Defendants to respond to such allegations in this securities fraud case, in which there has been no opportunity for discovery on these complex tax matters, is fundamentally inequitable. That inequity would only be increased where, as here, there is a real risk of the government achieving double recovery, or at least two bites at the same apple, through this securities fraud case and a potential subsequent tax case brought by the Secretary.

Moreover, the disgorgement remedy that the SEC seeks here would be inequitable because, at worst, Defendants' actions with regard to the offshore trusts and corporations resulted in deferral, rather than outright avoidance, of federal income taxes. When, for example, Defendants transferred stock options to the offshore corporations, they received annuities of

REDACTED

26

REDACTED

### 4.    The SEC's disgorgement claim against French is improper

The SEC has never suggested that French personally avoided federal income tax liability. Yet even though on its face the Complaint makes no such claim, the SEC has suggested that it will seek an order of disgorgement against French, on a joint and several basis, for taxes allegedly avoided *by the Wylys*.[10] Such joint and several liability is inappropriate where "the joint tortfeasors . . . demonstrat[e] that their liability can be reasonably apportioned." *SEC* v. *Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) *aff'd*, 438 F. App'x 23 (2d Cir. 2011); *see also SEC v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997); *SEC v. Pittsford Capital Income Partners, L.L.C.*, No. 06 Civ. 6353 T(P), 2007 WL 2455124, at *16 (W.D.N.Y. Aug. 23, 2007) ("[J]oint and several liability for disgorgement of the entire proceeds of a fraud is required *when it is impossible to determine the precise portion of the proceeds that each defendant ultimately took*.") (emphasis added).

Imposing disgorgement on a joint and several basis where it is undisputed that a defendant reaped no gain would serve no remedial purpose and flouts the well-established

---

[10] With regard to Schaufele, the SEC has asserted a different measure of damages. The Complaint's Prayer for Relief seeks "as to each Defendant, their own illicit profits, ill-gotten gain, illegal losses avoided, or unjust enrichment." In its response to Schaufele's Interrogatories, the SEC confirmed that the measure of disgorgement it was seeking from him were gains on the October 1, 1999 Sterling Software purchase and the commissions and similar compensation earned in relation to transactions in the offshore accounts. *See* Neish Decl. Ex. 15. The SEC has never suggested that Schaufele shared in any of the Wylys' alleged gains—however measured— and it cannot change its theory of recovery now, after discovery has ended.

principle that disgorgement is a remedial rather than a punitive measure. *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006). The one circumstance in which courts have departed from this general rule is in the insider trading context where certain courts have ordered disgorgement by tippers for the downstream profits received by their tippees. *See, e.g., SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998) ("The value of the rule in preventing misuse of insider information would be virtually nullified if those in possession of such information, although prohibited from trading for their own accounts, were free to use the inside information on trades to benefit their families, friends, and business associates."). This exception, however, is unique to insider trading and lacks broader application. Moreover, even in insider trading cases, many courts have declined to hold tippers liable for profits realized by their tippees when the tippers did not also share in the profits. *See, e.g., SEC v. Downe*, 969 F. Supp. 149, 158 (S.D.N.Y. 1997), *aff'd sub nom. SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) (declining to order the tipper to disgorge profits earned by his tippee brother because the SEC "failed to show how [the tipper] was enriched by [the tipee's] trades.").

It is undisputed that any gains stemming from taxes allegedly avoided by the Wylys were *not* shared with French, and thus, the precise portion of the proceeds received by French is easily determined—it is zero. Accordingly, the Court should deny the SEC's application for disgorgement against defendant French for this additional reason.[11]

It is also undisputed that French domesticated his own offshore trusts long ago and has paid all U.S. taxes owed with respect to such trusts. *See* Defs. R. 56.1 ¶ 95. Had the Wylys chosen to do likewise there would be no disgorgable gain, even assuming the alleged violations

---

[11] Because the Complaint does not allege insider trading allegations against defendant French, it is French's understanding, based on representations made by the SEC at the January 9, 2013, pre-motion conference, that if the Court rejects the SEC's tax theory of disgorgement, or its joint and several application to defendant French, there would be no remaining basis for disgorgement against French. *See* Defs. R. 56.1 ¶ 96.

had occurred.   Under these circumstances, imposing joint and several disgorgement against French would be all the more inequitable.

**D.    Summary Judgment Should Be Granted For The Wylys On The Insider Trading Claim Against Them.**

The SEC asserts a single insider trading claim against the Wylys based upon a set of contractual swap agreements, entered between foreign corporations and Lehman Brothers Finance, in two steps, on October 8 and October 20, 1999 (collectively the "Swap Transaction"). *See* Compl. at ¶¶ 124-26.   The record, however, conclusively establishes that any non-public information known by the Wylys at the time of the October 1999 Swap Transaction regarding a sale or merger of Sterling Software was immaterial as a matter of law.

The Supreme Court has "implicitly recognized the propriety of summary judgment where a prospective merger is too inchoate to be material." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 989 (S.D.N.Y. 1989) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240-241 (1988)).   Numerous courts "have concluded that preliminary merger negotiations were too incipient for a jury to find them material." *Id.* at 990 (citing multiple authorities).   Such is the case here.

Trading on the basis of non-public information is actionable under Section 10(b) and Rule 10b-5 only if the information is "material."   In order to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic*, 485 U.S. at 231-32 (internal quotation marks omitted).   The Supreme Court, in *Basic*, specifically addressed the materiality of information regarding a possible merger, observing that because of the "ever-present possibility that the contemplated transaction will not be effectuated," merger negotiations can be "contingent or speculative in nature," making it, therefore, difficult to ascertain their significance to a reasonable investor. *Id.* at 232.   As a result,

the materiality of information about a corporate sale or merger "'will depend at any given time upon a balancing of both the indicated probability that [a merger] will occur and the anticipated magnitude of the [merger] in light of the totality of the company activity.'" *Id.* at 238 (internal quotations and citations omitted).

The factors that courts may consider in determining the probability that a merger will actually occur include board resolutions, instructions to investment bankers, and actual negotiations between principals of the buying and selling parties or their respective intermediaries. *Id.* at 239. The test of materiality is a conservative one, where courts are required to consider "'[t]he probability of a transaction occurring . . . in light of the facts as they then existed [at the time of the securities purchase], not with the hindsight knowledge that the transaction was or was not completed.'" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001) (quoting *Panfil v. ACC Corp.*, 768 F. Supp. 54, 58-59 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991)) (alteration in original).

The *only* information regarding a prospective sale or merger involving Sterling Software that even arguably existed as of October 1999, is the alleged oral agreement between Sam Wyly and Charles Wyly *to pursue a sale* of the company. *See, e.g., Wyly I*, 788 F. Supp. at 119. Even assuming *arguendo* that an agreement did exist (it did not), the probability of a sale or merger of Sterling Software was non-existent at that time. Beyond that alleged agreement, no concrete steps in furtherance of a sale of Sterling Software had occurred, and all of the factors identified in *Basic* demonstrate that any sale was, at best, remote and speculative.

Even as late as November 11, 1999, there were no board discussions or resolutions regarding any sale of Sterling Software, no instructions to investment bankers, and no negotiations between buying or selling principals or their intermediaries regarding a potential merger. *See* Defs. R. 56.1 ¶ 99. Indeed, no discussion with any potential buyer occurred until

30

January 14, 2000, over three months after the execution of the Swap Transaction.[12]   Importantly,
Computer Associates' own SEC reports reflect that as of late 1999, Computer Associates was not
even interested in purchasing Sterling Software.  *See* Defs. R. 56.1 ¶ 110 ("Independently from
the management reviews, in late 1999, a representative of Morgan Stanley & Co. Incorporated,
contacted Mr. Sanjay Kumar . . . to inquire as to whether Computer Associates might be
interested in acquiring Sterling Software.  *At that time, Mr. Kumar advised Morgan Stanley that
Computer Associates was not interested in acquiring Sterling Software*.") (emphasis added).

The first internal discussions regarding a possible sale between Sterling Software
executives did not occur until November 15, 1999, over a month *after* the Swap Transaction.
*See* Defs. R. 56.1 ¶ 100.  Significantly, those discussions did not involve either of the Wylys.
*See* Defs. R. 56.1 ¶ 101.  Moreover, it was not until even later, on November 19, 1999, that
Sterling Software's CEO contacted Goldman Sachs for the purpose of discussing potential sales
of parts or all of the company.  *See* Defs. R. 56.1 ¶ 102.  At that time, however, Sterling
Software's executives were unsure what, if any, scenario would be pursued.  *See id*.; Defs. R.
56.1 ¶ 103.  Further, theoretical or potential merger partners were not identified by Goldman
Sachs until late December 1999, two months after the Swap Transaction.  *See* Defs. R. 56.1 ¶
107.  In fact, Sterling Software did not even engage Goldman Sachs as its investment banker
until January 10, 2000.  *See* Defs. R. 56.1 ¶ 111.

---

[12] *See* Defs. R. 56.1 ¶ 116 (Sterling Software Schedule 14D-9 at 22 ("[O]n January 14,
2000, before any contacts had been made with any third party, Mr. Sanjay Kumar, President and
Chief Operating Officer of Computer Associates, contacted Mr. Sam Wyly . . . to discuss the
possibility of a business combination between Computer Associates and Sterling Software. . . .
[I]n late January, 2000, representatives of Goldman, Sachs & Co. and Broadview contacted a
number of third parties in an effort to ascertain on a preliminary basis their level of interest in
engaging in a business combination transaction with Sterling Software.  *The third parties
contacted generally expressed either modest interest, indifference or no interest in a business
combination with Sterling Software*.") (emphasis added)).

Although Goldman Sachs identified Computer Associates as one of four hypothetical candidates to buy Sterling Software in late December 1999, *see* Defs. R. 56.1 ¶ 109, it was not until later, when Computer Associates' bankers suggested a transaction in January 2000, that Computer Associates first expressed an interest in exploring a transaction with Sterling Software. *See* Defs. R. 56.1 ¶¶ 112-13. The undisputed record clearly demonstrates that not a single discussion with any potential buyer occurred until January 14, 2000, when Sam Wyly received a call from Sanjay Kumar about scheduling a meeting to discuss a possible transaction. *See id.*; Defs. R. 56.1 ¶ 114.

Ignoring this overwhelming evidence demonstrating an absence of any probability, likelihood, or even possibility of a sale at the time of the Swap transaction, the SEC instead relies on a marketing book, prepared from publicly available information by Morgan Stanley, that was delivered to Sam Wyly on October 18, 1999 (the "Marketing Book"), and a subsequent meeting between Morgan Stanley representatives and Sam Wyly on November 22, 1999. *See* Compl. ¶ 91; Defs. R. 56.1 ¶¶ 97-98, 104. Each of these events are of no legal consequence because they occurred *after* the first step execution of the Swap Transaction. Significantly, the Morgan Stanley representative testified that with respect to the Marketing Book and the meeting, Morgan Stanley never acted as an advisor to Sam Wyly, was never retained to provide services, and was not tasked with any assignment or undertaking concerning a sale of Sterling Software. *See* Defs. R. 56.1 ¶ 105.

Courts considering analogous fact patterns have uniformly held that a company's unilateral intention, or even decision, to merge or sell itself is immaterial *as a matter of law* before negotiations have commenced with potential suitors. *See List v. Fashion Park, Inc.*, 340 F.2d 457, 464-65 (2d Cir. 1965) (affirming district court finding that corporate resolution to sell company was immaterial as a matter of law because prospective buyer was unidentified); *L.L.*

*Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1180-81 (S.D.N.Y.

1996) (holding an unrequited desire of one party to engage in a merger transaction with another

is immaterial); *Panfil*, 768 F. Supp. at 58 (W.D.N.Y. 1991) ("The mere intention to pursue a

possible merger at some time in the future, without more, is simply not a material fact[.]")

(internal quotation marks omitted).  Indeed, courts have held that the "mere intention to pursue

or an unrequited desire to explore selling the company at some time in the future is not material

irrespective of the importance of the restructuring."  *Rich v. Shrader*, No. 09-CV-0652-MMA

(WMc), 2010 WL 3717373, at *20 (S.D. Cal. Sept. 17, 2010) (internal quotations and citation

omitted); *see also Glazer v. Formica Corp.*, 964 F.2d 149, 155 (2d Cir. 1992); *Heliotrope Gen.,

Inc. v. Ford Motor Co.*, 189 F.3d 971, 980 (9th Cir. 1999); *Taylor v. First Union Corp. of S.

Carolina*, 857 F.2d 240, 244-45 (4th Cir. 1988), *cert. denied,* 489 U.S. 1080 (1989).

As the established record makes clear, there was *no* probability of a sale of Sterling

Software prior to Computer Associates' advances in January 2000.  Accordingly, no material

information regarding merger negotiations or a sale of Sterling Software existed before January

2000, a full three months after the Swap Transaction.  *See Panfil*, 768 F. Supp. at 58 ("The

probability of merger prior to any contact with potential suitors—prior to any evidence that a

suitor is in any way interested in merger—is too remote.").  Summary judgment should,

therefore, be granted dismissing the SEC's insider trading claim.

**E.    Schaufele Is Entitled to Summary Judgment on the Insider Trading Claim Against
Him.**

The Court should award summary judgment to Schaufele on the insider trading claim

asserted against him in the Second Claim of the Complaint.  The factual record is clear that

Schaufele did not have the information the SEC ascribes to him, or any other material

information.  According to the Complaint, Schaufele purchased Sterling Software shares on

October 1, 1999, "based upon non-public material information . . . *i.e., the Wylys' intent to make a massive, bullish*" transaction in that stock.  *See* Compl. ¶ 9 (emphasis added).  In rejecting Schaufele's motion to dismiss, the Court summarized the SEC's allegations, stating that: "the Wylys allegedly asked [Schaufele] for pricing on call options for *four million* Sterling Software shares at least three days before" October 1.  *Wyly I*, 788 F. Supp. 2d at 124 (emphasis in the original).  The Court then held: "it may be reasonably inferred that the Wylys' bullish determination, as well as the highly material terms concerning the transaction's sizing and date parameters, were known to Schaufele when he traded."  *Id.*

The facts developed in discovery flatly refute the Complaint's allegation.  While others may have been discussing buying options on four million Sterling Software shares in late September 1999, there is absolutely no evidence that Schaufele had any information about the proposed transaction's size—"four million shares," "massive," or even "large"—before his purchase.  To the contrary, any such information was affirmatively withheld from Schaufele until days after October 1.  Indeed, the initial trade orders he received—all after October 1—came in a piecemeal fashion that intentionally concealed the overall size of the contemplated trade.  Thus, on the undisputed facts, there is no evidence Schaufele possessed the material non-public information the Complaint alleges, and without that information there can be no insider trading liability under § 10(b) and Rule 10b-5.

The SEC relies on a September 28, 1999, email from Schaufele to Robertson providing market prices of Sterling Software options at different expiration dates and recommending that Robertson consider a swap transaction as an alternative to options.  *See* Schaufele R. 56.1 ¶ 5.  Robertson testified that the purpose of her pricing inquiry to Schaufele—which made absolutely no reference to transaction size—was to "gather[] information."  *See* Schaufele R. 56.1 ¶ 6.  Nor is there any evidence—testimonial or documentary—that an "intent" to proceed with a

transaction was communicated to Schaufele.  Schaufele's responsive email, which was based on a check of information publicly available on Bloomberg, makes no reference to, and was in no way dependent on or tied to, transaction size.  *See* Schaufele R. 56.1 ¶ 7.  Schaufele's email reflects no knowledge on his part about the number of options to be purchased, when or if a purchase would take place, or any other details about the contemplated transaction.  *See id.*

To the extent that trust protectors, trustees or anyone else was discussing among themselves a "massive" transaction in Sterling Software in late September 1999, there is (i) no evidence that Schaufele was privy to such discussions and (ii) clear evidence that he was excluded from any such knowledge.  The testimony from all of the trust protectors and trustees was consistent: written and oral communications between them were *not* shared with Schaufele. *See* Schaufele R. 56.1 ¶ 9.  Consistent with that, on October 4—three days *after* Schaufele's purchase—Boucher wrote to one of the trustees saying, "FYI, *Lou Schaufele is not aware of the expected size of the call/swap transaction.*"  Schaufele R. 56.1 ¶ 10 (emphasis added).  Nothing in the documentary or testimonial record suggests otherwise.

Moreover, the record clearly establishes that, as late as the first week of October—after Schaufele's trade—Boucher made sure that Schaufele remained ignorant of the intended size of any transaction.  *See* Schaufele R. 56.1 ¶ 11.  As one of the trustees recorded in a file note dated October 5, 1999:  "During conversations with Michelle Boucher she emphasized that *Lou Schaufele and anyone else at Lehman Brothers was not to be informed of the total of the intended transaction*[.]"  Schaufele R. 56.1 ¶ 12 (emphasis added).  The next day, Boucher sent this trustee a recommendation that the trust acquire $666,666 worth of Sterling Software on a daily basis until $4 million was spent.  Recommending that a masking order for only one-seventh of the intended total be conveyed, Boucher again stated, "[i]t is my understanding that Lou is not aware of the overall size of the transaction and each morning the day's trading instructions

35

should be communicated to him." Schaufele R. 56.1 ¶ 13. Boucher sent a nearly identical fax to another trustee on the same day, informing her of the protectors' recommendation that Schaufele should be given instructions for only a fraction of the total transaction each day. *See* Schaufele R. 56.1 ¶ 14. Boucher again emphasized that Schaufele did *not* know the size of the transaction. *Id.* Schaufele still did not know the size of the transaction on October 6, when he asked Boucher, "What is the term and size?" Schaufele R. 56.1 ¶ 16. Boucher forwarded Schaufele's email to Robertson, writing, "We need to confirm term and size . . . . Will we tell Lou in terms of shares or dollars?" *Id.* In short, there is no evidence that Schaufele knew the terms or size of the Sterling Software transaction on October 6—nearly a week after his alleged insider trade.[13]

Schaufele's knowledge on October 1, 1999, that the Wylys, or entities associated with Sterling Software insiders were making inquiries concerning a call or swap transaction of unknown size in Sterling Software stock in immaterial as a matter of law, because it could not have significantly altered the publicly available information concerning the stock. *See Basic*, 485 U.S. at 231-32; *see also SEC v. Rorech*, No. 09 Civ. 4329 (JGK), 2010 WL 2595111, at *42-44 (S.D.N.Y. June 25, 2010). This information was too speculative to be material. "Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement." *Taylor*, 857 F.2d at 244. When the inside information concerns a potential transaction, materiality will thus "'depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic*, 485 U.S. at 238 (quoting *SEC v. Texas Gulf*

---

[13] The SEC cites to a September 30 email from Robertson to Boucher stating that Schaufele was speaking with Evan Wyly about the transaction. *See* Neish Decl. Ex. 9. But the email does not indicate, and Evan Wyly did not say in his deposition, that he had discussed the size of the contemplated swap transaction with Schaufele prior to October 1. And it is clear from written communications on October 4, 5 and 6 that the intended size of the transaction still had not been revealed to Schaufele by then, days *after* his purchase. *See* Schaufele R. 56.1 ¶ 18.

*Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)). In evaluating the indicated probability of an event, courts consider whether the information is "accompanied by specific quantification or otherwise implied certainty." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4155 SAS, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000). Information that "lacks the basic elements of specificity" concerning a potential transaction—no matter how large—is immaterial. *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979); *see also Rorech*, 720 F. Supp. 2d. at 411 ("general information" about a potential deal "does not constitute material inside information"). *SEC v. Siebald*, No. 95 Civ. 2081, 1997 WL 605114, at *3 (S.D.N.Y. Sept. 30, 1997) (information about a "bare preference" for a stock did not give rise to an insider trading violation).

Contrary to the allegations in the Complaint, discovery provided no confirmation that on October 1 Schaufele had knowledge of an "intent" to enter into any transaction. At most, he knew of nothing more than a "bare preference" on the part of the Wylys or Wyly-related entities to explore the *possibility* of entering into some type of transaction involving Sterling Software stock. Without any specifics about the potential transaction, Schaufele could not know the probability that it would occur.

Moreover, the SEC has made clear that what made the information Schaufele allegedly possessed "material" was the size of the transaction being considered. But the record is undisputed: not only did Schaufele have no knowledge anyone was considering a "four million share" or "massive" trade, he had no information about any contemplated transaction size. Accordingly, he did not know the "material" information the SEC claims he knew, *i.e.*, that the transaction was "massive" and "unprecedented." Compl. ¶ 88. The fact that a large transaction was undertaken *after* Schaufele's trade is of no relevance to the materiality analysis, which turns on information known at the time of the transaction. *See Panfil*, 768 F. Supp. at 58-59.

Moreover, information that entities related to the Wylys were considering the "bullish" possibility of purchasing an unspecified number of options, or entering into a swap of unknown parameters, on Sterling Software stock in the fall of 1999, is immaterial for an additional reason: it is entirely consistent with contemporaneous publicly available information concerning the company and would not have significantly altered the "total mix" of information available to investors. *Basic,* 485 U.S. at 231-32. Information that does not "add, contradict, or significantly alter the material information available to the general public" is immaterial as a matter of law. *SEC v. Siebel Sys.*, 384 F. Supp. 2d 694, 705 (S.D.N.Y. 2005).

The fact that Sterling Software insiders were "bullish" on the company was well-known to the market in the fall of 1999. On September 3, 1999, Sterling Software announced a stock buyback program of up to five million shares after making "a series of great acquisitions" with "superb" synergy and an expected 20% top line growth over the coming fiscal year. Defs. R. 56.1 ¶ 18. In a press release announcing the buyback and these other positive developments, CEO Sterling Williams described the company's stock as "a vastly undervalued asset." *Id.* Stock analysts at the time similarly considered Sterling Software a good investment. *See* Defs. R. 56.1 ¶ 19; Schaufele R. 56.1 ¶ 4. Knowing on October 1 that the Wylys or Wylys-related entities might be interested in a transaction in Sterling Software stock was wholly consistent with information in the market and could not have altered the "total mix" of information concerning the company.[14]

---

[14] Notably, the SEC has previously made clear that it does not allege that Schaufele knew of any of the alleged facts underlying the insider trading claim against the Wylys, *i.e.*, the SEC has disclaimed any allegation that Schaufele knew the Wylys were contemplating a sale of the company.

Because the undisputed facts show that the information Schaufele knew about the Sterling Software transaction on October 1, 1999, was immaterial as a matter of law, Schaufele is entitled to summary judgment on the insider trading claim.

**F.    Summary Judgment Should Be Granted For Defendants On The SEC's Claim For Aiding And Abetting Alleged Trustee Violations Of Exchange Act Section 13(d).**

The SEC's claim for aiding and abetting, pursuant to Section 20(e), alleges that between 1992 and 2003, three foreign trust service providers "made, collectively, a total of twelve 13D filings with the Commission," that "[a]ll twelve of these 13D filings [are] false and materially misleading," and that the "making of the[] false 13D filings was orchestrated by the Wylys and French" who "knowingly provided substantial assistance to the violations of Exchange Act §13(d) and Rules 13d-1 and 13d-2 thereunder . . . ." Compl. ¶¶ 151, 152.[15]

To prevail on these claims, the SEC must demonstrate that: (1) the trustees violated Section 13(d) because the 13D filings were false and misleading; (2) the Wylys and French had actual knowledge that the trustees' 13D filings were false; and (3) the Wylys and French each substantially assisted in accomplishing the primary violations through their own affirmative conduct and involvement with respect to each trustee 13D filing in question. *See SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009). Even assuming, *arguendo*, that fact issues exist regarding primary violations by the trustees, summary judgment should nonetheless be granted because no genuine issue of fact exists regarding the second and third elements of the SEC's aiding and abetting claim.

---

[15] The Eighth Claim includes allegations that French aided and abetted primary violations of Section 13(d) and SEC Rules 13d-1 and 13d-2 by the Wylys, which are alleged in the SEC's Sixth Claim. *See* Compl. ¶ 150. That aspect of the Eighth Claim is not included as part of the motion for summary judgment.

1.   **Summary judgment should be granted for the Wylys.**

As an initial matter, the Court should consider that of the twelve allegedly false 13D filings the SEC identified in its claim pursuant to Section 20(e), the first six filings were made before April 1995. *See* Complaint ¶ 151.  Section 20(e), however, was not enacted until December 22, 1995 as part of the Private Securities Litigation Reform Act of 1995. *See* Pub. L. No. 104-67, § 104, 109 Stat. 737.  Therefore, Section 20(e) does not apply to trustee filings before December 1995.  In any event, no reasonable jury could find that the Wylys had *actual* knowledge of the alleged primary violations by trustees.  *See SEC v. Espuelas*, __ F. Supp. 2d __, 2012 WL 5288738, at *7 (S.D.N.Y. Oct. 26, 2012) (citing and interpreting *SEC v. Apuzzo*, 689 F.3d 204, 211 n.6 (2d Cir. 2012)).  Proving such knowledge would require evidence that the Wylys were actually aware that statements the trustees made in the 13D filings were false or misleading.  *See SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) (holding that "a bare inference that the defendant must have had knowledge of the primary [violation] is insufficient" to prove aiding and abetting liability).  The SEC, however, did not even develop evidence that the Wylys knew the trustee 13D filings at issue existed, much less that the Wylys knew that the specific disclosures contained therein were false or misleading.

In addition, the SEC cannot establish that Sam or Charles Wyly substantially assisted any trustee in accomplishing an alleged primary violation.  To prove "substantial assistance" to a trustee as a primary violator, the SEC must demonstrate that with respect to each defendant, he "consciously assisted the commission of the [primary violation] in some *active* way." *See Apuzzo*, 689 F.3d at 212 n.8 (emphasis added); *SEC v. Mudd*, __ F. Supp. 2d __, 2012 WL 3306961, at *14 (S.D.N.Y. Aug. 10, 2012).  Mere awareness, or even approval, of improper action by a trustee or any other person is insufficient; the SEC is required to prove *affirmative conduct* by each of the Wylys in furtherance of the allegedly false or misleading trustee

statements in 13D filings. *See SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006) ("[M]ere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance."); *see also SEC. v. Patel*, CIV. 07-CV-39-SM, 2008 WL 782465, at *17 (D.N.H. Mar. 24, 2008).

There is no evidence that Sam or Charles Wyly ever prepared, reviewed, participated or were in any other way involved with the preparation or dissemination of the 13D filings at issue. *See, e.g., SEC v. Woodruff*, 778 F. Supp. 2d 1073, 1091-93 (D. Colo. 2011); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006); *see also Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) ("In the context of aiding and abetting, where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself."). In fact, the SEC is unable to establish *any* action by Sam or Charles Wyly—conscious or otherwise—in furtherance of any alleged SEC reporting violation by the trustees. Accordingly, summary judgment for the Wylys should be granted on the SEC's aiding and abetting claim.

## 2.   <u>Summary judgment should also be granted to French regarding filings made by the Trustees after 2000.</u>

For the reasons stated above, French cannot be liable for aiding and abetting the alleged violations regarding 13D filings made by foreign trustees in the years 2001 through 2003 (the "Trustee III Filings"). French's working relationship with the Wyly family and associated entities had ended by early 2001. *See* Defs. R. 56.1 ¶ 122. Moreover, French was neither aware of, nor involved in, any Trustee III Filings.

As discussed above, to prevail on its claim, the SEC must prove that French possessed actual knowledge of the violation, *see Espuelas*, 2012 WL 5288738, at *7, which it cannot do. French lacked any knowledge of the Trustee III Filings; without knowledge of those filings, he cannot possibly have known of their alleged falsity.

Also fatal to the SEC's allegations is the absence of any evidence that French provided "substantial assistance" with respect to the preparation or dissemination of the Trustee III Filings.  *See Morin,* 711 F. Supp. at 113; *In re Union Carbide Corp. Consumer Products Business Sec. Litig.,* 666 F. Supp. 547, 564 (S.D.N.Y. 1987).   Since French provided no assistance at all with respect to those filings, he cannot have provided "substantial assistance." Accordingly, summary judgment should be granted for French on the SEC's aiding and abetting claims concerning the Trustee III Filings.

**G.    There Is No Genuine Factual Issue Regarding The Scienter Element Of The Fraud Claims Against The Wylys and French.**

The alleged basis for the Section 10(b), Rule 10b-5, and Section 17(a) claims asserted in the First and Fourth Claims of the Complaint is that the Wylys, assisted by French, failed to disclose in various SEC filings that they beneficially owned securities owned by offshore corporations.  *See* Compl. ¶¶ 5, 47, 66-67, 122, 130.   Even assuming that the Wylys were the beneficial owners of these securities and failed to disclose it, the record evidence is insufficient to permit a jury to find that the Wylys or French acted with the requisite scienter.  *See SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999) (recognizing that scienter is a required element of Section 10(b) and Rule 10b-5 claims, and of Section 17(a) claims where injunctive relief is not the sole remedy sought).

"Liability for securities fraud requires proof of scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Obus,* 693 F.3d 276, 286 (2d Cir. 2012) (internal quotations and citations omitted).  Although "[n]egligence is not a sufficiently culpable state of mind to support" securities fraud liability, "scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.*  Summary judgment in favor of a defendant on the scienter element of a securities fraud claim is appropriate

42

in the absence of a disputed issue of fact. *See Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005).

The undisputed evidence in the record establishes that the Wylys were not personally involved in the preparation or review of the SEC filings at issue. *See* Defs. R. 56.1 ¶ 124. Rather, the Wylys delegated responsibility over the filing process to family employees, Sharyl Robertson, and later Keeley Hennington, each of whom served in essence as the family's accountant. *See* Defs. R. 56.1 ¶ 125. Robertson and Hennington in turn, relied on experienced securities law counsel, from two separate and sophisticated law firms, for compliance advice. *See id.* Attorneys who provided compliance advice to the Wylys during the period at issue included James S. Ryan, III and Marilyn Post from Jackson Walker, and Robert Estep and John McCafferty from Jones Day. *See* Defs. R. 56.1 ¶¶ 125, 145.

There is no evidence in the record that the Wylys ever directed Robertson or Hennington to withhold relevant information regarding their relationship with the trusts from French or other attorneys; no evidence that French ever withheld relevant information from attorneys working under him whom he tasked with analyzing SEC filing issues for the Wylys; and no evidence that the Wylys ever instructed any of their employees or attorneys to provide false information in SEC filings. *See* Defs. R. 56.1 ¶¶ 125, 127-129 ("Q. Is there any Schedule 13D that you can recall as being filed on your behalf with your knowledge? A. I knew that there were regular filings being done that reflected whatever was known by the accountants and lawyers at the time they did the filing and that they were professionals and they did the right thing and they did it right."). To the contrary, the Wylys' attorneys and employees knew that the offshore trusts and corporations existed, knew that trust protectors selected by the Wylys regularly made recommendations to the trustees of the offshore trusts, *see* Defs. R. 56.1 ¶¶ 137-39—and knew that trustees acted on the protectors' recommendations, *see* Defs. R. 56.1 ¶ 139. The Wylys'

experienced attorneys nevertheless concluded that they were not required to disclose beneficial ownership of securities held by the offshore corporations. *See* Defs. R. 56.1 ¶ 142. The Wylys' attorneys maintained that view throughout subsequent securities sales by offshore corporations, and other relevant factual developments involving the offshore entities. *See* Defs. R. 56.1 ¶ 143; *see generally Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994) (observing that good-faith reliance on advice of fully-informed counsel it is a factor to be considered in assessing scienter).

*At best*, the evidence in the summary judgment record *might* arguably permit a reasonable jury to conclude that the Wylys were negligent in their trust and reliance on, or their oversight of, their attorneys and family employees; or that French was negligent in his handling of Wyly SEC filing matters. However, negligence is not a sufficiently culpable state of mind to support the securities fraud claims against the Wylys and French. *See Obus*, 693 F.3d at 286. Finally, the factual record bears out the Wylys' advice-of-counsel defense in all respects. *See Steed Fin. LDC*, 148 F. App'x at 69. Accordingly, summary judgment should be granted in favor of the Wylys and French on the SEC's First and Fourth Claims.

## H.   Summary Judgment Should Be Granted To Schaufele On The Aiding And Abetting Claim Against Him.

The Court should grant summary judgment on the aiding and abetting claim against Schaufele for two reasons. *First*, the SEC cannot prevail on the 10b-5 claim against the Wylys, and absent a primary violation, aiding and abetting liability cannot lie. *SEC v. Espuelas*, 579 F. Supp. 2d 461, 471 (S.D.N.Y. 2008). *Second*, the SEC cannot prove that Schaufele had actual knowledge of any fraud by the Wylys. *See id.*

The linchpin of the SEC's scienter allegation as to the Wylys is what the SEC calls a "detailed memorandum" with five "warning flags" prepared by an associate at Jackson Walker in 1992. Compl. ¶¶ 60, 61. That memo cautioned that some authority existed suggesting that too much influence over the offshore trusts, could run the risk of triggering SEC reporting

requirements. But Schaufele never saw that memorandum. *See* Schaufele R. 56.1 ¶ 19. Nor was he ever aware of any other warning sign of securities fraud. To the contrary, Schaufele knew only that, for a dozen years, the Wylys, the Trusts and the Issuers, guided by a host of lawyers at prominent law firms, always took the position that the offshore trusts were independent of the Wylys, not controlled by the Wylys and not affiliates of the Issuers. Faced with that consistent, lawyer-counseled conclusion, Schaufele cannot have had actual knowledge of a fraud. *See Howard v. SEC*, 376 F.3d 1136, 1146-47 (D.C. Cir. 2004) (no aiding and abetting liability where broker believed transactions had been approved by counsel); *Monetta v. SEC*, 390 F.3d 952, 956-57 (7th Cir. 2004).

From his earliest exposure to the offshore trusts, Schaufele knew the Wylys employed an array of experienced counsel to actively advise them with respect to those trusts and their securities transactions. He had every reason to think those lawyers were well informed. Although French now stands accused of securities fraud, he was managing partner of a prominent Dallas firm, Jackson Walker. On April 22, 1992, Schaufele met with French, another Jackson Walker partner, Jim Ryan, and an offshore trustee to discuss the first offshore transaction, whose documentation was prepared by those same attorneys. *See* Schaufele R. 56.1 ¶ 20.

There is absolutely no evidence Schaufele had reason to suspect, let alone had actual knowledge, that the Wylys ever withheld any information from these attorneys, or ever disregarded their advice. Nor does anything in the record indicate that Schaufele knew of any lawyer lacking information about the trusts relevant to their securities filings, or that those attorneys, writing opinions affirming the propriety of removing restrictive legends from shares held by the offshore trusts predicated on those trusts not being affiliates of the Issuer, had not satisfied themselves as to the accuracy of that conclusion. *See SEC v. Steadman*, 967 F.2d 636,

642 (D.C. Cir. 1992) (no aiding and abetting liability where defendants did not know lawyers' opinion was wrong).   Schaufele knew that French, as a protector for the Wyly offshore trusts, was intimately familiar with the trusts' investments.   French worked with other attorneys at Jackson Walker and, later, Jones Day—including Ryan, Charles Gilbert, Marilyn Post, Robert Estep, John McCafferty and others—to prepare the public filings related to those investments. The law presumes that attorneys within the same firm share client information.   *See Blue Planet Software Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004).   Schaufele had no reason to believe French would have withheld relevant information from his colleagues and no reason to believe the legal conclusions in the SEC filings they prepared were anything but accurate.

Nor is there any evidence that Schaufele, who is not a lawyer or securities law expert, was privy to information about the inner workings of the offshore trusts that would have informed him the SEC filings prepared by securities law experts were false.   The SEC casts Schaufele as a knowing aider and abetter, but the undisputed testimony of the offshore trustees presents a very different picture.   Witnesses uniformly testified Schaufele was not a member of the Wyly family's "inner circle" with respect to the trusts; he was an arms-length, third party service provider who was not privy to trusts' information other than the specific information needed to execute a particular transaction.   *See* Schaufele R. 56.1 ¶¶ 25-26.   In the dozen years that Schaufele dealt with the trusts, the trustees or corporate directors consistently asserted that they—as the legal owners of the accounts and their investments—exercised ultimate control over those holdings, and nothing to the contrary was shared with Schaufele.   Indeed, there is no evidence that Schaufele ever even saw the trust agreements.   *See* Schaufele R. 56.1 ¶ 28.

Moreover, the undisputed record establishes that Schaufele was not privy to the recommendations from the protectors to the trustees that the SEC claims were the essential

mechanism through which the Wylys purportedly exercised control over the trusts' investments. *See* Compl. ¶¶ 32-36; Schaufele R. 56.1 ¶ 29.  Schaufele did not participate in meetings or calls between the protectors and trustees at which recommendations were discussed.  *See* Schaufele R. 56.1 ¶ 31.  He was never shown written communications concerning such recommendations.  *See* Schaufele R. 56.1 ¶ 26.  The trustees never shared with Schaufele any notes, memos or other internal records reflecting their communications with the protectors or the Wylys.  *See* Schaufele R. 56.1 ¶ 32.  In addition, Schaufele was never present at trustees' meetings with protectors or members of the Wyly family.  *See* Schaufele R. 56.1 ¶ 33.  Since Schaufele was not privy to any recommendations, he could not have known their content and specificity, the frequency with which they were implemented, or any of the other alleged facts the SEC says demonstrate the Wylys' alleged secret control of the offshore trusts.

To the extent Schaufele was aware that the Wylys made suggestions about, or knew details of, trust related investments, he had no reason to believe this was improper.  The agenda for the very first April 1992 meeting at Jackson Walker reflects that specific securities transactions being executed by the trust companies were discussed by the trustee in the presence of Wyly family members and attorneys French and Ryan.  Consistent with that, Sterling Software general counsel Jeannette Meier, who was responsible for its SEC filings, and Jones Day attorney John McCafferty, both testified they saw nothing problematic with the Wylys providing investment recommendations to the trusts.  *See* Schaufele R. 56.1 ¶ 38.  And lawyers at Lehman Brothers consistently treated the trusts as non-affiliates for years after the trustees disclosed their investment recommendations were guided by the protectors.  *See* Schaufele R. 56.1 ¶ 39.  If the Wylys were crossing a line between legally permissible and impermissible

influence on the trusts' investments, that line was never communicated to Schaufele and he had no reason to know it was being crossed.[16]

It is also undisputed that Schaufele had no knowledge of the personal benefits the Wylys allegedly reaped from the offshore trusts' assets which the SEC says reveal that the trusts were a sham and the SEC filings were false. The Complaint recites a litany of personal benefits allegedly acquired with proceeds of stock sales by the offshore trusts: art and collectibles that were then displayed in the Wylys' homes and offices, *see* Compl. ¶ 43; jewelry for Wyly family members to wear, *see id.*; almost $100 million of real estate that the Wylys lived in or used, *see id.* ¶ 44; millions of dollars in charitable contributions on behalf of the Wylys, *see id.* ¶ 45; and the transfer of $120 million to the Wylys disguised as loans, *see id.* ¶ 46. But the undisputed fact is that Schaufele had no knowledge of the Wylys ever using the trusts for these purposes. *See* Schaufele R. 56.1 ¶ 34.

In an exercise in circular reasoning, the SEC claims that proof of Schaufele's knowledge of the fraud comes from the fact that he lied to his employers by telling colleagues at Lehman Brothers that the offshore trusts were non-affiliates. But Schaufele's statements would only be lies if he knew they were false, and the evidence is clear that he had no such knowledge. The statement that the trusts were not affiliates is the position consistently taken by the Issuers, the trusts and the Wylys in 12 years of public filings, and by the trusts in signed certifications that they repeatedly provided to Lehman Brothers. *See* Schaufele R. 56.1 ¶¶ 27, 40. Even the one ripple in this unbroken chain did not change the way attorneys prepared and filed SEC reports reflecting the status of the offshore trusts and their holdings, and gave Schaufele no knowledge

---

[16] While the SEC now suggests that the Wylys' knowledge of the trusts' holdings shows that they controlled the trusts, it is undisputed that beginning in 1992, counsel instructed the trusts to keep the Wylys' CFO fully informed of all securities transactions undertaken by the trusts. *See* Schaufele R. 56.1 ¶ 36.

of any fraud.  In October 2001, a Jones Day lawyer, Estep, told Lehman Brothers that he had not been retained to render a formal legal opinion on the question of affiliate status and therefore could not definitively say what his conclusion would be; that produced no change in Jones Day's SEC filings impacted by that issue.  Had the offshore trusts been affiliates by virtue of being controlled by the Wylys, the Wylys would have had to report the trusts' holdings on their Schedule 13D.  But in January 2002, Jones Day prepared and filed a 13D with the SEC for the Wylys, reflecting Estep as the contact lawyer, which took the same position taken ever since 1992—that the Wylys did not control the offshore trusts—and therefore would not be affiliates of the Issuers.  *See* Schaufele R. 56.1 ¶ 41.

As the SEC has repeatedly said in no-action letters declining to provide opinions on affiliate status in particular cases, "that is a question of fact which can be determined best by the parties concerned and their counsel in light of all of the relevant facts."  *See, e.g., Johnson Prods. Co., Inc.*, SEC No-Action Letter, 1973 WL 8530 (Sept. 28, 1973); *Hoedeman & Christy, P.A.*, SEC No-Action Letter, 1991 WL 206750 (Oct. 10, 1991); *Riordan & Mckinize*, SEC No-Action Letter, 2000 WL 554599 (May 5, 2000).  Indeed, on its website, the SEC instructs that the decision to remove a Rule 144 legend to permit sales of restricted stock by non-affiliates or affiliates who meet the rule's requirements is ultimately one to be decided by the Issuer. *See* http://www.sec.gov/investor/pubs/rule144.htm (last checked Mar. 1, 2013).  In relying on the determination by the Issuers, the trusts and their lawyers about the non-affiliate status of the trusts, Schaufele was doing no more than what the SEC recommends.

In sum, Schaufele had every reason to believe that the trust structure and operations, including the procedure for investment recommendations and decisions, had been reviewed and approved by knowledgeable and experienced counsel.  He had no reason to know that the trusts' undisputed legal control over their accounts and holdings was not the defining test for SEC

filings about those holdings and no reason to know that, as the SEC now alleges, the treatment of the offshore holdings in SEC filings prepared by that experienced and knowledge of counsel was not accurate.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment for Defendants.

Dated:  March 8, 2013
        New York, New York

Respectfully submitted,

BICKEL & BREWER

By:  /s/Michael L. Smith
     William A. Brewer III
     Michael L. Smith
     Alexander D. Widell
     James S. Renard
     Michael J. Collins
     767 Fifth Avenue, 50th Floor
     New York, NY 10153
     Telephone:  (212) 489-1400
     Facsimile: (212) 489-2384

     *Attorneys for Samuel E. Wyly*

SUSMAN GODFREY, L.L.P.

By:  /s/Mark H. Hatch-Miller
     Stephen D. Susman (SS8591)
     Mark H. Hatch-Miller (MH4981)
     560 Lexington Avenue, 15th Floor
     New York, New York  10022-6828
     Telephone: (212) 336-8330
     Facsimile: (212) 336-8340

     Terrell W. Oxford
     David D. Shank
     901 Main Street, Suite 5100
     Dallas, Texas  75202-3775
     Telephone: (214) 754-1900
     Facsimile: (214) 754-1933

     *Attorneys for Donald R. Miller, Jr.*

PETRILLO KLEIN & BOXER LLP

By:   /s/Joshua Klein
      Joshua Klein
      Nelson A. Boxer
      655 Third Avenue, 22nd Floor
      New York, New York  10017
      Telephone: (212) 370-0330
      Facsimile: (212) 370-0391

      *Attorneys for Michael C. French*


LAW OFFICES OF MARTIN J. AUERBACH

By:   /s/Martin J. Auerbach
      Martin J. Auerbach
      1185 Avenue of the Americas, 31st Floor
      New York, New York  10036
      Telephone: (212) 704-4347
      Facsimile: (646) 304-0175

      *Attorneys for Louis J. Schaufele, III*


ZUCKERMAN SPAEDER

By:   /s/Laura E. Neish
      Laura E. Neish
      1185 Avenue of the Americas, 31st Floor
      New York, New York  1036
      Telephone: (212) 704-9600
      Facsimile: (212) 704-4256

      *Attorneys for Louis J. Schaufele, III*


cc:   Gregory N. Miller
      Martin J. Zerwitz
      Alan M. Lieberman
      U.S. Securities and Exchange Commission
      Division of Enforcement

      *Attorneys for Plaintiff*