UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No. 1:10-cv-05760-SAS |
| SAMUEL E. WYLY, DONALD R. MILLER, JR., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., MICHAEL C. FRENCH and LOUIS J. SCHAUFELE III, | ECF Case |
| Defendants. | |

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  TABLE OF AUTHORITIES ...................................................................................v

II. STATEMENT OF FACTS ....................................................................................1

III. ARGUMENT .......................................................................................................1

   A.  The Applicable Summary Judgment Standard ...............................................1

   B.  The SEC's Penalty claims Are not Time-Barred ..........................................2

      1.  As This Court Has Already Determined, the Fraudulent Concealment Doctrine
         Applies to the SEC's Claims In This Case ............................................2

        a.  The Applicable Legal Standard .....................................................2

        b.  The *Gabelli* Decision Does Not Change Application of the Fraudulent
           Concealment Doctrine to the Facts of This Case ................................3

      2.  The SEC Meets the Legal Standard for Application of the Fraudulent
         Concealment Doctrine ........................................................................4

        a.  First Prong of the Fraudulent Concealment Standard: The Defendant Took
           Affirmative Steps, Beyond the Challenged Conduct of the Fraud Itself, To
           Conceal the Fraud ........................................................................4

           1)    The Wylys Misrepresented Their beneficial Ownership In
               Response to Direct SEC Inquiries...................................................4

           2)    The Wylys Misrepresented Their Beneficial Ownership In
               Response To Issuer Director & Officer Questionnaires .................5

           3)    The Wylys Actively Managed Their Offshore System to Minimize
               Section 13(d) Filings with the SEC ................................................6

           4)    The Wylys Used a Cayman Islands Office to Conceal Their
               Control of Their Offshore System ...................................................7

           5)    The Wylys Concealed Their Beneficial Ownership From Bank of
               America...........................................................................................8

        b.  Second Prong of the Fraudulent Concealment Standard: The SEC Only
           Discovered the Action at a Point Within Five Years (Plus tolling Extensions)
           of Filing the Action ........................................................................9

      c.   Third Prong of the Fraudulent Concealment Standard: the SEC Exercised Due Diligence In Discovering the Cause of Action ..................................................9

   3.  The Doctrine of Fraudulent Concealment Applies Equally to the Penalty Claims Against Schaufele and French .............................................................................11

   4.  The Claim for Injunctive Relief Against Schaufele Is Timely ..............................14

C.  The SEC Has Authority to Recover Unjust enrichment, Whatever Its Form .............14

   1.  The SEC's Claim for Disgorgement of Unjust Tax benefits Is Straightforward and Simple ....................................................................................................................15

   2.  Defendants' "Collecting Taxes" Argument Is Without Merit ...............................16

   3.  The Defendants' Legal Contention That the IRS Does Not Look to Dominion and Control of Assets in Determining Tax Liability Is Nonsense................................17

   4.  A Causal Connection Exists between the Defendants' Securities law Violation and Their Unjust Tax Benefits..............................................................................18

   5.  Disgorgement Shall Be Equitable Since the Calculation and Award of Any Disgorgement Is Subject to the Court's Sound Discretion ...................................20

   6.  Summary Judgment Is Unnecessary On Joint and Several Liability....................20

D.  Summary Judgment Should Be Denied on the Wylys' Insider Trading Claim...........21

   1.  "Materiality" of Inside Information Is a Jury Question ........................................21

   2.  The Wylys' Decision to Sell Sterling Software Was Material ..............................22

      a.   The Wylys Were Confident They Could Influence the Sale ..........................22

      b.   The Wylys' Intended to Sell Sterling Commerce First....................................22

      c.   Sam Wyly Personally Influenced the SSW Sale..............................................23

      d.   The Wylys Acted On Their Decision to Sell SSW ..........................................24

E.  Schaufele Is Not Entitled to Summary Judgment on the Insider Trading Claim Against Him..................................................................................................................25

   1.  Schaufele knew the Wylys' Transaction Was Bullish and Massive.....................25

   2.  Schaufele's Knowledge Was Inconsistent With the Public's Knowledge.............26

3.  Schaufele's Purchase of 4000 SSW Shares Indicated he viewed the information as Material ................................................................................27

F.  Summary Judgment Should Be Denied to the Defendants on the SEC's Claim for Aiding and Abetting Trustee Violations ................................................27

1.  Summary Judgment Should Be Denied to the Wylys ...........................................27

    a.  The Wylys Knew the Trustees Filed Schedule 13Ds .....................................28

    b.  The Wylys Knew the Trustees Filed False Schedule 13Ds ...........................29

    c.  The Wylys Substantially Assisted Filing False Schedule 13Ds ...................30

2.  Summary judgment Should Be Denied to French Regarding Filings Made By the Trustees After 2000 ................................................................................31

G.  Genuine Issues of Material Fact Preclude Summary Judgment On the Scienter Element of the Fraud claims Against the Wylys and French ...............................32

1.  Scienter and Reliance on Counsel ....................................................................33

2.  The Wylys Did Not Seek Advice nor Was Any provided On Whether the Facts and Circumstances of Their Operation of the Trusts Rendered Them beneficial Owners ................................................................................34

    a.  The Relevant Conduct Comprising the Facts and circumstances of Control ..34

    b.  The Relevant Legal Question for Counsel .....................................................35

3.  Jackson Walker and Jones Day Did Not Advice the Wylys That They Were not Beneficial Owners of the Offshore Trusts ...........................................36

    a.  Jackson Walker Did Not Advise the Wylys That They Were Not Beneficial Owners ................................................................................36

    b.  Jones Day Did Not Advise the Wylys That They Were Not Beneficial Owners ................................................................................38

4.  The Wylys Did Not Make Complete Disclosure of Relevant Facts .....................39

5.  The Wylys Cannot Claim Good Faith Reliance on French ...................................42

6.  The Wylys Did not Rely on the Advice of Counsel in Good Faith .......................43

H.  Summary Judgment Should Be Denied to Schaufele on the Aiding and Abetting Claim Against Him ................................................................................................44

1.  Schaufele knew the Wylys Controlled the Offshore Trusts...................................44

2.  Schaufele Concealed the Wylys' Control Over the Offshore Entities..................45

3.  Schaufele Did Not Rely on Others In Good Faith .................................................46

IV. CONCLUSION................................................................................................................47

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley*, No. 1:08-cv-07508-SAS, 2013 WL 837536 (S.D.N.Y. March 6, 2013) ................................................................1

*Arthur Lipper Corp. v. SEC*, 547 F.2d 171 (2d Cir. 1977) ...............................42

*Balis v. Comm'r of Internal Revenue*, 987 F.2d 770, 1993 WL 67224 (5th Cir. 1993) ........................................................................................................17

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).........................................21, 22

*Egghead.Com, Inc. v. Brookhaven Capital Management Co.*, 340 F. 3d 79 (2d Cir. 2003) ...................................................................................................18

*Gabelli v. SEC*, 133 S.Ct. 1216 (2013) ................................................. *passim*

*GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971)..........................................18

*In re Bank of America Corp. Sec. Derivative and ERISA Litig.*, No. 09 MD 2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...............................34, 40, 43

*In re Columbia Sec. Litig.*, 155 F.R.D. 466 (S.D.N.Y. 1998)...........................33

*In re Dana Corp.,* 574 F.3d 129 (2d Cir.2009)................................................26

*In re Reserve Fund Sec. and Derivative Litig.,* No. 09 MD 2011, 2012 WL 4774834 (S.D.N.Y. Sept. 12, 2012)...............................................42

*Kanter v. Comm'r of Internal Revenue*, 590 F.3d 410 (7th Cir. 2009)..............17

*Koch v. Christie's International PLC*, 699 F.3d 141 (2d Cir. 2012) ...................2

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-96 (1997)....................................3

*Markowski v. SEC*, 34 F.3d 99 (2d Cir. 1994)......................................34, 40, 41

*Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115 (2d Cir.2001) ...............18

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................44

*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999).........................33

*Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012)..................................................9

*Rollins v. Helvering*, 92 F.2d 390 (8th Cir. 1937) .............................................................18

*Schulz v. Comm'r of Internal Revenue*, 686 F.2d 490 (7th Cir. 1982) ..............................17

*SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423 (N.D. Ill. May 25, 2004)..............28

*SEC v. Cavanaugh*, 445 F.3d 105 (2d Cir. 2006) .............................................................17

*SEC v. Collins & Aikman,* 524 F.Supp.2d 477 (S.D.N.Y. 2007).......................................21

*SEC v. Enterprises Solutions, Inc.*, 142 F. Supp.2d 561 (S.D.N.Y. 2001) ............... *passim*

*SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450 (2d Cir. 1996)..............................15, 17, 20

*SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009) ...................................................................28

*SEC v. Lorin,* 76 F.3d 458 (2d Cir. 1996) .........................................................................17

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) .................................................................33, 44

*SEC v. O'Meally,* No. 06 Civ 6483(LTS)(RLE), 2010 WL 3911444, (S.D.N.Y. Sept. 29, 2010) ..............................................................................................................42

*SEC v. Wyly, et al.*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011).......................................... *passim*

*State of Texas v. Allan Const. Co.*, 851 F.2d 1526 ( 5th Cir. 1988)......................................8

*Stoecklin v. Comm'r of Internal Revenue*, 865 F.2d 1221 (11th Cir. 1989) ......................17

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119 (5th Cir. 1995) ..............................................................................................................................8

*Tarpo v. Comm'r of Internal Revenue*, No. 10338-03, 10303-04, 12819-04 2009 WL 3048627 (U.S. Tax Ct. Sept. 24, 2009) ..............................................................17

*United States. v. Kinzler*, 55 F.3d 70 (2d Cir. 1995)............................................................6

*United States v, Lovett*, 964 F.2d 1029 (10th Cir. 1992) ......................................................6

*Wesenberg v. Comm'r of Internal Revenue*, 69 T.C. 1005 (U.S. Tax Ct. 1978) ..............18

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012).......................................................1

## FEDERAL STATUTES

18 U.S.C. § 1956(a)(1)(B)(i) ............................................................................6

26 U.S.C. § 6103 ............................................................................................12

28 U.S.C.§ 2462 ..........................................................................................2, 3

**Securities Act of 1934**
Section 13(d)…….[15 U.S.C. § 78m(d)]...........................................18, 33, 37

Section 16…….[15 U.S.C. § 78p] ..................................................................33

Section 21A…….[15 U.S.C. § 78u-1].............................................................2

Section 20…….[15 U.S.C. § 78t] ..................................................................28

## LOCAL RULES

L.R. 56.1 ..........................................................................................................1

## STATE STATUTES

N.Y. Penal Law §190.25 ................................................................................12

N.Y. Penal Law §215.70 ................................................................................12

## MISCELLANEOUS

H.R. Rep. 98-355, at 7 (1983) reprinted in 1984 U.S.C.C.A.N.2274, 2280 .....................16

Jay A. Soled, *Reforming the Grantor Trust Rules*, 76 Notre Dame L. Rev. 375
(2001) ........................................................................................................15

Reuven S. Avi-Yonah, *International Tax As International Law*, 57 Tax L. Rev.
483 (2004) .................................................................................................16

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits it Memorandum of Law in Opposition to Defendants' Consolidated Motion for Partial Summary Judgment.

## I.   STATEMENT OF FACTS

The facts relevant to the disposition of the motion for partial summary judgment are set out in the SEC's Local Rule 56.1 Responses to Defendants' Local Rule 56.1 Statement ("SEC Counter 56.1" and in the SEC's Local Rule 56.1 Additional Statements of Material Fact ("SEC 56.1"), as well as in documents attached to the declarations submitted by defendants ("Smith Decl." and "Neish Decl.").

## II.   ARGUMENT

### A.   The Applicable Summary Judgment Standard

In deciding defendants' summary judgment motion, the Court is to construe all the evidence in the light most favorable to the SEC and draw all reasonable inferences in the SEC's favor.  *Abu Dhabi Commercial Bank v. Morgan Stanley*, No. 1:08-cv-07508-SAS, 2013 WL 837536, at *2 (S.D.N.Y. March 6, 2013).  It is for a jury, not the Court, to make credibility determinations, weigh the evidence, and the draw legitimate inferences from the facts.  *Id.* at *3. Defendants, not the SEC, bear the burden of demonstrating the absence of a material factual question.  *Id.* at *2.  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the" SEC. *Id* (quoting *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012).

**B.**       **The SEC's Penalty Claims Are Not Time-Barred**

The SEC has pled the facts and developed the evidence to support its claim that the

doctrine of fraudulent concealment tolls the relevant five-year statute of limitations under both

28 U.S.C.§ 2462 and Section 21A(d)(3) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78u-1(d)(3).  As shown below, Defendants completely misrepresent the

Supreme Court's recent decision in *Gabelli v. SEC*, 133 S.Ct. 1216 (2013).  To the extent that the

Defendants address any real issue with respect to fraudulent concealment, they simply assert

disputed issues of fact, which cannot support a motion for summary judgment.

**1.**       **As This Court Has Already Determined, the Fraudulent
             Concealment Doctrine Applies to the SEC's Claims In This Case**

In denying the defendants' motions to dismiss, this Court specifically declined to rely on

the discovery rule.  *SEC v. Wyly, et al.*, 788 F. Supp. 2d 92, 105-106 (S.D.N.Y. 2011).  Instead,

this Court found that the SEC adequately pled fraudulent concealment, and there was no need to

address whether the discovery rule applied.  *Id.* at 106.  This Court' reasoning and conclusion are

unaffected by the Supreme Court's recent decision in *Gabelli*.

**a.**       **The Applicable Legal Standard**

The three-prong test cited in this Court's decision still controls:

> To invoke fraudulent concealment, a plaintiff must allege that: (1) defendant concealed
> the cause of action; (2) plaintiff did not discover the cause of action until some point
> within five years of commencing the action; and (3) plaintiff's continuing ignorance was
> not attributable to lack of diligence on its part.

*Wyly, et al.*, 788 F. Supp. 2d at 104; s*ee also Koch v. Christie's International PLC*, 699 F.3d 141,
157 (2d Cir. 2012).

        **b.**    **The *Gabelli* Decision Does Not Change**
                 **Application of the Fraudulent**
                 <u>**Concealment Doctrine to the Facts of This Case**</u>

        *Gabelli* makes plain that it is a statutory interpretation case, for which the sole issue is the

meaning of "accrued" in 28 U.S.C. §2462.  *Gabelli*, 133 S.Ct. at 1220.   Moreover, the Court

specifically stated that it did not reach the issue of tolling under the fraudulent concealment

doctrine.  *Id.* at n.2.  Nevertheless, defendants argue *Gabelli* precludes the fraudulent

concealment doctrine from ever applying to the SEC.  Dkt. 138 (Def. Brf.) at 4-9.

        But the two issues are quite distinct.  Ruling that a cause of action "accrues" when the

acts creating the cause of action are completed, regardless of when they are discovered, says

nothing about whether equity will toll a statute of limitations when a defendant separately

engages in affirmative acts of concealment.[1]

        The doctrine of fraudulent concealment applies in this case.  The SEC specifically asked

about the core issues of this case – beneficial ownership and control of the securities held by the

Wylys' Isle of Man ("IOM") Trusts.  On four different occasions covering almost a decade, the

Wylys caused their agents and issuer counsel to conceal their beneficial ownership of IOM trust-

held securities from the SEC.  These lies, especially when coupled with the Wylys' other

independent acts of concealment, make plain that to deny application of the fraudulent

concealment doctrine here would be to deny its application everywhere.  As shown below, record

evidence reveals that defendants took steps of concealment that go far beyond their original

fraud.  *Gabelli* 133 S. Ct. at 1220, n 2.

---

[1] Moreover, the idea that *Gabelli* eliminated the fraudulent concealment doctrine whenever a
federal statute creates a specific limitations period is inconsistent with prior Supreme Court
rulings, upholding the doctrine of fraudulent concealment to toll statutory limitation periods in
the civil RICO context.  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-96 (1997).  In reaching its
decision in *Klehr*, the Supreme Court relied on "the consensus of authority" in antitrust cases,
"where the 'fraudulent concealment' doctrine is invoked fairly often."  *Id.*

2.      **The SEC Meets the Legal Standard for
Application of the Fraudulent Concealment Doctrine**

The SEC is entitled to a tolling of the statute of limitations until inquiry notice was

received in November of 2004.  Including extensions of the statute of limitations through tolling

agreements, the SEC's action was timely when filed on July 29, 2010.  The defendants' motion,

at best, raises disputed issues of fact.

a.      **First Prong of the Fraudulent Concealment Standard:
The Defendants Took Affirmative Steps, Beyond the
Challenged Conduct of the Fraud Itself, To Conceal the Fraud**

Any action to conceal the fraud must relate to the same subject matter as the fraud itself.

Otherwise, the action would not conceal it.  In this case, "steps beyond the challenged conduct"

are clearly evident.[2]

(1)      **The Wylys Misrepresented Their Beneficial
Ownership In Response to Direct SEC Inquiries**

The Wylys caused misrepresentations about their beneficial ownership of securities held

by their IOM Trusts in response to direct SEC inquiries made in connection with SEC filings.

*See* SEC 56.1 ¶¶ 1-6.   On January 12, 1994, Sterling Software, Inc.'s ("SSW") counsel

responded to an SEC inquiry about disclosures in SSW's 1993 proxy statement.  *See* SEC 56.1 ¶

1.  The Wylys' misrepresentations caused SSW counsel to represent to the SEC that the Wylys

---

[2] In the Order denying motions to dismiss, *SEC v. Wyly,* 788 F. Supp. 2d at 107-108, this Court identified several of the Wylys' forms of concealment:

> (i) the making of hundreds of false and materially misleading statements to the Issuers, the Issuers' attorneys, investors, the Commission, and, in the case of Schaufele, to brokerage firm intermediaries, (ii) the establishment and operation of an offshore "Wyly family office" in the Cayman Islands as a conduit and repository for the communications and records "which should not be seen in the USA," and (iii) the allocation of the Wylys' offshore holdings of Issuer Securities among different, and often newly created, offshore entities, all under the Wylys' control, solely to avoid making required Commission filings.

"disclaimed beneficial ownership of the securities held by such trusts." *Id.* On August 13, 1998, Sam Wyly's misrepresentations caused counsel for Scottish Life Holdings, Ltd. ("Scottish"), to represent to the SEC that he "disclaims beneficial ownership" of any Scottish securities held by his IOM Trusts and that he "has no power to vote or dispose, or to direct the voting or disposition," of the Scottish securities held by such trusts. *See* SEC 56.1 ¶ 2. On May 11, 1999, the Wylys' misrepresentations caused counsel for GreenMountain.com to represent to the SEC that the IOM Trustee for each of the IOM entities identified in GreenMountain's S-1 registration statement were independent of the Wyly families and that "[n]o member or group of members of the [Wyly] families . . . will control the trustee of any such trust." *See* SEC 56.1 ¶ 3. Finally, on March 12, 2003, the Wylys' misrepresentations caused Scottish's counsel to file an amended Form S-3 with the SEC which represented that each of the Wylys "disclaims beneficial ownership of the Scottish shares held by their IOM entities. *See* SEC 56.1 ¶¶ 4-6. In each instance, the SEC asked about the Wylys' relationship to the offshore securities, and in each instance, the Wylys' actions concealed the truth about those relationships.

**(2)   The Wylys Misrepresented Their
Beneficial Ownership In Response
To Director & Officer Questionnaires**

In responses to Director and Officer Questionnaires ("DOQs") provided to them by SSW, Sterling Commerce ("SE"), Michaels Stores, Inc. ("MIK"), and Scottish  (the "Issuers"), the Wylys explicitly denied beneficial ownership or control over securities held by IOM Trusts. *See* SEC 56.1 ¶ 7. The DOQs expressly asked the Wylys to identify their share holdings, including any shares for which they had beneficial ownership. *Id.* In making these requests, the DOQs gave a layman's explanation of what it meant to be a "beneficial owner" of a security under the securities laws:

In general, under [SEC] rules you are deemed to be the beneficial owner of a security if, among other things, you have or share (i) voting power or (ii) investment power (i.e., the power to dispose or direct the disposition of such security), or both. Your power to vote or dispose of securities may result from legal ownership of such securities or from contracts, relationships or understandings with third parties. *See* SEC 56.1 ¶ 8.

In their responses, the Wylys acknowledged beneficial ownership of their personal and family holdings, including some shares held in domestic family trusts, but specifically excluded the securities held by their IOM entities. *See* SEC 56.1 ¶ 7. The Wylys' omissions concealed their beneficial ownership of the offshore shares from both their own attorneys and the Issuers' counsel, and directly caused the Issuers' counsel to conceal that information from the SEC as described above.[3]

### (3)   The Wylys Actively Managed Their Offshore System to Minimize Section 13(d) Filings with the SEC

The Wylys actively managed their offshore holdings to minimize SEC filings under Section 13(d). *See* SEC 56.1 ¶ 9. On several occasions, the Wylys allocated shares among

---

[3] Defendants may argue that by using intermediaries, they did not actively deceive the SEC, but this would defy common sense, as well as established law. Such an argument is often made in money-laundering cases where defendants try to spin the statute's language -- "to conceal or disguise the nature, the location, the source, the ownership, or control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In those cases, misleading intermediaries does not immunize defendants from responsibility for their deceitful activities. For example, in *U.S. v. Kinzler*, 55 F.3d 70 (2d Cir. 1995), the defendant argued he did not conceal his identity in his transactions with intermediaries. The Court of Appeals, applying common sense, determined:

> We see no reason why the concealment requirement may not be met by other affirmative acts related to the commercial transaction—acts designed to quell the suspicions of third parties regarding the nature, location, source, ownership or control of the proceeds of the defendant's unlawful activity. … [T]he statute is aimed broadly at transactions designed in whole or in part to conceal or disguise in any manner the nature, location, source, ownership or control of the proceeds of unlawful activity.

*Id*. at 73 (quoting *United States v, Lovett*, 964 F.2d 1029, 1034 n. 3 (10th Cir. 1992)).

multiple IOM Trusts and IOM Trustees in order to keep each IOM Trustee's securities holdings below 5% of an Issuer's outstanding shares, which would require an SEC filing.  *Id.*

The Wylys and their agents hired additional IOM Trustees and created numerous new IOM Trusts in order to allocate shares in a manner that kept individual Trustees from exceeding the SEC's 5% reporting threshold.  *Id.*  Contemporaneous documents and testimony establish that the multiplicity of trusts was designed to avoid SEC disclosure obligations for the overseas system. *See* SEC 56.1 ¶ 9.

### (4)   The Wylys Used a Cayman Islands Office to Conceal Their Control of Their Offshore System

The Wylys also set up a Cayman Islands office as a conduit and repository of information "which should not be seen in the U.S."  *See* SEC 56.1 ¶ 10.  The Wylys hired Michelle Boucher ("Boucher") as the head of the Cayman Office to further conceal their control over the IOM Trusts.  *Id.*  By routing their instructions for offshore transactions to Boucher in the Cayman Islands, who then conveyed them to the IOM Trustees, the Wylys sought that "any trail of communications ... does not give rise to any potential claim that control is being exercised in the USA."  *Id.*

As a further example of the use of the Cayman Islands as a buffer, the Wylys employed a Cayman Islands special purpose entity, Security Capital Limited, whose sole function was to borrow money from the IOM Trusts, and then lend the money to the Wylys for their personal use in the United States.  *See* SEC 56.1 ¶ 11.  Such a vehicle existed for one purpose only, to add a layer of complexity that disguised the fact that the Wylys were using the overseas trust assets for their own personal enjoyment.  *Id.*  Such personal use evidenced that the IOM trusts were beneficially owned by the Wylys, and concealing these facts reduced the probability of anyone detecting the Wylys' beneficial ownership.

### (5) The Wylys Concealed Their
### Beneficial Ownership from Bank of America

In early 2004, Bank of America's clearing firm, National Financial Services, Inc.

("NFS"), flagged the Wylys' IOM accounts, because of their overseas location, their large

single-stock holdings, and the movement of shares between the accounts.  Def. 56.1 ¶ 12.  NFS

insisted on knowing the underlying beneficiaries of the trusts.  *Id.*  Rather than provide the

requested information, the Wylys refused to identify the beneficial owners.  *Id.*  In late 2004,

Bank of America fired defendant Schaufele.  *See id.*

Defendants insist that the actions, above, do not satisfy the first prong of the fraudulent

concealment standard because those acts were not "beyond the challenged conduct;" that they

were part of the overall "scheme" to make false filings.  Def. Br. at 10.  Defendants' misinterpret

the standard.  To take "steps beyond the challenged conduct itself" simply requires steps that are

affirmative, independent, separate, and apart from the fraud.  Again, because the *Gabelli*

standard is new to the securities laws, the antitrust laws are most instructive on this point.  In that

area, a useful formulation for acts "beyond the challenged conduct itself" has resolved itself into

a distinction between "acts of concealment" and "acts of perpetration."  *See e.g. State of Texas v.*

*Allan Const. Co.*, 851 F.2d 1526, 1531 ( 5th Cir. 1988).[4]

This case satisfies all formulations.  If none of the acts described above had taken place –

– no lies to the SEC, no false statements on DOQs, no movement of shares to avoid Section

13(d) filing requirements, no Cayman Islands intermediaries, no obfuscation with Bank of

America — the fraud would still have existed.  These are "affirmative acts" that are "separate

---

[4] Other formulations include acts "separate and apart" from the underlying violation, and simply "affirmative acts" of concealment. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119 (5th Cir. 1995).

and apart" from the underlying fraud.  They are not "acts of  perpetration;" they are "acts of

concealment."

> **b.     Second Prong of the Fraudulent Concealment Standard:
> The SEC Only Discovered the Action at a Point Within
> Five Years (Plus Tolling Extensions) of Filing the Action**

The SEC was put on inquiry notice on November 16, 2004 with information from Bank

of America.  The Wylys' tolling agreements were in place continuously since February 1, 2006,

French's tolling agreement was in place continuously since August 1, 2009, and Schaufele's

tolling agreement was in place continuously since October 29, 2009.  Def. 56.1 ¶¶ 12-14.  All of

these agreements began to toll the statute of limitations within the five-year period following the

date of inquiry notice.  The action was filed on July 29, 2010.  Def. 56.1 ¶ 15.  The SEC thus

clearly meets the second prong of the standard.

> **c.     Third Prong of the Fraudulent Concealment
> Standard: The SEC Exercised Due Diligence
> In Discovering the Cause of Action**

The Second Circuit recently reaffirmed the general proposition that "the inquiry into

when a factual predicate could have been discovered with due diligence is, by definition, a

question of fact."  *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012).  This makes such an issue

a poor candidate for resolution on a motion for summary judgment.

To build the basic framework of its cause of action, the SEC obtained documents and

witness accounts from dozens of persons and entities, often involving foreign jurisdictions with

stringent financial secrecy laws.  Although a U.S. Senate Report highlighted many of the same

facts that the SEC is now asserting, the Senate never received any information from the overseas

sources, and never challenged the Wylys' claim that they had relied on counsel as to the

propriety of what they were doing.  In light of the complexity of the Wylys' Offshore System,

the number and complexity of transactions the defendants had undertaken, the number of years that they operated their Offshore System, <u>and</u> their claim that all of these matters were approved by fully informed counsel, the SEC could not responsibly file a case until it had, *inter alia*, investigated both the overseas sources and the reliance on counsel defense.

While the SEC gathered substantial information from the overseas sources during 2006 and 2007, the Wylys' assertion of privilege over large amounts relevant attorney information blocked the SEC's investigation into the Wylys' primary defense to these charges. In the spring of 2008, the Wylys finally acknowledged that they would have to waive at least some of their privilege claims to provide the SEC with an opportunity to assess their advice-of-counsel defense. *See* SEC 56.1 ¶ 13. Even then, the scope of their waiver was unclear and incomplete. For example, in September 2008, French's counsel wrote to the SEC to express exasperation about what French would be able to say in his upcoming testimony session, because French's counsel did not understand the scope of the Wylys' waiver. *See* SEC 56.1 ¶ 13. In January of 2009, counsel for the Wylys' primary Dallas law firm wrote a letter to the SEC expressing his confusion as to what documents his client could produce due to a belief that he had received conflicting communications from the SEC staff and counsel for the Wylys the waiver issue. *Id.* Indeed, the SEC was communicating and complaining to counsel for the Wylys as late as May of 2010 about "carve outs" from the attorney-client privilege waiver, specifically with respect to issues involving defendant French and the purported tax advice that the Wylys had received. *Id.* As this Court is well aware, these issues were not fully resolved until after this litigation commenced.

Although the scope of the Wylys' privilege waiver always remained unclear, the SEC pressed for discovery from the various lawyers and law firms who had done work for the Wylys

during the course of the scheme.  This involved collecting and reviewing tens of thousands of

pages of documents well into 2009, and taking testimony from as many as six attorney witnesses

during the summer, fall, and winter of 2008.  French gave additional testimony in September of

2008.

While certain aspects of the reliance on counsel defense were not resolved, in mid-June

2009 the SEC staff provided Wells notices to the defendants, informing them of possible SEC

claims.  *See* SEC 56.1 ¶ 14.  Responses came in late July of 2009.  *Id*.  Subsequently, the SEC

staff delayed taking a recommendation to the Commission at the behest of defendants, who

asserted that they wished to consider settlement possibilities.  *See* SEC 56.1 ¶ 15.  Negotiations

ultimately proved unsuccessful, but the Wylys persisted in this approach right to the end.

Indeed, the Wylys wrote a letter directly to the five members of the Commission dated July 19,

2010, asking them it to delay any decision to sue pending review of the Wylys' most recent

settlement proposal.  *Id.*  The SEC filed this action ten days later on July 29, 2010.  Def. 56.1 ¶

15.  In short, the SEC acted with due diligence.

### 3.    The Doctrine of Fraudulent Concealment Applies Equally to the Penalty Claims Against Schaufele and French

Defendants Schaufele and French challenge whether the SEC "should have" been on

inquiry notice of the fraud before November 16, 2004.  Def. Br. at 14-18.  They contend that

pushing the inquiry notice date up to the summer of 2004 would moot their tolling agreements,

because the five-year statute of limitations would have already expired before they executed

those documents.[5]  *Id.*

The crux of the Schaufele-French argument is that others raised questions about the

overseas trusts before the SEC did, and the SEC should have known of the violations sooner.

_____

[5] The Wylys' tolling agreement is dated February of 2006, so this issue does not affect them.

11

The argument has no merit.  First, as shown above, the SEC asked for information about the beneficial ownership of the overseas shares four times between 1994 and 2003.  *See* pp. 4-5, *supra*.  All of the inquiries by other agencies cited by the defendants date from 2004, after the SEC had received the misinformation discussed above.

Schaufele and French nevertheless argue that the SEC should have been aware of these inquiries by other agencies.  They are simply wrong about what the SEC "should have" known.

Schaufele and French assert that the IRS discovered these issues in February, 2004, *see* Def. Br. at 17, yet fail to acknowledge that attorneys for the Wylys went to the IRS in the summer of 2003 to inquire as to a preemptive settlement of any tax claims.  *See* SEC 56.1 ¶ 16.  While this approach to the IRS was to be "on a no-name basis," the Wylys came to believe that the IRS had figured out their identities from that occasion.  *See id.*  The IRS did not alert the SEC of their concerns due to stringent confidentiality laws that preclude sharing any information with other enforcement agencies.  26 U.S.C. § 6103.  It is uncontested that the SEC did not know of the IRS's investigation until well after the SEC's own investigation had begun.

It is also uncontested that the SEC did not learn of the New York County District Attorney's ("NYDA") investigation before the SEC received inquiry notice from Bank of America in November of 2004.  Record evidence fails to explain how or why the NYDA came to issue grand jury subpoenas to Bank of America in October 2004 about the Wylys' account, yet there is evidence that the NYDA was conducting a criminal investigation of Bank of America in 2004 regarding violations of anti-money laundering rules in connection with suspicious transfers of hundreds of millions of dollars to offshore entities.  *See* SEC 56.1 ¶ 17.  In any event, the NYDA cannot disclose to the SEC or any other outside party evidence collected through the grand jury.  N.Y. Penal Law §190.25 (2008); N.Y. Penal Law §215.70 (2008).

In early 2004, Bank of America's clearing firm, NFS, flagged the trust accounts because of their overseas location, their large single-stock holdings, and the movement of shares between the accounts.  Def. 56.1 ¶ 49.  NFS insisted on knowing the underlying beneficiaries of the trusts. *Id.*  When the Wylys failed to comply, NFS apparently filed a Suspicious Activity Report ("SAR") sometime before November 16, 2004.  *See* SEC Counter 56.1 ¶ 67.  While it may be reasonable to assume that this SAR was related to the Wylys' Offshore System, it is undisputed that:  the SEC did not know about this SAR, has never received this SAR, and did not even know of its existence until well after the SEC's investigation began.  *See* SEC Counter. 56.1 at ¶¶ 66, 67.  Indeed, there is no evidence of when this SAR was actually filed, or with whom.[6]

Schaufele and French try to bolster their argument by parading minutes from several meetings of the Bank of America Risk Committee held during the summer of 2004.  Def. Br. at 15-16.  On the "Agenda" page for five of these meetings was an item identified as the Wyly ("Wiley" sic) accounts.  *See* Neish Decl. Ex. 1-2.  In two of the sets of minutes, although never on the "Agenda" page, there is a mention of an SEC examination.  *Id.*  The second and last mention of this examination identifies the "latest point of regulatory focus: using money from re-financing of mortgages to invest in brokerage accounts."  *Id.* at BAIS00009834.  There is not even a remote connection between the violations involved in this case (regarding the Wyly offshore accounts) and the SEC examination.  These documents were available to Schaufele and

---

[6] The defendants claim that the SEC should have known about this SAR in 2004 because "SARs are made available to appropriate law enforcement agencies including the SEC."  Def. Br. at 16-17.  Defendants have failed to provide any support for this statement or provide a time frame for its applicability.  *See* SEC Counter 56.1 ¶ 66.  In fact, as the SEC informed defense counsel, SARs were not made available to the SEC in 2004 and the SEC could only obtain SARs during that period if it had a specific reason to request a SAR, such as an existing open SEC investigation.

French because Bank of America produced approximately 150,000 pages of documents to the SEC during its investigation.  Yet, only these two pages mention this SEC examination.

Schaufele and French have had those two pages from the outset of discovery in this case, and had every opportunity to request documents from Bank of America that concerned the scope of the SEC examination.  They chose not to do so.  Instead, they employ innuendo – that the SEC should have found the "Wiley [sic]" account issue during its examination of Bank of America – with no showing of a connection between overseas accounts and the subject matter of the SEC's examination.  Whatever one might make of such a contrived argument, it surely does not support summary judgment for the defense.

### 4.     The Claim for Injunctive Relief Against Schaufele Is Timely

Schaufele raised this issue in his motion to dismiss.  The SEC stands on its arguments there.  *See* Dkt. 32 (SEC Brief in Opposition to Motions to Dismiss) at 62-64.[7]

The facts and arguments presented above establish that the SEC diligently pursued an investigation of this case and timely filed the instant action within the proper time limit.

### C.     The SEC Has Authority to Recover Unjust Enrichment, Whatever Its Form

On their motion for summary judgment, defendants challenge only the tax benefit component of their unjust enrichment.[8]  Def. Br. at pp. 22-29.  This motion is premature.  There

---

[7] One non-legal point requires elaboration.  The record is replete with examples of Schaufele lying to his employers, hiding trades in his wife's accounts, and – on at least one occasion – leaving his employer to avoid regulatory compliance with respect to the shares in the overseas accounts.  *See infra* at 27-28, 45-47.  No one needs to speculate if Schaufele would violate the law again.  He already has, many times.  His actions demonstrate the need and propriety of an injunction.

[8] The SEC seeks disgorgement of several types of unjust enrichment in this case.  Dkt. 1.  For the insider trading claims, it seeks disgorgement of the illegal trading profits.  *Id.*  For the Section 5 claims, it seeks disgorgement of the proceeds from the sales of unregistered shares.  *Id.*  For the remaining violations by the Wylys -- generally their failure to disclose their true beneficial ownership of Issuer Securities in any of their Section 13(d), Form 4, or other SEC filings -- the

14

will be no remedy phase of this case unless there is a liability finding from a jury.  At that point, this case becomes one for the sound discretion of this Court sitting in equity.  *SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450, 1474 (2d Cir. 1996).  If more discovery and briefing are appropriate, they can take place.  If an evidentiary hearing is necessary, it can take place.  Seen from this perspective, the defendants' motion is more a plea for premature judicial intervention than it is for summary judgment.  Hypothetical horror stories of purportedly complex concepts and computations are not, by their nature, undisputed facts.

### 1. The SEC's Claim for Disgorgement of Unjust Tax Benefits Is Straightforward and Simple

There are two basic types of trusts at issue in this case – grantor and  non-grantor trusts. In a grantor trust, the grantor maintains beneficial ownership and control of the trust assets.  In a non-grantor trust, the grantor irrevocably relinquishes beneficial ownership and control.  These distinctions have obvious implications for both the tax laws and the securities laws.

> The grantor trust [tax] rules attempt to determine when a trust should be respected for tax purposes and when it should be ignored. More specifically, the grantor trust rules recognize the separate existence of a trust when a grantor has parted with dominion and control over the contributed trust property, but ignore the separate existence of a trust when the grantor has retained dominion and control over trust assets.

Jay A. Soled, *Reforming the Grantor Trust Rules*, 76 Notre Dame L. Rev. 375, 379 (2001).

"Dominion and control" are the essence of beneficial ownership under both the securities and the tax laws.  The Wylys set up their overseas trusts to create the appearance of "non-grantor" trusts, *see id.*, which would make them separate taxable entities and provide favorable tax treatment of capital gains on transactions involving the trust-held securities because:

> income from services is sourced where the services are provided (and not where they are consumed); dividend and interest income are sourced by the residence of the payor; *capital gains are sourced by the residence of the seller*; and so on.

---

SEC seeks to recover the unjustly obtained tax benefits received from not disclosing their beneficial ownership.  *Id.*

Reuven S. Avi-Yonah, *International Tax As International Law*, 57 Tax L. Rev. 483, 491 (2004) (emphasis added).  In fact, however, the trusts were grantor trusts because the Wylys exercised dominion and control over them.

Thus, by form, any capital gains that the trusts would receive would be taxed at the Isle of Man rates, which are essentially zero.  *See* SEC 56.1 ¶ 19.  If, however, a trust is in substance a grantor trust, then income and capital gains are taxed at the rate of the grantor, who was the beneficial owner.  In this case, that would make the income and capital gains from the sale of these overseas shares income to the Wylys and taxable at the applicable U.S. rates. By misrepresenting the beneficial ownership of the trusts, and by misrepresenting the dominion and control over the trust assets, the Wylys created an unjust tax benefit for themselves.  That unjust tax benefit is the subject of the SEC's disgorgement claim at issue on this motion.

## 2.    Defendants' "Collecting Taxes" Argument Is Without Merit

The claim that the SEC has no explicit authority to collect taxes, Def. Br. at pp. 22-24, misses the point entirely.  The SEC has no explicit authority to "collect" brokerage commissions, audit fees, legal fees, finders' fees, trading profits, salaries, corporate bonuses, proceeds from the sales of unregistered securities, or other types of "ill-gotten gains" that arise in the course of violations of the securities laws.  But it is undeniable that the SEC does have the authority to recover such "ill-gotten gains" due to violations of the securities laws as part of its authority to sue in equity to prevent "unjust enrichment."[9]

---

[9] This point is plain from the legislative history of the Insider Trading and Sanctions Act, the first statute to expand the SEC's authority to include penalties. 15 U.S.C. § 78u-1. "Once the equity jurisdiction of a Court has been invoked on a showing of a securities violation, the Court possesses the necessary power to fashion an appropriate remedy.  Thus, the Commission may request that the Court order certain equitable relief, such as the disgorgement (giving up) of illegal profits." H.R. Rep. 98-355, at 7 (1983) reprinted in 1984 U.S.C.C.A.N. 2274, 2280.

It is well-settled that "[t]he primary purpose of disgorgement … is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *First Jersey Sec. Corp.*, 101 F.3d at 1474.  Since the purpose of disgorgement is not to get rescission or to compensate for damages, courts focus on the benefits to the violator.  *SEC v. Cavanaugh*, 445 F.3d 105, 117 (2d Cir. 2006).  The law leaves the award and calculation of any disgorgement to the broad discretion of the Court, *First Jersey Sec. Corp.*, 101 F.3d at 1474-75, and when disgorgement calculations cannot be exact, "any risk of uncertainty . . . should fall on the wrongdoer."  *SEC v. Lorin,* 76 F.3d 458, 462 (2d Cir. 1996).

The tax benefits sought here are a direct and primary measure of the Wylys' "ill-gotten gains" in this case, and are simply the basis for calculating unjust enrichment.  The SEC is not collecting taxes; it is recovering ill-gotten gains to make sure that these securities law violations are not profitable.  Consequently, tax benefits are a proper measure of disgorgement here.

### 3.     The Defendants' Legal Contention That the IRS Does Not Look to Dominion and Control of Assets in Determining Tax Liability Is Nonsense

The defendants' sole legal argument appears to be no more than the claim that: "*De Facto* investment power over a security, however, is not a factor that the Secretary and IRS consider in determining federal income tax liability."  Def. Brf. at 26.  But this claim is baseless.

> The main thrust of the grantor trust provisions is that the trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has substantially unfettered powers of disposition.

*Schulz v. Comm'r of Internal Revenue*, 686 F.2d 490, 495 (7th Cir. 1982); *accord Kanter v. Comm'r of Internal Revenue*, 590 F.3d 410, 422-23 (7th Cir. 2009).  *See also Balis v. Comm'r of Internal Revenue*, 987 F.2d 770, 1993 WL 67224 (5th Cir. 1993); *Stoecklin v. Comm'r of Internal Revenue*, 865 F.2d 1221 (11th Cir. 1989); *Tarpo v. Comm'r of Internal Revenue*, No. 10338-03,

10303-04, 12819-04 2009 WL 3048627 (U.S. Tax Ct. Sept. 24, 2009); *Wesenberg v. Comm'r of Internal Revenue*, 69 T.C. 1005 (U.S. Tax Ct. 1978). This has been the law for a very long time. *See Rollins v. Helvering*, 92 F.2d 390 (8th Cir. 1937) ("if such [arrangements] leave any power of enjoyment of gains (in their nature taxable) in any person, the constitutional power exists in Congress to tax such gain to that person."[10]

> **4.   A Causal Connection Exists Between the  Defendants' Securities Law Violations and Their Unjust Tax Benefits**

Defendants' failure to disclose their beneficial ownership in IOM Trust-held securities is linked to the tax benefits at issue. For example, Sam Wyly, Evan Wyly (Sam's son), Donald Miller (Charles Wyly's son-in-law, and now a successor defendant), and French testified repeatedly that the Offshore System was created – at least in part – for tax advantages. *See* SEC 56.1 ¶ 20. Indeed, the only purpose the defendants have ever offered for setting up this trust structure, other than tax avoidance ("tax and estate planning"), was "asset protection," literally

---

[10] The securities law standard is of course the same. *See e.g. Egghead.Com, Inc. v. Brookhaven Capital Management Co.*, 340 F. 3d 79, 83-84 (2d Cir. 2003):

> Section 13(d) of the Exchange Act requires any entity (or group of entities) which is the beneficial owner of more than five percent of particular types of individual equity securities to disclose that fact to the S.E.C. Under § 13, the definition of beneficial owner is quite broad:
>> (a) For the purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or
>> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security. 17 C.F.R. § 240.13d-3(a).

> This broad definition of beneficial ownership is consistent with § 13's purpose, which is to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 122-23 (2d Cir.2001) (quoting *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971)).

putting the assets in a jurisdiction beyond the power of U.S. courts and judgments. *See id.* Of course, this "asset protection" concept does not depend in the slightest on the grantor versus non-grantor distinction.

The connection between disclosures to the SEC and the impact on the Wylys' tax situation was clear to the Wylys and their agents. When the Wylys completed the sale of Sterling Software to Computer Associates ("CA") in the spring of 2000, compensation to the Wylys and their IOM Trusts came in the form of CA securities. *See* SEC 56.1 ¶ 22. After the uncovering of an accounting fraud at CA greatly reduced the value of the Wylys' CA shares, the Wylys sued CA and commenced proxy battles to get rid of management. *See* SEC 56.1 ¶ 23. In their second proxy contest, Sam Wyly desired to inform the other CA shareholders of the stock he really controlled by adding the families' IOM Trust-held shares to their domestic holdings. *See* SEC 56.1 ¶ 24. However, in a February 26, 2002 memo, Keeley Hennington[11] warned him off:

> There needs to be a good answer to the increase in shares from what was publicly represented during the [first] CA proxy fight. I think those watching this closely will raise this issue and there needs to be an answer that does not jeopardize the offshore system. . . . Our friendly IRS agent is still looming around and although he has verbally agreed to not look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.

*Id.* Hennington foresaw that the IRS might look at SEC filings to search for inconsistencies with the tax filings of the Wylys.

The Wylys' IOM Trusts were initially created so shares and options were exchanged for promises by the trusts to make private annuity payments to the Wylys at some future date. Def. 56.1 ¶¶ 90-92. The Wylys, realizing that the annuities would have to be paid at some point,

---

[11] Keeley Hennington was an employee in the Wyly family office, but she also has a Master's Degree in tax accounting, and spent ten years in Ernst & Young's Tax Department, rising to senior manager.

became concerned about tax treatment of the future annuity payments, so they had counsel approach the IRS through in August of 2003 to discuss possible parameters of a tax settlement on an "anonymous" basis.  *See* Def. 56.1 ¶ 93; SEC 56.1 ¶ 16.  During discussions, IRS staff asked whether the taxpayers (the Wylys) had disclosed these matters in any SEC filings. *See* SEC 56.1 ¶ 16.  Any declaration of beneficial ownership in an SEC filing could constitute an admission for purposes of a tax case.  It could also evidence a knowing state of mind for any tax fraud or criminal proceeding.  In short, by failing to disclose their beneficial ownership of IOM Trust held securities to the IRS directly, or in SEC filings, the Wylys obtained a significant tax benefit. That tax benefit constitutes ill-gotten gains which should be disgorged in this action.

### 5.    Disgorgement Shall Be Equitable Since the Calculation and Award of Any Disgorgement Is Subject to the Court's Sound Discretion

Defendants argue that any remedy that includes disgorgement of the tax benefits would be inequitable because it involves complicated calculations.  Def. Br. at 27. Undoubtedly, such "complications" are resolved by this Court on a routine basis, and are not insurmountable.

Defendants also argue that "the disgorgement remedy that the SEC seeks here would be inequitable because, at worse, Defendants' actions with regard to the offshore trusts and corporations resulted in deferral, rather than outright avoidance, of federal income taxes." *Id.* Even if this "deferral" argument is supported by evidence, which it is not, it would still not justify summary judgment.  This is a fact issue, which could be resolved at a contested remedies hearing.  This sort of process occurs every day in the courts of the United States. *First Jersey Sec. Corp.*, 101 F.3d at 1474-75.

### 6.    Summary Judgment Is Unnecessary On Joint and Several Liability

The SEC makes no specific prayer for joint and several liability in its complaint.  Dkt 1 Moreover, the SEC has never claimed that French shared in the Wylys' unjust tax benefits, and

does not seek disgorgement from French on that basis.  This does not mean, however,  that French is not subject to disgorgement.

### D.     Summary Judgment Should Be Denied on the Wylys' Insider Trading Claim

The Wylys recycle the same argument raised unsuccessfully in their motion to dismiss, *i.e.*, that their July 1999 decision to sell Sterling Commerce (SE) and Sterling Software (SSW) is insufficient to satisfy the insider trading "materiality" standard, because "no concrete steps in furtherance of a sale of Sterling Software had occurred, and all of the factors identified in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988) demonstrate that any sale was, at best, remote and speculative."  Def. Brf. at 29-30; Dkt. 31 at 9 (Def. Motion to Dismiss Brf.).  Their argument once again falls short.

### 1.     "Materiality" of Inside Information Is a Jury Question

Whether or not inside information is material is a jury question, not one to be decided on summary judgment.  *SEC v. Collins & Aikman,* 524 F.Supp.2d 477, 488 (S.D.N.Y. 2007). Determining materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."  *Wyly*, 788 F.Supp.2d at 118 [Dkt. 50].  Moreover, since the information here concerned a possible merger, materiality depends "upon a balancing of both indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity," and "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." *Id*.

### 2.      The Wylys' Decision to Sell Sterling Software Was Material

The Wylys' argue that their decision to sell Sterling Software was immaterial, because factors cited in *Basic* were absent, ignoring this Court's holding that the absence of the "factors, enumerated by the Supreme Court in *Basic*, is not dispositive of materiality." *SEC v. Wyly*, 788 F.Supp.2d at 122.  In contrast, evidence developed in this case shows there was a high probability that the sale of Sterling Software would occur, as the evidence reveals that the Wylys wanted the sale to occur, had a tremendous degree of influence and ability to cause that result, and ultimately took steps to make it happen.

### a.      The Wylys Were Confident They Could Influence the Sale

Sam and Charles Wyly were not typical corporate insiders.  They co-founded Sterling Software in 1981, and together they developed it into one of the country's largest business software and services companies, spinning off Sterling Commerce in 1995.  *See* SEC 56.1 ¶ 25. Leading up to the sale of Sterling Commerce and Sterling Software, the Wylys served as Chairman and Vice Chairman of the Board of Sterling Software, comprised two-thirds of its executive committee, and, along with other family members and French, comprised half of its Board of Directors.  *See* SEC 56.1 ¶ 26.  Given the Wylys' positions and influence at Sterling Software, "they could be confident that they could effectuate any planned sale, enhancing the probability that it would occur."  *Wyly*, 788 F.Supp.2d at 123.

### b.      The Wylys' Intended to Sell Sterling Commerce First

When the Wylys decided it was time to sell Sterling Software, they also agreed to sell Sterling Commerce first.  *See* SEC 56.1 ¶ 36.  By the time the Wylys' directed their offshore entities to engage in the equity swap, substantial steps were taken to carry out the sale of Sterling Commerce.  In September 1999, Sterling Commerce had discussed plans to sell the company,

and retained Goldman Sachs to identify and evaluate possible buyers of the company.  *See* SEC 56.1 ¶ 28.  The Wylys' ability to effectuate the first part of their plan certainly increased the probability that they could also sell Sterling Software.  *See Wyly*, 788 F.Supp.2d at 123.

**c.   Sam Wyly Personally Influenced the SSW Sale**

Sam Wyly took actions outside the guidance of Sterling Software's officers or directors that led to Computer Associates acquiring Sterling Software, further evidencing his exercise of personal influence and authority over the company's sale.  On October 15, 1999, Richard Hanlon, a friend and confidant of Sam Wyly met with William Sanders, a Morgan Stanley investment banker focusing on technology companies.  *See* SEC 56.1 ¶ 29.  Hanlon initiated the meeting with Sanders at Sam Wyly's request, as he knew that Morgan Stanley had previously provided investment banking work for Computer Associates, a probable acquirer of Sterling Software.  *See* SEC 56.1 ¶ 30.  At the meeting, Hanlon was given a package of materials entitled "Project Windfall," which included identification of Computer Associates as a potential Sterling Software buyer. *See* Klein Decl. Ex. 32.  Sanders sent the "Project Windfall" materials to Sam Wyly, *id.*, who then invited Sanders to Dallas for a meeting which ultimately took place the following month in November 1999.  *See* SEC 56.1 ¶ 29.  During the meeting, Sam Wyly told Sanders he was interested in selling Sterling Software, and Computer Associates was identified as a potential buyer.  *Id.* at ¶ 31.

After the meeting, Sanders met with Computer Associates President and Chief Operating Officer, Sanjay Kumar.  *See* SEC 56.1 ¶ 32.  Upon informing Kumar that Sam Wyly was willing to sell Sterling Software, Sanders arranged a call between Kumar and Sam Wyly, during which they scheduled a private meeting to discuss the sale.  *See* SEC 56.1 ¶ 33. Kumar flew to Dallas for his private meeting with Sam Wyly, and they agreed to a purchase of Sterling Software by

Computer Associates.  *See* SEC 56.1 ¶ 34.  When SSW CEO Sterling Williams learned of Sam's backchannel meeting and negotiation with Kumar, he felt "blindsided."  *See* SEC 56.1 ¶ 35. Although many of these actions occurred after the Wylys' initiated their 2 million Sterling Software share equity swap, they reveal the extent of Sam Wylys' personal influence and involvement in events leading to the sale of Sterling Software, and evidence a significant probability that the Wylys could effectuate the sale of Sterling Software according to their initial decision to sell.

### d.    The Wylys Acted On Their Decision to Sell SSW

The Wylys themselves demonstrated the importance they gave to their decision to sell Sterling Software "by acting on that nonpublic information in short order, engaging in a unique, 'massive and bullish' transaction in Sterling Software stock*."  Wyly*, 788 F.Supp.2d at 123. "'Given the importance that the Wylys, as investors, attached to this information, it is hard for them now to protest … that no reasonable investor could have found it material.' Indeed, the very purpose of insider-transaction reporting requirements—requirements the Wylys skillfully avoided by funneling their trades through offshore entities—'is to give investors an idea of the purchases and sales by insiders *which may in turn indicate their private opinion as to prospects of the company.*'"  *Id.*

Thus, construing the evidence and drawing all reasonable inferences in the SEC's favor, it has been shown that a material factual question exists as to whether the Wylys' decision to sell Sterling Commerce and Sterling Software constitutes material, non-public information; therefore, summary judgment should be denied to the Wylys.

E.    **Schaufele Is Not Entitled to Summary
      <u>Judgment on the Insider Trading Claim Against Him</u>**

Schaufele argues he did not possess material information about the Wylys' equity swap prior to his October 1, 1999 SSW stock purchases, claiming that he did not know the exact size of the swap.   Def. Br. at 34.   Schaufele did not need to know the full scope and terms of the Wylys' intended transaction prior to his October 1 purchases for that information to be material. Schaufele's prior securities transactions with the Wylys, his own knowledge of structured transactions as well as his actions upon receiving the information show he possessed material information about the Wylys' intentions at the time of his own SSW trades.

1.    <u>Schaufele Knew the Wylys' Transaction Was Bullish and Massive</u>

Schaufele knew the Wylys' proposed transaction would be both bullish and massive based on his prior experience with the Wylys and their offshore accounts, and his knowledge of structured transactions, such as call options and swaps.   During the four and a half years prior to his October 1 trades, Schaufele negotiated multiple structured transactions between Lehman Brothers and either the Wylys domestically or with their IOM entities.   Each of the prior structured transactions was massive, ranging in size from 500,000 to over 2,000,000 shares.   *See* SEC 56.1 ¶ 36.   Thus, it is reasonable to conclude that Schaufele would surmise from his September 28, 1999 email with Sharyl Robertson, regarding structured transactions such as 24-month call option purchases and equity swaps, that the Wylys' proposed transaction would concern a sizable number of Sterling Software shares.

The specific contents of Schaufele's September 28 email to Sharyl Robertson further evidences his knowledge.   First, Schaufele noted that Lehman Brothers would not only have to hedge its risk from the likely option transaction, but would need to adjust that hedge "throughout the life of the option."   Smith Decl. Ex. 5.   These are not steps that a brokerage firm of Lehman's

size in late 1999 would take for a transaction involving only a few thousand shares.  Second, Schaufele knew that Lehman charged significant fees for both executing and collapsing a swap, such that it would not have made financial sense to engage in a swap transaction unless a sizable number of shares were involved.  *See* SEC 56.1 ¶ 38.  Finally, on or before September 30, 1999, Schaufele discussed the terms of the Wylys' equity swap directly with Sam Wyly's son Evan.  *See* SEC 56.1 ¶ 39.  This evidence clearly supports a plausible inference that Schaufele had every reason to believe the equity swap would be bullish and massive, even if he did not know its exact size and terms.  *Wyly*, 788 F.Supp.2d at 124.

### 2.     Schaufele's Knowledge Was Inconsistent with the Public's Knowledge

Schaufele also claims that even if he did know that the Wylys were interested in engaging in a large, bullish transaction in Sterling Software such information was immaterial, because it was consistent with public knowledge that Sterling Software insiders were "bullish" on the company.[12] Def. Brf. at 38.  This argument is as unavailing now as it was in his motion to dismiss, because it "invites precisely the type of factual weighing and analysis inappropriate for the Court to conduct."  *Wyly*, 788 F.Supp.2d at 125; *see also In re Dana Corp.,* 574 F.3d 129, 156 (2d Cir.2009) (court's role "is to identify factual issues, not to resolve them").  Schaufele's argument also "overlooks the crucial fact that the marketplace was wholly ignorant of the fact that it was the Wylys who were (secretly) increasing their stake in the company by engaging in a massive transaction through their offshore entities.  It cannot be said that this information was

---

[12] It should be noted that there is no evidence in the record that Schaufele was aware of any of the alleged public information that Sterling Software insiders were "bullish" at the time he purchased the 4000 Sterling Software shares.  The fact that Schaufele bought his shares on October 1, 1999, only days after learning about the Wyly transaction, and nearly a month after Sterling Software announced its stock buy-back plan, *see* Def. Br. at 38, indicates that it was not the stock buy-back plan that served as Schaufele's motivation.

'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance.'" *Wyly*, 788 F.Supp.2d at 125.

### 3. Schaufele's Purchase of 4000 SSW Shares Indicates He Viewed the Information as Material

Schaufele's purchase of 4000 shares of Sterling Stock "demonstrated the importance he placed on the information by acting immediately to buy the stock, notwithstanding at least four prohibitions on such trading by his employer." *Id.* The evidence raises "a plausible inference that the information on which Schaufele traded was material." *Id.*

In sum, a genuine issue of material fact exists as to whether Schaufele possessed material, non-public information prior to his October 1 purchase of SSW stock, and summary judgment should be denied on this question.

### F. Summary Judgment Should Be Denied to the Defendants on the SEC's Claim for Aiding and Abetting Trustee Violations

### 1. Summary Judgment Should Be Denied to the Wylys

The Wylys claim that they did not know of, nor personally prepare or disseminate, false Schedule 13Ds[13] filed by three Isle of Man (IOM) trustees (the Trustees);[14] therefore, there can

---

[13] As noted by this Court:

> Schedule 13D is a disclosure report required under section 13(d) of the Exchange Act to be filed by any person who 'is directly or indirectly the beneficial owner of more than five percent' of the stock of any class of a public company's outstanding stock. A person beneficially owns a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares (i) voting power, which includes the power to vote, or to direct the voting of, such security; and/or (ii) investment power, which includes the power to dispose, or to direct the disposition of, such security.

*Wyly*, 788 F.Supp.2d at 97.

[14] Lorne House, Trident Trust and Aundyr Trust/ IFG International Trust (IFG).

be no finding that they aided and abetted the Trustees' false filings.  Def. Brief at 39-41.  The

Wylys' argument is without merit.[15]

### a.   The Wylys Knew the Trustees Filed Schedule 13Ds

There is ample evidence showing that the Wylys knew the Trustees filed Schedule 13Ds.

First, the Wylys initially funded their Offshore System in April 1992 when they

transferred millions of Michaels Stores and Sterling Software options and warrants to newly

created IOM entities administered by Lorne House Trust.  *See* SEC 56.1 ¶ 43.  As a result of

these transfers, the Wylys and Lorne House both beneficially owned greater than 5% of the

outstanding shares of Michaels Stores and Sterling Software, and they filed Schedule 13Ds for

both issuers.  *See id.*  Charles Wyly, and Sam Wyly's adult son Evan Wyly, as well as Ronald

Buchanan, Lorne House's managing director who traveled from the Isle of Man to Dallas,

attended meetings on April 22, 1992, with Michael French at Jackson & Walker's offices where

the Wylys and Buchanan signed Schedule 13Ds.  Neish Decl. Ex. 3 at 1.

Second, the Wylys received copies of Lorne House's April 22, 1992 Schedule 13Ds, as

well as all subsequent 13Ds filed by the Wylys' offshore Trustees.  *See* SEC 56.1 ¶ 40.  Third,

the Trustees' Schedule 13D filings were expressly referenced in Sterling Software's SEC proxy

filings at a time when both Wylys served on those companies' Boards of Directors and which

were mailed to Sterling Software shareholders with a cover letter from Sam Wyly.  *See* SEC 56.1

---

[15] As a preliminary matter, the Wylys argue that since Section 20(e) of the Exchange Act was
enacted on December 22, 1995, they cannot be held liable for Lorne House filings made prior to
December 1995.  Section 20(e) merely codified the SEC's pre-existing authority to bring aiding
and abetting actions.  Consequently, defendants remain liable for the pre-December 1995 trustee
filings.  *See* Judge Wayne R. Andersen's analysis in *SEC v. Buntrock*, No. 02 C 2180, 2004 WL
1179423, at *7 (N.D. Ill. May 25, 2004) *aff'd in part and remanded by SEC v. Koenig*, 557 F.3d
736 (7th Cir. 2009).

¶ 41.  Finally, Sam Wyly was specifically informed of IFG's need to make a Schedule 13G[16] filing by Keeley Hennington, CFO of the Wyly Family Office.  *See* SEC 56.1 ¶ 42.

Additionally, there is substantial evidence that the Wylys went to great lengths to avoid or minimize further Schedule 13D disclosures by the Trustees from which a reasonable inference may be drawn that the Wylys, in fact, knew that the Trustees had filed Schedule 13Ds.  See pp. 6-7, *supra*.  For example, in December 1995 and January 1996, the Wylys created several new trusts and hired two additional IOM Trustees to transfer and allocate additional millions of SSW and MIK options among their various trusts so that each Trustees' holdings remained below Schedule 13D's 5%, ownership reporting threshold.  *See* SEC 56.1 ¶ 52; *see also* Smith Decl. Ex. 15 (Wylys 12/29/95 Sch. 13D disclosing the transfer of 1.65 million Sterling Software options to a total of four IOM Trusts). They allocated securities among multiple Isle of Man trusts and trustees to ensure the IOM trust and trust-owned entities' holdings were below the SEC's 5% reporting threshold.  *See* SEC 56.1 ¶ 9.  These facts permit a reasonable inference that the Wylys knew that the Trustees filed Schedule 13Ds.

### b.  The Wylys Knew the Trustees Filed False Schedule 13Ds

The Wylys knew that Schedule 13Ds and 13Gs filed by the Trustees were false.  The Trustees signed Schedule 13Ds and 13Gs, indicating they held sole dispositive and voting power over securities in the offshore trusts, when in fact the Wylys knew they shared dispositive and voting power with the Trustees.  The Wylys were well aware of the standards for determining "beneficial ownership" under Section 13(d).   They received annual Director & Officer

---

[16] "Schedule 13G is a short-form version of Schedule 13D which may be filed by a person who 'has acquired [ ] securities in the ordinary course of his business and not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect.'"  *Wyly*, 788 F.Supp.2d at 97 n.8 (quoting language of 17 C.F.R. § 240.13d–1).

questionnaires from Michaels Stores, Sterling Software and Sterling Commerce (SE), which included the definition of "beneficial ownership."  *See* SEC 56.1 ¶¶ 7-8.  Moreover, co-defendant French gave them information that explained the "facts and circumstances" test for determining whether they would be considered to "beneficially own" the securities held by the offshore trusts. *See* SEC 56.1 ¶ 44.  The Wylys also knew that they shared dispositive and voting power with the trustees since (i) they initiated or approved all investment decisions regarding trust-held securities, conveying those instructions to their employees, *e.g.*, French, Robertson, and Boucher, who then conveyed them to the trustees, *see* SEC 56.1 ¶ 45, and (ii) the Trustees never failed to comply with the Wylys' securities investment instructions.  SEC 56.1 ¶ 46.  Thus, an inference may be drawn that the Wylys knew the IOM Trustees' Schedule 13Ds and 13Gs falsely represented that the Trustees held sole investment and voting power over the securities.

### c.  The Wylys Substantially Assisted Filing False Schedule 13Ds

The Wylys substantially assisted in the filing of false Schedule 13ds by the Trustees. Through their agents, the Wylys told the Trustees that they would take responsibility for preparing and filing Trustee SEC filings. *See e.g.,* SEC 56.1 ¶ 47.  The Wylys, not the Trustees, decided which law firms would prepare SEC filings for the Trustees.  *See* SEC 56.1 ¶ 48. Moreover, there is no evidence those law firms were informed that the Wylys shared dispositive and voting power over the securities held by the trusts and trust-owned entities with the Trustees. In fact, French, acting on the Wylys' behalf, affirmatively misrepresented to Jones Day - the law firm that assisted with filing the last six of the false, trustee Schedule 13Ds - that the Trustees had sole dispositive and voting power.  *See* SEC 56.1 ¶ 49.

From this evidence, a jury could reasonably conclude not only that the Wylys knew the Trustees filed false Schedule 13Ds, but that the Wylys substantially assisted the Trustees in those

filings.  Consequently, a genuine issue of material fact exists as to whether the Wylys aided and abetted the Trustees' filing of false Schedule 13Ds, and summary judgment should be denied.

       **2.**     **Summary Judgment Should Be Denied to
French Regarding Filings Made By the Trustees After 2000**

     French argues that he cannot be held liable for aiding and abetting the IOM Trustees' Section 13(d) violations for the years 2001 through 2003, because his working relationship with the Wyly family and the "associated entities" ended in early 2001.  Def. Br. at 42.  However, French's direct actions prior to his break with the Wylys caused false Schedule 13D filings, and his ongoing knowledge of the Trustees' post-2001 false Schedule 13G filings in Scottish, a company for which French served as CEO and Chairman during the relevant period, supports a finding that he aided and abetted the post-2001 false Schedule 13G filings.

     The Trustees' false Schedule 13Ds fall into three general categories:  (1) Schedule 13Ds filed by Lorne House between 1992 and 1995 that were prepared by Jackson Walker; (2) Schedule 13Ds filed by Trident Trust between 1997 and 1998 that were prepared by Jones Day; and (3) Schedule 13Gs filed by IFG between 2001 and 2003 that were also prepared by Jones Day.  *See e.g.*, Hatch-Miller Decl. Exs. 16, 22.[17]  French's argument as to the Schedule 13Gs filed by IFG between 2001 and 2003 (the third category) is unavailing.

     As stated above, French misrepresented to Robert Estep - the Jones Day partner who oversaw the preparation of Trident's Schedule 13Ds (the second category) – that the Trustees had sole dispositive and voting power over the securities held by the IOM trusts, and that the Wylys did not exercise any such control.  *See* SEC 56.1 ¶ 49.  Relying on French's misrepresentation, Estep informed other Jones Day attorneys - who assisted in representing MIK,

---

[17] French has not moved for summary judgment with respect to the SEC's claim that he aided and abetted the first two categories.

SSW and SE as well as the prepared Trustees' Schedule 13Ds - that French confirmed the Trustees exercised sole dispositive and voting authority, and that the issue should be considered as settled.  *See* SEC 56.1 ¶ 50.  After French parted ways with the Wylys, he did not correct his misrepresentations to Estep as to Trustee dispositive and voting power, and Jones Day continued to rely on French's prior misrepresentations when the firm prepared IFG's Schedule 13Gs (the third category) as to their greater than 5% holdings in Scottish in 2001, 2002 and 2003.  *See* SEC 56.1 ¶ 51.  French was not only aware that these false filings were made, he had ample opportunities to correct his earlier misrepresentations since he served as the CEO and Chairman of the Board of Scottish, which continued to use Jones Day as its primary outside counsel.  *See* SEC 56.1 ¶ 52.  Rather than stop IFG from filing false 13Gs, French continued to conceal the fact that the Wylys beneficially owned greater than 5% of Scottish's outstanding securities held by the offshore trusts by having Scottish file multiple Form 10-K and proxy filings between 2001 and 2004 with beneficial ownership tables that failed to reflect the Wylys' significant Scottish holdings, yet included IFG's holdings based on the false 13Gs they filed.  *See* SEC 56.1 ¶ 53.  A jury may reasonably conclude from these facts that French knew the Trustees filed false Schedule 13Ds and that French substantially assisted in those filings even after he left the Wylys; therefore, summary judgment should be denied to French.

### G.    Genuine Issues of Material Fact Preclude Summary Judgment On the Scienter Element of the Fraud Claims Against the Wylys and French

Genuine issues of material fact relevant to the Wylys' and French's scienter permeate the entire record of this case. Ignoring these facts, the Wylys argue their delegation of SEC filing

responsibility to Sharyl Robertson and Keeley Hennington[18] who they claim relied on the advice of "two separate and sophisticated law firms" negates scienter. Def. Br. at 43. Defendants' argument fails because there are genuine issues of material fact relevant to scienter, and neither the Wylys nor French can satisfy <u>any</u> of the elements required to invoke good faith reliance on advice of counsel.

### 1.   <u>Scienter and Reliance on Counsel</u>

Given its subjective nature, scienter is generally considered a question of fact and, therefore, "the Second Circuit has been lenient in allowing scienter issues to withstand summary judgment." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999); *see also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 479 (S.D.N.Y. 1998)[19] (resolution of scienter turns on a witness's demeanor and credibility and is inappropriate for summary disposition). In the context of a civil securities case reliance on advice of counsel "is not a complete defense, but only one factor" bearing on scienter. *SEC v. Enterprises Solutions, Inc.*, 142 F. Supp.2d 561, 576 (S.D.N.Y. 2001). To invoke reliance on advice of counsel, the record must show that defendants (i) made complete disclosure to counsel; (ii) sought advice as to the legality of their conduct; (iii) received advice that their conduct was legal; and, (iv) relied on that advice in good faith.

---

[18] Robertson and, after her, Hennington acted as the accountant for the Wyly Family Office in Dallas, Texas. Robertson was also a trust protector who served in that capacity with defendant Michael French. *See* SEC 56.1 ¶¶ 54, 55.

[19] Defendants concede that "scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

*Markowski v. SEC*, 34 F.3d 99, 104-105 (2d Cir. 1994).  When any of those four requirements is

not met, courts have rejected the defense.[20]  Here, none of the requirements has been met.

> **2.     The Wylys Did Not Seek Advice Nor Was Any**
> **Provided On Whether the Facts and Circumstances of**
> **Their Operation of the Trusts Rendered Them Beneficial Owners**

There is no evidence in the record that the Wylys or their surrogates ever sought legal

advice on the question of whether their communications with the IOM Trustees constituted

control over trust assets and rendered them beneficial owners of those assets.  In order to assess

defendants' contention that reliance on others, including counsel, negated scienter as a matter of

law, it is necessary to identify the relevant conduct and legal issue that flows from it.

> **a.     The Relevant Conduct Comprising**
> **the Facts and Circumstances of Control**

The Wylys' obligation to disclose their offshore securities on Forms 13D and other SEC

filings turned on whether they were "beneficial owners" of those securities. Beneficial ownership

is a fact question.  *See* SEC 56.1 ¶ 63.  The relevant conduct comprised the frequent and detailed

"recommendations" the Wylys submitted to the Trustees through their surrogates Robertson,

---

[20] *See In re Bank of America Corp. Sec. Derivative and ERISA Litig.*, No. 09 MD 2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) (rejecting former CEO's and former CFO's advice of counsel defense where the former CFO failed to make a complete disclosure of all the relevant facts to the general counsel and the former CEO "took no steps" to ensure that counsel had complete and current information.)*; Enterprises Solutions, Inc.*, 142 F. Supp.2d at 575-76 (rejecting advice of counsel defense where defendant never sought or received "specific advice from counsel" regarding whether certain information needed to be disclosed in SEC filings).  In *Enterprises Solutions, Inc.*, the defendant argued— just as the Wylys do here—that the omission while negligent was not intentional because he disclosed the information to counsel and relied in good faith on counsel to include in the SEC filing "anything that was required to be disclosed." *Id.*  The court rejected defendant's assertion of good faith reliance on counsel:

> [Defendant] included information about the bankruptcy, along with a lot of other information, … .But he never sought specific advice … with respect to disclosure of the bankruptcy, … . Good faith reliance on the advice of counsel means more than simply supplying counsel with information.

*Id.*

Hennington, and co-defendant French.  The record establishes that in every instance the investment and disposition of trust assets was instigated by a Wyly "recommendation" and was followed by the Trustees without fail.  *See* SEC 56.1 ¶ 56.  The Trustees never initiated investment ideas or  took action that was not "recommended" by the Wylys. *See* SEC 56.1 ¶ 61.  Robertson, Hennington and French never recommended a transaction to the trustee that was not initiated by the Wylys.  *See* SEC 56.1 ¶ 60.  These recommendations covered every offshore securities transaction, as well as the purchase of millions of dollars of jewelry, real estate and art for the personal use of the Wylys and their families; and, tens of millions of dollars of "loans" made by the trusts through foreign straw entities as a means to repatriate cash for the Wylys to use as venture capital without any trust involvement. *See* SEC 56.1 ¶¶ 58-59.

### b.        The Relevant Legal Question for Counsel

The relevant legal question is whether the Wylys' submission of frequent and detailed transaction "recommendations" to the Trustees constituted "facts and circumstances" sufficient to establish the Wylys' control thereby rendering them "beneficial owners" of the trust assets.  This is a central fact issue in this case and the matrix for analyzing the alleged legal advice underlying the Wylys' argument.  According to the Wylys and their surrogates, the only limitation on the Wylys' input on their use and disposition of trust assets was that the Wylys not *require* the Trustees to take actions.  The Wylys engaged in a simplistic charade and couched their communications to the trustees as "recommendations."  Thus, the defendants argue that because the IOM trust instruments granted final authority to the trustees over whether to follow the "recommendations," the Wylys were not beneficial owners.  There is no evidence that any lawyer so advised the Wylys.

### 3. Jackson Walker and Jones Day Did Not Advise the Wylys That They Were Not Beneficial Owners of the Offshore Trusts

Jackson Walker lawyers and, thereafter, Jones Day lawyers assisted in the preparation of Forms 10-K, proxy statements and Forms 13D for the Wylys, Michaels, Sterling Software, and Schedule 13Ds for certain of the IOM Trusts. Def. Br. at 43. Their services were not the equivalent of, or substitute for, the specificity required to negate scienter. *See Enterprises Solutions, Inc., 142 F. Supp.2d* at 576. None of those lawyers advised the Wylys that they were not beneficial owners of the securities held by the Offshore Trust.

#### a. Jackson Walker Did Not Advise the Wylys That They Were Not Beneficial Owners

Marilyn Post, an associate who had been with Jackson Walker for just three months, prepared at French's request a research memorandum dated December 6, 1991, on how ownership of Issuer's shares held by the IOM Trusts should be reported under Sections 13(d) and 16 of the Exchange Act.[21]  *See* SEC 56.1 ¶ 62.  Post explained that reporting obligations under the securities laws flowed from "beneficial ownership," not legal ownership. *See* SEC 56.1 ¶ 63. Thus, the IOM Trusts could have legal ownership of the securities, but if the Wylys, as a factual matter, had the "significant ability" to influence the investment or voting decisions of the trusts, they would be deemed beneficial owners of the securities held in the trusts. *Id.*  Nowhere in her

---

[21] During its engagement, Jackson Walker rarely provided advice regarding the Offshore System. None of these rare instances addressed the real-time facts and circumstances of the trust operations.  In November 1991, French prepared a memorandum for Sam Wyly analyzing the types and utility of foreign trusts for "asset protection." *See* SEC 56.1 ¶ 18 (citing to a November 11, 1991 memo from French to Sam Wyly). French recommended a foreign grantor trust as "the best structure" for asset protection. He explained that a grantor trust is "tax neutral" and that Wyly would be taxed during his life on all accumulated trust income.  In contrast, income in a foreign non-grantor trust can be accumulated "free of U. S. income taxes, including capital gains on U.S. securities.  After noting that the non-grantor trust "is a much trickier animal" than a grantor trust, French advised Sam Wyly that it could be treated as an accumulation trust and he would still be deemed  the owner of the trust assets. *Id.*

memorandum does Post state that simply couching the Wylys' inputs to the Trustees as "recommendations" that could be rejected by the Trustees immunized the Wylys from Section 13(d) liability. In fact, her conclusions are to the contrary.  *See* SEC 56.1 ¶ 64.  Ms. Post's memorandum is not an opinion or advice on the legality of the Wylys' conduct in their treatment of the IOM trusts.  It is, rather, a cautionary piece—a general roadmap—of the conduct to avoid lest the Wylys be deemed beneficial owners of the securities held by the IOM trusts.  In short, Post never advised the Wylys that they in fact were not the beneficial owners of the securities held by the Offshore Trusts.

Post did no fact investigation in preparing her memo. *See* SEC 56.1 ¶ 65.  She assumed for purposes of her research that the Wylys relinquished all control to the trusts. *See* SEC 56.1 ¶ 66.  Her understanding of such facts as may have existed at this early stage came from Jackson Walker partner James Ryan.  *See* SEC 56.1 ¶ 67.  Ryan did not discuss with either Wyly what his ongoing involvement in the trust activities would be or give advice to either of them on their trust activities. *See* SEC 56.1 ¶ 71.  Both Ryan and French testified that consistent with French's practice French would have provided the Post memorandum to the Wylys or at least discussed it with them. *See* SEC 56.1 ¶ 68.  Post was never asked to update her memorandum based on actual facts and circumstances.[22] *See* SEC 56.1 ¶ 69.

The Post December 1991 memoranda is replete with red flags that if transgressed would have severe financial and legal consequences. Yet, going forward the Wylys disregarded their lawyers' warnings.

---

[22] Sharyl Robertson for her part was unaware of the Wylys getting any legal advice that the offshore trusts were not affiliates of Michaels or SSW. *See* SEC 56.1 ¶ 72.  Robertson "assumed" the Wylys received advice from Jackson Walker regarding disclosure of the shares held offshore. *See* SEC 56.1 ¶ 74.

**b.     Jones Day Did Not Advise the**
**Wylys That They Were Not Beneficial Owners**

In 1995, French severed his relationship with Jackson Walker, became a consultant at

Jones Day and brought the Wyly accounts with him. *See* SEC 56.1 ¶ 75.  From the fall of 1995

through 2005, Jones Day acted as outside securities counsel for the Wylys, Michaels and Sterling

Software. *See* SEC 56.1 ¶ 77.  The Wylys identify Robert Estep and James McCafferty as the

two Jones Day partners on whom they relied.[23] Def. Br. at 43**.**

The Wylys never asked Estep to explain the concept of beneficial ownership under

Section 13(d). *See* SEC 56.1 ¶ 78.  Estep does not recall ever being asked to provide advice

regarding the Wylys' transfers of SSW shares offshore. *See* SEC 56.1 ¶ 80.  Jones Day did not

conduct an investigation of the facts; rather, Estep accepted the facts as provided by French, the

Wylys' D&O questionnaire responses, the Wylys and others at the Wyly Family office.  *See* SEC

56.1 ¶ 84.

Events of early October 2001 are probabtive of the Wylys' awareness that that (i) neither

Estep, nor any other lawyer at Jones Day had been asked to advise the Wylys on beneficial

ownership issues related to the IOM Trusts; and, (ii) that full disclosure of the facts and

circumstances of the Wylys' communications with the Trustees had not been made to Estep or

any other Jones Day lawyer.

In October 2001, Estep was asked by Hennington to provide assurance to Lehman

Brothers that one of Sam Wyly's Offshore entities (Devotion Limited) was not an affiliate of

Michaels, because it was not controlled by Sam Wyly, Michaels Chairman.  *See* SEC 56.1 ¶ 85.

---

[23] It is undisputed that other law firms at various times provided services to the Wylys in
connection with the offshore trusts. These included Meadows Owens tax partners, Rodney
Owens and Charles Pulman, Morgan Lewis tax partner Charles Lubar and Miriam Fisher, also a
tax lawyer. Defendants do not contend in their motion that any of these firms or lawyers
provided securities advice or were relied on for such advice.

Lehman Brothers' request was in connection with a proposed forward sale of Michaels shares held by Devotion. *See id.* This request resulted in two telephone conferences, the first involving Estep, Lehman lawyers, Lehman transactional people and Keeley Hennington. *See id.* On the first call, Estep was unable to provide the requested assurance. *See* SEC 56.1 ¶¶ 85-87. He explained that he would have to undertake an investigation into the relevant facts and circumstances of Sam Wyly's relationship with Devotion in order to address the affiliation question, but he had never been asked to do so. *Id.* The second call, which occurred the following day, involved McCafferty, Estep, Rodney Owens and the same Lehman people. Neither Owens nor McCafferty offered Lehman the comfort it was seeking. *See* SEC 56.1 ¶¶ 85-87. This episode reveals not only that the Wylys never sought or received any advice that they did not control the Offshore Trusts, but also that they knew the lawyers, upon whom they now claim to have relied, had never been asked to provide any such advice.

On this record, whether the Wylys ever sought specific advice on the relevant question of control and beneficial ownership is very much in dispute.

### 4. The Wylys Did Not Make Complete Disclosure of Relevant Facts

Defendants have completely misrepresented the evidence regarding the alleged knowledge of outside counsel. For example, they claim that "the Wylys' attorneys . . . knew that trust protectors selected by the Wylys *regularly made recommendations to the trustees of the offshore trusts and knew that trustees acted on the protectors recommendations*." Def. Br. p. 44 (emphasis added). In support of this key statement, defendants cite only to the deposition testimony of James Ryan, who testified that prior to the initial creation of the first offshore trusts he understood "the trustee had ultimate control over the management of the assets of the trusts, and that there was a letter of wishes that the settlor provided, and – I don't know whether I

remember this from contemporaneous recollection or preparation for testimony, but that there was a committee of protectors that provided advice to the trustee."  *See* Smith Decl. Ex. 12.

Good faith reliance on counsel requires complete disclosure of relevant facts specific to the advice sought.  *Markowski*, 43 F.3d at 105; *Enterprises Solutions, Inc.*, 142 F. Supp.2d at 576.  Good faith reliance also requires that counsel be "in the loop" and updated with current facts. *In re Bank of America Corp. Sec. Derivative and ERISA Litig.*, 2011 WL 3211472, at *8-9. This is particularly critical in this case where the "facts and circumstances" relevant to beneficial ownership are not static.

None of the lawyers identified by the Wylys (Ryan and Post of Jackson Walker and Estep and McCafferty of Jones Day) was aware of the relevant facts.  *See* SEC 56.1 ¶ 88.  Estep did not know French was a protector, had no understanding of the role of "protector," and had not heard the term until the SEC's investigation. *See* SEC 56.1 ¶ 81.  He did not know the frequency, degree or nature of the Wylys' communications with the trusts. Nor did he know that the trustees followed the Wylys' recommendations without fail.  *See* SEC 56.1 ¶¶ 81-82.

The Wylys contend there is no evidence that they ever directed Robertson or Hennington to withhold relevant information regarding their relationship with the trusts from French or other attorneys; no evidence that French withheld information from other attorneys at Jackson Walker; and no evidence that the Wylys instructed their employees or attorneys to provide false information in SEC filings.  Def. Br. at 43**.**  Even if these summary assertions are entirely accurate, which they are not, they are beside the point and serve only to highlight the material facts in dispute on the issue of defendants' scienter and defendants' fundamental misunderstanding of the elements good faith reliance on counsel. The fact that the Wylys may not have affirmatively instructed their employees and lawyers to withhold information or lie is

40

not the equivalent of making "complete disclosure to counsel," as required. *See Markowski*, 43 F.3d at 105; *Enterprises Solutions, Inc.*, 142 F. Supp.2d at 576. Reliance on counsel is an active process that begins with a client's request for advice and requires the client to affirmatively disclose all relevant facts. Of course, the request itself will trigger an inquiry by counsel of those facts. In rendering advice, counsel properly accepts the facts as given by the client. Defendants in their brief, as they must, ignore this logical and objective sequence of steps for obtaining legal advice because there is no evidence that these steps were followed.

Robertson did not seek advice from French or other lawyers at Jackson Walker regarding the beneficial ownership question under Section 13(d). *See* SEC 56.1 ¶ 73. She "assumed" advice had been given, but had no knowledge of it. *See id.* She did not seek legal advice, receive any or communicate any to the Wylys. *Id.* The same is true of Hennington. *See* SEC 56.1 ¶ 79. The Jackson Walker lawyers, Ryan and Post, as of early 1992 were told only that the Wylys relinquished all control to the trusts. *See* SEC 56.1 ¶ 70. They accepted this general assertion as true and were never told any facts thereafter to call this into question. *See id.* They knew nothing of the frequent and detailed inputs the Wylys had with the trustees and the influence those inputs had on the voting and disposition of the securities held in those trusts. *See* SEC 56.1 ¶ 88. Estep, for his part, knew none of the facts regarding the Wylys inputs to the trustees and the degree of influence the Wylys had over the voting and disposition of securities held in the trusts. *See* SEC 56.1 ¶ 83.

Whether the Wylys affirmatively withheld information from their lawyers or were simply passive is irrelevant. What is relevant is that none of the lawyers upon whom the Wylys claim to rely had knowledge of the frequency and detail of the Wylys communications with the trusts and the influence they had over the disposition and use of the assets in the trusts.

### 5.      The Wylys Cannot Claim Good Faith Reliance on French

In order to benefit from reliance on counsel, the record must demonstrate that counsel was "disinterested and independent." *In re Reserve Fund Sec. and Derivative Litig.*, No. 09 MD 2011, 2012 WL 4774834, at *4 (S.D.N.Y. Sept. 12, 2012) (quoting *SEC v. O'Meally*, No. 06 Civ 6483(LTS)(RLE), 2010 WL 3911444, at *4 (S.D.N.Y.Sept. 29, 2010).  Michael French was neither. Reliance on his advice cannot be in good faith and did not negate scienter.  *O'Meally*, 2010 WL 3911444, at *4 (the legal and compliance department of defendant's employer was not in a position to provide disinterested advice because the employer "reaped significant revenues from defendant's activity").

It is not surprising that the Wylys do not explicitly identify French as having provided legal advice.  In 1992, to capitalize on his relationship with the Wylys, French left Jackson Walker's offices and shared space with the Wylys in the Wyly Family Office.  SEC Counter. French wore at least four hats: he was a lawyer; he was a trust protector from 1992 through his acrimonious split with the Wylys in 2000; he was a Michaels and Sterling Software board member; and, he was a co-venturer in certain Wyly businesses.  In 1995, when he formally left Jackson Walker, he was able to capitalize further on his relationship with the Wylys by arranging a lucrative consulting position at Jones Day.  *See* SEC 56.1 ¶ 76.  These various involvements resulted in financial gains far beyond his former income as a partner at Jackson Walker.  *See id.*

On this record, whether reliance on any alleged advice provided by French was in good faith is a material fact in dispute.  Summary judgment should be denied. *See Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181-82 (2d Cir. 1977) (the court rejected reliance on counsel argument where defendants could not reasonably have thought counsel's advice was independent because

counsel's primary concern was to promote the interests of counsel's investment advisor client by assisting the defendants).

### 6. The Wylys Did Not Rely on the Advice of Counsel in Good Faith

The Wylys could not have relied on advice of counsel in good faith because they knew that beneficial ownership was determined by "facts and circumstances," which by their very nature are not static and require analysis as changes may occur over time, as happened here. *See* SEC 56.1 ¶ 89.

Multiple times each year during the relevant time period the Wylys were obligated as directors and officers of Michaels Stores, Sterling Software and Scottish Re to disclose in various SEC filings their beneficial ownership of securities in those issuers. *See* SEC 56.1 ¶ 91. The Wylys were sophisticated businessmen who founded companies, took them public, and served as executive officers and members of the boards.  Mark Beasley, Michaels' general counsel, circulated a memorandum to the officers and directors including the Wylys, explaining their disclosure obligations and offering legal assistance to the recipients to ensure compliance. *See* SEC 56.1 ¶ 90.  The Wylys, as executive officers and directors of the issuers, had "an independent duty to insure that proper disclosures" of their beneficial ownership of the issuers' securities were made.  *See Enterprises Solutions, Inc.*, 142 F. Supp.2d at 576; *In re Bank of America Corp. Sec. Derivative and ERISA Litig.*, 2011 WL 3211472, at *8.  The Wylys demonstrated a "reckless disregard for the truth" in failing to meet their obligations to disclose beneficial ownership of shares in the issuers.  Once they "delegated" matters to others, they abdicated all personal involvement and responsibility to ensure their disclosure obligations as officers and directors were fulfilled.  Both Wylys were actively and intimately involved in orchestrating the disposition and repatriation of hundreds of millions of dollars of IOM trust

assets for personal use. Yet all the while knowing their disclosure obligations and their virtual unfettered use of trust assets, they never once sought specific advice from counsel regarding whether the "facts and circumstances" of their frequent and detailed "recommendations" constituted control under the securities laws making them beneficial owners requiring disclosure. This conduct was "highly unreasonable" and an "extreme departure from the standards of ordinary care." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012); *see also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference…of recklessness"). The motion should be denied.

### H.   Summary Judgment Should Be Denied to Schaufele on the Aiding and Abetting Claim Against Him

Schaufele contends there is no proof he aided and abetted the Wylys' securities fraud, because he never had any knowledge that they were committing fraud. Schaufele's argument is unpersuasive. Evidence supports a finding that the Wylys engaged in securities fraud, and that Schaufele knew of it.

### 1.   Schaufele Knew the Wylys Controlled the Offshore Trusts

For over fifteen years, Schaufele served as the registered representative for the Wylys' onshore and offshore entities' accounts. In that capacity, Schaufele knew the key feature of the Wylys' fraud – that all securities transactions engaged in by the offshore trusts were specifically authorized by the Wylys in advance and that those transactions would not have occurred absent specific initiation or advance authorization by the Wylys. *See* SEC 56.1 ¶ 92.

Schaufele's knowledge of the Wylys' control over the offshore trusts is evident from his actions: (1) he discussed offshore securities transactions directly with the Wylys, *see* SEC 56.1 ¶ 93; (2) he negotiated the terms of offshore securities transaction directly with Sam Wyly's son,

Evan, *see* SEC 56.1 ¶ 94; (3) he executed an offshore securities transaction based solely on direction from Keeley Hennington, the Wyly Family Office CFO, bypassing the Trustee entirely, *see* SEC 56.1 ¶ 95; (4) he executed offshore securities transactions on Sam Wyly's directions, *see* SEC 56.1 ¶ 96;  and (5) he received an offer directly from Sam Wyly to cancel a Trustee's transaction. *See* SEC 56.1 ¶ 97.

### 2.     Schaufele Concealed the Wylys' Control Over the Offshore Entities

Schaufele substantially assisted the Wylys' fraud by concealing from his employers that the Wylys made the investment decisions for the offshore entities.  Schaufele repeatedly misrepresented to his employers that the Trustees were totally independent of the Wylys, including telling several of his supervisors at Lehman stating that "you do not talk offshore business with the family and all dealings/orders come via fax from the offshore directors and to me everything appears in order."  *See* SEC 56.1 ¶ 98.

When Schaufele left Lehman Brothers and joined Bank of America, he convinced the Wylys to move their offshore entities' brokerage accounts with him by promising them that he would work to maintain the offshore accounts as independent entities, unlike at Lehman which came to view the Wylys' onshore and offshore accounts as "linked" and "chose to treat [the offshore accounts] as affiliates."  *See* SEC 56.1 ¶ 99.  Schaufele kept his word to the Wylys by again misrepresenting the Wylys' control over the offshore entities to his superiors at Bank of America.  In 2004, when company officials became concerned about the offshore entities and insisted that the offshore trustees provide the names of each trust's beneficiaries, Schaufele informed his boss that although he suspected the beneficiaries were members of the Wyly family, "the trustees generally do not involve the beneficiaries in the operation of the offshores." *See* SEC 56.1 ¶ 100.  Schaufele also helped the Wylys contrive excuses as to why the Trustees

could not provide the requested information.  *See* SEC 56.1 ¶ 101.  A jury could reasonably conclude that Schaufele lied to his bosses about the Wylys' control over their Offshore entities, because he knew the Wylys were engaged in fraud and did not want it to be discovered.

### 3.     Schaufele Did Not Rely on Others In Good Faith

Finally, Schaufele's argument that he was justified in relying upon the statements and opinion of others, including lawyers representing the Wylys, the offshore entities, the Issuers, and even Schaufele's own brokerage firms, is unavailing.  First, there is no record evidence that anyone at the brokerage firms ever examined the issue of the Wylys' role in making investment decision for the offshore entities.  Rather, the brokerage firm employees relied on Schaufele for confirmation that the offshore entities were not affiliates, and that their securities were not restricted - confirmation which he readily provided.[24]  *See* SEC 56.1 ¶ 102.  Also, Schaufele cannot claim to rely on SEC filings made by the Wylys, the offshore entities and the Issuers in which the Wylys disclaimed beneficial ownership over the offshore securities, since he testified that it was not his practice to review such filings.  *See* SEC 56.1 ¶ 103.

In any event, in October 2001, Schaufele learned that the attorneys upon whom he also now claims reliance were unable to provide Lehman Brothers with an opinion that the Wylys' offshore entities were not affiliates of Michaels Stores.  *See* SEC 56.1 ¶ 104.  Rather than report this fact to Bank of America when he and the Wylys' onshore and offshore accounts moved from Lehman Brothers to Bank of America in February 2002, Schaufele wrote to the Wylys and promised to help maintain the Wylys' offshore trust accounts as independent once the accounts

---

[24] In one email asking Schaufele to confirm that an offshore trust was not an affiliate, Schaufele responded, "for the hundredth time, the client was never an affiliate."  *See* SEC 56.1 ¶ 111. When asked about this email, Schaufele testified that he did not know why he kept getting asked about the offshore entities' affiliate status and could not recall whether Lehman ever obtained or prepared an opinion that the offshore entities were not affiliates.  *Id.*

were opened at Bank of America.  *See* SEC 56.1 ¶ 99.  As such, a genuine issue of material fact

exists as to whether Schaufele substantially assisted the Wylys' fraud, and summary judgment

should be denied to him on this issue.

### III.   <u>CONCLUSION</u>

On the basis of the facts and arguments presented herein, defendants' motion for partial

summary judgment should be denied.

Dated:  April 10, 2013                              Respectfully submitted,


                                                    _s/_____
                                                    Gregory N. Miller (GM-5922)
                                                    Alan M. Lieberman (AL-6517)
                                                    John D. Worland, Jr. (JDW-1962)
                                                    Martin Zerwitz (MZ-9765)
                                                    Counsel for Plaintiff
                                                    SECURITIES AND EXCHANGE COMMISSION
                                                    100 F Street, N.E.
                                                    Washington, DC 20549-5977
                                                    Tel.:    (202) 551-4469 (Miller)
                                                    Fax:    (202) 772-9292