UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

            **Plaintiff,**

        **- against -**

SAMUEL WYLY, CHARLES J. WYLY,
JR., MICHAEL C. FRENCH, AND
LOUIS J. SCHAUFELE III,

            **Defendants.**

--------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 5760 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       The Securities and Exchange Commission ("SEC") brings suit against

Samuel Wyly; Donald R. Miller, Jr. as the Independent Executor of the Will and

Estate of Charles J. Wyly Jr. (Charles Wyly and, together with Samuel Wyly, the

"Wylys"); the Wylys' attorney Michael C. French;[1] and their stockbroker Louis J.

---

[1]    French was an attorney who represented the Wylys and their business
interests, first at Jackson & Walker LLP ("Jackson Walker") and then as a
consultant to Jones Day Reavis & Pogue ("Jones Day"). *See* Statement of
Undisputed Material Facts Pursuant to Local Civil Rule 56.1 In Support of
Defendants' Consolidated Motion for Partial Summary Judgment ("Def. 56.1") ¶ 3.

1

Schaufele III[2] (together, "Defendants").  The SEC alleges thirteen securities violations based on Defendants' participation in a scheme from 1992 through at least 2004, in which the Wylys hid their ownership of and trading activity in the shares of four public companies (the "Issuers")[3] on whose boards they sat by creating a labyrinth of offshore trusts and subsidiary entities in the Isle of Man ("IOM") and the Cayman Islands (the "Offshore System"); transferring hundreds of millions of shares of the Issuers' stock to those entities; and installing surrogates to carry out their wishes regarding the disposition of the stock – all while preserving their anonymity and evading federal securities laws governing trading by corporate insiders and significant shareholders.  The SEC seeks penalties, injunctive relief, disgorgement of roughly $550 million in gains, and prejudgment interest.

Defendants now move for summary judgment on the grounds that: (1) the SEC's claims for civil penalties and injunctive relief are time-barred; (2) unpaid federal income taxes are not the proper subject of disgorgement; (3) the

---

[2]     Schaufele is a securities broker who worked for Credit Suisse First Boston, Lehman Brothers ("Lehman") and Bank of America ("BofA").  *See id.* ¶ 4.

[3]     These companies were Michaels Stores, Inc. ("Michaels Stores"); Sterling Software, Inc. ("Sterling Software"); Sterling Commerce, Inc. ("Sterling Commerce"); and Scottish Annuity & Life Holdings, Ltd. ("Scottish Re").  *See id.* ¶¶ 1-2.

insider trading claims against the Wylys and Schaufele did not involve material non-public information; (4) the aiding and abetting claims against the Wylys and French fail as a matter of law; (5) the SEC has not established scienter to support the fraud claims against the Wylys and French; (6) the SEC has not established scienter to support the aiding and abetting fraud claim against Schaufele.[4]  I address each ground below with the exception of the disgorgement issue, which I will address in a separate opinion.[5]

## II.    BACKGROUND[6]

### A.    The False Filing and Fraud Claims

The crux of the allegations against the Wylys is a "13-year fraudulent scheme to hold and trade tens of millions of securities of public companies while they were members of the boards of directors of those companies, without disclosing their ownership and their trading of those securities."[7]  Through this

---

[4]    *See* Memorandum of Law in Support of Defendants' Consolidated Motion for Partial Summary Judgment ("Def. Mem.") at 1.

[5]    To be clear, I do not accept the SEC's argument that the disgorgement question should be reserved for the remedies phase of trial. *See* Plaintiff Security and Exchange Commission's Memorandum of Law in Opposition to Defendants' Consolidated Motion for Partial Summary Judgment ("SEC Opp.") at 15.

[6]    A detailed overview of the allegations is provided in this Court's March 31, 2011 Opinion.  *See SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011). Only facts directly relevant to the summary judgment motion are repeated here.

[7]    Complaint ("Compl") ¶ 1.

scheme, the Wylys allegedly "s[old] without disclosing their beneficial ownership over $750 million worth of Issuer Securities, and [committed] an insider trading violation resulting in unlawful gain of over $31.7 million."[8]  The Wylys' attorney, French, and their stockbroker, Schaufele, allegedly substantially assisted the scheme and reaped financial rewards for doing so.[9]

Specifically, between March 1992 and January 1996 a number of trusts were settled in IOM (the "Offshore Trusts") and governed and administered by IOM-based corporate trust and corporate service providers (the "Trustees").[10] The trust agreements governing the Offshore Trusts purported to confer upon the Trustees broad and exclusive authority to manage trust assets, but in practice the Offshore Trusts were controlled by trust "Protectors," Wyly-appointed loyalists who did the Wylys' bidding: French, Sharyl Robertson, Michelle Boucher, and Keeley Hennington.[11]  The Wylys used the Offshore Trusts to transfer and allocate millions of shares of the Issuers to ensure that no single trustee held more than five

---

[8]      *Id.* ¶ 4.

[9]      *See id.* ¶ 5.

[10]     *See id.* ¶ 6.

[11]     *See id.* ¶¶ 48-51; Declaration of Sharyl Robertson (Robertson Decl.), Ex. 18 to Declaration of Gregory N. Miller in Opposition to Defendants' Consolidated Motion for Partial Summary Judgment ("Miller Decl.").  Keeley Hennington took over for Robertson as the Wyly family CFO.

percent of an Issuer's outstanding stock – the trigger for filing requirements under Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act").[12]  This enabled the Wylys to hide their beneficial ownership of and trading in the Issuers' shares held in the Offshore System and to evade the federal securities laws' beneficial ownership reporting provisions.  The Wylys knew that they met the requirements for beneficial ownership because they initiated or approved all investment decisions regarding trust-held securities vis-a-vis their employees, and the Trustees never failed to comply with the Wylys' instructions.[13]

---

[12]    *See* SEC's Local Rule 56.1 Statement of Additional Material Facts ("SEC 56.1 Supp.") ¶ 9 (citing 9/10/08 Deposition of Michael French ("French Dep."), Ex. 32 to  Declaration of Martin Zerwitz ("Zerwitz Decl.")).  Schedule 13D is a disclosure report required under Section 13(d) of the Exchange Act to be filed by any person who "is directly or indirectly the beneficial owner of more than five percent" of the stock of any class of a public company's outstanding stock.  17 C.F.R. § 240.13d-1.  A person beneficially owns a security if such person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares (i) voting power, which includes the power to vote, or to direct the voting of, such security; and/or (ii) investment power, which includes the power to dispose, or to direct the disposition of, such security.  *See id.* § 240.13d-3.  Schedule 13G is a short-form version of Schedule 13D which may be filed by a person who "has acquired [] securities in the ordinary course of his business and not with the purpose nor with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect."  *Id.* § 240.13d-1.  Schedule 13G filers are required to file amended Schedule 13Gs when "there are any changes in the information reported in the previous [Section 13(d)] filing."  *Id.* § 240.13d-2.

[13]    *See* SEC 56.1 Supp. ¶¶ 45-46 (citing Robertson Decl. at 2, Ex. 18 to Miller Decl.).

5

The allegedly false 13D filings fall into three general categories: (1) Schedule 13Ds filed by Lorne House between 1992 and 1995 and prepared by Jackson Walker; (2) Schedule 13Ds filed by Trident Trust Company (IOM) Ltd. between 1997 and 1998 prepared by Jones Day; (3) Schedule 13Gs filed by IFG International Trust Company Ltd. ("IFG") between 2001 and 2003 and prepared by Jones Day.[14]  The Wylys, through their agents, told the Trustees that they would take responsibility for preparing and filing the Trustee filings and decided which law firms would prepare the SEC filings.[15]

## B.   Insider Trading Claims

The Wylys co-founded Sterling Software in 1981 and spun off Sterling Commerce in 1995.[16]  Leading up to the sale of Sterling Commerce and Sterling Software in 2000, the Wylys served as Chairman and Vice Chairman of the Board of Sterling Software, comprised two-thirds of its executive committee and, along with other family members and French, comprised half of its Board of

---

[14]     SEC Opp. at 31.  *See also* Def. 56.1 ¶¶ 33-44 (discussing filings).

[15]     *See* SEC 56.1 Supp. ¶¶ 47-48 (citing 7/18/12 Deposition of Shaun Cairns at 99, Ex. 33 to Zerwitz Decl. ("I recall having a discussion with [French], and he said he would do all [SEC] filings that were necessary."); 9/20/12 Deposition of Sharyl Robertson at 272-73, Ex. 30 to Zerwitz Decl.).

[16]     *Id.* ¶ 25.

Directors.[17]

   The SEC has produced evidence that the Wylys agreed that it was time to sell Sterling Software and that Sterling Commerce should be sold first.[18]  In September 1999, discussions took place about selling Sterling Commerce, and Goldman Sachs was retained to identify and evaluate potential buyers.[19]  On October 15, 1999, Richard Hanlon, a friend of Sam Wyly's, met, at Wyly's request, with William Sanders, a Morgan Stanley investment banker focusing on technology companies.[20]  Morgan Stanley had previously provided investment banking services to Computer Associates, a potential purchaser of Sterling Software, and Sam Wyly invited Sanders to a meeting in November 1999 where he informed Sanders that he was interested in selling Sterling Software.[21]  Sanders then arranged a meeting between Sam Wyly and the President and CEO of Computer Associates, Sanjay Kumar, which resulted in a purchase agreement.[22]

---

[17]  *See id.* ¶ 26.

[18]  *See id.* ¶ 27 (citing 2002 Interview of Sam Wyly, Ex. 16 to Miller Decl").

[19]  *See id.* ¶ 28 (citing 9/29/99 Minutes of Sterling Commerce Board Meeting, Ex. 17 to Miller Decl.).

[20]  *See id.* ¶¶ 29-30.

[21]  *See id.* ¶¶ 30-31 (citing 3/3/11 Deposition of William Sanders).

[22]  *See id.* ¶¶ 32-34.

Sterling Software's CEO testified to feeling "blindsided" when he learned of the meeting between Kumar and Wyly.[23]

The insider trading claim against Schaufele is based on his October 1, 1999 purchase of Sterling Software stock.  In the four and a half years prior to this purchase, Schaufele negotiated multiple structured transactions between Lehman and either the Wylys domestically or their offshore entities, ranging from half a million to over two million shares.[24]  In a September 28, 1999 email regarding Sterling Software, Schaufele suggested that the Wylys engage in a swap as an alternative to call options – a suggestion that, given the high fees Lehman charged for structuring a swap, would only make sense if a sizable number of shares were involved.[25]  Schaufele discussed "the terms of the swap and how it was executed [–] the full description of the transaction" with Sam Wyly's son, Evan Wyly, just days before the alleged insider trading transaction occurred.[26]

---

[23]     *See id.* ¶ 35 (quoting 9/18/07 Testimony of Sterling Williams (Sterling Software CEO) at 205-206, Ex. 32 to Zerwitz Decl.).

[24]     *See id.* ¶ 36 (citing 3/10/95 Lehman Bros. Sterling Software Transaction Outline; 5/13/96 Memo from Schaufele to Sam and Evan Wyly, Ex. 17 to Miller Decl. at 4-5).

[25]     *See id.* ¶¶ 37-38.

[26]     *Id.* ¶ 39 (citing 9/30/99 Email from S. Robertson to M. Boucher re: "Evan is having discussions with Lou", Ex. 15 to Miller Decl.; 11/27/12 Deposition of Evan Wyly ("E. Wyly Dep.") at 102-103, Ex. 33 to Zerwitz Decl.).

### C.    Fraudulent Concealment

The SEC filings that form the basis for the SEC's fraud and false filing claims were filed between April 1992 and April 2004 or, according to the SEC, as late as April 2005.[27]  The swap transactions that formed the basis for the insider trading claims were complete no later than November 3, 1999.[28]  The SEC was put on inquiry notice of the potential violations by defendants on November 16, 2004, through information from BofA.[29]  The SEC entered into tolling agreements with the Wylys on February 1, 2006, with French on August 1, 2009, and with Schaufele on October 29, 2009.[30]

The SEC cites the following acts of concealment in support of equitable tolling: (1) the Wylys caused misrepresentations about their beneficial

---

[27]    *See* Def. 56.1 ¶ 17 ("The allegedly false SEC filings . . . were all filed between April 1992 and April 2004").  *But see* Plaintiff [SEC]'s Counterstatement to Defendants' and Schaufele's Local Rule 56.1 Statements of Material Facts ("SEC 56.1") ¶ 17 (In April 2005, "after learning of the SEC investigation, the Wylys first reported their beneficial ownership of their offshore Michael's securities holdings in an amended Schedule 13D filing).

[28]    *See* Def. 56.1 ¶ 22 (swap transaction was executed on October 8, 1999).  *But see* SEC 56.1 ¶ 22 (undisputed, but noting that on November 3, 1999, Lehman entered into a second swap transaction with two additional Offshore Companies involving another 500,000 Sterling Software Shares for a term of eighteen months).

[29]    SEC Opp. at 9.

[30]    Def. 56.1 ¶¶ 12-14.  The SEC filed this action on July 29, 2010.

ownership of securities held by their Offshore Trusts in response to direct SEC

inquiries made in connection with SEC filings; (2) in response to Director and

Officer Questionnaires ("DOQs") provided by the Issuers, the Wylys explicitly

denied beneficial ownership or control over securities held by the Offshore Trusts;

(3) the Wylys actively managed their offshore holdings to minimize SEC filings

under Section 13(d) and avoid disclosure obligations; (4) the Wylys set up a

Cayman Islands office as a conduit and repository of information and routed

instructions for offshore transactions through that office to further conceal their

control over the Offshore Trusts; (5) in early 2004, BofA's clearing firm, National

Financial Services, Inc., flagged the Wylys' offshore accounts and insisted on

knowing the underlying beneficiaries of the trusts, which the Wylys refused to

do.[31]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the

evidence in the light most favorable to the non-movant and drawing all reasonable

inferences in that party's favor, there is 'no genuine issue as to any material fact

and . . . the movant is entitled to judgment as a matter of law.'"[32]  "A fact is

---

[31]     *See* SEC Opp. at 4-8.

[32]     *Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 692 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)) (other quotations omitted).

material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[33]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law."[34] "When the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."[35] The burden then "shifts to the non[-]moving party to present specific evidence showing a genuine dispute."[36] This requires "'more than simply show[ing] that there is some metaphysical doubt as to the material facts,'"[37] and the non-moving party

---

[33]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012) (internal quotations and alterations omitted).

[34]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (internal citations ommitted).

[35]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, No. 11 Civ. 3025, 2013 WL 48688, at *1 (2d Cir. Jan. 4, 2013).

[36]     *Jaramillo*, 536 F.3d at 145.

[37]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

cannot "rely on conclusory allegations or unsubstantiated speculation."[38]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[39] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[40]

## IV.    STATUTE OF LIMITATIONS

### A.    Applicable Statutes of Limitations

The SEC seeks civil monetary penalties under Section 21(d)(3) of the Exchange Act, which governs recovery for all violations of the Exchange Act except insider trading under Section 21A.[41]  Section 21(d)(3) does not contain an express statute of limitations.  Therefore, 28 U.S.C. § 2462 governs the SEC's 21(d) penalty claims, and requires that claims be "commenced within five years

---

[38]    *Id.*

[39]    *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[40]    *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[41]    15 U.S.C. § 78u(d)(3)(A).  The Complaint does not seek civil penalties in connection with any of the alleged violations of the Securities Act.

from the date when the claim first accrued."[42]

Section 21A authorizes the SEC to seek treble civil penalties for violations of the Exchange Act that constitute insider trading.[43]  Section 21A's statute of limitations provides that "[n]o action may be brought under this section more than [five] years after the date of the purchase or sale."[44]

## B.    Availability of Tolling After *Gabelli v. SEC*

On February 27, 2013, the Supreme Court held that the discovery rule is unavailable in SEC enforcement actions governed by 28 U.S.C. § 2462.[45]  In so ruling, the court clarified some, but not all, of the existing "confusion in the case law."[46]  The Supreme Court provided three reasons why the SEC may not avail itself of the discovery rule: (1) the "discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury," a rationale which does not extend to the SEC whose

---

[42]    *Gabelli v. SEC*, 133 S. Ct. 1216, 1219 (2013) ("*Gabelli II*").

[43]    *See* 15 U.S.C. § 78u-1(a)(2).

[44]    *Id.* § 78u-1(d)(5).  *Accord SEC v. Rosenthal*, 650 F.3d 156, 159-62 (2d Cir. 2011).

[45]    *See Gabelli II*, 133 S. Ct. at 1224.  Rather, in such enforcement actions, "a claim based on fraud accrues . . . when a defendant's allegedly fraudulent conduct occurs."  *Id.* at 1220.

[46]    *Wyly*, 788 F. Supp. 2d at 106.

"central mission" is to "investigat[e] potential violations of the federal securities laws;"[47] (2) "the discovery rule helps to ensure that the injured receive recompense [whereas SEC enforcement actions] are intended to punish;"[48] and (3) "[d]etermining when the Government, as opposed to an individual, knew or reasonably should have known of a fraud presents particular challenges for the courts."[49]

The Supreme Court recognized a distinction between "'the discovery rule, which governs when a claim accrues, [and] doctrines [such as fraudulent concealment] that toll the running of an applicable limitations period when the defendant takes steps beyond the challenged conduct itself to conceal that conduct from the plaintiff.'"[50]  In declining to address the latter theory, which the SEC waived in *Gabelli*, the Supreme Court left open the possibility that the SEC could invoke tolling based on fraudulent concealment but offered no guidance on the contours of the doctrine.[51]

---

[47]      *Gabelli II*, 133 S. Ct. at 1222 (internal citations and quotations omitted).

[48]      *Id.* at 1223.

[49]      *Id.*

[50]      *Id.* at 1220 n.2 (quoting *SEC v. Gabelli*, 653 F.3d 49, 59-60 (2d Cir. 2011) ("*Gabelli I*"), *rev'd on other grounds*, *Gabelli II*, 133 S. Ct. 1216).

[51]      *See id.*

The Second Circuit test for tolling under the doctrine of fraudulent concealment requires that: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled."[52]  This formulation is confusing and may run afoul of *Gabelli* insofar as it encompasses the discovery rule.  The more straightforward definition of fraudulent concealment is that the statute of limitations may be tolled on a claim that has already accrued if defendants take steps *beyond* the "self-concealing" fraudulent acts to hinder the SEC's investigation and prosecution of the fraud, as opposed to the initial discovery of the fraud.[53]  For example,

---

[52]     *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012).

[53]     *See Gabelli I*, 653 F.3d at 59-60 (fraudulent concealment is available only where defendant "took affirmative steps *beyond the allegedly wrongful activity* itself to conceal [its] activity from the plaintiff") (emphasis added); *Koch*, 699 F.3d at 157 ("'Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'") (quoting *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).  *Accord Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990) ("Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant – above and beyond the wrongdoing upon which the plaintiff's claim is founded – to prevent the plaintiff from suing in time.") (cited approvingly in *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004)).

fraudulent concealment "'com[es] into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations,'"[54] or by spoliating evidence.[55]

## C.   Discussion

Defendants argue that all of the SEC's claims for civil monetary penalties under Section 21(d)(3) that accrued over five years before the effective date of Defendants' tolling agreements are time-barred – specifically, any conduct predating February 1, 2001 as to Sam Wyly, July 29, 2004 as to French, and October 29, 2004, as to Schaufele.[56]  As for the insider trading claims against the Wylys and Schaufele, the only alleged transactions occurred in 1999, almost seven years before the effective date of the Wylys' tolling agreements and ten years before Schaufele's tolling agreement.[57]

---

[54]     *Wyly*, 788 F. Supp. 2d at 103 (quoting *Cada*, 920 F.2d at 450-51).

[55]     *See Whitlock Corp. v. Deloitte & Touche, L.L.P.*, 233 F.3d 1063, 1066 (7th Cir. 2000) (suggesting that "spoliat[ing] evidence or l[ying] in response to inquiries" might constitute fraudulent concealment but that "[s]imple denials of liability do not").

[56]     *See* Def. 56.1 ¶¶ 12-14.  The SEC abandoned its penalty claims against Charles Wyly following his death on August 7, 2011.  *See SEC v. Wyly*, 860 F. Supp. 2d 275, 276 (S.D.N.Y. 2012).  Defendants argue that the last alleged violation occurred on May 6, 2004, and therefore all claims against French and Schaufele are barred.  *See* Def. 56.1 ¶ 17.

[57]     *See* Compl. ¶ 77.

### 1.    Penalty Claims Under Section 21(d)(3)

The SEC argues that "record evidence reveals that Defendants took steps of concealment that go beyond their fraud," which entitles it to tolling under the doctrine of fraudulent concealment.[58]  It urges the Court to look to antitrust law in light of the fact that *Gabelli* is only recently decided, and to distinguish between "'acts of perpetration'" and "'acts of concealment.'"[59]  This proposed analogy glosses over the very thing that makes fraud unique – and renders the distinction between the discovery rule and fraudulent concealment elusive.  In many fraud cases, the acts of concealment and the acts of perpetration are one and the same.  The SEC argues that this is not such a case and that "[i]f none of the [concealing] acts described above had taken place – no lies to the SEC, no false statements on DOQs, no movement of shares to avoid Section 13(d) filing requirements, no Cayman Islands intermediaries, no obfuscation with Bank of America – the fraud would still have existed."[60]  However, the SEC fails to draw a meaningful distinction between acts of perpetration and acts of concealment and identifies no acts akin to promising not to plead the statute of limitations or spoliating evidence.

---

[58]    SEC Opp. at 3.

[59]    *Id.* at 8-9 (quoting *State of Texas v. Allan Const. Co.*, 851 1526, 1531 (5th Cir. 1988)).

[60]    *Id.* at 9.

Rather, in support of its fraudulent concealment argument, the SEC cites the very disclaimers of beneficial ownership of securities and use of the Offshore Trusts that form the basis for the claims in the Complaint.[61]  It also cites instances when the Wylys, and others on their behalf, affirmed the misrepresentations in response to inquiries by the SEC.[62]  The Supreme Court's reasoning in *Gabelli* strongly implies that these acts of concealment, which represented at most an "unwillingness to divulge [the] allegedly wrongful activity,"[63] are not grounds for tolling an SEC enforcement action.[64]

[61]    *See* SEC 56.1 Supp. ¶¶ 1-12.  Prior to the *Gabelli* decision, I found fraudulent concealment based on these allegations.  *See Wyly*, 788 F. Supp. 2d at 107-08 (citing Compl.).  However, the rationale of *Gabelli* mandates reconsideration of this holding.  As I previously recognized, "the doctrine most applicable to the SEC's fraud claims is the discovery rule . . . because the SEC has not alleged that [Defendants] took active steps to prevent the SEC from suing in time by, for example, promising not to plead a statute of limitations defense [but rather] has alleged . . . facts that are precisely 'within the domain of the discovery rule' (postponing accrual ) and that are 'not to be confused with' fraudulent concealment."  *Id.* at 106 n. 95 (quoting *Cada*, 920 F.2d at 451).

[62]    For example, the SEC cites a 1994 representation by Marilyn Post of Jackson Walker in response to SEC comments regarding Sterling Software that "[the Wylys] have disclaimed beneficial ownership of the securities held by such trusts," SEC 56.1 Supp. ¶ 1, and similar statements by other counsel as well as the Wylys denial of beneficial ownership of the Offshore Trusts in DOQs, *see id.* ¶ 7.

[63]    *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988); *New Jersey v. RRI Energy Mid-Atl. Power Holdings, LLC*, No. 07 Civ. 05298, 2013 WL 1285456 (E.D. Pa. Mar. 28, 2013).  Although these cases made clear that the requirement for tolling of "affirmative acts of concealment" did not extend to fraud cases, applying this requirement in the context of SEC fraud

While I leave open the possibility that acts which go "beyond the [fraud]" but are not directly analogous to "promising not to plead the statute of limitations,"[65] might form the basis for fraudulent concealment in an SEC enforcement action, I need not elaborate on where the line is drawn.[66]  Because the

_____

enforcement actions is a useful way to distinguish acts constituting fraudulent concealment from those which fall within the domain of the now foreclosed discovery rule.  *See also Cada*, 920 F.2d at 451 (rejecting the notion that "a defendant is guilty of fraudulent concealment [in the age discrimination context] unless it tells the plaintiff, 'We're firing you because of your age.'").  Although the Seventh Circuit suggested that "l[ying] in response to inquiries" might constitute fraudulent concealment, *Whitlock Corp.*, 233 F.3d at 1066 (7th Cir. 2000), the SEC cites no instances in which Defendants lied in response to formal SEC investigations as opposed to routine inquiries.  Moreover, *Whitlock* involved a private litigant, not the SEC – if lying in response to routine SEC filing requirements and inquiries qualified for tolling then the Exchange Act statute of limitations would be meaningless.

[64]     A narrow reading of fraudulent concealment in fraud cases is also consistent with the Second Circuit holding that "equitable tolling is only appropriate 'in rare and exceptional circumstances,' in which a party is 'prevented in some extraordinary way from exercising [its] rights.'"  *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) and *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir.1996)) (quotation marks and alterations omitted).

[65]     *Cada*, 920 F.2d at 450-51.

[66]     By way of example, however, the SEC states that "[i]n the summer of 2003, the Wylys instructed counsel to approach the Internal Revenue Service ("IRS") on a 'no-name basis,' to inquire as to a preemptive settlement of any tax claims [and] came to believe that the IRS had figured out their identities as a result of that meeting."  SEC 56.1 Supp. ¶ 20.  This is the *type* of separate concealing action that might form the basis for tolling under the doctrine of fraudulent concealment in a fraud claim.  However, the SEC does not assert that this action

SEC has not cited any acts sufficiently separate from the substantive fraud at issue, its penalty claims for the securities laws violations against the Wylys, French and Schaufele are barred to the extent that they arose more than five years before the Defendants' respective tolling agreements.

### 2.    Section 21A of the Exchange Act (Civil Penalties for Insider Trading)

The SEC seeks penalties for the Wylys' and French's alleged 1999 insider trading violations under Section 21A.  Nothing in Section 21A suggests that the reasoning in *Gabelli* does not extend to insider trading claims.  Thus, because the SEC has not cited concealment beyond that which forms the basis for the insider trading claims themselves, the insider trading penalties are time-barred for the reasons set forth above.

### 3.    Claims for Injunctive Relief Against Schaufele

Schaufele argues that an injunction "[d]enying a man the ability to perform his life-long profession is clearly punitive," and is thus time-barred under Section 2462.[67]  While some courts have held that no statute of limitations applies

---

prevented it from discovering the violations.  *See* SEC Opp. at 4-9.  *See also id.* at 13 (the IRS would not have shared concerns with the SEC regardless because of stringent confidentiality rules).

[67]    Def. Mem. at 21.  Because I determined that none of the claims were time-barred at the motion to dismiss stage, I did not reach the question of whether Section 2642 applied to the claims for injunctive relief against Schaufele.  *See*

to claims for equitable relief,[68] many apply Section 2462 where the injunctive relief sought is punitive in nature, but not where it is remedial, *i.e.* "seeks to undo prior damage or protect the public from future harm."[69]

Of course many forms of equitable relief intended to "undo prior damage or protect the public from future harm" will be perceived by the subject of the injunction as punitive.[70]  However, an injunction under the securities laws requires demonstrating a "cognizable danger of recurrent violation."[71]  In other words, the primary purpose of the injunction cannot be to penalize – it must be to protect against future harm.  As such, the statute of limitations question merges

*Wyly*, 788 F. Supp. 2d at 102 n. 64.

[68]     *See, e.g.*, *SEC v. McAskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999) ("No statute of limitations applies to the SEC's claims for equitable remedies."). *Accord SEC v. Rind*, 991 F.2d 1486, 1491-93 (9th Cir.1993) (enforcement actions by the SEC seeking injunctive relief and disgorgement are not subject to a statute of limitations).

[69]     *SEC v. Jones*, 476 F. Supp. 2d 374, 380 (S.D.N.Y. 2007) (citing, *inter alia*, *Johnson v. SEC*, 87 F.3d 484, 486–92 (D.C. Cir. 1996) (where equitable relief acts as a penalty – not a remedial measure – the five-year limitations period in § 2462 applies)).  *Accord SEC v. Bartek*, 484 Fed. App'x 949, 957 (5th Cir. 2012); *United States v. Telluride*, 146 F.3d 1241, 1245–46 (10th Cir. 1998).

[70]     *See United States v. Halper*, 490 U.S. 435, 447 n.7 (1989) ("even remedial sanctions carry the sting of punishment").

[71]     *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959).  *Accord SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) ("likelihood of future misconduct . . . is always an important element in deciding whether the substantial unfitness found justifies the imposition of a lifetime ban").

with the substantive requirements for obtaining an injunction under the securities laws – if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations.

The Second Circuit has held that the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence."[72] Relevant factors include:

> [whether] defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an isolated occurrence; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.[73]

Given the allegations against Schaufele, which involve conduct over an extended period, at different institutions, and include an insider trading claim, it would be premature to find that injunctive relief is not warranted prior to determining the

---

[72]   *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978).

[73]   *Id.  Accord SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (upholding a permanent injunction prohibiting defendants from serving as officers or directors of any public company where the district court found a high degree of scienter, past securities laws violations, lack of assurances against future violations and defendants were repeat offenders who previously had been enjoined from violating the securities laws).

merits of the SEC's claims against him.[74]  Because the remedy of equitable relief survives, the claim is not time-barred.

## V.   INSIDER TRADING CLAIMS[75]

Defendants' sole argument for summary judgment on the insider trading claims against the Wylys and Schaufele is that the "record . . . conclusively establishes that any non-public information known by the Wylys at the time of the October 1999 Swap Transaction regarding a sale or merger of Sterling Software was immaterial as a matter of law."[76]

### A.   Applicable Law

An insider trading violation under Section 10(b) and Rule 10b-5 requires that the trading occur on the basis of "material, nonpublic information."[77]

---

[74]   As set forth below, the SEC has produced sufficient evidence against Schaufele to survive summary judgment on all claims against him.

[75]   Although the penalty claims for insider trading violations are time-barred, *see supra* Part IV.C.2, the SEC still has claims for disgorgement of illegal trading profits.

[76]   Def. Mem. at 29.

[77]   *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) ("Under the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders. A second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the

Information is material if "'there is a substantial likelihood that a reasonable shareholder would consider it important' or, in other words, 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available.'"[78]

Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information."[79]  With respect to "contingent or speculative" information,

> materiality will depend at any given time upon a balancing of both indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. . . . [I]n order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels [such as] board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries . . . .  To assess the magnitude of the transaction . . . , a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.  No particular event or factor short of closing the transaction need be either necessary

---

securities market.") (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).

[78]     *SEC v. DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).  *Accord ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

[79]     *Basic*, 485 U.S. at 240.

or sufficient by itself to render merger discussions material.[80] "Furthermore, where there is a question of whether certain information is material, courts often look to the actions of those who were privy to the information in determining materiality."[81]  "While the materiality question is not often amenable to disposition as a matter of law,"[82] information may be immaterial as a matter of law, for example where "a prospective merger is too inchoate to be material."[83]

### B.    Discussion

#### 1.    Insider Trading Claims Against the Wylys

Defendants argue that "[t]he *only* information regarding a prospective sale or merger involving Sterling Software . . . as of October 1999, is the alleged oral agreement between [the Wylys] *to pursue a sale* of the company."[84]  "[N]o

---

[80]    *Id.* at 239 (quotation marks and citations omitted).

[81]    *SEC v. Rorech*, 720 F. Supp. 2d 367, 412 (S.D.N.Y. 2010).  *Accord Basic*, 485 U.S. at 241 n.18 ("[T]rading (and profit making) by insiders can serve as an indication of materiality . . . .") (emphasis omitted); *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("major factor" in determining materiality of information is "the importance attached to it by those who knew about it"); *SEC v. Geon Indus.*, 531 F.2d 39, 48 (2d Cir. 1976) (individuals "demonstrated the importance they attached to the information by purchasing shares").

[82]    *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 488 (S.D.N.Y. 2007) (citing *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002)).

[83]    *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 989 (S.D.N.Y. 1989) (citing *Basic*, 485 U.S. at 240-41).

[84]    Def. Mem. at 30 (emphasis in original).

concrete steps in furtherance of a sale of Sterling Software had occurred, and all of the factors identified in *Basic* demonstrate that any sale was, at best, remote and speculative."[85]   I previously held that "the absence of the[] factors[] enumerated by the Supreme Court in *Basic*, is not dispositive of materiality, especially on a motion to dismiss."[86]

   Now, on summary judgment, Defendants argue that no discussion with any potential buyer occurred until January 14, 2000, over three months after the execution of the Swap Transaction, and that in late 1999, Computer Associates had disclaimed interest in acquiring Sterling Software.[87]   However, the SEC cites evidence that in October and November 1999, Sam Wyly was soliciting information and participating in negotiations regarding the sale of Sterling Software.[88]   The SEC argues that "[a]lthough many of these actions occurred after the Wylys initiated their [two] million Sterling Software share equity swap, they reveal the extent of Sam Wyly's personal influence and involvement in events leading to the sale of Sterling Software, and evidence a significant probability that

---

[85] *Id.*

[86] *Wyly*, 788 F. Supp. 2d at 122 (citing *Basic*, 485 U.S. at 239 (declining to "catalog all such possible factors")).

[87] *See* Def. Mem. at 30-31.

[88] *See* SEC 56.1 Supp. ¶¶ 29-33.

the Wylys could effectuate the sale of Sterling Software according to their initial decision to sell."[89]

In further support of materiality, the SEC argues that "[t]he Wylys themselves demonstrated the importance they gave to their decision to sell Sterling Software 'by acting on that nonpublic information in short order, engaging in a unique, massive and bullish transaction in Sterling Software Stock.'"[90]  The SEC has produced evidence that the Wylys were set on selling the Sterling entities, and possessed the power to make that wish a reality, and that the Wylys themselves acted in response to this information.  This information, which "came from an insider and [indicated] that the [sale] discussions were actual and serious,"[91] is not immaterial as a matter of law.  Summary judgment on the insider trading claims against the Wylys is therefore denied.

### 2.    Insider Trading Claims Against Schaufele

The insider trading claim against Schaufele is based on the allegation that Schaufele purchased Sterling Software shares on October 1, 1999, "based

---

[89]    SEC Opp. at 24.

[90]    *Id.* (quoting *Wyly*, 788 F. Supp. 2d at 123).

[91]    *Mayhew*, 121 F.3d at 52.  As I noted previously, "the very purpose of insider-transaction reporting requirements . . . is to give investors an idea of the purchases and sales by insiders which may in turn indicate their private opinion as to prospects of the company."  *Wyly*, 788 F. Supp. 2d at 123.

27

upon non-public material information . . . *i.e.*, the Wylys' intent to make a massive bullish" transaction in that stock.[92]  In declining to dismiss the insider trading claims against Schaufele, I held that because "the Wylys allegedly asked [Schaufele] for pricing on call options for *four million* Sterling Software shares at least three days before" October 1, 1999, "it may be reasonably inferred that the Wylys' bullish determination, as well as the highly material terms concerning the transaction's sizing and date parameters, were known to Schaufele when he traded."[93]

Defendants argue that discovery has revealed "absolutely no evidence that Schaufele had any information about the proposed transaction's size . . . before his purchase [and, in fact,] such information was affirmatively withheld from Schaufele until days after October 1."[94]  The evidence shows that Schaufele was not notified of the total anticipated transaction, rather he was given instructions for the trading to be done on any given day – a fraction of the total transaction.[95]  For

---

[92]    Compl. ¶ 9.

[93]    *Wyly*, 788 F. Supp. 2d at 124.

[94]    Def. Mem. at 34.

[95]    *See* Defendant Louis J. Schaufele III's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Defendants' Consolidated Motion for Summary Judgment ¶ 14.

example, on October 6, 1999, five days after the alleged insider trading occurred, Schaufele emailed Michelle Boucher and asked "What is the term and size?"[96]

The SEC counters that based on his prior experience with the Wylys and their offshore accounts – specifically that each prior structured transaction was "massive" – and his knowledge of structured transactions such as call options and swaps generally, Schaufele "knew the Wylys' proposed transaction would be both bullish and massive."[97]  Moreover, Evan Wyly testified that Schaufele provided "a full description of the transaction" just prior to execution, which suggests that even if Schaufele did not know the precise size of the transaction, he did know considerable detail, and that there was a high likelihood if not a certainty that the transaction would go forward.

The record reveals that Schaufele knew considerably more detail than the existence of a "bare preference to explore the *possibility* of entering into some type of transaction involving Sterling Software stock . . . [w]ithout any specifics about the potential transaction" such that he could not know the probability that it

---

[96]    *Id.* ¶ 16 (quoting 10/6/99 Email from Schaufele to Boucher, Ex. 4 to Declaration of Laura E. Neish, counsel for Schaufele ("Neish Decl.").

[97]    SEC Opp. at 25 (citing SEC 56.1 Supp. ¶ 36 (each prior structured transaction over the course of four and a half years ranged in size from half a million to over two million shares)).

would occur."[98]  He knew more than that Sterling Software insiders were "bullish"

on the company – a fact which Defendants argue was "well-known to the market in

the fall of 1999."[99]  The information Schaufele possessed by virtue of his

conversations with Evan Wyly and Sharyl Robertson, his history with the Wylys,

and his financial background, was far more specific than that known to the public

and could have altered the total mix of information concerning the company.  The

materiality is bolstered by Schaufele's purchase of four thousand shares of Sterling

Stock immediately after obtaining information regarding the anticipated

transactions and "notwithstanding at least four prohibitions on such trading by his

employer."[100]  Summary judgment on the insider trading claim against Schaufele is

therefore denied.

## VI.   AIDING AND ABETTING  TRUSTEE VIOLATIONS OF SECTION 13(D)[101]

The SEC's claim for aiding and abetting pursuant to Section 20(e) of

the Exchange Act alleges that between 1992 and 2003, three foreign trust services

---

[98]      Def. Mem. at 37.

[99]      *Id.* at 38.

[100]     *Wyly*, 788 F. Supp. 2d at 125.

[101]     Defendants do not move for summary judgment on Claim Eight – that French aided and abetted primary violations of Section 13(d) by the Wylys (Claim Six).  *See* Def. Mem. at 39 n.15.

providers "made, collectively, a total of twelve 13D filings with the [SEC]" that were "false and misleading," and that the "making of the[] false 13D filings was orchestrated by the Wylys and French."[102]

## A.   Applicable Law

To prevail on its claims for aiding and abetting trustee violations of 13(d), the SEC must demonstrate: "(1) the existence of a securities law violation by the [Trustee]; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."[103]  The scienter requirement is "actual knowledge."[104] Substantial assistance means that the aider and abettor "consciously assisted the commission of the [primary violation] in some active way."[105]

## B.   Discussion

Defendants dispute the second and third elements of aiding and

---

[102]    Compl. ¶¶ 151-152.

[103]    *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009).

[104]    *SEC v. Apuzzo*, 689 F.3d 204, 210 (2d Cir. 2012).  "The Dodd–Frank Act of 2010 amended Section 20(e) to add the words 'or recklessly' after 'knowingly.'"  *Id.* at 210 n.4 (citing Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, 124 Stat. 1376, § 929O (codified at 15 U.S.C. § 78t(e)). This amendment does not apply retroactively to the claims in this case.

[105]    *Id.* at 212 n.8.

abetting liability as to both the Wylys and French.

      1.     **The Wylys**

          a.     **There Is Evidence that the Wylys Had Actual**
                    **Knowledge of the False 13D and 13G Filings**

      Defendants argue that the SEC cannot even show that "the Wylys knew the trustee 13D filings at issue existed, much less that the Wylys knew that the specific disclosures contained therein were false or misleading."[106]  Yet there is ample evidence in support of the claim that the Wylys knew of the 13D filings and their falsity.  The Wylys received copies of the Offshore Trustee's 13D forms as well as the legal bills for the preparation of the Schedule 13D and 13G filings,[107] and attended meetings which contained on the agenda "Required [SEC] Filings."[108] The 13D filings were referenced in Sterling Software's SEC proxy filings at the time when the Wylys served on the Board of Directors.[109]  French testified that the Wylys were aware that the Offshore Trusts were being used to evade 13D

---

[106]    Def. Mem. at 40.

[107]    *See* SEC 56.1 Supp. ¶ 40 (citing 3/29/02 Jones Day Invoice re: Wyly Family Matters, Ex. 17 to Miller Decl.).

[108]    4/22/92 Meeting Agenda re: Pitkin and Bulldog Trusts, Ex. 3 to Neish Decl.

[109]    *See* SEC 56.1 Supp. ¶ 41.  The proxy statement was mailed to Sterling Software shareholders with a cover letter from Sam Wyly.  *See id.*

reporting requirements.[110]  Sam Wyly was specifically informed by the Wyly Family CFO that one of the trustees (IFG) would need to make a 13G filing.[111]

The SEC has also produced evidence that the Wylys knew these forms were falsified. The trustees signed 13Ds and 13Gs indicating that they held sole dispositive and voting power over securities in the Offshore Trusts, when in fact the Wylys shared this power with the trustees – a fact that the Wylys knew.  The Wylys were aware of the standards for determining beneficial ownership, which were provided to them in memoranda, as well as in annual DOQs.[112]  The Wylys knew that they met the requirements for beneficial ownership because they initiated or approved all investment decisions regarding trust-held securities vis-a-vis their employees, and the trustees never failed to comply with the Wylys' instructions.[113]  This is more than sufficient to raise a question of fact as to whether

---

[110]     *See* French Dep. at 82, Ex. 32 to Zerwitz Decl.

[111]     *See* SEC 56.1 Supp. ¶ 42.

[112]     *See id.* ¶¶ 7-8, 44.

[113]     *See id.* ¶¶ 45-46 (citing Robertson Decl. at 2, Ex. 18 to Miller Decl. ("[The Wylys] would notify me or my co-protector of their request that one or more of the Offshore Companies enter into a particular securities transaction.  I or my co-protector would then recommend that securities transaction to the appropriate Offshore Trustee . . . . [T]he Offshore Trustees always followed the securities transaction recommendations I or my co-protector communicated to them on behalf of the Wylys.")).

the Wylys had actual knowledge that the 13D and 13G filings were false and misleading.

### b. There Is Evidence that the Wylys Substantially Assisted in Falsifying the SEC Filings

Defendants also argue that the SEC cannot establish that the Wylys provided the affirmative conduct required to prove substantial assistance.[114]  Yet the SEC offers evidence that the Wylys, through their agents, told the Trustees that they would take responsibility for preparing and filing the Trustee filings and decided which law firms would prepare the SEC filings.[115]  Furthermore, there is evidence that French, acting as an agent of the Wylys, affirmatively misrepresented to the law firms involved in preparing the filings that the Wylys did not possess dispositive and voting power over the securities held by the Offshore Trusts.[116] This suggests that not only did the Wylys, largely through their agents, assist in the

---

[114]    *See* Def. Mem. at 40.

[115]    *See* Cairns Dep. at 99, Ex. 33 to Zerwitz Decl.

[116]    *See* SEC 56.1 Supp. ¶ 49 (citing 4/25/12 Deposition of Robert Estep at 133, Ex. 31 to Zerwitz Decl. ("And then I asked him what was the situation, were there in fact shares in those – some of those offshore trusts which were controlled and therefore beneficially owned by Charles Wyly or others.  And he said, no, that's just wrong . . . the Wylys [] have no investment or disposition control over [the trusts] and the documents have been carefully written for that purpose. . . . I said . . . what's in the documents is a good starting place, but . . . are the facts and circumstances consistent with the documentary provisions, and he assured me that they were.").

preparation of the false filings, but that they controlled the entire operation.  This

goes well beyond the "mere awareness and approval" or "inaction" that courts have

found insufficient to establish aiding and abetting, and which Defendants urge is

all that exists here.[117]  Nor does the requirement that substantial assistance "relate

to the preparation or dissemination of the document itself"[118] shield from liability

individuals who exercise substantial or complete control over the falsification of

documents through agents.[119]  Summary judgment on the aiding and abetting

claims against the Wylys is therefore denied.

### 2.     French

Defendants argue that French cannot be liable for aiding and abetting

the alleged 13D filing violations that occurred between 2001 and 2003 ("Trustee

III filings") because his relationship with the Wylys ended by early 2001 and, as

---

[117]    *See* Def. Mem. at 41 (citing *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006)).

[118]    *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989).

[119]    *See Apuzzo*, 689 F.3d at 214 n.12 ("Although Apuzzo took on more of a supervisory role . . . and was less involved in some of the day to day communication with URI, his actions were more than sufficient to meet the substantial assistance standard set forth above. He retained ultimate control over the transaction, negotiated its key terms with Nolan and URI, approved the agreements with URI and GECC, and knew about the issuance of inflated invoices.").

such, he was neither aware of nor involved in the Trustee III filings.[120]  The SEC

counters that French misrepresented to Robert Estep – the Jones Day partner who

oversaw the preparation of the Trident Trust 13Ds – that the Trustees had sole

dispositive and voting power over the securities in the trusts, and that, relying on

this misrepresentation, Estep passed this misrepresentation along to other attorneys

involved in the preparation of the Offshore System's 13Ds.[121]  After French parted

ways with the Wylys he did not correct his misrepresentations and Jones Day

continued to rely on the prior misrepresentations in preparing IFG's Schedule

13Gs, which did not reflect that IFG, a Trustee of an Offshore Trust, had greater

than five percent holdings in Scottish Re in 2001 through 2003.[122]  French was the

CEO and Chairman of the Board of Scottish Re from 1998-2005, which continued

to use Jones Day as its primary outside counsel after he left the company.[123]

        The Second Circuit recently confirmed that with respect to aiding and

---

[120]        *See* Def. Mem. at 41-42.

[121]        *See* SEC 56.1 Supp. ¶ 50.

[122]        *Id.* ¶ 51.

[123]        *See id.* ¶ 52.  *See also* Answer Filed by Michael French ¶ 17 (Dkt. No.
52) ("Mr. French admits that he served as President of Scottish Re from 1998 until
2000, that he served as Chief Executive Officer of Scottish Re from 1998 until
2005, and that he served as a Director of Scottish Re from 1998 until 2007.").
French also "served as a Consultant to the law firm Jones, Day, Reavis & Pogue
("Jones Day") from 1995 until 2000." *Id.*

abetting liability, and substantial assistance in particular, "[o]ne who proximately causes a primary violation with actual knowledge of the primary violation will inherently meet the test . . . ."[124]  The SEC has raised a question of fact as to whether French proximately caused the false 13G filings with knowledge that his misrepresentations would have that effect, particularly in light of his continued association with Scottish Re.[125]  Therefore, summary judgment on the aiding and abetting claims against French for filings between 2001 and 2003 is denied.

## VII.   FRAUD CLAIMS

The SEC alleges fraud under Section 10(b), Rule 10b-5, and Section 17(a) – specifically that the Wylys, assisted by French, failed to disclose in various SEC filings that they beneficially owned securities held by offshore corporations. Defendants argue that there is insufficient evidence for a jury to find that either the Wylys or French acted with the requisite scienter.  They also argue that Schaufele did not have the requisite knowledge for aiding and abetting liability.

### A.     Applicable Law

---

[124]     *Apuzzo*, 689 F.3d at 213 n.11.

[125]     Because beneficial ownership is determined by the "facts and circumstances," Jones Day likely had an independent duty to assess the relevant facts and circumstances as of the time of each filing.  However, this does not, as a matter of law, exculpate French for the representations he made in earlier years insofar as they proximately caused the misstatements in 2001-2003.

37

"Liability for securities fraud requires proof of scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud."[126]  This element may be established by showing "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."[127]  Aiding and abetting liability requires actual knowledge.[128]

## B.    Discussion

### 1.    Scienter of the Wylys and French

The Wylys disclaim the "intent to deceive, manipulate, or defraud" by asserting that they "delegated responsibility over the filing process to family employees, Sharyl Robertson, and later Keeley Hennington [and that] Robertson and Hennington in turn, relied on experienced securities law counsel, from two separate and sophisticated law firms, for compliance advice."[129]  The Second Circuit has made clear that reliance upon advice of counsel is a defense only if an individual "made complete disclosure to counsel, sought advice as to the legality of

---

[126]    *Obus*, 693 F.3d at 286.

[127]    *Id.*

[128]    *See SEC v. Espuelas*, 579 F. Supp. 2d 461, 471 (S.D.N.Y. 2008).

[129]    Def. Mem. at 43.

his conduct, received advice that his conduct was legal, and relied on that advice in good faith."[130]  Even then, "such reliance is not a complete defense, but only one factor for consideration."[131]

There is no evidence that the Wylys were explicitly advised that they were not beneficial owners of securities held by the Offshore Trusts.  To the contrary, Marilyn Post, a young associate at Jackson Walker, prepared, at French's request, a memorandum discussing reporting requirements for the Issuer's shares under Sections 13(d) and 16 of the Exchange Act.[132]  The memorandum noted that if the Wylys had the significant ability to influence the investment or voting decisions of the trusts they would be deemed beneficial owners of the trust-held securities.[133]  Moreover, Post's memorandum was forward-looking and not based on full disclosure of all relevant facts.[134]

---

[130]     *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994).

[131]     *Id.* at 105.

[132]     *See* Memorandum from M. Post to M. French re: Reporting Requirements with Respect to Sam Wyly's Trusts, Ex. 19 to Miller Decl.

[133]     *See id.* ("Mr. Wyly should at least be aware, however, of Rule 13d-3(b) which states: 'Any person who directly or indirectly, creates or uses a trust . . . with the purpose of divesting such person of beneficial ownership . . . as part of a plan or scheme to evade the reporting requirements of Section 13(d) . . . of the Act shall be deemed to be the beneficial owner of such security.").

[134]     *See id.* (stating that "[p]resumably [Rule 13d-3(b)] does not apply").

With respect to Jones Day, as discussed in connection with aiding and abetting 13(d) violations, there is evidence that French actively deceived Estep at Jones Day regarding the Wylys' beneficial ownership.  Thus, there is a question of fact whether complete disclosures were made.  Moreover, while French informed the lawyers that the documents had been specifically prepared in order to avoid disclosure requirements, there is no evidence that the Wylys or French ever sought counsel as to whether the "facts and circumstances" of their operation of the trusts, which Estep made clear was relevant, triggered disclosure requirements.[135]

In sum, there is evidence that the Wylys and French did not provide full disclosure to the attorneys on whose advice they purportedly relied, did not request legal counsel about certain relevant conduct, which they knew was relevant, and did not, in fact, receive advice that their conduct was legal.  Because Defendants have not established any of the elements of the advice of counsel defense, and there is evidence that the Wylys knew that their conduct made them beneficial owners of the Issuer securities, summary judgment on the aiding and abetting fraud claims is denied.

---

[135]   Nor can the Wylys claim good faith reliance on French, as the record suggests that he was far from "disinterested and independent" of the Wylys.  *In re Reserve Fund Sec. and Derivative Litig.*, No. 09 MD 2011, 2012 WL 4774834, at *4 (S.D.N.Y. Sept. 12, 2012).  Thus, reliance on his advice is not sufficient to negate scienter as a matter of law.  *See SEC v. O'Meally*, No. 06 Civ. 6483, 2010 WL 3911444, at *4 (S.D.N.Y. Sept. 29, 2010).

### 2. Aiding and Abetting Liability Against Schaufele

Defendants argue that the SEC cannot prove that Schaufele had actual knowledge of any fraud by the Wylys as is required to state a claim for aiding and abetting fraud.[136]  The SEC argues that "Schaufele knew the key feature of the Wylys' fraud – that all securities transactions were specifically authorized by the Wylys [and] would not have occurred absent specific initiation or advance authorization by the Wylys."[137]  The SEC cites the following evidence in support of Schaufele's actual knowledge of the Wylys' fraud, *i.e.* that the Wylys controlled the Offshore Trusts: (1) he discussed offshore securities transactions directly with the Wylys;[138] (2) he negotiated the terms of offshore securities transaction[s]

---

[136]    *See* Def. Mem. at 44.  Defendants also argue that absent a 10b-5 claims against the Wylys, aiding and abetting claims against Schaufele cannot lie. *See id.*  However, because I declined to dismiss the 10b-5 claims against the Wylys, I need not consider this argument.

[137]    SEC 56.1 Supp. ¶ 92 (citing 10/10/12 Deposition of Michelle Boucher ("Boucher Dep.") at 498, Ex. 30 to Zerwitz Decl. ("Q: And Lou understood that you were acting on behalf of the protectors? A: I believe he did. Q: And do you think Lou understood the protectors were acting on behalf of the Wylys? A: Yes. . . . Lou was aware that the Wylys were making decisions with regard to the stock transactions in thos companies.")).

[138]    *See id.* ¶ 93 (citing Boucher Dep. at 499, Ex. 30 to Zerwitz Decl. ("Lou would indicate that he [] spoke with Sam and Charles about a transaction relating to an Isle of Man entity.")).

directly with Sam Wyly's son, Evan;[139] (3) he executed an offshore securities transaction based solely on direction from Keeley Hennington, the Wyly Family Office CFO, bypassing the Trustee entirely;[140] (4) he executed offshore securities transactions on Sam Wyly's directions;[141] and (5) he received an offer directly from Sam Wyly to cancel a Trustee's transaction.[142]

There is also evidence that Schaufele substantially assisted the Wylys in maintaining the appearance of separation between themselves and offshore entities, in furtherance of the alleged fraud.  When Schaufele left Lehman to join BofA he wrote a memorandum to the Wyly brothers touting the fact that at BofA

---

[139]   *See id.* ¶ 94 (citing E. Wyly Dep. at 103, Ex. 33 to Zerwitz Decl. (discussing conversations with Schaufele).  *See also* Boucher Dep. at 503 ("Q: [I]s it your understanding that Schaufele knew that when he communicated with you, you would forward those communications to Evan, Sam, and Charles? . . . A: Yes.")).

[140]   *See id.* ¶ 95 (citing Deposition of Keeley Hennington at 364-365, Ex. 30 to Zerwitz Decl. ("[A]t one point [I] ma[de] a mistake and call[ed] Mr. Schaufele . .. And told him to move forward with the trade that had already been in discussions. . . Mr. Wyly wanted to make the recommendation that . . . this happen today. . . It was past hours for the Isle of Man trustees. . . . So I made a mistake and picked up the phone and made that call myself.")).

[141]   *See id.* ¶ 96.

[142]   *See id.* ¶ 97 (citing 11/10/95 Memo from Schaufele re: Sterling Software ("[Sam Wyly] stated that the collar transaction was desired for financing benefits, but that he did not want to 'hurt' Lehman and if Lehman wanted to unwind the pending trade, he would be happy to accommodate")).

the offshore accounts were not viewed as linked with the Wylys, whereas at Lehman "it evolved to the point that Lehman viewed some of the accounts (off and on) as linked [and] went as far as getting the counsel for Michaels on the phone to see if they viewed the offshore accounts as affiliates."[143]  Schaufele promised that he would "work to maintain" the view that they were independent entities.[144]  He kept his word by misrepresenting the extent of the Wylys' control over the offshore entities to his superiors at BofA, including by stating in response to direct questions about the affiliation, that "the trustees generally do not involve the beneficiaries in the operation of the offshores."[145]

Given Schaufele's knowledge of how the Wylys operated the offshore entities, a jury could conclude that his representations to BofA constitute knowing, substantial assistance of the primary fraud.  Schaufele cannot negate scienter by arguing that he relied on representations by counsel when these representations were inconsistent with Schaufele's actual knowledge of the facts and circumstances.  Moreover, the counsel upon whom he claims he relied was unable

---

[143]    2/14/02 Email from Schaufele to Boucher, Ex. 26 to Declaration of Alan J. Lieberman in Opposition to the Motion for Partial Summary Judgment ("Lieberman Decl.").

[144]    *Id.*

[145]    5/12/04 Email from Schaufele to [BofA] re: Offshore Accounts, Ex. 26 to Lieberman Decl.

to provide an opinion that the Wylys' offshore entities were not affiliates of Michaels Stores in October 2001.[146]  Yet Schaufele agreed to help maintain the belief that the Offshore Trust accounts were independent when they were transferred to BofA.  Summary judgment on the aiding and abetting fraud claims against Schaufele is denied.

## VIII. CONCLUSION

For the foregoing reasons, my rulings are as follows: (1) the SEC's penalty claims for conduct occurring more than five years prior to the execution of each defendant's respective tolling agreement are time-barred as to that defendant; (2) summary judgment on the claim for injunctive relief against Schaufele is denied; (3) summary judgment on the insider trading claims against the Wylys and Schaufele is denied; (4) summary judgment on the aiding and abetting Section 13(d) violations is denied; and (5) summary judgment on the fraud claims against the Wylys and French, and aiding abetting fraud against Schaufele are denied.

---

[146]    *See* SEC 56.1 Supp. ¶ 104 (citing 10/5/01 Email from Schaufele re: Sam Wyly (forwarding email in which a Lehman employee wrote "In a conversation yesterday between Michael[s] Store[s]' counsel and Gordon Kiesling, the attorney said that while Michael[s] Stores considers the entity not to be an affiliate, that attorney was not sure he would arrive at the same conclusion if asked. This was not a comforting conversation.  What we need is for credible counsel to Wyly to state that this entity is not an affiliate [and] address the current facts and circumstances.").

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              June 6, 2013

**- Appearances -**

**For the SEC:**

Gregory Nelson Miller, Esq.
Alan M. Lieberman, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4469

**For Samuel E. Wyly:**

William Andrew Brewer, III, Esq.
Michael J. Collins, Esq.
James S. Renard, Esq.
Michael L. Smith, Esq.
Bickel & Brewer
767 Fifth Avenue, 50th Floor
New York, NY 10153
(212) 489-1400

**For Donald R. Miller, Jr.:**

Stephen D. Susman, Esq.
Mark H. Hatch-Miller, Esq.
Susman Godfrey, LLP
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 336-8330

Terrell W. Oxford, Esq.
David D. Shank, Esq.
Susman Godfrey, LLP
901 Main Street, Suite 5100
Dallas, TX 75202

(214) 754-1900

**For Louis J. Schaufele, III:**

Martin Joel Auerbach, Esq.
Law Offices of Martin J. Auerbach
1185 Avenue of the Americas, 31st Floor
New York, New York 10105
(212) 704-4347

Laura Elizabeth Neish, Esq.
Zuckerman Spaeder, LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10105
(212) 704-9600

**For Michael C. French:**

Joshua Klein, Esq.
Nelson A. Boxer, Esq.
Petrillo Klein & Boxer LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
(212) 370-0330