UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

     - against -

SAMUEL WYLY, CHARLES J. WYLY,
JR., MICHAEL C. FRENCH, AND
LOUIS J. SCHAUFELE III,

              Defendants.

------------------------------------------------------- X

**OPINION AND ORDER**

10 Civ. 5760 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

In an Opinion and Order dated June 6, 2013 ("June 6 Opinion"), I held, among other things, that the Securities and Exchange Commission's ("SEC") penalty claims against defendants in this case were time barred insofar as they accrued more than five years before tolling agreements with the SEC took effect. Therefore, for those claims against the Wylys that accrued prior to February 1, 2001, the only monetary relief available is disgorgement. For the Wylys' alleged failure to disclose their beneficial ownership of certain securities in SEC filings,

1

the SEC contends that the measure of disgorgement is the amount of federal income taxes that the Wylys allegedly avoided by transferring stock options to the Offshore Corporations[1] and failing to disclose their control over the options.[2] The sole issue addressed in this Opinion is whether the SEC has the authority to seek disgorgement measured as the amount of federal income taxes it claims the Wylys would have been required to pay if they had disclosed their beneficial ownership of the securities in question, or whether such relief impermissibly impinges upon the Secretary of the Treasury's ("Secretary") exclusive authority to assess and collect taxes.

## II. FACTS

A detailed factual background of the case is set forth in the March 31, 2011 Motion to Dismiss Opinion and the June 6 Opinion.[3] Only the background

---

[1] The definitions of terms used in this Opinion are set forth in the June 6 Opinion.

[2] *See* 1/9/13 Transcript ("Tr.") at 14:9-12 ("THE COURT: And if the Court said no [to disgorgement of taxes], is there anything else you could go after [with regard to the fraud claims]? MR. MILLER: I don't have anything to proffer to the Court at this point, no."). The SEC argues that the disgorgement argument is premature and should be reserved for the remedies phase of trial. *See* Plaintiff SEC's Memorandum of Law in Opposition to Defendants' Consolidated Motion for Partial Summary Judgment ("SEC Opp.") at 15.

[3] *See SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011); 6/6/13 Order (Dkt. No. 190).

relevant to disgorgement is discussed here. The factual predicate for the disgorgement of unpaid taxes is that "[t]he Wylys set up their overseas trusts to create the appearance of 'non-grantor' trusts, which would make them separate taxable entities and provide favorable tax treatment of capital gains on transactions involving the trust-held securities. . . [when, in fact,] the trusts were grantor trusts because the Wylys exercised dominion and control over them."[4] As non-grantor trusts, the tax rates on the trusts' capital gains would be "Isle of Man rates, which are essentially zero[,]" whereas as grantor trusts, they would be taxed at the rate of the beneficial owner, making capital gains from the sale of overseas shares income to the Wylys and taxable at the applicable U.S. capital gains rate.[5] "By misrepresenting the beneficial ownership of the trusts, and by misrepresenting the dominion and control over the trust assets, the Wylys created an unjust tax benefit for themselves."[6]

    A Wyly family employee, Keeley Hennington, recognized the relationship between the non-disclosure of beneficial ownership of securities and the Wylys' tax avoidance measures. When, as a part of a proxy battle, Samuel

---

[4]   SEC Opp. at 15-16.

[5]   *Id.* at 16.

[6]   *Id.*

Wyly desired to disclose his ownership of the stock held through the Wyly family's Offshore System, Hennington warned in a February 26, 2002 memorandum:

> [T]here needs to be an answer [for the increase in shares from what was previously publicly represented] that does not jeopardize the offshore system . . . Our friendly IRS agent is still looming around and although he has verbally agreed not to look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.[7]

In August 2003, the Wylys approached the IRS about a potential settlement of issues regarding tax treatment of the Offshore Trusts.[8] A memorandum sent to the IRS by Wyly family employees in advance of the August 12 meeting stated, in relevant part, that "1992 Trusts were formed under foreign law by Individual and were intended to be foreign non-grantor trusts" and the "1994 and 1995 Trusts were formed under foreign law and were intended to be

---

[7] SEC's Local Rule 56.1 Statement of Additional Material Facts ("SEC 56.1 Supp.") ¶ 54.

[8] *See* 8/29/03 Memorandum from Michelle Boucher and Keeley Hennington to Wylys and Donald Miller ("IRS Memo") at 1-2, Ex. 10 to Declaration of John D. Worland in Opposition to the Motion for Partial Summary Judgment ("Worland Decl.") (attaching memo sent to IRS prior to August 12 meeting and noting that the meeting involved "ten representatives from very high levels in the IRS . . . from employee benefits, international tax and individual tax areas [and] two tax litigators" and that the IRS "obviously took the matter very seriously").

treated as foreign grantor trusts."[9] As to tax treatment, "based upon the position that the 1992 Trusts were not grantor trusts where Individual was the grantor and the 1994 and 1995 Trusts were foreign grantor trusts, no U.S. person included in income any amount . . . with respect to the 1992, 1994 and 1995 Trusts."[10]

One IRS official, Ronald Pinsky, expressed concern at the meeting with the Wylys' "reporting [to the SEC] of the initial transactions."[11] Meeting minutes reflect that Pinsky asked "[h]ave you checked SEC filings," "[w]ere [the Wylys] significant enough shareholders that their holdings would be listed on SEC filings," and "[did] SEC filings show beneficial interest in shares?"[12]

## III. APPLICABLE LAW

The securities law violations at issue arise from the Section 13(d) requirement that any person who acquires "beneficial ownership" of more than five percent of a class of registered securities must file a statement disclosing such ownership with the SEC.[13] It is well-established that "[o]nce the district court has

---

[9] *Id.* at 3.

[10] *Id.* at 4.

[11] *Id.* at 2.

[12] 8/13/03 Minutes of Meeting with IRS ("IRS Minutes") at 5-6, Ex. 10 to Worland Decl.

[13] *See* 15 U.S.C. § 78m(d)(1).

found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."[14] The primary purpose of disgorgement is "to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."[15] The authority to order disgorgement includes the authority to "calculat[e] the amount to be disgorged," and that calculation "need only be a reasonable approximation of profits causally connected to the violation."[16]  "District courts [are] given wide latitude in . . . approximat[ing] the losses avoided by [defendants] that [a]re causally connected to the securities fraud violations."[17]

---

[14]     *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) (citing *SEC v. Lorin*, 76 F.3d 458, 461–62 (2d Cir. 1996) (per curiam); *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)).

[15]     *Id. Accord SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) ("In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his fraud."). *See also SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) (civil penalties under the Exchange Act are "necessary because '[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud . . . authority to seek or impose substantial monetary penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.'" (quoting H.R. Rep. No. 101-616 (1990)).

[16]     *First Jersey*, 101 F.3d at 1475 (citations omitted).

[17]     *Patel*, 61 F.3d at 140.

Moreover, "'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"[18]

At the same time, Congress has granted exclusive authority to assess and collect taxes to the Secretary and mandates compliance with specific procedures in exercising this authority.[19] Assessment of taxes must be done "by recording the liability of the taxpayer in the office of the Secretary in accordance with the rules or regulations prescribed by the Secretary."[20] The Secretary also has exclusive authority to "collect the taxes imposed by the internal revenue laws."[21] The Internal Revenue Code ("Tax Code") states that "[n]o civil action for the collection or recovery of taxes, or of any fine, penalty or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegates directs that the action be commenced."[22]

### III. DISCUSSION

#### A. The SEC Is Not Foreclosed as a Matter of Law from Seeking Disgorgement Measured as a Tax Benefit

---

[18] *First Jersey*, 101 F.3d at 1475 (quoting *Patel*, 61 F.3d at 140).

[19] *See* 26 U.S.C. §§ 6201-6216. The Secretary has delegated its authority to collect taxes to the Internal Revenue Service ("IRS").

[20] *Id.* § 6203.

[21] *Id.* § 6301.

[22] *Id.* § 7401.

Defendants argue that the SEC is foreclosed as a matter of law from seeking disgorgement in the amount of the taxes that the Wylys avoided because, in substance, this remedy is the equivalent of a tax collection action, and thus must comport with the requirements set forth in the Tax Code, which delegates the authority to collect taxes to the Secretary exclusively.[23]  Whether the SEC has the authority to seek disgorgement in the form of unpaid federal income taxes is truly an issue of first impression – no court has ever addressed the question, indeed the SEC acknowledges that it has never before sought unassessed federal taxes as a measure of disgorgement.[24]

As a formal matter, this is *not* a "civil action for the collection or recovery of taxes," which would clearly fall within the exclusive authority of the IRS under Section 7401 of the Tax Code.  Rather, this is a civil action for securities law violations, the *remedy* for which is measured by the amount of taxes avoided.  There is no explicit prohibition, either in the Tax Code or in the

---

[23]   *See* Memorandum of Law in Support of Defendants' Consolidated Motion for Partial Summary Judgment ("Def. Mem.") at 22.

[24]   *See* 6/5/13 Tr. at 20.  The SEC cited only one case involving disgorgement of taxes, which took place in the context of settlement and "included certain tax credits that the bankrupt entity had and believed they could use to satisfy disgorgement." *Id.* (citing *Frame v. Hillman*, No. 01 Civ. 2193, 2002 WL 34520817 (S.D. Cal. July 31, 2002)).  Of course in that case the tax credits had already been formally assessed by the IRS.

Exchange Act, on using tax benefits as a measure of unjust enrichment in other contexts.[25]  Nor is there any express limitation on the SEC's authority to calculate and disgorge any "'reasonable approximation of profits causally connected to the violation.'"[26]  The cases on which Defendants rely to argue that this remedy is barred are therefore inapposite.

For example, in *United States ex rel. Lissack v. Sakura Global Capital Markets, Inc*., the Second Circuit addressed the scope of the IRS's exclusive tax authority in the context of the False Claims Act ("FCA").[27]  The FCA contains an explicit statutory exemption for "claims, records, or statements made under the Internal Revenue Code of 1986 . . . which reserved discretion to prosecute tax violations to the IRS and barred FCA actions based on tax violations [(the 'Tax Bar')]."[28]  The Second Circuit explained that the Tax Bar codified case

---

[25]     For example, a court may calculate prejudgment interest on disgorgement amounts using "the rate of interest used by the [IRS] for the underpayment of taxes as set forth at 26 U.S.C. § 6621(a)(2), w[here that] is a reasonable approximation of the additional unjust enrichment defendants could have earned on the moneys to be disgorged." *Kenton Capital*, 69 F. Supp. 2d at 20.

[26]     *SEC v. Kelly*, 765 F. Supp. 2d 301, 325 (S.D.N.Y. 2011) (quoting *Patel*, 61 F.3d at 139).

[27]     377 F.3d 145 (2d Cir. 2004).

[28]     *Id.* at 152-53.

law "which reserved discretion to prosecute tax violations to the IRS" and that "[t]he conclusion that the IRS has exclusive jurisdiction over tax matters stems in part from [Section] 7401 of the Tax Code."[29]

It was undisputed in *Lissack* that the Tax Bar foreclosed FCA claims "seeking to recover taxes that citizens have avoided."[30] The Second Circuit, while recognizing that Lissack did not characterize his claim as one seeking to "collect taxes" held that the claim nonetheless "f[e]ll squarely within the language and evident intent of the Tax Bar [where] the very basis for Lissack's case depends entirely on a purported violation of the Tax Code [and] the IRS has authority to recover the precise amounts Lissack is seeking in this action."[31] *Lissack* is distinguishable from this case for several reasons.

*First*, no analogue to the FCA Tax Bar exists in the securities context. *Second*, the Second Circuit emphasized in *Lissack* that the purpose of the Tax Bar was "to prevent *private* litigants from interfering with the IRS's efforts to enforce the tax laws."[32] To the contrary, the SEC has a broad grant to pursue its

---

[29]   *Id.* at 153.

[30]   *Id.*

[31]   *See id.*

[32]   *Lissack*, 377 F.3d at 156 (2d Cir. 2004) (emphasis added) (citing *United States ex rel. Fallon v. Accudyne Corp.*, 880 F.Supp. 636, 639 (D. Wis.

central mission of making securities law violations unprofitable by seeking disgorgement. Moreover, two government agencies are generally assumed capable of "administering their [overlapping] obligations and yet avoid[ing] inconsistency."[33] *Third*, the Tax Code is irrelevant to the success of the SEC's *claims* in this case – only the requested remedy is measured by reference to provisions of the Tax Code – therefore the SEC's requested remedy does not literally run afoul of Section 7401.[34] In the absence of a clear statutory mandate or

---

1995) ("Since such fraud is directly addressed and remedied by the Internal Revenue Code it follows that Congress would not intend to duplicate those remedies with an FCA claim arising from the identical conduct. Not surprisingly, such claims are now expressly excluded from application of the FCA.")). I note that in FCA cases Relators seek personal pecuniary gain. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 123 (2003) ("The relator's share of the 'proceeds of the action or settlement' may be up to 30 percent, depending on whether the Government intervened and, if so, how much the relator contributed to the prosecution of the claim.") (quoting 31 U.S.C. § 3730(d)). Here, in contrast, all disgorgement would go to the Treasury.

[33] *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).

[34] *Cf. Lissack*, 377 F.3d at 157 ("Here, however, the IRS has complete jurisdiction over the [tax] *fraud* alleged and can recover for the Government the precise amounts that Lissack seeks to recover under the FCA.") (emphasis added). The instant case is distinguishable on the same ground from *United States v. Letscher*, in which the court entertained a motion for summary judgment by a plaintiff against whom tax liability had been assessed on the ground that the court "lack[ed] subject matter jurisdiction because th[e] action was allegedly not properly authorized pursuant to 26 U.S.C. §§ 7401 and 7403 [requiring] authorization by both the Secretary of the Treasury and the Attorney General or their respective delegates [for such actions]." 83 F. Supp. 2d 367, 378-79 (S.D.N.Y. 1999).

any directive from a higher court I decline to deprive the SEC of a potentially powerful arrow in its quiver for ensuring that those who violate the securities laws do not retain their unlawful gains.

    **B.    The SEC Has Produced Evidence of a Causal Connection Between the Alleged Securities Violations and the Taxes Allegedly Avoided**

Defendants argue that even if the SEC is not barred from seeking disgorgement measured by reference to the Tax Code, there is no "causal link between the securities law violations alleged and what the SEC contends constitute unjust tax benefits."[35] The SEC responds that the "tax benefits sought here are a direct and primary measure of the Wylys' ill-gotten gains."[36]

---

[35]    Reply Memorandum of Law in Further Support of Defendants' Consolidated Motion for Partial Summary Judgment ("Rep. Mem.") at 12 (citing Def. Mem. at 25-26).

[36]    SEC Opp. at 17. A causal connection between the securities fraud and taxes allegedly avoided is particularly important insofar as a clear connection will limit the need for the SEC and this Court to interpret and apply complex provisions of the Tax Code – a job generally reserved for the IRS, subject to judicial review. In some instances disgorgement of tax benefits requires no application of the Tax Code. For example, if an individual earned tax credits by virtue of securities fraud, and those tax credits had been calculated and applied, disgorgement of those profits would require no interpretation of the Tax Code. Here, by contrast, the Wylys' tax liability has never been formally assessed by the IRS, so disgorgement may require this Court to interpret and apply the Tax Code. However, if the securities fraud at issue significantly overlaps the distinction between grantor and non-grantor trusts in the Tax Code then no complex tax analysis will be required.

12

In support of the SEC's contention that the tax benefits it seeks to disgorge are causally connected to the alleged securities fraud, the SEC cites the following evidence. The Wylys acknowledged that the Offshore System was created at least in part for tax advantages.[37] Hennington warned the Wylys in a February 26, 2002 memorandum that the IRS might look at SEC filings to search for inconsistencies between the Wylys' SEC disclosures and their tax filings.[38] When the Wylys approached the IRS in August 2003 about a possible tax settlement relating to the Offshore Trusts, the IRS staff asked whether the Wylys had disclosed these matters in any SEC filings.[39] The SEC contends that this is because "[a]ny declaration of beneficial ownership in an SEC filing could constitute an admission for purposes of a tax case" or "evidence a knowing state of mind for any tax fraud or criminal proceeding."[40]

Minutes from an August 12, 2003 meeting with the IRS regarding the status of the trusts and a potential settlement highlight the connection between the SEC filing requirements and the tax treatment. Participants recognized a

---

[37] *See* SEC 56.1 Supp. ¶ 20.

[38] *See* SEC 56.1 Supp. ¶ 54.

[39] *See* IRS Memo; IRS Minutes.

[40] SEC Opp. at 20.

"serious risk they were grantor trusts from [the] beginning" and, in connection with this discussion, IRS Agent Pinsky asked "[h]ave you checked SEC filing" and "[w]ere they significant enough shareholders that their holdings would be listed on SEC filings?"[41]

The SEC argues further that the 13(d) filing requirements and the Tax Code's grantor trust tax provisions overlap substantially because "[t]he main thrust of the grantor trust provisions is that the trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has *substantially unfettered powers of disposition.*"[42] "If a grantor is deemed an 'owner' of a portion of a trust, that portion attributable to the grantor must be included in the true owner's taxable income."[43] Sections 672 through 679 of the Tax Code outline the ways in which a grantor may be deemed an owner of a trust.[44] At oral argument, the SEC relied on Section 674(a), which provides that: "[t]he grantor

---

[41] IRS Minutes at 4-5.

[42] *Schulz v. Commissioner Internal Revenue*, 686 F.2d 490, 492 (7th Cir. 1982) (emphasis added).

[43] *Kanter v. C.I.R.*, 590 F.3d 410, 422 (7th Cir. 2009).

[44] *See id.* Section 671 states: "No items of a trust shall be included in computing the taxable income credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust . . . except as specified in this subpart." 26 U.S.C. § 671.

shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is *subject to a power of disposition*, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party."[45]  A beneficial owner for purposes of 13(d) filing requirements is defined in Rule 13d-3(a) as "any person who, directly or indirectly . . . has or shares (1) [v]oting power . . . ; and/or (2) *investment power which includes the power to dispose, or to direct the disposition of, such security*."[46]

      I find that the SEC has produced sufficient evidence of a causal connection between the taxes allegedly avoided and the alleged securities violations.  Therefore, *if* the SEC is successful on its fraud claims, the parties will have the opportunity to litigate to the Court whether there is a sufficient causal connection between the securities violations and the tax avoidance.[47]

---

[45]    *Id.* § 674(a) (emphasis added).

[46]    17 C.F.R. § 240.13d-3(a) (emphasis added).

[47]    Defendants also argue that their "actions with regard to the offshore trusts and corporations resulted in deferral rather than outright avoidance of federal income taxes." Def. Mem. at 26.  For example, when "Defendants transferred stock options to the offshore corporations, they received annuities of equivalent value in exchange[,] began receiving payment on these annuities in 2003 and 2004[, and] [s]ince that time, []have paid ordinary income taxes and self-employment taxes on approximately $300 million in annuity-related income." *Id.* at 26-27.  This is an issue that can be addressed, if necessary, at the remedies

### C.     Threat of Double Recovery

This Opinion would be incomplete if it did not address the potential for double enforcement by both the IRS and the SEC.  As the SEC points out, the IRS was investigating these Offshore Trusts as early as 2003, and ultimately declined to pursue tax liability against the Wylys on the basis of these trusts.[48]  Neither the SEC nor Defendants could answer definitively whether the IRS would be foreclosed by the governing statute of limitations from pursuing an action against the Wylys now.[49]  I would welcome the Secretary's input on the question.  However, the specter of the IRS reversing its previous decision not to pursue tax liability against the Wylys does not warrant precluding the SEC from pursuing its own mission of deterring securities fraud.[50]

---

phase.  Moreover, while disgorgement cannot become a substitute for penalties, it is well established that calculation "need only be a reasonable approximation of profits causally connected to the violation [and] any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty."  *First Jersey*, 101 F.3d at 1475.

[48]     *See* SEC Opp. at 20; 6/5 Tr. at 13.  *See also* IRS Memo at 4 ("[The IRS is] not eager and do[es] not have resources to litigate these issues and would rather pursue a settlement.").

[49]     *See* 6/5 Tr. at 35, 40-41.

[50]     Indeed, if the SEC is successful and disgorgement of the tax savings is ordered, the Wylys could raise the court-ordered disgorgement as a defense to any action later brought by the IRS.

## IV. CONCLUSION

For the foregoing reasons, if the Wylys are found liable for the fraud claims, the SEC will have the opportunity to make its case for disgorgement at that time. A conference is scheduled for July 15, 2013 at 4:30 pm. The Clerk of Court is directed to close this motion (Docket No. 169).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:	New York, New York
	June 13, 2013

## - Appearances -

**For the SEC:**

Gregory Nelson Miller, Esq.
Alan M. Lieberman, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4469

**For Samuel E. Wyly:**

William Andrew Brewer, III, Esq.
Michael J. Collins, Esq.
James S. Renard, Esq.
Michael L. Smith, Esq.
Bickel & Brewer
767 Fifth Avenue, 50th Floor
New York, NY 10153
(212) 489-1400

**For Donald R. Miller, Jr.:**

Stephen D. Susman, Esq.
Mark H. Hatch-Miller, Esq.
Susman Godfrey, LLP
560 Lexington Avenue, 15th Floor
New York, NY 10022
(212) 336-8330

Terrell W. Oxford, Esq.
David D. Shank, Esq.
Susman Godfrey, LLP
901 Main Street, Suite 5100
Dallas, TX 75202

(214) 754-1900

**For Louis J. Schaufele, III:**

Martin Joel Auerbach, Esq.
Law Offices of Martin J. Auerbach
1185 Avenue of the Americas, 31st Floor
New York, New York 10105
(212) 704-4347

Laura Elizabeth Neish, Esq.
Zuckerman Spaeder, LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10105
(212) 704-9600

**For Michael C. French:**

Joshua Klein, Esq.
Nelson A. Boxer, Esq.
Petrillo Klein & Boxer LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
(212) 370-0330