E249SECD                    Decision

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                          10 CV 5760 (SAS)

SAMUEL E. WYLY, ET AL.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        February 4, 2014
                                        4:30 p.m.

Before:

                HON. SHIRA A. SCHEINDLIN

                                              District Judge

                            APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
BY:  GREGORY N. MILLER
            BRIDGET M. FITZPATRICK
            JOHN D. WORLAND, JR.
            MARTIN L. ZERWITZ

SUSMAN GODFREY
        Attorneys for Defendant Samuel E. Wyly and Estate of
Charles Wyly
BY:  STEPHEN D. SUSMAN
            TERRELL W. OXFORD
            HARRY P. SUSMAN
            STEVEN M. SHEPARD

PETRILLO KLEIN & BOXER
        Attorney for Defendant Mike French
BY:  JOSHUA KLEIN

1          (In open court; case called)

2          THE COURT:  Let me just help the reporter by doing

3    this again.  I said I would.  You're Mr. Miller.

4          MR. MILLER:  Yes, your Honor.

5          THE COURT:  Ms. Fitzpatrick, Mr. Worland, Mr. Zerwitz.

6          That's all the SEC.

7          In the second row we have Mr. Susman, Mr. Oxford,

8    Mr. Shepard, and Mr. Susman, and Mr. Klein.

9          My goal today really is to rule on a number of the

10   motions in limine, all the ones that are fully briefed.  But

11   just before I do I want to take up the issue raised by e-mail

12   yesterday with my chambers where defense counsel, Mr. Stephen

13   Susman, wrote to the court and asked that the trial that is now

14   scheduled to be a jury trial become a nonjury trial primarily

15   because his living client, Mr. Sam Wyly, has a number of

16   medical problems which have just been confirmed by a letter

17   from his doctor, which I've just been handed, dated February 3,

18   that would prevent him from being able to testify for more than

19   one to two hours at a time.

20         I must say my own sense of that problem/letter was

21   that that wasn't any reason not to have a jury trial.  So he

22   can only testify for one to two hours at a time.  We'll all

23   work around that.  If anything, I'm sure the jury would be

24   extra sympathetic to your client as a result of his disabling

25   condition.

1            But, either way, we have to work around it, whether

2    it's jury or nonjury.  So if that's the only basis, I wasn't

3    inclined.  But, of course, I would want to hear if the SEC

4    consents.  That's a different issue.

5            MR. S. SUSMAN:  Your Honor, it's not the only basis.

6            THE COURT:  What's the other reason?

7            MR. S. SUSMAN:  The other basis is that you have to --

8    you're ultimately involved in this anyway.  Only a very small

9    portion of their claims is even triable to the jury.

10            THE COURT:  Do we agree with that?

11            In other words, does the SEC agree on which

12    portions -- excuse me one minute.

13            Does the SEC agree on which portions are jury and

14    which portions are nonjury?  Have you talked with them about

15    that?

16            MR. S. SUSMAN:  Yes, I have.

17            MR. MILLER:  Briefly.

18            MS. FITZPATRICK:  Your Honor, the SEC's position is

19    that something is either triable to a jury or it is not.

20            THE COURT:  Some issues are.  Some claims are.

21            Do you at least agree on which claims are equitable

22    claims, if they're only for the Court, which claims are claims

23    at law that go to the jury?  Can you agree with each other as

24    to which is which?

25            MS. FITZPATRICK:  I believe it's the remedy that makes

1    something equitable versus jury demandable.  So the

2    disgorgement remedy traditionally has not been jury demandable

3    whereas the penalty remedy has been.  The penalty remedy, in

4    this case, is time limited.  So there's a limited portion of

5    time for which we can seek a penalty.  Those claims, which are

6    really every claim on which we would seek a civil penalty, are

7    triable to a jury.

8          THE COURT:  You're saying only some of the relief

9    sought is equitable; there is no claim for injunctive relief,

10   or declaratory relief, that sort of thing?

11         MS. FITZPATRICK:  Much of the relief sought is

12   equitable, and then the civil penalty which is also sought,

13   which --

14         THE COURT:  So there is injunctive relief?  There is

15   declaratory relief?

16         MS. FITZPATRICK:  Yes.

17         THE COURT:  Those are tried to the Court.  Those are

18   equitable remedies.

19         MS. FITZPATRICK:  I believe traditionally the remedies

20   are determined by the Court after.

21         THE COURT:  Yes.  I said injunctions and declaratory

22   relief are equitable remedies.  They're for the Court.

23         MS. FITZPATRICK:  Yes.

24         THE COURT:  In this case disgorgement might be

25   equitable and for the Court.  So what does that leave the jury

1    to do on the remedies side?  Are there damages?

2              MS. FITZPATRICK:  I think the Court would also

3    determine the penalty in the remedies phase.  But, the portions

4    of the claims for which we still seek civil penalties, which

5    are limited with respect to time but apply across the SEC's

6    claims, are jury demandable.

7              THE COURT:  On the liability side?

8              MS. FITZPATRICK:  On the liability side, yes, your

9    Honor.

10             THE COURT:  So the jury says whether they find that

11   defendants I guess violated certain things and, therefore, are

12   liable for penalties?

13             MS. FITZPATRICK:  Yes, your Honor.

14             THE COURT:  For liability.

15             Mr. Susman, where do we disagree?

16             MR. S. SUSMAN:  Well, as I understand it, the only

17   thing -- issue triable by a jury is the liability for a penalty

18   for conduct after 2001.

19             The statute of limitations governs liability for a

20   penalty prior to that time.  And liability for disgorgement is

21   an equitable claim, which is triable to you.  It's not triable

22   to the jury, the liability.

23             The disgorgement claims are hundreds of millions of

24   dollars.  The penalty claims are like under $10 million.  It's

25   a huge -- most of the case is going to be calling on you anyway

1    to decide.  So it just -- we thought that to get the thing

2    quicker.  We have a two-month trial with a jury, a complicated

3    case, that ultimately is going to call on the Court to decide

4    how much --

5                THE COURT:  But if I recall, when I bifurcated

6    damages, if, for example, some jury says no liability, I would

7    not reach damages.

8                MR. S. SUSMAN:  Absolutely.  But we are --

9                THE COURT:  Don't you want the jury to tell you that?

10               MR. S. SUSMAN:  No.

11               THE COURT:  No.

12                I understand.  You want the "no liability" part.  It

13   doesn't matter who tells you.  Got it.  Okay.

14               MR. S. SUSMAN:  We are comfortable with having the

15   case tried to the bench.

16               THE COURT:  Right.  Okay.  But if the SEC doesn't

17   agree I can't -- I can't force that.  They are entitled to a

18   jury, right?  You agree with that?

19               MR. S. SUSMAN:  Only on that little issue.

20               THE COURT:  Well, you call it "little."  But the

21   evidence isn't little.  The remedy might be.  In the end that

22   might be the ten-million-dollar tail wagging the

23   hundred-million-dollar dog.  But the evidence is the same.  It

24   would support -- what is the SEC's position?  Who is going to

25   speak?  Ms. Fitzpatrick.

1          MS. FITZPATRICK:  Yes.  Thank you, your Honor.

2          THE COURT:  One second.  Can I hear the SEC's position

3     for a minute.

4          MS. FITZPATRICK:  Yes, your Honor.  Our position with

5     respect to the evidence is that this is one large scheme.  And

6     while different portions of time may be --

7          THE COURT:  I understand.  What's your position with

8     respect to jury versus nonjury.

9          MS. FITZPATRICK:  Your Honor, respectfully, we learned

10    of this request yesterday and we're still trying to think it

11    through and its implications.  We've been preparing for a jury

12    trial for quite some time and thinking of our presentation and

13    evidence in that manner.  And we're just trying to think

14    through the idea.  We will -- we'll reach a decision quickly

15    and can alert everyone by letter, but we need more than a day.

16         THE COURT:  So you're not saying "no" yet.  You're

17    saying you haven't decided yet.

18         MS. FITZPATRICK:  We're saying we haven't decided, but

19    we're saying we have the right to demand a jury trial.

20         THE COURT:  I think you do.  I think you have the

21    right to.  I don't think you can be compelled to waive a jury.

22    You're entitled to a jury.  So I guess the question is should I

23    be making any effort to persuade you, and the answer is no.

24    You decide.  Do what you have to do and let me know.

25         MS. FITZPATRICK:  Thank you, your Honor.

1      THE COURT:  But the prompter, the better.  It is a

2   long trial.  And it's long for jurors if they have to be here.

3   It's long for me.  It's long for everybody.

4      So when do you think you could answer the question?

5      MS. FITZPATRICK:  Perhaps a week, your Honor.

6      I believe Mr. French's attorney learned of this for

7   the first time yesterday as well.  And those decisions may be

8   intertwined, or they may be independent.  But I don't know if

9   they've reached a decision on the issue yet either.

10      Do you have a right to demand a jury?  Let's say the

11   SEC and the Wyly defendants agree to not have a jury.  Do you

12   have the right to compel a jury?

13      MR. KLEIN:  I don't think so, your Honor.

14      THE COURT:  That takes care of Mr. Klein.  One way or

15   the other, he's going to have to along with the boat.

16      We're waiting for the SEC.

17      MS. FITZPATRICK:  We'll try to reach the decision

18   within a week, your Honor.

19      THE COURT:  Today is Tuesday, February 4.  So let's

20   have a hard stop of Tuesday, February 11 so we all know where

21   we're heading.

22      I don't know what the difference in presentation is.

23   You said you've been planning on it and preparing and actually

24   my nonjury trials are pretty similar.  I require opening

25   statements, and closing arguments.  And I don't take direct by

1    affidavit.  I take it live.  It's not all that different in

2    terms of preparation.  I like little charts and graphs too and

3    lots of pictures and posters.  So I don't know if the

4    preparation is really different.

5             MS. FITZPATRICK:  That's actually helpful, your Honor,

6    versus what a jury trial.

7             THE COURT:  I take openings.  I take closings.  I take

8    the whole thing.  It's just the difference is there's often

9    more work at the end without the jury.  I mean very detailed

10   findings of facts and conclusions of law.  It takes sometimes

11   longer to come out.

12            The jury has a verdict and the Court, even though the

13   Court has to do a lot of work in this particular case on the

14   remedies side, is still bound by the jury's findings of fact.

15   Because I've tried jury and nonjury issues together on prior

16   occasions and I have to follow their lead on the facts.

17            With that, I am afraid that you are now a captive

18   audience, all nine of you, for a very lengthy reading.  I

19   apologize.  The alternative is a written opinion, and I usually

20   do a lot of written opinions, but there wasn't all that much

21   new.  I'm just ruling.  So I'm going to forego it and read and

22   read.  So here we go.

23            The SEC has -- there's two nonexpert motions in

24   limine.  One, preclusion of the advice-of-counsel defense; and

25   two, admission of statements made by various employees and

1   agents of the defendants under Rule 801(d)(2)(D).

2          Defendants submitted joint briefing on two nonexpert

3   motions in limine seeking the exclusion of evidence about:

4   One, nonsecurity transactions, such as purchases of artwork and

5   jewelry; and, two, profits earned by foreign trust entities.

6          I begin with the SEC's motion, first being the

7   advice-of-counsel defense.

8          In an opinion and order dated June 6, 2013, the Court

9   denied the Wylys' motion for summary judgment on the aiding and

10  abetting of fraud claims, "because defendants have not

11  established any of the elements of the advice-of-counsel

12  defense and there is evidence that the Wylys knew that their

13  conduct made them beneficial owners of the issuer securities."

14  The SEC argues that the evidentiary record has not changed

15  since the summary judgment motion and that "because the

16  defendants have failed to establish the factual predicate for

17  the defense, evidence regarding the retention and presence or

18  involvement of lawyers is not relevant and would confuse and

19  mislead the jury."  That's the SEC memorandum of October 16.

20         Defendants strenuously object.  First, defendants

21  argue that the summary judgment decision "did not foreclose

22  defendants' reliance-on-counsel defense as a matter of law."

23  And that's from the defendants' opposition brief of October 28.

24         Second, defendants argue that "a motion in limine is

25  not a proper vehicle for a party to ask the Court to weigh the

1    sufficiency of the evidence to support a particular claim or

2    defense because that is the function of a motion for summary

3    judgment with its accompanying and crucial procedural

4    safeguards."

5          Finally, defendants argue that evidence of attorney

6    involvement is relevant even if defendants are not ultimately

7    entitled to a jury instruction on the advice-of-counsel defense

8    because such evidence is highly relevant to establishing the

9    Wylys' state of mind.

10          The June 6, 2013 ruling did not foreclose defendants'

11    advice-of-counsel defense as a matter of law.  The issue the

12    Court decided was whether or not the SEC established an issue

13    of material fact as to scienter.  It is neither accurate nor

14    appropriate to now construe this ruling as a judgment as a

15    matter of law on the advice-of-counsel defense.  Further, the

16    SEC may not now use a motion in limine to make a summary

17    judgment motion it could have sought earlier.  If defendants do

18    not present the necessary evidence to justify a jury

19    instruction on the advice-of-counsel defense, the SEC should

20    ask the Court not to give it at the conclusion of trial.  In

21    any event, this evidence would be admissible regardless of the

22    advice-of-counsel defense because it is relevant to the Wylys'

23    state of mind.

24          I turn to the agent/employee statements.

25          The SEC seeks to introduce various statements from

1   eight current and former employees or purported agents of the

2   defendants.  The defendants concede that most of these

3   individuals were agents or employees at some point in time but

4   dispute that every statement these individuals made during that

5   time period was within the scope of their agency.  I will

6   reserve rulings on the scope and relevancy of particular

7   statements until they are offered.  Defendants' specific

8   objections to the agency status of certain individuals are as

9   follows:

10         Beginning with Donald Miller and Evan Wyly.

11         Defendants argue that Miller is Charles Wyly's

12  son-in-law and "occasionally represented or spoke on Wyly's

13  behalf" and that Evan Wyly is Sam Wyly's eldest son and "works

14  closely with his father and at times communicated with Sharyl

15  Robertson, who is the family business CFO, on his father's

16  behalf."Defendants disagree that these facts render Miller and

17  Wyly agents throughout the entire period relevant to this case.

18  The SEC responds that defendants do not contest that such

19  authorization began before 1992 and was still in place through

20  at least 2010.  These facts do not render Miller and Wyly

21  agents throughout the entire period.  The Court will have to

22  evaluate each proffered statement to determine whether it was

23  made while the individuals were acting as agents.

24         Turning to Sharyl Robertson.  Defendants dispute that

25  Robertson's employment with Maverick Capital, a hedge fund

1   established by Sam Wyly and operated in the same building as

2   the Wyly family office, made her an agent of the Wylys in and

3   of itself.  No ruling is needed here because defendants concede

4   that Robertson was an employee of the Wylys from the late '70s

5   until 1998 and was an agent of the Wylys by virtue of her role

6   as a protecter of certain trusts from March '92 through

7   November of 2004.

8           Turning to Michele Crittenden.

9           Crittenden was Louis Schaufele's primary sales

10  assistant from '98 to 2004.  Defendants disagree that

11  Crittenden was an agent of the Wylys by virtue of her

12  relationship with Mr. Schaufele.  This argument is all the more

13  important now that Schaufele is no longer a defendant.  The SEC

14  responds that Crittenden was an agent of Schaufele and that

15  Schaufele was an agent of the Wylys as a result of his serving

16  as their stockholder from 1992 through 2004 thus rendering

17  Crittenden a subagent of the Wylys in the performance of her

18  duties assisting Schaufele and servicing the Wyly-related

19  accounts.

20          Quoting from the restatement (Second) of Agency, "A

21  subagent is a person appointed by the agent empowered to do so,

22  to perform functions undertaken by the agent or the principal,

23  but for whose conduct the agent agrees with the principal to be

24  primarily responsible."

25          From the same restatement.  "A subagent performing

1    acts which the appointing agent has authorized him to perform

2    in accordance with an authorization from the principal is an

3    agent of the principal."

4        Bus Crittenden was a subagent of the Wylys only in the

5    performance of her duties assisting Schaufele with the Wyly

6    accounts, that is the extent of her agency status.

7        Turning now to Michelle Boucher.

8        Boucher worked for the Irish Trust Company, which I'll

9    call ITC, as manager of finance from '95 to '99 and as CFO from

10   '99 to 2010.  The ITC, this have from the SEC's brief,

11   "provided administrative services to foreign trusts established

12   by or for the benefit of" the Wylys.  The Wylys were not

13   shareholders or officers of ITC, nor were they directly

14   involved in day-to-day operations.  Defendants agree that

15   Boucher "conducted certain discussions with or provided

16   necessary information to legal counsel on behalf of the Wylys

17   but dispute that Boucher was the Wylys' agent throughout '95 to

18   2010 merely as a result of her position with ITC."  That quote,

19   of course, is if from the defendants' opposition.

20       Even though Boucher report to the CFO of the Wyly

21   family office, defendants contend that there is no evidence

22   "that she reported directly to the Wylys or that the Wylys were

23   directly responsible for Boucher."

24       The SEC presents the following evidence to support

25   Boucher's agency status:  One, a declaration from Keeley

1    Hennington, the CFO of the family office since 2000, stating

2    that Boucher represented the Wyly family office in connection

3    with the Wylys' non-U.S. interests;" second, Special Master

4    Capra's conclusion that Boucher was the Wylys' agent when

5    resolving certain discovery disputes; three, statements from

6    Boucher's deposition stating that she reported directly to

7    Sharyl Robertson, the CFO of the Wyly family office from '92 to

8    '98, and from Robertson's deposition that Boucher's salary and

9    annual bonuses were decided by the Wyly family; and that, four,

10   Boucher served as a co-protector of all the Wyly offshore

11   trusts from 2001 through 2004 and as the sole protector from

12   2004 to 2010.  The totality of this evidence, especially

13   Boucher's own deposition testimony, supports the SEC's argument

14   that Boucher served as the Wylys' agent during this time

15   period.

16        Now I turn to the defendants' motions in limine, the

17   first one being with respect to nonsecurity transactions.

18        The defendants seek to preclude the SEC from offering

19   evidence of various nonsecurity transactions, including

20   acquisitions of artwork and jewelry items by two foreign trust

21   entities, as well as investments in real estate that was used

22   or enjoyed by certain Wyly family members, and loans or

23   charitable donations made by foreign trust entities.

24   Defendants argue that while the SEC wants to introduce these

25   transactions as evidence that the Wylys "controlled or enjoyed

1   the benefits of certain nonsecurity assets also owned by

2   certain foreign trust entities, the receipt and enjoyment of an

3   economic benefit from a security" is irrelevant to "determining

4   beneficial ownership pursuant to Section 13(d)" of the Exchange

5   Act.  Much of that I was quoting from the defendants'

6   memorandum on this issue.

7           The SEC responds that evidence of these transactions

8   is "probative evidence that the Wylys controlled every aspect

9   of their offshore system and their power to direct the

10  expenditure of proceeds for personal benefit refutes their

11  claims that they lack control over the trustees."  That's a

12  quote from the SEC's brief.

13          The SEC further contends that the evidence is

14  probative to its Section 5, Section 13, and Section 16 claims.

15  Finally, the SEC argues that the nonsecurity transactions are

16  inextricably intertwined with the fabric of the fraud and

17  necessary to complete the story of the fraud on trial.

18  Defendants reply that the SEC has never argued that these

19  transactions were unlawful and is seeking to introduce this

20  evidence only to "transform the trial into an episode of

21  Lifestyles of the Rich and Famous."  I thought that was a nice

22  line.  That was from the defendants' reply memorandum.

23          Evidence that the trustees allowed defendants to

24  receive personal benefits from these entities is probative

25  evidence that the Wylys exercised control over the trustees.

1   This could, in turn, lead to an inference that they exercised

2   control in terms of voting power and investment.  For that

3   reason, the SEC may offer evidence of the nonsecurity

4   transactions.  Defendants can rebut the potential prejudice by

5   eliciting expert testimony that these transactions were lawful.

6          However, the SEC may not reference or offer specific

7   evidence of the value of these personal benefits.  Such

8   evidence is unduly prejudicial.  By way of example, it would be

9   appropriate for the SEC to reference "a painting, jewelry, and

10  charitable contributions," but inappropriate to say "a Picasso,

11  a diamond necklace, and a one-million-dollar donation to the

12  Dallas Symphony."

13         Turning now to profits earned by foreign trusts.  The

14  SEC plans to introduce evidence that Sam Wyly's offshore

15  entities realized gains in excess of $370 million and Charles

16  Wyly's offshore entities realized gains in excess of $180

17  million between '92 and 2004 allegedly "from undisclosed and

18  frequently unregistered sales of Issuer securities."

19  Defendants seek to preclude the SEC from offering any evidence

20  or reference to "the profits earned by foreign trust entities,

21  provided that the SEC may seek to offer other evidence of the

22  foreign trust entities' holdings of the securities that the SEC

23  alleges were beneficially owned by the Wylys."  Long quote from

24  the defendants' memorandum.  Defendants argue that evidence of

25  profits is not relevant to the materiality of any alleged

1    failure to file.

2            The SEC responds that this evidence "is relevant to

3    several of the SEC claims because it shows the Wylys' scienter

4    and the materiality of the fraud, and is also relevant to the

5    SEC's false reporting claims, and its unregistered securities

6    claim." Obviously, a quote from the SEC brief. This evidence

7    is admissible because, as the SEC argues, the amount of gains

8    realized is the direct result of the specific conduct that the

9    SEC alleges was fraudulent and is relevant to a number of the

10   SEC's claims.

11           Now I turn to the motions, the *Daubert* motions,

12   starting with the SEC's *Daubert* motion.

13           The proponent of expert evidence bears the burden of

14   establishing admissibility by a preponderance of proof. For

15   expert testimony to be admissible under Rule 702, three

16   requirements must be met. First the witness must be qualified

17   as an expert by knowledge, skill, experience, training or

18   education. Second, the expert's knowledge must be of the type

19   that will assist the trier of fact understand the evidence or

20   to determine a fact in issue. Expert witnesses are generally

21   not permitted to address issues of fact that a jury's capable

22   of understanding without the aid of expert testimony or about

23   issues of law which are properly the domain of the trial judge

24   and jury. Third, the proposed expert testimony must be based

25   on a reliable foundation.

1          And that has been recently spelled out in the Second

2     Circuit as follows.  "In this inquiry, the district court

3     should consider the indicia of reliability identified in Rule

4     702, namely, (1) that the testimony is grounded on sufficient

5     facts or data; (2) that the testimony is the product of

6     reliable principles and methods; and (3) that the witness has

7     applied the principles and methods reliably to the facts of the

8     case."  That is a quote, as I said, from a 2002 Second Circuit

9     case, long name, Amorgianos.

10         In sum, district courts are charged with acting as

11    gatekeepers to exclude invalid and unreliable expert testimony.

12    The SEC moves to exclude the testimony of three defense

13    experts.

14         The first is Jonathan Macey.  But defendants do not

15    oppose the SEC's motion to exclude Professor Macey's expert

16    opinion testimony.  In the defendants' response of January 20

17    they so state.

18         Then there is Robert Ham and Gideon Rothschild.

19         At the October 7 conference I ruled that neither party

20    can introduce evidence as to whether the Wylys did or did not

21    comply with trust law.  I also ruled that defendants may have a

22    witness explain how the trusts work and how a trust operates

23    because trusts are not common.  And all this is from the

24    transcript of the October 7 conference.

25         Defendants seek to offer expert opinion testimony from

1   Robert Ham and Gideon Rothschild, both of whom are practicing

2   attorneys who specialize in Isle of Man and American trust law,

3   respectfully.  Ham makes the following five conclusion, and I

4   quote from his expert report which was attached to the Zerwitz

5   declaration.  So this is a long quote.  These are his five

6   opinions.

7          "1.  The trusts are not shams, nor are the trustee

8   powers illusory under Isle of Man law.

9          "2.  Both the trustees and the protectors are required

10  to exercise their own judgment in performance of their

11  functions under the trusts.  The fact that, in practice, they

12  may have followed requests from the protectors or the Wylys'

13  wishes does not imply that the trustees and protectors did not,

14  in fact, exercise their own judgment or act independently, or

15  that the Wylys controlled the assets of the trusts or the

16  companies owned by the trusts.

17         "3.  The names of trusts and companies are not

18  significant for present purposes.

19         "4.  It is normal procedure to monitor assets held in

20  family trusts.

21         "5.  It is not surprising or significant that the

22  Wylys and their families enjoy benefits from some of the trusts

23  in question, or that the trustees exercised their powers in

24  this regard in accordance with their wishes.  This does not

25  imply that the Wylys controlled the trusts."

1          The second person, Gideon Rothschild, makes the

2     following five conclusions.  Again, it's a quote from his

3     report which, again, is attached to the Zerwitz declaration.

4     And the five quotes are:

5          "1.  The Wylys did not, and could not, control or have

6     the power to control the decisions and actions of the trustees.

7          "2.  The investments, asset transfers and securities

8     transactions which the protectors recommended were made in a

9     manner consistent with the provisions of the trust deeds, as

10    well as the established practices of foreign trust

11    administration.

12         "3.  The trustees utilized discretion in ultimately

13    deciding whether to effectuate such recommendations in

14    accordance with the provisions of the trust deeds.

15         "4.  The trustees acted independently in deciding

16    whether to effectuate the protectors' recommendations.

17         "5.  The trustees utilized the assets of the Isle of

18    Man trusts for the use and enjoyment of the beneficiaries

19    through investments, and the purchase of real estate, jewelry,

20    artwork and other collectibles."

21         That's the end of the quote.

22         The SEC does not challenge the experts' qualifications

23    or methodology, nor does the SEC dispute that the experts may

24    testify about "basic trust concepts, trust operations in

25    general, or even the specific terms of the Wylys' seventeen

1   offshore trusts."  However, the SEC contends that Ham and

2   Rothschild's opinions "regarding the propriety of the creation

3   and operation of the Wylys' offshore trusts or their compliance

4   with trust laws" are inappropriate in light of the October 7

5   rulings and exceed the scope of permissible expert testimony by

6   reaching conclusions properly in the hands of a jury.

7           Defendants respond:  One, they will only introduce

8   evidence as to trust law compliance if the SEC opens the door

9   with allegations that the trusts were a sham; two, that expert

10  opinions as to legal ownership and control of the trusts, as

11  well as the duties owed by trustees and protectors, are

12  relevant to the issue of beneficial ownership; three, that

13  opinions regarding the disposition of trust assets for the

14  Wylys' use and enjoyment is relevant to rebut the SEC's

15  evidence of various nonsecurity transactions; and four, that

16  Ham's opinions that the trusts are not shams is relevant to

17  rebut the SEC's scienter argument.

18          Some of Ham and Rothschild's proposed testimony is

19  admissible.  Ham and Rothschild may testify, first of all,

20  about general principles of trust law, including legal concepts

21  of control, ownership and fiduciary duties.  And they can

22  testify about specific provisions of the Wylys' trusts,

23  including provisions governing ownership or control.  Further,

24  they may, if necessary, rebut certain allegations made by the

25  SEC.  For example, since the SEC is going to present evidence

1    of nonsecurity transactions, because I just allowed it,

2    defendants can use these experts to elicit testimony that the

3    nonsecurity transactions are not unlawful.

4         Ham and Rothschild may not otherwise testify about

5    compliance with trust law.  Ham's opinion that the trusts were

6    not shams under Isle of Man law falls squarely within my prior

7    ruling precluding testimony about compliance with trust law.

8    Whether the trusts were, in fact, compliant with Isle of Man

9    law is not at issue in this trial, nor is it relevant to

10   scienter.  Defendants may present evidence as to the Wylys'

11   state of mind about the trusts through other testimony.

12   However, I remind the SEC that my October 7 ruling also

13   precludes testimony about noncompliance with trust law.  The

14   SEC may open the door to rebuttal expert testimony if it

15   repeatedly questions the trusts' legal validity.

16        Ham and Rothschild may not testify about the propriety

17   of anything the Wylys, trustees or protectors did.  They cannot

18   testify that the trustees exercised independent judgment and

19   acted with discretion or that the Wylys did not control or did

20   not own the trusts.  These are highly contested factual and

21   legal issues for the jury to decide.

22        Finally, the SEC contends that testimony from both

23   experts is cumulative.  It could well be, but I don't know

24   which expert is going to testify about which opinions.  I will

25   say defendants are not permitted to call two experts to testify

1    to identical opinions, but Ham and Rothschild may turnout to

2    testify without any overlap.

3           I turn to Erik Sirri.  Professor Sirri is a former

4    Chief Economist of the SEC and a former Director of the SEC's

5    Division of Trading and Markets.  Sirri's report consists of

6    two parts.  First, an analysis of the insider-trading claim;

7    and second, an opinion on the materiality of the Wylys'

8    nondisclosure of the Isle of Man transactions.  The SEC does

9    not challenge Sirri's qualifications but raises various issues

10   as to the reliability of his data and methodology.

11          I begin with the insider trading analysis.

12          The SEC claims that the Wylys decided to sell Sterling

13   Software in a merger or acquisition in October '99 and "caused

14   their overseas entities to enter into equity swap transactions

15   related to the Sterling Software stock with a Lehman Brothers

16   overseas affiliate as a counterparty in order to profit from

17   their undisclosed decision to sell."  That's from the

18   December 31 memorandum by the SEC on this issue.

19          Sirri's opinion has two components.  First, he argues

20   that the SEC's disgorgement calculation is overstated based on

21   an analysis which tries to decompose the actual per share

22   return over the relevant period of time to attribute the

23   increase in share price to the different components, including

24   the nonpublic information the Wylys allegedly traded on.

25   Second, Sirri opines that the information the Wylys traded on

1   was not material.

2          I begin with the decomposition analysis.

3          The SEC argues that the decomposition analysis is not

4   relevant to the liability phase of the trial which will not

5   address disgorgement.  Defendants respond that the analysis is

6   necessary to rebut the SEC's theory of materiality.  If the SEC

7   will argue that the rise in Sterling Software share price after

8   the public announcement of a merger proves materiality, then

9   Sirri's analysis which concludes that the vast majority of the

10  price increase was due to factors unrelated to the alleged

11  nonpublic information is relevant for rebuttal.  For that

12  reason I will rule on the admissibility of Sirri's testimony at

13  this time.

14         Substantively, the SEC contends that Sirri's

15  methodology is unreliable.  Sirri used an event study which,

16  and I quote from the SEC brief on this issue, "Sirri used an

17  event study which "involves the identification of an event that

18  caused investors to change their expectations about the value

19  of a firm" and compares the "stock price movement

20  contemporaneous with the event to the expected stock price

21  movement if the event had not taken place."  The SEC contends

22  that February 14, 2000, the day Sterling Software announced a

23  potential merger, it is "the only possible relevant date for

24  Sirri's event study and that the appropriate event window would

25  allow for a few days before or after that announcement to

account for leakage of the information before the announcement

date or a slight delay after that date to allow the market to

react fully.  In light of this standard, the SEC argues that

Sirri's event window, a 129-day calendar period from October 8,

'99 to February 14, 2000 is inappropriate.

The SEC also contends that Sirri's regression model,

which is used to establish independent variable coefficients to

compare against the 129-day event window, is unreliable for two

reasons.  First, the SEC argues that the regression model's

baseline period, October 8, '97 and October 7, '99, is

inapposite for the relevant holding period because the period

between October 8, '99 and February 14, 2000 was unusually

active in the technology industry.  Second, the SEC argues that

Sirri's regression model uses two market and industry indices

that are highly and unnecessarily correlated.

Defendants respond that the regression model is a well

known and accepted econometric technique for assessing the

effects on a single stock price of market-wide and

industry-wide price movements.  Defendants argue that Sirri was

aware of the extraordinariness of the 1999 or 2000 period and

performed a regime shift analysis on his regression model to

see if there were any structural breaks or other changes that

would render it inapplicable.  Sirri's analysis did not find

any evidence that the regression model was inapplicable.  The

defendants also contend that regression models frequently have

1    a multicollinearity of indices.

2           The SEC does not challenge the use of a regression

3    model, but rather Sirri's choices in developing his regression

4    model.  The fatal problem with Sirri's analysis is the 129-day

5    event window.  The current academic standard for measuring the

6    effect of the release of information on a stock's price is to

7    use a several-day event window extending "to the close of

8    trading on the day after the release of the pertinent

9    information."  And I'm citing the Business Law article from

10   1994 by Mark Mitchell and Jeffry Netter which it turned out I

11   cited in the Liberty Media v. Vivendi decision of 2013.

12          As defendants and the SEC point out, when Sirri

13   performed a similar analysis in the SEC v. Mark Cuban case,

14   Sirri used a five-day event window, including several days

15   after the announcement.  A 129-day event window is simply too

16   large to be reliable in an event study.

17          Further compounding the problem of a 129-day event

18   window is that the estimation window, that is the two years

19   from October 8, '97 to October 7, '99, is too far removed from

20   the market announcement to be helpful.  Defendants are trying

21   to show that the price increase from October '99, when the

22   Wylys traded on the nonpublic information, to February 2000

23   when the merger was announced, could be attributed to many

24   factors.  But an event study is not a reliable way to

25   demonstrate this.  Sirri's event study appears to have been

1    designed to generate a particular outcome and is not based on

2    sound or accepted methodology.  For those reasons, the

3    decomposition analysis is not admissible.

4             Turning then to the materiality opinion.

5             In addition to the decomposition analysis, Sirri

6    offers the following opinion regarding the materiality of the

7    February 14, 2000 disclosure on the Sterling Software stock

8    price.  And I quote from his report.

9             "The announcement on February 14, 2000 revealed

10   information that was not known and could not have been known at

11   the time of the execution of the Lehman swaps in October '99.

12   Specifically, it incorporated subsequent developments that

13   ultimately led to a successful merger, including the decision

14   by Sterling Software's management to pursue a potential sale,

15   the retention of Goldman Sachs, Computer Associates' indication

16   of interest, the engagement of Broadview International, the

17   outcome of mutual due diligence examinations, and the

18   negotiations of the merger agreement and related documents."

19            That's the end of that quote from his report at

20   paragraph 34.

21            Defendants argue that this opinion is based on Sirri's

22   background, knowledge of and experience in the way that

23   corporate mergers occur and the way that financial markets

24   react to news of mergers.  The SEC does not question Sirri's

25   qualifications but questions Sirri's conclusion because the

SEC's expert shows that announcements regarding strategic

alternatives commonly have a material impact on share prices.

This is exactly the kind of dispute juries commonly

resolve in insider trading cases.  The SEC points to a rise in

stock price and says that the undisclosed information was

material and then the defendant highlights other potentially

relevant data points and say that it was not material.  Sirri

is qualified to comment about the types of factors that can

have a material impact on stock prices.  So this part is

admissible.

Now to the impact of nondisclosure.  The SEC alleges

that the Wylys should have filed various forms, whether the

Isle of Man trusts sold or bought securities from four issuer

corporations because information pertaining to insider sales

would have been material to a reasonable investor.  Sirri's

opinion examines the market's reaction to the Wylys' disclosed

transactions, that is made by domestic trusts and Wyly

insiders, and concludes that because there was no evidence of a

statistically significant reaction to those disclosures, then

the undisclosed transactions, which were made by the offshore

trusts, were similarly immaterial.

The SEC contends, and Sirri now agrees, that the

original dataset was incorrect because it assumed that the

total domestic and the total offshore sales in the relevant

period were roughly the same when, in fact, the offshore sales

exceeded domestic sales by a ratio of 20 to 1.  Defendants

contest that these were ministerial data counting errors and

that Sirri has discovered, acknowledged, and corrected them.

Defendants argue that Sirri's conclusion is unchanged because

it rests on the size of the average domestic disclosed

transaction which is comparable to the average offshore

undisclosed transaction.

Further, the SEC contends that Sirri's analysis uses

an inappropriately short window period to assess market

reaction to disclosures and is unreliable for lack of

sufficient data points.  Sirri's analysis examines the stock

market reaction to domestic transactions on the day the SEC

stamped a disclosure form as received and then over a five-day

period thereafter.  The SEC argues that this is not an adequate

event window to identify impact because the SEC's stamp on a

disclosure form does not indicate that the information was

publicly available on that date, and the information may not

have become available to the market for several days after the

date.  The SEC also argues that Sirri's results are unreliable

because the sample size is too small to be statistically

significant.  For example, there is only one disclosed

transaction over a period of 2,079 trading days for Sterling

Software and even the largest set of sample transaction, that

of Michael Stores, only has 19 transactions over 3,267 trading

days, which just to make it clear is twelve years.

1            Defendants respond that the filing date of the

2     disclosure form is the standard day zero for such an analysis.

3     Defendants also claim that Sirri performed additional

4     calculations, which were sent to the SEC on December 22, 2013,

5     which showed no evidence of market impact even over a ten-day

6     event window.  Finally, defendants argue that Sirri's opinion

7     is reliable because it contains all available data related to

8     the Wylys' disclosures.

9            At the outset, the SEC presents no evidence suggesting

10    that a five- or a ten-day window is not an accepted window for

11    such a study, nor does the SEC propose an alternate window.

12    The SEC's brief merely alluded to the possibility that there

13    may have been some delay between the date of filing and the

14    date the form became available to the public.  This does not

15    mean that the information in the form was not available to the

16    public at the date of the filing or that the five- or ten-day

17    window was not long enough to show a market impact.

18            However, Sirri's methodology does have other flaws,

19    which the SEC pointed out.  While Sirri's testimony cannot be

20    inadmissible based on sample size alone, the tiny sample size

21    here renders Sirri's conclusions based on the average size of

22    each transaction unhelpful.  For some of the securities, there

23    is only one disclosed transaction.  And one is not a sample.

24    Sirri's opinion about materiality based on the comparison

25    between a handful of disclosed domestic transactions and the

1   average of far more frequent and sizeable undisclosed offshore

2   transactions does not take into account the potential outlier

3   nature of the domestic transactions and blurs together the

4   characteristics of the much more prolific offshore

5   transactions.  The SEC highlights one example, and I quote from

6   their brief at page seven, the reply.

7        "There was only one onshore sale of Sterling Software

8   between '92 and 2000.  That sale was for 300,000 shares making

9   the average 300,000 shares.  But there was nearly 7 million

10  shares sold overseas during the same period for a purported

11  average of 465,000 shares.  To say the reaction of the market

12  to this one domestic sale can stand as a proxy for the sales of

13  22 times more shares for the overseas sales during the same

14  time period is ridiculous."

15       Although the Supreme Court has instructed district

16  courts to focus "on the principles and methodology" employed by

17  the expert and "not on the conclusions that they generate," it

18  has recognized that "conclusions and methodology are not

19  entirely distinct from one another."  That is a quote from the

20  Joiner case, 522 U.S. at 146.  The data underlying Sirri's

21  opinion is too meager and unreliable to support his

22  conclusions.  For these reasons, Sirri's opinion as to the

23  materiality of undisclosed offshore transactions is

24  inadmissible.

25       And that concludes my rulings on the issues fully

1    briefed to date.

2           We still have defendants' *Daubert* motions but they

3    will not be fully submitted until, I guess, today.  Yes.

4    Today.

5           Is that right?  No.  March 4.  Sorry.  Opposition is

6    due October 21.  Reply March 4.  And then I meet with you

7    March 10.

8           MR. MILLER:  Yes.

9           THE COURT:  So that remains to be decided because it's

10   not yet briefed.  So those are the rulings.  Obviously, it's

11   hard to get it all when you just listen, but you'll have a

12   transcript, and you'll be able to review it.  I think we have

13   no more business today.

14          MR. MILLER:  We do, your Honor.

15          THE COURT:  What is it?  Because I don't have anymore

16   time today.

17          MR. S. SUSMAN:  Very quickly, your Honor.

18          THE COURT:  Yes.

19          MR. S. SUSMAN:  One is a scheduling issue.

20          THE COURT:  Okay.

21          MR. S. SUSMAN:  April 1, that evening my wife and I

22   are being honored at a dinner in Houston at the Young Center.

23          THE COURT:  That's fine.

24          MR. S. SUSMAN:  So I know that that's the second day

25   of trial.  But would the court be willing to let us off at noon

1  that day if I'm back by noon the next day?

2         THE COURT:  I think so.  I might have some days that I

3  can't sit either.  I've got to get to the calendar.

4         MR. S. SUSMAN:  I just wanted to mention it as quickly

5  as I knew it.

6         THE COURT:  No.  I appreciate it.  When does this

7  trial start?

8         MR. MILLER:  March 31, your Honor.

9         THE COURT:  I can't be here April 4.  I committed to

10 some symposium on the rules of evidence.  So there goes

11 April 4.  And then let's see if there's any others.  I don't

12 think so.  That stayed pretty clear.

13        MR. ZERWITZ:  The first two days of Passover are at

14 some point in April as well.

15        THE COURT:  I'll get there.  The first Seder is the

16 night of April 14.  And the second is -- I would probably want

17 to take off the 14th and the 15th, the Monday and Tuesday

18 but not the holiday itself on Wednesday.  Anybody have to take

19 off the Wednesday?  Nobody.  Monday and Tuesday I usually take

20 off.  So that's the 14th and 15th.

21        Wait there's more.  I agreed to speak at a very

22 important symposium honoring Jack Weinstein in Chicago, which

23 is on April 25.  And I have to travel on April 24.  So that's a

24 short day too.  No trial Friday the 25th and a short day on

25 the 24th.  I've got something written down Friday, May 2, but

1   I don't believe it, haven't been in contact for a while.  I'm

2   good to go until we're done.  I hope you got all those dates.

3   If you didn't, they're on the transcript.

4        So, yes, you can attend the dinner in which you're

5   honored.  Look, you've got four lawyers from your firm here.

6   It may be that you can schedule some witness that you don't

7   have to be here for; at least two of the four because one might

8   want to be at your dinner, but the other two better forego it.

9        MR. H. SUSMAN:  One better be there.

10       THE COURT:  We can revisit, but that's the tentative

11  schedule.  Thank you for raising it.

12       What else?  I've really got to go.

13       MR. S. SUSMAN:  I'm sorry.  Could we go off the record

14  a second.

15       THE COURT:  Yes.

16       (Discussion off the record)

17       MR. MILLER:  On Friday February 14 the SEC is required

18  by your order to submit a joint pretrial order to the defense.

19  We're to exchange exhibit lists.

20       So we have a massive amount of material to exchange.

21  And trying to engage in settlement at this point, I can tell

22  your Honor we're just not going to settle unless there's

23  admissions by the defendant -- well, by Mr. Wyly, Sam Wyly,

24  admission to the allegations in the complaint, and then we

25  could bifurcate and you decide the remedies.  But short of

E249SECD                    Decision

1    that, we're not going to go anywhere, your Honor.

2           THE COURT:  I want you to sit down at least once with

3    a good settlement magistrate and see if there's anything to

4    talk about.  I will figure out who it is and let you know

5    promptly.

6           MR. MILLER:  Thank you, your Honor.

7           THE COURT:  All right.  Can I go.  Thank you.

8           Do we have another date in court?

9           March 10.  Okay.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25