UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>        **Plaintiff,**<br><br>v.<br><br>**SAMUEL E. WYLY,**<br>**DONALD R. MILLER, JR., in his capacity**<br>**as the Independent Executor of the Will**<br>**and Estate of Charles J. Wyly, Jr.,**<br>**MICHAEL C. FRENCH and**<br>**LOUIS J. SCHAUFELE III,**<br><br>        **Defendants.** | No. 1:10-cv-05760-SAS<br><br>ECF Case |

SEC'S STATEMENT OF MATERIAL FACTS AND CONCLUSIONS
OF LAW REGARDING ITS INSIDER TRADING CLAIM

I.  INTRODUCTION

The SEC alleges that Sam Wyly ("Sam") and Charles Wyly ("Charles", jointly, the

"Wylys") used their Offshore System to commit illegal insider trading.  In October 1999, after

having agreed to put Sterling Software on the selling block, the Wylys, through their Offshore

System, entered into a bullish offshore transaction in the form of a security-based swap

agreement with Lehman Brothers that economically replicated the purchase of two million

shares of Sterling Software for approximately $20.36 per share.  Based on Sterling Software's

closing price of $36.25 on February 14, 2000—the date that Sterling Software's agreement to be

acquired by Computer Associates was announced—the Wylys' illegal imputed profits from this

transaction totaled approximately $31.7 million.

II.     **STATEMENT OF MATERIAL FACTS**

   **A.  The Wylys' Decision to Sell Sterling Software and Sterling Commerce**

Sam and Charles founded Sterling Software, Inc. ("Sterling Software") and served as

Chairman and Vice-Chairman of Sterling Software's Board of Directors, respectively, from 1981

through 2000.  In 1999, the Wylys, along with Sam's son Evan Wyly, Charles' son-in-law

Donald Miller, and the Wylys' lawyer Michael French, comprised over half the seats on Sterling

Software's Board of Directors.

Sam and Charles also served as members of the Board of Directors of Sterling

Commerce, Inc. ("Sterling Commerce"), as well as the Chairman and Vice-Chairman of Sterling

Commerce's Executive Committee from December 1995 through 2000.  Sterling Commerce had

been a wholly-owned subsidiary of Sterling Software before being spun-off in 1996.

In the summer of 1999, Sam Wyly determined that it was time to sell both Sterling

Software and Sterling Commerce.  Sam conferred with his brother Charles, who agreed, and they

mutually decided that they should commence with the  sale of Sterling Commerce first.

On September 12 and 13, 1999, Sterling Commerce's senior management met with

Goldman Sachs about the company's strategic alternatives, including pursuing acquisition or

merger partners.  And on September 29, 1999, Sterling Commerce's Board of Directors,

including Sam and Charles Wyly, formally voted to retain Goldman Sachs.


   **B.  The Wylys' Decision to Enter Into An Equity Swap with Lehman Brothers**

In late September 1999, Sam Wyly instructed Shari Robertson, one of the protectors of

the Wylys' Isle of Man Trusts, to determine the cost of purchasing from Lehman Brothers up to

4 million Sterling Software call options at the company's current trading price, with expiration

dates between 12 and 24 months in the future.  On September 28, 1999, Schaufele provided

Robertson with the requested pricing information, but also suggested that Robertson look at a

swap transaction as an alternative to purchasing call options.

In preparation for the upcoming transaction, Boucher told the Isle of Man Trustees on

September 29, 1999 how they should raise the funds needed for the upcoming transaction,

which at that time was expected to be a purchase of 4.5 million Sterling Software call options

for approximately $22.5 million.

Between September 30, 1999 and October 6, 1999, Schaufele negotiated the terms of a

swap transaction directly with Sam Wyly's son, Evan.  During this time, Charles Wyly agreed to

participate for one-third of the transaction.

On October 6, 1999, Schaufele informed Boucher that Lehman should be ready the

following day to send the Isle of Man entities the transaction documentation, which included a

representation that the Isle of Man entities were not insiders of Sterling Software, and did not

possess any material non-public information.  He asked her to confirm the length and the

ultimate size of the transaction.  Boucher forwarded his request to Robertson, who then

forwarded it to Evan Wyly.  That same day, Boucher proposed to the IOM Trustees that they

prepare to enter into a swap transaction involving 3.5 million Sterling Software shares.

On either October 6 or October 7, 1999, Schaufele and Evan Wyly spoke about the swap

and agreed to set its size at between 3 and 4 million shares and the term at 3 years.  However, in

order to minimize the borrowing costs imposed by Lehman's credit department, the Wylys

decided to follow Schaufele's advice and agreed to limit the initial size of the transaction to 1.5

million shares with an 18-month term, and to later seek to increase its size.

On October 7, 1999, Schaufele emailed Boucher proposed term sheets for the swap. Boucher forwarded the email to Robertson asking if it is okay for the Isle of Man Trustees to execute the documents. Robertson forwarded the email to Evan Wyly and asked him to "let us know whether to accept the agreement as stated." After hearing from Evan, Robertson informed Boucher that the terms were acceptable. Boucher then cleared the trustees to sign the transaction documents.

On October 8, 1999, Greenbriar Limited, Moberly Limited, and Quayle Limited, subsidiary companies of the Wylys' offshore trusts, entered into swap transactions involving 1,500,000 Sterling Software shares with Lehman Brothers ("Lehman"). Each of the swaps had a stated term of 18 months, subject to certain early termination provisions, with the final payment scheduled to take place on April 25, 2001. The transaction provided that if the price of Sterling Software rose during the term of the swap, Lehman would pay the Isle of Man Entities cash equal to the amount of the increase in the share price from the initial, or notional, amount times the number of shares, and if the price of Sterling Software decreased over the term of the swap, the Isle of Man Entities would pay Lehman cash equal to the amount of the decrease times the number of shares. In essence, the swap transactions were the economic equivalent of the Isle of Man Entities buying 1.5 million Sterling Software shares.

In order to establish the notional price for the swap agreements from which all gains or losses would be calculated, and to hedge its short position, Lehman purchased 1,500,000 shares of Sterling Software in the market. The terms of the swap transaction documents required Lehman to purchase the shares in the market and provided that the Isle of Man entities would pay Lehman $0.06 per share for the costs incurred in establishing and unwinding its hedge position.

Over eight trading days from October 8, 1999 through October 20, 1999, Lehman gradually purchased the 1,500,000 Sterling Software shares underlying the swaps at a weighted average price of $20.4273 per share.  October 20, 1999 was thus considered the trade date for the swap, and Lehman's average purchase price of $20.4273 was incorporated into the trade confirmation documents as the notional share price for calculating the total return on Sterling Software over the life of the swap.

On October 18, 1999, as Lehman neared completing its hedge of the 1.5 million shares, Schaufele emailed Boucher and presented her with different options for how the Wylys could extend the swap transaction beyond the initial 1.5 million Sterling Software shares.  One of the options Schaufele suggested was to enter into another swap transaction involving an additional 500,000 Sterling Software shares.  Schaufele stated that 2 million shares of Sterling Software was the maximum exposure Lehman wanted.  Boucher forwarded the email to Sam, Charles and Evan Wyly, as well as Shari Robertson, asking them to advise how they would like to proceed.  Boucher responded to Schaufele that she received his email and that he may get a response directly from Evan Wyly.

On October 20, 1999, Boucher spoke with both Sam and Charles Wyly, both of whom authorized her to have the Isle of Man entities enter into another swap transaction with Lehman for another 500,000 Sterling Software shares.  Boucher then notified the trustees of the decision, and informed Robertson that she had already told Schaufele and the Isle of Man Trustees, but that she hadn't yet determined which Isle of Man Entities would participate in the additional swap.

Over seven trading days from October 20, 1999 through October 29, 1999, Lehman gradually purchased the additional 500,000 Sterling Software shares underlying the swaps at a

weighted average price of $20.1624 per share. Lehman's purchases again established the notional price for the swap agreements from which all gains or losses would be calculated. October 29, 1999 was thus considered the trade date for the second set of swaps, and Lehman's average purchase price of $20.1624 was incorporated into the trade confirmation documents as the notional share price for calculating the total return on Sterling Software over the life of the swap.

After Lehman had already completed its purchases of the additional 500,000 Sterling Software shares in the market, Boucher finally notified the Isle of Man Trustees that Sarnia Investments Ltd. and Roaring Fork Ltd., two additional subsidiaries of the Wylys' offshore trusts, would be the entities participating in the transaction.  Sarnia Investments and Roaring Fork subsequently sign their swap transaction documents.

Between October 8 and October 29, 1999, the Wylys received daily spreadsheets, prepared by Lehman and provided to them through Schaufele via the Cayman Accountant or the Wyly Family CFO, disclosing: (i) how many shares Lehman had purchased, (ii) the shares' average execution price, (iii) the shares' percentage of Sterling Software's trading volume, (iv) the volume weighted average price ("VWAP") of the total shares traded, (v) the deviation of Lehman's purchases from the VWAP, (vi) the amount of upfront collateral the Wylys' Offshore System would need to provide for Lehman's purchases, (vii) the cumulative number of shares Lehman had purchased toward its hedge, and (viii) the remaining number of shares Lehman still needed to purchase to complete its hedge.

In total, five Offshore Companies (three associated with Sam Wyly and two associated with Charles Wyly) purchased the right to receive any gains from, and the risk of paying any losses on, two million Sterling Software shares at the "notional" prices.  The Wylys had their

Offshore System pay Lehman approximately $13 million in collateral and borrow from Lehman with interest the transaction's remaining approximate $27 million cost during the term of the swap.  The transaction made economic sense for the Wylys only if they believed Sterling Software's share price would increase enough to cover their transaction and borrowing costs before the swap was unwound or expired eighteen months later.

### C.  Sterling Software Agrees to Be Acquired by Computer Associates

On February 8, 2000, the Board of Directors of Sterling Software was advised that Computer Associates had made an offer for the company.  All of the Directors supported pursuing the merger transaction with CA.  On February 13, 2000, the Board was informed that the negotiations between the company and CA were complete.

On February 14, 2000, CA announced that it had reached an agreement to acquire Sterling Software in a stock swap valued at approximately $4 billion.  Sterling Software's stock price closed on that date at $36.25.  Based on that day's closing price, the Wylys' imputed profits from their two-million-share swap transaction exceeded $31.77 million.

## II.    CONCLUSIONS OF LAW

### A.    Applicable Law

1.    Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance."

2.      Rule 10b-5 under the Exchange Act, 17 C.F.R. § 240.10b-5, implements

Section 10(b) and makes it unlawful for any person to "employ any

device, scheme, or artifice to defraud" or to "engage in any act, practice,

or course of business which operates or would operate as a fraud or deceit

upon any person, in connection with the purchase or sale of any security."

3.      Insider trading—unlawful trading in securities based on material, non-

public information—is well established as a violation of Section 10(b) and

Rule 10b-5.  *See Chiarella v. United States*, 445 U.S. 222, 226-30 (1980);

*SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012); *SEC v. Texas Gulf*

*Sulphur Co.*, 401 F.2d 833, 847-48 (2d Cir. 1968) (*in banc*).

4.      Under the "classical" theory of insider trading, a corporate insider is

prohibited from trading shares of that corporation based on material non-

public information in violation of the duty of trust and confidence that

insiders owe to shareholders.  *See Chiarella*, 445 U.S. at 226-30; *Obus*,

693 F.3d at 284.

5.      Such insiders have a duty to disclose or abstain, meaning that they cannot

trade on the inside information, but must either wait for the issuer to

publicly disclose the information, or abstain from trading.  *See Chiarella*,

445 U.S. at 226-27; *Obus*, 693 F.3d at 285.

6.      This "disclose or abstain" rule is designed to prevent insiders from using

their position of trust and confidence to gain an unfair trading advantage

over shareholders.  *See Chiarella*, 445 U.S. at 227-30; *Dirks v. SEC*, 463

U.S. 646, 660 (1983); *Obus*, 693 F.3d at 285.

**B. The Wylys were insiders of Sterling Software who had a duty to shareholders not to trade on the basis of inside information.**

7.      Sam Wyly and Charles Wyly were insiders of Sterling Software. *See*

*United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (officers and

directors are insiders); *accord Dirks*, 463 U.S. at 655 n.14.

8.      As insiders, the Wylys owed a duty to shareholders not to use non-public

corporate information to their own advantage. *See O'Hagan*, 521 U.S. at

652; *Chiarella*, 445 U.S. at 228-29; *Obus*, 693 F.3d at 285; *Chris-Craft*

*Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 364 (2d Cir. 1973) (*en*

*banc*) ("Corporate officers and directors in their relations with

shareholders owe a high fiduciary duty of honesty and fair dealing.").

**C. The Wylys obtained non-public information about Sterling Software as a result of their position as insiders.**

9.      As a result of their position as insiders, the Wylys knew in the summer of

1999 that they had decided to sell Sterling Software.

10.      The Wylys' knowledge that they would sell Sterling Software was non-

public information because it was not available to the investing public.

*See SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (citing *Dirks*, 463

U.S. at 653 n.12); *United States v. Libera*, 989 F.2d 596, 601 (2d Cir.

1993); *Texas Gulf Sulphur*, 401 F.2d 833.

**D. The information that the Wylys obtained was material.**

11.      Information is material if there is a substantial likelihood that a reasonable

shareholder would have considered it important when deciding whether to

buy, sell, or hold securities of the company at issue. *See SEC v. Wyly*, 788

F. Supp. 2d 92, 118 (S.D.N.Y. 2011); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

12.  Put differently, there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the "total mix" of information available concerning the company. *See Wyly*, 788 F. Supp. 2d at 118; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic v. Levinson*, 485 U.S. at 232 (adopting *TSC* in the Section 10(b) and Rule 10b-5 context).

13.  To show that information is material, it is not necessary to show that it would have caused a reasonable investor to change his or her mind about buying, selling, or holding stock. *See TSC*, 426 U.S. at 449 (materiality standard "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote"); *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533-34 (2d Cir. 1991) (holding that jury charge that may have misled jury to believe that information is material only if it is outcome-determinative was error); *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004) (the materiality standard "does not require proof that an investor would not have invested had he known the truth"); *SEC v. MacDonald*, 699 F.2d 47, 49 (1st Cir. 1983) (*en banc*) ("it is not necessary to show that the undisclosed information would have been sufficient to alter the shareholder's decision").

14.   Materiality is based on the quantitative "probability that the event will

      occur" and the qualitative "magnitude of the event." *Basic*, 485 U.S. at

      238-39.

15.   A merger is an event of considerable magnitude to an investor because "a

      merger in which it is bought out is the most important event that can occur

      in a small corporation's life."  *Basic*, 485 U.S. at 238-39 (quoting *SEC v.*

      *Geon Industries, Inc.*, 531 F.2d 39, 47 (2d Cir. 1976) (Friendly, J.)); *see*

      *also SEC v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) (materiality of a

      takeover is "not open to doubt"); *Obus*, 693 F.3d at 289-290 n.3

      ("Unannounced acquisitions are a prototypical example of material non-

      public information.").

16.   With regard to probability, in the case of merger discussions no particular

      event or factor short of closing the transaction need be either necessary or

      sufficient by itself to render merger discussions material.   *See Wyly*, 788

      F. Supp. 2d at 118 (citing *Basic*, 485 U.S. at 239); *see also Warde*, 151

      F.3d at 47 ("that management was *contemplating* a leveraged buyout"

      supports materiality) (emphasis added); *United States v. Mylett*, 97 F.3d

      663, 667 (2d Cir. 1996) (upholding district court finding that inside

      information regarding merger was material even though merger

      transaction had not closed); *SEC v. Materia*, 745 F.2d 197, 199 (2d Cir.

      1984) ("[E]ven a hint of an upcoming tender offer may send the price of

      the target company's stock soaring.").

17.    In addition, materiality can be established by the actions of those who
       knew about the information at issue.  *Wyly*, 788 F. Supp. 2d at 118 &
       n.178 (citing cases); *see also Warde*, 151 F.3d at 47.

18.    Thus, trading and profit making by insiders can establish materiality.
       *Wyly*, 788 F. Supp. 2d at 118 ("where there is a question of whether
       certain information is material, courts often look to the actions of those
       who were privy to the information in determining materiality") (citing
       *Basic*, 485 U.S. at 241 n.18); *see also Rothberg v. Rosenbloom*, 771 F.2d
       818, 821 (3d Cir. 1985) ("The best proof of the materiality of that
       information is that the ... experienced investors, found it to be sufficiently
       material ... to purchase [the] stock."); *Texas Gulf Sulphur*, 401 F.2d at 851
       (a major factor in determining whether [discovery of mineral ore] was a
       material fact" was "the importance attached to the drilling results by those
       who knew about it").

19.    In addition, the impact that information has on market price after it is
       disclosed may confirm the information's materiality.  *Mylett*, 97 F.3d at
       667; *Warde*, 151 F.3d at 47; *Libera*, 989 F.2d at 601.

20.    In this case, there is a substantial likelihood that a reasonable investor
       would have considered it important that the Wylys had decided to sell
       Sterling Software.

**E.    The Wylys acted with the requisite scienter because they traded while in
        knowing possession of material non-public information.**

21.    When the Wylys directed their offshore entities to enter into the swap
       agreements with Lehman Brothers, they knew, or were reckless in not

knowing, that the information in their possession about the sale of Sterling Software was material.

22.     When the Wylys directed their offshore entities to enter into the swap agreements with Lehman Brothers, they knew, or were reckless in not knowing, that the information in their possession about the sale of Sterling was non-public.

23.     Accordingly, the Wylys acted with the requisite scienter because they traded while in "knowing possession" of material non-public information. *See Obus*, 693 F.3d at 293; *United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008); *United States v. Teicher*, 987 F.2d 112, 120-21 (2d Cir. 1993).

**F.      The equity swap was "in connection with" the purchase or sale of a security.**

24.     The equity swap was "in connection with" the purchase or sale of a security.  *SEC v. Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011) (recognizing that the swap at issue in this case was "clearly" in connection with the purchase or sale of securities); *see generally SEC v. Zandford*, 535 U.S. 813 (2002).

**G.      The Wylys used or caused to be used instrumentalities of interstate commerce**

25.     The Wylys knowingly used, or caused to be used, the mails or an instrumentality of interstate commerce in furtherance of their unlawful insider trading.  *See United States v. Re*, 336 F.2d 306, 315 (2d Cir. 1964) (trades made through the American Stock Exchange).

Dated:  April 4, 2014                                  Respectfully submitted,


                                                       ___/s/ Martin L. Zerwitz_____
                                                       Martin L. Zerwitz (MZ-9765)
                                                       Bridget M. Fitzpatrick
                                                       Gregory N. Miller (GM-5922)
                                                       John D. Worland, Jr. (JDW-1962)
                                                       Counsel for Plaintiff
                                                       Securities and Exchange
                                                       Commission
                                                       100 F Street, N.E.
                                                       Washington, D.C. 20549
                                                       (202) 551-4566 (Zerwitz)
                                                       (202) 772-9292 (fax)
                                                       ZertwitzM@SEC.GOV