# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 1:10-cv-5760-SAS |
| | : | |
| SAMUEL WYLY and DONALD R. MILLER, JR., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., | : | ECF Case |
| | : | |
| Defendants. | : | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

3110155v1/012798

## <u>TABLE OF CONTENTS</u>

PROPOSED FINDINGS OF FACT ...................................................................................1

    A.     Sterling Software and Sterling Commerce ............................................1

    B.     The Isle of Man Trusts and Corporations ..............................................1

    C.     Administration of the Isle of Man Trusts and Corporations ..................2

    D.     Sam and Charles Wyly Discuss Potential Sales of Selling Sterling Commerce and Sterling Software .........................................................3

    E.     Sterling Software Announces Stock Repurchase Program .....................4

    F.     Sterling Williams Independently Considers a Sale of Sterling Commerce .........................................................................................4

    G.     The Isle of Man Corporations Enter Swap Transactions Referencing Sterling Software .........................................................................................5

    H.     Morgan Stanley Delivers a Wide-Ranging Pitch to a Sam Wyly Associate .........................................................................................7

    I.     Sam Wyly and Sterling Williams Discuss a Possible Sale of Sterling Software .........................................................................................8

    J.     Sterling Software Begins Taking Steps Toward a Possible Sale ............9

    K.     Sterling Software's Stock Price Between October 7, 1999 and February 14, 2000.........................................................................................10

    L.     The Isle of Man Corporations Unwind the Swap Transactions .............11

PROPOSED CONCLUSIONS OF LAW ..........................................................................11

    A.     Elements of the SEC's Claim ..............................................................12

    B.     Defendants Were Insiders of Sterling Software......................................13

    C.     There Was No Trade by the Defendants .................................................13

    D.     The Material Non-Public Information Standard .....................................14

    E.     The Swap Transactions Were Not Based on Material Non-Public Information .........................................................................................15

    F.     Sam and Charles Wyly Did Not Act with Scienter................................21

G.     Sam Wyly and Charles Wyly Did Not Personally Profit from the
       Trades In Question ................................................................................22

# TABLE OF AUTHORITIES

**CASES**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................... 17

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) .............................................................................. 18

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ........................................................................................... 12

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*,
    921 F. Supp. 1174 (S.D.N.Y. 1996) ................................................................. 15

*List v. Fashion Park, Inc.*,
    340 F.2d 457 (2d Cir. 1965) .............................................................................. 15

*Mathis v. SEC*,
    671 F.3d 210 (2d Cir. 2012) .............................................................................. 14

*Panfil v. ACC Corp.*,
    768 F. Supp. 54 (W.D.N.Y. 1991), ................................................................. 15

*SEC v. Contorinis*,
    743 F.3d 296 (2d Cir. 2014) .............................................................................. 14

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012) .............................................................................. 13

*SEC v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010) ............................................................. 16

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014) .............................................................................. 12

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................................................... 15

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2013) .............................................................................. 15

**STATUTES**

15 U.S.C. § 78j(b) ..................................................................................................... 18

**REGULATIONS**

17 C.F.R. § 240.10b-5 ............................................................................................... 18

3110155v1/012798

As required by the Court's Individual Rules and Practices, Defendants Samuel Wyly and Donald R. Miller, Jr., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., submit the following proposed findings of fact and conclusions of law prior to the bench trial on the SEC's insider trading claims against them.

## PROPOSED FINDINGS OF FACT

### A. Sterling Software and Sterling Commerce

1.      Sterling Williams and Sam and Charles Wyly co-founded Sterling Software in 1981.

2.      The electronic commerce division of Sterling Software was spun-off to form a separate corporation, Sterling Commerce, in 1995.

3.      Sterling Williams was the Chief Executive Officer and a Director of Sterling Software from 1981 to 2000, and the Chairman of the Board of Sterling Commerce from 1995 to 2000.

4.      Defendant Sam Wyly was the Chairman of the Board of Sterling Software from 1981 to 2000, and a Director Sterling Commerce from 1995 to 2000.

5.      Charles Wyly, represented here by Defendant Donald Miller, was the Vice-Chairman of the Board of Sterling Software from 1984 to 2000, and a Director of Sterling Commerce from 1995 to 2000.

### B. The Isle of Man Trusts and Corporations

6.      Delhi International Trust was an Isle of Man trust settled by Sam Wyly in 1992. Greenbriar Limited was an Isle of Man corporation owned by Delhi International Trust.

7.      Pitkin Non-Grantor Trust was an Isle of Man trust settled by Charles Wyly in 1992. Roaring Fork Ltd. was an Isle of Man corporation owned by Pitkin Non-Grantor Trust.

1

8.      Lake Providence International Trust was an Isle of Man trust settled by Sam Wyly in 1992. Sarnia Investments Limited was an Isle of Man corporation owned by Lake Providence International Trust.

9.      Castle Creek International Trust was an Isle of Man trust settled by Charles Wyly in 1992. Quayle Limited was an Isle of Man corporation owned by Castle Creek International Trust.

10.      Plaquemines Trust was an Isle of Man trust settled in 1995, with beneficiaries including Sam Wyly's family members. Moberly Limited was an Isle of Man corporation owned by Plaquemines Trust.

## C. Administration of the Isle of Man Trusts and Corporations

11.      Delhi International Trust, Pitkin Non-Grantor Trust, Lake Providence International Trust, and Castle Creek International Trust were all settled by Sam Wyly or Charles Wyly. Plaquemines Trust was settled by Bulldog Non-Grantor Trust, which was settled by Sam Wyly. Sam and Charles Wyly were not beneficiaries of any of these trusts.

12.      Control over the assets held by these trusts and subsidiary corporations owned by them was entrusted to exclusive power of independent trustees pursuant to the legal documents establishing these trusts.

13.      Sam and Charles Wyly designated Sharyl Robertson and Michael French to serve as the protectors of Delhi International Trust, Pitkin Non-Grantor Trust, Lake Providence International Trust, Castle Creek International Trust, and Plaquemines Trusts during the period at issue.

14.      In their capacity as protectors of these trusts, Sharyl Robertson and Michael French conveyed recommendations for investments by the trusts and their subsidiary corporations to the trustees, often originating from Sam and Charles Wyly.

2

15.      During the period at issue, Michelle Boucher, a Cayman Islands-based employee of a company called Irish Trust, sometimes relayed investment recommendations from the protectors to the trustees. The trustees were at no time required to follow the protector's recommendations and at all times had the discretion to refuse them.

16.      During the period at issue, Lou Schaufele of Lehman Brothers served as the investment broker for Delhi International Trust, Pitkin Non-Grantor Trust, Lake Providence International Trust, Castle Creek International Trust, and Plaquemines Trust, as well as for the subsidiary corporations owned by those trusts.

**D. Sam and Charles Wyly Discuss Potential Sales of Selling Sterling Commerce and Sterling Software**

17.      In or about July 1999, Sam Wyly independently reached the conclusion that stock in Sterling Commerce and Sterling Software was undervalued, such that it could be desirable to sell the two corporations for a premium. Sam Wyly reached this conclusion not based on any inside information about the corporations, but rather, based on his observations regarding the market's apparent interest in technology businesses at the time.

18.      In July 1999, Sam Wyly communicated his belief that Sterling Commerce and Sterling Software were undervalued and might be sold for a premium to Charles Wyly for the first time. Charles Wyly did not express either agreement or disagreement with Sam Wyly's belief regarding the proper value of the two corporations' stock and the prospects for a sale of the corporations at the time of the July 1999 conversation.

19.      Sam Wyly did not communicate his belief regarding the two corporations to any other person besides Charles Wyly at or near the time of the July 1999 conversation.

20.      Sam Wyly's conversation with Charles Wyly did not commence processes to sell either Sterling Commerce or Sterling Software.

3110155v1/012798

21.     Neither Sam Wyly nor Charles Wyly took any further steps toward selling either Sterling Commerce or Sterling Software in the summer of 1999.

**E. Sterling Software Announces Stock Repurchase Program**

22.     On September 3, 1999, Sterling Software issued guidance for the corporation's fourth quarter ending September 30, 1999.

23.     In the news release announcing the guidance, Sterling Software revealed the initiation of a repurchase program through which it planned to buy up to 5 million shares of its outstanding common stock, or about 6% of its approximately 85 million total shares.

24.     The news release included a quote from Sterling Williams stating that "we believe [Sterling Software stock] is a vastly undervalued asset."

25.     The view expressed publicly in the September 3, 1999 news release was fully consistent with Sam Wyly's private view, developed in July 1999 and expressed to Charles Wyly, that Sterling Software's stock was undervalued.

**F. Sterling Williams Independently Considers a Sale of Sterling Commerce**

26.     In mid-1999, Sterling Williams independently reached the conclusion that a sale of Sterling Commerce should be pursued. Sterling Williams reached this conclusion solely because of Sterling Commerce's financial performance during the fiscal quarter ending in June 1999. Sterling Williams first communicated his independently-formed view that a sale of Sterling Commerce should be pursued to Sam Wyly.

27.     Sterling Williams thereafter communicated his view that a sale of Sterling Commerce should be pursued to Werner Blow, the Chief Executive Officer of the corporation.

28.     After Sterling Williams communicated his view to Sam Wyly and Werner Blow, Sterling Commerce retained the Goldman Sachs investment bank to advise the corporation in connection with a possible sale. Goldman Sachs delivered its initial presentation to Sterling

4

Commerce regarding potential sale strategies on September 12 and 13, 1999. The presentation dealt only with Sterling Commerce; it did not relate to, and did not include any discussion of, a potential sale of Sterling Software.

29.     From September 1999 through the eventual sale of Sterling Commerce to SBC Communications, announced on February 22, 2000, the process of selling Sterling Commerce was kept entirely separate from any process of selling Sterling Software.

**G. The Isle of Man Corporations Enter Swap Transactions Referencing Sterling Software**

30.     A total return swap is a derivative contract that replicates with cash payments the payoffs to a specified investment strategy, with one party taking a long position and the other party taking a short position regarding a particular referenced security.

31.     During October 1999, five Isle of Man corporations associated with Sam Wyly and Charles Wyly—Greenbriar, Roaring Fork, Sarnia, Quayle, and Moberly—entered into several different total return swap contracts with a Swiss affiliate of Lehman Brothers ("Lehman Brothers"). The referenced security in these contracts was Sterling Software common stock.

32.     The Isle of Man corporations took the long position in these contracts, and their overall position was economically equivalent to (a) borrowing $40 million from the Lehman affiliate for up to 18 months, (b) using the loan proceeds to buy 2 million total shares of Sterling Software stock, (c) holding the shares for up to 18 months, and (d) selling the shares within 18 months and using part of the proceeds to pay off the loan and the interest accrued on the loan.

33.     As holders of the long position, the Isle of Man corporations stood to earn significant returns under these swap contracts if Sterling Software's price increased during the 18 months after October 1999—as Sterling Software had itself publicly anticipated it would by announcing a buyback plan in September 1999.

34.     In order to hedge against the risk inherent in its short position in the swap transactions, the Lehman affiliate involved in the swap transactions gradually purchased 2 million shares of Sterling Software stock on the open market. The Lehman affiliate began to purchase Sterling Software shares toward its hedge on October 7, 1999.

35.     The Isle of Man corporations' process of entering the total return swap transactions with the Lehman affiliate was underway by no later than September 29, 1999.

36.     Prior to that time, the protectors had recommended that certain Isle of Man corporations take a significant long position in Sterling Software by purchasing call options.

37.     But on September 28, 1999, Lou Schaufele opined that entering into total return swap transactions referencing Sterling Software stock might be a preferable way for the Isle of Man corporations to take a significant long position on Sterling Software stock than purchasing call options outright.

38.     On October 4, 1999, Lehman began to prepare the paperwork to formalize the total return swap transactions with the Isle of Man corporations. As originally envisioned, the swap transactions would reference 4.5 million shares of Sterling Software in total, and would proceed in two phases. The first phase would reference 1.5 million shares, and the second would reference the rest.

39.     The transaction term sheets encompassing the first set of total return swap transactions, referencing 1.5 million total shares of Sterling Software stock, were finalized by October 8, 1999.

40.     The average starting price of Sterling Software stock calculated for purposes of the first set of total return swap transactions was $20.43.

41.      Two weeks after the first set of term sheets for the total return swap transactions were finalized, on October 18, 1999, Lou Schaufele provided the protectors with a list of options for the second phase of the swap transactions.

42.      On October 20, 1999, the protectors made a recommendation, approved by Sam Wyly, that the Isle of Man corporations increase to the overall size of the total return swap transactions only by 500,000 shares, so that the total size of the swap was 2 million shares, rather than the 4.5 million originally envisioned.

43.      The transaction term sheets encompassing the second set of total return swap transactions, referencing 500,000 shares of Sterling Software stock, were finalized by October 29, 1999.

44.      The average starting price of Sterling Software stock calculated for purposes of the second set of total return swap transactions was $20.16.

45.      The average weighted entry price for all of the notional shares referenced in the total return swap transactions between the Isle of Man corporations and the Lehman affiliate was $20.36.

## H. Morgan Stanley Delivers a Wide-Ranging Pitch to a Sam Wyly Associate

46.      Over a week after the transaction term sheets encompassing the first set of swap transactions were finalized, on October 14, 1999, William Sanders of Morgan Stanley delivered a wide-ranging business pitch to Richard Hanlon, a director of Michaels Stores.

47.      The Morgan Stanley presentation discussed strategic options for five different companies in which Sam Wyly had significant personal holdings, including Michaels Stores, Sterling Commerce, Scottish Annuity & Life Holdings, and Green Mountain Energy Resources, in addition to Sterling Software.

48.      Neither Sam Wyly nor Richard Hanlon requested the meeting with Morgan Stanley for the purpose of exploring sale options for Sterling Software.

49.      In the course of the presentation, however, William Sanders independently and without prompting raised the possibility of a sale of Sterling Software, and identified Computer Associates International as a natural buyer for Sterling Software based solely on publicly-available information. The presentation also stated that a deal with Computer Associates would be difficult to value.

50.      Sanders also identified two other companies, Veritas and Legato, that might be interested in buying certain pieces of Sterling Software's business.

51.      On October 18, 1999, William Sanders faxed a copy of his complete PowerPoint from the October 14, 1999 meeting to Sam Wyly.

52.      Despite receiving the fax from Morgan Stanley, Sam Wyly did not take any steps toward commencing a process to sell Sterling Software in October 1999.

**I. Sam Wyly and Sterling Williams Discuss a Possible Sale of Sterling Software**

53.      Sam Wyly and Sterling Williams first discussed a possible sale of Sterling Software during a Sterling Software corporate retreat on November 15, 1999.

54.      During that retreat, Sterling Williams broke off into a group with his senior executives and discussed the future of the company. Several alternatives were discussed, including (1) continuing current operations of the company, (2) dividing the company into four companies, (3) selling certain divisions or businesses within the company, or (4) selling the entire company. During that meeting, Williams and the other executives decided that the company should be sold. After the meeting, Williams went to Sam Wyly and told him that the company should be sold, and Sam Wyly agreed.

3110155v1/012798

55.     Neither Sam Wyly nor Charles Wyly had any authority to commence a process to sell Sterling Software without the approval of the Chief Executive Officer, Sterling Williams, and the other members of Sterling Software's Board of Directors.

56.     Sterling Software had a nine-member Board of Directors, which included several independent Directors in 1999.

57.     Sterling Software's bylaws required a majority of the Board of Directors to approve any change in control of the company.

58.     Following the November 15, 1999 meeting, Sterling Williams and the rest of Sterling Software's management team began to explore a possible sale of the company.

**J. Sterling Software Begins Taking Steps Toward a Possible Sale**

59.     On November 22, 1999, Sam Wyly met with William Sanders of Morgan Stanley and informed him that Sterling Software might be for sale if the right buyer was available.

60.     Several weeks after the November 22, 1999 meeting, William Sanders contacted Sanjay Kumar, the Chief Executive Officer and Chairman of the Board of Computer Associates, and informed him that Sterling Software was open to considering an acquisition.

61.     On January 10, 2000, Sterling Software retained Goldman Sachs to represent it in connection with a possible sale of the company.

62.     The first direct contact between Sterling Software and Computer Associates regarding a potential acquisition of the former company occurred on January 14, 2000, at the earliest.

63.     On January 21, 2000, Sterling Software retained Broadview International as a financial advisor in connection with a possible sale of the company.

64.     On February 8, 2000, Sterling Williams informed Sterling Software's Board of Directors that Computer Associates had made a formal offer to acquire the company.

9

65.     Sterling Software and Computer Associates conducted mutual due diligence between February 9 at 13, 2000.

66.     Sterling Software's Board of Directors voted to approve the final terms of the acquisition at a meeting held on February 13, 2000.

67.     The merger terms included a conversion ratio of 0.5634 shares in Computer Associates for each share in Sterling Software.

68.     Computer Associates announced before the markets opened on February 14, 2000, that it was acquiring Sterling Software.

69.     Sterling Software shares were converted to Computer Associates shares at midnight on March 31, 2000.

**K. Sterling Software's Stock Price Between October 7, 1999 and February 14, 2000**

70.     On October 7, 1999, the day before the transaction term sheets encompassing the first set of total return swap transactions were finalized, the closing price of Sterling Software stock was $20.31.

71.     On Friday, February 11, 2000, the last trading day before Computer Associates announced its acquisition of Sterling Software, the closing price of Sterling Software stock was $34.44.

72.     On Monday, February 14, 2000, the day that Computer Associates announced its acquisition of Sterling Software, the closing price of Sterling Software stock was $36.25.

73.     Most of the $15.94 increase in the price of Sterling Software stock between October 7, 1999 and February 14, 2000, occurred prior to the announcement of the acquisition.

74.     On November 11, 1999, the day when Sterling Software announced record fourth quarter results, the closing price of its stock was $28.00.

3110155v1/012798

75.     On December 15, 1999, the day when Sterling Software announced the release of a new software product, the closing price of its stock was $30.19.

76.     On February 10, 2000, the day when Sterling Software announced record first quarter results, the closing price of its stock was $32.25.

77.     The period between October 7, 1999, and February 14, 2000, also coincided with the height of the "dot com boom" in technology stocks.

78.     The period from October 1999 through February 2000 saw higher returns for technology stocks than any other time between 1995 and 2012.

**L. The Isle of Man Corporations Unwind the Swap Transactions**

79.     The Isle of Man corporations' total return swap transactions with the Lehman affiliate did not end by their terms on February 14, 2000, the day when Computer Associates announced that it was acquiring Sterling Software.

80.     The Isle of Man corporations also did not immediately terminate or unwind the total return swap contracts upon the sale of Sterling Software to Computer Associates.

81.     Instead, the Isle of Man corporations initially agreed with the Lehman affiliate to change the reference security in the swap transactions from Sterling Software stock to Computer associates stock.

82.     At the protectors' recommendation, all of the Isle of Man corporations had fully unwound their swap transactions with Lehman, which by that time referenced Computer Associates stock rather than Sterling Software stock, by no later than June 1999.

**PROPOSED CONCLUSIONS OF LAW**

83.     The single claim at issue in the bench trial alleges insider trading by Sam Wyly and  Charles Wyly—represented here by Donald Miller, the Executor of his Estate—in violation

11

of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

84.     In addition, for the reasons set forth below, the SEC has failed to carry its burden of proving the elements of its insider trading claims against Defendants by a preponderance of the credible evidence.

## A.     Elements of the SEC's Claim

85.     The SEC brings this action under the "classical theory" of insider trading pursuant to Section 10(b) and Rule 10b-5; the SEC does not rely on the alternative "misappropriation theory."

86.     The classical theory imposes liability on corporate insiders who trade on the basis of material, non-public information obtained by reason of their position with the corporation, and is based on the idea that corporate insiders breach a duty of trust and confidence to shareholders when they trade on the basis of such information. *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014).

87.     The SEC is further required to demonstrate that the defendant acted with scienter, which encompasses "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

88.     In this insider trading context, establishing this element requires proof that the corporate insider knew the information that he possessed at the time of the trade was material as well as non-public. *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

89.     In sum, the elements of the SEC's insider trading claims are that Sam Wyly and Charles Wyly were corporate insiders, traded in Sterling Software securities, and did so on the basis of material nonpublic information in their possession at the time of the trades, and knew that the information they possessed at the time of the trade was material and non-public.

12

90.     The SEC's claim fails because it has not proven (a) that Sam and Charles Wyly engaged in a trade in Sterling Software securities, (b) that they engaged in any trade based on material non-public information, or (c) that they knew that information in their possession at the time of any trades was material and non-public.

## B. Defendants Were Insiders of Sterling Software

91.     There is no dispute in this case that Sam Wyly and Charles Wyly, who sat on the Board of Directors of Sterling Software during the period at issue, were insiders of that company, and as such, owed a duty to refrain from trading in Sterling Software securities on the basis of material non-public information.

## C. There Was No Trade by the Defendants

92.     The SEC has failed to carry its burden of demonstrating that Sam and Charles Wyly engaged in any trade.

93.     The October 1999 swap transactions were derivative contracts between the Isle of Man corporations and a foreign Lehman affiliate.

94.     Neither Sam Wyly nor Charles Wyly was a party to these derivative contracts.

95.     Although the SEC alleges that Sam and Charles Wyly caused the Isle of Man trusts to enter into these contracts, the SEC did not plead in the Complaint or the Joint Pretrial Order, and did not prove during the bench trial, any recognized vicarious liability claim against Sam and Charles Wyly.

96.     The SEC did not plead or prove a control person claim against Sam and Charles Wyly pursuant to Section 20(a) of the Exchange Act with regard to insider trading by the Isle of Man corporations.

97.       The SEC did not plead or prove an aiding and abetting claim against Sam and Charles Wyly pursuant to Section 20(e) of the Exchange Act with regarding to insider trading by the Isle of Man corporations.

98.       Moreover, the SEC has never alleged, and did not prove, that Sam and Charles Wyly provided a "tip" to the Isle of Man corporations regarding material, non-public information about Sterling Software, or obtained a direct or indirect personal benefit from the disclosure. *SEC v. Contorinis*, 743 F.3d 296, 311 (2d Cir. 2014).

99.       For these reasons, the SEC's insider trading claims against Sam and Charles Wyly fail as a matter of law.

**D. The Material Non-Public Information Standard**

100.       Even assuming there was a trade by Sam and Charles Wyly, or that the SEC had pleaded and proven a valid vicarious liability theory, the SEC's insider trading claims still fail because the transactions at issue were not based on material non-public information.

101.       Information is considered material if its disclosure would be viewed by the reasonable investor significantly altering the total mix of available information made available regarding the security. *Mathis v. SEC*, 671 F.3d 210, 219-20 (2d Cir. 2012).

102.       Assessing materiality requires a delicate assessment of the significance that a reasonable shareholder would draw from a given set of facts, making the assessment peculiarly one for the trier of fact to decide. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

103.       Information is considered non-public if it not available to the public through SEC filings, the media, or other sources. *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2013).

104.       "The mere 'intention' to pursue a possible merger at some time in the future, without more, is simply not a material fact under rule 10b–5." *Panfil v. ACC Corp.*, 768 F. Supp. 54, 58-59 (W.D.N.Y. 1991), *aff'd,* 952 F.2d 394 (2d Cir. 1991). "The probability of merger prior

14

to any contact with potential suitors—prior to any evidence that a suitor is in any way interested in merger—is too remote [to be material]." *Id.* (citing *List v. Fashion Park, Inc.,* 340 F.2d 457, 464 (2d Cir. 1965) (insider's knowledge that company's board had resolved to seek a merger or sale and had been informed that unknown purchaser was interested in acquiring company not material)); *accord L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*, 921 F. Supp. 1174, 1180-81 (S.D.N.Y. 1996) (holding that "the likelihood of a deal with [the potential counterparty], given the existence only of [the defendant]'s desire to explore such a possibility, was so speculative that [the defendant]'s desire was immaterial as a matter of law irrespective of the unquestioned importance of such a transaction were it to have occurred").

**E. The Swap Transactions Were Not Based on Material Non-Public Information**

105.     The SEC has failed to demonstrate that the first phase of swap transactions, which were finalized by no later than October 8, 1999, were based on material non-public information possessed by Sam and Charles Wyly at that time.

106.     With regard to these swap transactions, the only conceivable non-public information that Sam and Charles Wyly could have possessed by the time the Isle of Man corporations were committed to entering these transactions was that Sam Wyly had reached the conclusion that Sterling Software's stock was undervalued, such that a sale of the company might be desirable, and had also communicated that belief to Charles Wyly.

107.     Information that Sterling Commerce, a separate company despite its overlapping officers and directors, had commenced a sale process does not constitute inside information for purposes of a claim for insider trading in Sterling Software stock.

108.     In any case, such information about *a different company's* sale process would not have been viewed by a reasonable investor in Sterling Software as significantly altering the total mix of information available regarding that company and its stock.

109.     It is self-evident that insider trading liability cannot be premised on information that did not exist at the time of the allegedly illegal activity. *SEC v. Rorech*, 720 F. Supp. 2d 367 (S.D.N.Y. 2010). As such, information about steps taken toward accomplishing a sale of Sterling Software after October 8, 1999, is irrelevant as a matter of law.

110.     Moreover, Sam Wyly's personal belief that Sterling Software stock was undervalued had effectively become public information by October 8, 1999.

111.     Sam's belief, and the belief of other Sterling Software Directors, that Sterling Software's stock was undervalued was fully incorporated into the September 3, 1999 announcement by Sterling Software of the plan to buy up to 5 million shares of the company's outstanding stock, about 6% of its approximately 85 million total shares.

112.     There is no evidence that Charles Wyly had come to the belief that a sale of Sterling Software was desirable as of October 8, 1999.

113.     Information about Sam Wyly's belief regarding the desirability of sale of Sterling Software and his communication of that belief to Charles Wyly was not available to public as of October 8, 1999, and did not become public until years after Computer Associates acquired Sterling Software.

114.     However, a reasonable investor in Sterling Software would not have considered the revelation of this information about Sam Wyly's subject beliefs to have significantly altered the total mix of information made available regarding the company and its stock.

115.     With respect to contingent or speculative information such as the information at issue here, materiality depends on a balancing of the indicated probability of an event occurring and the anticipated magnitude of the event in the life of the company. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 (1988)

3110155v1/012798

116.     The sale of a corporation is undoubtedly an event with significant magnitude in the life of the company.

117.     However, by October 8, 1999, any speculative desire to sell Sterling Software—which had not even been communicated beyond Sam and Charles Wyly to the other members of the Board of Directors—had not yet moved beyond the incipient stages and ripened into purposeful action. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001).

118.     The conclusion that a reasonable investor would not have viewed information regarding Sam Wyly's communicated interest in pursuing a sale of Sterling Software as material obtains with particular force where, as here, the corporation in question had already recently announced publicly that it viewed its stock as significantly undervalue by the market and that it was undertaking a major repurchase plan.

119.     Reasonable investors could easily infer from this publicly-available information that corporate directors who had fiduciary duties to maximize shareholder value would also naturally be interested in pursuing a sale of the unvalued company's shares for a premium over the current market price.

120.     This is confirmed by the fact that, on October 14, 1999, Morgan Stanley independently reached the conclusion, based solely on public information, that a sale of Sterling Software might be realistically pursued.

121.     No reasonable inference of materiality can be drawn here from the mere fact that the Isle of Man corporations decided to engage in the trade, given that no reliable evidence has been presented to indicate that these entities entered the swap contracts *because of* Sam Wyly's belief that a sale of Sterling Software was desirable.

122.     The evidence shows that Sam Wyly developed this belief as early as July 1999, and that no further steps whatsoever were taken toward a sale of Sterling Software to make a sale more likely until after October 8, 1999.

123.     It is not plausible to infer that a person eager to profit from insider information about a corporation would wait nearly three months to trade based on the information.

124.     Given that the process of entering into the swap transactions occurred very close in time after the September 3, 1999 public announcement about Sterling Software's earnings and buyback plan, it is far more plausible that *this information* was the basis for the Isle of Man corporations' desire to take a long position on Sterling Software.

125.     Nor can any reasonable inference of materiality be drawn from the mere fact that the price of Sterling Software stock increased between October 8, 1999, and February 14, 2000.

126.     Most of the price increase between October 8, 1999, and February 14, 2000, can be reasonably attributed to other factors, based on the simply face that the closing price on Friday, February 11, 2000—the last trading day before Computer Associates announced its acquisition of Sterling Software, was $34.44, and that the price only rose to $36.25 on the day of the announcement.

127.     The SEC has provided no evidence to suggest that information about the acquisition leaked to the market before February 14, 2000.

128.     In addition, no inference of materiality can be reasonably inferred from the mere fact that the price of Sterling Software stock increased by $1.81 on the day of the merger announcement.

129.     The fact that the news of the merger cause an increase in Sterling Software price indicates that information regarding an agreed-to acquisition was material, but says nothing

18

about whether _inchoate_ information existing months earlier would have been significant from the perspective of a reasonable investor.

130.     The SEC's expert testimony regarding materiality is unpersuasive because the expert studied disclosures of formal corporate decisions to put a company up for sale—an announcement based on information that could not have existed in this case until November 15, 1999 at the earliest, a month after the trades at issue.

131.     As a result, the SEC's insider trading claim fails to the extent it is based on the first set of swap transactions.

132.     The SEC has also failed to demonstrate that the second set of swap transactions, which were finalized by no later than October 20, 1999, were based on material non-public information possessed by Sam and Charles Wyly at that time. The decision to engage in a second phase of swap transactions was part of the plan all along.

133.     The information possessed by Sam and Charles Wyly as of October 20, 1999, was public and/or immaterial largely for the same reasons stated above.

134.     The _only_ additional information that Sam and Charles Wyly may have possessed at the time when the second set of swap transactions were finalized was information derived from the October 12, 1999 Morgan Stanley presentation, a copy of which was faxed to Sam Wyly on October 18, 1999.

135.     The Morgan Stanley presentation merely compiled publicly available information about many companies in which Sam Wyly invested, not limited to Sterling Software.

136.     The Morgan Stanley meeting was a general pitch for Sam Wyly-related business, and was not arranged with an eye toward selling Sterling Software specifically.

137.     William Sanders decided to include a discussion of options for a sale of Sterling Software in the presentation on his own.

138.     Although the Morgan Stanley presentation identified Computer Associates as a natural buyer for Sterling Software, that identification was based solely on public information about the two companies. Moreover, the presentation cautioned that Computer Associates would "likely be difficult on value," reducing the likelihood that this identification could actually lead to a successful, mutually-desirable acquisition.

139.     The presentation also identified two other companies as potential buyers of certain parts of Sterling Software's business, which further demonstrates the speculative nature of the identification of Computer Associates.

140.     There was no actual communication between Sterling Software and Computer Associates regarding a potential merger until months after the Morgan Stanley presentation.

141.     There is no evidence that Charles Wyly knew about the Morgan Stanley presentation knew about the Morgan Stanley presentation by October 20, 1999, nor that Charles Wyly had come to the belief that a sale of Sterling Software was desirable by that date.

142.     For all of these reasons, any speculative plan to sell Sterling Software had also not yet moved beyond the incipient stages and ripened into purposeful action by October 20, 1999, and any non-public information possessed by Sam and Charles Wyly at that time would not have been considered material from the viewpoint of a reasonable investor.

143.     As a result, the SEC's insider trading claim also fails to the extent it is based on the second set of swap transactions.

**F. Sam and Charles Wyly Did Not Act with Scienter**

144.     Even assuming that Sam Wyly and/or Charles Wyly engaged in one or more trades in October 1999 based on material non-public information about Sterling Software, the SEC's claims still fail because it has not proven scienter by a preponderance of the evidence.

145.     The SEC presented no direct evidence that Sam Wyly or Charles Wyly knew, nor even had reason to believe, that the information they possessed at the time of the October 1999 swap transactions was either non-public or material.

146.     In addition, there is no persuasive circumstantial evidence that a knowing violation of the securities laws occurred in this case.

147.     No reasonable inference of scienter can be drawn from the mere fact that the swap transactions occurred offshore.

148.     The preponderance of the evidence indicates that Sam and Charles Wyly placed various assets into offshore trusts and subsidiary entities for tax deferral and asset protection purchases.

149.     The fact that there were legitimate purposes for placing assets into such offshore entities undercuts any suggestion that the entities were merely a mechanism for hiding knowing securities law violations. Further, there is no basis for the SEC's suggested inference that the Wylys recommended that the Isle of Man entities engage in the swap, rather than the Wylys themselves, in order to hide the transaction from public view. Even if the swap transactions were entered into by the Wylys, they would not have had to report them.

150.     Likewise, no reasonable inference of scienter can be drawn from the mere fact that the swap transaction ended up being profitable in the end. If that were true, a securities fraud plaintiff could easily demonstrate scienter through circumstantial evidence in cases in which an insider made a successful bet on his or her company's future prospects.

3110155v1/012798

**G. Sam Wyly and Charles Wyly Did Not Personally Profit from the Trades In Question**

151.     The alleged insider trades at issue here were derivative contracts between Isle of Man corporations associated with Sam and Charles Wyle and an offshore Lehman affiliate.

152.     The Isle of Man corporations, and the trusts that owned the corporations, profited when the swap transactions were unwound in or around June 2000.

153.     However, Sam and Charles Wyly did not directly receive any of the proceeds of these transactions.

Dated: April 4, 2014

Respectfully submitted,

SUSMAN GODFREY, L.L.P.

By:   /s/ David D. Shank

Stephen D. Susman (SS8591)
Mark H. Hatch-Miller (MH4981)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Terrell W. Oxford
David D. Shank
901 Main Street, Suite 5100
Dallas, Texas  75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

*Attorneys for Donald R. Miller, Jr.
and Samuel E. Wyly*

3110155v1/012798

## CERTIFICATE OF SERVICE

I hereby certify that on _April 4, 2014, a true and correct copy of the foregoing Proposed Findings of Fact and Conclusions of Law was served upon all counsel of record via the ECF filing system.

/s/ David D. Shank_____
David D. Shank