# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 1:10-cv-5760-SAS |
| | : | |
| SAMUEL WYLY and DONALD R. MILLER, JR., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., | : | ECF Case |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' BENCH TRIAL MEMORANDUM
## OF LAW REGARDING INSIDER TRADING CLAIMS

3110606v1/012798

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF THE FACTS ............................................................................. 2

III.   APPLICABLE LAW AND ARGUMENT ........................................................... 6

       A.    Sam and Charles Wyly Did Not Engage In a Trade ................................. 6

       B.    Sam and Charles Wyly Did Not Trade on Material, Non-Public
             Information ............................................................................................ 7

       C.    Sam and Charles Wyly Did Not Act With Scienter ............................... 11

IV.    EVIDENTIARY ISSUES .................................................................................... 13

V.     CONCLUSION ................................................................................................... 13

## TABLE OF AUTHORITIES

**CASES**

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................. 11

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001) .......................................................................... 7

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
  654 F.3d 276 (2d Cir. 2011) ........................................................................ 13

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*,
  723 F. Supp. 976 (S.D.N.Y. 1989) ................................................................. 9

*In re General Motors Class E Stock Buyout Sec. Litig.*,
  694 F. Supp. 1119 (D. Del. 1988) ............................................................ 8, 10

*Jackvony v. Riht Financial Corp.*,
  873 F.2d 411, (1st Cir. 1989) ...................................................................... 10

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*,
  921 F. Supp. 1174 (S.D.N.Y. 1996) ............................................................... 8

*List v. Fashion Park, Inc.*,
  340 F.2d 457 (2d Cir. 1965) ..................................................................... 8, 10

*Panfil v. ACC Corp.*,
  768 F. Supp. 54 (W.D.N.Y. 1991), ........................................................... 8, 10

*SEC v. Geon Indus.*,
  531 F.2d 39 (2d Cir. 1976) ........................................................................... 8

*SEC v. Monarch Fund*,
  608 F.2d 938 (2d Cir. 1979) ........................................................................ 11

*SEC v. Obus*,
  693 F.3d 276 (2d Cir. 2012) ........................................................... 1, 6, 11, 12

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*,
  296 F.R.D. 241 (S.D.N.Y. 2013) ................................................................... 6

*SEC v. Shapiro*,
  494 F.2d 1301 (2d Cir. 1974) ...................................................................... 10

*SEC v. Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) .............................................................. 1

3110606v1/012798

*Steginsky v. Xcelera Inc.*,
   741 F.3d 365 (2d Cir. 2014) ................................................................................. 1

**STATUTES**

15 U.S.C. § 78j(b) .................................................................................................... 1

**REGULATIONS**

17 C.F.R. § 240.10b-5 .............................................................................................. 1

Defendants Samuel ("Sam") Wyly and Donald R. Miller, in his capacity as Executor of the Will and Estate of Charles J. Wyly, Jr., submit this trial memorandum of law pursuant to the Court's Individual Rules and Procedures regarding bench trials.

## I.     INTRODUCTION

The bench trial in this case is set to begin following the conclusion of the separate jury trial on other claims brought by the SEC against the Wylys. During the bench trial, the Court will be asked to resolve just one claim. This claim alleges that in October 1999, Sam Wyly and his now-deceased brother Charles committed insider trading in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.[1]

Section 10(b) and Rule 10b-5 make it unlawful for any person to employ a device, scheme, or artifice to defraud someone else in connection with the purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Under the "classical" insider trading theory, a plaintiff can establish such a claim by proving that a defendant who was a corporate insider traded in the securities of his corporation based on material, non-public information. *Steginsky v. Xcelera Inc.*, 741 F.3d 365 (2d Cir. 2014). To prevail on such a claim, the plaintiff must also demonstrate that the defendant acted with scienter in entering the trade in question. *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

The Court will have to resolve three ultimate questions during the bench trial:

(1) Did Sam and Charles Wyly engage in any trade in October 1999?[2]

---

[1] The Court has indicated that it will decide the available remedies, if any, on the claims at issue in both the jury trial and bench trial during a separate, post-trial proceeding. The parties have not yet engaged in any expert discovery related to the calculation of the remedies sought by the SEC.

[2] Defendants concede that Sam Wyly and Charles Wyly were Sterling Software insiders in October 1999. Defendants dispute that the securities laws in existence in October 1999 reached the total return swap transaction as issue in this case. However, the Court has already resolved that disputed issue as a matter of law in denying Defendants' motion to dismiss. *SEC v. Wyly*, 788 F. Supp. 2d 92, 119-22 (S.D.N.Y. 2011).

(2) Did Sam and Charles Wyly enter into any trade on the basis of material non-public information regarding Sterling Software?

(3) Did Sam and Charles Wyly act with scienter in entering into any trade?

As explained below, the Court should answer "no" to all three questions.

## II.     SUMMARY OF THE FACTS

Sam and Charles Wyly co-founded Sterling Software in 1981 with Sterling Williams. Williams served as the CEO and a director of Sterling Software from 1981 until 2000, when it was acquired by Computer Associates in a stock-for-stock transaction. During the same period, Sam Wyly served as chairman of Sterling Software's board, and Charles served as vice chairman.

In 1995, Sterling Software spun off its electronic commerce division into a separate public company, Sterling Commerce. Sterling Williams served as chairman of the Sterling Commerce board of directors from 1995 until 2000, when Sterling Commerce was acquired by SBC Communications in a cash deal valued at $3.9 billion. During the same period, Sam and Charles Wyly served as directors of Sterling Commerce.

In the summer of 1999, Sam Wyly independently reached the conclusion that, in light of the market's interest in technology businesses at the time, Sterling Software and Sterling Commerce were undervalued and, therefore, might be sold at a premium. In July 1999, Sam Wyly communicated this conclusion to his brother Charles. At that time, neither Sam nor Charles took any steps towards pursuing a sale of either company.

On September 3, 1999, Sterling Software announced a $5 million stock repurchase program, based on the company's view, as expressed by Sterling Williams, that Sterling Software's stock "is a vastly undervalued asset." This, of course, was entirely consistent with Sam Wyly's private view, expressed only to Charles in July 1999.

2

In mid-1999, Sterling Williams independently came to the conclusion that Sterling Commerce should be sold. This conclusion was based on Sterling Commerce's financial performance during the fiscal quarter ending in June 1999. Williams first shared his view with Sam Wyly, and then with Sterling Commerce's CEO, Werner Blow. Thereafter, Sterling Commerce retained Goldman Sachs to advise it in connection with a possible sale. Goldman Sachs delivered its initial presentation to Sterling Commerce on September 12 and 13, 1999. The presentation dealt only with Sterling Commerce; it did not include any analysis or discussion of a potential sale of Sterling Software. The presentation included an illustrative list of 36 potential buyers, one of which was Computer Associates. Ultimately, Sterling Commerce was sold to SBC Communications. From September 1999 until February 22, 2000, when the sale of Sterling Commerce was announced, the process of selling Sterling Commerce was kept entirely separate from any notion of selling Sterling Software.

In September 1999, the protectors of the Isle of Man trusts recommended that several of the Isle of Man companies take a significant long position in Sterling Software by purchasing call options. On September 28, 1999, Lou Schaufele, who was the broker for the Isle of Man entities and the Wylys, suggested that the Isle of Man entities take the long position by entering into total return swap transactions, rather than by purchasing call options, because the swaps "had fewer moving parts."

Lehman Brothers began formalizing the paperwork for the swap on October 4, 1999. As initially envisioned, the swap would reference 4.5 million shares of Sterling Software stock. This size was later reduced to 3.75 million shares, to occur in two phases. The transaction terms sheets for the first phase of the swap—referencing 1.5 million shares—were finalized by October 8, 1999. The notional price for this phase of the swap was $20.43 per share. The Isle of Man

3

entities limited their participation in the second phase only by 500,000 shares, at the recommendation of the protectors. The swap thus ultimately referenced only 2 million shares. The notional price for the second phase was $20.16 per share, and the average weighted notional price was $20.36 per share.

On October 14, 1999—over a week after the first phase of the swap transaction was underway—William Sanders of Morgan Stanley delivered a wide-ranging business pitch to Richard Hanlon, a director of Michaels Stores. The presentation discussed strategic options for five different companies in which Sam Wyly had personal holdings: Michaels Stores, Sterling Commerce, Sterling Software, Scottish Re, and Green Mountain Energy.

Neither Sam Wyly nor Richard Hanlon had requested the meeting for the purpose of exploring sale options for Sterling Software. In the course of the presentation, however, Sanders independently raised the prospect of selling Sterling Software. Based on publicly available information, Sanders suggested that Computer Associates was a natural buyer, though such a deal would be difficult to value. Sanders also identified two other companies, Veritas and Legato, that might be interested in buying certain pieces of Sterling Software's business. On October 18, 1999, Sanders faxed Sam Wyly a copy of Sanders's presentation.

Neither Sam nor Charles Wyly took any steps toward pursuing a sale of Sterling Software until after November 15, 1999, which was the date of Sterling Software's off-campus company retreat. At the retreat, Sterling Williams broke off into a group with his senior executives (which did not include either Sam or Charles Wyly) and discussed the future of the company. Several alternatives were discussed, including (1) continue current operations of the company; (2) divide the company into four companies; (3) sell certain divisions or businesses within the company; or (4) sell the entire company. In that discussion, Williams and the other executives decided to

4

pursue the fourth alternative—sell the company. After the meeting, Williams went to Sam Wyly and told him that the company should be sold, and Sam Wyly agreed.

On November 22, 1999, Sam Wyly met with Williams Sanders—the Morgan Stanley investment banker who had prepared the earlier presentation—and told him that Sterling Software might be for sale if the right buyer was available. Several weeks later, Sanders contacted Sanjay Kumar, Computer Associates' CEO and Chairman of the Board, and informed him that Sterling Software was open to pursuing an acquisition.

On January 10, 2000, Sterling Software retained Goldman Sachs to represent it in connection with the possible sale of the company. A few days later, on January 14, 2000, Sterling Software had its first direct contact with Computer Associates regarding the potential sale of the company.  Then, on January 21, 2000, Sterling Software retained Broadview International as financial advisor for a possible sale of the company.

On February 8, 2000, Sterling Williams informed Sterling Software's board of directors that Computer Associates had made a formal offer to acquire the company. The two companies performed mutual due diligence between February 9 and 13, 2000, and Sterling Software's board of directors voted to approve the final terms of the acquisition at a meeting held on February 13, 2000.  The merger was a stock-for-stock deal in each share of Sterling Software would be converted into 0.5634 shares of Computer Associates.

On February 14, 2000, Computer Associates announced the acquisition of Sterling Software. The closing price of Sterling Software on that day was $36.25, which was $1.81 higher than the previous trading day's closing price, representing an increase of 5.3%.[3] By way of comparison, Sterling Software's stock price increased by 18.5% (from $23.63 to $28.00) after

---

[3] By contrast, the share price of Sterling Commerce increased by 38% after SBC announced its acquisition of that company.

releasing record fourth quarter results in November 1999. Similarly, the stock price increased by 2.6% (from $27.63 to $30.19) on December 15, 1999, after Sterling Software announced the release of a new software product.

The swap transactions between the Isle of Man entities did not end on February 14, 2000, nor did the Isle of Man entities unwind the transactions on that date. When Sterling Software's stock was converted to Computer Associates stock, the reference security for the swaps was changed to Computer Associates stock. The swap was ultimately unwound no later than June 1999—three months longer than originally planned.

## III.   APPLICABLE LAW AND ARGUMENT

To prevail on its claim for insider trading, the SEC must prove by a preponderance of the credible evidence that Defendants (a) traded, (b) on the basis of material, non-public information, (c) that they knew or were reckless is not knowing, to be material and non-public. *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 296 F.R.D. 241, 249 (S.D.N.Y. 2013) (citing *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012)). Here, the SEC cannot establish any of these elements.

### A.   Sam and Charles Wyly Did Not Engage In a Trade

To prove its insider trading claim, the SEC must first prove that Sam and Charles Wyly engaged in a trade.[4] Here, it is undisputed that neither Sam nor Charles Wyly executed the alleged insider trade—a total return equity swap—on their own account. Rather, the SEC's theory relies solely on the notion that Sam and Charles Wyly "had their Offshore System" enter into the trade in question (Compl. ¶ 77), which in turn relies on the premise—which the Wylys

---

[4] An insider trading claim can also be premised on tipping, but the SEC has not alleged such a theory here. Even if it had, tipper liability requires that the defendant disclose the allegedly material nonpublic information to a tippee. Here, there is no evidence that Sam or Charles Wyly ever disclosed their desire to pursue a sale of Sterling Commerce prior to the swap transaction.

vigorously dispute—that the Wylys controlled the Isle of Man Entities that actually engaged in the trade. As the Wylys intend to demonstrate during the jury phase of the trial, however, the independent trustees had ultimate control over the Isle of Man Entitles' trading in securities. Therefore, the Wylys did not engage in a trade and cannot be held liable for insider trading.

### B.    Sam and Charles Wyly Did Not Trade on Material, Non-Public Information

Even assuming that Sam or Charles Wyly entered into one or more trades involving Sterling Software stock in October 1999, the SEC's insider trading claim still fails because Sam and Charles Wyly did not possess material, non-public information about Sterling Software at the time the Isle of Man entities entered the swap transaction.

 "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" regarding the company. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks omitted). "When contingent or speculative events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* (internal quotation marks omitted). In such circumstances, "no single event or factor is necessarily determinative of the materiality inquiry." *Id.*

Accordingly, "the potential significance of a merger [or acquisition] is considered in light of the likelihood that it will occur." *Id.* at 181.  "A merger is often of tremendous significance to shareholders; indeed, a merger in which a corporation is bought out has been called the most important event that can occur in a corporation's life, to wit, its death." *Id.* (internal quotation marks and ellipsis omitted). That being the case, "information regarding a merger can become

7

material at an earlier stage than would be the case as regards lesser transactions." *SEC v. Geon Indus.*, 531 F.2d 39, 48–49 (2d Cir. 1976).

Nevertheless, "[t]he mere 'intention' to pursue a possible merger at some time in the future, without more, is simply not a material fact under rule 10b–5." *Panfil v. ACC Corp.*, 768 F. Supp. 54, 58-59 (W.D.N.Y. 1991), *aff'd,* 952 F.2d 394 (2d Cir. 1991). "The probability of merger prior to any contact with potential suitors—prior to any evidence that a suitor is in any way interested in merger—is too remote [to be material]." *Id.* (citing *List v. Fashion Park, Inc.*, 340 F.2d 457, 464 (2d Cir. 1965) (insider's knowledge that company's board had resolved to seek a merger or sale and had been informed that unknown purchaser was interested in acquiring company not material)); *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*, 921 F. Supp. 1174, 1180-81 (S.D.N.Y. 1996) (holding that "the likelihood of a deal with [the potential counterparty], given the existence only of [the defendant]'s desire to explore such a possibility, was so speculative that [the defendant]'s desire was immaterial as a matter of law irrespective of the unquestioned importance of such a transaction were it to have occurred").

Further, the SEC "cannot rely on the fact that subsequent merger discussions were held to bolster his claim[;] [t]he probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed." *Panfil*, 768 F. Supp. at 58–59 (citing *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1128 (D. Del. 1988)).

Here, the SEC cannot meet its burden of proving that the Wylys were in possession of material, non-public information. According to the SEC's Complaint, the alleged material, non-public information was the fact that Sam Wyly had "personally decided" in June 1999 that Sterling Software should be sold to potential buyers, a decision which Sam shared with his

8

brother Charles, who allegedly concurred. (Compl. ¶ 89.) In the three months following that decision until the swap transaction took place, the Wylys learned no further information and did nothing to pursue the sale. Thus, at the time of the alleged insider trade, any merger was entirely speculative.

At the time the Isle of Man trusts entered into the swap, the Wylys had not discussed the prospect of selling Sterling Software with Sterling Williams, the company's CEO and a director, whose approval was required to commence any process to sell Sterling Software. Nor had they discussed it with any other members of Sterling Software's board, whose approval they would also need. They had not reached out to any investment banks about the prospect of selling the company. They had not identified, much less spoken to, any prospective buyers. In short, neither the Wylys nor Sterling Software had taken any concrete steps to pursue a sale of the company.

Nevertheless, the SEC claims that the inchoate *desire* of two board members to sell the company, without more, is material information. This theory of materiality is completely unprecedented. Although "information regarding a merger can become material at an earlier stage than would be the case as regards lesser transactions," no court in the Second Circuit has ever found material one company's desire (much less the desire of just two members of the board) to be acquired when there has been no contact, much less negotiations, with a prospective purchaser. To the contrary, multiple courts in the Second Circuit and elsewhere have found the opposite to be true. *E.g., List v. Fashion Park, Inc.,* 340 F.2d 457, 464 (2d Cir. 1965) (insider's knowledge that company's board had resolved to seek a merger or sale and had been informed that unknown purchaser was interested in acquiring company not material); *Jackvony v. Riht Financial Corp.,* 873 F.2d 411, 413–14, 417 (1st Cir. 1989) (series of statements and tentative probes regarding possibility of being acquired not material); *Hartford Fire Ins. Co. v. Federated*

*Dep't Stores, Inc.*, 723 F. Supp. 976, 987 (S.D.N.Y. 1989) (no suitor had contacted target or made an offer to buy; board had taken no action to show interest in being acquired); *In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1128 (D. Del. 1988) (unilateral decision of management to spin off subsidiary and relationship with high-profile director of subsidiary prior to negotiations not material); *Panfil v. ACC Corp.*, 768 F. Supp. 54, 58-59 (W.D.N.Y. 1991) *aff'd,* 952 F.2d 394 (2d Cir. 1991).

Furthermore, the Wylys' conduct provides no basis for inferring materiality. To the contrary, their conduct demonstrates that they did not attach material importance to the alleged nonpublic information. According to the SEC's own theory, the Wylys decided that Sterling Software should be sold in July 1999. Yet, they did not trade "immediately after" reaching that decision. *See SEC v. Shapiro*, 494 F.2d 1301, 1306–07 (2d Cir. 1974). They did not trade in the following day, the following week, or even the following month. Rather, the trade in question did not occur until *three months* after the Wylys decided that Sterling Software should be sold.

Moreover, the Wylys did not push to pursue the sale of Sterling Software. Even after William Sanders of Morgan Stanley provided a strategic review of several Wyly-related companies that suggested the possibility of selling Sterling Software, the Wylys did nothing to bring that sale about. It was not until Sterling Williams and his senior executives *independently* arrived at the opinion that the company should be sold, and then informed Sam Wyly of his opinion, that any steps were taken towards pursuing a sale.

In fact, not only did the Wylys fail to take steps to capitalize on the alleged nonpublic information, but the company itself publicly *disclosed* its opinion that its stock was undervalued. On September 3, 1999, Sterling Software announced a stock repurchase program under which it would buy back up to five million shares of its stock—which it described as "a vastly

10

undervalued asset." It was not until after this public announcement that the Wylys first recommended that the Isle of Man entities take a significant long position in Sterling Software.

Nor is there any evidence of market activity that suggests Sam Wyly's incipient opinion would have been material. The SEC points to the 5% increase in Sterling Software's stock price after the announcement of a *completed* merger with Computer Associates. This, of course, is no evidence of how the market would have reacted (if at all) had Sam Wyly announced his inchoate decision to pursue a sale of the company in July 1999—before even any potential acquirers had been identified. Rather, it is evidence only of the materiality of news of a completed merger. Moreover, the SEC's reliance on this data ignores the law's requirement that the magnitude of a contingent or speculative event be balanced against the "indicated probability that the event will occur." And as explained, that probability was de minimis at the time the of the alleged insider trade.

In sum, *none* of the facts that courts have relied on in finding information material in other cases are present in this case. Although shareholders may be curious to know corporate directors' every thought, that is not the test for materiality. The test for materiality asks whether there is "a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Where, as here, the information is "so general that the recipient thereof is still undertaking a substantial economic risk that his tempting target will prove to be a white elephant," *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979), the information is not material and there can be no liability for insider trading.

### C.     Sam and Charles Wyly Did Not Act With Scienter

Like all securities fraud claims under Section 10(b) and Rule 10b-5, insider trading claims require proof of scienter. *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). That is, in order

11

to be liable for insider trading, "at the moment of tipping or trading, the [defendant] must know or be reckless in not knowing that the conduct was deceptive." *Id.* This, in turn, requires proof that the defendant "kn[ew] that the information that is the subject of the tip [or trade] is non-public and is material for securities trading purposes or act with reckless disregard for the nature of the information." *Id.*

The record here, however, is devoid of any evidence that at the time of the swap transaction, Sam or Charles Wyly knew or recklessly disregarded the risk that they were in possession of material, non-public information. As explained above, nothing about the Wylys' behavior in the months leading up to the swap transaction indicated that they believed they possessed material nonpublic information. The trade did not occur immediately after they acquired that information, but only after Sterling Software publicly announced the board's view that the company's stock was undervalued. There also is no evidence that the Wylys or the protectors attempted to hide the transaction. The terms of the transaction were negotiated largely over email with the broker for the Isle of Man entities and the Wylys, Louis Schaufele.

Post-transaction conduct likewise demonstrates that the Wylys did not believe that their desire to pursue a sale of Sterling Software was material. Sam Wyly openly discussed the issue with the ghostwriter who was helping him write his next book. These are not the actions of someone who believes that they have just traded on material nonpublic information.

Nevertheless, the SEC intends to argue that the mere fact the swap transaction was carried out by the Isle of Man entities, rather than on the Wylys' own accounts, demonstrates an intent to hide the transactions and, therefore, indicates that there was something to hide, i.e., that the Wylys possessed material nonpublic information. This is a red herring. Even if the Wylys had entered into the swap transaction themselves—rather than recommending that the Isle of

12

Man entities do so—the transaction would not have been reported in any SEC filing because the swap transaction would not have resulted in any additional reporting obligations for the Wylys. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 288 (2d Cir. 2011) (Winter, J., concurring) (stating that the long party of a total return equity swap does not become the beneficial owner of any securities purchased by the short party to hedge unless there is some agreement between the long and short party permitting the long party to acquire or to control the stock purchased by the short party).

The SEC simply lacks any evidence that Sam or Charles Wyly knew or were reckless in not knowing that a reasonable shareholder would have found Sam Wyly's embryonic and entirely speculative opinion about the desirability of selling the company significant in making investment decisions.

## IV.    EVIDENTIARY ISSUES

Defendants are not presently aware of any outstanding evidentiary issues pertaining to the bench trial on the SEC's insider trading claims.

## V.    CONCLUSION

The SEC's insider trading is premised on a completely unprecedented theory of materiality and scienter that would turn any personal opinion of a corporate director about the future of the company into potentially material information. Because the SEC cannot meet its burden on these and other elements, the Court should enter judgment for Defendants on the insider trading claim.

3110606v1/012798

Dated: April 4, 2014

Respectfully submitted,

SUSMAN GODFREY, L.L.P.

By:   /s/ David D. Shank
     Stephen D. Susman (SS8591)
     Mark H. Hatch-Miller (MH4981)
     Steven M. Shepard (*pro hac vice*)
     560 Lexington Avenue, 15th Floor
     New York, New York  10022-6828
     Telephone: (212) 336-8330
     Facsimile: (212) 336-8340

     Terrell W. Oxford (*pro hac vice*)
     David D. Shank (*pro hac vice*)
     901 Main Street, Suite 5100
     Dallas, Texas  75202-3775
     Telephone: (214) 754-1900
     Facsimile: (214) 754-1933

     *Attorneys for Samuel E. Wyly and Donald*
     *R. Miller, Jr.*

14

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 4, 2014, a true and correct copy of the foregoing Bench

Trial Memorandum of Law was served upon all counsel of record via the ECF filing system.


    /s/ David D. Shank_____
    David D. Shank