UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

   - against -

SAMUEL WYLY, and DONALD R.
MILLER, JR., in his Capacity as the
Independent Executor of the Will and Estate
of Charles J. Wyly, Jr.,

                Defendants.

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/10/14

## OPINION AND ORDER

### 10-cv-5760 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       The Securities and Exchange Commission ("SEC") brought this civil

enforcement action against Samuel Wyly and Donald R. Miller, Jr. as the

Independent Executor of the Will and Estate of Charles J. Wyly Jr. (Charles Wyly

and, together with Samuel Wyly, the "Wylys"). The SEC alleged ten securities

violations arising from a scheme in which the Wylys established a group of

offshore trusts and subsidiary entities in the Isle of Man ("IOM"), used those

offshore entities to trade in shares of four public companies on whose boards the

Wylys sat, and failed to make the requisite disclosures. I presided over a jury trial

1

on nine of the ten claims from March 31 to May 7, 2014.  On May 12, 2014, the

jury returned a verdict of "liable" as to both Sam and Charles Wyly on all nine

claims.

The tenth claim, alleging insider trading in connection with several

October 1999 equity swaps, was not tried to the jury because the SEC was time-

barred from seeking civil penalties for this claim.[1]  The parties agreed that no new

testimony is necessary for the Court to decide the insider trading claim.[2]  The

parties made post-trial submissions on June 3, 2014 and I heard oral argument on

July 2, 2014.   Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I

make the following findings of fact and conclusions of law.  In reaching these

findings and conclusions, I considered the testimony admitted during the jury trial,

examined the documentary evidence, and reviewed the arguments and submissions

of counsel.

## II.    FINDINGS OF FACT

### A.    The Offshore Trusts

Between 1992 and 1996, Sam and Charles Wyly created a number of

---

[1]      *See SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013);
Transcript of 2/19/14 Conference, at 3.

[2]      Pursuant to a joint stipulation, the parties moved to admit an
additional thirty exhibits for purposes of the insider trading trial.  *See* 7/1/14 Notice
of Joint Agreement (Dkt. No. 402).  These exhibits are hereby admitted.

IOM trusts, each of which owned several subsidiary companies.[3]  The relevant

trusts and subsidiary companies for purposes of the insider trading claim are 1)

Delhi International Trust and its subsidiary, Greenbriar Limited ("Greenbriar"); 2)

Pitkin Non-Grantor Trust and its subsidiary, Roaring Fork Ltd. ("Roaring Fork");

3) Lake Providence International Trust and its subsidiary, Sarnia Investments

Limited ("Sarnia"); 4) Castle Creek International Trust and its subsidiary, Quayle

Limited ("Quayle"); and 5) Plaquemines Trust and its subsidiary, Moberly Limited

("Moberly").[4]

Michael French, the Wylys' family attorney, and Sharyl Robertson,

the Chief Financial Officer ("CFO") of the Wyly Family Office, served as

protectors of the IOM trusts.[5]  French, Robertson, and Michelle Boucher, the CFO

of the Irish Trust Company, a Wyly-related entity in the Cayman Islands,[6]

conveyed the Wylys' investment recommendations to the IOM trustees.  Most, if

not all, of the IOM trustees' transactions were based on these recommendations.[7]

---

[3]     *See* Stipulation of Undisputed Facts ("Stip. Facts") ¶¶ 20-46.

[4]     *See id*. ¶¶ 22, 24-26, 29, 36-40.

[5]     *See id.*  ¶¶ 49-50.

[6]     Boucher also became a Protector in 2001.  *See id*. ¶ 50.

[7]     *See* Trial Transcript ("Trial Tr.") at 96 (opening statement of Stephen
Susman, counsel for defense) ("We don't dispute that the trustees followed the
recommendations.  Yes, indeed, they did, most of the time for sure, and almost

**B.    Sterling Commerce and Sterling Software**

Sam and Charles Wyly co-founded Sterling Software with a former employee, Sterling Williams, in 1981.[8]  In 1996, Sterling Software spun off its electronic commerce division into a separate company – Sterling Commerce.[9] During the relevant time period, Sam Wyly served as the Chairman of the Board of Sterling Software and a Director of Sterling Commerce, Charles Wyly served as the Vice-Chairman of the Board of Sterling Software and a Director of Sterling Commerce, and Williams served as Chief Executive Officer of Sterling Software and Chairman of the Board of Sterling Commerce.[10]  Sterling Software's Board of Directors also included Sam Wyly's son Evan, Charles Wyly's son-in-law, Miller, and French.[11]

**C.    Equity Swap**

In late September 1999, Robertson, Boucher, Evan Wyly, and Louis Schaufele, a broker at Lehman Brothers, began to discuss a transaction whereby

---

always . . . when it came to the four securities that were in companies that the Wylys were more familiar with than anyone in the world.").

[8]    *See* Stip. Facts ¶ 4; Trial Tr. at 2501-2504 (Sterling Williams).

[9]    *See* Stip. Facts ¶ 2.

[10]    *See id*. ¶¶ 4, 6, 8.

[11]    *See* Plaintiff's Exhibit ("PX") 750 (2/13/00 minutes of Sterling Software's Board of Directors meeting).

4

several offshore entities would take a long position in Sterling Software.  Sam Wyly testified that he did not remember who came up with the idea for the transaction, but that he recommended the investment because he believed Sterling Software was undervalued.[12]  The Wylys originally planned to structure the transaction with call options,[13] but Schaufele recommended a swap "as an alternative . . . because there are less moving parts . . . if one wanted out [of the deal] before the maturity [date]."[14]  Evan Wyly negotiated the terms of the swaps with Schaufele.[15]  The terms of the transaction were confirmed and approved by the Wylys and entered into by the IOM trustees upon recommendations from Robertson and Boucher.[16]

On October 8, Greenbriar, Moberly, and Quayle executed the first

---

[12]     See Trial Tr. at 1856-1858 (Sam Wyly).

[13]     See PX 626 (9/28/99 fax from Michelle Boucher to Sharyl Robertson).

[14]     PX 625 (9/28/99 email from Louis Schaufele to Robertson).

[15]     See PX 633 (9/30/99 email from Robertson to Boucher) ("Evan is having discussions with Lou"); PX 645 (10/7/99 email from Schaufele to Boucher) (referencing "conversations with Evan" about the terms of the swap).

[16]     See PX 653 and 654 (10/8/99 emails between Robertson, Boucher, and Evan Wyly confirming the terms); PX 649 (10/7/99 fax from Boucher to Ken Jones, trustee of Plaquemines Trust, recommending that Moberly participate in the swap); PX 660 (10/8/99 fax from Boucher to Kathy Harding, trustee for Castle Creek International Trust, recommending that Quayle participate in the transaction).

three swap agreements with Lehman as the counterparty.  In total, these three

swaps referenced 1,500,000 common shares of Sterling Software.[17]  Each swap had

a term of eighteen months, subject to early termination provisions.  If the price of

the stock rose over this term, "Lehman was required to pay each of its Isle of Man

counterparties a cash amount equal to the total return on the relevant number of

underlying shares of Sterling Software stock over the term of the swap, including

both dividends and any capital appreciation."[18]  "The terms of the swap required

Lehman to purchase the 1.5 million Sterling Software shares, as the notional value

of the swap and the total return calculation were both based directly on Lehman's

average purchase price for those shares."[19]  "Over eight trading days from October

8, 1999 through October 20, 1999, Lehman gradually purchased the 1,500,000

Sterling Software shares . . . at a weighted average price of $20.4273 per share.

October 20, 1999 was thus considered the trade date for the swap."[20]  "Together,

---

[17]     *See* Declaration ("Decl.") of Professor Charles M. Jones in Support of the SEC's Submission Seeking a Liability Finding on the Insider Trading Claim ¶ 28.  Defendants have no objection to admitting the Jones declaration for the limited purpose of describing the economic structure of the swap agreements.

[18]     *Id*. ¶ 29.

[19]     *Id.* ¶ 30.

[20]     *Id.*  Lehman's purchases during this period comprised 49.21% of Sterling Software's trading volume.  *See* PX 656 (10/8/99-10/21/99 emails from Robertson to Sam, Evan, and Charles Wyly about the day's trading "on the SSW

these three total return swaps had a notional value of $30,640,950."[21]

On October 20, 1999, Roaring Fork and Sarnia entered into additional swap agreements referencing a a total of 500,000 shares.[22]  The average purchase price of Lehman's shares for these two swaps was $20.1623 per share and the notional value of the swaps was $10,081,150.[23]  The parties unwound the swaps in June 2000, approximately ten months before the expiration of the eighteen month term.

The equity swaps are financially complicated transactions, but in substance, the IOM's "long position was economically equivalent to the [IOM entities] (a) borrowing $40 million from the Lehman affiliate for up to 18 months, (b) using the loan proceeds to purchase 2 million shares of Sterling Software stock, (c) holding the shares for up to 18 months, and (d) selling the shares at the end of

_____

hedge").

[21]    Jones Decl. ¶ 31.

[22]    Although the Wylys originally planned to have the five swaps reference 4.5 million shares in total, Lehman capped it at 2 million shares because it "[was] the maximum exposure Lehman want[ed]."  PX 668 (10/18/99 email from Schaufele to Boucher).

[23]    *See* Jones Decl. ¶ 38.  The terms of the second set of swap agreements differed slightly, but not materially, from the terms of the earlier swap agreements. *See id*.

7

the swap and using the proceeds to pay off the loan and accrued interest."[24]  And

"in order to hedge against its short positions in the swaps – that is, to reduce the

risk that the price of Sterling Software stock would increase during the terms of the

swaps as the corporations were betting – Lehman purchased 2 million common

shares of Sterling Software stock on the open market."[25]  Thus, the transaction is

equivalent to the IOM entities purchasing 2 million shares of Sterling Software

stock on the open market in October 1999.

### D.    Decision to Sell Sterling Commerce and Sterling Software

In the summer of 1999, Sam Wyly decided that he wanted to sell both

Sterling Software and Sterling Commerce because he believed the market's

"valuations for the whole tech area [had reached] euphoric proportions."[26]  Wyly's

feelings were confirmed when the initial public offering for Greenmountain.com,

one of his other companies, failed in June 1999.[27]  At the trial, Wyly testified that

he only reached this conclusion about Sterling Commerce, not Sterling Software,

---

[24]    Stip. Facts ¶ 70.

[25]    *Id.* ¶ 71.

[26]    PX 962 (06/01 transcript of "webcast" to promote Ranger Governance, Ltd.) at 11.

[27]    *See* PX 1411 (12/16/05 Sam Wyly's notes for his autobiography) ("It was when the Green Mountain IPO didn't go through that I knew for SURE that it was time to sell Sterling.") at 1.  *See also* Trial Tr. at 1980-1981 (Sam Wyly).

because he believed that the e-commerce sector in general, and Sterling Commerce specifically, were overvalued, while Sterling Software was undervalued.[28]  But this is inconsistent with, and not credible in light of, the statements Wyly has consistently made over the last decade admitting that he decided, in the summer of 1999, that he would like to sell both companies.[29]

### E.    Sale of Sterling Commerce

Although Sam Wyly's *desire* to sell Sterling Software dates to the summer of 1999, and despite the fact that he may have even discussed this desire with his brother Charles, neither he nor his brother nor Williams took any affirmative steps towards pursuing a sale until November 1999.[30]  By contrast,

---

[28]    *See* Trial Tr. at 1878 (Wyly) ("A decision on Sterling Software had not been made in the summer of 1999.").  *See also id.* at 1982-1983 (Wyly) ("Sterling Software was the opposite [of Sterling Commerce].  It had a low price-earnings multiple.  It was a solid company, growing good. . . .").

[29]    *See* PX 1469 (11/28/12 deposition of Sam Wyly) at 373 ("Q: When you talked to your brother, Charles, about your idea of selling the company, this was in the summer or July of 1999?  A: It was about then."); PX 1205 (12/6/02 interview of Sam Wyly by David Allison of the Smithsonian National Museum of American History) at 33 ("I thought that the entire market was overpriced and that the tech end was getting more and more overpriced . . . but hadn't really arrived at any conclusions until the summer of 1999.  At that time, I concluded that the game was over.").

[30]    The Wylys may not have even approached Williams to discuss selling Sterling Software in the summer of 1999.  Williams testified that he did not discuss the sale of Sterling Software with the Wylys until November 1999. *See* Trial Tr. at 2530 (Williams).  The SEC argues that Williams was impeached on cross-

significant efforts were undertaken to pursue a sale of Sterling Commerce.  In the late summer of 1999, Williams reached out to Goldman Sachs about retaining the firm in connection with a possible sale of Sterling Commerce.[31]  On September 12 and 13, Goldman Sachs delivered an initial presentation to Sterling Commerce's management about the sale process and potential buyers.[32]  On September 15,

---

examination by contradictory testimony at his SEC investigative deposition, where he testified that while he "can't guarantee that" the conversation did not happen in the summer of 1999, he "do[esn't] think [it] happened [and] do[esn't] remember [it] happening."  *Id.* at 2581 (cross-examination of Williams by Martin Zerwitz, counsel for the SEC).  But this testimony is not contradictory; it merely reiterates that Williams does not believe he had such a conversation with the Wylys in the summer of 1999.

The only evidence in the record suggesting that the Wylys approached Williams to discuss selling Sterling Software in the summer of 1999 is a newspaper article stating that the "trio" made a decision to sell Sterling Software around that time, *see* PX 757 (Evan Ramstad, "A Dallas Financier Strikes It Rich Again With Company Sales," Wall Street Journal (02/23/00)), and Sam Wyly's handwritten notes on a draft of his ghostwritten autobiography relating a conversation with Williams regarding selling Sterling Software, *see* PX 1413 (3/10/06 Sam Wyly's notes on draft chapter).  However, as acknowledged in the correspondence between Wyly and his biographer, many of the "scenes" in the book are "ma[de] up."  *Id.*  I cannot find, based on this evidence, that the Wylys discussed the sale of Sterling Software with Williams in the summer of 1999.

[31]     *See* Trial Tr. at 2518 (Williams).

[32]     *See id.* at 2520-21 (Williams); Defendants' Exhibit ("DX") 396 (9/12/99 and 9/13/99 Goldman Sachs presentation).

10

Sterling Commerce's Board of Directors met to discuss the sale of the company.[33] On September 29, the Board of Directors discussed potential buyers and resolved to formally retain Goldman Sachs for "strategic third party transaction alternatives."[34]

### F.   Sale of Sterling Software

#### 1.   Goldman Sachs

The SEC contends that the Wylys and Williams either simultaneously discussed the sale of Sterling Software with Goldman Sachs, or at the very least, intended to use Goldman Sachs for the sale of Sterling Software after the sale of Sterling Commerce was finalized.  In support of this contention, the SEC again points to Wyly's prior statements that "[i]n July of '99, we retained Goldman Sachs with a view to the sale of two companies: First, Sterling Commerce . . . and also Sterling Software."[35]  But there is no evidence that the Wylys or Williams approached Goldman Sachs about Sterling Software before late November 1999.[36]

---

[33]     *See* PX 613 (minutes from 9/15/99 and 9/29/99 meetings of Sterling Commerce's Board of Directors).

[34]     *Id*.  The sale of Sterling Commerce to SBC Communications was announced on February 22, 2000.

[35]     PX 1403 (7/26/05 deposition testimony of Wyly) at 20.

[36]     *See* Trial Tr. 2539-2540 (Williams); DX 276 (11/19/99 email between Williams and Andy Rabin, representative of Goldman Sachs).

After this approach, Goldman Sachs did a presentation to Sterling Software's management and deal counsel on December 20 and signed a formal retainer agreement on January 10, 2000.[37]  This timeline is consistent with Williams's testimony that the decision to seriously pursue a sale of Sterling Software came at a November 15-17 corporate retreat.[38]

### 2.    Morgan Stanley

Alternatively, the SEC argues that Sam Wyly approached Morgan Stanley to discuss the sale of Wylys' companies – including Sterling Software – in October 1999.  However, the evidence shows that Richard Hanlon, a friend of the Wylys and Director of Michaels' Stores, not Sam Wyly, approached Morgan Stanley to generally discuss Wyly's companies.  William Sanders, an investment banker from Morgan Stanley, testified that Hanlon, "wanted to come in and meet some bankers and talk about some of the portfolio companies" that Sam Wyly was invested in.[39]  Sanders then prepared a presentation for a meeting with Hanlon on

---

[37]    *See* DX 574 (12/20/99 Goldman Sachs presentation); DX 390 (1/10/00 letter from Goldman Sachs to Williams containing signed retainer agreement).

[38]    *See* Trial Tr. at 2530-2533 (Williams); *see id.* at 2544-2545 (Williams).

[39]    Joint Exhibit ("JX") 9 (3/3/11 deposition of William Sanders, investment banker at Morgan Stanley) at 14.

October 14, 1999.  The presentation, titled "Project Windfall" included publicly available "materials about . . . all [the] businesses that [Morgan Stanley] knew that Sam had owned at that time," including Michaels' Stores, Sterling Software, Sterling Commerce, Scottish Annuity & Life Holdings, Ltd., and Green Mountain.[40]  On October 18, Hanlon sent Sam Wyly a copy of the presentation by fax.[41]  On October 25, David Martin from Morgan Stanley sent Hanlon an email reporting that he and Sanders reached out to the CFO of Michaels' Stores and the CEO of Scottish Annuity & Life.[42]  In the email, Martin wrote "[Sanders] and I are interested to hear your thoughts regarding the best way to proceed and be helpful to Sterling Software and Sterling Commerce; that is, whether we ought to have a conversation with Sam directly, or proceed in some other fashion."[43]

### 3.    Changes to Corporate Documents

On October 22, 1999, Sterling Software adopted several changes to its corporate documents, including among other things, modifying the "Change in Control Severance Agreements" to include "minor modifications" that would

---

[40]    *Id.* at 19.

[41]    *See* DX 278 (10/18/99 fax from Hanlon to Sam Wyly).

[42]    *See* DX 279 (10/25/99 email from David Martin, investment banker at Morgan Stanley, to Hanlon).

[43]    *Id.*

benefit directors in the event of severance.[44]  Don McDermett, Sterling Software's

general counsel, told the Board of Directors that "Skadden [, Arps, Slate, Meagher,

& Flom] [Sterling Software's outside counsel] advised [the company] that [these]

agreements will continue to be well within the mainstream of what other public

companies have done in the area of change-in-control severance agreements."[45]

### 4.    French's Meeting with IOM Trustees

        In November 1999, French and Robertson attended a bi-annual

meeting with the IOM trustees.  In a file note pertaining to a November 9 meeting

with French, trustee David Harris noted that French "indicated that there was a

fairly large chance of an external offer being made for [Sterling Commerce] in the

not too distant future."[46]  Harris noted that "[t]he comments on Sterling Commerce

. . . constitute 'inside information.  Readers of this note should act, or not act,

accordingly."[47]  On November 9, French also met with Francis Webb, another

---

[44]      *See* PX 1484 (10/22/99 memo from Don McDermett, general counsel
to Sterling Software,  to Sterling Software Board of Directors), at 3.  Other changes
adopted on October 22 include bylaw amendments pertaining to the adoption of
procedures for special stockholder meetings, advance notice provisions concerning
stockholders' meetings, indemnification, removal of directors without cause,
electronic and telephonic voting, and other "minor adjustments."  *Id*. at 2.

[45]      *Id*. at 3.

[46]      PX 697 (11/9/99 file note of David Harris) at 3.

[47]      *Id*.

trustee.  Webb's file note recalls that French "advised that within the next year it is possible that . . . Sterling Commerce and Sterling Software might be disposed of by the family – as part of a general trend away from the dominant investment positions held in the companies with which members of the elder generation were actively involved."[48]  French testified at trial that, in November 1999, he knew that Sterling Commerce was for sale, but was not aware of plans to sell Sterling Software.[49]

### 5.     Sale to Computer Associates

On November 22, 1999, Wyly met with Sanders to discuss selling Sterling Commerce and Sterling Software, focusing specifically on Computer Associates as a potential buyer for Sterling Software.[50]  After this meeting Sanders contacted Sanjay Kumar, CEO of Computer Associates, but Kumar reported that he was not interested in buying Sterling Software because he "didn't think Sam would ever sell."[51]  On January 14, 2000, Sanders met with Kumar and again

---

[48]     PX 692 (11/9/99 file note of Francis Webb) at 2.

[49]     *See* Trial Tr. at 2236-2237 (French).

[50]     *See* JX 9 (3/11/13 Sanders deposition) at 37-40.

[51]     *Id.* at 43.

suggested a possible deal with Sterling Software.[52]  On January 18, Kumar met

with Wyly in person.[53]  On January 23, Kumar and other Computer Associates

executives met with Williams and Sterling Software's management.[54]  On February

8, Kumar made a formal offer, which was discussed at board meetings on February

9 and 13.[55]  The Board of Directors voted to approve the merger on February 13

and it was publicly announced on February 14.[56]

       The SEC points to Wyly's subsequent statements to an interviewer in

December 2002 to confirm that Wyly approached Morgan Stanley to find a buyer

for Sterling Software:

> In fact, Sterling Software was for not sale [sic] initially, just
> Sterling Commerce.  And Goldman found different buyers. . . . On
> Computer Associates, the Goldman folks said, "Look, you know
> and we know, there is only one buyer and you know who he is."
> So what we did was to hire Goldman just for Sterling Commerce
> and then we took the disappointed Morgan Stanley people and
> told them, "Why don't you whisper in Sanjay Kumar's and
> Charles Wang's ears that just maybe Sterling Software could be
> bought.  They needed a deal.  The way Computer Associates
> played their game, they were going to be in deep trouble if they

---

[52]    *See* DX 1 (2/22/00 Form S-4 Registration Statement filed by
Computer Associates) at 28.

[53]    *See id.*

[54]    *See id.*

[55]    *See id.*

[56]    *See id.*

> didn't do another deal . . . And sure enough, about two months
> later I got a call from Morgan Stanley that Sanjay wanted to come
> talk to us.[57]

But nothing in this statement, or elsewhere in the record, suggests that

these conversations occurred in the summer of 1999. Wyly's recollection is

entirely consistent with Sanders' timeline – the first constructive meeting with

Wyly regarding the sale of Sterling Software occurred in November 1999 and two

months later, in January 2000, Sanders reported that Kumar was interested in the

deal.

Thus, there is no evidence that any concrete steps were taken as to the

sale of Sterling Software by either Morgan Stanley or Goldman Sachs prior to mid

to late November 1999. Hanlon's October 14 meeting discussed Wyly's portfolio

only generally and without input or contact from Wyly. Morgan Stanley's

presentation was based solely on publicly available information about Sam Wyly's

companies. The October 25 email confirms that Morgan Stanley took no steps,

and had no authorization to take any steps, as to Sterling Commerce or Sterling

Software at that time.

## III.   CONCLUSIONS OF LAW

Section 10(b) of the Securities Exchange Act of 1934 and

accompanying Rule 10b-5 forbid insiders from trading on the basis of "material,

---

[57]     PX 1205 (12/6/02 Wyly interview with Allison) at 33.

nonpublic information."[58]  An insider "in possession of material inside information must either disclose it to the investing public, or . . . abstain from trading in . . . the securities concerned while such inside information remains undisclosed."[59]  Inside information is "material" if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[60]  "[M]ateriality [is] to be determined as of the date 'when an insider has committed himself to purchase the stock.'"[61]

      The SEC argues that on October 8 and October 20, 1999 – the dates of the swap agreements – the Wylys "were in possession of material, non-public information concerning Sterling Software.  Specifically, the Wylys were aware that

---

[58]    *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) ("Under the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders.") (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).

[59]    *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc).

[60]    *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway Inc.*, 426 U.S. 438, 449 (1976)).

[61]    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 181 (2d Cir. 2001) (quoting *Radiation Dynamics v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972)).

they – as Chairman and Vice-Chairman of Sterling Software – had agreed and resolved that the sale of Sterling Software to an external buyer should be pursued."[62]  I conclude that this information is not material as a matter of law and cannot be the basis for insider trading liability under Section 10(b) and Rule 10b-5.

"Material facts include those that "affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.""[63] When the fact involves a "contingent or speculative" event, materiality depends on

> a balancing of both indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. . . . [I]n order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels [such as] board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries . . . . To assess the magnitude of the transaction . . . , a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.  No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.[64]

"In the context of a merger, where information can be speculative and

---

[62]    SEC Proposed Findings of Fact ¶ 26.

[63]    *Castellano*, 257 F.3d at 180 (quoting *Texas Gulf Sulphur*, 401 F.2d at 849).

[64]    *Basic*, 485 U.S. at 239 (quotation marks and citations omitted).

tenuous, the materiality standard may be difficult to apply."[65]  Because "a merger

in which it is bought out is the most important event that can occur in a small

corporation's life . . . inside information . . . can become material at an earlier stage

than would be the case [otherwise]."[66] "Moreover, where information regarding a

merger originates from an insider, the information, even if not detailed, 'takes on

an added charge.'"[67]  However, "[i]nformation [that] is so general that the recipient

thereof is still 'undertaking a substantial economic risk that his tempting target will

prove to be a 'white elephant'" is not material.[68]  While bright line rules regarding

when merger negotiations become material are disfavored, this Circuit's cases

establish that something beyond desire to transact is necessary.

        In *SEC v. Geon Industries*, the court noted that prior to alleged insider

trading in Geon's stock, Geon had retained an investment bank to discuss a merger

with Burmah, a larger company.[69]  "After some preliminary discussions, Burmah

requested a [financial] forecast from Geon" as well as other financial

---

[65]     *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997).

[66]     *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47 (2d Cir. 1976).

[67]     *Mayhew*, 121 F.3d at 52 (quoting *Geon*, 531 F.2d at 48)).

[68]     *Id*.  (quoting *SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir.
1979)).

[69]     *See Geon*, 531 F.2d at 42.

information."[70]  While "nothing definite" was concluded in the meetings, Burmah "indicated further interest in the company and a desire to pursue its investigation."[71]  Based on these facts, the court concluded that information about the merger discussions was material.

In *SEC v. Shapiro*, the court cited "two significant events [that] occurred shortly prior to [the insider] purchases," including the fact that the president of the target company provided non-public financial information to an investment bank in anticipation of merger negotiations, and that negotiations between the target company and the acquiring company had "recommenced" after the acquiring company initially rejected a merger.[72]  The court concluded that information about the discussions was material.  "Although the negotiations had not jelled to the point where a merger was probable, the possibility was not so remote that . . . it might not have influenced a reasonable investor."[73]  In *SEC v. Mayhew*, the court again stated that information does not have to be specific in order to be material, where "merger discussions were actual and serious."[74]

---

[70]  *Id*.

[71]  *Id.*

[72]  *SEC v. Shapiro*, 494 F.2d 1301, 1306 (2d Cir. 1974).

[73]  *Id*. at 1306-07.

[74]  *Mayhew*, 121 F.3d at 52.

Finally, in *Castellano v. Young & Rubicam,* the Second Circuit's most recent case on the materiality of pre-merger negotiations, the court again found materiality based on the fact that Young & Rubicam "had established contact with a potential suitor," "had engaged in extensive negotiations with this suitor," and "did not give up its consideration of corporate restructuring and capital infusion" after those negotiations broke down.[75]

The SEC bears the burden of proving by a preponderance of the evidence that the Wylys' *desire* to sell Sterling Software constituted material non-public information on October 8 and October 20, 1999.  But there is not enough in the record to justify that conclusion.  The SEC is right that investors would probably "want to know if the chairman and vice chairman . . . of a company had agreed they were going to try to sell it."[76]  But a fact is not material "merely because a reasonable investor would very much like to know [it]."[77]

The law requires a balancing between the probability of a future event and its potential impact to determine whether information about that event is material.  The fact that the potential impact of a merger on Sterling Software was

---

[75]     *Castellano*, 257 F.3d at 182.

[76]     Transcript of 7/2/14 Oral Argument ("Argument Tr."), at 98 (Bridget Fitzpatrick, counsel for the SEC).

[77]     *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

undoubtedly significant does not eliminate the probability prong from the equation.

The SEC argues that because the Wylys controlled at least five of the nine seats on Sterling Software's Board of Directors, the sale was inevitable.  It is true that the Wylys controlled the Sterling Software side of *any* potential transaction.  But there is no evidence that the Wylys acted to exert that control to *pursue a sale* before November 1999.  The Board of Directors did not convene to consider any strategic alternatives.  The Wylys did not approach the members of the Board that they controlled – Evan Wyly, Donald Miller, or Michael French – to explore a sale.  Finally, as discussed earlier, there is insufficient evidence to find that the Wylys and Williams spoke about selling the company before the corporate retreat in mid-November.

Critically, there is no evidence that the Wylys approached any necessary third party – an investment firm or a potential buyer – about selling Sterling Software before entering into the swap transactions on October 8 and 20.  Although there is no bright line rule that contact with an investment firm or buyer is necessary to find materiality, the facts in this case are much thinner than the Second Circuit cases described above.

While Goldman Sachs was retained in September to pursue the sale of Sterling Commerce, there is no evidence that the firm was asked to work on

23

Sterling Software before November.  Hanlon's initial meetings with Morgan

Stanley are best characterized as general pitch meetings by the investment bank

and they did not involve members of the Wyly family.  There is no evidence that

Morgan Stanley took any action, or believed it was authorized to take any action,

to pursue a sale of Sterling Software as a result of those meetings.  Although all the

parties involved, including Wyly, appear to have considered Computer Associates

a natural buyer, there is no evidence that anyone approached Kumar to discuss the

acquisition until November.  Wyly's personal belief that Computer Associates

"needed a deal" is immaterial, especially in light of the fact that Kumar first

rejected the merger.[78]

The SEC argues that the sale of Sterling Software cannot be separated

from the sale of Sterling Commerce, which was undisputedly  underway by

September 1999.[79]  Under this theory, the Wylys "had watched the sale process

unfold with Sterling Commerce and knew both that (1) they could convince a

substantially similar Board to implement their decision, and (2) there was market

interest in this type of company."[80]  But the sale of Sterling Software was not

---

[78]    PX 1205 (12/6/02 Wyly interview with Allison), at 33.

[79]    *See* SEC

[80]    SEC Proposed Findings of Fact ¶ 26.  *Accord* Argument Tr. at 100-
101 (Fitzpatrick) (arguing that Goldman Sachs was regularly updating the Sterling

contingent on or connected to the ongoing sale of Sterling Commerce. Sterling

Commerce and Sterling Software were in two different sectors of the technology

market and the sales process was separate for each. Although Goldman Sachs

found several interested buyers for Sterling Commerce, it does not appear that

those buyers were solicited to acquire Sterling Software, or that they would have

been interested in such a transaction. While the relative ease of finding buyers for

Sterling Commerce may have affirmed Wyly's belief that Sterling Software could

be sold, it did not impact the objective probability that such a sale would happen.

Nor is the October 22 change of control agreement sufficient on its

own to warrant a conclusion of materiality. At best, the preferential terms confirm

Wyly's desire to sell the company. But the amendment to the change of control

agreement does not increase the probability that a sale would occur. Similarly,

French's indication to the IOM trustees that a sale "is possible" does not, without

more, lead to a conclusion of materiality, especially in light of French's testimony

that he was not aware of any discussions regarding a Sterling Software sale at the

time he attended these meetings.

The SEC urges that the court can infer materiality based on the type of

transaction at issue. In *Mayhew*, the Second Circuit held that it was reasonable to

---

Commerce Board of Directors on potential buyers, which suggested to the Wylys
that Sterling Software sale would happen because "they are in the same sector").

conclude that information was material because one of the tippees "invest[ed] . . .

for the first time in options and for the first time in [the company's] securities" and

another tippee "plunged heavily into [the company's] stock and options,

committing more than half of his portfolio to the investment."[81]  There are no

analogous facts here.  The Wylys had always been heavily invested in Sterling

Software domestically and through the offshore trusts, as they were in each of their

other public companies.[82]  Although this was the first time the Wylys engaged in

an equity swap, the Wylys had previously made large leveraged trades in these

securities, in both domestic and offshore accounts.[83]  Without more, the nature of

the equity swap is not so unusual that it warrants the conclusion of materiality.

> The SEC contends that finding insider trading liability here is merely

an application of existing precedent.  I disagree.  Accepting the SEC's theory in

this case would mean extending the definition of materiality to cover the thought

process and personal desires of any director or shareholder with substantial control

over a company.  While it is difficult to draw the line between inchoate desire and

---

[81]     *Id.*

[82]     *See* Attachment B to Stip. Facts (charts demonstrating the transactions
and holdings in the offshore trusts); PX 2038 (6/99 Wyly Family Financial
Statements).

[83]     *See id.*

something more material, that line must be drawn somewhere.  Failing to do so would both impermissibly broaden civil and criminal insider trading liability and potentially extend the reach of other securities laws, which turn on materiality.

## IV.    CONCLUSION

For the foregoing reasons, the SEC's insider trading claim against Sam and Charles Wyly is dismissed with prejudice.  The remedies trial as to the remaining nine claims will proceed as scheduled on August 4, 2014 at 10:00 am.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 10, 2014

27

**- Appearances -**

**For the SEC:**

Bridget Fitzpatrick, Esq.
Gregory Nelson Miller, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Defendants:**

Stephen D. Susman, Esq.
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002
(713) 653-7801

David D. Shank, Esq.
Terrell Wallace Oxford, Esq.
Susman Godfrey LLP
901 Main Street
Suite 5100
Dallas, TX 75202
(214) 754-1935

Mark Howard Hatch-Miller, Esq.
Susman Godfrey LLP
560 Lexington Avenue
New York, NY 10022
(212) 336-8332