## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>**v.**<br><br>**SAMUEL E. WYLY and DONALD R. MILLER, JR., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr.,**<br><br>                              **Defendants.** | **No. 1:10-cv-05760-SAS** |

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO <u>PRECLUDE THE SEC'S "TOTAL PROFITS" THEORY OF DISGORGEMENT</u>

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits its Memorandum of Law in Opposition to Defendants' Motion to Preclude the SEC's Total Profits Theory of Disgorgement.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. i

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ESTABLISHED IN JURY TRIAL ........................................................ 2

RELEVANT DISGORGEMENT PRINCIPLES ............................................... 4

    A.  This Court Has Broad Discretion To Order Disgorgement And To Require Disgorgement Of Ill-Gotten Gains Made On Fraudulent Trades ................................. 4

    B.  In Fraudulent Section 13(d) Cases, As In Other Fraud Cases, Defendants' Actual Profits On Unlawful Transactions Is A Reasonable Approximation Of Their Ill-Gotten Gains ............................................................................ 5

        1.  *SEC v. First City* ................................................................. 6

        2.  *SEC v. Bilzerian* ................................................................. 8

        3.  *SEC v. Teo* ........................................................................ 8

ANALYSIS ........................................................................................................ 10

    A.  The SEC Should Be Permitted To Present A Disgorgement Theory That Is Consistent With Existing Law and Supported by the Evidence ................................... 10

    B.  The Wylys' Motion in Limine Misunderstands the Nature of the SEC's Burden To Show A Reasonable Approximation ......................................... 12

    C.  Disgorgement of the Total Profits from a Scheme is Particularly Appropriate Because the Wylys Were High-Level Insiders ........................................ 16

    D.  This Case Should Follow The Standard Procedure For Determining Disgorgement .. 19

    E.  The SEC Properly Disclosed its Remedies Theory in this Bifurcated Proceeding ...... 20

        1.  This Court Has Broad Discretion To Order Disgorgement And To Require Disgorgement Of Ill-Gotten Gains Made On Fraudulent Trades ........................ 21

        2.  The Wylys Are Not Prejudiced From Having To Defend The Total Profits Theory At The Remedies Stage ................................................... 24

CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp.*, No 04 Civ. 3854RCCAJP, 2005 WL 977850 (S.D.N.Y. Apr. 28, 2005),................................22, 23

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988).......................................................................17

*CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir. 1986) .............7, 16

*Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980)..............................................7

*Foremost-McKesson, Inc. v. Provident  Sec. Co.*, 423 U.S. 232 (1976)...........................18

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 2014 WL 494522, No. 08 Civ. 00312 (S.D.N.Y. Feb. 6, 2014) ............................................22, 23

*Martin v. Holloran*, No. 4:05CV01857 AGF, 2010 WL 2735569 (E.D. Mo. July 9, 2010) ...........................................................................................................................22

*SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C. 1993), *aff'd* 29 F.3d 689 (D.C. Cir. 1994).  ........................................................................................................................8, 13

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) ..................................................................12

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ................................................................23

*SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014).  ..........................................................4, 20

*SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) ...............................23

*SEC v. Curshen*, 372 Fed.Appx. 872 (10th Cir. 2010) ......................................................12

*SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 612 (S.D.N.Y. 1993), *aff'd sub nom SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994) ....................................11, 17

*SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989).................................................................................. *passim*

*SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004) ........................................................................12

*SEC v. Hasho*, 784 F.Supp. 1059 (S.D.N.Y.1992) ...........................................................11

*SEC v. Kelly*, 765 F. Supp. 2d 301 (S.D.N.Y. 2011) .................................................23, 24

*SEC v. Lawton*, 449 Fed.Appx. 555 (8th Cir. 2012) ..............................................12

*SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) ............................................5, 11

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ...........................................................11

*SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072 (9th Cir. 2010) .........12

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013) ......................................... *passim*

*SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009),
    *aff'd*, 712 F.3d 321 (6th Cir. 2013) ...............................................................14

*SEC v. Teo*, 746 F.3d 90 (3d Cir. 2014) .................................................... *passim*

*SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971) ............................7

*SEC v. Tome*, 833 F.2d 1086 (2d Cir. 1987) .........................................................5

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) ....................................................5, 11

*Whiting v. Dow Chemical Co.*, 386 F. Supp. 1130 (S.D.N.Y. 1974) .................18

## FEDERAL STATUTES

FED. R. CIV. P. 26(a) ........................................................................3, 22, 23

FED. R. CIV. P. 37(c) ...............................................................................3, 23

**Securities Act of 1933**
Section 17(a) .................................................................................. *passim*

Section 5.................................................................................................1

**Exchange Act of 1934**
Sections 10(b) ................................................................................. *passim*

Sections 13(d) ................................................................................. *passim*

Sections 14(a).........................................................................................1

Sections 16(a) ................................................................................. *passim*

## LOCAL RULES

S.D.N.Y. R. 33.3(c).................................................................................22

**MISCELANEOUS**

H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934) ..........................................................17

2 Loss, Securities Regulation 1038 (1961) .....................................................................18

## PRELIMINARY STATEMENT

A jury unanimously found that Sam and Charles Wyly ("the Wylys") engaged in a thirteen-year securities fraud that allowed them, as high-level insiders, to hold and trade massive quantities of their own company stock out of the public eye. This scheme had two chief benefits: (1) it allowed the Wylys to trade securities in secret, and (2) it concealed the Wylys' failure to pay taxes on the relevant compensation and capital gains. The SEC seeks to present these ill-gotten gains – the secret profits from securities transactions and the unpaid taxes – as alternative or overlapping bases for disgorgement for the Securities Act (Section 17(a)) and Exchange Act (Sections 10(b), 13(d), 14(a) and 16(a)) violations found by the jury.[1]

The Wylys seek to prevent the SEC from presenting evidence on its disgorgement theories. Essentially, the Wylys assert that disgorgement is unavailable as a matter of law and that their ill-gotten gains from the fraud are zero. They previously moved – unsuccessfully – to prevent the SEC from using unpaid taxes as a measure of ill-gotten gains and they now seek to prevent the SEC from even presenting its total profits theory to the Court. They argue that the SEC's total profits theory is (1) contrary to established law and (2) untimely. Neither position has merit.

First, the SEC's disgorgement analysis is consistent with established precedent holding that a reasonable approximation of ill-gotten gains in fraud cases is the actual profits made by a defendant in fraudulent transactions. Contrary to the Wylys' position, under established precedent in the context of Section 13(d) of the Exchange Act, there is no reason to treat this fraud differently. In fact, disgorgement is especially appropriate here because the Wylys were high-level corporate insiders who deliberately violated laws designed to prohibit insiders from

---

[1]     The SEC's disgorgement theory for the Wylys' violation of Securities Act Section 5 is not at issue in this motion.

trading in the dark in company securities.  And the SEC is only seeking disgorgement in the amount of profits that were earned on securities transferred to the Isle of Man pursuant to an ongoing scheme and with the intent to falsely disclaim beneficial ownership and minimize any public disclosure.  This is the core of the misconduct found by the jury and the profits from these transactions constitute a reasonable approximation of the ill-gotten gains the Wylys received from their fraud.  Thus, the Wylys' have the burden to establish a contrary figure.  Instead of meeting that burden, the Wylys seek to preclude the SEC from even presenting this argument to the Court.

Second, the Wylys' procedural objections to the SEC's even seeking disgorgement are meritless.  This is a bifurcated proceeding and the SEC has appropriately disclosed its disgorgement theory at the remedies phase.  The Wylys cannot explain how they are harmed by defending at this stage (which was designed to postpone remedies discovery) a theory that they concede relies on "no new evidence or previously unknown information."  ECF 404 at 2.

## FACTS ESTABLISHED IN JURY TRIAL

The evidence at trial showed that beginning in 1992, the Wylys—powerful insiders of publicly-held companies (the "Issuers")—transferred stock options to their offshore system of trusts and companies.  At the same time, the Wylys falsely told the world that they no longer had beneficial ownership and investment control over those transferred options and that the trustees of the recipient trusts were independent of the Wylys.  This fraudulent transfer and public disclaimer misled the Issuers, shareholders, and investors into believing that the Wylys no longer had the power to direct the disposition of those options.  From 1992 until at least 2005, the Issuers, who were required to publicly disclose beneficial ownership positions held by officers and directors in their periodic filings, no longer attributed those stock options to the Wylys in

their beneficial ownership tables.  And during that period, the Wylys omitted their ownership and control of the options in the disclosures that they were required to file under Section 13(d) and 16(a) of the Exchange Act.

In fact, the Wylys never divested their beneficial ownership and control of the options held offshore.  Contrary to what they told shareholders, investors and the publicly-held Issuers that they controlled, the Wylys directed all subsequent exercises of those options and purchases of Issuer stock, and directed the sales of that stock.

The public was entitled to full disclosure of the Wylys' beneficial ownership and control over those securities transactions under the federal securities laws.  Beginning in 1992, the Wylys' scheme deprived the public of valuable information.  Full disclosure would have informed the market that (1) the Wylys still controlled options entitling them to purchase very large stakes in the Issuers under their control; (2) the Wylys were secretly exercising those options and purchasing Issuer stock, making them substantial stockholders in addition to being control persons; and (3) the Wylys were secretly selling Issuer stock, cashing in their options to sell their substantial stake in the Issuers.  The Wylys used their offshore trusts to hide what they were doing with Issuer securities and to prevent the public from scrutinizing their trades.  Their undisclosed beneficial ownership and secret trading in Issuer securities was informed by what they knew as officers and directors of the Issuers that they controlled, and their fraudulent scheme deprived investors of the important information that knowledgeable insiders were trading.  Their secret trading in an uninformed marketplace allowed them to reap significant profits.

The jury found that the Wylys committed securities fraud by filing materially false 13(d) and 16(a) reports about the extent of their beneficial ownership and control over Issuer securities,

and by failing to make proper disclosure when they engaged in over 700 secret securities transactions over more than a decade.  Significantly, the jury also found that the Wylys' conduct comprised an intentional fraudulent scheme in violation of Section 10(b) and 17(a)(1).

## RELEVANT DISGORGEMENT PRINCIPLES

**A.     This Court Has Broad Discretion To Order Disgorgement And To Require Disgorgement Of Ill-Gotten Gains Made On Fraudulent Trades.**

Upon a finding that defendants have violated the securities laws, this Court has "'broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.'"  *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).  Disgorgement is an equitable remedy, imposed to force a defendant to give up the amount by which he was unjustly enriched.  *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).  By forcing wrongdoers to give back the fruits of their illegal conduct, disgorgement also deters subsequent fraud.  *Id.*  Disgorgement need not compensate the victims of the wrongdoing.  *Id.*  Rather, disgorgement "'forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court.'"  *Id.*

The Court has "broad discretion" in calculating the amount to be disgorged.  *Contorinis*, 743 F.3d at 301.  In determining disgorgement awards, courts employ a burden-shifting test.  *Razmilovic*, 738 F.3d at 31.  Under that test, the SEC must first present a figure representing a "'reasonable approximation of profits causally connected to the violation.'"  *Id.*  If the SEC meets that burden, the burden shifts to the wrongdoer "to show that his gains 'were unaffected by his offenses.'"  *Id.*  Because the risk of uncertainty should fall on the wrongdoer, if the wrongdoer fails to carry that burden, the SEC's figure controls.  *See id.*

In securities fraud cases, courts routinely require defendants to disgorge all profits made on unlawful trades.  In the insider trading context, for example, defendants who purchase shares

based on favorable, material nonpublic information and later sell those shares at a higher price must disgorge all gains from the sales.  *E.g.*, *SEC v. Warde*, 151 F.3d 42, 45-50 (2d Cir. 1998); *SEC v. Tome*, 833 F.2d 1086, 1087-90, 1096 (2d Cir. 1987).  Likewise, defendants who commit fraud in violation of Exchange Act Section 10(b) and Securities Act Section 17(a) by manipulating the market for securities that they trade have been held liable for disgorgement on profits "in all of their trades in those securities."  *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (per curiam) (explaining that it was "well within the discretion of the district court" to order such disgorgement given that "the purpose and effect" of the fraudulent scheme was to manipulate the market).

**B.    In Fraudulent Section 13(d) Cases, As In Other Fraud Cases, Defendants' Actual Profits On Unlawful Transactions Are A Reasonable Approximation Of Their Ill-Gotten Gains.**

The Wylys seek to characterize their violation as merely failing to file a form after stock had been sold.  The Wylys then argue that the subsequent failure to file is distinct from all the profits earned on the securities prior to the sale.  By describing their conduct as a series of unconnected disclosure violations, the Wylys seek to avoid liability for the fraudulent scheme found by the jury.  For thirteen years, securities were transferred to the Isle of Man with the false statement that the Wylys were disclaiming beneficial ownership and the intent to never attribute any subsequent transactions in those securities to the Wylys' direction.  The securities were held as part of a fraudulent scheme the entire time they were in the Isle of Man and the Wylys have no right to the secret profits earned during that period.  This theory – which the Wylys seek to preclude – is consistent with previous holdings in Exchange Act Section 13(d) cases based on fraud.  As in other fraud cases, courts addressing fraudulent 13(d) schemes have held that profits

made on unlawful transactions represent a reasonable approximation of defendants' ill-gotten gains.

### 1.     *SEC v. First City*

In *SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989), for example, the defendants secretly accumulated an issuer's stock as part of an attempted (but ultimately failed) hostile takeover.  890 F.2d at 1217-18.  In the process, defendants deliberately violated Section 13(d) by failing to file required reports after crossing the 5% threshold.  *Id.* at 1221-28.  Stressing that the "very purpose" for the defendants' scheme was to "conceal their position in [the issuer] from the marketplace," the district court ordered the defendants to disgorge all of the profits they made on shares during the time they violated the law and failed to file a 13D statement.  688 F. Supp. at 726-28.  In reaching this result, the district court analogized defendants' intentional Section 13(d) violation to an insider trading violation.  *Id.* at 727.

Relying on the expert testimony of Daniel Fischel, the *First City* defendants argued that the appropriate measure of damages was the profits they "could have obtained if [they] had filed a [timely] 13D statement," subtracted from the profits they actually obtained while in violation of the law.  688 F. Supp. at 727-28.   The district court rejected Fischel's attempt to "isolate the precise amount of profits that flowed from the violation," reasoning that his approach necessarily "resort[ed] to and rel[ied] upon purely speculative hypothetical figures."  688 F. Supp. at 728.  The court explained that "faced with the inexact science of establishing causation, courts have explicitly refused to make it even more indeterminate by engaging in speculative inquiries as to what the price of stock would have been had the violations never occurred."  *Id.*

The D.C. Circuit affirmed, concluding that the SEC's "showing of appellants' actual profits on the unlawful transactions at least presumptively" satisfied the SEC's burden to reasonably approximate the disgorgement figure.  890 F.2d at 1232.  In reaching this result, the court cited Second Circuit cases that:  have rejected calls to restrict the disgorgement to the precise impact of the illegal trading on the market price; in the insider trading context, typically require the violator to return all profits made on the illegal trades; and have held that a nexus between unlawful conduct and the disgorgement figure need not be shown because of the pervasiveness of the fraud.  *Id.*[2]

Because the total profits made while in violation of the law served as a reasonable approximation of defendants' unjust enrichment, the court held that defendants were "obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation."  890 F.2d at 1232.  And although the court agreed that a defendant could make such a showing by "pointing to intervening events from the time of the violation," the court held that defendants failed to make that showing.  *Id.*  Thus, like the district court, the court of appeals rejected defendants' reliance on Fischel's analysis.  *Id.*  The court reasoned that defendants' "efforts to hypothesize" the conduct of a First City that complied with the law, as well as the market reaction to that, were "impossibly speculative."  *Id.*

The court concluded by expressly recognizing that "[p]lacing the burden on the defendants of rebutting the SEC's showing of actual profits … may result, as it has in the insider trader context, in actual profits becoming the typical disgorgement measure."  890 F.2d at 1232.

---

[2]    Specifically, the court cited *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980); and *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir. 1986) (per curiam).

But the court held that this outcome was fair because "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.*

### 2. *SEC v. Bilzerian*

*First City*'s analysis was followed in *SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C. 1993), *aff'd* 29 F.3d 689 (D.C. Cir. 1994). There, defendants used a "series of trusts" to commit fraudulent violations of Section 13(d). 814 F. Supp. at 117, 121. Citing *First City*, in determining disgorgement, the court recognized that "it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains." *Id.* at 121.

Bilzerian argued that because he did not purchase any shares of one of the companies at issue during the roughly six-week period between the Schedule 13D filing deadline and the date on which the filing was made, his late filing was "harmless and caused him to realize no more profit than would otherwise have been realized." 814 F. Supp. at 122. The court rejected that argument, reasoning that Bilzerian was found not only to have made an untimely filing, but "more importantly, to have made numerous misrepresentations in the filing when made." *Id.*

### 3. *SEC v. Teo*

In *SEC v. Teo*, 746 F.3d 90, 93-94 (3d Cir. 2014), Teo and a trust that he controlled (collectively "Teo") committed intentional violations of Section 13(d) by deliberately misrepresenting the extent and purpose of Teo's beneficial ownership of a company's shares. Specifically, although Teo disclosed a large portion of his beneficial ownership of the company's shares, he concealed holdings he accumulated after crossing a poison pill threshold set by the company. *Id.* After a tender offer by an unrelated third party, Teo sold all of his shares for a substantial profit. *Id.* at 94. The Third Circuit affirmed the district court's order requiring Teo to

disgorge all profits he made from the stock he held after his reporting violation. *Id.* at 94, 107 n.31.

Applying  relevant disgorgement principles, the court held that the SEC "presumptively demonstrated a reasonable approximation of the profits arising from transactions tainted by the Section 13(d) and Section 10(b) violations" by identifying profits the defendants made on shares they failed to report. *Teo*, 746 F.3d at 107.  It was thus for the defendants to "adduce—at a minimum—specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue, the market valuation of the stock at fixed points in time, and any other cause for the profits they assert were untainted by illegality.  In so doing, they must account for the ambiguities, uncertainties and myriad market forces inherent to any analysis of fluctuations in stock pricing to credibly demonstrate the unreasonableness of the government's proposed disgorgement." *Teo*, 746 F.3d at 107-08.

The court found that Teo failed to sustain his burden.  It rejected Teo's argument that the "SEC failed to produce any evidence that the violations impacted the stock price," reasoning that it was not the SEC's burden to do so. *Id.*  It further rejected Teo's argument that the tender offer was an intervening, proximate cause of his profits. *Id.* at 100-01.  The court agreed that a defendant could demonstrate that this disgorgement figure is not a reasonable approximation of unjust enrichment by "'pointing to intervening events from the time of the violation.'" *Id.* at 105.  But the court held that "intervening causation is not an element of the SEC's evidentiary burden in setting out an amount to be disgorged that reasonably approximates illegal profits." *Id.* at 105-06.  Rather, "if the issue of an intervening cause is to be raised, it will normally be the defendant's burden to do so." *Id.* at 106.  And the court concluded that "it might have been

possible for Appellants to demonstrate that intervening causes made the profits in question greatly attenuated from the violations at issue, but they failed to do so." *Id.* at 108.

As further justification for the disgorgement award, the court noted that Teo's violations were a flagrant fraud, enabling Teo to acquire a sizeable ownership interest in a publicly-traded company "without the awareness of company directors, fellow shareholders, the SEC or the market-at-large." *Teo*, 746 F.3d at 109.  Teo's fraudulent acts allowed him to surreptitiously acquire a large volume of stock that netted him huge profits when sold.  "It is precisely this type of shadowy dealing that the Securities Exchange Act—and specifically Section 13(d) and Section 10(b)—was designed to combat in order to uphold the integrity of the stock market."  *Id.*

## <u>ANALYSIS</u>

### A.    The SEC Should Be Permitted To Present A Disgorgement Theory That Is Consistent With Existing Law And Supported By The Evidence.

The Wylys' incorrect interpretation of *Teo* and *Second* Circuit law is not a basis for preventing the SEC from developing a record on its total-profits theory and presenting appropriate legal arguments to the Court in tandem with its other, overlapping disgorgement theories.  This is particularly true when, as demonstrated above, courts have consistently held that a "showing of [defendants'] actual profits on the tainted transactions at least presumptively" satisfies the SEC's burden to reasonably approximate disgorgement.  *First City*, 890 F.2d at 1232.

Here, the Wylys' fraud began in 1992, when they falsely disclaimed having beneficial ownership over options that they transferred into the Offshore System.  The fraud continued at least until 2005.  It involved hundreds of affirmative misrepresentations and omissions and hid approximately 700 secret, unlawful transactions that deceived not only the investing public, but also the Issuers' themselves, and even the trustees of the Wylys' offshore trusts.  The proper

starting point for quantifying the Wylys' ill-gotten gains from this egregious fraud is the profit they earned from executing those illegal, secret trades.  In this case, the reasonable approximation is the difference between what the trusts paid to exercise the options and purchase stock, and what they received when they sold them unlawfully.

The Wylys disparage this approach as a "novel 'insider secrecy' theory."  ECF 404 at 2.  But total profits is the traditional measure of disgorgement in fraud cases.  *See SEC v. Warde*, 151 F.3d at 45-50; *SEC v. Lorin*, 76 F.3d at 462.  There is no reason to treat this fraud case any differently, nor is there anything novel in analogizing the unlawful trades at issue here to insider trading violations.  *First City* expressly stated that there is "no relevant distinction between disgorgement of inside trading profits and disgorgement of post-section 13(d) violation profits."  890 F.2d at 1230.  More specifically, the court "recognize[d]" that the consequence of its holding could result in "actual profits becoming the typical disgorgement measure" for Section 13(d) violations.  *Id.* at 1232.  At any rate, the Wylys *were* insiders who traded secretly and therefore engaged in materially deceptive, unlawful conduct in violation of Section 10(b).

In *Teo,* the Third Circuit applied the longstanding disgorgement principles articulated in *First City* and routinely adopted by the Second Circuit in SEC enforcement actions.[3]  Defendants' claim that the SEC's theory is contrary to Second Circuit law amounts to no more

---

[3]     *SEC v. Razmilovic*, 738 F.3d at 31-32 (once the SEC has met its burden to approximate profits causally related to the fraud, the burden shifts to the defendant to show that his gains are unaffected by his offenses) (*citing First City*);  *Lorin*, 76 F.3d at 462 (burden shifts to wrongdoer to show what transactions were unaffected by his offenses) (*citing First City*); *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1994) ("[W]e agree with the District of Columbia Circuit that any 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty'") (*quoting First City*); *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 612 (S.D.N.Y. 1993), *aff'd sub nom SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994) ("The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation'") (*quoting First City*); *SEC v. Hasho*, 784 F.Supp. 1059, 1111 (S.D.N.Y.1992) (defendant must "'demonstrate that the disgorgement figure was not a reasonable approximation'") (*quoting First City*).

than a statement that the Second Circuit has yet to address a fact pattern where securities were

held as part of an ongoing fraud that was perpetuated through a series of false statements or

material omissions in required SEC disclosures.  However, there is no reason to believe that the

Second Circuit will adopt a new rubric for determining the proper amount of disgorgement when

faced with this fact pattern.  To the contrary, established precedent indicates that the Second

Circuit will continue to apply the principles articulated by the D.C. Circuit in First City (just as

the Third Circuit did in *Teo*).[4]

**B.     The Wylys' Motion In Limine Misunderstands The Nature Of The SEC's Burden
        To Show A Reasonable Approximation**.

        The Wylys seek extraordinary relief – preventing the SEC from even making a

disgorgement argument at a remedies hearing–based on a misreading of applicable law.  The

Wylys err first by misreading *Teo*'s reference to "but-for" causation.  *Teo* stated that under *First

City* (which never speaks of "but-for" causation), "the SEC is required to produce evidence

*supporting a reasonable approximation of 'actual profits on the tainted transactions,' which is*

essentially satisfying a but-for standard."  *Teo*, 746 F.3d at 105 (emphasis added).  The Wylys

omit the italicized portion of that quote, *see* ECF 404 at 4, but the entirety of the quotation makes

plain in context that providing an approximation of profits on tainted transactions itself satisfies

any "but-for" requirement as *Teo* conceived of it.  This is evident also from *Teo*'s clarification

that it read the term "'reasonable approximation' in an equitable context, focusing on the fairness

of the SEC's claim to disgorgement."  *Id.* at n.27.

---

[4]     The principles explained in *First City* have been widely followed in a variety of securities
fraud actions brought by the Commission outside of this Circuit as well.  *See SEC v. Happ*, 392
F.3d 12 (1st Cir. 2004); *SEC v. Lawton*, 449 Fed.Appx. 555, at *1 (8th Cir. 2012) (per curiam);
*SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. Curshen*,
372 Fed.Appx. 872, at *10 (10th Cir. 2010); *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir.
2004).

Nor is there any merit to the argument that the SEC must show that but-for the Wylys' fraud, they would have been unable to execute their trades.  Of course, if the Wylys had complied with the law, they would have been entitled to profits.  But that is not what happened. The Wylys chose to engage in fraud and, therefore, like *First City*, *Bilzerian*, and *Teo*, they must disgorge the profits they made on their unlawful trades.  In any event, that profit must be a consequence of wrongdoing does not mean that the wrongdoing must be the exclusive source of profit.  *See Teo*, 746 F.3d at 106 ("[T]hat the profit is the 'proximate consequence' of the defendant's wrong does not mean that the defendant's wrong is the exclusive or even the predominant source of the defendant's profit.").

Here, the requisite causal link is established by a showing that the Wylys made profits through unlawful trading in a market that they fraudulently distorted, and the integrity of which they increasingly undermined with every additional fraudulent affirmative misrepresentation and omission.  The Wylys deceived the market from the very start of their scheme because every option transferred to an Isle of Man trust was sent pursuant to a fraudulent misrepresentation that the Wylys no longer beneficially owned that option and that the trustees were independent.  The Wylys' conduct—their sales of massive quantities of stock—was proven at trial to be an egregious fraud, not a series of technical violations or negligent oversights.  The jury unanimously found that the Wylys' deception was material.  The Wylys seek to ignore this finding by arguing that disclosure would have had no impact on the market.  In making this argument, the Wylys improperly minimize the importance of the SEC's disclosure regime.

The Wylys argue that they received no unjust enrichment from their unlawful transactions because the required disclosures here were required to be filed after they traded. ECF 404 at 3.  That argument possibly makes sense in cases like *Bilzerian* where a defendant

accumulates shares ahead of a unique tender offer and where the reporting deadline therefore marks the inception of the wrongdoing.  *See* 814 F. Supp. at 116; *First City*, 890 F.2d at 1230-31. In the circumstances of this case, however, the claim that unlawful trades made in the subsequent, increasingly distorted market did not redound to the Wylys' benefit is wrong.  The Wylys' fraud was not simply a series of 700 unique and discrete non-disclosures.  It might have been plausible for the Wylys to argue that no disgorgement is due on the profits they made on their first non-reported transaction.  But their fraud began in 1992 and lasted at least until 2005, and during that time they illegally deceived the investing market hundreds of times.  In this circumstance, the Wylys cannot credibly argue that they would have received the vast majority of the profits in the absence of their securities violations.

The Wylys offer as a "typical example" of their violations a transaction where Sam Wyly was granted an option by Michaels Stores in 1986, with an exercise price of $3; transferred that option to the Isle of Man in April 1992 and then exercised and sold that share a month later when the then-market price was $22, earning a "profit" of $19.  ECF 404 at 4-5.  The Wylys assert that any increase in the price took place before the fraud and, therefore, "a huge portion of the $19 profit was earned before any securities violation, and thus could not be causally related to the violation in any way."  ECF 404 at 5.  The Wylys also claim that the profit earned on these shares "closely resembles the profit earned by *Teo* on shares bought before his securities violation but sold afterward."  *Id.*

In determining disgorgement, however, courts "are not required to engage in counterfactual scenarios."  *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 970 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir. 2013).  Unlike the pre-violation securities bought by *Teo*, the Wylys transferred unexercised stock options and thereafter exercised them, purchased

- 14 -

stock and sold that stock in a fraudulent, unlawful manner.  To discharge their burden of countering the SEC's reasonable approximation, the Wylys must do more than simply posit a hypothetical Wyly enterprise that complied with the law.  *See First City*, 890 F.2d at 1232.

There is no telling what the market would have done had the Wylys lawfully tried to exercise those options in 1992 and sell the stock to lock in a profit—and it stands to reason from the Wylys' decision not to engage in those sales onshore (where they would have been reported), that there were advantages to engaging in those transactions in secret.  Moreover, "faced with the inexact science of establishing causation, courts have explicitly refused to make it even more indeterminate by engaging in speculative inquiries as to what the price of stock would have been had the violations never occurred."  *First City*, 688 F. Supp. at 728.  So too, given the breadth and duration of the fraudulent scheme, the number of Issuers and the vast amount of options at issue, the number of transactions, and the lack of any corrective disclosure for at least a decade, any hypothesis about what the Wylys could have received had they not committed fraud, depends on a myriad of speculative assumptions.  *See First City*, 890 F.2d at 1231 ("Despite sophisticated econometric modeling, predicting stock market responses to alternative variables is ... at best speculative.") (*quoted in Razmilovic*, 738 F.3d at 31).  Defendants' burden to defeat the SEC's reasonable approximation is more than picking and choosing among all possible alternatives, and settling on the hypothetical that best serves their position.

At best, this speculative example demonstrates that the Wylys' position that no disgorgement is proper here as a matter of law cannot be correct.  Even if the Wylys are right that a "huge portion" of the increase in share value between 1986 and 1992 is to be deducted from their total profits as profits "earned," the same clearly is not true of any profits based on the stock price rise postdating 1992 during which time the Wylys illegally sold tens of millions of

shares into a deceived marketplace.  Thus, the Wylys' own argument shows that a substantial amount of disgorgement is appropriate in this case.  Moreover, the Wylys' "typical example" does not account at all for the options transferred to the Isle of Man after 1992.  In short, although calculating the precise amount of their disgorgement may be difficult, it is plain that the Wylys earned substantial profits on unlawful transactions and they, as the wrongdoers, must bear the risk of uncertainty.  *Razmilovic*, 738 F.3d at 31.

Finally, the Wylys note that in *Teo*, the SEC sought disgorgement only of profits that Teo made on shares he purchased after he began concealing his holdings.  ECF 404 at 4.  But the same is true here; the SEC is seeking profits only on those options that the Wylys transferred, exercised, and sold while intentionally violating the law.[5]  True, separating the lawful from the unlawful gains is difficult, but given the "systematic and pervasive" nature of the fraud, the real "problem in this case is finding *any* activity that was lawful."  *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d at 93-94 (rejecting argument that CFTC "must establish, dollar for dollar, the proceeds that were derived from fraudulent conduct").

C.    **Disgorgement Of The Total Profits From A Scheme Is Particularly Appropriate Because The Wylys Were High-Level Insiders.**

The Wylys' argument that the SEC should not be permitted to present a total-profits disgorgement theory is particularly misplaced because, unlike the defendant in *Teo,* the Wylys were high-level insiders of the companies at issue.  The Wylys thus represent the core

---

[5] As was the case in *Teo*, the SEC's disgorgement theory is tailored to the ill-gotten gains at the core of the defendants' fraudulent scheme. The SEC is not seeking disgorgement for (1) the Wylys' offshore sales of Michaels stock which occurred after the Wylys filed their Schedule 13D in early 2005 disclosing for the first time that they may be beneficial owners of the securities held by their offshore system, (2) the profits derived from the Wylys' offshore sales of Computer Associates ("CA") securities (because the Wylys were neither officers or directors or significant shareholders in CA and thus, had no ongoing reporting requirements for their holdings and sales of CA securities), and (3) domestic sales of Issuer securities, even though those sales resulted in false Form 4 filings that omitted the Wylys' offshore holdings.

constituency of the federal securities laws' disclosure regime and cannot argue that their total profits would have been untouched by 700 disclosures of an ongoing fraud.

The Supreme Court has repeatedly emphasized that the Exchange Act's disclosure requirements reflect a legislative philosophy of full and honest disclosure in the belief that "dishonest practices of the market place thrive upon mystery and secrecy." *Basic Inc. v. Levinson*, 485 U.S. 224, 982-83 (1988) (*quoting* H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934)). The disclosure scheme requiring insiders to report beneficial ownership and any changes in that ownership reflects Congress's judgment that public disclosure of insiders' ownership of, and trading in, company stock in section 13(d) and 16(a) reports provides valuable information to investors. The effect of those provisions is to prohibit insiders from trading and profiting secretly. The Wylys' fraud was an egregious assault against these two very important disclosure requirements.

First, Section 13(d) reports disclose what company insiders think about the future prospects for the company, and the identity of the persons who are in a position to control, and change control, of the company. *Drexel Burnham Lambert Inc.*, 837 F. Supp. at 607; *First City Fin. Corp.*, 890 F.2d at 1230. Such information has the potential to influence investors' decisions whether to buy or sell the securities. As *First City* explained, "Section 13(d) is a crucial requirement in the congressional scheme, and a violator, it is legislatively assumed, improperly benefits by purchasing stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment decision." 890 F.2d at 1230. That analysis is equally true when an insider engages in not only secret purchases but also secret sales. The legislative assumption in requiring insiders to disclose all changes in beneficial ownership— whether by purchase or sale—is that the insider who fails to disclose the change improperly

- 17 -

benefits from an uninformed marketplace.  If the insider secretly buys, he buys at an artificially

low price, and if he secretly sells, he sells at an artificially high price.

Second, timely Section 16(a) disclosure of all changes in beneficial ownership by insiders

is necessary to prevent insiders from secretly profiting from information not known outside of

the boardroom.  *Foremost-McKesson, Inc. v. Provident  Sec. Co.*, 423 U.S. 232, 243 (1976)

(Congress recognized that "insiders may have access to information about their corporations not

available to the rest of the investing public" and that, "[b]y trading on this information,"

corporate insiders "could reap profits at the expense of less well informed investors.").  By

requiring insiders to report their transactions in company securities, the securities laws protect

outside investors and the markets against secret trading by insiders.  Indeed, "detailed exposure

itself will discourage abuses."  *Whiting v. Dow Chemical Co.*, 386 F. Supp. 1130, 1133

(S.D.N.Y. 1974) (citing 2 Loss, Securities Regulation 1038 (1961)).

Here, the legislative judgment was borne out by evidence at trial showing that the Wylys

were well aware that investors paid attention to their trades, and that their trades could affect

stock prices.  Michelle Boucher recalled that when a collar had been put on certain domestic

holdings, "there was a lot of negative public backlash when they were reported."  April 16, 2014

Tr. Trans. at 1025.  Michael French testified that the "principal benefit [of trading offshore]

would be to get out of the insider sales reports that seem to set everybody off."  April 22, 2104

Tr. Trans. at 1764.  Sam Wyly acknowledged that some people would have a negative view

when insiders sold big blocks of shares.  April 29, 2104 Tr. Trans. at 2168; *see also* May 2, 2014

Tr. Trans. at 2726. (Evan Wyly acknowledging that when leaders of a company buy stock, "it

sometimes shows the market that they are standing behind the company").  In light of this

evidence, the Wylys cannot now be heard to argue that the market would not have reacted to

- 18 -

their sales of substantial quantities of securities in companies they controlled had they been disclosed as required by law.

Given the unique nature of the Wylys' power and control over the Issuer companies, the Court would undermine the legislative intent of the federal disclosure scheme for corporate insiders if it prevented the SEC from even arguing that insiders are not entitled to profits from securities held and sold pursuant to a fraudulent scheme to violate disclosure requirements.

**D**.      **This Case Should Follow The Standard Procedure For Determining Disgorgement.**

The SEC seeks an opportunity to meet its initial burden of approximating the Wylys' unlawful gain by presenting evidence of the Wylys' total profits from unlawful transactions.  It is not asking this Court to adopt any "*per se* rule regarding 'total profits,'" as the Wylys suggest. ECF 404 at 3.  The SEC agrees that the Wylys should be "afforded an opportunity to show that a portion of the profits was obtained due to causes unrelated to the violation."  *Id.*  The SEC is not arguing that its reasonable approximation is the end of the analysis.  We do not take the position that "nothing the defense could put forward would alter the 'total profits' calculation," nor does our approximation of defendants' ill-gotten gains rely on any dicta in *Teo*, as the Wylys suggest. *See* ECF 404 at 6.

At the same time, the Wylys significantly overstate the SEC's burden at this juncture. Contrary to the Wylys' suggestion, to satisfy its own burden the SEC does not have to produce "data to measure the precise amount of the ill-gotten gains."  *First City*, 890 F.2d at 1231. "Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task."  *Id.*  As a result, courts have "rejected calls to restrict the disgorgement to the precise impact of the illegal trading on the market price."  *Id.* at 1232.  Thus, although the Wylys are correct that they should be permitted an opportunity to show

which portion of the profits is attributable to lawful causes, after the SEC has satisfied its burden of providing an initial reasonable approximation, the burden shifts to the Wylys to show the opposite. *Razmilovic*, 738 F.3d at 31. There is simply no reason for the Court to preclude this standard process by granting the Wylys' Motion and preventing the SEC from making its initial reasonable approximation.[6]

**E.    The SEC Properly Disclosed Its Remedies Theory In This Bifurcated Proceeding.**

Now that a jury has found the Wylys liable for a massive fraud spanning more than a decade it is truly extraordinary and without basis for the Wylys to attempt to preclude the SEC from seeking all available disgorgement under the law. As the foregoing discussion shows, once liability for securities fraud has been proven, the traditional starting point for quantifying disgorgement is profits received from illicit transactions.

The Wylys nonetheless argue that the SEC should be precluded from even presenting this disgorgement approximation because, in their view, the SEC has not "timely" raised its "new theory." Their request should be rejected for two reasons. First, the remedies phase was bifurcated from the liability phase and discovery for remedies was postponed until after the jury rendered its verdict. Consistent with this process, the SEC timely amended its response to a premature contention interrogatory to include its intent to seek disgorgement based on profits

---

[6]    The Wylys further argue that because the SEC's approximation exceeds the amount causally connected to their violations of the securities laws, it constitutes punishment (see ECF 404 at 9-11). This claim requires no extended response. The SEC agrees that disgorgement cannot include amounts not causally connected to their violations. But the Wylys cannot be heard on this argument before they have shouldered their burden to "demonstrate[] a clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits." *First City*, 890 F.2d at 1232. The Wylys cannot meet this burden merely through the testimony of a retained expert opining on the hypothetical profits the Wylys would have earned had they actually complied with the law. *Id.* Moreover, the Wylys' argument that any disgorgement that fails to return them to their status quo before their wrongdoing is "impermissible," appears to be based on the dissent, not the majority opinion of the Second Circuit in *Contorinis*, 743 F.3d at 309. *See* ECF 404 at 9.

received.  Second, the Wylys predicate their motion on the erroneous assumption that the SEC was required to identify all of the legal theories it would rely upon to quantify its disgorgement approximation in advance of the jury verdict, before discovery for remedies was even scheduled to take place.  The Wylys fail to demonstrate that they are now prejudiced if the SEC is permitted to rely on well-established disgorgement principles applied in fraud cases.

### 1.     The SEC Properly Disclosed Its Theory In This Bifurcated Proceeding.

Not surprisingly, the Wylys fail to acknowledge in their motion that discovery for remedies was bifurcated from the liability phase of this action and postponed until after the jury verdict.  But this Court has treated this case as a bifurcated proceeding at least as early as the summary judgment stage, where it noted that "if the Wylys are found liable for the fraud claims, the SEC will have the opportunity to make its case for disgorgement at that time."  ECF 193 at 17.  It is true that during the liability phase, the SEC stated in a contention interrogatory that it would seek disgorgement based on a theory that a reasonable approximation of ill-gotten gains would be taxes avoided through the Wylys' fraudulent offshore scheme.  But bifurcation of remedies discovery was predicated on the obvious advantages of not requiring the parties to fully develop the remedies portion of the case or conduct expensive and time-consuming discovery on appropriate remedies in advance of a jury verdict involving numerous claims under the securities laws.  After all, the question of remedies would be mooted if the jury found in favor of the Wylys, and quantifying disgorgement would differ depending on whether the Wylys were liable on some but not all claims.

Now that a jury has found the Wylys liable for all of the SEC's claims, including fraud, the SEC is entitled to use all available legal theories to satisfy its burden to approximate the Wylys' ill-gotten gains, and it promptly served the defense with an amended response to the

previous contention interrogatory, giving notice to the defendants that a reasonable approximation includes profits on their fraudulent offshore sales.  In the Southern District, contention interrogatories "are designed to assist parties in narrowing and clarifying the disputed issues in advance of summary judgment practice or trial."  Local Rule of Civil Procedure 33.3(c) "anticipates that in the normal course, responses to contention interrogatories will be due at the very end of the fact discovery period."  *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, No. 08 Civ. 312, 2014 WL 494522 (S.D.N.Y. Feb. 6, 2014).  The SEC amended its response within the relevant discovery period, while both sides were conducting expert discovery, and well before the remedies trial.  As this Court allowed the SEC to address the disgorgement issue at a later stage of the proceeding, there was no "improper delay" that advantaged the SEC.  Rather, any delay was imposed and agreed to by the Court.  Dkt. 404 at 11.

Defendants cite inapposite cases in support of their preclusion argument.  Neither *Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp.*, No. 04 Civ. 3854, 2005 WL 977850 (S.D.N.Y. Apr. 28, 2005), nor *In re MTBE*, involved a bifurcated proceeding.  This is significant because courts have recognized that when proceedings are separated into distinct liability and remedies phases each phase is accompanied by its own discrete disclosure and discovery phase.  *See, e.g.*, *Martin v. Holloran*, No. 05-CV-1857, 2010 WL 2735569, *1 (E.D. Mo. July 9, 2010) (bifurcated proceeding had separate disclosure and discovery deadlines for liabilities and remedies phases of trial).  Here, it is perfectly appropriate for the SEC to tailor its disgorgement theory to the facts as proven at trial.

*Austrian Airlines* and *In re MTBE* are further distinguishable from this case.  Those cases dealt with the situation where the plaintiff asserted a new damages theory after discovery had closed.  Whereas Rule 26(a) requires a party to provide to the other parties "a computation of

each category of damages claimed by the disclosing party," that provision does not require the SEC to provide detailed computation of disgorgement because disgorgement is not a "damages" remedy.  In an enforcement action, the SEC does not seek damages, but rather, equitable relief. Its disgorgement remedy is ancillary to the power to award all equitable relief appropriate to remedy the violations.  *See, e.g., SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006); *SEC v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002).  As disgorgement is not a damages remedy and the SEC is not seeking damages in this case, Rule 26(a)(1)(A)(iii) does not require disclosure of disgorgement computations and theories.  As such, there is no preclusion available under Fed. R. Civ. P. 37(c).

In any event, in precluding Austrian Airlines from presenting a new theory of damages, the court found that notice had not been given in either Austrian Airlines' complaint or their Rule 26(a) disclosures. *Austrian Airlines*, 2005 WL 977850 at *2.  Here, in contrast, the SEC's complaint alleged that the Wylys' secret offshore transactions generated profits in excess of $465 million, and its prayer for relief explicitly sought disgorgement of "all illicit profits or other ill-gotten gains received," and all amounts by which they "have been unjustly enriched, as a result of the misconduct alleged in this Complaint."  ECF 1, ¶ 74 and Prayer for Relief V.  And as noted, the Wylys were given further notice that the SEC would seek profits from illicit transactions during the relevant discovery phase.  ECF 387 at 1.

Nor is there any similarity here with the facts in *In re MTBE*.  There, the plaintiffs did not seek to amend their contention interrogatories, asserted a new damages theory after the close of discovery and sought to impose liability on a new party.  Under those circumstances, preclusion was appropriate.  The same result does not follow when the SEC has amended its interrogatories within the relevant discovery period, and its profits calculation depends on no new evidence;  the

SEC merely intends to apply case law to facts that have been available to the defense for approximately a year, and relies on no new evidence or previously unknown information.  In support of its reasonable approximation of ill-gotten gain, the SEC relies on the report of Yasmine Misuraca, available to defendants since August 28, 2013 and the subject of prior deposition and trial testimony.

        **2.**      **The Wylys Are Not Prejudiced From Having To Defend The Total Profits Theory At The Remedies Stage.**

Even if the SEC were required to disclose its explicit intent to seek profits from illicit transactions at some earlier time in this action, its failure to do so was harmless and did not give the SEC any advantages in litigation.  Defendants have known from the start of this case that the SEC intended to pursue disgorgement as a remedy.  Dkt. 1.  Unlike *SEC v. Kelly*, which defendants rely upon to support this contention, the SEC has provided evidence from which the court can calculate a "reasonable approximation" of profits to be disgorged.  765 F. Supp. at 325–26.  In fact, the Wylys concede that the total-profits disgorgement theory relies on no new evidence or previously unknown information about transactions or the operative facts of the fraud.  ECF 404 at 2.  The Wylys argument that the SEC's theory will "require a longer trial" is not a serious basis for prohibiting an appropriate remedy after years of litigation and a six-week jury trial.  *Id. at 14.*  By their own admission, the Wylys simply need to add an additional expert report to the six they have generated during the remedies discovery period.  The SEC does not object to a reasonable extension of time for that purpose.  The remedies hearing could proceed – as scheduled – on August 4, 2014, and the record could be held open while the defendants obtain an additional expert report.

Given the relative ease with which any scheduling issues can be resolved, the potential for a "longer" trial is not a serious basis for the extraordinary relief sought by the Wylys in the

present Motion.  The SEC should be permitted to present all of its disgorgement theories to the

Court and the Court should have an opportunity to evaluate those theories based on the

evidentiary record developed at the remedies hearing.

## CONCLUSION

For the foregoing reasons, the Commission respectfully submits that the Wylys' motions

to preclude the SEC's total profits theory of disgorgement should be denied in its entirety.

Dated:  July 14, 2014                                     Respectfully submitted,


                                                          /s/ *Hope Hall Augustini*
                                                          Hope Hall Augustini
                                                          Bridget Fitzpatrick
                                                          John D. Worland, Jr. (JDW-1962)
                                                          Martin Zerwitz (MZ-9765)
                                                          Daniel Staroselsky
                                                          Gregory N. Miller (GM-5922)
                                                          Counsel for Plaintiff
                                                          Securities and Exchange
                                                          Commission
                                                          100 F Street, N.E.
                                                          Washington, D.C. 20549
                                                          (202) 551-4678 (Fitzpatrick)
                                                          (202) 772-9292 (fax)
                                                          fitzpatrickbr@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of July 2014, copies of the SEC's Memorandum of

Law in Opposition to Defendants' Motion to Preclude the SEC's Total Profits Theory of

Disgorgement were served in .pdf format on the following parties via the Court's ECF system:

Stephen D. Susman
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096

Terrell W. Oxford
David D. Shank
SUSMAN GODFREY
901 Main Street, Suite 5100
Dallas, Texas  75202-3775

Mark Hatch-Miller
Steven M. Shepard
SUSMAN GODFREY
560 Lexington Avenue
15th Floor
New York, NY 10022-6828
**Counsel for Defendants Sam Wyly and
Donald R. Miller Jr.**

Michael L. Smith
BICKEL & BREWER
767 Fifth Avenue
50th Floor
New York, New York  10153
**Counsel for Defendant Samuel E. Wyly**

  _/s/ *Gregory N. Miller*
Gregory N. Miller
Counsel for Plaintiff