# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                                      **Plaintiff,**

v.

SAMUEL E. WYLY,
DONALD R. MILLER, JR., in his capacity
as the Independent Executor of the Will
and Estate of Charles J. Wyly, Jr.,

                                 **Defendants.**

No. 1:10-cv-05760-SAS

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS REQUEST FOR DISGORGEMENT AND PRE-JUDGMENT INTEREST

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ....................................................................................3

   A.  The Securities Fraud ................................................................................3

   B.  The Substantial Benefits of the Wylys' Fraud .....................................5

      1.  Profits on Offshore Investments ..................................................5

   C.  The Unpaid Taxes ...................................................................................6

      1.  The Offshore System was Established to Evade U.S. Taxes ........6

      2.  The Wylys Knew Their Offshore Tax Strategy Was Aggressive .................................7

      3.  The Wylys Learn Their Aggressive Tax Position Was Wrong ....8

      4.  The Continuing Concealment of the Offshore System from the IRS .........................10

      5.  The IRS Audit Looks to Information in SEC Filings ..................12

ARGUMENT .....................................................................................................13

  I.  THE WYLYS SHOULD BE REQUIRED TO DISGORGE THEIR ILL-GOTTEN GAINS AND PAY PRE-JUDGMENT INTEREST.......................13

   A.  The Legal Standard For Disgorgement ................................................13

   B.  The Wylys Should Disgorge Profits From Registered Issuer Transactions ................14

   C.  The Wylys Should Disgorge Their Profits From Offshore Transactions of Unregistered Michaels Securities ................17

   D.  The Wylys Should Disgorge the Unpaid Taxes Concealed By Their Scheme...........20

      1.  The Wylys Owed Taxes On The Offshore Transactions .......................21

      2.  The Unpaid Taxes Were Causally Connected To and Concealed by the Securities Fraud ...............24

      3.  Reasonable Approximation....................................................27

   E.  The Wylys Should Pay Pre-Judgment Interest ....................................30

  II.  SAM WYLY SHOULD PAY SUBSTANTIAL PENALTIES .........................31

i

III. THE COURT SHOULD IMPOSE A PERMANENT INJUNCTION .............................34

CONCLUSION............................................................................................................................35

# TABLE OF AUTHORITIES

<u>CASES</u>

*Birkelbach v. SEC,*
    751 F.3d 472 (7th Cir. 2014) ............................................................33

*Comm'r v. Southwest Exploration Co.,*
    350 U.S. 308 (1956)............................................................................24

*Estate of O'Connor v. Comm'r,*
    69 T.C. 165 (1977)..............................................................................22

*In re Reserve Fund Sec. and Derivative Litig.,*
    Nos. 09 MD. 2011(PGG), 09 Civ. 4346(PGG), 2013 WL 5432334 (S.D.N.Y.
    Sept. 30, 2013) ...................................................................................32

*Johnson v. Comm'r,*
    86 F.2d 710 (2d Cir. 1936)................................................................24

*Kadillac v. Comm'r,*
    127 T.C. 184, 196 (2006), aff'd, 534 F.3d 1197 (9th Cir. 2008)......................22

*Kaplan v. Comm'r,*
    107 T.C.M. (CCH) 1226, *17 (2014) ...............................................22

*Keefover v. Comm'r,*
    65 T.C.M. (CCH) 2999, 1993 WL 221066, at *9 (1993) ..................................23

*Neely v. United States,*
    775 F.2d 1092, 1094 (9th Cir. 1985) ...............................................22

*PPL Corp. v. Comm'r,*
    133 S.Ct. 1897, 1905 (2013)............................................................24

*Resolution Trust Corp. v. MacKenzie,*
    60 F.3d 972, 976–77 (2d Cir. 1995)..................................................22

*Schulz v. Comm'r,*
    686 F.2d 490, 493 (7th Cir. 1982) ..............................................22,24

*SEC v. AbsoluteFuture.com,*
    393 F.3d 94, 96 (2d Cir. 2004)..........................................................14

*SEC v. Bilzerian,*
    814 F. Supp. 116 (D.D.C. 1993), aff'd 29 F.3d 689 (D.C. Cir.)........................15

*SEC v. Blackout Media Corp.*,
  No. 09 Civ. 5454(GBD)(DF), 2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012) .................18

*SEC v. Boock*,
  No. 09 Civ. 8261(DLC), 2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012)...........................18

*SEC v. Cavanagh*,
  155 F.3d 129, 135 (2d Cir. 1988)....................................................................................34

*SEC v. Cavanagh*,
  445 F.3d 105, 117 (2d Cir. 2006)....................................................................................13

*SEC v. Colonial Inv. Mgmt. LLC*,
  381 Fed. Appx. 27, 32 (2d Cir. 2010) .............................................................................30

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90, 102 (2d Cir. 1978).................................................................................13,34

*SEC v. Contorinis*,
  743 F.3d 296, 301 (2d Cir. 2014)...........................................................................13,14,17

*SEC v. Elliot*,
  No. 09 Civ. 7594(KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) .........................18

*SEC v. First City Fin. Corp., Ltd.*,
  688 F. Supp. 705, 728 (D.D.C. 1988), aff'd 890 F.2d 1215 (D.C. Cir. 1989).........15,17,18

*SEC v. First Jersey Sec,. Inc.*,
  101 F.3d 1450, 1474 (2d Cir. 1996).......................................................................13,14,21,30

*SEC v. Haligiannis*,
  470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007)......................................................................30

*SEC v. Koenig*,
  557 F.3d 736, 745 (7th Cir. 2009) ...................................................................................33

*SEC v. Lorin*,
  76 F.3d 458,  462 (2d Cir. 1996)......................................................................................14

*SEC v. Manor Nursing Ctrs., Inc.*,
  458 F.2d 1082, 1104 (2d Cir. 1972)............................................................................13,18

*SEC v. Milligan*,
  436 Fed. Appx. 1, 2 (2d Cir. 2011) (same) ......................................................................30

iv

*SEC v. Moran*,
    944 F. Supp. 286, 295 (S.D.N.Y. 1996)..........................................................................30

*SEC v. Musella*,
    748 F. Supp. 1028, 1042 (S.D.N.Y 1989).......................................................................35

*SEC v. Opulentica*, LLC,
    479 F. Supp. 2d 319, 331-32(S.D.N.Y. 2007) ................................................................31

*SEC v. Patel*,
    61 F.3d 137, 139 (2d Cir. 1995).......................................................................................13

*SEC v. Pentagon Capital Management*,
    No. 08 Civ. 3324(RWS), 2012 WL 1036087, at *4 (S.D.N.Y. Mar. 28, 2012),
    aff'd in relevant part, 725 F.3d 279, 288 (2d Cir. 2013)................................................32

*SEC v. Posner*,
    16 F.3d 520, 521-22 (2d Cir. 1994) ................................................................................35

*SEC v. Razmilovic*,
    738 F.3d 14, 31 (2d Cir. 2013)....................................................................13,14,16,28,32

*SEC v. Taber*,
    No. 13 Misc. 282(KBF), 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) ................ 14

*SEC v. Teo*,
    746 F.3d 90, 107 (3d Cir. 2014).......................................................................................15

*SEC v. Texas Gulf Sulfur Co.*,
    446 F.2d 1301, 1308 (2d Cir. 1971)................................................................................13

*SEC v. Tourre*,
    No. 10 Civ. 3229(KBF), 2014 WL 969442, at *9 (S.D.N.Y. Mar. 12, 2014) .............32,33

*SEC v. Tzolov*,
    No. 08 Civ. 7699(SAS), 2011 WL 308274, at *5 (S.D.N.Y. Jan. 26, 2011)...............34,35

*SEC v. Universal Express, Inc.*,
    646 F. Supp. 2d 552 (S.D.N.Y. 2009)..............................................................................31

*SEC v. Verdiramo*,
    907 F. Supp. 2d 367 (S.D.N.Y. 2012) .............................................................................18

*SEC v. Wang*,
    944 F.2d 80, 85 (2d Cir. 1991).........................................................................................13

v

*SEC v. Warde*,
    151 F.3d 42, 50 (2d Cir. 1998)..................................................................14,29,30

*SEC v. Whittemore*,
    659 F.3d 1 (D.C. Cir. 2011) ...............................................................................18

*SEC v. Wyly*,
    860 F. Supp. 2d 275, 282-83 (S.D.N.Y. 2012) ..................................................13

*SEC v. Wyly*,
    No. 10 Civ. 5760(SAS), 2013 WL 2951960, at *3 (S.D.N.Y. June 13, 2013)................21

*Smith v. Comm'r*,
    52 T.C.M. (CCH) 691, 693 (1986) .....................................................................22

*United States v. Bryant*,
    128 F.3d 74, 75-76 (2d Cir. 1997) ......................................................................30

*United States v. Trupin*,
    119 Fed. Appx. 323, 326 (2d Cir. 2005)..............................................................24

*Wyly v. United States*,
    662 F.2d 397 (5th Cir. 1981) ................................................................................2


## STATUTES

Internal Revenue Code § 671.....................................................................................6,8

Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(d) .........................31,32,34

Section 21(d) of the Exchange Act of 1934, 15 U.S.C. § 78u(d)(3)....................31,32,34

Treas. Reg. § 1.671–2(b).............................................................................................22

U.S.S.G. § 2T1.1........................................................................................................29,30


## OTHER AUTHORITIES

H.R. Rep. No. 98-355, 7-8 (1984) ..............................................................................31

Jay A. Soled, *Reforming the Grantor Trust Rules*, 76 Notre Dame L. Rev. 375, 379 (2001).......21

Plaintiff, the Securities and Exchange Commission ("SEC"), respectfully submits this memorandum of law in support of its request for disgorgement in the amount of $553,176,052 and pre-judgment interest against defendants Sam Wyly and Charles Wyly (jointly, the "Wylys"), civil monetary penalties in the amount of $72,286,920.64 against Sam Wyly, and injunctive relief against defendant Sam Wyly.[1]

## PRELIMINARY STATEMENT

The Wylys stand before the Court, having been found liable for engaging in a thirteen-year fraudulent scheme during which they violated a myriad of federal securities laws through their creation and operation of a secret offshore system.[2]  This scheme was breathtaking in its scope, encompassing 17 trusts and 40 subsidiary companies in the Isle of Man, as well as a Cayman Island entity to pass on communications and hold "documents which should not be seen in the USA."[3]  It was also breathtaking in its profitability, yielding in $553 million in trading profits from more than 700 secret transactions in the securities of four companies of which the Wylys were high level-insiders, more than $400 million in tax savings, and, at certain points, nearly $1 billion in assets being held offshore.[4]

---

[1] Plaintiff's exhibits are referred to as "PX," Defendants' exhibits are referred to as "DX," and joint exhibits are referred to as "JX."  The Stipulations of Undisputed Fact (ECF No. 270-1 exh. A) are referred to as "Stipulations."  Citations to the trial transcript are preceded by "Tr."  The transcript of the trial is consecutively paginated and appears as numbers 337-381 on the case docket.  All citations to depositions in this memorandum are preceded by the last name of the witness and "Depo."  All relevant deposition designations will be admitted into evidence during the remedies hearing.

[2] On August 7, 2011, Charles Wyly was killed in an automobile accident, and the executor of his estate, Donald R. Miller, Jr., was substituted as a defendant in the action.  ECF No. 89. Throughout this Memorandum, the SEC will use the term "Charles Wyly" to refer to Charles Wyly and his estate collectively.  The SEC does not seek a penalty or injunctive relief against Charles Wyly due to his death.

[3] PX-194.

[4] PX-366, PX-1454, PX-2093.

The jury found the Wylys liable for violating <u>nine</u> different securities laws. These findings encompassed years of false public statements and material omissions by the Wylys, their offshore trusts, and the four publicly-traded companies the Wylys largely controlled ("the Issuers").  The jury found that the Wylys beneficially owned the Issuer securities held by the offshore trusts, that they controlled the offshore trusts, and that the Wylys engaged in a fraudulent scheme to conceal these facts in order to secretly trade in company securities.[5]  This memorandum addresses the proper remedies based on those findings.  While the Wylys were knowingly violating the federal securities laws and, as discussed below, federal tax laws, they enjoyed the fruits of their misconduct.  Trust money was funneled through a series of shell corporations to purchase homes, art, jewelry and furniture.[6]  The Wylys treated their offshore system like a personal "cookie jar."[7]  At the same time, the Wylys held themselves out to the world as responsible corporate leaders and upstanding citizens.

To date, this scheme remains enormously profitable. It was implemented with a cynical view of the government's ability to ever hold men as rich and powerful as the Wylys fully accountable for their misconduct.  It was designed to place as much of their wealth as possible beyond the reach of U.S. Courts through a euphemism called "asset protection."  At the time he decided to create his secret offshore system, Sam Wyly was subject to an injunction for prior securities violations and had previously litigated against the IRS for years regarding the appropriate taxation of family trusts.[8]  He was warned that the Wylys' position with respect to the taxation of the trusts was aggressive and risky for tax purposes.  Sam Wyly responded that, if

---

[5] Verdict Form questions 1a-c, 7 and 11.

[6] DX-1001 at 307-308.

[7] Tr. 130-131 (defense opening: "maybe they were using them as their personal piggy bank, their cookie jar, fine").

[8] PX-0004, *see also Wyly v. United States*, 662 F.2d 397 (5th Cir. 1981).

the IRS ever challenged his position, he would litigate for years and settle for pennies on the dollar.[9]  The Wylys violated the securities laws to ensure that they did not get caught, to protect their hundreds of millions of dollars in offshore trading gains and unpaid taxes.  It worked.  The Wylys hid behind the complexity of the offshore system they had created.  The hundreds of misstatements that the Wylys made and caused others to make in required federal securities filings concealed their misconduct for thirteen years.

The SEC has investigated and litigated this matter for nine years culminating in a six-week jury trial.  The jury's verdict was unequivocal and demands more than pennies on the dollar.  It is time to hold the Wylys accountable.  It is time to strip away the immense profits that flowed from their misconduct.  It is time to impose the maximum penalty allowable under the securities laws.  And it is time to enjoin Sam Wyly from future violations.

<u>**STATEMENT OF FACTS**</u>

**A.  The Securities Fraud.**

During the course of the fraudulent scheme found by the jury, the Wylys were Board members (including, at times, the chairman and vice-chairman) of four publicly traded companies:  Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Re Group Ltd.[10]  Sam Wyly knew that, with these positions of enormous power came the responsibility to tell the public when he traded in Issuer securities.  Both he and his brother reaped enormous rewards from their positions within the Issuers, including millions of shares in options.

In 1991, Sam Wyly asked Sharyl Robertson, the then-head of the Wyly family office, to attend a seminar by a lawyer named David Tedder.  Robertson circulated a memo about Tedder's

---

[9] Admissions of Michael C. French ("French Admissions") ¶ 57, ECF 279.
[10] The Statement of Facts in this Memorandum is based on the annotated Proposed Findings of Fact that is being submitted in advance of the remedies hearing.  The SEC hereby incorporates by reference the record citations provided in the Proposed Findings of Fact.

proposed system of "Asset Protection and Tax Deferral."  Sam Wyly, Charles Wyly, and Michael French, an attorney who worked for the Wylys, attended a second seminar that Tedder held in New Orleans before setting up a private meeting with Tedder at Sam Wylys' home in Malibu, California.  At that meeting, Tedder recommended that the Wylys transfer their options in Sterling Software and Michaels to foreign non-grantor trusts in exchange for a private annuity agreement.  This was intended to be a tax-free transaction in which the Wylys would not recognize compensation or pay any taxes until far in the future when, and if, the annuities ever began paying off.

At the Malibu meeting, French raised his concern that the Wylys had filing obligations with respect to the securities of public companies.  Tedder said that reporting the Wylys' trusts' shares in their SEC filings could trigger tax problems.  In this conversation, Tedder noted that "the tax-free status of the trusts was contingent upon the Wylys' lack of control over the Trusts." He further cautioned the Wylys both (1) that disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and (2) that the IRS might use the Wylys' SEC filings against them if the tax issue were ever litigated.

Tedder was subsequently hired as a lawyer for the Wylys.  He assisted the Wylys in establishing a network of offshore trusts in the Isle of Man.  Between 1992 and 1999, the Wylys transferred unexercised options and warrants for millions of Issuer shares to the offshore system. The misstatements accompanying these transfers followed the same pattern:  (1) the Wylys falsely disclaimed beneficial ownership in public filings showing the options and shares going offshore, (2) subsequent transactions involving these shares were never publicly revealed as having been directed by the Wylys, and (3) filings by the offshore trustees falsely indicated that they had "sole dispositive power" over the relevant securities.  In addition to these false filings,

the Wyly family office tracked the holdings of each offshore trust to keep as many trust
management companies as possible below the 5% reporting threshold and avoid public filings.
Securities were transferred between and among trusts to prevent filings in advance of planned
transactions and deprive investors of valuable information that the law required the Wylys to
disclose.  Thus, the link between the Wylys' trading decisions and the securities transactions was
unlawfully hidden from public view for more than a decade.

### B.  The Substantial Benefits of the Wylys' Fraud.

#### 1.  Profits on Offshore Investments.

Once options and warrants in Issuer securities were transferred offshore and exercised –
usually in secret – they grew into a massive fortune.  The cash gains from Issuer transactions
through the end of 2004 totaled $371,149,237 for Sam Wyly and $182,026,815 for Charles
Wyly.  But these numbers only tell half the story.  They do not include money the Wylys earned
from Sterling Software shares that were converted to Computer Associates ("CA") shares or
from Michaels shares that were sold after the Wylys' offshore system was publicly exposed,
gains from a $40 million equity swap agreement with Lehman Brothers that referenced the price
of Sterling Software (and subsequently CA) shares, or gains from transactions or investments in
other companies.  The Wylys used the money they made from Issuer transactions to build entire
businesses and earn hundreds of millions of dollars.  For example, tens of millions of dollars
from the offshore system were funneled through Security Capital – a Cayman island entity
whose sole purpose was to "loan" offshore money back to the Wylys in the United States – in
order to fund Green Mountain.  By July 2003, the Wyly' offshore system held $173,725,215 in
Green Mountain.  In 2010, Green Mountain was sold, and the rate of return on the offshore
system's investment was better than the stock or bond market for the same period.

Through Security Capital loans and other purchases the Wylys directed, the Wylys had the unfettered use and enjoyment of the wealth that flowed from offshore transactions in Issuer securities. Sam Wyly admitted that one purpose of the trusts was to purchase items for the Wylys, such as the approximately $60 million in offshore proceeds used to purchase large ranches outside Aspen, Colorado, and nearly $30 million in offshore proceeds spent on jewelry, art, and other collectibles used by Wyly family members.

### C. The Unpaid Taxes.

#### 1. The Offshore System was Established to Evade U.S. Taxes.

Part of how the Wylys were able to amass such a vast fortune offshore was by not paying U.S. taxes on any of the gains earned on sales of Issuer securities (or any other offshore transactions prior to the commencement of the annuity payments in approximately 2003). The initial motivation for the offshore system was largely tax based. The trust agreements for the initial Isle of Man trusts explicitly provided that the trusts "shall be treated as non-grantor trust[s] rather than a grantor trust under Sections 671 through 678 of the Code," and further provided that they *shall not* be treated as United States Trusts for the purposed of U.S. taxation. Acting as the Wylys' lawyer, Tedder sent a letter to Sterling Software and Michaels on April 9, 1992. The letter addressed the appropriate tax treatment for planned transactions wherein the Wylys would transfer company securities to domestic corporations wholly owned by foreign corporations that were wholly owned by foreign trusts. In exchange, the Wylys were promised future annuity payments. The letter included the following understanding about the degree of control the Wylys would exercise over the transferred securities:

> [Y]ou will not preserve or reserve any control of any kind or character over such Securities or any income therefrom that would constitute a retained interest in the possession and/or enjoyment of the Securities being exchanged .... It is thus expressly intended that you will irrevocably surrender the enjoyment, control,

> ownership, and all economic benefits attributable to the ownership of the Securities.

The letter concluded that the sale of property to the domestic corporation in exchange for private annuity promises was not a taxable event and that subsequent sales of the securities by the offshore corporations would not generate a taxable event for the Wylys.

Jeanette Meier, the general counsel of Sterling Software in 1992, recalled a meeting with other company lawyers to determine the proper tax treatment of the securities transfers at which she believes the Tedder letter was discussed. The company was required to assess whether to take a compensation expense to the Wylys for the transferred securities and whether to issue the Wylys 1099 or W-2 forms. Meier discussed the proper disclosure of the beneficial ownership of the transferred securities after the discussion in which she reviewed the Tedder letter. The tax and disclosure issues were intertwined because the compensation charges that Sterling Software did not take for the transferred securities could have been large enough to change the company's financials and affect their 10-K and 10-Q filings.

### 2. The Wylys Knew Their Offshore Tax Strategy Was Aggressive.

French told Sam Wyly that the Tedder opinion was aggressive and that Jackson Walker would not be willing to issue a similar opinion. Sam Wyly pursued the tax-free strategy, stating that, even if he were caught, he could settle with the government for pennies on the dollar. He understood that – even under this aggressive strategy – it was critical from a U.S. tax standpoint that there be no appearance that the Wylys were in control of the trusts or the protectors. Nevertheless, all investment decisions related to Issuer securities started with the Wylys. Sam Wyly *explicitly* acknowledged that omitting this information from public SEC filings helped the tax benefits of the offshore system because there was no appearance of control.

Contrary to the tax position taken by the Wylys, the Jury found that they very much controlled the offshore system and at all times retained beneficial ownership and control of the securities. The overwhelming evidence at trial proved that (i) <u>every</u> action taken by the trustees was initiated or authorized by Sam or Charles Wyly; (ii) the trustees never failed to comply with directions given to them by the Wylys or their agents; and (iii) the Wylys used the wealth accumulated in their offshore entities to fund their lifestyle.

### 3. The Wylys Learn Their Aggressive Tax Position Was Wrong.

At the outset of the system, Sam Wyly knew from French that Tedder's proposed tax treatment of these transactions was aggressive. The risks were clearly set forth in the November, 1991 estate planning memo from French to Sam Wyly. Moreover, in 1993, the Wylys retained Morgan, Lewis & Bockius ("Morgan Lewis") to research whether the Bulldog Trust would be treated as a grantor trust pursuant to Internal Revenue Code ("Code") §§ 671-679. The memorandum concluded that "[t]here is significant risk under §679 that the Trust will be characterized as a grantor trust on the basis that income is being currently accumulated for the benefit of U.S. beneficiaries." Morgan Lewis showed this memo to French, who was acting as an agent of the Wylys, and advised him that there was "meaningful risk" under two sections of the Code that the trusts were grantor trusts. "If you are a U.S. citizen and you set up a foreign trust that is treated as a grantor trust, then you are treated as owning all of the income of that trust." If, on the other hand, a U.S. citizen establishes a foreign non-grantor trust, then no U.S. taxes would be owed until a distribution was made to a U.S. beneficiary.

In an effort to fix these problems, French asked Morgan Lewis what the tax implications would be if a foreign person funded the trust without receiving any consideration, reimbursement or other benefit for doing so. As a result of conversations, new trusts were created with foreign

settlors.  However, the use of foreign settlors for the new trust documents was a charade meant to paper the record and further conceal the Wylys' ongoing non-payment of taxes.  The Bessie Trust and Tyler Trust, for example, were settled by Keith King with purported contributions of $25,000.  King then borrowed back $24,999 for each of his contributions and the loans were forgiven.  Similarly, the LaFourche and Red Mountain Trusts were established by Shaun Cairns, who wrote letters stating that he was funding each trust with $25,000 "to show his gratitude" for the Wylys' many years of personal support and friendship.  Yet Cairns testified that he had never met the Wylys prior to writing this letter and did not provide $25,000 to establish either trust. The false letters were provided to Cairns by French for the Wylys' files.

The Wylys did not pay U.S. income tax on income as it was transferred to, nor as it accumulated in, these new Trusts.  This tax position was not supported by Morgan Lewis' advice, which assumed that the foreign grantor would be the sole transferor of property to the trusts.  The Wylys transferred significant assets to subsidiaries of the Bessie, Tyler, LaFourche and Red Mountain Trusts.  According to the Wylys' Morgan Lewis lawyer, if "a U.S. person indirectly puts money into a foreign trust, then you are back into the 679 problem with a U.S. person setting up a foreign trust in which he is also a beneficiary, and that clearly doesn't work."

In 1997, French approached Morgan Lewis again and provided them with more information about how the offshore system was funded.  He explained that options and warrants had been transferred in exchange for annuities and asked the firm to look into whether it was a taxable event.  Charles Lubar, the Morgan Lewis attorney who previously worked with the Wylys, was "really concerned" about the transaction because the options were transferred to a company that did not have any other assets, calling into question whether the private annuity agreement was really an arm's length transaction.  Lubar further concluded that, even if King

9

contributed $25,000 to establish the Trusts (which he did not), that gift "would be overwhelmed by the nature of the gift that came out of the U.S.; hence, you had grantor trusts."

Because the issues he identified were "serious," Lubar involved multiple lawyers at Morgan Lewis. One of those lawyers, a recent hire from the Department of Justice ("DOJ"), met with two tax partners at the firm, including a future chief counsel of the IRS, and then wrote an email to Lubar articulating their concerns under the subheading, "The potential for criminal prosecution of Wyly for tax evasion as a result of his engaging in these transactions":

> The government may have a persuasive argument that the transactions elevate form over substance repeatedly, indeed at every pivotal turn, and thus, when viewed in the aggregate, constitute a sham designed, not to legally defer or avoid tax, but to evade tax.

In another section, the memo addressed the predicament of the law firm:

> We do not believe, given our analysis of the merits of the opinion letters, that [the firm] can advise Wyly that there is a "realistic possibility" (which is defined as a "one in three or greater" chance) that the position set forth [in the Tedder letters] will be sustained by the Court. Therefore, we cannot advise Wyly regarding the reporting of the 1996 transactions on his 1996 federal tax returns. … Counseling him any further risks implicating [the firm], perhaps with unjustifiable hindsight, in the continuing concealment of a fraud.

Lubar did not raise the potential criminal liability with French, but advised him that "there were all sorts of problems that arose from the transfer of the options and exchange for the annuity."

### 4. The Continuing Concealment of the Offshore System from the IRS.

The Wylys and their employees took additional steps to hide their control over the offshore system from the IRS and knew that statements in SEC filings could be used by the IRS. They worked to ensure that the relevant public companies did not issue 1099s showing option exercises or stock sales by entities within the Wylys' offshore system as compensation paid to the Wylys. However, in 2003, the initial annuity payments were about to commence, and the Wylys could no longer conceal a decade of unpaid taxes. Two family office employees, Keeley

10

Hennington and Michelle Boucher, warned the Wylys that the annuity payments would be reported on their Form 1040 and it "is almost certain given the amount of these payments that the reporting will result in an IRS audit." They cautioned, "There is also a high likelihood that as a result of this audit the entire structure of the foreign system will be audited by the IRS," and that the annuity payments "will bankrupt several of the IOM companies, which could bring the validity of the annuity transaction into question." The Wylys again approached Morgan Lewis for advice. Morgan Lewis again concluded that, contrary to the tax position the Wylys had taken, the Bulldog and Pitkin Trusts should be treated as grantor trusts.

In a March 25, 2003, meeting with Boucher and Hennington, Morgan Lewis suggested "an approach to the IRS on a no-names basis [which] could give [the Wylys] an idea of where negotiations with the IRS might lead." Attorneys for the Wylys met anonymously with several high-ranking IRS officials on August 13, 2003. Acting as the Wylys' attorney, Lubar told the IRS there was "serious risk they were grantor trusts" from beginning. When Lubar explained the scheme of foreign subsidiaries acquiring stock options for annuities, the IRS asked if they were publicly traded corporations. The IRS then asked, "Have you checked SEC filing?" Lubar replied in the negative, prompting more questions from the IRS about whether there was disclosure in a financial statement footnote. Another IRS official stated, "Don't think anyone was reporting this to the SEC at this time." Lubar informed the IRS that his clients' tax returns for the past 11 years had been filed without any disclosure of these transactions. Later in the meeting, the IRS again asked, "Were they significant enough shareholders that their holdings would be listed on SEC filings?" and "Did SEC filings show beneficial interest in shares?"

Boucher and Hennington updated the Wylys about the anonymous meeting with the IRS in an August 29, 2003, memorandum. The memorandum noted that one IRS official "seemed

11

very interested in any SEC reporting of the initial transactions."   The Wylys continued to falsely disclaim beneficial ownership of the securities held by the offshore system after being advised of the IRS' interest in the treatment of these transactions in SEC filings.  When attorneys and advisors within the family office recommended reporting the offshore system to the IRS on his 2002 tax return, Sam asked them "to explore what happens if he is not a US citizen."

**5.   The IRS Audit Looks to Information in SEC Filings.**

By February 2004, the IRS was auditing the Wylys based on information it learned during an examination of Michaels Stores.  The IRS subsequently met with counsel for the Wylys and asked where the options that went to offshore companies were now.  The Wylys' attorney responded, "I don't know."  This information had been carefully hidden by the Wylys' securities fraud and was thus unavailable in Michaels' SEC filings, which the IRS agents conducting the audit were clearly reviewing.  At one point, an IRS agent told counsel for the Wylys, "I found this valuable information from the SEC filings," and, "Based on the SEC, there should be 5471s filed if ownership is greater than 50%."  Further, document requests or IDRs sent by the IRS during the course of this audit make clear that the IRS was reviewing SEC filings for the pertinent information.  For example, an August 3, 2004, IDR quoted Michaels' 10-K reporting a transfer to an "independent" trustee.  A second IDR dated August 3, 2004, quoted a footnote in Sterling Software's 10-K in which Charles Wyly disclaimed beneficial ownership for transferred options.  As these document requests make clear, what started as an audit of Michaels branched out into an audit of transactions related to all four Issuers based on information in SEC filings.  Indeed, the IRS told the Wylys' attorneys, "[T]he balance of the IDRs are on the transfers that we have pulled from SEC filings."

After the Wylys had learned of both the IRS audit and an SEC investigation, they made their first corrective disclosures, acknowledging that they *may* be beneficial owners of some securities held offshore.  This was in 2005, thirteen years after the start of the offshore system. The SEC is not seeking relief for any transactions after this partial disclosure.

## ARGUMENT

I.   **THE WYLYS SHOULD BE REQUIRED TO DISGORGE THEIR ILL-GOTTEN GAINS AND PAY PRE-JUDGMENT INTEREST.**

### A.  The Legal Standard For Disgorgement.

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."[11]  The Wylys' anticipated argument that disgorgement and all other forms of relief sought by the SEC are time-barred as to violations occurring before February 1, 2001 because these remedies are alternatively "forfeiture" or "penalties" has already been addressed and correctly rejected by this Court.[12]  "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."[13]  Disgorgement "forces a defendant to account for all profits reaped through his securities law violations."[14]

---

[11] *SEC v. First Jersey Sec,. Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) ("the deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits") (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)); *see also SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013);  *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).

[12] *SEC v. Wyly*, 860 F. Supp. 2d 275, 282-83 (S.D.N.Y. 2012) (holding that disgorgement claim is remedial, not punitive).

[13] *First Jersey Sec.*, 101 F.3d at 1474 (citing *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)).

[14] *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) (quoting *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006)); *see also SEC v. Texas Gulf Sulfur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971)

The district court has broad discretion in determining the amount of disgorgement.[15]  In determining disgorgement awards, courts employ a burden shifting test.  Under that test, the SEC must first present a figure representing a "reasonable approximation of profits causally connected to the violation."[16]  The reasonable approximation "does not require exactitude," but "the court should include all gains flowing from illegal activities, plus prejudgment interest."[17]  "Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[18]  "Any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."[19]  If the wrongdoer fails to carry his burden, the SEC figure controls.[20]

### B.  The Wylys Should Disgorge Profits From Registered Issuer Transactions.

For the Section 10(b), 13(a), 13(d), 14(a) and 16(a) violations found by the jury, the Court should determine the Wylys' ill-gotten gains to be the amount of profit ($323,755,892 for Sam Wyly and $164,025,007 for Charles Wyly) earned on the secret, illegal offshore Issuer securities transactions.[21]  In an ongoing fraud, defendants' actual profits on unlawful transactions

---

("It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation.").

[15] *See Contorinis*, 743 F.3d at 301; *First Jersey Sec.*, 101 F.3d at 1474-75; *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996).

[16] *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey Sec.*, 101 F.3d at 1475).

[17] *SEC v. Taber*, No. 13 Misc. 282(KBF), 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) (quotations omitted); *see also SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004) ("[T]he amount of disgorgement, as an equitable remedy, is determined by the amount of profit realized by the defendant.") (citation omitted).

[18] *Razmilovic*, 738 F.3d at 31 (quoting *Lorin*, 76 F.3d at 462).

[19] *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998); *see also First Jersey Sec.*, 101 F.3d at 1475 (risk of uncertainty falls on the wrongdoer); *Patel*, 61 F.3d at 140 (same).

[20] *Razmilovic*, 738 F.3d at 31.

[21] DX-1076 at Exh. 3A &3B.

are a reasonable approximation of their ill-gotten gain.[22]  The SEC hereby incorporates by reference its brief setting forth the legal support for the total-profits theory (ECF 406).

Here, the Wylys lied in securities filings when they transferred options and warrants offshore as part of an ongoing fraudulent scheme and then repeatedly hid from the public their exercise of those options or subsequent sales transactions in Issuer securities. All of the Wylys' offshore securities trades were made in a market (1) unaware that the Wylys held substantially larger positions in the Issuers than they told the public, and (2) that the Wylys were secretly selling massive amounts of securities in companies they controlled.  The Wylys knew that some people would have a negative view when they, as high-level insiders, sold large blocks of shares.[23]  They also knew that the media covered their transactions in Issuer securities.[24]  The Wylys took advantage of their secret offshore system to execute transactions offshore that, had they been done domestically, would have resulted in public scrutiny and a stock price decline.[25] If the stock price went down, it would affect the Wylys' substantial remaining undisclosed

---

[22] *See SEC v. Teo*, 746 F.3d 90, 107 (3d Cir. 2014) (the SEC "presumptively demonstrated a reasonable approximation of the profits arising from transactions tainted by the Section 13(d) and Section 10(b) violations" by identifying profits the defendants made on shares they failed to report); *see also SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 728 (D.D.C. 1988), *aff'd* 890 F.2d 1215 (D.C. Cir. 1989) (ordering defendants to disgorge all the profits they made on shares during the time they failed to file a 13D statement because the "very purpose" of defendants' scheme was to "conceal their position in [the issuer] from the marketplace"); *SEC v. Bilzerian,* 814 F. Supp. 116 (D.D.C. 1993), *aff'd* 29 F.3d 689 (D.C. Cir.) ("it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains") (citation omitted).

[23] Tr. 2168:2-5 (Sam Wyly); Tr. 1323:12-23 (Charles Wyly).

[24] Tr. 2163:3-12, 2164:24-2165:2 (Sam Wyly); Tr. 1025 (Boucher: when a collar had been put on certain domestic holdings, "there was a lot of negative public backlash when they were reported"); PX-123 (reporting on Wyly trades), PX-6000 (same), PX-6011 (same).

[25] Tr. 1326:10-14; PX-1264.

holdings.  Indeed, the Wylys allocated their offshore securities amongst multiple trusts so that none of their trustees would go above the 5 percent reporting threshold.[26]

The option transfers and securities transactions were tainted by the Wylys' initial misrepresentations and disclaimers of beneficial ownership, and the Wylys' subsequent failure to report their total holdings and all transactions as required by law. Their intent was to hide what the law required them to disclose and to deceive market participants.  At no time during the 13-year scheme did the Wylys provide corrective disclosure.  All secret transactions during this period were therefore illegal, making their secret profits ill-gotten gains.

Defendants argue that their undisclosed transactions were not illegal and not prohibited by law.  But in requiring insiders to disclose all securities transactions, their beneficial ownership, and changes in beneficial ownership, Sections 13(d) and 16(a) set forth a scheme whereby insiders are not permitted to own, control or trade their own company's stock in secret. Disclosure thus does not exist in the ether; it is tied to trading, and that trading is unlawful if not accompanied by disclosure.  In any event, the jury did not find that the Wylys merely failed to make required disclosures.  Rather, the jury found that beginning in 1992, the Wylys engaged in a fraudulent scheme to falsely disclaim beneficial ownership and to trade in secret.  Trades executed in furtherance of this fraudulent scheme were materially deceptive devices made with scienter under Section 10(b), and were thus illegal fraudulent transactions.

On the present record, all of the Wylys' offshore profits on Issuer transactions constitute a reasonable approximation of their ill-gotten gains, and the burden thus shifts to the Wylys to prove their gains "were unaffected by [their] offenses."[27]  The Wylys may attempt to use the McConnell Expert Report to meet this burden, but that report largely ignores the jury's finding

---

[26] Tr.1035:10-12.
[27] *Razmilovic*, 738 F.3d at 31 (quoting *Lorin*, 76 F.3d at 462).

that the Wylys violated all three prongs of Rule 10b-5 and Section 17(a) and therefore engaged

in an ongoing scheme.  McConnell simply attempts to hypothesize about the market effect from

each disclosure violation as independent from prior violations.  In other words, the McConnell

Report says nothing about the 13-year "fraudulent scheme" case that dominated both the SEC's

evidence and the majority of the Jury's Section 10(b) and 17(a) verdict.

To address the jury's verdict on the SEC's scheme case, McConnell would have had to

assess what would have happened to the stock prices of the Issuer securities if the Wylys had

made the following hypothetical "curative disclosure" in April 1992: "The Wylys intend to move

a majority of their Issuer securities overseas and then sell practically all of those securities in

complete secrecy, all while retaining positions at the top of these companies."  McConnell does

not even attempt to address this question.  Thus, the Court should disregard the "purely

speculative hypothetical figures" put forth by McConnell and require the Wylys to disgorge "all

profits reaped through [their] securities law violations."[28]

### C. The Wylys Should Disgorge Their Profits From Offshore Transactions of Unregistered Michaels Securities.

The Court should order additional disgorgement of the gains Sam Wyly ($47,393,344)

and Charles Wyly ($18,001,807) realized as a result of their impermissible sale of unregistered

securities.[29]  A jury has found that part of the Wylys fraudulent scheme included selling

restricted securities in unregistered transactions prohibited by Section 5.  As noted in the

previous section, courts require the SEC to reasonably approximate ill-gotten gains from illegal

transactions.   "The effective enforcement of the federal securities laws requires that the SEC be

---

[28] *First City*, 688 F. Supp. at 728; *Contorinis*, 743 F.3d at 301; *see also First City*, 890 F.2d at 1232 ("efforts to hypothesize" conduct that complied with the law were "impossibly speculative").

[29] *See* PX-9201, PX-9202.

able to make violations unprofitable."[30]   In the context of Section 5 violations, courts routinely

order disgorgement of total profits received to remedy section 5 violations.[31]

  Here, the parties do not dispute the specifics of the transactions that form the basis of the

Wylys' Section 5 violations.[32]   Based on the purchase and sales prices of the unregistered shares,

Sam Wyly's Isle of Man companies earned $47,393,344 and Charles Wyly's Isle of Man

companies earned $18,001,807 in profits from their illegal sales of unregistered Michaels

shares.[33]  The Wylys will argue that they would have received much if not all of the proceeds

had they registered the securities in advance of sale.  This argument lacks merit.[34]  First, in

calculating disgorgement, this Court is not obligated to consider the profits the defendants would

have received had they acted lawfully.  The securities laws prohibit the sale of unregistered

securities.  The jury found that the Wylys violated that prohibition, and their securities

transactions were illegal and fraudulent.   The SEC has thus established the requisite causal

connection between their fraud and the profits received.[35]  Argument about what the Wylys

would have received had they registered the securities are a rehash of their failed argument at

---

[30] *Manor Nursing Ctrs.*, 458 F.2d at 1104 (holding order to disgorge proceeds received in connection with a fraudulent offering in violation of Section 5 "a proper exercise of the district court's equity powers.").

[31] *See SEC v. Verdiramo*, 907 F. Supp. 2d 367 (S.D.N.Y. 2012) (ordering defendant to disgorge profits from unregistered transactions); *SEC v. Blackout Media Corp.*, No. 09 Civ. 5454(GBD)(DF), 2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012) (ordering defendant to disgorge proceeds obtained from selling unregistered shares); *SEC v. Boock*, No. 09 Civ. 8261(DLC), 2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012) (same); *SEC v. Elliot*, No. 09 Civ. 7594(KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) (same).

[32] *See* ECF Dkt 298 (March 28, 2014 Joint Statement of Undisputed Facts Regarding the Section 5 Claim).

[33] *See* Stipulations of Fact, Attachment B, Exs. 12A, 12B, 13A and 13B; PX-9201 (Misuraca calculation), PX-9202 (same).

[34] The SEC is not seeking disgorgement of all proceeds from the illegal unregistered sales, although that has been a viable disgorgement theory in other SEC enforcement actions.  *See, e.g., SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011).

[35] *See, e.g., First City*, 688 F. Supp. at 728 (rejecting expert's attempt to "isolate the precise amount of profits that flowed from the violation").

trial that their Section 5 violations were immaterial so long as investors can cobble together information about the issuer from other sources.  This cavalier approach to the importance of Section 5 would make registration unnecessary for insider sales of restricted securities in large publicly held companies and greatly undermine the deterrent purpose of disgorgement.

Second, although defendants may at times argue that there is an independent intervening cause for the amount of profits received  to rebut the SEC's reasonable approximation of disgorgement, the Wylys cannot do so on this record.  Here, the Wylys' trusts' purchase of the restricted securities was publicized in Michaels' press releases touting their infusion of capital to aid Michaels Stores, which was then in troubled financial condition.[36]  The Wylys orchestrated public disclosure about their trusts' significant investment in Michaels because such news would be viewed positively by the market.  But the Wylys made no public disclosure when less than a year later, their trusts began selling those unregistered shares.  The Wylys' failure to register the securities or disclose the sales as required was designed to keep the sales secret and the price up. It is thus unreasonable to view the unregistered sales in isolation of their purchase and assume that any part of proceeds from their illegal and fraudulent sales were solely based on legitimate profits.  To the contrary, given that the fraudulent scheme encompassed both the purchase and sale of these securities, it is equitable to require the Wylys to disgorge all of their profit without engaging in the speculative inquiry about how much they would have made if they had not consistently and repeatedly deceived the market, including when they purchased and sold those restricted securities.

---

[36] See DX-48 and DX-156; Tr. at 1850:15-1851:20.

**D. The Wylys Should Disgorge the Unpaid Taxes Concealed By Their Scheme.**

This scheme had a very specific motive – tax evasion – and that was how the Wylys' judged the success of the offshore system.[37]  From the beginning, Tedder cautioned that the Wylys' SEC filings could be used against them by the IRS.[38]  He was right.  The offshore system was eventually audited and, when that happened, the IRS reviewed SEC filings to determine whether there was a taxable event in connection with the transferred Issuer options.  Because of the Wylys' fraud, that information was not part of the public record.[39]  Hundreds of millions of dollars in trading gains had been hidden from public view for more than a decade.

In this case, the securities fraud and the Wylys' tax benefits overlapped.  The securities fraud, in essence, was perpetrated to conceal the unpaid taxes.  Moreover, the same conduct that made the Wylys' securities reporting posture untenable – their control over the offshore system – also gave rise to tax liability.[40]  For these reasons, the taxes the Wylys should have paid on offshore transactions are an appropriate, alternative measure of the Wylys' ill-gotten gains.  The SEC intends to measure those ill-gotten gains by looking only to the taxes that should have been paid on the fraudulently concealed Issuer transactions, not the entirety of the offshore system.

In seeking disgorgement, the SEC is not asking this Court to reconstruct more than a decade of the Wylys' tax returns, or to determine the appropriate tax treatment of the hundreds of millions of dollars in Maverick, Green Mountain, Ranger and other investments that the Wylys held offshore – although the Wylys' securities fraud also concealed their failure to pay taxes on those investments.  The SEC is not seeking the substantial penalties the IRS would be entitled to

---

[37] PX 366 ("Sam likes the #'s!"); Tr. 106:8-10 (Defense Opening: "Those twin motives of asset protection and tax benefits were the motives from the beginning and they never changed.")
[38] French Admissions ¶ 9.
[39] PX-9085 (asking when stock options shown in a Registration Statement were exercised).
[40] Code § 674(a).

impose in the same circumstance.  Rather, the SEC is using the same yardstick – unpaid and

deferred taxes – that the Wylys used to define the benefits of the offshore system as a reasonable

approximation of their unjust enrichment.  The Wylys will no doubt reiterate their legal claim

that this exceeds the SEC's authority and impermissibly impinges upon the Secretary of the

Treasury.  This Court has already rejected that argument.  Disgorgement, an equitable remedy

for securities laws violations, may be measured by the amount of taxes evaded.[41]  Such an

approach is consistent with the broad discretion provided to courts in the award and calculation

of disgorgement as part of its general equitable authority to award full and adequate relief.[42]

      1.   *The Wylys Owed Taxes On The Offshore Transactions.*

      In general, "the grantor trust rules recognize the separate existence of a trust when a

grantor has parted with dominion and control over the contributed trust property, but ignore the

separate existence of a trust when the grantor has retained dominion and control over trust

assets."[43]  The evidence presented at trial established that the Wylys did not part with dominion

and control over the property held by the offshore Trusts.[44]  The Wylys apparently will attempt

to rebut the clear impact of this evidence by bringing in a law professor, Robert Danforth, to

parse technical differences in the securities laws and the Code and then conclude that neither the

facts found by the jury or a hypothetical contemporaneous disclosure of beneficial ownership on

an SEC filing would automatically establish that the Wylys owed taxes.   However, the SEC is

not seeking *collateral estoppel* in a tax case – if it was, it would go after the taxes owed on all the

---

[41] *SEC v. Wyly*, No. 10 Civ. 5760(SAS), 2013 WL 2951960, at *3 (S.D.N.Y. June 13, 2013) ("I decline to deprive the SEC of a potentially powerful arrow in its quiver for ensuring that those who violate the securities laws do not retain unlawful gains").

[42] *First Jersey Sec.*, 101 F.3d at 1474-75.

[43] Jay A. Soled, *Reforming the Grantor Trust Rules*, 76 Notre Dame L. Rev. 375, 379 (2001).

[44] Tr. 2970:7-9 (Court: "I remember evidence that sounded like a lot more than influence.  It sounded like the Wylys were directing the trusts what to do.")

offshore transactions.  Rather, it is asking the Court to look at the same evidence of control presented to the jury and find that it satisfies a very similar legal standard.

Courts and the IRS look at control in determining grantor trust status, including control over investment decisions. "When a grantor or other person has certain powers in respect of trust property that are tantamount to dominion and control over such property, the Code 'looks through' the trust form and deems such grantor or other person to be the owner of the trust property and attributes the trust income to such person."[45]  Under Code § 671, the grantor of a grantor trust is treated "as the owner of the trust assets, thus making the trust assets taxable to the grantor, until those trust assets are distributed to the grantee."[46]  A grantor trust is disregarded as a separate taxable entity to the extent of the grantor's retained interest, and the grantor must report the trust's income on his or her own return.[47]

It has been held in similar cases that a "trust arrangement may not be used to turn a family's personal activities into trust activities, with the family expenses becoming expenses of trust administration."[48]  For example, "[t]he acquisition by the Trust of a new residence for [taxpayers] in response to a personal need of [taxpayers] reflects the manner in which the Trust was used as [taxpayers'] personal bank account."[49]  In such situations, the Tax Court "will look through the form of the trust arrangement and determine the tax consequences based upon the

---

[45] *See Kaplan v. Comm'r*, 107 T.C.M. (CCH) 1226, *17 (2014) (quoting *Estate of O'Connor v. Comm'r*, 69 T.C. 165, 174(1977)); *Kadillac v. Comm'r*, 127 T.C. 184, 196 (2006) (under the tax code "[b]eneficial ownership is identified by a taxpayer's command over property or enjoyment of its economic benefits") (citation omitted), *aff'd*, 534 F.3d 1197 (9th Cir. 2008).

[46] *Resolution Trust Corp. v. MacKenzie*, 60 F.3d 972, 976–77 (2d Cir. 1995).

[47] Code § 671; Treas. Reg. § 1.671–2(b).

[48] *Neely v. United States*, 775 F.2d 1092, 1094 (9th Cir. 1985) (citing *Schulz v. Comm'r*, 686 F.2d 490, 493 (7th Cir. 1982)).

[49] *Smith v. Comm'r*, 52 T.C.M. (CCH) 691, 693 (1986).

substance of the transaction."[50]   Among the factors considered by courts in determining whether to disregard a trust for income tax purposes are the taxpayer's role "in the decision-making process with respect to investment of trust assets."[51]

The findings made by the jury in response to the Court's Section 5 and Section 13(d) instructions closely mirror the analysis applied by Tax Courts in determining the grantor status of a trust.[52]   Moreover, those findings were consistent with the overwhelming evidence at trial, which proved that (i) <u>every</u> action taken by the trustees was initiated or authorized by Sam or Charles Wyly; (ii) the trustees never failed to comply with directions given to them by the Wylys or their agents[53]; and (iii) the Wylys used the wealth accumulated in their offshore entities to purchase, furnish, and decorate houses in which they and their families lived.   The evidence showed that the Wylys expected their recommendations to the offshore trustees to be followed, and they always were.[54]   The Wylys knew they were not supposed to control the trusts but chose to treat the tax-free trust funds like a personal piggybank.[55]   In this circumstance, the Wylys' trusts should either be disregarded for the purposes of determining appropriate taxation or treated

---

[50] *Keefover v. Comm'r*, 65 T.C.M. (CCH) 2999, 1993 WL 221066, at *9 (1993) (citation omitted).

[51] *Id.*

[52] Tr. 3266:25-3267:3 (Section 5: "control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the Isle of Man entities") and Tr. 3257:7-12 (Section 13(d): "a person is a beneficial owner of a security if that person directly or indirectly has or shares either voting power or investment power for the security. Beneficial ownership can also be obtained through any contract, arrangement, understanding, or relationship that grants an individual voting or investment power").

[53] *See e.g.* Tr. at 997:22-24; 999:9-22; 1005:10-22; Tr. at 581:18-23.

[54] Tr. 1000:9-1002:10; 2181:20-2182:6.

[55] Tr. 1005:24-1006:12 (Michelle Boucher testified that "the Wylys . . . did not want to be seen as controlling the Isle of Man entities"; she "participated in discussions with Sam and Charles Wyly . . . regarding taking steps so that Sam and Charles would not be seen to control the Isle of Man Trusts," and they "took steps to ensure the confidentiality of the Isle of Man trusts to avoid the appearance of control").

as grantor trusts pursuant to § 674(a).[56]  Under either approach, the Wylys would be taxed on the transactions done by the offshore system they controlled.

2. *The Unpaid Taxes Were Causally Connected To and Concealed by the Securities Fraud.*

The SEC must prove that the Wylys' tax benefits were causally connected to their securities fraud.  That burden is easily met.  Their securities fraud consisted of illegal transactions that resulted in what should have been treated as taxable profits.  Moreover the securities fraud was intimately intertwined with their tax benefits.  The Wylys falsely disclaimed beneficial ownership over the securities held by their offshore system in statements made to the Issuers and the public.  Additionally, the Wylys' lawyer sent letters to Sterling Software and Michaels stating that the Wylys would "irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable … to the Securities."[57]  The companies relied on the letters in determining that the exercise of offshore options was not taxable to the Wylys and thus neither 1099s nor W-2s reflecting the additional compensation needed to be issued to the Wylys.[58]  As the IRS has an automatic matching program to detect income reported on 1099s and W-2s that is

---

[56]  It is a "black-letter principle that 'tax law deals in economic realities, not legal abstractions.'" *PPL Corp. v. Comm'r*, 133 S.Ct. 1897, 1905 (2013) ("we [the Supreme Court] follow substance over form") (quoting *Comm'r v. Southwest Exploration Co.*, 350 U.S. 308, 315 (1956)).  *See also United States v. Trupin*, 119 Fed. Appx. 323, 326 (2d Cir. 2005) ("assets in a trust [are] the property of the taxpayer for purposes of federal tax law where the trust beneficiary has assisted in the domination of trust assets by the taxpayer for the sole purpose of the taxpayer's use and enjoyment of those assets"); *Johnson v. Comm'r*, 86 F.2d 710, 712 (2d Cir. 1936) (because "the question is always whether the transaction under scrutiny is in reality what it appears to be in form," taxpayer was treated as owning money that was gifted to his wife, placed in trust, and then loaned to taxpayer by trustee); *Schulz*, 686 F.2d at 495 ("The main thrust of the grantor trust provisions is that the trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has substantially unfettered powers of disposition").

[57]  PX-0013 at 4.

[58]  PX-438.

not reported on personal returns, the Wylys' lies to the Issuers resulted in the companies not issuing tax forms to the Wylys that would have triggered IRS scrutiny.[59]

The Wylys were aware that Tedder's tax treatment was "aggressive" from the onset, but even that aggressive treatment was premised on the idea that they would not control the transferred securities.[60]  Both Sam Wyly and the family office employees knew that control could undermine the tax treatment and went to great lengths to conceal the appearance of that control.[61]  These lengths included concealing transactions of the offshore system and omitting all offshore activity from any disclosures the Wylys made with respect to their domestic holdings. The tax issue and the need to limit SEC filings were often discussed in the same meetings with the offshore trustees.[62]  Sam Wyly testified that the omission of the Wylys' transaction recommendations from SEC filings helped the tax benefits.[63]

As early as 1993, Morgan Lewis advised that there was "meaningful risk" with the tax treatment of the trusts pursuant to § 679 because the offshore trustees were accumulating income

---

[59] Meier Depo. at 84:24-95:10; PX-0438, PX-9026 (Hennington: "this may be the only way to avoid a 1099), PX-9033, PX-9034 (Wyly memo to SBC: "In summary, no withholding or information reporting is required"); PX-9027 (Hennington: "This was used in all the company filings where it stated that options were transferred"); PX-9028 (French: "SE didn't issue a 1099 because it relied on the Chatzky opinion").

[60] PX-0013 at 4.

[61] PX-890 ("remember it is critical from a U.S. tax standpoint that there is no appearance that the Wylys are in control of the trusts or the protectors"); Tr. 2354:17-20 (Sam Wyly: "I knew … I could not control the trust").

[62] PX-0194 (noting both that (1) issue of trustee management company owning a percentage of Sterling Software "which would bring it within SEC reporting requirements" have been resolved, and (2) French and Robertson "are anxious that any trail of communications between themselves, [Boucher] and Meespierson not give rise to any potential claim that control is being exercised in the USA"); PX-241 (noting both (1) "One of the reasons they have a variety of offshore trusts is that … any trust company holding an aggregate of more than 5% of any one class of shares in a company then has certain … filing requirements with the SEC," and  (2) because the Crazy Horse Trust is currently a US grantor trust, its Sterling Software options "will be sold across" to another offshore company in exchange for an annuity).

[63] Tr. 2355:19-2356:3.

for U.S. beneficiaries.[64]  The Wylys endeavored to fix this problem in the most cynical of ways: creating a false paper trail to indicate foreign citizens had created and funded new trusts for their benefit.  Thus, early in the scheme, the Wylys were on notice that their tax treatment was not only aggressive but legally unsupportable.[65]  The need to conceal the transfers between and among tainted trusts became even more important.  As the scheme progressed, the Wylys learned that the promoter of the entire offshore system had been incarcerated.[66]  Fear of an audit escalated, and the securities fraud that was concealing these problems continued.

The defense may nevertheless assert that the tax issue and the Wylys' securities fraud are separate.  They have hired an expert to testify that the IRS' DIF process – an automated system that pulls returns for review – did not rely on SEC filings.  They appear to be arguing that the risk of audit from an SEC filing was therefore low.  This is a red herring.  It ignores all the other ways in which the IRS develops information, including extensive training materials that instruct revenue agents to review SEC filings.  More importantly, it ignores the actual facts of this case.  Not only did Tedder warn the Wylys that SEC filings could lead to an audit, but when the Wylys

---

[64] PX-083; Lubar Depo at 13:21-23, 14:2-6, 16:22-17:5, 17:15-17.

[65] The Wylys' transactions "elevate[d] form over substance repeatedly, indeed at every pivotal turn, and thus, when viewed in the aggregate, constitute a sham designed not to legally defer or avoid tax, but to evade tax."  PX-0435.  Because the SEC is not arguing a tax case but, instead, using unpaid taxes as a measure of ill-gotten gain, it is not briefing every manner in which the Wylys' complex transactions violated the Revenue Code.  However, the Wylys' securities fraud essentially concealed the offshore system from view and, thus, also concealed the § 679 problem with the Wylys' tax position.  The Wylys' own lawyers concluded that the Bulldog Trust "should be classified as a grantor trust," and told the IRS (anonymously) there was a "serious risk they were grantor trusts from the beginning."  PX-1236, PX-83, Lubar Depo. at 18:12-14.  Section 679 therefore represents an additional basis for concluding these were grantor trusts and taxing the Wylys' on their income and capital gains.  The reasonable approximation of the taxes owed would be the same under either theory.

[66] PX-1255 at WYLYSEC01115166 ("David Tedder, the attorney who originally promoted the 1992 trusts and annuity transactions is now in jail …. A recent article also referenced Michael Chatzky who opined on the 1996 annuity transactions and the 1998 extensions of the 1992 annuities as being aware of and somewhat involved in Tedder's schemes").

approached the IRS anonymously, the IRS repeatedly asked what information was reflected in relevant SEC filings.[67]  The Wylys were told that the IRS "seemed very interested in any SEC reporting of the initial transactions," elected not to report their conduct to the IRS, and then continued to conceal their beneficial ownership of Issuer securities in SEC filings.[68]

And then the audit happened.  The IRS told the Wylys' lawyers that they found "valuable information from the SEC filings."[69]  However, the same revenue agents had to ask what happened to the options after they were transferred offshore.  The IDRs sent by the IRS during the course of the audit make clear that the IRS was learning about the transactions from SEC filings but could glean little information beyond the initial offshore transfers because of the Wylys' fraudulent misstatements and omissions.[70]  From the beginning of the Wylys' scheme to the end, the unpaid taxes and the securities fraud were causally connected.

### 3.  *Reasonable Approximation*

The SEC has the initial burden of producing a reasonable approximation of their ill-gotten gains, which includes what the taxes on these transactions should have been.  The reasonable approximation "does not require exactitude."[71]  So long as the SEC's approximation

---

[67] PX-1259 at 2 ("[IRS:] Have you checked the SEC filings?"), 5 ([IRS:]"were they significant enough shareholders that their holdings would be listed on SEC filings?"), and 6 ([IRS:]" "Did the SEC filings show beneficial ownership in shares?").

[68] PX-1260 at 2.

[69] PX-1373 at WYLYSEC01106568.

[70] PX-9003 (referencing information in Issuer SEC filing), PX-9085 (same); PX-9087 (same); PX-9089 (same); PX-9102 (same); PX-9106 (same); PX-9110 (same); PX-9112 (same); PX-9114 (same); PX-9116 (same); PX-9118 (same); PX-9120 (same); PX-9122 (same); PX-9124 (same); PX-9126 (same); PX-9128 (same); PX-9130 (same); PX-9132 (same);  PX-9134 (same); PX-9136 (same); PX-9138 (same); PX-9140 (same); PX-9142 (same); PX-9144 (same); PX-9146 (same);  PX-9148 (same); PX-9150 (same); PX-9152 (same); PX-9154 (same); PX-9156 (same); PX-9158 (same).

[71] *Taber*, 2013 WL 6334375, at *2 (quotations omitted).

of unpaid taxes is reasonable, "the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[72]

The defense has never disputed that these transactions resulted in $553,176,052 in gains. If the Court finds that taxes were owed, the end result is that the $553,176,052 should be taxed as either ordinary income or capital gains (or a combination of both).  If the Wylys are held to the corporate form of the offshore trusts they created (but those trusts are treated as grantor trusts), then the subsidiary companies are controlled foreign corporations pursuant to Code § 957(a). The gains in Issuer securities as a result of transactions done by the controlled foreign corporations would be taxed as ordinary income under Code § 951(b), resulting in unpaid taxes and prejudgment interest of $341,316,986 for Sam Wyly and $200,437,220 for Charles Wyly.[73] On the other hand, if the Court adopts a substance-over-form, step transaction or beneficial ownership analysis, it should ignore the offshore entities and tax the offshore transactions as if they were directly attributable to the Wylys, applying the ordinary income rate to options and other forms of compensation from the issuers and the capital gains rate to other trading profits.

The defense produced its own expert who reviewed the SEC's calculations and determined that, following the SEC's approach, the resulting tax gain and prejudgment interest was $308,929,704.00 for Sam Wyly and $160,341,605.00 for Charles Wyly.[74]  This number improperly provides the Wylys with an offset for annuities paid in later years that could have been fully or partially funded by the proceeds of investments – like Maverick – that are not

---

[72] *Razmilovic*, 738 F.3d at 31 (quoting *Lorin*, 76 F.3d at 462).

[73] PX-9193 exh. 1A1 &1A2.

[74] Kosowsky's Report at p. 9 (Schedule 2-INT. (Sam Wyly)) and p. 6 (Schedule l-INT. (Charles Wyly)); Kosowsky Depo. at 106:2-12.

included in the SEC's disgorgement calculations (to the Wylys' great benefit).  As a result, there is no proof that the Wylys would be entitled to a full offset.[75]

The SEC submits that treating the offshore subsidiaries as foreign controlled corporations is the best measure of disgorgement in the present case.  With respect to the SEC's tax-based theories, the Court should award $341,316,987 against Sam Wyly and $200,437,220 in disgorgement against Charles Wyly.  However, "[d]isgorgement need only be a reasonable approximation of the profits causally connected to the violation."[76]  Any of the numbers above would be an appropriate measure of the Wylys' ill-gotten gain given that the Court is tasked with making a reasonable approximation, and not reconstructing 26 tax returns filed during a 13 year scheme.

Indeed, the exercise is similar to that routinely employed by district courts in determining the correct sentence in criminal tax cases.  Disgorgement, like the criminal law, is focused on illegal acts.  In criminal sentencing hearings, the U.S. Sentencing Guidelines provide for sentencing enhancements where the tax loss was calculated by multiplying the unreported income that was the object of the offense by twenty-eight percent.[77]  This is in a proceeding

---

[75] The source of the annuity payments is unclear.  Hennington expressed concerns in 2003 that the annuity payments "will bankrupt several of the IOM companies."  PX-1255 at WYLYSEC01115159.  In 2003, the Wylys had stakes in Maverick, Green Mountain, and First Ranger worth more than $500 million.  PX-2086 at SEC/ITC013448.  Although many of these investments were initially funded with the proceeds of sales of issuer securities, the SEC has not included the taxes that should have been paid on those investments in its disgorgement figure. Under the circumstances, it would be inequitable to assume that the annuities were not funded by these gains and award the Wylys a full offset.  The Wylys appear to be in the process of requesting refunds for the taxes paid on the annuities, perhaps under the assumption that this Court will order tax-based disgorgement. There is thus a remedy in place to address any threat of double taxation, and the Wylys can pursue a refund with the IRS if necessary.

[76] *Warde*, 151 F.3d at 50 (quoting *Patel*, 61 F.3d at 139).

[77] *See* U.S.S.G. § 2T1.1 Note (A) and app. n.1 ("In some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts.")

where the government bears the burden of proof and the end result may be an increase in the length of a defendant's incarceration.  The more precise calculation set forth in this Memorandum, which applies the correct ordinary income rate for the applicable years, clearly satisfies the SEC's initial burden of a "reasonable approximation."  And, given the facts of this case, the Wylys cannot prove that the tax-free status of the offshore transactions was unaffected by their securities fraud.

### E.  The Wylys Should Pay Pre-Judgment Interest.

In any case, an award of prejudgment interest is appropriate when defendants have had the time value of money.  Without pre-judgment interest, defendants would have "the benefit of what amounts to an interest free loan procured as a result of illegal activity."[78]  But an award of prejudgment interest is particularly appropriate here because the Wylys "had use of unlawful profits for the entire period," spanning more than a decade.[79]  In that time, the Wylys used their ill-gotten gains to amass even greater wealth.  Maverick, Green Mountain, and Ranger were created using offshore funds and the Wylys' investments in those companies grew to be more than $500 million.[80]  The Wylys should not "profit from [their] ill-gotten gains, including the time value of money," and the Court should award pre-judgment interest on the SEC's disgorgement figures.[81]

---

(2013); *see also United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997) (holding that courts need not calculate the amount of tax loss with precision, citing to U.S.S.G. § 2T1.1 Application Note 1).

[78] *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).

[79] *Warde*, 151 F.3d at 50 (quoting *First Jersey Sec.*,101 F.3d at 1477).

[80] PX-2086 at SEC/ITC013448 (showing $173,725,215 in Green Mountain, $187,305,118 in Maverick, and $147,763,489 in Ranger).

[81] *Elliot*, 2012 WL 2161647, at *13; *see also First Jersey Sec.*, 101 F.3d at 1476 (affirming assessment of pre-judgment interest); *SEC v. Milligan*, 436 Fed. Appx. 1, 2 (2d Cir. 2011) (same); *SEC v. Colonial Inv. Mgmt. LLC*, 381 Fed. Appx. 27, 32 (2d Cir. 2010) (same); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (same).

***

In sum, the SEC requests that Sam Wyly be ordered to disgorge $899,174,862 (inclusive of pre-judgment interest) for his total-profits on the illegal transactions involving offshore Issuer securities ($341,316,986 of which should also be awarded on the tax-based disgorgement theory).  The SEC requests that Charles Wyly be ordered to disgorge $443,691,539 (inclusive of pre-judgment interest) for his total-profits ($200,437,220 of which should also be awarded on the tax-based disgorgement theory).

## II.     SAM WYLY SHOULD PAY SUBSTANTIAL PENALTIES.

In light of Sam Wyly's extensive fraud, disgorgement alone is an insufficient remedy, and would provide little deterrent because it would require only the return of ill-gotten gain.[82] Accordingly, the Court should order Sam Wyly to pay a $72,286,920.64 civil penalty.  This amount is based on the amount of Sam Wyly's pecuniary gain from his secret, offshore transactions in Issuer securities after February 1, 2001, plus prejudgment interest.

Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties in increasing severity for statutory violations.[83]  Civil penalties serve to deter, punish, and exact a penalty for illegal behavior.[84]  "[A] first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;'" and a third-tier penalty may be imposed when, in addition to meeting the second-tier requirements, the "'violation directly or indirectly

---

[82] *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331-32 (S.D.N.Y. 2007) ("[T]here is little deterrent in a rule that allows the violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught.")

[83] 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

[84] *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552 (S.D.N.Y. 2009) ("'[W]hereas disgorgement 'merely restores [the] defendant to his original position without exacting a real penalty for his illegal behavior,'…the imposition of civil penalties is appropriate to accomplish the goal of punishment.") (quoting H.R. Rep. No. 98-355, 7-8 (1984)).

resulted in substantial losses or created a significant risk of substantial losses to other persons.'"[85]  Each tier establishes a maximum penalty, leaving for the court to determine the amount.  Here, the jury found that Sam Wyly acted with fraudulent or reckless intent, qualifying him for second-tier penalties. That tier provides that for each violation, the amount of penalty "shall not exceed *the greater of*" a specified monetary amount or the defendant's gross pecuniary gain.[86]  Although the court has discretion to choose between a fixed statutory penalty or a penalty equivalent to gross pecuniary gain from the violations, the choice ought to reflect the nature of the defendant's violation and relative culpability.[87]

During the relevant time period, the specified monetary amount was $60,000 for second-tier penalty, which should be imposed per-violation.[88]  Each false or submitted filing represents a violation and, as a result, the Court has the authority to impose 43 statutory penalties totaling $2,280,000.[89]  This number is dwarfed, however, by the $38,758,009.68 Sam Wyly made on secret Issuer transactions after February 1, 2001.[90]  With prejudgment interest, the amount

---

[85] *Razmilovic*, 738 F.3d at 38 (quoting 15 U.S.C. §§ 77t(d)(2)(A)-(C) and 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)).

[86] 15 U.S.C. § 77t(d) (emphasis added); 15 U.S.C. § 78u(d)(3) (same).

[87] *SEC v. Pentagon Capital Management*, No. 08 Civ. 3324(RWS), 2012 WL 1036087, at *4 (S.D.N.Y. Mar. 28, 2012), *aff'd* in relevant part, 725 F.3d 279, 288 (2d Cir. 2013) (choosing gross pecuniary gain instead of statutory penalties as "proportionate to the pecuniary gain from Defendants' repeated violations as well as the harm caused by them."); *In re Reserve Fund Sec. and Derivative Litig.*, Nos. 09 MD. 2011(PGG), 09 Civ. 4346(PGG), 2013 WL 5432334, at *21 (S.D.N.Y. Sept. 30, 2013) (choosing a level of tier 1 penalty to reflect the jury's determination of defendant's liability and culpability).

[88] *SEC v. Tourre*, No. 10 Civ. 3229(KBF), 2014 WL 969442, at *9 (S.D.N.Y. Mar. 12, 2014); *Reserve Fund Sec. and Derivative Litig.*, 2013 WL 5432334, at *20.

[89] A chart listing the 43 false and omitted filings during the relevant time period is attached hereto as exhibit __.

[90] As a result of the Court's ruling denying the SEC's claim that the fraudulent concealment doctrine stayed the applicable statute of limitations, the SEC is only entitled to obtain penalties from conduct after February 1, 2001, which is five years before the Wylys signed tolling agreements with the SEC.

increases to $72,286,920.64.[91]  Relevant factors in assessing the propriety and amount of a civil penalty include (1) the egregiousness of the defendant's conduct, (2) the degree of defendant's scienter, (3) whether the violation created losses or substantial risk of losses, (4) whether the violations were isolated or recurrent, and (5) whether the penalty should be reduced due to defendant's current and future financial condition.[92]

In the present case, the jury found Sam Wyly engaged in a fraudulent scheme with a high degree of scienter for thirteen years.  Moreover, he did so while serving in high-level positions at four publicly traded companies and while subject to a prior SEC injunction.  The violations found by the jury do not reflect an isolated instance of misconduct but, rather, hundreds of knowing violations lasting more than a decade.  To date, there has been no accountability for this misconduct.  The Wylys were not subject to criminal prosecution or shareholder litigation.  This Court has ruled that penalties are only available for the final few years of the Wylys' fraud, but it can look at the totality of the Wylys' scheme in determining an appropriate penalty for the transactions that occurred in the relevant time period.[93]  Without a substantial penalty, the Wylys will be in the same position they would have been in without engaging in a decade-long fraud and the deterrent impact of this action would essentially be void.  For these reasons, the SEC requests that the Court impose the maximum available penalty of $72,286,920.64.

---

[91] *See SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (holding that Koenig's pecuniary gain includes not just disgorgement but also prejudgment interest to factor in the economic return he made between the time he was enriched and the judgment of liability).

[92] *SEC v. Tourre*, 2014 WL 969442, at *11.

[93] *Birkelbach v. SEC*, 751 F.3d 472, 482 (7th Cir. 2014) ("[E]ven assuming the five-year period applies, there was no error in the SEC considering events outside that period in crafting its sanction.").

### III.    THE COURT SHOULD IMPOSE A PERMANENT INJUNCTION.

The Court should permanently enjoin Sam Wyly against future violations of Sections 5 and 17(a) of the Securities Act, and Sections 13(d), 13(a), 14(a), 16(a), and 10(b), including Rule 10b-5 thereunder, of the Exchange Act.  "Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws."[94]  The Securities Act and the Exchange Act provide for the issuance of permanent injunctive relief in the face of a violation of any of their provisions.[95]  Courts look to the following factors in determining whether to enjoin a defendant from future violations of the securities laws: (1) the fact that a defendant has been found liable for illegal conduct; (2) the degree of scienter; (3) whether the infraction is an isolated occurrence; (4) whether defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.[96]  In the present case, these factors weigh heavily in favor of injunctive relief.

First, Sam Wyly has not just been found liable for misconduct; the jury found <u>nine</u> distinct securities laws violations over a thirteen year period.  Second, the jury found that Sam Wyly acted with fraudulent or reckless intent.  Third, these violations were not an isolated occurrence.  The present fraud spanned thirteen years, involved four publicly traded companies, the creation of 17 trusts and 40 subsidiary companies, and approximately 700 transactions.  Rather than being isolated, the Wylys misconduct was so pervasive that it necessitated hiring a Cayman Island accountant to maintain records that should not be seen in the USA.  By the time this matter went to trial, that employee had been working for the Wylys for 19 years.

---

[94] *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1988); *see also SEC v. Tzolov*, No. 08 Civ. 7699(SAS), 2011 WL 308274, at *5 (S.D.N.Y. Jan. 26, 2011).
[95] 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d)(e), 78u-1.
[96] *Tzolov*, 2011 WL 308274, at *5 (citing *Commonwealth Chem. Sec.*, 574 F.2d at 100.

Fourth, the only regret Sam Wyly has shown during the course of this trial relates to the size of his legal fees.[97]  His litigation position that he did not control the Isle of Man trusts bordered on frivolous.  His testimony about several key events at trial was not credible.[98]  As the Second Circuit has noted, "persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction."[99]  Finally, Sam Wyly's vast wealth gives him the ability to purchase large ownership positions in publicly traded companies.  At the time of these offenses, he was subject to an injunction as a result of prior litigation with the SEC.  In the absence of injunctive relief, there is no assurance he will not violate the securities laws again.[100]

## CONCLUSION

The SEC respectfully requests that the Court order disgorgement in the amount of $182,026,815, with pre-judgment interest in the amount of $260,664,724 against Defendant Charles Wyly.  Further, the SEC respectfully requests that the Court order disgorgement in the amount of $371,149,237, with prejudgment interest in the amount of $528,025,625 a civil penalty in the amount of $72,286,920.64, and a permanent injunction against Defendant Sam Wyly.

---

[97] Tr. 1612:7-14.

[98] ECF 405 at 9 ("this is inconsistent with, and not credible in light of, the statements Wyly has consistently made over the last decade").

[99] *Lorin*, 76 F.3d at 461 (internal quotation marks omitted); *see also Elliot*, 2012 WL 2161647, at *9 ("the Court's view of continued protestations of innocence may be relevant to whether a defendant is likely to repeat prior conduct").  *SEC v. Musella*, 748 F. Supp. 1028, 1042 (S.D.N.Y 1989) ("lack of remorse" bears on likelihood of future of misconduct); *Tzolov*, 2011 WL 308274, at *5 (noting injunction is supported by defendant's "conduct in this litigation including his almost frivolous opposition to the instant motion").

[100] *See SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994) (an injunction was warranted where defendants violated securities laws with a "high degree of scienter" and failed to assure the court that future violations were not likely to recur).

Dated:  July 25, 2014.                    Respectfully submitted,


                                          _/s/_ *Bridget Fitzpatrick*_____
                                          Gregory N. Miller (GM-5922)
                                          Bridget Fitzpatrick
                                          John D. Worland, Jr. (JDW-1962)
                                          Martin Zerwitz (MZ-9765)
                                          Counsel for Plaintiff
                                          SECURITIES AND EXCHANGE COMMISSION
                                          100 F Street, N.E.
                                          Washington, DC 20549-5977
                                          Tel.:    (202) 551-4678 (Fitzpatrick)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 25th day of July 2014, electronic copies of the Plaintiff's Memorandum of Law in Support of its Request for Disgorgement and Pre-Judgment Interest were served on the following parties via electronic mail:

Stephen D. Susman
Harry Susman
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096

Terrell W. Oxford
David D. Shank
SUSMAN GODFREY
901 Main Street, Suite 5100
Dallas, Texas 75202-3775

MARK HATCH-MILLER
STEVEN SHEPARD
SUSMAN GODFREY
560 Lexington Avenue
15th Floor
New York, New York 10022-6828

**Counsel for Defendants**
**Samuel E. Wyly and**
**Donald R. Miller Jr.**

William A. Brewer III
Michael Smith
BICKEL & BREWER
1717 Main Street, Suite 4800
Dallas, Texas 75201

**Co-Counsel for Defendant**
**Samuel E. Wyly**


___/s/__ *Bridget Fitzpatrick*_____
Bridget Fitzpatrick
Counsel for Plaintiff
Securities & Exchange Commission

37