**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    No. 1:10-cv-5760-SAS |
| | : |
| SAMUEL WYLY and DONALD R. MILLER, | :    ECF Case |
| JR., in his Capacity as the Independent | : |
| Executor of the Will and Estate of | : |
| Charles J. Wyly, Jr., | : |
| | : |
| Defendants. | : |

**DEFENDANTS' REMEDIES**
**<u>HEARING MEMORANDUM OF LAW</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ......................................................................1

ARGUMENTS AND AUTHORITIES ...........................................................2

I.    The Tax Disgorgement Theory Should Be Rejected. .............................2

    A.    No Causal Connection Exists Between the Violations Found By the Jury and Illegal Tax Benefits.........................................3

        1.    The SEC Must Show That Correct SEC Disclosures Would Have Resulted In Tax Liability. ...........................3

        2.    The Information That Fully Accurate SEC Filings Would Have Disclosed Has No Relevance to Section 674.............................................................6

            a.    The "Power of Disposition" Means the Power to Pay Out Trust Assets to Beneficiaries. ............10

            b.    Application of the "Trustee" Exception to Section 674(a) Has Nothing to Do with SEC Disclosures. ...............................................17

            c.    The post-1992 trusts raise a different question under Section 674. ..........................18

            d.    The Defendants' influence over trust spending does not implicate Section 674. .........................19

        3.    The SEC's Other Causal Connection Theories Do Not Work. ...............................................................19

    B.    The Court Should Not Exercise Its Equitable Power to Award Disgorgement Based on a Hotly Contested, Alleged Tax Liability.................................................................22

II.    The Total Profits Disgorgement Theory Should Be Rejected ...............23

    A.    The SEC Has Not Met Its Burden of Showing That All Profits Are a Reasonable Approximation of the Ill-Gotten Gains from the Violation.............................................................24

    B.    The Defendants' Evidence Easily Rebuts the SEC's Total Profits Theory. ........................................................28

C.      Total Profits Disgorgement Should Also Be Rejected for the
                 Section 5 Claims .......................................................................................28

III.    Disgorgement Is Only Available for Post-February 1, 2001 Violations. ..............32

IV.     The Total Profits Penalty Theory Should Be Rejected ..........................................34

CONCLUSION ......................................................................................................................35

# TABLE OF AUTHORITIES

<u>Cases</u>

*Ackerberg v. Johnson,*
   892 F.2d 1328 (8th Cir. 1989) ................................................................. 31

*Adams v. Woods,*
   2 Cranch 336 (1805) ............................................................................. 33

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) .............................................................................. 26

*Bennett v. CIR,*
   79 T.C. 470 (1982) ............................................................................... 14

*Boulware v. United States,*
   552 U.S. 421 (2008) ............................................................................... 7

*Broide v. United States,*
   156 F. Supp. 12 (N.D. Ill. 1957) ............................................................. 14

*Duffy v. United States,*
   487 F.2d 282 (6th Cir. 1973) ................................................................... 8

*Estate of Goodwyn v. CIR,*
   T.C. Memo 1976-238, 1976 WL 3423 (1976) ........................................ 14

*Halliburton Co. v. Erica P. John Fund, Inc.,*
   134 S. Ct. 2398 (2014) .......................................................................... 26

*Helvering v. Clifford,*
   309 U.S. 331 (1940) .............................................................................. 21

*Kanter v. CIR,*
   590 F.3d 410 (7th Cir. 2009) ..................................................... 15, 18, 22

*Lawson v. FMR LLC,*
   134 S. Ct. 1158 (2014) .......................................................................... 17

*Loughrin v. United States,*
   134 S. Ct. 2384 (2014) .......................................................................... 13

*McNeill v. United States,*
   131 S. Ct. 2218 (2011) .......................................................................... 12

*Riordan v. SEC,*
   627 F.3d 1230 (D.C. Cir. 2010) .......................................................... 32, 34

*S.E.C. v. Graham*,
   --- F. Supp. 2d ----, 2014 WL 1891418 (S.D. Fla. May 12, 2014) .......................................... 34

*Schulz v. CIR*,
   686 F.2d 490 (7th Cir. 1982) ................................................................................... passim

*Schwartz v. U.S. Ins. Co.*,
   21 F. Cas. 770 (C.C. Pa. 1812) ....................................................................................... 32

*Sebelius v. Cloer*,
   133 S. Ct. 1886 (2013) ................................................................................................... 11

*SEC v. Aqua-Sonic Products Corp.*,
   687 F.2d 577 (2d Cir. 1982) ........................................................................................... 30

*SEC v. Bilzerian*,
   814 F. Supp. 116 (D.D.C. 1993) ...................................................................................... 4

*SEC v. Calvo*,
   378 F.3d 1211 (11th Cir. 2004) ..................................................................................... 34

*SEC v. Cavanagh*,
   98 CIV. 1818 DLC, 2004 WL 1594818 (S.D.N.Y. July 16, 2004)
   *aff'd*, 445 F.3d 105 (2d Cir. 2006) ................................................................................ 28

*SEC v. Contorinis*,
   743 F.3d 296 (2d Cir. 2014) ........................................................................................... 27

*SEC v. First City Financial Corp., Ltd.*,
   890 F.2d 1215 (D.C. Cir. 1989) ................................................................................. 3, 33

*SEC v. First Jersey Securities, Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ........................................................................................... 3

*SEC v. Gabelli*,
   133 S. Ct. 1216 (2013) ................................................................................................... 33

*SEC v. Huff*,
   758 F. Supp. 2d 1288 (S.D. Fla. 2010) .......................................................................... 35

*SEC v. Kelly*,
   663 F. Supp. 2d 276 (S.D.N.Y. 2009) ........................................................................... 34

*SEC v. MacDonald*,
   699 F.2d 47 (1st Cir. 1983) ............................................................................................ 25

*SEC v. Pentagon Capital Mgmt. PLC*,
   725 F.3d 279 (2d Cir. 2013) ........................................................................................... 33

iv

*SEC v. Rind,*
   991 F.2d 1486 (9th Cir. 1993) ................................................ 34

*SEC v. Tambone,*
   550 F.3d 106 (1st Cir. 2008), *reh'g granted*, 573 F.3d 54 (2009) ........................... 34

*SEC v. UNIOIL,*
   951 F.2d 1304 (D.C. Cir. 1991) ............................................ 4, 25

*SEC v. Whittemore,*
   659 F.3d 1 (D.C. Cir. 2011) ................................................ 29

*United States v. Byrum,*
   408 U.S. 125 (1972) .................................................... 12, 15

*United States v. Ursery,*
   518 U.S. 267 (1996) .................................................... 32

<u>Statutes</u>

15 U.S.C. § 77 ............................................................ 30, 35

15 U.S.C. § 78 ............................................................ 35

26 U.S.C. § 671 .......................................................... 7, 10

26 U.S.C. § 672 .......................................................... 8

26 U.S.C. § 674 .......................................................... 12, 15, 17

26 U.S.C. § 675 .......................................................... 13, 14

26 U.S.C. § 679 .......................................................... 20, 21

26 U.S.C. §§ 671-79 ...................................................... 7

Act of February 28, 1839, § 4 ............................................ 32

<u>Federal Regulations</u>

17 C.F.R. § 230.144(d)(1) (1996), *as amended by* 62 Fed. Reg. 9242 (Feb. 28, 1997) .............. 31

Regulation S-K, 17 C.F.R. Pt. 229 (2014) ................................ 30

Regulation S-X, 17 C.F.R. Pt. 210 (2014) ................................ 30

3230297v1/013572

Other Authorities

A. Burrill, *A Law Dictionary and Glossary* (1850) ...................................................... 33

Black's Law Dictionary (9th ed. 2009)..................................................................... 32

Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income,*
    *Estates and Gifts* § 80 (Thompson Reuters 2014) ............................................. passim

David Westfall et al., *Estate Planning Law & Taxation* ¶ 17.03
    (Thompson Reuters 2014) ................................................................................. 14, 15

John Bouvier, *A Law Dictionary* (1856)..................................................................... 33

Robert T. Danforth et al., *Federal Income Taxation of Estates*
    *& Trusts* ¶ 9.04[1] (Thompson Reuters 2014)................................................. 11, 14

Robert T. Danforth, *A Proposal for Integrating the Income and*
    *Transfer Taxation of Trusts*, 18 Va. Tax Rev. 545 ................................................ 7

Russell G. Ryan, *The Equity Façade of SEC Disgorgement*,
    4 Harv. Bus. L. Rev. Online 1 (2013)..................................................................... 33

*Trust Grantors & Section 674: Adventures in Income Tax Avoidance*,
    60 Colum. L. Rev. 326 (1960) .............................................................................. 15

Defendants Samuel Wyly and Donald R. Miller, Jr., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., respectfully submit this memorandum of law to aid the Court during the post-trial remedies hearing.

## PRELIMINARY STATEMENT

The SEC, having prevailed at trial on certain claims against the Defendants, now requests that the Court: (1) permanently enjoin Sam Wyly from violating the federal securities laws; (2) permanently bar Sam Wyly from serving as a director or officer of any public company; (3) impose a civil penalty of approximately $72 million on Sam Wyly; (4) disgorge all of the approximately $65 million profits from the Defendants' sales of unregistered securities; and (5) on the SEC's fraud claims and its related claims based on false or omitted SEC filings, disgorge either (a) all of the approximately $488 million profits from the securities sales related to these filings, or alternatively, (b) the approximately $224 million in federal income taxes that the SEC alleges the Defendants should have personally paid on those sales. In addition to that, the SEC also asks the Court to impose pre-judgment interest on top of disgorgement.

For the reasons explained in this memorandum of law, the Defendants respectfully disagree that these are the appropriate remedies for the violations found by the jury. The Defendants wish to focus the Court's attention before the hearing on the following four key remedies issues.[1] First, there is no causal connection between the securities violations and the illegal tax savings alleged by the SEC. The SEC's theory is premised on a fundamental misreading of the Tax Code. Even if the SEC could establish a causal connection, this Court should decline to exercise its equitable powers because the underlying tax issues involve novel,

---

[1] The Defendants' Proposed Findings of Facts and Conclusions of Law will separately address several issues that do not require extensive legal argument—specifically, whether the Court should issue an injunction or a director and officer bar against Sam Wyly, whether disgorgement is an "equitable" remedy, whether any disgorgement amount should be awarded jointly and severally, and whether pre-judgment interest should be awarded on top of disgorgement.

1

disputed issues of tax law, some of which are the subjects of current IRS audits. The Court should not wade into these tax issues in a disgorgement remedies proceeding involving SEC violations. Second, the SEC's total profits disgorgement measures for both the unregistered security sales and the fraud/false or omitted filings claims massively overestimate the profits *causally connected to* any securities violations. Third, the statute of limitations applies to disgorgement such that only amounts tied to violations occurring after February 1, 2001 can be disgorged. Fourth, the SEC's total profits penalty calculation is incorrect as a matter of law because, much like the SEC's total profits disgorgement measure, it comes nowhere close to reflecting pecuniary gains to Mr. Sam Wyly *resulting from* the violations found by the jury.

In short, while most of the total monetary amount sought here (as much as $625 million, even before pre-judgment interest—and, according to the SEC's calculations including pre-judgment interest, nearly $900 million just for Sam Wyly) is supposedly "equitable," there would be nothing equitable about imposing such a massive judgment. The facts and circumstances demonstrate that the amounts of any monetary profits *resulting from* or *causally connected* to the Defendants' violations are far, far smaller than what the SEC claims.

<u>**ARGUMENTS AND AUTHORITIES**</u>

**I.      The Tax Disgorgement Theory Should Be Rejected.**

This Court should not exercise its "equitable" powers to award disgorgement based on alleged tax savings for two reasons. First, the SEC cannot show any causal connection between the securities violations or wrong-doing found by the jury and any alleged tax savings. The violations in question were based solely on inaccurate SEC disclosures or failures to disclose. The information that the jury found should have been disclosed, however, has no connection to the tax issues implicated by the Defendants' offshore trusts. Second, even if there were some causal link between the violations and the tax issues, this Court should decline to exercise its

2

equitable powers because the underlying tax liability is uncertain and novel. Contrary to the way in which the claim was advertised to the Court at summary judgment, the underlying tax issue is far from straight-forward. This Court should not endeavor to resolve such complex tax issues in a truncated remedy proceeding involving securities violations.

A.     No Causal Connection Exists Between the Violations Found By the Jury and Illegal Tax Benefits

1.     The SEC Must Show That Correct SEC Disclosures Would Have Resulted In Tax Liability.

The SEC seeks the unprecedented remedy of disgorging tax benefits that it claims are somehow causally connected to the Defendants' securities law violations. Because no court has ever before approved the use of such a disgorgement measure—or any analogous indirect measure of unjust profits, for that matter—it is not entirely clear how the SEC can satisfy its obligation to demonstrate the required causal connection between the Defendants' securities violations and the federal income tax benefits alleged by the SEC.

In the SEC-drafted portion of the Proposed Joint Pretrial Order, the SEC indicates that it plans to satisfy the causal connection standard by showing that "the same *evidence* of control, which supported the jury's verdict that the Defendants violated Section 5 of the Securities Act, and Section 13(d) of the Exchange Act, trigger[s] grantor trust status, pursuant to 26 U.S.C. § 674(a)." The law permits disgorgement of amounts "causally connected to the *violation*." *SEC v. First Jersey Securities, Inc*., 101 F.3d 1450, 1475 (2d Cir. 1996) (emphasis added); *see also SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the *wrongdoing*." (emphasis added)). Here, whether called a scheme to violate the securities law or some other label, the underlying violation or wrong-doing was based on failures to disclose specific information in SEC filings. While the

SEC relied on a great deal of evidence related to general control over the trusts at the trial, this was circumstantial evidence, and admitted only to show that the Defendants had a duty to disclose "beneficial ownership" and "control" as defined under SEC regulations. There was no claim before the jury that the Defendants had a duty to disclose the "evidence" in SEC filings— and moreover, exercising control over a trust does not by itself violate any securities laws. The Defendants are unaware of any case that supports an award of disgorgement based on a showing of a causal connection between the disgorged amount and the "evidence" presented at a trial.

While in a typical disgorgement case the disgorged amount "proceed[s] directly and proximately from the violation," *see SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993); *SEC v. UNIOIL,* 951 F.2d 1304, 1306 (D.C. Cir. 1991), the SEC's tax measure is wholly theoretical. Unlike in all other disgorgement cases to date, the tax theory essentially requires the Court to make a finding that the Defendants are liable to someone else, under a separate body of law (here, the tax laws), during the "remedies" phase of a securities case. Without such a finding of a separate legal violation, the tax savings in question cannot be considered ill-gotten gains.

To allay concerns about unduly intruding into the tax arena in an SEC enforcement action, this Court previously emphasized that a "clear connection" will be required. Disgorgement Summ. J. Op., at 12 n. 36 ("A causal connection between the securities fraud and taxes allegedly avoided is particularly important insofar as a clear connection will limit the need for the SEC and this Court to interpret and apply complex provisions of the Tax Code."). While the Defendants believe the Court should not entertain this theory at all, *see supra* at Part I.B., the Court at a minimum should require proof of a <u>*crystal clear*</u> causal connection (*e.g.*, proof that the incorrect securities disclosures unambiguously and directly permitted the Defendants to obtain

4

patently illegal tax savings), lest the Court make a finding of liability on a disputed tax issue for a violation of law that was never alleged, charged, or fully litigated.

To show a clear causal connection to the "violations," the SEC must show that tax savings were in fact causally connected to the Defendants' inaccurate SEC disclosures. That is, the SEC must show that the information that would have been contained in the required disclosures would have resulted in the imposition of additional taxes under Section 674 of the Internal Revenue Code. This is the only provision the SEC relied on in the Joint Pretrial Order.

The only violations found by the jury that could plausibly be causally connected to tax savings were based on either misleading or omitted disclosures about "beneficial ownership" as defined in Section 13(d) of the Exchange Act, Jury Charge at 37-39; and "beneficial ownership" as defined separately in Section 16(a) of the Exchange Act, Jury Charge at 44.[2] As defined in the Jury Charge for Section 13(d) purposes, "beneficial ownership" refers to sole or shared voting or investment power over securities. As defined for Section 16(a) purposes, an officer or director who is a trust beneficiary is a beneficial owner if he has or shares investment control over securities. (Importantly, the SEC cannot rely on an alleged Section 16 violation to establish a causal connection to tax savings on securities transactions by the 1992 trusts. The Court granted judgment as a matter of law against the SEC on the Section 16 claims related to these trusts. Jury Charge at 44. These definitions make clear that the information that should have been disclosed was that the Defendants had, or shared, investment power or voting power over securities.

Arguably, by rejecting the Defendants' affirmative defense under Section 5(a), the jury also found that the trusts were "affiliates," which meant that the Defendants could exercise

---

[2] Other than making misleading disclosures about beneficial ownership, the only other charged wrong-doing was the failure to register Michaels Stores shares. The SEC has never purported to articulate a causal connection between the lack of registration and any tax savings.

"direct or indirect power over the management and policies" of the trusts. Jury Charge at 46-47. The jury was given no further refinement of what exercising "power over management and policies" meant. There is no affirmative duty to disclose "affiliate" status under the securities laws—if the trusts were affiliates, a registration statement would have had to have been filed disclosing the beneficial ownership of the selling shareholders, including the trusts. Nevertheless, the Defendants will assume that proper disclosures would also have revealed that they exercised direct or indirect "power over the management and policies" of the trusts.

The analysis below focuses primarily on whether the proper disclosures of beneficial ownership and "power over management and policies" would even have been _relevant_ to tax liability under Section 674(a), let alone resulted in actual tax liability. In response to the Defendants' Motion in Limine to exclude irrelevant tax evidence, however, the SEC has thrown out two additional causal connection theories. First, the SEC claims that the mere fact that the Defendants' alleged motive for false filings or filing omissions was a tax concern establishes a causal connection. Second, the SEC makes a shotgun causal connection argument that somehow proper SEC disclosures would have revealed tax problems other than under section 674— specifically, under section 679 and substance over form doctrines. The Defendants address those new theories in only brief fashion here.

> 2.     The Information That Fully Accurate SEC Filings Would Have Disclosed Has No Relevance to Section 674.

The SEC primarily claims that disclosures of "beneficial ownership" by the Defendants would have somehow triggered taxation under Section 674 of the Tax Code, a provision titled "Power to control beneficial enjoyment." The argument is based on nothing more than semantics. Although there is some superficial resemblance between a few words in the SEC's definitions of "beneficial ownership" and the language of Section 674, a careful reading of the

tax statute reveals that there is no overlap between its application and what any SEC disclosure would have revealed. At most, SEC filings would have indicated that the Defendants shared some modicum of control over investment and voting decisions by the trustees.

Section 674 is one of a series of "grantor trust" provisions enacted by Congress in 1954. 26 U.S.C. §§ 671-79; *see* Robert T. Danforth, *A Proposal for Integrating the Income and Transfer Taxation of Trusts*, 18 Va. Tax Rev. 545, 551-55 (discussing history of grantor trust rules). While the "main thrust" of these provisions is that a "trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has substantially unfettered powers of disposition," *Schulz v. CIR*, 686 F.2d 490, 495 (7th Cir. 1982), the provisions provide specific and technical definitions of what sorts of power trigger this treatment and "are meant to supplant judicial rulemaking on the subject." *Id.* at 494 n.15. Section 671 introduces the provisions with the statutory command that a tax shall not be imposed on a taxpayer "solely on the grounds of his dominion and control over the trust . . . except as specified in this subpart." *See* 26 U.S.C. § 671 ("No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 [the statutory definition of "gross income"] . . . or any other provision of this title, *except as specified* in this subpart." (emphasis added)). As a leading treatise explains, merely showing that a grantor has "dominion and control" does not prove tax liability under the grantor trust rules:

> [I]f a grantor's powers over a trust are not explicitly condemned by §§ 673 through 677, the IRS cannot treat the grantor as owner of the trust on the theory that his or her powers, although individual innocent, have the effect, when combined, of preserving dominion and control over the transferred property.

Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* § 80.1.6 (Thompson Reuters 2014); *see, e.g.*, *Boulware v. United States*, 552 U.S. 421, 425 (2008) (citing

Bittker & Lokken's analysis to support construction of tax provisions). The statutorily enumerated powers are the "exclusive means" of determining when a taxpayer has exercised control over a trust sufficient to impose a tax liability. *Schulz*, 686 F.2d at 494-95.

Section 674 provides that "[t]he grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor or a nonadverse party [*e.g.*, a non-beneficiary trustee], or both, without the approval or consent of any adverse party [*e.g.,* a beneficiary]." This dense rule is followed by ten statutory exceptions. Although written in a confusing manner, Section 674(a) treats the person who creates a trust as the owner of the trust's assets if he or the trustee can, without the approval or consent of trust beneficiaries, exercise a "power of disposition" over the "beneficial enjoyment of the corpus or the income" of the trust.[3] The power relevant to this provision—a "power of disposition" over "the beneficial enjoyment of the corpus or the income—means the power "to alter beneficiaries' enjoyment of income or corpus." Bittker & Lokken § 80.6.1.

This includes both powers to "effect such major changes in the enjoyment of a trust's income and corpus as the addition and elimination of beneficiaries," as well as "minor and customary power[s]" over income and corpus distribution. *Id.* Because this power is exactly the sort of power that *almost every* trustee (a "nonadverse" party) has, Section 674(a) captures virtually every trust, including the Defendants' trusts. The exceptions are in practice much more

---

[3] The terms "adverse party" and "nonadverse party" are defined in § 672. In this context, the term "'adverse party' means any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." 26 U.S.C. § 672(a). Essentially, this means a trust beneficiary. *Duffy v. United States*, 487 F.2d 282 (6th Cir. 1973). The term "nonadverse party" means "any person who is not an adverse party," 26 U.S.C. § 672(b)—or anyone other than a beneficiary.

8

important than the general rule to determining tax liability. *See id.* ("[T]he general rule comes in like a lion but out like a lamb.").

The SEC's inference that the Defendants somehow falsified SEC filings because they were worried that making such filings would reveal information that might trigger the application of Section 674(a) thus makes little sense. First, the power to influence decisions to buy or sell securities is not the power that triggers Section 674(a), so disclosing that the Defendants retained this power would make no difference under Section 674(a). Second, no one would be worried about triggering Section 674(a) because it *obviously was triggered*. As with many trusts, the trustees of *every* Wyly-related trust clearly had income and corpus distribution powers under the trust instruments, and these powers trigger Section 674(a). As even the SEC concedes, almost every discretionary trust triggers Section 674(a). *See* SEC Opp. to Defs.' Tax-Related Mtn. *in Limine,* ECF No. 423, at 10. Ultimate liability under Section 674(a), however, usually turns on whether any of the statutory exceptions apply. For the Defendants' trusts created in 1992, the relevant exception is the "trustee exception" found in Section 674(c). Whether that exception applies (and thus whether the Defendants were or were not liable for tax) has nothing to do with any information that would be disclosed in an SEC filing. *See infra.* at Part I.A.2.b. With regard to the trusts created after 1992, Section 674 could not threaten to impose any tax liability at all upon the Wylys.  Section 674(a) imposes tax liability on *the grantor* only**,** and the Wylys were not the "grantors" of those trusts—two foreign residents were. While the SEC claims that the Defendants were the "real" grantors, this issue again turns on information that would not have been disclosed in any SEC filings. As a result, whether the Defendants were taxable under Section 674 has nothing to do with SEC filings.

> a.   The *"Power of Disposition" Means the Power to Pay Out Trust Assets to Beneficiaries.*

The starting premise of the SEC's argument is that if the Defendants had made SEC disclosures acknowledging that they retained control over the trusts, this would have triggered Section 674(a). This fundamental premise is wrong because Section 674(a) is not triggered by a grantor retaining any "control" over a trust—*e.g.*, control over "management and policies"—or even by a grantor retaining the specific power to control investment or voting decisions by the trustee.

The SEC cannot cite a case holding that Section 674(a) is triggered by the general exercise of "control" over a trust. To the contrary, Section 671 makes clear that generally exercising "dominion and control" over a trust is not sufficient to trigger tax liability. Instead, tax liability turns on the existence of a specific power enumerated in the subsequent sections, which in turn carefully detail very specific powers that might trigger tax liability. *See supra* at Part I.A.2 (quoting 26 U.S.C. § 671); *see also Schulz*, 686 F.2d, at 494 (observing that the specific powers enumerated in sections 671-679 are the "exclusive means" of determining when too much control is exercised). Section 671 would make no sense, and many of the subsequent sections would be rendered meaningless, if Section 674 were construed to trigger tax liability by any general exercise of "dominion and control" over a trust. As a result, the Court can easily disregard the SEC's assertion that any disclosure which revealed that the Defendants exercised control generally over the trusts would result in tax liability. This is simply false—only disclosures that revealed that the Defendants possessed a specific power enumerated in Sections 671-679 could pose a tax problem.

This Court also can dismiss any suggestion that a tax problem would arise from a disclosure which revealed that the Defendants had power over a trust's "management and

policies." The specific phrase "management and policies" is not mentioned anywhere in the grantor trust provisions as a relevant power, and because it was not defined further in the jury instructions or by law, it cannot be fairly analogized to any power that is specifically enumerated. Moreover, Section 671 effectively protects a taxpayer from exposure merely because he exercised some general power of control over the trust.

The SEC's more concrete position is that Section 674(a) is triggered by a grantor exercising investment control, and that a disclosure that the Defendants retained "beneficial ownership" of securities held by the trusts would have amounted to an admission to liability under Section 674(a). This argument misunderstands the triggering power under Section 674(a). The specific power that triggers Section 674(a) is the "power of disposition" over "the beneficial enjoyment of [trust] corpus or the income therefrom," and this power is not the power to control investment decisions, but rather the power to control how money is given out to beneficiaries (or distributed) by the trust. Admittedly, no case has rejected the SEC's argument, but no court has ever addressed it before because it appears that no one (other than perhaps a few law professors) has ever tried to make such an argument until now.

The Defendants start with the statutory text and structure. *See Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). No "disposition" of "the beneficial enjoyment of the corpus or the income" of a trust occurs when the trust sells a security or other investment—the trust merely substitutes one asset for another. The "beneficial enjoyment" of trust assets, which resides with the beneficiaries (not the trustee or trust), is "disposed" of by making a distribution or payment to beneficiaries. Robert T. Danforth et al., *Federal Income Taxation of Estates & Trusts* ¶ 9.04[1] (Thompson Reuters 2014) (the "beneficial enjoyment of the corpus or the income" is not even affected until the proceeds from a sale are distributed to beneficiaries). As a result, the

relevant "power of disposition" for Section 674(a) purposes is the power to make or control decisions about how money comes out of the trust to beneficiaries, or to decide who is a beneficiary.

The SEC's argument is that when a trust sells an asset, the "enjoyment of beneficial ownership" is disposed of because the trustee no longer owns the asset. This argument misunderstands the fundamentals of the trust relationship. The trustee, who has only legal title to trust property, has no "enjoyment" of beneficial ownership of trust corpus and income, and the beneficiaries, who are the beneficial owners of trust assets, typically "enjoy" beneficial ownership only when assets or income are distributed out. *Cf. United States v. Byrum*, 408 U.S. 125, 145 (1972) ("It is well settled that the terms 'enjoy' and 'enjoyment,' as used in various estate tax statutes, are not terms of art, but connote substantial present economic benefit rather than technical vesting of title or estates." (internal quotation marks omitted)). A sale of trust assets disposes of the trustee's legal title, but in no sense causes a dispose of the beneficiaries' enjoyment of beneficial ownership of trust income or corpus.

More importantly, the SEC's reading ignores the surrounding statutory context. *See McNeill v. United States*, 131 S. Ct. 2218, 2222 (2011). Most of the exceptions to Section 674(a) permit persons, such as trustees, to retain powers related to the distribution of trust corpus and income to beneficiaries without triggering a tax liability. See 26 U.S.C. § 674(b)(1) (permitting application of income to support of a dependent); *id.* § 674(b)(4); id. § 674(b)(5)(A) (permitting distribution of corpus to beneficiaries if "limited by a reasonably definite standard); *id.* § 674(c) (permitting trustees who are not related or subordinate parties to distribute income or corpus to beneficiaries). These exceptions save every day, ordinary trusts from becoming taxable as grantor trusts. By contrast, if the SEC were correct that "power of disposition" in Section 674(a)

included investment power—a power that almost every trustee necessarily has—there would be _no applicable exception_ to prevent every trust from being taxable as a grantor trust, which is an absurd result to be sure. This interpretation would make all of the carefully-crafted exceptions to Section 674(a) largely irrelevant.

A further indication that the SEC's reading cannot possibly be correct is that this reading would render a portion of one of the other grantor trust provisions, Section 675(4), superfluous. _See Loughrin v. United States_, 134 S. Ct. 2384, 2390 (2014). Under Section 675(4), the grantor is liable for tax if he or she can exercise certain "powers of administration," including the power to "vote or direct the voting of stock" or the "power to control the investment of the trust funds," without the consent or approval of a trustee. 26 U.S.C. § 675(4) (person acting in "nonfiduciary capacity" who exercises certain "powers of administration" is liable for tax if they can act "without the approval or consent of anyone in a fiduciary capacity"). In other words, if the grantor needs the consent or approval of a trustee to make investment or voting decisions, no tax is triggered. Under the SEC's reading of Section 674(a), however, the mere fact that a grantor has retained investment power is sufficient to trigger tax liability, regardless of whether a trustee is involved or not. This would render Section 675(4) meaningless. Even more importantly, Section 675(4) illustrates that Congress knew how to specifically address the very sort of power implicated by the securities rules at issue in this case—the power to "vote or direct the voting of stock" or the "power to control the investments"—but chose not to do so in drafting Section 674(a).  To the extent that Congress did address this power in Section 675(4), the relevant statutory provision would absolve the Defendants of tax liability because, regardless of whatever informal power the Defendants had over investment decisions, a trustee's approval or consent was required.

Finally, and crucially, even if the Court were to adopt the SEC's novel reading of "power of disposition," the SEC would still be unable to demonstrate a direct causal connection because beneficial ownership under the securities laws can be triggered by *de facto* rather than <u>legal</u> "power." Numerous courts applying Section 674(a) have concluded that only <u>*legally enforceable*</u> powers matter for Section 674(a) purposes. In *Estate of Goodwyn v. CIR*, T.C. Memo 1976-238, 1976 WL 3423 (1976), the Tax Court concluded that "the power of a grantor upon which he will be taxed is a power reserved by instrument or contract creating an ascertainable and legally enforceable right, not merely the persuasive control which he might exercise over an independent trustee who is receptive to his wishes." *Accord* 26 U.S.C. § 675(4) (permitting grantor to influence trustee investment decisions, so long as final trustee approval or consent is required). *Goodwyn* is widely recognized by commentators as the leading case on this issue. *See* David Westfall et al., *Estate Planning Law & Taxation* ¶ 17.03 (Thompson Reuters 2014) (citing *Goodwyn* for "formalistic" proposition that Section 674(a) requires "a legally enforceable right, not merely an informal delegation of management and control by the named independent trustees"); Bittker & Lokken ¶ 80.1.5 n.90, 80.1.6 n.99, 80.6.3 n.43; Danforth et al., *Federal Income Taxation of Estates and Trusts* ¶ 9.04[1] n.55 ("A power cannot affect beneficial enjoyment if it does not legally exist. The mistaken or improper exercise of powers not actually granted . . . by the trust instrument will not trigger grantor taxation."). Additionally, other courts have reached similar conclusions about the reach of the term "power." *See Broide v. United States*, 156 F. Supp. 12, 16 (N.D. Ill. 1957) ("While the evidence shows that the trustees, in the matter of investment of the trust fund, were influenced by the grantors, the grantors did not in fact reserve a right to direct such investments in the trust agreements . . . ."); *Bennett v. CIR*, 79 T.C. 470, 486-88 (1982) (finding trust instrument determinative and confirming that improper

exercise of power not formally granted does not cause taxation); *cf. Byrum*, 408 U.S. at 136 (concluding that, in tax context, "right" connotes "an ascertainable and legally enforceable power").

The SEC has claimed before that cases like *Schulz v. CIR*, 686 F.2d 490 (7th Cir. 1982), and *Kanter v. CIR*, 590 F.3d 410 (7th Cir. 2009), support its argument that Section 674(a)'s "power of disposition" includes the power to make investment decisions. But these cases do nothing of the sort. *Schulz* merely states, after observing that "nothing in the . . . terms of the trusts [in question] impose[d] any substantive limits whatever on what the trustees may do" and quoting the trust instrument provisions supporting that conclusion, that "these trusts violate Section 674(a) because there is unconstrained power to dispose of the beneficial enjoyment of trust income or corpus." 686 F.2d at 496-97. Nothing in that reasoning indicates that unconstrained investment power—rather than unconstrained power to make distributions or to add beneficiaries, *see* 26 U.S.C. § 674(c)—was what concerned the *Schultz* court. *Kanter* is even less helpful to the SEC's position. In that case, the Tax Court found that the "power of disposition" existed under section 674(a) because 60 new beneficiaries were added. 590 F.3d at 423; *see also id.*, at 424 (reversing the Tax Court's imposition of tax liability because the defendant was not the "grantor").

Admittedly, one academic commentator has suggested that investment-related power might fall within Section 674(a) or the regulations thereunder. Professor David Westfall argued in a 1960 law review article that investment power is a form of "power of disposition" because it can indirectly impact what is available to distribute to beneficiaries later on. *See Trust Grantors & Section 674: Adventures in Income Tax Avoidance*, 60 Colum. L. Rev. 326, 333-34 (1960) (arguing that investment decisions ultimately impact beneficial enjoyment); *see also* Westfall et

al., *Estate Planning Law & Taxation* ¶ 17.03 (same). But this view, which is contrary to the plain meaning of the statutory language, is uncommon. The widely-cited Bittker & Lokken treatise characterizes this reading, which would "result in taxing a grantor if a trustee has only such customary and virtually indispensable administrative powers as a right to control the trust's investment policies (which, even if exercised fairly, necessarily affects the relative positions of income and remainder beneficiaries)," as reflecting the possible "outer limits" of the rule. Bittker & Lokken § 80.6.1. And no court has adopted Professor Westfall's broad reading.

The SEC points to the fact that the Defendants allegedly were advised by David Tedder that they should avoid an appearance of control over the trusts to avoid tax problems. The exact nature of this oral advice has been lost to history. No witness can explain exactly why Tedder believed the appearance of control would matter under the tax laws—much less that he was concerned specifically about Section 674(a). No witness has testified that Tedder advised the Defendants that exercising control generally would result in any tax liability. To the contrary, as described by Shari Robertson and Mike French, the advice to avoid the "appearance of control" is fairly characterized as a caution to prevent creating unnecessary problems in defending the tax position. Moreover, the evidence presented during the bench trial will show that the Defendants believed that the actual control that was exercised over the trusts did not pose any tax problems.

Finally, the SEC points to various documents that indicate that the Defendants' tax advisors were concerned about Section 674. This is true, but the concerns had nothing to do with whether the Defendants exercised investment control over the trusts. The concerns had nothing to do with the day-to-day operation of the trusts at all, but rather with whether the original drafting of the trust agreement's provisions regarding the addition of beneficiaries precluded application of any exception to Section 674(a).

> b.    Application of the "Trustee" Exception to Section 674(a) Has
>        Nothing to Do with SEC Disclosures.

Although the Court need not and should not reach the merits of this issue, whether the trusts created in 1992 are deemed grantor trusts under Section 674 turns on application of a statutory exception in Section 674(c), titled the "[e]xception for certain powers of independent trustees." This exception clarifies that Section 674 is not triggered if the power to "distribute . . . income" or "pay out corpus" to trust beneficiaries resides with a trustee. This "trustee exception" is what allows many grantors to avoid triggering taxing liability—*i.e.,* grantors provide that the power to distribute shall be given to a trustee. The exception, however, does not apply where the trustee also has the power to add beneficiaries. *Id*. ("A power does not fall within the power described in this subsection if any person has a power to add to the beneficiary or beneficiaries or to a class of beneficiaries designated to receive the income or corpus . . . ."). Because the 1992 trust had a provision that designated all charities as beneficiaries but provided for subsequent specification by name, there was a question whether the 1992 trust could find shelter in Section 674(c). Of course, this debate turns on interpretation of the trust instrument, and has nothing at all to do with information that would have been disclosed in any SEC filing, which do not require disclosures about whether a trustee may add beneficiaries.

To the extent that the SEC may speculate that accurate SEC filings by the Defendants disclosing "beneficial ownership" or "control" would have led the IRS to question whether the trustees of the Wyly-related trusts were truly independent, the argument has no merit because the statute itself does not use the word "independent." Although the word "independent" appears in the heading to Section 674(c), the text itself uses a more specific term, "related or subordinate party." *See Lawson v. FMR LLC*, 134 S. Ct. 1158, 1169 (2014) (stating that where statutory "text is complicated and prolific, headings and titles can do no more than indicate the provision in a

17

most general manner" (internal quotation marks omitted)). This term is defined in Section 672(c) to mean only "any nonadverse party who is—(1) the grantor's spouse if living with the grantor; [or] (2) any one of the following: The grantor's father, mother, issue, brother or sister; an employee of the grantor; a corporation or any employee of a corporation in which the stock holdings of the grantor and the trust are significant from the viewpoint of voting control; a subordinate employee of a corporation in which the grantor is an executive." The application of this provision simply does not turn on the common meaning of "independent." Indeed, as the *Goodwyn* case makes clear, a trustee qualifies for the statutory exception even where the trustee abdicates day-to-day control to the grantor. The SEC filings that the jury found the Defendants should have made would in no way have indicated that any trustees were related or subordinate to the Defendants under this statutory definition.

> c.     *The post-1992 trusts raise a different question under Section 674.*

Section 674 only triggers tax to the "grantor" of the trust. Because the Defendants were not the grantor of the trusts created after 1992, Section 674 may trigger a tax liability, but the tax liability runs to the grantors, who were foreigners not subject to United States tax. The Wylys certainly faced no tax exposure under Section 674 for these trusts.

The SEC has suggested that the IRS might attempt to deem the Defendants as the "grantors" because the nominal grantors (two Isle of Man residents) were not the real grantors. While the Defendants believe their tax position is perfectly defensible,[4] this issue has nothing whatsoever to do with any information that the jury found needed to be disclosed under the

---

[4] There are plenty of cases that refuse to disregard grantors who contribute little to a trust.  *E.g. Kanter v. Comm'r of Internal Revenue*, 590 F.2d 410, 424 (7th Cir. 2009) (reversing effort to disregard as grantor, the taxpayer's mother who contributed only $100 to trusts for benefit of taxpayer and his family even though the trusts grew to be worth millions without additional contributions from the mother).

securities laws.[5] The SEC cannot plausibly suggest any causal connection between inaccurate SEC disclosures and the Defendants' obtaining a tax benefit based on the status of the real settlor of these trusts.

> d.  The Defendants' influence over trust spending does not implicate Section 674.

The SEC has suggested that the Defendants had the power to distribute under Section 674(a) because they had the alleged power to cause the trustees to loan money to buy real estate, to buy personal items for use by the Defendants or their family members, and to make charitable contributions. This is another red-herring. The jury made no findings about whether the Defendants had such a power. In any event, no SEC filing would require (or even imply) that the Defendants had such power, as the evidence at trial regarding these matters was only admitted circumstantially to show investment power.

In any event, many of the "personal expenditures" actually took the form of loans. Under Section 675(2), loans only trigger tax liability if the grantor has the power to borrow from the trust without "adequate interest or security." Whether the loans in question were made with adequate interest and security is irrelevant to any SEC filings. Moreover, purchases of art and jewelry and the charitable contributions came from post-1992 trusts, which no one disputes were grantor trusts under section 674—the grantors who have the tax liability as a result, however, were not the Wylys.

> 3.  The SEC's Other Causal Connection Theories Do Not Work.

The SEC recently proffered two additional causation theories. The first is that the Defendants' motive for not disclosing "beneficial ownership" or "control" in SEC filings was to

---

[5] Among the various issues that are implicated by this issue is whether the Wylys' transfers were gratuitous.  A grantor is someone who makes a "gratuitous transfer to a trust."  The Wylys transferred options and warrants to corporations owned by the trusts in exchange for annuities— *i.e.,* the transfers were not gratuitous.

avoid tax problems, and that this by itself establishes the required causal connection. This argument fails for three reasons. First, the SEC wrongly suggests that while there was no jury question on motive, the jury's scienter finding implicitly found that the Defendants' motive was tax-related. This ignores that the SEC proffered two other theories to establish scienter. The SEC argued that the Defendants were concerned about shareholders knowing about their trading, and the SEC also argued that the Defendants simply were reckless in failing to obtain adequate legal advice. Second, with the exception of Mr. French, every witness testified that there was never any connection made between SEC filings and tax concerns (much less between the specific issue of disclosing beneficial ownership and tax issues). With regard to Mr. French's testimony, it remains unclear exactly what the alleged concern was, and more importantly, the Defendants believe there is serious reason to doubt the credibility of his testimony. Third, even if the Defendants were concerned that SEC filings could trigger tax problems, this would not establish a causal connection unless the concern had some real basis—*i.e.*, that the SEC disclosures could in fact have triggered a tax liability.

The SEC has also suggested that had the Defendants made accurate disclosures, it would have caused the IRS to discover other problems with the tax structure, such as under Section 679 or the substance over form doctrines. The SEC does not explain what information in "accurate" disclosures would have provoked the IRS to discover these issues, either by commencing an audit or in the course of an ongoing audit. With regard to Section 679, the SEC does not say what should have been disclosed that would be relevant to this issue. Under Section 679(a), the general rule is that a taxpayer is taxed on the income of a portion of a foreign trust representing property transferred by the taxpayer, if there are United States beneficiaries of the trust. 26 U.S.C. § 679(a).

While tax lawyers can debate the applicability of Section 679 to the Defendants' trust, taxation under Section 679 is utterly irrelevant to SEC filings. First, the SEC does not claim that the Defendants' SEC disclosures incorrectly identified the trust beneficiaries. Defendants are not aware of any SEC rule that requires disclosure of trust beneficiaries, in any event. Nevertheless, the Defendants' SEC filings repeatedly disclosed that the trusts were for the benefit of Sam and Charles Wyly and/or their family members (all US residents). What constitutes having United States beneficiaries under Section 679(c), however, was unclear, particularly prior to regulations enacted in August 2000. Obviously, SEC rules do not require disclosure of whether a trust has United States beneficiaries as defined in Section 679(c) of the Internal Revenue Code.

Whether Section 679 applies to the Defendants' trusts hinges upon whether the trusts had United States beneficiaries during the lives of the grantors, where the trust instruments prohibited payment of corpus or income to any United State until two years after the grantors' deaths. *Compare* 26 U.S.C. § 679(b). There also are exceptions to Section 679's general rule that are implicated by the structure of the transactions. Nevertheless, none of these underlying tax issues has anything to do with SEC disclosures.

Finally, the SEC has suggested that accurate SEC filings would have exposed the trusts to an attack based on application of the substance over form doctrine. The SEC does not explain why any securities disclosure would implicate this doctrine. More importantly, there is a real question whether this doctrine has any application to grantor trusts. The grantor trusts rules— Section 671-678—were enacted in 1954 to eliminate confusion caused by application of the fuzzy substance over form doctrine to trusts by the United States Supreme Court's decision in *Helvering v. Clifford*, 309 U.S. 331 (1940). (Section 679 was added to the Tax Code later, in 1976.) Hence, Section 671 specifies that a taxpayer will not have liability based on exercising

"dominion and control" except as enumerated in the statute. The cases cited by the SEC do not actually endorse the substantive over form doctrine. To the contrary, the cases acknowledge that rules in Sections 671-679 are the "exclusive" means of determining whether a grantor exercises too much control over a trust and were designed to stop judicial rulemaking spawned by the *Clifford* decision. *See Schulz*, 686 F.2d at 494-495, 498 n.15. And, as noted above, the results in these cases are based on application of the literal language of Section 674, rather than on application of any broad control concept. *E.g., Kanter*, 590 F.2d, at 422-23.

In sum, the SEC cannot demonstrate a causal connection between the violations at issue because there is no evidence that the Defendants were ever motiviated by concerns about potential *Section 674(a)* liability; because the information about investment power that would have been revealed in truthful SEC filings is irrelevant to Section 674(a) tax liability; and, even if information regarding investment power were relevant to Section 674(a), *Goodwyn* and other cases suggest that the sort of *de facto* power that would have been revealed in truthful SEC filings would not be sufficient to demonstrate tax liability.

B.     The Court Should Not Exercise Its Equitable Power to Award Disgorgement Based on a Hotly Contested, Alleged Tax Liability.

While the Defendants disagree that this Court has the equitable power to order disgorgement in the form of tax savings, this Court should not exercise its equitable powers in this case. The IRS has been auditing the offshore trusts since late 2004—its audit continues. Obviously, in early 2005, the Defendants began making corrective SEC disclosures, and in 2006, the Senate released a report containing most of the evidence that was presented to the jury. Yet, even ten years later, the IRS still has not determined or assessed any tax liability. The Defendants cannot be ordered to disgorge illegal tax savings unless the tax liability was owed—otherwise, the Defendants would be disgorging legally-obtained benefits. As illustrated above, the tax issues

raised by the Defendants' offshore trusts are novel and complicated. In fact, the above discussion largely avoids the underlying question of whether any tax was owed, focusing instead on the causation question. The SEC has the burden of proving that an illegal benefit was obtained at all, and to date, the SEC has not explained why the Defendants would owe any additional tax other than to posit a theory of liability under Section 674(a) that does not withstand scrutiny.

This Court has already acknowledged concerns about exercising such equitable power where the tax issues are not clear. *See* Disgorgement Summ. J. Op. at 12 n. 36. The Defendants believe the uncertainty about the Defendants' underlying tax liability raises serious procedural and substantive concerns. To begin with, the Defendants are not being afforded in this truncated remedies proceeding the normal procedural protections that they would have in a tax litigation. Moreover, central to the Court's reading that section 7401 of the Internal Revenue Code did not apply was that "the Tax Code is irrelevant to the success of SEC's claims." *Id.* at 11. That might be true in a case where the underlying tax liability was clearly established under the Code; in this case, however, the Court is confronted with various issues of first impression regarding the Tax Code. At a minimum, even if section 7401 did not literally apply, the legislative concerns that laminated section 7401 are magnified where someone other the IRS seeks to litigate a highly complex tax issue. As a result, Defendants urge this Court to decline to exercise its equitable powers to order disgorgement based on the particular, alleged tax liability implicated in this case.

## II.    The Total Profits Disgorgement Theory Should Be Rejected

As outlined in detail in various pre-hearing filings, the Defendants believe that the SEC has not (and cannot) meet its burden of establishing that *all* of the profits earned on sales of issuer securities by the Isle of Man entities constitutes a "reasonable approximation" of the ill-gotten gain derived from violations. While the Defendants hope the Court will eliminate this

issue before the hearing, this brief assumes the issue is still alive, and addresses a few points that were raised during the oral argument on this issue.

A.   The SEC Has Not Met Its Burden of Showing That All Profits Are a Reasonable Approximation of the Ill-Gotten Gains from the Violation

In its attempt to justify the total profits theory, the SEC repeatedly cites the jury's finding of "scheme to defraud." That repetition overlooks the point (made clear in the Court's instructions) that the jury was able to find fraud here based simply on a finding that beneficial ownership-related SEC disclosures were untrue; that the Defendants knew (or were reckless in not knowing) that they were untrue; and that the untrue information was material. [6] The jury's verdict (even on the fraud claims) is based on one core violation: The Defendants failed to disclose beneficial ownership. More importantly, given the definition of materiality, the SEC was not required to prove that the "scheme" had any actual impact at all on the market or investors. [7] The fact that the Defendants were found liable for a "scheme to defraud" says nothing about whether the Defendants actually obtained any benefit at all from the scheme. The SEC also attempts to label the transfers of options, exercise of options, and sale of stock, as illegal, yet even when expressly asked by the Court, the SEC was unable to point to any specific statute or case that would render the transfers, exercises, or sales "illegal" because subsequent disclosures about the beneficial ownership of the securities were inaccurate or omitted.

Finally, the SEC suggests that all appreciation in the value of the securities after the initial transfer was tainted by illegality and thus can be disgorged. The SEC's argument is that

---

[6] Jury Charge at 23 (explaining that a "scheme to defraud" "may involve . . . untrue statements or omissions of material facts").

[7] Jury Charge at 26 ("The materiality of a misstatement or omission does not depend on whether a reasonable investor would have made a different purchasing or selling decision if no material misstatement or omission had been made.  It is also unnecessary that any investor actually relied on one or more misstatements or omissions, or that one or more misstatements or omissions caused any investor to lose money.")

because the initial Form 4 reporting the transfer wrongly disclaimed beneficial ownership, all subsequent appreciation in value was illegal. There are a host of flaws with this argument. First, with regard to all transfers to the 1992 trusts, the Form 4s were deemed accurate as a matter of law by this Court. Second, the SEC's calculation of total profits on its face does not attempt to distinguish between appreciation pre-transfer versus post-transfer. Contrary to the SEC's argument, many of the transferred options (not just the ones transferred in 1992) had been granted to the Defendants long before the transfer, and had significant value before transfer. The SEC has the burden of producing a reasonable approximation; and a calculation that on its face that includes legal profits even under the SEC's own theory is not reasonable. Third, no case law supports the SEC's assertion that all value derived from securities is illegally-obtained merely because some disclosure concerning the securities was incorrect. Fourth, even if one accepts the SEC's premise that the securities were "tainted" once-transferred, it is facially unreasonable to contend this "taint" caused any, much less 100%, of the subsequent appreciation in value that was realized when the securities were sold.

In any event, the SEC has failed utterly to show any price impact on the securities resulting from the violations, through expert testimony or otherwise. The SEC "is entitled to recover the amount of the fraud, but only the fraud, changed the market. Moves in the stock price due to the inherent value of the corporation, or lack thereof, inure to the benefit or risk of the defendant." *SEC v. UNIOIL*, 951 F.2d 1304, 1307 (D.C. Cir. 1991) (Edwards, J., concurring) (citing *SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983) (en banc) (in case involving insider purchase, declining to award disgorgement of profits realized after the inside information became public)).

25

Here, the issuers were successful companies that were widely traded on the NASDAQ or the New York Stock Exchange. "[T]he market price of shares traded on well-developed markets reflects _all_ publicly available information." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)). Although "all information" includes, of course, "material misrepresentations," *id.*, it also includes "all" the good and true information about these companies' repeated strong performance, year in and year out. These companies had real value that grew over time, and the market priced their shares accordingly. The Defendants' trusts always sold at market value. That market value was based, in turn, on the intrinsic value of these companies—value the Defendants played a large part in creating through their work founding, funding, building and guiding these companies. In short, the shares the Defendants sold through their trusts were worth every penny they sold for.

The SEC does not offer any theory—let alone any evidence—to show that the inaccurate SEC disclosures or the omitted SEC disclosures at issue in this case caused any distortion at all in the market's valuations of these companies. The SEC cannot even show that a market manipulation was _intended_ by the Defendants. (Even the SEC's star witness, Mr. French, testified to the contrary, on both direct and cross-examination.[8])

The SEC has conspicuously failed to present the Court with the one theoretical basis the SEC had on hand for presuming that the non-disclosure could have affected market prices: namely, the academic literature on the stock-price effects that follow Form 4s disclosing insider

---

[8] The SEC twice asked Mr. French this on direct, and he twice denied it. Trial Tr. 1762:24-1763:3 ("I don't know that I could say it [avoiding SEC reporting] was a real benefit [to the Defendants]."); *id.* 1884:24-1885:1 ("I don't know whether 'benefit' is the right word."). On Mr. French's cross, this was the first substantive point the defense established. *Id.* 1919:3-9. ("I never had a conversation with them [the Defendants] about something like [the idea that transferring assets to the Isle of Man was motivated by some concern about what the market would think].").

3230297v1/013572

sales. The SEC's own retained expert, Charles Jones, used this literature in a rebuttal report that the SEC submitted to the Court during the liability phase expert *limine* briefing. At that time, the SEC's expert asserted that "disclosure of trades by the Isle of Man Entities would be expected to have a significant impact on the relevant issuer's share price."[9] The reason for the SEC's recent about-face on this issue is obvious: Though the SEC liked these studies at the liability phase (because they were some evidence that the non-disclosures were material), the SEC would now rather the Court not see the empirical truth these studies reveal: Disclosures of insider sales reports lead to a price drop in the range of just 0.20% to 0.61%. This explains why, despite having the burden here, the SEC has not found any expert who purports to measure the *actual* gains resulting from the violations.

The SEC's conscious choice to forgo this known potential source of a "reasonable approximation" of gain is cause enough for the Court to reject this theory now. The initial burden was the SEC's to show a "reasonable approximation of profits causally connected to the violation," *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014), and when it came to the core "violation" in this case—inaccurate or omitted disclosures—the SEC chose to shirk that burden rather than carry it.[10]

---

[9] Worland Decl. in Supp. of Mot. to Exclude Sirri, Ex. 7, at 2 (Dec. 31, 2013), ECF No. 227-7)

[10] During the recent oral argument, the SEC mentioned a price response to a news article about an onshore collar transaction by the Defendants. This hardly proves there would have been a price response to disclosures about offshore trades. First, the onshore "collar" was disclosed in SEC filings, yet the SEC points to no price response when the disclosure was made. The alleged price response was to a news article written weeks later that characterized the transaction inaccurately. The fact that the market reacted to inaccurate information (after having not reacted to accurate SEC disclosures) proves nothing about what would happen if accurate disclosures were made about offshore sales. Second, the SEC is not seeking disgorgement of any profits related to offshore collars.

B.     The Defendants' Evidence Easily Rebuts the SEC's Total Profits Theory.

If the Court chooses to entertain the SEC's total profits theory, the defendants have retained an expert, Professor John McConnell, who has analyzed the literature, applied it to the sales data in this case, and calculated various ranges of potential theoretical effects. Professor McConnell also confirms that the available data of actual market responses to actual disclosures by the Defendants show no discernible price reaction at all. *See* McConnell Report Ex. 15.

C.     Total Profits Disgorgement Should Also Be Rejected for the Section 5 Claims

The SEC seeks to portray its request for disgorgement of total profits as a remedy for the Section 5 violation as a garden-variety application of settled disgorgement principles. Not so. The SEC's request for total profits disgorgement here is both unprecedented and extraordinary. Michaels Stores *did* have a registration statement—on the full Form S-1, with the accompanying prospectus—on file with the SEC, which was in effect and kept up-to-date throughout the relevant time period. The failure here was the failure to file an abbreviated Form S-3, which would have covered not all of the company's shares, but rather the small subset of shares that were sold to the Defendants' trusts in two private placements in 1996.

In stark contrast to the facts of this case, other SEC enforcement actions under Section 5 typically involve two facts: (a) the underlying investment was worthless, or at least highly risky; and (b) no Form S-1 (original registration statement) had ever been filed by the issuer, and thus investors were given *none* of the hundreds of pieces of information about the investment that a truthful Form S-1 would have contained. *See, e.g., SEC v. Cavanagh*, 98 CIV. 1818 DLC, 2004 WL 1594818 (S.D.N.Y. July 16, 2004) (awarding full disgorgement for Section 5 violation where defendants "drove the stock price north of $5 in a 'pump and dump' scheme from which they and their associates pocketed millions of dollars"), *aff'd*, 445 F.3d 105 (2d Cir. 2006). Defendants have looked for any prior court decision imposing remedies for a Section 5 violation

28

in which the issuer actually had filed a valid Form S-1 registration statement, and have found none. Even in Section 5 cases involving (a) speculative investments and (b) no Form S-1, courts still permit the defendant to rebut the SEC's disgorgement calculation by showing the "fair market value" of the unregistered stock prior to its public sale. *See, e.g.*, *SEC v. Whittemore*, 659 F.3d 1, 8 (D.C. Cir. 2011) (awarding full disgorgement of proceeds of sales of unregistered shares, but noting that the defendant could have rebutted that calculation if he had shown "independent evidence of the stock's market value").

It is unsurprising that defendants rarely succeed in making that showing. Full disgorgement makes sense in most Section 5 cases because the causal link between the violation and the total profits is clear: But for the failure to file a Form S-1, profits would have been zero. That is because if a Form S-1 had been filed, *no one would have bought* the security. The Form S-1 would have revealed tons of damning information about the investment.

This case involves neither (a) worthless, risky, or lightly traded shares; nor (b) failure to disclose the hundreds of pieces of information required by the regulations. Here, (a) the unregistered shares of Michaels Stores were identical to all the other, registered shares that were trading in the market at the same time. The unregistered shares paid the same dividends; gave the same voting rights; and could be resold at the same price as the registered shares. Similarly, (b) Michaels Stores had filed a Form S-1 for all those other shares. That Form S-1 (and the subsequent SEC filings Michaels Stores made) informed investors of all the hundreds of pieces of information required by a Form S-1.

The difference between a full Form S-1 and the Form S-3s that were required here is enormous. A Form S-1 (which must be filed before an issuer's Initial Public Offering (IPO)) is a massive undertaking involving hundreds of detailed disclosures about every aspect of the issuer's

29

business, market, finances, and prospects.[11] A Form S-3, by contrast—which is sometimes called a "shelf" registration statement—would, in this case, have been a straightforward exercise consisting largely of incorporations by reference of recent SEC filings (Michaels Stores most recent 10-Q and 10-K, for example). As defense expert Andrew Thorpe will testify, the sole new piece of information that a Form S-3 would have revealed was the same piece of information at issue in the all the non-disclosure claims: the Defendants were beneficial owners of these shares.

The only reason to believe that the Defendants gained an illicit profit from their sales of these unregistered shares is to assume that the market price was affected by the non-disclosures of beneficial ownership. A Form S-3, if filed, would have disclosed that information (and nothing else). The Form S-3 should therefore be seen, in the context of this case, as one more non-disclosure. There is no economic reason to treat it differently. The SEC's sole reason for seeking total disgorgement for the Section 5 violations turns on a formality—the way the law is written. That formalistic reasoning should fail because it is contrary to "the purposes of the securities laws, which "require disregarding form for substance and placing emphasis upon economic reality." *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) (Friendly, J.).

The only conceivably relevant economic difference between the Section 5 claims and all the other non-disclosure claims is this: The Section 5 claims involve an additional form (namely, the Form S-3) that, if it had been filed, could in theory have had a negative impact on the stock price. Professor McConnell has analyzed that theory by comparing it to the effects, as measured

---

[11] *See* 15 U.S.C. § 77aa ("Schedule A") (listing voluminous information and documents that must be included in a registration statement); Regulation S-X, 17 C.F.R. Pt. 210 (2014) (detailed requirements for financial statements to be included in registration statements); Regulation S-K, 17 C.F.R. Pt. 229 (2014) (detailed disclosures of description of business; description of assets; share price and dividend expectations; management's analysis of financial data; changes to and any disagreements with accountants; market risks; and internal controls).

in the academic literature, of three somewhat analogous events. In all three cases, these events are found to cause an immediate but small decline in the price of the issuer's stock—between 0.20% and 2.76%, depending on the kind of event and the parameters of the academic study. Just as the Defendants may be presumed to have avoided a series of small price drops by their non-disclosures on Form 4s and Schedule 13Ds, so too the Defendants may be estimated to have avoided some small price drops because no Form S-3 was filed.

Here, as with the other non-disclosure violations, the proper measure of disgorgement is zero because the effect of the non-disclosure is unobservable in actual practice, and because the effects are so difficult to measure with precision. If the Court nevertheless chooses to apply the comparisons discussed by Professor McConnell to arrive at a presumed impact of non-disclosure, then the amount corresponding to the bottom of the ranges calculated by Professor McConnell are appropriate.[12] The Defendants also will seek to provide an alternative measure by calculating the value the trusts could have obtained by selling the shares without a registration statement in a private sale to a sophisticated buyer, which is permitted under the securities law.[13] In such a case, the third-party investor would take restricted, unregistered stock, which he or she would not be permitted to resell until the one-year holding period then in effect had passed,[14] and a result would demand a discount.

---

[12] Professor McConnell calculates a range of between $110,831 and $1.65m for the presumed effect on subsequent sales of Defendants' Michaels Stores stock held in the Isle of Man. The range is between $178,322 and $3.5m for the presumed effect on subsequent sales of the Defendants' Michaels Stores stock held onshore.

[13] Because this exemption involves a combination of Section 4(1) and 4(2), it is commonly referred to as a "Section 4(1½) exemption." *Ackerberg v. Johnson*, 892 F.2d 1328, 1335-37 (8th Cir. 1989) (under this exemption, no Section 5 violation where issuer's founder and CEO resold unregistered shares to a sophisticated investor).

[14] 17 C.F.R. § 230.144(d)(1) (1996), *as amended by* 62 Fed. Reg. 9242 (Feb. 28, 1997) (reducing previous two-year holding period to one year).

3230297v1/013572

**III.      Disgorgement Is Only Available for Post-February 1, 2001 Violations.**

Title 28 U.S.C. § 2462 provides that "any action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued" (emphasis added). The text of this statute clearly applies to the SEC's claims for forfeiture in this action. There is no difference between a claim for "disgorgement" and "forfeiture" where, as here, the government agency seeking disgorgement has no obligation or intent to return the proceeds to victims (if there are any victims). *See Riordan v. SEC*, 627 F.3d 1230, 1234 n.1 (D.C. Cir. 2010).

The terms "disgorgement" and "forfeiture" are defined virtually identically in legal dictionaries. *See* Black's Law Dictionary (9th ed. 2009). Many contemporary courts—including the Supreme Court—use the terms interchangeable. *See United States v. Ursery*, 518 U.S. 267, 284 (1996) ("[Civil f]orfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require *disgorgement of the fruits of illegal conduct*." (emphasis added)).

It is no answer to this argument that § 2462 does not specifically use the term "disgorgement." That is because § 2462 was initially enacted in 1839 and did not use the term disgorgement but rather forfeiture.  *See* Act of February 28, 1839, § 4, 5 Stat. 322.  In the first half of the nineteenth century, "disgorgement" was not a widely used legal term. A search of Westlaw's federal opinions database for the terms "disgorgement" and "disgorge" yields just one pre-1850 result. *See Schwartz v. U.S. Ins. Co.*, 21 F. Cas. 770, 772 (C.C. Pa. 1812); *see also* Russell G. Ryan, *The Equity Façade of SEC Disgorgement*, 4 Harv. Bus. L. Rev. Online 1, 10-11

(2013), http://www.hblr.org/wp-content/ uploads/2013/11/Ryan__The-Equity-Fa%C3%A7ade-of-SEC-Disgorgement.pdf.[15] By contrast, a search for the term "forfeiture" yields 1,054 results.

Notably, interpreting the term "forfeiture" in § 2462 to encompass SEC actions for disgorgement of unjust profits is also fully consistent with the policy rationales underlying the Supreme Court's recent decision in *SEC v. Gabelli*, 133 S. Ct. 1216 (2013). Just as it would be "utterly repugnant to the genius of our laws" if actions "for penalties" could be brought at any distance of time," *SEC v. Gabelli*, 133 S. Ct. at 1223 (quoting *Adams v. Woods*, 2 Cranch 336, 342 (1805) (Marshall, *C.J.*)), it would be equally repellent to allow a government agency like the SEC unfettered authority to seek disgorgement decades removed from the acts in question. *See also id.* at 1221 (discussing the fundamentally policies underlying all statutes of limitations).[16]

There is no binding authority regarding whether § 2462's five-year statute of limitations applies to SEC claims for disgorgement. The Supreme Court has never considered the issue. The Second Circuit has expressly reserved decision on the question, noting in *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013), that it did "not understand the appellants to argue that a disgorgement award would be subject to the statute of limitations provided by . . . § 2462." To date, the D.C. Circuit is the only appellate court to have directly confronted the question of § 2462's applicability to SEC disgorgement actions. *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (concluding that § 2462 does not apply to

---

[15] There are no entries defining "disgorgement" in two widely-used law dictionaries from the same period. *See* A. Burrill, *A Law Dictionary and Glossary* (1850); John Bouvier, *A Law Dictionary* (1856). The Supreme Court recently relied on the former dictionary's definition of the term "accue" in its decision in *Gabelli v. SEC*, 133 S. Ct. 1216, 1221 (2013).

[16] This policy rationale is particularly applicable to the extent the SEC seeks disgorgement in the form of tax savings. If the SEC is right that it has authority to collect tax revenues for the general treasury fund via disgorgement actions—which the defendants of course still vehemently dispute—then a disgorgement action can provide the federal government with a convenient work-around to the statutes of limitations otherwise applicable to tax collection actions.

SEC disgorgement claims); *Riordan*, 627 F.3d at 1234 n.1 (following *First City* as binding circuit precedent but flagging the potential textual argument to the contrary).[17]

Although there are some district court decisions from within the Second Circuit which conclude that § 2462 does not apply to disgorgement actions, *see, e.g.*, *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87 (S.D.N.Y. 2009), those decisions do not bind this Court. Moreover, their reasoning is unpersuasive because *none of them* confronted the import of Congress's inclusion of the term "forfeiture" in § 2462. Indeed, no federal court at any level appears to have confronted this language before the D.C. Circuit's 2010 decision in *Riordan*, which first flagged the statutory language. *See* 627 F.3d at 1234 n. 1. Since *Riordan*, one district court decision has concluded that § 2462 *does* apply to SEC disgorgement actions, though for different reasons. *See S.E.C. v. Graham*, --- F. Supp. 2d ----, 2014 WL 1891418, at *9 (S.D. Fla. May 12, 2014).

## IV.    The Total Profits Penalty Theory Should Be Rejected

The SEC also seeks to impose a penalty of approximately $72 million against Sam Wyly pursuant to 15 U.S.C. §§ 77t(d)(2)(B)(ii) and 78u(d)(3). These statutory provisions permit the SEC to obtain maximum penalties measured by *either* the number of penalties involved, or alternatively, the "gross amount of pecuniary gain" to the defendant "as a result of the violation." The SEC's penalty calculation is measured by the total amount of gains to Mr. Sam Wyly from the securities transactions at issue falling within the applicable five-year statute of limitations.

The SEC's "total profits" penalties measurement fails for the same reason as the "total profits" disgorgement measure—lack of causation proof. The words "as a result of" clearly signal that proof of a causal connection between gains and *the violation* is required here, just as it

---

[17] The Ninth and Eleventh Circuits have concluded that there is no statute of limitations applicable to SEC disgorgement actions without considering § 2462. *See SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004); *SEC v. Rind*, 991 F.2d 1486, 1492 (9th Cir. 1993). The First Circuit once reached the same conclusion, but the decision was withdrawn for other reasons. *See SEC v. Tambone*, 550 F.3d 106, 148 (1st Cir. 2008), *reh'g granted*, 573 F.3d 54 (2009).

is for disgorgement. Only a few district courts have construed the phrase "as a result of the violation" in these statutes, but those that have considered the issue all agree that it unambiguously embodies a causal connection requirement. *See, e.g.*, *SEC v. Huff*, 758 F. Supp. 2d 1288, 1364-66 (S.D. Fla. 2010). Thus, if the Court finds penalties are warranted (the Defendants do not believe that they are), the Court should adopt a calculation of approximately $450,000 based on the number of violations. Three specific findings support that calculation.

First, Sam Wyly may be held responsible for no more than 15 violations during the limitations period.[18] Second, the amount of penalty for each violation should be set at $30,000 per violation, which is the middle of the authorized second-tier range of penalties per violation (from $0 to $60,000). The middle of the range is appropriate because the large number of penalties overstates the extent of the misconduct, all of which arose out of what was, in essence, one violation: A decision not to disclose his beneficial ownership. Third, the second tier, rather than the third tier, is appropriate because the violations did not "directly or indirectly result[] in substantial losses or create[] a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); *id.* § 78u(d)(3)(B)(iii). As noted, investors lost nothing and realistically were not at risk of losing anything as a result of these violations. Wholly separate from Sam Wyly's reporting position, the issuers in this case were sound—and indeed, successful—companies, which regularly outperformed the market.

## CONCLUSION

For the foregoing reasons, the Court should deny all of the SEC's requested relief.

---

[18] This calculation of the number of post-February 1, 2001 violations will be explained in further detail in the Defendants' Proposed Findings of Fact and Conclusions of Law.

Respectfully submitted:

SUSMAN GODFREY, L.L.P.

By:

/s/ *Mark H. Hatch-Miller*

Stephen D. Susman (SS8591)
Mark H. Hatch-Miller (MH4981)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Terrell W. Oxford
David D. Shank
901 Main Street, Suite 5100
Dallas, Texas  75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

Harry S. Susman*, Pro Hac Vice*
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: (713) 653-7834
Facsimile: (713) 654-6666

*Attorneys for Samuel E. Wyly and Donald R. Miller, Jr.*

Dated: July 25, 2014

36