# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,

v.                                                    No. 1:10-cv-05760-SAS

SAMUEL E. WYLY and DONALD R. MILLER,
JR., in his capacity as the Independent Executor of
the Will and Estate of Charles J. Wyly, Jr.,

                          Defendants.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## IN SUPPORT OF ITS REQUEST FOR REMEDIES

As required by the Court's Individual Rules and Practices, Plaintiff U.S. Securities and Exchange Commission submits the following proposed findings of fact and conclusions of law regarding the remedies to be imposed on Defendants Sam Wyly and Charles Wyly (jointly, the "Wylys").[1]

## FINDINGS OF FACT

**A.    The Jury Verdict**

1.     The jury found that the Wylys committed securities fraud in violation of Exchange Act Section 10(b) and Rules 10b-5(a), 10b-5(b) and 10b-5(c) thereunder and Securities Act Sections 17(a)(1), 17(a)(2) and 17(a)(3) by intentionally (a) engaging in a fraudulent scheme; (b) making materially false statements or omissions; and (c) engaging in fraudulent acts, practices or courses of dealings.  JV, 1-6.

2.     The jury found that the Wylys beneficially owned the securities held by their Isle of Man entities under both Exchange Act Sections 13(d) and 16(a).  JV, 7(a), 8(a) and 10(a).

3.     The jury found that the Wylys violated Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 thereunder by filing materially false Schedule 13Ds which omitted the offshore securities and by failing to file required Schedule 13Ds when engaging in offshore securities transactions.  JV, 7(b), 7(c), 8(b), 8(c).

4.     The jury found that the Wylys violated Exchange Act Section 14(a) and Rules 14a-3 and 14a-9 thereunder by causing the issuance of materially false proxy solicitations by

---

[1] Plaintiff's exhibits are referred to as "PX," Defendants' exhibits are referred to as "DX, and joint exhibits are referred to as "JX" followed by the applicable number. The Stipulations of Undisputed fact, which were filed as ECF No. 270-1 on the case docket, are cited as "Stipulations" followed by the applicable paragraph and/or attachment number.  The Jury's Completed Verdict Form is referred to as "JV" followed by the paragraph number.  And citations to the trial transcript are preceded by "Tr." and then the page number.  The trial transcript is consecutively paginated and appears as the odd number entries between ECF 337 and 381 on the case docket.

Michaels, Sterling Software, Sterling Commerce and Scottish Re (the "Issuers") which failed to disclose the Wylys' ownership of the offshore securities.  JV, 9.

5.      The jury found that the Wylys violated Exchange Act Section 16(a) and Rules 13a-2 and 16a-3 thereunder by failing to file required Form 4s when they engaged in offshore securities transactions.  JV, 10.

6.      The jury found that the Wylys controlled the Isle of Man entities.  JV, 11.

7.      The jury found that the Wylys violated Securities Act Section 5 by selling unregistered securities. JV, 11.

8.      The jury found that the Wylys aided and abetted violations of Exchange Act Section 13(a) and Rules 13a-1 thereunder by knowingly providing substantial assistance to the Issuers filing materially false 10-K statements. JV, 12.

9.      The jury found that the Wylys aided and abetted violations of Exchange Act Section 14(a) and Rules 14a-3 and 14a-9 thereunder by knowingly providing substantial assistance to the Issuers filing materially false proxy solicitations.  JV, 13.

10.     The jury found that the Wylys aided and abetted violations of Exchange Act Section 13(d) by knowingly providing substantial assistance to the Isle of Man Trustees' materially false Schedule 13D filings.  JV, 14.

11.     The jury found that the Wylys committed each of the above securities violations before February 1, 2001 as well as after February 1, 2001.  JV, 1-14.

**B.      The Wylys Used Their Offshore System to Fraudulently Acquire, Hold and Sell Tens of Millions of Issuer Securities.**

12.     The Wylys' fraudulent scheme employed 17 Isle of Man Trusts, 40 subsidiary companies and at least 7 different Isle of Man trustees.[2]

---

[2] Stipulations, ¶¶ 20-47 and Attachment A.

13.     The Wylys used Michelle Boucher in the Cayman Islands to serve as a conduit for information between the Isle of Man trustees and the Wyly family in Dallas, and to maintain "documents which should not be seen in the USA."[3]

14.     During the entire period of the fraudulent scheme, Sam Wyly was subject to an injunction for prior securities violations.[4]

15.     During the fraudulent scheme, the Wylys were directors of Michaels Stores, Sterling Software, Sterling Commerce and Scottish Re Group Ltd.[5]

16.     Sam Wyly understood that, as a director of public companies, he had the legal responsibility to inform the public when he obtained or sold Issuer securities.[6]

17.     Between 1992 and 1999, the Wylys either transferred or sold unexercised options and warrants to purchase tens of millions of Issuer shares to the offshore system.[7]  Once the securities were held by the Wylys' offshore system, the Wylys no longer publicly disclosed their ownership of the securities.  When the Wylys exercised the offshore options and warrants, they did not publicly disclose their acquisition of the underlying shares.  And when the Wylys then proceeded to sell the tens of millions of Issuer shares without making any public disclosures identifying themselves as the sellers.[8]

18.     The Wylys misstatements and omissions accompanying these transfers followed the same pattern:  (1) the Wylys falsely disclaimed beneficial ownership in public filings showing the options and shares going offshore, (2) subsequent transactions involving these shares were never publicly revealed as having been directed by the Wylys, and (3) filings by the

---

[3] PX-194.
[4] PX-0004.
[5] Stipulations ¶¶ 4-9.
[6] Tr. 2160:16-2162:5.
[7] PX-9208, PX-9209.
[8] Stipulations, ¶¶99-100 and Attachments B and C.

offshore trustees falsely indicated that they had "sole dispositive power" over the relevant securities.[9]

19.     Between late February 1996 and June 1996, the Wylys had nine of their offshore entities exercise options and then sell over 2,500,000 Sterling Software shares, at prices ranging from $65 to $80 per share, without any public disclosures.[10]   Yet, in the middle of that time period, on April 24, 1996, Sam Wyly stated in Sterling Software's proxy statement, which was sent to all shareholders of record and was publicly filed with the SEC, that "[t]he Board believes that stock options, which align the interests of the grantees with those of the stockholders, are an extremely effective form of incentive compensation."[11]

**C.     The Wylys Advertised Their Offshore Acquisitions, But Hid Their Offshore Sales Because They Knew the Market Reacted to Reports of Their Issuer Securities Transactions**

20.     The Wylys knew that some people would have a negative view when they, as high-level insiders, sold large blocks of shares.[13]

21.     They also knew that the media covered their transactions in Issuer securities.[14]

22.     On Sunday, March 12, 1995, the New York Times published a critical article about a transaction involving Michaels Stores and Sterling Software stock the Wylys entered into domestically that was titled "If These Stocks Soar, the Boss May Regret It."[15]

23.     On Monday, March 13, 1995, the first trading day after the New York Times article, Michaels stock price closed at $30.875, which was $1.625 lower than its $32.50 closing

---

[9] Stipulations, ¶¶99-100 and Attachment C.
[10] Stipulations, ¶¶99-100 and Attachment B, Exhs. 5A, 5B, 6A and 6B.
[11] PX-4130, p. 4, fifth paragraph.
[13] Tr. 2168:2-5 (Sam Wyly); Tr. 1323:12-23 (Charles Wyly).
[14] Tr. 2163:3-12, 2164:24-2165:2 (Sam Wyly); PX-984 (Hennington and Boucher discussing that "when collars were put on domestic holdings . . . there was a lot of negative public backlash when they were reported" and that the "negative press [] would probably keep Sam from doing another collar"); PX-123 (reporting on Wyly trades), PX-6000 (same), PX-6011 (same).
[15] PX-123.

price on Friday, March 10, 1995, the last trading day before the New York Times article was published.[16] This represents a 5% drop ($1.675/$32.50) in Michaels stock price.

24.     Less than two weeks later, on March 24, 1995, French sends a memo to Sam Wyly requesting that both Sterling Software and Michaels Stores revise their option plans to allow the transfer of options to family trusts (such as the ones the Wylys and French had established offshore), so that the "subsequent exercises of the options and the sales of shares by the trustee are not required to be reported to the SEC. . . .  The principal benefit would be to get out of the insider sales reports that seem to set everybody off." (emphasis added)[17]

25.     The Wylys went to great lengths to ensure that even the offshore trusts and trustees themselves avoided having to make any public disclosures of their sales.  The Wylys created additional trusts and used multiple trustees to ensure that each trustee's securities holdings stayed below the threshold which required public disclosures.[18]  The Wyly family office closely tracked the holdings of each offshore trust to ensure that the trustees stayed below the SEC's 5% reporting threshold and, thus, avoided having to make public filings.[19]

26.     The Wylys would arrange for multiple trusts to enter into a transaction so that

---

[16] DX-1038, p. 38.

[17] PX-131.

[18]  See e.g. PX-62, p.3 (establishing two new trusts with a new trustee and then transferring to them just under 5% of the outstanding Sterling Software shares); PX-117 (creating a new trust with a new trustee and then transferring ownership of subsidiary companies which owned stock in Sterling Software to the new trust for "the purpose . . .[of] divid[ing] ownership of Sterling Software" so that neither trustee held over 5% of Sterling Software's outstading stock); PX-146 (limiting the size of a proposed transaction "to approximately 600,000 or 700,000 calls, in order to stay under 5% of the outstanding shares and avoid SEC reporting").

[19] Tr. 247:4-25, 1021:1-23, Tr. 1609:21-24; PX-241 ("One of the reasons they have a variety of offshore trusts is . . . any trust company holding an aggregate of more than 5% of any one class of shares in a company then has certain onerous filing requirements with the SEC.  They confirmed that they were always aware of this as far as the various Wyly entities were concerned.")

none of the trustees would go above the 5 percent reporting threshold.[20]  Securities were transferred between and among trusts to prevent filings in advance of planned transactions.

27.     For example, in March 1995, Sam Wyly created a new offshore trust—Plaquemines Trusts—with a newly retained trustee and then had 350,000 Sterling Software shares transferred from the Bulldog Trust, a pre-existing offshore trust to Plaquemines "for no consideration."[21]  This transfer reduced the Sterling Software holdings administered by the trustee of the Bulldog Trust below 5% of Sterling Software's outstanding shares.  That trustee then filed a final Schedule 13D terminating its reporting.[22]

28.     Weeks later, the Wylys finalized a collar transaction between six of their offshore entities and Lehman Brothers involving a total of 900,000 Sterling Software shares (including 200,000 of the transferred shares).[23]  Because neither the Bulldog Trust's nor the Plaquemines Trust's trustees nominally held greater than 5% of Sterling Software's outstanding shares at the time of execution, the transaction (which was the same as the transactions which had been criticized by the New York Times only weeks earlier) remained undisclosed.

29.     The Wylys used their secret offshore system to execute transactions offshore that they would not have done domestically, and thereby avoid negative news.[24]

30.     This exploitation is particularly evident from the massive disparity between the Wylys' disclosed domestic sales and their secret offshore sales of Sterling Software, Sterling Commerce and Scottish Re.  Between 1992 and 2004, the Wylys revealed to the investing public that they sold only 300,000 shares of Sterling Software, just over 1 million shares of Sterling

---

[20] Tr.1035:10-12.
[21] PX-117.
[22] PX-120.
[23] PX-125.
[24] Tr. 1326:10-14; PX-1264.

Commerce, and not a single share of Scottish Re; yet they secretly sold over 6 million shares of Sterling Software, nearly 4 million shares of Sterling Commerce, and over 1 million shares of Scottish Re.[25]

31.    While shareholders in those companies, as well as the larger investing market, were led to believe that the Wylys rarely, if ever, sold the companies' securities, in fact the Wylys sold over 11 million shares of their own companies' shares in secret.

32.    In stark contrast, however, when it was advantageous to the Wylys to publicize their trusts' acquisition of Issuer securities, such purchases were touted to the press.[26]

33.    On Friday, March 29, 1996, Michaels issued a press release that three "independent trusts of which Wyly family members are beneficiaries" purchased 2 million unregistered shares of Michaels for $12.50 per share.  In that press release, Sam Wyly stated that "We have had tremendous confidence in Michaels' concept since we took it public in 1984."[27]

34.    Within one week from the date of Michaels' press release, Michaels stock had risen from $14.25 (its closing price on Thursday, March 28, 1996) to $15.375 (its closing price on Friday, April 4, 1996), an increase of almost 8% ($1.125/$14.25) in Michaels' stock price.[28]

35.    On December 26, 1996, Michaels issued a press release announcing that it had sold options to purchase 2 million unregistered shares at $10.50 to two "separate entities owned by independent trusts of which Wyly family members are beneficiaries."  Michaels' Chief Executive Officer stated that the "purchase of these options reflects confidence in the Michaels concept."[29]

---

[25] Id.
[26] See DX-48 and DX-156; Tr. at 1850:15-1851:20.
[27] DX-48.
[28] DX-1038, p. 42.
[29] DX-156.

36.     The public message that the April 1996 and the December 1996 private placements with Wyly-related trusts were long-term investments was reinforced by the inclusion in both sets of transaction documents that the securities being acquired by the offshore entities would not be registered by Michaels for at least one year from the date they were issued.[30]

37.     On January 7, 1997, the Wall Street Journal ran an article about the purchase of the 2 million options titled "Michaels Stores Turns to Chairman Again for Infusion of Cash."  In the article, Sam Wyly touts the purchase by saying that the cash infusion was "intended to bolster investor confidence in the company."[31]

38.     Within a few days from the date of Michaels press release, Michaels stock had risen from $10.75 (the closing price on December 26, 1996) to $12 (the closing price on December 31, 1996), and increase of over 11% ($1.25/$10.75).  And by January 8, 1997, the day after the Wall Street Journal article ran, Michaels stock had risen to $13.125, an increase of over 22% ($2.375/$10.75) from the price on the date when the transaction was announced.[32]

39.     Yet, when the Wylys had their offshore entities sell large blocks of the unregistered shares that had been acquired in the private placement transactions with Michaels— 1.2 million shares between June 19 and July 7, 1997 (at prices around $20 per share) and another 600,000 shares between October 27 and December 18, 1997 (at prices between $30 and $35 per share)—there was no public disclosure revealing the Wylys' involvement in the sales.[33]  No press release by Michaels explaining what these sales reflect and no articles in the press about the Wylys' sales.

---

[30] See e.g. DX-52, p. 14 (JDSEC-96127), sec. 4.1 ("Upon receipt of a written request by Purchaser at any time after one year from the date of the initial closing, Seller shall cause to be filed . . . a registration statement").
[31] DX-53.
[32] DX-1038, p. 45.
[33] Stipulations, ¶¶99-101 and Attachment B, Exhs. 12A, 12B, 13A and 13B.

40.     The Wylys also exploited the secrecy of their offshore system by increasing the value of the Michaels options they had transferred offshore by reducing the exercise price of those options.  On March 4, 1996, Michaels lowered the exercise price on all outstanding stock options from $17 to $12.50.[34]  Because Michaels' stock price had dropped precipitously since the grant of those options, the company justified this action as needed to retain and motivate its executives.  However, the option repricing was also applied to the Michaels options which the Wylys had transferred to their offshore entities, despite there being no need to retain or motivate those entities. [35]

**D.     The Wylys Earned Substantial Profits Through Their Offshore System.**

41.     Both Wylys reaped enormous rewards from their positions within the companies, including millions of shares in options.[36]

42.     Sam Wyly earned $371,149,237 and Charles Wyly earned $182,026,815 in trading profits from more than 700 secret transactions in Issuer securities entered into by their offshore entities between 1992 and 2004. [37]  Of these amounts, Sam Wyly earned $323,755,892 in trading profits from registered Issuer securities transactions and $47,393,344 from unregistered Issuer securities transactions entered into by his offshore entities, and Charles Wyly earned $164,025,007 in trading profits from registered Issuer securities transactions and $18,001,807 from unregistered Issuer securities transactions entered into by his offshore entities.[38]

43.     In addition to those amounts, the Wylys earned additional profits from (i) the sale

---

[34] PX-4154 (Michaels 4/30/97 Proxy), at p. 19.
[35] DX-1001, p. 177.
[36] PX-9208, PX-9209.
[37] ECF Dkt. 428 (Proposed Joint Pre-Trial Order - Remedies), Section 5(a).
[38] ECF Dkt 425, Ex. 2 (Supplemental Report of Yasmine Misuraca at Exs. 3A & 3B); PX-9201, PX-9202.

of offshore Sterling Software shares that were subsequently converted to Computer Associates ("CA") shares, (ii) profits from $40 million Sterling Software equity swap agreement entered into with Lehman Brothers, (iii) profits from Michaels shares that were sold offshore after the Wylys began disclosing that they may beneficially own such shares in 2005, or (iv) profits generated from offshore non-Issuer securities transactions, such as investments made in Maverick Fund, Green Mountain and Ranger Fund.

44.     According to their own records, the Wylys earned more than $400 million in tax savings, and, at certain points, held nearly $1 billion in assets in their offshore system.[39]

45.     The Wylys treated their offshore system like a personal "cookie jar,"[40] using offshore trust assets to purchase homes, art, jewelry and furniture for the Wylys' own use and enjoyment.[41]

46.     The profits generated from the sales of Issuer transactions by Sam Wyly's offshore entities totaled $371,149,237 and by Charles Wyly's offshore entities totaled $182,026,815 for Charles Wyly.[42]

47.     For example, tens of millions of dollars from the offshore system were funneled through Security Capital – a Cayman island entity whose sole purpose was to "loan" offshore money back to the Wylys in the United States – in order to fund Green Mountain.[43]  By July 2003, the Wyly' offshore system held $173,725,215 in Green Mountain.[44]  In 2010, Green Mountain was sold to a public company and the rate of return on the offshore system's

---

[39] PX-366, PX-1454, PX-2093.
[40] Tr. 130-131 (defense opening: "maybe they were using them as their personal piggy bank, their cookie jar, fine").
[41] DX-1001 at 307-308.
[42] ECF Dkt. No. 428 (Proposed Joint Pre-Trial Order - Remedies), Section 5(a).
[43] PX-2.
[44] PX-2086 at SEC/ITC013448 (also showing $187,305,118 in Maverick, $147,763,489 in Ranger).

investment was better than the stock or bond market for the same period.[45]

48.     Sam Wyly admitted that one purpose of the trusts was to purchase items for the Wylys, such as the approximately $60 million in offshore proceeds used to purchase large ranches outside Aspen, Colorado, and nearly $30 million in offshore proceeds spent on jewelry, art, and other collectibles used by Wyly family members.[46]

**E.     The Wylys Established the Offshore System to Avoid U.S. Taxes.**

49.     Sam Wyly had previously litigated against the IRS for years regarding the appropriate taxation of family trusts.[47]

50.     In 1991, Sam Wyly asked Sharyl Robertson, the then-head of the Wyly family office, to attend a seminar being conducted by a lawyer named David Tedder.[48]  Robertson circulated a memo about Tedder's proposed system of "Asset Protection and Tax Deferral."[49]

51.     Sam Wyly, Charles Wyly, and Michael French, an attorney who worked for the Wylys, attended a second seminar that Tedder held in New Orleans before setting up a subsequent, private meeting with Tedder at Sam Wylys' home in Malibu California.[50]

52.     At that meeting, Tedder recommended that the Wylys transfer their options in Sterling Software and Michaels to foreign non-grantor trusts in exchange for a private annuity agreement.[51]  This was intended to be a tax-free transaction in which the Wylys did not treat the

---

[45] Tr. 2681-2682:8.

[46] Tr. 1661:3-7  ("Q:  Did you ever try to hide from anyone that you were using the financial resources of those Isle of Man trusts to purchase real estate, art and jewelry for the enjoyment of you and your family members who were beneficiaries?  A:  No.  That's what they were for."); PX-2086 at SEC/ITC013449; Tr. 1360:6-24; PX-394; PX-472; PX-575; PX-845; Tr. 269:17-23; Tr. 289:9-13.

[47] *Sam Wyly v. U.S.*, 662 F.2d 397 (5th Cir. 1981).

[48] Tr. 156:22-157:10; PX-0008.

[49] PX-0008.

[50] Tr. 168:2-10, 1718:5-12.

[51] Tr. 1718:13-23, 1719:7-17.

transfer of the options as compensation, and therefore never recognized the annuities as having any value or paid taxes on any of the resulting gains.[52]

53.     At the Malibu meeting, French raised his concern that the Wylys had filing obligations with respect to the securities of public companies.[53]  Tedder responded that, if the Wylys reported their ownership over shares held by the trusts in their SEC filings, it could trigger tax problems,[54] inasmuch as "the tax-free status of the trusts was contingent upon the Wylys' lack of control over the Trusts."  He further cautioned the Wylys both (1) that "disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and (2) that the IRS might use the Wylys' SEC filings against them if the tax issue was ever litigated."[55]

54.     At the onset of the offshore system, Sam Wyly knew from French that Tedder's proposed tax treatment of these transactions was aggressive, as the risks were clearly set forth in the November, 1991 estate planning memo from French to Sam Wyly.[56]  However, Sam Wyly decided that, if the IRS ever challenged their position, they would litigate for years and settle for pennies on the dollar.[57]

55.     Tedder was subsequently hired as a lawyer for the Wylys.[58]  He assisted the Wylys in establishing a network of offshore trusts in the Isle of Man.  The motivation for the offshore system was largely tax avoidance, and that was how the Wylys' judged the success of

---

[52] Tr. 1719:10-14.
[53] Tr. 1719:9-17.
[54] Tr. 1884:12-21.
[55] French Admissions ¶¶ 8-9; *see also* PX-1101 (Hennington advising Sam not to disclose publicly the offshore securities because "[o]ur friendly IRS Agent is still looming").
[56] PX-0009.
[57] French Settlement ¶ 57.
[58] Tr. 169:10-12.

the offshore system.[59]

56.     Many of the Isle of Man Trust agreements explicitly provided that the Trusts "shall be treated as non-grantor trust[s] rather than a grantor trust under Sections 671 through 678 of the Code," and further provided that they *shall not* be treated as United States Trusts for the purposed of U.S. taxation.[60]

57.     Sam Wyly testified that he understood that it was critical from a U.S. tax standpoint that there was no appearance that the Wylys were in control of the trusts or the protectors.[61]

58.     Sam Wyly testified that he knew that omitting this information from public SEC filings helped the tax benefits of the offshore system because there was no appearance of control.[62]

59.     Sam Wyly further testified that he would have had to pay taxes on the transferred options and warrants if they had remained in the United States.[63]

60.     Both Sam Wyly and the family office employees knew that control could

---

[59] PX 366 ("Sam likes the #'s!"); Tr. 106:8-10 (Defense Opening: "Those twin motives of asset protection and tax benefits were the motives from the beginning and they never changed").

[60] *See e.g.* DX-257 at 5; DX-262 at 5.

[61] Tr. 2354:17-20 (Sam: "I knew from the lawyers I could not control the trust, I could not influence, I could not control the trusts or the protectors.  I knew that.  Lawyers told me that."); Tr. 2353:18-24; Tr. 1005:24-1006:12  (Michelle Boucher testified that "the Wylys . . . did not want to be seen as controlling the Isle of Man entities;" she "participated in discussions with Sam and Charles Wyly . . . regarding taking steps so that Sam and Charles would not be seen to control the Isle of Man Trusts;" and the Wyly family office "took steps to ensure the confidentiality of the Isle of Man trusts to avoid the appearance of control by Sam and Charles Wyly"); Tr. at 130:23-25; PX-890 ("remember that it is critical from a U.S. tax standpoint that there is no appearance that the Wylys' are in control of the trusts or the protectors").

[62] Tr. 2355:14-2356:3.

[63] Tr. 2352:18 – 2353:5 ("if the money were in the U.S., … yeah - , I would be paying taxes or losses on the gains or losses in the portfolio at the time that they happen, yes," and "that's not true if the money is in the Isle of Man").

undermine the tax treatment and went to great lengths to conceal the appearance of that control.[64]

61.     The tax issue and the need to limit SEC disclosures were often discussed in the same meetings with the offshore trustees.[65]

62.     Yet, the Wylys did control the offshore entities,[66] as evidenced by the fact that (i) every action taken by the trustees was initiated or authorized by Sam or Charles Wyly; (ii) the Wylys expected their directions to the offshore trustees to be followed;[67] (iii) the trustees never failed to comply with directions given to them by the Wylys or their agents;[68] and (iv) the Wylys used the wealth accumulated in their offshore entities to start businesses for their children (such as equestrian centers, art galleries, and private investment companies), and to purchase, furnish and decorate houses in which they and their families lived.[69]

**F.     The Wylys Mislead the Issuers to Ensure the IRS is Not Notified.**

63.     Acting as the Wylys' lawyer, Tedder sent a letter to Sterling Software and Michaels on April 9, 1992. The letter addressed the appropriate tax treatment for planned transactions wherein the Wylys would transfer company securities to domestic corporations wholly owned by foreign corporations that were wholly owned by foreign Trusts.  In exchange,

---

[64] PX-890 ("remember it is critical from a U.S. tax standpoint that there is no appearance that the Wylys are in control of the trusts or the protectors"); Tr. 2354:17-20 ("I knew … I could not control the trust").

[65] PX-0194 (noting both that (1) issue of trustee management company owning a percentage of Sterling Software "which would bring it within SEC reporting requirements" have been resolved, and (2) French and Robertson "are anxious that any trail of communications between themselves, [Boucher] and Meespierson not give rise to any potential claim that control is being exercised in the USA"); PX-241 (noting both (1) "One of the reasons they have a variety of offshore trusts is that … any trust company holding an aggregate of more than 5% of any one class of shares in a company then has certain … filing requirements with the SEC," and  (2) because the Crazy Horse Trust is currently a US grantor trust, its Sterling Software options "will be sold across" to another offshore company in exchange for an annuity).

[66] Verdict Form question 11.

[67] Tr. 1000:9-1002:10; 2181:20-2182:20.

[68] *See e.g.* Tr. at 997:22-24; 999:9-22; 1005:10-22; Tr. at 581:18-23.

[69] *See e.g.* Tr. at 291:24-293:18; Tr. at  1360:6-1363:10; Tr. at 2623:23-2625:8; PX-927 (real estate); PX-544 (Edinburgh Fund); PX-794 (First Dallas).

the Wylys were promised future annuity payments.[70]

64.     Tedder's letter stated the following about the degree of control the Wylys would exercise over the transferred securities:

> You will not preserve or reserve any control of any kind or character over such Securities or any income therefrom that would constitute a retained interest in the possession and/or enjoyment of the Securities being exchanged .... It is thus expressly intended that you will irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the Securities.[71]

65.     The letter concluded that the sale of property to the domestic corporation in exchange for private annuity promises was not a taxable event and that subsequent exercise of the securities by the offshore corporations would not generate a taxable event for the Wylys.[72]

66.     Jeanette Meier, the general counsel of Sterling Software in 1992, recalled discussing the Tedder letter at a meeting with other company lawyers about whether Sterling Software could take a compensation expense to the Wylys for the exercise of the transferred Sterling Software options, and whether it would have to issue the Wylys 1099s or W-2s.[73]

67.     During this meeting, Meier also recalled discussing the proper disclosure of the beneficial ownership of the Wylys' transferred securities after the discussion in which she reviewed the Tedder letter.[74]   The tax and disclosure issues were intertwined because the compensation charges that Sterling Software did not take for the transferred securities could have been large enough to change the company's financials and impact the 10-K and 10-Q filings.[75]

68.     The Wylys continuously and repeatedly lied to Michaels, Sterling Software, Sterling Commerce and Scottish Re that they did not own the securities held by their offshore

---

[70] PX-0013 at 3.
[71] PX-0013 at 4.
[72] PX-0013 at 5 and 19.
[73] Meier Depo. at 84:24-86:24
[74] Meier Depo. at 90:10-16.
[75] Meier Depo at 94:24-95:10.

entities in their responses to 90 Directors and Officers Questionnaires completed between 1992 and 2005.[76]

69.     The same corporate entities that received and reiterated the Wylys' lies about beneficial ownership were responsible for deciding whether to issue 1099s or W-2s to the Wylys, which could possibly trigger IRS interest in the offshore system.[77]

70.     As a result of the Wylys representations, none of the Issuers provided either Sam Wyly or Charles Wyly with 1099's or W-2s related to the exercise of options or warrants or the sale of any Issuer shares by the Wylys' offshore entities between January 1, 1992 and December 31, 2004.[78] Had any of the Issuers issued the Wylys with 1099s or W-2s that included gains from any of the offshore transactions, the 1099 and W-2 information would have been inconsistent with the tax position that the Wylys took on their income tax returns between 1992 and 2004 during which they reported no taxable gains from any exercise of stock options transferred offshore.[79]

71.     Copies of 1099s and W-2 are also provided to the IRS, which matched the information provided on such forms with the information reflected on the taxpayer's returns.[80]

72.     This inconsistency between information provided on 1099s or W-2s and the Wylys' income tax returns would have resulted in the IRS making further inquiry into the reason

---

[76] PX-7018.

[77] Meier Depo. at 84:24-95:10; PX-0438, PX-9026 (Hennington: "this may be the only way to avoid a 1099), PX-9033, PX-9034 (Wyly memo to SBC: "In summary, no withholding or information reporting is required"); PX-9027 (Hennington: "This was used in all the company filings where it stated that options were transferred"); PX-9028 (French: "SE didn't issue a 1099 because it relied on the Chatzky opinion").

[78] ECF Dkt. No. 428 (Proposed Joint Pre-Trial Order - Remedies), Section 5(c).

[79] *Id.* at Section 5(b).

[80] *See e.g.* Deposition of Defendants' Expert Gerald Songy ("Songy Dep.") at p.99:5-100:16 (IRS has matched 1099s with taxpayer returns since at least 1977).

for the inconsistency, which could have resulted in an examination of the Wylys' returns.[81]

**G.      The Wylys Learn Their Aggressive Tax Position Was Wrong.**

73.      In 1993, the Wylys retained Morgan, Lewis & Bockius ("Morgan Lewis") to research whether the Bulldog Trust would be treated as a grantor trust pursuant to Internal Revenue Code ("Code") §§ 671-679.[82]  Morgan Lewis prepared a memorandum that concluded "[t]here is significant risk under §679 that the Trust will be characterized as a grantor trust on the basis that income is being currently accumulated for the benefit of U.S. beneficiaries."[83]

74.      Charles Lubar, the Morgan Lewis partner, provided this memo to French, who was acting as an agent of the Wylys, and advised him that there was "meaningful risk" under two sections of the Code that the trusts were grantor trusts.[84]  "If you are a foreign citizen and you set up a foreign trust that is treated as a grantor trust, then you are treated as owning all of the income of that trust."[85]  If, on the other hand, it was a foreign non-grantor trust, there would be no U.S. taxes until a distribution was made to a U.S. beneficiary.[86]

75.      In an effort to fix these problems, French asked Morgan Lewis what the tax implications would be if a foreign person funded the trust.[87]  French told Morgan Lewis to assume that "[a]ll moneys contributed to the Trusts, now or in the future, will belong to the Grantor," who was a non-resident agent of the United States, and that the grantor "will not in the

---

[81] Songy Dep. at p.174:2-175:24.
[82] PX-83, Lubar Depo at 12:10-12:16.
[83] PX-0083 at 2 and 3 ("Section 679 provides that a United States person who directly or indirectly transfers property to a foreign trust is treated as the owner for his taxable year of the portion of the Trust attributable to such property if for such year there is a U.S. beneficiary of any portion of the Trust").
[84] PX-0083; Lubar Depo. at 13:21-23, 14:2-6, 16:22-17:5, 17:15-17.
[85] Lubar Depo. at 15:4-8.
[86] Lubar Depo at 15:9-19.
[87] Lubar Depo at 27:7-27:25, 28:3-7.

future receive any consideration, reimbursement or other benefit" for establishing the trust.[88]

76.     As a result of conversations with Morgan Lewis, new trusts were created with foreign settlors.  Sam and Charles Wyly picked the names for their new trusts, which were settled by non-U.S. citizens.[89]

77.     However, the use of foreign settlors for the new trusts documents was a charade meant to paper the record and further conceal the Wylys' ongoing tax fraud.  The Bessie Trust and Tyler Trust, for example, were settled by Keith King with purported contributions of $25,000.[90]  King then borrowed back $24,999 for each of his contributions and the loans were forgiven.[91]

78.     Similarly, the LaFourche and Red Mountain Trusts were established by Shaun Cairns, who wrote letters stating that he was funding each trust with $25,000 "to show his gratitude" for the Wylys' many years of personal support and friendship.[92]  Cairns testified that he had never met the Wylys prior to writing this letter and he did not provide $25,000 to establish either trust.[93]  The false letters were provided to Cairns by French for the Wylys' files.[94]

79.     The Wylys did not pay U.S. income tax on the income transferred to, or accumulated in, these new Trusts.  This tax position was not supported by Morgan Lewis' advice, which assumed that the foreign grantor would be "the sole transferor of property to the trusts."[95]

80.     The Wylys transferred significant assets to subsidiaries of the Bessie, Tyler,

---

[88] PX-90 at WYLYSEC00010967.
[89] Tr. 205:23-25, 1753:25-1754:16, 2191:20-25.
[90] DX-271, PX-9017.
[91] PX-208, PX-209, PX-210.
[92] PX-0157, PX-158.
[93] JX001 at 46:7-13, 48:05-18, 56:9-57:4.
[94] JX001 at 43:3-6.
[95] PX-0090 at WYLYSEC00010968, Lubar Depo at 28:23-29:20.

LaFourche and Red Mountain Trusts.[96]  According to the Wylys' Morgan Lewis lawyer, if "a U.S. person indirectly puts money into a foreign trust, then you are back into the [Code §] 679 problem with a U.S. person setting up a foreign trust in which he is also a beneficiary, and that clearly doesn't work."[97]

81.     In 1997, French approached Morgan Lewis again and provided them with more information about how the offshore system was funded.  He explained that options and warrants had been transferred in exchange for annuities and asked the firm to look into whether it was a taxable event.

82.     Charles Lubar, the Morgan Lewis attorney who previously worked with the Wylys, involved multiple attorneys in the analysis because the issue was "serious."[98]  He was "really concerned" about the transaction because the options were transferred to a company that did not have any other assets, calling into question whether the private annuity agreement was really an arm's length transaction.[99]

83.     Lubar further concluded that, even if King contributed $25,000 to establish the Trusts (which he did not), that gift "would be overwhelmed by the nature of the gift that came out of the U.S.; hence, you had grantor trusts."[100]

84.     A recent hire from the Department of Justice ("DOJ") met with two tax partners at the firm, including a future chief counsel of the IRS, and then wrote an email to Lubar articulating their concerns under the subheading, "The potential for criminal prosecution of Wyly for tax evasion as a result of his engaging in these transactions":

---

[96] Stipulations exh. 4A.
[97] Lubar Depo at 29:16-20.
[98] Lubar Depo at 35:19-36:16, PX-412.
[99] Lubar Depo at 39:7-16.
[100] Lubar Depo at 40:19-25.

The government may have a persuasive argument that the transactions elevate form over substance repeatedly, indeed at every pivotal turn, and thus, when viewed in the aggregate, constitute a sham designed, not to legally defer or avoid tax, but to evade tax.[101]

85.    In another section, the memo addressed the predicament of the law firm:

We do not believe, given our analysis of the merits of the opinion letters, that [the firm] can advise Wyly that there is a "realistic possibility" (which is defined as a "one in three or greater" chance) that the position set forth [in the Tedder letters] will be sustained by the Court. Therefore, we cannot advise Wyly regarding the reporting of the 1996 transactions on his 1996 federal tax returns. … Counseling him any further risks implicating [the firm], perhaps with unjustifiable hindsight, in the continuing concealment of a fraud.[102]

86.    A longer draft memo reiterated these concerns and noted that Sam Wyly's failure to report income, "elevates our typically cautious concerns about substantial civil liability to a grave concern encompassing criminal liability as well."[103]  Lubar did not raise the potential for criminal liability with French, but advised him that "there were all sorts of problems that arose from the transfer of the options and exchange for the annuity."[104]

## H.    The Continuing Concealment of the Offshore System from the IRS.

87.    The Wylys and their employees took additional steps to shield the offshore system from the IRS and were aware that any statements in SEC disclosures could trigger an audit. They worked to ensure that the relevant public companies did not issue 1099s showing option exercises or stock sales by entities within the Wylys' offshore system as compensation that was paid to the Wylys.[105]

88.    When Sam Wyly's Ranger Governance was in a proxy battle to take over CA,

---

[101]  Lubar Depo at 46:8-13, PX-0435.
[102]  PX-0435 at 1-2.
[103]  PX-0436 at 18.
[104]  Lubar Depo at 56:6-15.
[105]  PX-9022, PX-9023, PX-9024, PX-9026 (Hennington: "this may be the only way to avoid a 1099), PX-9033, PX-9034 (Wyly memo to SBC: "In summary, no withholding or information reporting is required").

Hennington cautioned that the Wylys could not include offshore holdings in their representations of ownership because:

> Our friendly IRS agent is still looming around and although he has verbally agreed not to look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.[106]

89.     When CA asked the Wylys to provide details about their sale of Sterling Software options offshore, in connection with an ongoing IRS audit, Hennington wrote Boucher that she planned to answer that the "options were sold to the following corporations, all of which no Wyly family members has any ownership interest."[107]  Even though this response merely repeated the myth that the Wylys did not have beneficial ownership over the offshore assets, Boucher still felt that response said too much, and advised Hennington to say that she didn't know who owned the offshore companies which had purchased the Wylys' options.[108]

90.     In 2003, the initial annuity payments were about to commence and the Wylys were concerned about the potential ramifications for more than a decade of unpaid taxes.[109] Also, they had learned that David Tedder, the lawyer who had promoted offshore trusts and helped the Wylys set up their initial trusts, had been convicted.[110]

91.     The Wylys again approached Morgan Lewis for advice.[111]  Morgan Lewis again concluded that, contrary to the tax position the Wylys had taken for a decade, the Bulldog Trust should be treated as a grantor trust.[112]

---

[106] PX-1101.
[107] PX-1150.
[108] *Id.*
[109] PX-1255.
[110] PX-1255 at WYLYSEC01115166 ("David Tedder, the attorney who originally promoted the 1992 trusts and annuity transactions is now in jail …. A recent article also referenced Michael Chatzky who opined on the 1996 annuity transactions and the 1998 extensions of the 1992 annuities as being aware of and somewhat involved in Tedder's schemes").
[111] PX-1224.
[112] PX-1236.

92.     In a subsequent memo to the Wylys, Hennington and Boucher discussed their concerns regarding "logistical problems" when the offshore system began paying the annuities. They noted that the payments would be reported on the Wylys' Form 1040 and it "is almost certain given the amount of these payments that the reporting will result in an IRS audit."[113] They cautioned, "There is also a high likelihood that as a result of this audit the entire structure of the foreign system will be audited by the IRS," and that the annuity payments "will bankrupt several of the IOM companies, which could bring the validity of the annuity transaction into question."[114] They warned that, in a contested tax case, the Wylys' and the trusts could be subject to civil fraud penalties that reach 75 percent, and that "it is likely an audit may be triggered solely due to routine inquiries."[115]

93.     In a March 25, 2003 meeting with Boucher and Hennington, Morgan Lewis suggested "an approach to the IRS on a no-names basis [which] could give [the Wylys] an idea of where negotiations with the IRS might lead."[116]

94.     Attorneys for the Wylys, including Lubar, met anonymously with several high-ranking IRS officials on August 13, 2003.[117] Lubar told the IRS there was "serious risk they were grantor trusts" from beginning."[118] When Lubar explained the scheme of foreign subsidiaries acquiring stock options for annuities, the IRS asked if they were publicly traded corporations. The IRS then asked, "Have you checked SEC filing?"[119] Lubar replied in the negative, prompting more questions from the IRS about whether there was disclosure in a

---

[113] PX-1255.
[114] PX-1255.
[115] PX-1255 at WYLYSEC01115165.
[116] PX-1239 at 6.
[117] PX-1259.
[118] PX-1259.
[119] PX-1259 at 2.

financial statement footnote.[120]  Another IRS official stated, "Don't think anyone was reporting this to the SEC at this time."[121]  Lubar informed the IRS that his clients' tax returns for the past 11 years had been filed with no disclosure of these transactions.[122]

95.     Later in that same meeting, the IRS again asked, "Were they significant enough shareholders that their holdings would be listed on SEC filings?" and "Did SEC filings show beneficial interest in shares?"[123]

96.     Boucher and Hennington updated the Wylys about the anonymous meeting with the IRS in an August 29, 2003 memorandum.  The memorandum noted that one IRS official "seemed very interested in any SEC reporting of the initial transactions."[124]

97.     The Wylys continued to falsely disclaim beneficial ownership of the securities held by the offshore system after being advised of the IRS' interest in the treatment of these transactions in SEC filings.  When attorneys and advisors within the family office recommended reporting the offshore system to the IRS on his 2002 tax return, Sam asked them "to explore what happens if he is not a US citizen."[125]

**I.     The IRS Audit Looks to Information in SEC Filings.**

98.     By February 2004, the IRS was auditing Charles Wyly based on information it learned during an examination of Michaels Stores.[126]

99.     The IRS subsequently met with counsel for the Wylys and asked for the current location of the options that went to offshore companies.  The Wylys' attorney responded, "I

---

[120] PX-1259 at 2.
[121] PX-1259 at 2.
[122] PX-1259 at 3.
[123] PX-1259 at 5-6.
[124] PX-1260 at 2.
[125] PX-1306, PX-1307, PX-1308.
[126] PX-9082.

don't know."[127]  This information had been carefully hidden by the Wylys' securities fraud and was thus unavailable in Michaels' SEC filings, which the IRS agents conducting the audit were clearly reviewing.  At one point, an IRS agent told counsel for the Wylys, "I found this valuable information from the SEC filings," and "[b]ased on the SEC, there should be 5471s filed if ownership is greater than 50%."[128]

100.    Further, document requests or IDRs sent by the IRS during the course of this audit make clear that the IRS was reviewing SEC filings for the pertinent information, but could glean little information beyond the initial offshore transfers because of the Wylys' fraudulent reporting practices.[129]  For example, an August 3, 2004 IDR quoted Michaels' 10-K reporting a transfer to an "independent" trustee and then asked for information about the transaction.[130]

101.    A second IDR dated August 3, 2004 quoted a footnote in Sterling Software's 10K in which Charles Wyly disclaimed beneficial ownership for transferred options.[131]

102.    As these document requests make clear, what started as an audit of Michaels branched out into an audit of transactions related to all four Issuers based on information in SEC filings.  Indeed, the IRS told the Wylys' attorneys, "the balance of the IDRs are on the transfers that we have pulled from SEC filings."[132]

103.    After the Wylys had learned of both the IRS audit and an SEC investigation, they made their first corrective disclosures, acknowledging that they *may* be beneficial owners of

---

[127] PX-1373 at WYLYSEC01106561.
[128] PX-1373 at WYLYSEC01106568.
[129] PX-9003 (referencing information in Issuer SEC filing).  See also PX-9085; PX-9087; PX-9089; PX-9102; PX-9106; PX-9110; PX-9112; PX-9114; PX-9116; PX-9118; PX-9120; PX-9122; PX-9124; PX-9126; PX-9128; PX-9130; PX-9132;  PX-9134; PX-9136; PX-9138; PX-9140; PX-9142; PX-9144; PX-9146;  PX-9148; PX-9150; PX-9152; PX-9154; PX-9156; PX-9158.
[130] PX-9003.
[131] PX-9089.
[132] PX-1373 at WYLYSEC01106569.

some securities held offshore, in 2005, thirteen years after the start of the offshore system.[133]

Dated:  Washington, DC                        Respectfully submitted,
        July 28, 2014


                                               /s/ Bridget Fitzpatrick
                                              Bridget Fitzpatrick
                                              John D. Worland, Jr. (JDW-1962)
                                              Martin L. Zerwitz (MZ-9765)
                                              Hope Hall Augustini
                                              Daniel Staroselsky
                                              Gregory N. Miller (GM-5922)
                                              Counsel for Plaintiff
                                              SECURITIES & EXCHANGE COMMISSION
                                              100 F Street, N.E.
                                              Washington, D.C. 20549
                                              (202) 551-4678 (Fitzpatrick)
                                              (202) 772-9292 (fax)
                                              fitzpatrickbr@sec.gov

---

[133] PX-4312, PX-4315.