# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 1:10-cv-5760-SAS |
| | : | |
| SAMUEL WYLY and DONALD R. MILLER, JR., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., | : | ECF Case |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REMEDIES HEARING PROPOSED
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## <u>TABLE OF CONTENTS</u>

PROPOSED FINDINGS OF FACT ............................................................................1

    I.     Findings of Fact Related to the SEC's Disgorgement Requests............................1

    II.    Findings of Fact Related to the SEC's Penalty Requests ......................................3

    III.   Findings of Fact Related to Injunctive Relief ......................................................3

PROPOSED CONCLUSIONS OF LAW ..............................................................4

    I.     Disgorgement, Particularly Disgorgement in the Full Amount Sought
          by the SEC, is Inappropriate in this Case ..............................................................4

         A.    The Type of Disgorgement Sought Here Is Unavailable As a
              Matter of Law .....................................................................................................4

         B.    The SEC May Only Obtain Disgorgement, if Any, for Post-
              February 1, 2001 Violations ...............................................................................5

         C.    The SEC's Tax-Based Disgorgement Measure Fails as a Matter
              of Law and Fact ..................................................................................................6

         D.    The SEC Has Not Carried Its Burden of Demonstrating that
              Total Profits Disgorgement Is Appropriate in this Case ............................12

              (1)    The SEC Has Not Carried its Burden of Showing that
                     Total Profits Should Be Awarded on the Non-
                     Disclosure Claims .....................................................................................12

               (2)    The SEC Has Not Carried its Burden of Showing that
                     Total Profits Should Be Awarded on the Registration
                     Claims .........................................................................................................15

         E.    Awarding Pre-Judgment Interest on Top of Disgorgement Is
               Not Equitable ....................................................................................................19

         F.    Awarding Joint and Several Disgorgement Is Not Equitable ..................20

    II.    The Appropriate Penalties Are Tier-Two Penalties Based on the
          Number of Violations .........................................................................................21

    III.   Injunctive Relief Is Unnecessary Given Sam Wyly's Present
          Circumstances .....................................................................................................25

3230297v1/013572

## TABLE OF AUTHORITIES

### Cases

*Ackerberg v. Johnson,*
  892 F.2d 1328 (8th Cir. 1989) ............................................................................ 18

*Gabelli v. SEC,*
  133 S. Ct. 1216, 1218 (2013) ............................................................................ 20

*Great-West Life & Annuity Ins. Co. v. Knudson,*
  534 U.S. 204 (2002) .................................................................................... 5, 21

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ....................................................................................... 4

*Riordan v. SEC,*
  627 F.3d 1230 (D.C. Cir. 2010) ......................................................................... 6

*Schulz v. CIR,*
  686 F.2d 490 (7th Cir. 1982) ............................................................................ 9

*SEC v. Aqua-Sonic Prods. Corp.,*
  687 F.2d 577 (2d Cir. 1982) ........................................................................... 16

*SEC v. Bankosky,*
  716 F.3d 45 (2d Cir. 2013) ............................................................................. 25

*SEC v. Bilzerian,*
  814 F. Supp. 116 (D.D.C. 1993) ........................................................................ 8

*SEC v. Cavanagh,*
  445 F.3d 105 (2d Cir. 2006) .......................................................................... 4, 5

*SEC v. Cavanagh,*
  98-CV-1818 (DLC), 2004 WL 1594818 (S.D.N.Y. July 16, 2004) ....................................... 16

*SEC v. Commonwealth Chem. Sec., Inc.,*
  574 F.2d 90 (2d Cir. 1978) ......................................................................... 20, 25

*SEC v. Contorinis,*
  743 F.3d 296 (2d Cir. 2014) ........................................................................... 19

*SEC v. Fisher,*
  No. 07 C 4483, 2012 WL 3757375 (N.D. Ill. Aug. 28, 2012) ............................................ 25

*SEC v. Huff,*
  758 F. Supp. 2d 1288 (S.D. Fla. 2010) ................................................................ 22

*SEC v. Jones*,
   476 F. Supp. 2d 374 (S.D.N.Y. 2007) ................................................................ 14, 16

*SEC v. Kelly*,
   765 F. Supp. 2d 301 (S.D.N.Y. 2011) ............................................................... 14, 16

*SEC v. Koenig*,
   557 F.3d 736 (7th Cir. 2009) ................................................................................. 24

*SEC v. MacDonald*,
   699 F.2d 47 (1st Cir. 1983) .................................................................................... 24

*SEC v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir. 1972) ................................................................................. 24

*SEC v. Moran*,
   944 F. Supp. 286 (S.D.N.Y. 1996) ......................................................................... 24

*SEC v. National Student Mktg. Corp.*,
   360 F. Supp. 284 (D.D.C. 1973) ............................................................................ 25

*SEC v. Pentagon Capital Mgm't PLC*,
   725 F.3d 279 (2d Cir. 2013) ................................................................................... 20

*SEC v. Rabinovich & Associates, LP*,
   07-CV-10547 (GEL), 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) ..................... 24

*SEC v. Razmilovic*,
   738 F.3d 14 (2d Cir. 2013) .................................................................................. 4, 19

*SEC v. Syndicated Food Serv. Int'l, Inc.*,
   2014 WL 2884578 (E.D.N.Y. Feb. 14, 2014) ......................................................... 19

*SEC v. UNIOIL*,
   951 F.2d 1304 (D.C. Cir. 1991) ............................................................................... 8

*SEC v. Whittemore*,
   659 F.3d 1 (D.C. Cir. 2011) .................................................................................... 18

*SEC v. Wyly*,
   No. 10-CV-5760 (SAS), 2013 WL 2951960 (S.D.N.Y. June 13, 2013) ............... 6, 8

*Young v. Higbee Co.*,
   324 U.S. 204 (1945) ................................................................................................ 16

iii

**Statutes**

15 U.S.C. § 77t ........................................................................................... 21, 22, 24

15 U.S.C. § 78u ............................................................................................... passim

26 U.S.C. § 671 ....................................................................................................... 9

26 U.S.C. § 674(a) ............................................................................................... 8, 9

26 U.S.C. § 675(4) ................................................................................................... 8

26 U.S.C. § 679(a)(1) .............................................................................................. 9

26 U.S.C. § 7401 ................................................................................................. 7, 8

28 U.S.C. § 2462 ..................................................................................................... 5

**Regulations**

17 C.F.R. Pt. 201 (2014) ....................................................................................... 22

## PROPOSED FINDINGS OF FACT

I.    Findings of Fact Related to the SEC's Disgorgement Requests

1.    Lawfully minimizing and deferring tax liability was one of several reasons why the Defendants began establishing trusts and corporations in the Isle of Man starting in 1992.

2.    Michael French's testimony that David Tedder warned the Defendants that making required SEC filings might put their tax position at risk in or around 1992 is not credible.

3.    No other evidence corroborates Mr. French's memory regarding a conversation that occurred more than 20 years ago—a memory that Mr. French revealed for the first time on the eve of trial, and only after reaching a favorable settlement with the SEC.

4.    Mr. French's testimony that he told the Defendants that Jackson Walker was unwilling to back up the tax advice that they received from Mr. Tedder is likewise not credible in light of other documents and testimony in the record.

5.    Although, at various times, tax lawyers retained by the Defendants assessed the potential risk that the IRS might not agree with all of their tax positions, no tax lawyer ever advised the Defendants conclusively that any one of their tax positions was legally unsupportable.

6.    Indeed, some of the advice that the Defendants received regarding the potential risks in their tax positions focused as much on the fact that the Defendants were easy, high-profile targets for the IRS to investigate as on the fact that some of their tax arguments were novel and untested.

7.    No tax lawyer retained by the Defendants ever expressed any concern that participating in the offshore entities' investment decisions could present a problem under 26 U.S.C. § 674(a).

8.    The Defendants' filing of the disclosures the jury found they should have made would not by itself have triggered an IRS audit.

9.      There is no evidence that, either in the audits at issue in this case specifically, or in IRS audits generally, revenue agents rely on disclosures of "beneficial ownership" or "control" in SEC filings to identify tax deficiencies.

10.     In particular, there is no evidence that IRS revenue agents rely on disclosures of "beneficial ownership" or "control" in SEC filings to identify deficiencies under Section 674(a).

11.     The IRS is currently auditing both of the Defendants for many of the years in question in this case; it is possible that the scope of those audits could be expanded.

12.     It is not impossible that the IRS could eventually seek to obtain some or all of the same allegedly unpaid taxes that the SEC is seeking to collect in the form of disgorgement here.

13.     If the IRS were to succeed in obtaining these taxes, the Defendants could be entitled to refunds for past taxes on annuities payments, which appear to be reasonably traceable to the same underlying securities transactions at issue in this case.

14.     There is no guarantee that the IRS or the Tax Court would agree to deduct the amount of "taxes" paid in the form of disgorgement to the SEC in this case from a future tax assessment.

15.     The Defendants received most of their securities in Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Re ("Issue Securities") as deferred compensation for their services as corporate officers and directors of these companies.

16.     During the period at issue, the Issuer Securities were widely traded and highly valued by the market, and all four companies had Form S-1 Registration statements on file with the SEC.

17.     Disclosures of the information the jury found the Defendants should have disclosed in SEC filings would have had only a minuscule price impact on the securities at issue, if any.

18.     With regard to the Defendants' sales of unregistered Michaels Stores securities, the only new piece of information that a Form S-3 registration statement for Michaels Stores would have disclosed was the Defendants' "beneficial ownership" of the shares in question.

19.     Michaels Stores stock was not worthless or highly risky at the time of the Defendants' unregistered securities sales—to the contrary, the stock was highly valued by the market.

20.     There is no evidence that any investors in these companies were injured by the Defendants' failures to disclose this information in SEC filings, including the missing Michaels Stores Form S-3 registration statement.

21.     The Defendants, individually as well as collectively, are financially unable to pay the full amount of disgorgement sought by the SEC even before pre-judgment interest is applied.

II.     Findings of Fact Related to the SEC's Penalty Requests

22.     The record establishes that Sam Wyly is responsible for no more than 23 post-February 1, 2001 violations.

23.     Sam Wyly's post-February 1, 2001 violations did not directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons.

III.    Findings of Fact Related to Injunctive Relief

24.     Sam Wyly will turn 80 later this year.

25.     Sam Wyly does not currently serve as an officer or director of any public company, and the last time he served in such a capacity was over 8 years ago, in 2006.

26.     Sam Wyly has a long-standing medical condition that would make it very difficult for him to fulfill the duties of a corporate officer or director.

27.     Sam Wyly's only current occupations are writing books and owning a book store.

## PROPOSED CONCLUSIONS OF LAW

I.   Disgorgement, Particularly Disgorgement in the Full Amount Sought by the SEC, is Inappropriate in this Case

28.   The Court has equitable power to fashion appropriate remedies for the securities law violations found by the jury at trial, including disgorgement of profits. *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).

29.   In order to establish a proper disgorgement amount, the SEC must distinguish between legally and illegally derived profits, so that disgorgement may only be awarded with respect to illegally derived profits. *Id.*

30.   The Court need not, however, determine the amount of illegally derived profits with exactitude; rather, the amount of disgorgement need only be a reasonable approximation of the profits causally connected to the violations found by the jury. *Id.*

31.   The SEC has the initial burden of establishing a reasonable approximation of the profits causally connected to the violations found by the jury. *Id.*

32.   Once the SEC has met this initial burden, the burden shifts to the Defendants to show that their gains were unaffected by the offense. *Id.*

A.   The Type of Disgorgement Sought Here Is Unavailable As a Matter of Law

33.   As a preliminary matter, Congress has never named "disgorgement" as among a district court's remedial powers in an SEC enforcement action. Instead, Congress has spoken more broadly: district courts may award "equitable relief." 15 U.S.C. § 78u(d)(5).

34.   The Second Circuit has held that disgorgement is a form of equitable relief because disgorgement was among "those categories of relief that were typically available in equity." *SEC v. Cavanagh*, 445 F.3d 105, 119 (2d Cir. 2006) (applying *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999)).

4

35.     Even though *Cavanagh* is controlling law that disgorgement <u>*may*</u> be awarded as equitable relief, *Cavanagh* is not controlling that the Court <u>*must*</u> do so.

36.     Moreover, the particular disgorgement that the SEC seeks here is not a form of "equitable relief" under *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (interpreting "equitable relief" as used in ERISA Section 502(a)(3)), a case the Second Circuit failed to consider in *Cavanagh*. To be available as "equitable relief," restitution must seek the return of "particular property" that is "in the defendant's possession." *Id.* at 213-14.

37.     Here, by contrast, what the SEC seeks is not "restitution at equity," but rather a form of "restitution at law," specifically, a judgment of "personal liability" upon the Defendants "to pay a sum of money" that corresponds to "some benefit the defendant had received" through wrongdoing. *Id.* at 213. Such "restitution at law" is not a form of "equitable relief." *Id.*

B.     <u>The SEC May Only Obtain Disgorgement, if Any, for Post-February 1, 2001 Violations</u>

38.     Even assuming that disgorgement is legally available, the applicable statute of limitations bars claims for disgorgement here for violations that occurred before February 1, 2001.

39.     28 U.S.C. § 2462 provides that, "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any . . . forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

40.     This five-year statute of limitations applies here by its plain terms; there is no difference between a claim for "disgorgement" and a claim for "forfeiture" where, as here, the government agency seeking disgorgement has no obligation or intent to return the proceeds to victims. *See Riordan v. SEC*, 627 F.3d 1230, 1234 n.1 (D.C. Cir. 2010).

41.     No Act of Congress specifically authorizes the SEC to seek disgorgement beyond this five-year limitations period.

42.     As a result, the SEC cannot seek disgorgement of profits from either of the Defendants here on any securities law claims that accrued before February 1, 2001, a date five years before the day when the Defendants entered into tolling agreements with the SEC.

C.     The SEC's Tax-Based Disgorgement Measure Fails as a Matter of Law and Fact

43.     The SEC first seeks to disgorge the amounts of federal income taxes that it alleges the Defendants should have paid, but failed to pay, on offshore transactions in Issuer Securities during the period at issue in this case.

44.     The SEC has acknowledged that whether it may obtain disgorgement using the amount of federal income taxes allegedly avoided through the Defendants' securities law violations as the "reasonable approximation" is an issue of first impression in any federal court. *SEC v. Wyly*, No. 10-CV-5760 (SAS), 2013 WL 2951960, at *3 (S.D.N.Y. June 13, 2013).

45.     In addition, there are <u>no</u> prior SEC disgorgement cases in which any district court, at the remedies stage, had to find some separate legal violation, giving rise to a separate liability to a different person or entity (albeit, here, a different agency of the same federal government), to conclude that some portion of the defendants' profits were unlawfully obtained.

46.     As a matter of equity, it is inappropriate to award disgorgement based on any theory that requires adjudicating a subsidiary legal issue; to do so during the remedies phase of a securities case would deprive securities defendants of full opportunities to defend against separate claims brought by different plaintiffs (here, against tax claims brought by the IRS).

47.     Further undermining the conclusion that an award of tax-based disgorgement could be equitable, there is a significant risk of double recovery by the United States government here.

48.     There are current IRS audits regarding the same questions involved here already underway, and it is far from clear whether the IRS or the Tax Court would agree to deduct, let alone be legally required to deduct, the amount of any tax-based disgorgement ordered in this case from a future tax assessment.

49.     Moreover, the recovery the SEC seeks is legally unauthorized; Congress specifically mandated that "[n]o civil action for the collection or recovery of taxes . . . shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced." 26 U.S.C. § 7401.

50.     Semantics aside, permitting the SEC to use the amount of an unassessed, alleged tax liability as the "reasonable approximation" of unlawful profits would run afoul of Section 7401.

51.     That is so because the Court cannot determine whether the tax benefits obtained by the Defendants were *illegal* without first making a separate finding that the Defendants in fact owe additional taxes to the IRS; adjudicating that issue would be akin to permitting the SEC to try a "civil action for the collection or recovery of taxes." *Id.*

7

52.     Even if allowing the use of such a measure did not automatically violate Section 7401, the SEC would have to show a clear and direct causal connection between the securities violations and the alleged tax liability to "limit the need for the SEC and this Court to interpret and apply complex provisions of the Tax Code—a job generally reserved for the IRS, subject to judicial review." *Wyly*, 2013 WL 2951960, at *4 n.36; *see  SEC v. UNIOIL*, 951 F.2d 1304, 1306 (D.C. Cir. 1991); *SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993) (holding that the defendant's unjust profits must "proceed directly and proximately from the violation" to be disgorgeable).

53.     The SEC has not made such a clear showing, and it cannot carry its initial burden of showing that alleged tax savings are a reasonable approximation of the profits causally connected to the securities law violations found by the jury, for four reasons.

54.     First, to the extent that the SEC's causal connection argument relies on 26 U.S.C. § 674(a), the SEC's claim of a clear causal connection between the claims at issue fails because the SEC's construction of the statute relies on a doubtful reading of § 674(a)'s text that has never before been tested in a tax case.

55.     Under § 674(a), the grantor of a trust will be taxed personally on the trust's income where he retains a "power of disposition" over "the beneficial enjoyment of the [trust] corpus or the income therefrom"; it is, at best, unclear whether this "power" encompasses investment decision-making power, which is specifically mentioned in a related tax provision, 26 U.S.C. § 675(4).

8

56.    As a result, it is at best uncertain whether the disclosures that the jury found the Defendants should have made—which, on the Section 13(d) and 16(a) claims, would have revealed investment power and voting power over securities, and on the Section 5(a) claims, would have revealed control over the management and policies of the offshore trusts—would have been evidence (let alone conclusive evidence) that the Defendants owed any taxes under § 674(a).

57.    In short, despite the Court's preliminary ruling at the summary judgment stage to the contrary, there appears to be no clear and substantial overlap between the § 674(a) tax standard and the securities law standards that the jury applied at trial in this case.

58.    Second, the SEC has not demonstrated that information of this nature, if it had been revealed in SEC filings, would have been evidence (let alone conclusive evidence) that taxes were owed under _any other_ grantor trust provision, including 26 U.S.C. § 679(a)(1).

59.    Third, the SEC has not demonstrated that information of this nature, if it had been revealed in SEC filings, would have been evidence (let alone conclusive evidence) that taxes were owed under the judicially created "substance over form" doctrine—particularly since 26 U.S.C. § 671 indicates that the highly technical grantor trust rules that follow it were enacted by Congress to "supplant judicial rulemaking on the subject" of when a grantor exercises too much control over a trust. _Schulz v. CIR_, 686 F.2d 490, 494 n.15 (7th Cir. 1982).

60.    Fourth, to the extent that the evidence introduced by the SEC at the hearing indicates that tax considerations played a role on the Defendants' SEC filing decisions, this motive evidence cannot by itself show a causal connection as a matter of law.

61.     Even assuming that the Defendants were in fact motivated to withhold information by a worry that the information in truthful SEC filings might have raised questions about the validity of their tax position, that does not suffice to show that their tax position was in fact invalid.

62.     For these reasons, no tax-based disgorgement should be awarded.

63.     Alternatively, for the same four reasons, the Defendants have carried their burden of demonstrating that their tax benefits were not obtained through securities violations.

64.     Even if it were appropriate to award tax-based disgorgement in this case—which it is not—the SEC's tax calculations far overestimate the amounts that should be paid now.

65.     The SEC's unpaid tax calculations of $147,184,191.58 for Sam Wyly and $76,742,915.31 for the Estate of Charles Wyly assume that all applicable taxes are ordinary income taxes; the calculations also include taxes that the SEC alleges should have been paid on transactions in unregistered securities, even though the SEC also seeks to recover the full profits on these transactions.

66.     The SEC's own tax calculation expert, James Robbins, acknowledged that, if the SEC is correct that the substance rather than the form of the offshore entities should be honored, some of the taxes owed would be capital gains taxes rather than ordinary income taxes, which would lower the calculations to $125,253,436.72 for Sam Wyly and $64,345,686.06 for the Estate of Charles Wyly.

3230297v1/013572

67.     Moreover, Mr. Robbins also acknowledged that, if taxes on unregistered securities are excluded—which they must be as a matter of equity to avoid duplicative relief, if the total profits of the unregistered securities sales are disgorged (otherwise the Defendants would be left in the position of effectively having to pay tax on profits they are not allowed to keep)—these calculations reduce to $114,288,518.08 for Sam Wyly and $59,187,027.94 for the Estate of Charles Wyly.

68.     The Defendants' tax calculation expert, Allen Kosowsky, identified further reductions, based largely on deductions that the Defendants could have claimed if they had had more income during the years in question, of $2,232,458 for Sam Wyly and $290,746 for the Estate of Charles Wyly; the SEC has failed to identify any legal or equitable reason why these amounts should not be deducted from Mr. Robbins' calculations.

69.     Finally, Mr. Kosowsky identified tax payments that have already been made by the Defendants on the annuity payments they received from the Isle of Man entities, totaling $66,835,793 for Sam Wyly and $35,354,969 for the Estate of Charles Wyly; because these payments are reasonably traceable to the proceeds from the same securities transactions at issue in this case, there is no legal or equitable reason not to deduct these amounts here as well.

70.     The fact that the Defendants have filed protective claims for refunds on these past tax payments (plus interest) with the IRS is not a reason for the Court to refrain from making the above-described deductions; these protective claims were filed only to preserve the argument in the event of _a future tax case_ seeking to determine whether the Defendants should have paid taxes directly on trust income sooner.

11

71.     Based on these adjustments, even if the Court were to determine that tax-based disgorgement were appropriate and equitable—and it does not—the *maximum* tax-based disgorgement amounts would be far less than what the SEC claims, and in no event more than $56,185,185.72 for Sam Wyly (or $45,220,267.08, to avoid duplication on an award of disgorgement of the total profits of his unregistered securities sales) and $28,699,971.06 for the Estate of Charles Wyly (or $23,541,312.94, to avoid duplication on an award of disgorgement of the total profits of unregistered securities sales).[1]

     D.    <u>The SEC Has Not Carried Its Burden of Demonstrating that Total Profits Disgorgement Is Appropriate in this Case</u>

72.     The SEC also seeks to disgorge the Defendants' total profits from all offshore transactions in issuer securities as alternative to the tax-based measure, and separately, seeks to obtain the total profits from unregistered securities sales as a remedy for the Section 5 claims.

     (1)    <u>The SEC Has Not Carried its Burden of Showing that Total Profits Should Be Awarded on the Non-Disclosure Claims</u>

73.     Insofar as the SEC seeks the total profits of *all* offshore transactions in issuer securities, it has not carried its initial burden of demonstrating that this is a reasonable approximation of the profits casually connected to the securities law violations found by the jury.

74.     There is no evidence to support the conclusion that all, or even substantially all, of the profits that the Defendants made on sales of otherwise valuable stock in four highly successful public companies are reasonably attributable to the specific violations found by the jury.

---

[1] The Defendants will present an alternative, lower calculation should the Court agree that the statute of limitations bars claims for disgorgement based on pre-February 1, 2001 violations.

75.    There is no evidence to suggest that the manner in which Defendants obtained these securities was tainted by any violation—the vast majority of the securities at issue were obtained by the exercise of compensatory options and warrants. The resulting shares were sold on the open market at the prevailing market price, and the SEC has failed to introduce any evidence whatsoever to suggest that these violations had _any_ price impact.

76.    Because it failed to carry its initial burden, the SEC is not entitled to obtain disgorgement of _any percentage_ of the profits on the Defendants' offshore sales of issuer securities, let alone all of the profits from these sales.

77.    Alternatively, even if the SEC had met its initial burden of showing that total profits were a "reasonable approximation" of the gains causally connected to the violations, the Defendants have rebutted that showing.

78.    The Defendants' expert witness John McConnell testified that academic studies show that making the disclosures the jury found the Defendants were required to make here would have had only a minor impact on stock prices (a drop of just 0.20% to 0.61% per disclosure). Mr. McConnell created a framework for estimating what the stock-market reactions would have been, had the Defendants made the required disclosures. The framework yielded a disgorgement range far smaller than the total profits sought by the SEC.

79.    Moreover, Mr. McConnell also noted that the actual disclosures that were made in this case (_i.e._, when the Defendants disclosed their onshore sales of securities) did not lead to any observable impact. Mr. McConnell opined that it is possible that the required disclosures, even if made, would have had zero effect on this particular stock market price, and that zero effect may be the best guess that can be made about the likely effects of such disclosures in this particular case.

80.     In sum, Mr. McConnell's testimony carried the Defendants' burden of showing that, at most, only a small percentage of their gains are attributable to the securities violations. Therefore, the appropriate amount of disgorgement for these particular violations is zero. *See SEC v. Kelly*, 765 F. Supp. 2d 301, 325-26 (S.D.N.Y. 2011) (awarding zero disgorgement due to insufficient evidence as to what portion of the defendant's gain was attributable to the violation); *SEC v. Jones,* 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (same).

81.     Alternatively, based on Mr. McConnell's framework, the Court will award an amount of disgorgement based on what it concludes are the most appropriate studies and assumptions discussed by Mr. McConnell and implemented using his framework. There are three different relevant studies, and one of the most crucial assumptions is the length of time that a presumed price drop is assumed to remain in effect.

14

82.     The studies and assumptions made by Mr. McConnell—considered in the absence of the actual data relevant to the Defendants' onshore disclosures—yield a range of reasonable approximations of the total profits traceable to these particular securities violations.  The range stretches from a gain of $3.6 million (based on the Lakonishok and Lee study, and an assumed price effect duration of 90 days) to a gain of $21.1 million (based on the Brochet study, and an assumed price effect duration of 360 days).. The Court will exercise its discretion to award disgorgement in the amount at the bottom of that range ($3.6 million), in light of the actual onshore data that show no price impact at all. Although Mr. McConnell has not separately broken out the totals for each Defendant, he testified that it is reasonable to divide this total in a ratio of 2:1, as that ratio of investments and gains was consistently followed throughout the transfers and sales of these securities. Split 2:1, the appropriate disgorgement here is no more than $2.4 million for Sam Wyly and $1.2 million for the Estate of Charles Wyly.[2]

(2)     The SEC Has Not Carried its Burden of Showing that Total Profits Should Be Awarded on the Registration Claims

83.     Insofar as the SEC seeks total profits as a specific remedy for the Section 5 violation, it has also failed to carry its initial burden of demonstrating that this is a reasonable approximation of the profits causally connected to the Section 5 violations in question.

84.     Although total profits have sometimes been awarded in other Section 5 cases, this is not *always* the appropriate measure of disgorgement for a Section 5 registration violation; there are simply no *per se* rules governing the disgorgement calculation in particular categories of cases, and the appropriate measure depends on all the facts and circumstances in each individual case.

---

[2] The Defendants will present an alternative, lower range should the Court agree that the statute of limitations bars claims for disgorgement based on pre-February 1, 2001 violations.

3230297v1/013572

85.     Where the SEC has obtained total profits disgorgement in other Section 5 cases, it is typically because the underlying investment was worthless or highly risky, and no initial registration statement, or Form S-1, was ever filed by the issuer. *See, e.g.*, *SEC v. Cavanagh*, 98-CV-1818 (DLC), 2004 WL 1594818 (S.D.N.Y. July 16, 2004).

86.     Here, by contrast, the underlying investment—stock in Michaels Stores—was widely traded and highly valued by the market. Moreover, the Defendants' expert witness Andrew Thorpe has testified that the registration statements that would have been filed in this case would have been Form S-3s, which would have mostly repeated other publicly available information. The only new piece of information that an accurate Form S-3 would have disclosed was the Defendants' "beneficial ownership" of the shares in question. It is unreasonable to presume that *all* of the profits on unregistered sales are traceable to the withholding of only this limited information.

87.     As discussed above, Mr. McConnell created a comprehensive framework to assess the likely benefit to the Defendants (if any) of the non-disclosure of beneficial ownership of all shares, both registered and unregistered. That framework is equally persuasive in the case of the unregistered securities because the nature and substance of the violation is the same as in the case of the registered shares. *See SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) (Friendly, J.) (recognizing that "the purposes of the securities laws" require "disregarding form for substance and placing emphasis upon economic reality"); *see also Young v. Higbee Co.*, 324 U.S. 204, 209 (1945) ("Equity looks to the substance and not merely to the form.").

88.     Here, the appropriate amount of profits to be disgorged is also zero dollars because the SEC failed to carry its initial burden, and even if it did, the Defendants successfully rebutted the SEC's showing. *See Kelly*, 765 F. Supp. 2d at 325-26; *Jones,* 476 F. Supp. 2d at 386.

16

89.     Alternatively, based on Mr. McConnell's framework, the Court will award an amount of disgorgement based on what it concludes are the most applicable studies and assumptions discussed by Mr. McConnell. The Court concludes that here, the filing of a Form S-3 in this case would have signaled to the market that Defendants were preparing to sell Michaels shares that they beneficially owned. The Court further concludes that this signal would have had an effect on the market roughly analogous to the effect observed when an insider files a Form 4 disclosing a recent sale of the company stock.

90.     The Court therefore calculates disgorgement for these resales of unregistered shares using the same framework used above in the case of the registered shares.

Based on those assumptions and on Mr. McConnell's framework, the Court finds that the range of reasonable approximations stretches from $289,000 (based on the Lakonishok and Lee study) to $1.14 million (based on the Brochet study at 360 days).    Again the Court will choose the bottom of this range because of the actual data in this case, which show no average stock price reaction, in Michael's Stores stock, following 17 different onshore disclosures of Defendants' sales of this stock. Although Mr. McConnell has not separately broken out the totals for each Defendant, he testified that it is reasonable to divide this total in a ratio of 2:1, as that ratio of investments and gains was consistently followed throughout the transfers and sales of these securities. Split 2:1, the appropriate disgorgement here is no more than $193,000 for Sam Wyly and $96,000 for the Estate of Charles Wyly.[3]

---

[3] The Defendants will present an alternative, lower range should the Court agree that the statute of limitations bars claims for disgorgement based on pre-February 1, 2001 violations.

17

91.    As a third alternative, the Defendants are also permitted to rebut the SEC's disgorgement calculation of total profits on the Section 5 claims by showing the "fair market value" of the unregistered shares, and then subtracting that amount from the proceeds of the sales. *See SEC v. Whittemore*, 659 F.3d 1, 8 (D.C. Cir. 2011) (reasoning that at the disgorgement stage, a defendant liable for a Section 5 violation has the right to show "independent evidence of the stock's market value" in order to rebut SEC's approximation).

92.    Here, the Defendants have introduced evidence of the fair market value of their unregistered shares of Michaels Stores stock. Even without registering these shares, Defendants could have lawfully resold them to a sophisticated third-party investor, albeit at a discount, pursuant to what has been referred to the "Section 4(1 1/2) exemption." *See generally Ackerberg v. Johnson*, 892 F.2d 1328 (8th Cir. 1989).

93.    The Court agrees with Mr. McConnell's analysis, which applies a study of private placements by Bajaj.  One implementation of that study yields a total discount of $23.5 million for all the unregistered shares had they been sold pursuant to the Section 4(1 1/2) exemption. Another implementation of that study yields a total discount of $17.5 million.  . The Court uses the lower value implementation because it more closely tracks the actual market values of the resales in this case. The Court further divides it, as discussed above, in a 2:1 ratio between Sam Wyly and the Estate of Charles Wyly, for a _maximum_ reasonable award of disgorgement on the Section 5 claims of $11.6 million for Sam Wyly and $5.8 million for the Estate of Charles Wyly.[4]

---

[4] The Defendants will present an alternative, lower range should the Court agree that the statute of limitations bars claims for disgorgement based on pre-February 1, 2001 violations.

E.  Awarding Pre-Judgment Interest on Top of Disgorgement Is Not Equitable

94.  The Court may award prejudgment interest on the disgorgement amount for the period in which a defendant had the use of his illegal profits. *Razmilovic*, 738 F.3d at 36-37.

95.  However, the decision whether to award such interest is entrusted to the Court's full discretion as governed by the equities; as such, an award of prejudgment interest must reflect "considerations of fairness." *SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014).

96.  Here, one important equitable consideration is the inherent difficulty of ascertaining a particular amount to be disgorged. As Mr. McConnell opined, "zero" is a reasonable "best guess" as to the amount of actual gain the Defendants received as a result of their non-disclosures and inaccurate disclosures regarding beneficial ownership. Further, in awarding an actual sum based on Mr. McConnell's calculations, the Court necessarily incorporated into the calculation a number of important and conservative assumptions that had the likely effect of overstating the actual amount of gains to the Defendants. Because of the length of time at issue, adding on pre-judgment interest would more than double the amount to be disgorged, exacerbating the impact of these conservative estimates. Therefore, in this case, it would be unfair to add pre-judgment interest to the sum.

97.  Moreover, an award of pre-judgment interest on top of any disgorgement measure—and particularly a tax-based disgorgement measure—would be inequitable given the uncertainty surrounding the current tax audits of the Defendants and the potential for duplicative recovery in a future tax case, in which deductions based on the award here may not be permitted.

98.  The Defendants' financial circumstances and ability to pay are another equitable factor that may be considered in determining whether pre-judgment interest should be awarded. *SEC v. Syndicated Food Serv. Int'l, Inc.*, 2014 WL 2884578, at *14 (E.D.N.Y. Feb. 14, 2014).

19

99.     Here, awarding pre-judgment interest on top of disgorgement would be inequitable because the Defendants have demonstrated that, both individually as well as collectively, they are unable to pay any amount close to the full disgorgement award sought by the SEC.[5]

      F.    <u>Awarding Joint and Several Disgorgement Is Not Equitable</u>

100.    The SEC seeks to hold Sam Wyly and the Estate of Charles Wyly jointly and severally liable for any disgorgement award, including for any pre-judgment interest awarded.

101.    The Second Circuit has held that joint and several liability with respect to disgorgement may be warranted in SEC cases where the defendants collaborated in the underlying securities violations. *See SEC v. Pentagon Capital Mgm't PLC*, 725 F.3d 279, 288 (2d Cir. 2013).

102.    However, the appropriateness of joint and several liability should be reconsidered in light of *Gabelli v. SEC*, which recognized that the SEC is "a different kind of plaintiff" seeking "a different kind of relief" than a private plaintiff. 133 S. Ct. 1216, 1218 (2013). There are three specific reasons why joint and several liability is particularly inappropriate in this case.

103.    First, joint and several liability is inappropriate in an SEC case because, unlike a private plaintiff in a tort case, the SEC is not an injured victim suing to be made whole for an injury. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (Friend, J.) (recognizing, in a case involving disgorgement "ordered on a several, not a joint basis," that "[t]he primary purpose of disgorgement is not to compensate investors").

104.    Indeed, the SEC has not even demonstrated that any investors were harmed by the violations found by the jury, making joint and several liability particularly inequitable here.

---

[5] Should the Court award disgorgement and determine that pre-judgment interest is appropriate, the Defendants will present the Court with an alternative pre-judgment interest measure commensurate to the final disgorgement award.

105.     Second, prior Second Circuit cases regarding disgorgement and joint and several liability have overlooked the significant fact that such liability cannot be considered "equitable relief" where it played no role in the historic practice of "restitution in equity." *Great-West Life & Annuity*, 534 U.S. at 213-14.

106.     Third, awarding joint and several liability effectively transforms a supposedly equitable form of relief into a kind of penalty, particularly where, as here, the Defendants' transactions were separate, and the Court faces no real difficulty in calculating two separate disgorgement awards.

107.     Even assuming that joint and several is legally available, such liability is particularly inequitable and inappropriate for any disgorgement award based on unpaid federal income taxes, since the SEC has failed to make any showing that Sam Wyly and the Estate of Charles Wyly could conceivably be held jointly and severally liable in a tax case.

II.     <u>The Appropriate Penalties Are Tier-Two Penalties Based on the Number of Violations</u>

108.     In addition to disgorgement, the SEC also seeks to impose penalties on Sam Wyly pursuant to 15 U.S.C. §§ 77t(d) and 78u(d)(3) for post-February 1, 2001 violations.

109.     The SEC has the burden of making a proper showing that penalties are appropriate, and the Court must determine the amount of the appropriate penalty in light of all of the facts and circumstances. 15 U.S.C. § 77t(d)(1), 77t(d)(2)(A); *id.* §§ 78u(d)(3)(A), 78u(d)(3)(B)(i).

110.     To the extent that the SEC seeks to obtain the total profits that Sam Wyly earned on all post-February 1, 2001 violations, such a measure of penalties is inappropriate under the circumstances because, under §§ 77t(d)(2)(A)(ii)  and 78u(d)(3)(B)(i)(II), penalties must reflect the gross pecuniary gain to the defendant "as a result of the violation."

111.   The words "as a result of the violation" in these two statutes indicate that Congress required the SEC to—at a minimum—satisfy the same causal connection standard necessary to obtain disgorgement measured by some percentage of the defendant's overall profits. *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1364-66 (S.D. Fla. 2010).

112.   Where the SEC has not demonstrated that the amounts of profits it seeks as a penalty are causally connected to the violation or violation in question, §§ 77t(d)(2) and 78u(d)(3)(B) set forth the maximum available penalties per violation under three different tiers.[6]

113.   Under current regulations, the maximum penalty per violation is $60,000 for tier-two violations and $120,000 for tier-three violations. 17 C.F.R. Pt. 201, Subpt. E, Tbl. II. (2014).

114.   Here, tier-two penalties of no more than $60,000 per violation are the maximum available because the violations in question did not directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons. 15 U.S.C. § 77t(d)(2)(C)(ii)(II); *id.* § 78u(d)(3)(B)(iii)(II)(bb).

115.   Based on the jury's findings and the Court's review of the evidence from trial and the remedies hearing, Sam Wyly is responsible for no more than 23 violations during the relevant period, as detailed in the following paragraphs.[7]

---

[6] The amount of any gains actually earned by Sam Wyly *as a result* of the post-February 1, 2001 violations found by the jury is far less than the SEC's $38,758,009.68 total profits measure for the same reasons discussed regarding disgorgement, *supra* at ¶¶ 72-82. Indeed, under any reasonable measure, this amount is actually *less* than the maximum penalty amount calculated using the number of violations at the second-tier level. Assuming the Brochet study cited by Mr. McConnell is used to estimate the price effect, and the price effect is deemed to last for 180 days, the appropriate amount of disgorgement for registered and unregistered shares together would be $866,000 in total. Split 2:1 to exclude the Estate of Charles Wyly, which the Court has already determined cannot be penalized, yields a penalty of $577,600 for Sam Wyly.

[7] The Defendants' pre-trial memorandum counted 15 violations. However, after further review, the Defendants believe that an additional 8 violations should be counted for Sam Wyly's aiding and abetting Michaels Stores Form 10-K and proxy statement filings.

116.    First, the Court concludes that sales of blocks of unregistered Michaels Stores shares in September 2001 and November 2001 constitute no more than two violations, since the evidence at trial indicated that, while the two blocks of securities were sold over multiple transactions, Sam Wyly likely gave only two directions to sell.

117.    Second, the Court concludes that Sam Wyly committed three violations when he failed to file Schedule 13D amendments relating to material changes in his ownership of Scottish Re stock on or about June 11, October 1, and December 18, 2011.

118.    Third, the Court concludes that Sam Wyly committed one violation when he failed to file a Form 4 as a 10%-plus owner of outstanding Scottish Re stock on or about October 1, 2001.

119.    Fourth, the Court concludes that Sam Wyly committed two violations when he failed to file Schedule 13D relating to material changes in his ownership of Michaels Stores stock on or about September 7 and November 7, 2001.

120.    Fifth, the Court concludes that Sam Wyly committed seven violations when he failed to file required Form 4s relating to sales of Michaels Stores stock on October 10 and December 10, 2001, as well as a Form 4 in November 2002, a Form 4 in December 2003, a Form 4 in March 2003, a Form 4 in April 2003, and a Form 4 in December 2003.

121.    Sixth, the Court concludes that Sam Wyly committed eight further violations when he aided and abetted false Michaels Stores Forms 10-K filed on April 30, 2001, April 12, 2002, April 11, 2003, and April 2, 2004; and aided and abetted false Michaels Stores proxy statements filed on August 31, 2001, May 6, 2002, May 6, 2003, and May 6, 2004.

122.    As such, a *maximum* penalty of no more than $1,380,000 is appropriate here. Even a lower figure than that may be appropriate given that the Court has discretion here to find a single violation. *See, e.g.*, *SEC v. Rabinovich & Associates, LP*, 07-CV-10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) (awarding penalty based on just one violation because, although the defendant "engaged in repeated violations of the securities laws, they all arose from a single scheme or plan"); *SEC v. Moran*, 944 F. Supp. 286, 298 (S.D.N.Y. 1996) ("[A]lthough the failure to accurately disclose the directors of his firms violates three statutory provisions and two rules, Moran Sr.'s actions constitute only two transgressions: the misrepresentation of the directorships of Moran Asset and the same misrepresentation affecting Moran Brokerage.").

123.    To the extent that the SEC seeks pre-judgment interest on the above-described penalties, no other court has ever awarded pre-judgment interest on top of penalties calculated based on the number of violations; this Court declines to be the first to do so.[8]

---

[8] To the extent that the Court determines that penalties should be awarded measured by Sam Wyly's profits resulting from post-February 1, 2001 violations, the SEC's prejudgment interest argument relies exclusively on a case that has never been applied outside the Seventh Circuit, *SEC v. Koenig*, 557 F.3d 736, 744-45 (7th Cir. 2009). *Koenig*'s conclusion that a defendant's pecuniary gains from the violation should be calculated to include prejudgment interest has no basis the text of §§ 77t and 78u. The conclusion that gains from securities violations necessarily include the interest thereon is also in contrast to well-established disgorgement case law, under which the decision to award pre-judgment interest on top of the amount of profits obtained through the violation is far from automatic. Moreover, this reasoning is inconsistent with a long line of cases holding that, in the insider trading context, the interest earned on the proceeds of insider trading is not "profit" subject to disgorgement. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972); *see SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (en banc) (no disgorgement of profits earned after inside information became public). This unpersuasive, nonbinding decision should not be followed here.

III.    Injunctive Relief Is Unnecessary Given Sam Wyly's Present Circumstances

124.    A permanent injunction against future violations of the securities laws is warranted where the defendant's past conduct indicates that there is a reasonable likelihood of a further violation in the future. *SEC v. Commonwealth Chem. Sec. Inc.*, 574 F.2d 90, 99 (2d Cir. 1978).

125.    The factors relevant to this determination include, among other things, "whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *Id.* at 100.

126.    To obtain an order barring a defendant from serving as an officer or director of a public company, it is the SEC's burden to show that the defendant's conduct demonstrated unfitness to serve as an officer or director. 15 U.S.C. § 78u(d)(2).

127.    One of the factors relevant to that showing is "the likelihood that misconduct will recur." *SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013).

128.    Given Sam Wyly's age, health, and current occupation, there is no real need to enjoin him from future violations or bar him from serving as an officer or director. *See, e.g.*, *SEC v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *15 (N.D. Ill. Aug. 28, 2012) (defendant "retired from her working life altogether"); *SEC v. National Student Mktg. Corp.*, 360 F. Supp. 284, 300 (D.D.C. 1973) (retired defendants were no longer connected with the securities field). The Court declines to do so.

Respectfully submitted:

SUSMAN GODFREY, L.L.P.

By:

/s/ *Mark H. Hatch-Miller*
Stephen D. Susman (SS8591)
Mark H. Hatch-Miller (MH4981)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Terrell W. Oxford
David D. Shank
901 Main Street, Suite 5100
Dallas, Texas  75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

Harry S. Susman*, Pro Hac Vice*
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: (713) 653-7834
Facsimile: (713) 654-6666

*Attorneys for Samuel E. Wyly and Donald R. Miller, Jr.*

Dated:   July 28, 2014