UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          - against -

SAMUEL WYLY, and DONALD R.
MILLER, JR., in his Capacity as the
Independent Executor of the Will and Estate
of Charles J. Wyly, Jr.,

                    Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/29/14

OPINION AND ORDER

10-cv-5760 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

The Securities and Exchange Commission ("SEC") brought this civil

enforcement action against Samuel Wyly and Donald R. Miller, Jr. as the

Independent Executor of the Will and Estate of Charles J. Wyly Jr. (Charles Wyly

and, together with Samuel Wyly, the "Wylys").  The SEC alleged ten securities

violations arising from a scheme in which the Wylys established a group of

offshore trusts and subsidiary entities in the Isle of Man ("IOM"), used those

offshore entities to trade in shares of four public companies (the "Issuers") on

whose boards the Wylys sat, and failed to properly disclose their beneficial

ownership of that stock.

The liabilities and remedies phases of the trial were bifurcated.  I presided over a jury trial on nine of the ten claims from March 31 to May 7, 2014. On May 12, 2014, the jury returned a verdict against both Sam and Charles Wyly on all nine claims, including securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and section 17(a) of the Securities Act of 1933 (the "Securities Act"), and failure to make various disclosures, in violation of sections 13(d), 14(a), and 16(a) of the Exchange Act.[1] Following the jury verdict, I set a discovery and trial schedule for the remedies phase.

On June 6, 2014, the SEC disclosed for the first time in an amended response to defendants' contention interrogatory that it "intends to seek in disgorgement . . . all of the profits Sam [and Charles] Wyly earned through their [o]ffshore Issuer securities transactions."[2]  Defendants move to preclude the SEC's

---

[1]     The jury also found the Wylys liable for selling unregistered securities in violation of section 5 of the Securities Act, and aiding and abetting violations of sections 13 and 14 by the IOM trusts and the Issuers.  On July 10, 2014, I dismissed the SEC's insider trading claim, which was tried to the bench for purposes of liability.  The SEC's disgorgement theory for the section 5 claim is not at issue on this motion.

[2]     6/6/14 SEC's Revised Responses and Objections to Wylys' Interrogatory Number 4, Exhibit ("Ex.") 2 to 7/18/14 Declaration of Steven M. Shepard ("Shepard Decl."), counsel for defendants, at 2.  In its previous response

theory of "total profit" disgorgement as insufficient as a matter of law or, in the alternative, as untimely.  For the following reasons, defendants' motion is GRANTED.

## II.    BACKGROUND

Between 1992 and 1996, Sam and Charles Wyly created a number of IOM trusts, each of which owned several subsidiary companies.[3]  Michael French, the Wylys' family attorney, and Sharyl Robertson, the Chief Financial Officer ("CFO") of the Wyly Family Office, served as protectors of the IOM trusts.[4] French, Robertson, and Michelle Boucher, the CFO of the Irish Trust Company, a Wyly-related entity in the Cayman Islands,[5] conveyed the Wylys' investment recommendations to the IOM trustees.  Most, if not all, of the IOM trustees'

---

to defendants' contention interrogatory dated October 26, 2012, the SEC objected to the interrogatory as "premature to the extent it requires the SEC to provide the amount it seeks" in disgorgement, but provided two alternate theories of disgorgement, including unpaid taxes and profits gained on the transactions in the section 5 claim.  The SEC contends, and defendants do not dispute, that the theory "relies on no new evidence or previously unknown information."  7/14/14 SEC's Memorandum of Law in Opposition to Defendants' Motion to Preclude the SEC's "Total Profits" Theory of Disgorgement ("SEC Opp."), at 24.

[3]        See Stipulation of Undisputed Facts ("Stip. Facts") ¶¶ 20-46.

[4]        See id.  ¶¶ 49-50.

[5]        Boucher also became a protector in 2001.  See id. ¶ 50.

transactions were based on these recommendations.[6]

The Wylys served as directors of Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Re.[7]  As part of their compensation, the Wylys received stock options and warrants.  "Between 1992 and 1999, Sam and Charles Wyly sold or transferred to the [IOM] trusts and companies stock options in Michaels Stores, Sterling Software and Sterling Commerce."[8]  Between 1995 and 2005, the IOM trusts and companies exercised these options, separately acquired options and stock in all four companies, and sold the shares.[9]  The SEC's expert,

---

[6]    *See* Trial Transcript ("Trial Tr.") at 96 (opening statement of Stephen Susman, counsel for defense) ("We don't dispute that the trustees followed the recommendations.  Yes, indeed, they did, most of the time for sure, and almost always . . . when it came to the four securities that were in companies that the Wylys were more familiar with than anyone in the world.").

[7]    Sam and Charles Wyly were co-founders of Sterling Software and served on its board of directors from 1981 and 1984, respectively, until its acquisition by Computer Associates in 2000.  The Wylys served on the board of directors of Michaels Stores from 1984 until its acquisition by a consortium of private equity firms in 2006.  The Wylys served on the board of Sterling Commerce, a spin-off of Sterling Software, from 1985 until its acquisition by SBC Communications in 2000.  Sam and Charles Wyly became directors for Scottish Re (formerly known as Scottish Annuity and Life Holdings, Ltd.) in October 1998 and served through March and November 2000, respectively.  *See* Stip. Facts ¶¶ 4-11.

[8]    *Id.* ¶ 59.

[9]    *See* Attachment B to Stip. Facts (charts detailing the IOM trusts' transactions in the Issuers' stock during the relevant time period).  *Accord* 8/28/13 Expert Report ("Rep.") of Yasmine Misuraca, Ex. 1 to 7/24/14 Shepard Decl., at 4-14.

Yasmine L. Misuraca, calculates the total profits from these transactions to be $487,780,099.[10]

## III.   APPLICABLE LAW

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct."[11]  "Because disgorgement does not serve a punitive function, the disgorgement amount may not exceed the amount obtained through the wrongdoing."[12]  "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court."[13]  Because disgorgement is an equitable remedy, "[t]he district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."[14]

---

[10]   *See* 10/23/13 Misuraca Rep. at 15-16; 6/5/14 Misuraca Supplemental Rep., Ex. 2 to 7/24/14 Shepard Decl., at 3A and 3B.  The gain attributable to Sam Wyly is $323,755,892 and the gain attributable to Charles Wyly is $164,025,007. An additional gain of $65,395,151 arising from the sale of unregistered securities is not at issue on this motion.

[11]   *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) (defendant liable for insider trading).

[12]   *Id.*

[13]   *SEC v. Cavanaugh*, 445 F.3d 105, 117 (2d Cir. 2006) (defendants held liable for selling unregistered securities and fraud in connection with a "pump and dump" scheme).

[14]   *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996) (defendants held liable for fraud in connection with a "pump and dump" scheme).

"Because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds – especially profits from transactions in securities whose market price has been affected by the frauds –the court need not determine the amount of such gains with exactitude. "[15]  Under Second Circuit law, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation."[16]

"Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[17]  Defendants are "entitled to prove that the [] measure is inaccurate,"[18] but the "risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty."[19]

---

[15]    *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (defendant held liable for fraudulent transactions arising from widespread accounting fraud).

[16]    *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1474-75).

[17]    *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).

[18]    *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) ("Bilzerian, however, bears the burden of establishing that the price increases that occurred during his ownership of the stocks were attributable to market forces rather than to his violations.")).

[19]    *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

"Generally, where benefits result from both lawful and unlawful conduct, the party seeking disgorgement must distinguish between the legally and illegally derived profits."[20]  In certain contexts, the Second Circuit has affirmed disgorgement awards of all proceeds from a business or activity.  In *CFTC v. British American Commodity Corporation*, the court upheld the disgorgement of all proceeds earned by a company that engaged in options trading without registering as a futures commission merchant.  In addition to failing to register, the company "seriously misrepresented the risks, guarantees, costs, mechanics of commodities investments, [and its own] status and expertise."[21]  The court affirmed the disgorgement award because the company "was involved not in isolated instances of fraud, but in systemic and pervasive fraud," in addition to committing the regulatory violation of failing to register.[22]

In *SEC v. Lorin*, the defendant corporation and its president engaged in a scheme to manipulate the price of certain publicly traded securities.  The district court ordered disgorgement of all of the profits defendants received from trading in those securities during the relevant time period, while defendants argued

---

[20]     *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir. 1986).  *Accord Razmilovic*, 788 F.3d at 31 (citing *British Am.*, 788 F.2d at 93).

[21]     *British Am.*, 788 F.2d at 93.

[22]     *Id*. at 93-94.

that "disgorgement should have been limited to profits from transactions with the other parties to the manipulation agreement."[23]  The Second Circuit affirmed the district court's order, concluding that "because the purpose and effect of the scheme was to manipulate and stabilize the prices of the [] stocks, [defendants] likely profited from the scheme in all of their trades in those securities."[24]

The Second Circuit has also upheld total profit disgorgement awards in insider trading cases.  The court has held that "where stock is purchased on the basis of inside information, the proper measure of damages [for purposes of disgorgement] is the difference between the price paid for shares at the time of purchase and the price of the shares shortly after the disclosure of the inside information."[25]  In *SEC v. Razmilovic*, the Second Circuit recently affirmed a disgorgement award of total profits from the defendant's collar transactions, finding that "the transactions themselves were fraudulent because Razmilovic falsely represented to the other party that he was not in possession of material

---

[23]     *Lorin*, 76 F.3d at 462.

[24]     *Id*.

[25]     *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).  *Accord Drucker v. SEC*, 346 Fed. App'x 662, 666 (2d Cir. 2009) (affirming district court's disgorgement award of the value of the entire forty-one percent decline in stock price after disclosure of material nonpublic information).

nonpublic information."[26]

The SEC additionally relies on three cases from other circuits, *SEC v. First City Financial Corporation*,[27] *SEC v. Bilzerian*, and *SEC v. Teo*,[28] in support of its theory that disgorgement of total profits is reasonable in this case.  In *First City*, the D.C. Circuit affirmed a disgorgement award of all proceeds resulting from defendants' accumulation of stock in anticipation of a hostile takeover bid. Defendants delayed filing section 13(d) disclosures after reaching the five percent reporting threshold for eleven days in order to conceal their position.  After the belated disclosures were filed, the stock price of the target corporation rose dramatically.  Although defendants did not succeed in the hostile takeover bid because they were bought out by the target company, they nevertheless secured a significant profit due to the pre-announcement accumulation.

In dealing with "an issue of first impression – whether federal courts have the authority to employ [disgorgement] with respect to section 13(d) violations," the D.C. Circuit concluded that disgorgement of total profits was an appropriate remedy in light of the circumstances.  The court concluded that

---

[26]    *Razmilovic*, 738 F.3d at 35.

[27]    890 F.2d 1215 (D.C. Cir. 1989).

[28]    746 F.3d 90 (3d Cir. 2014).

9

defendants' section 13(d) violation amounted to insider trading, because timely disclosures would have "suggest[ed] to the rest of the market a likely takeover and therefore may [have] increased the price of the stock. . . ."[29]   Indeed, as in insider trading cases, the market reacted strongly to the disclosures once they were made. In this case, there was "no relevant distinction between disgorgement of insider trading profits and disgorgement of post-section 13(d) violation profits."[30]

    In *SEC v. Bilzerian*, the defendant entered into a stock accumulation agreement with a broker-dealer who purchased stock in its own account in anticipation of Bilzerian's repurchase of that stock on a later date.  While Bilzerian was the beneficial owner of these shares, he delayed making the requisite section 13(d) disclosures for fourteen days with respect to one company and thirty days with respect to a second company.  Further, Bilzerian's late disclosures were materially false because he "misrepresented the source of funds used to purchase the stocks."[31]  "Bilzerian's misrepresentations were designed to create the impression that he was ready, willing and able to mount hostile takeovers" of the two target companies in order "to induce a 'white knight' to rescue the companies

---

[29] *First City*, 890 F.2d at 1230.

[30] *Id*.

[31] *Bilzerian*, 29 F.3d at 692.

from his hostile takeover by purchasing stock, including his own, at a premium," which is exactly what happened.[32]   Bilzerian was found liable for violations of section 10(b) and section 17(a), in addition to the disclosure violations.  The D.C. Circuit upheld the disgorgement order of total proceeds, finding that his "misrepresentations inflated the price he received from the sale of the securities."[33]

Finally, in *SEC v. Teo*, defendant and a trust that he controlled filed false or incomplete section 13(d) disclosures misrepresenting Teo's true ownership in Musicland in order to avoid that company's poison pill provision.  The poison pill provision, which took effect when an individual or group owned 17.5% or more of the stock, allowed other shareholders to purchase large amounts of unsold stock directly from the company at a below market price to deter any hostile takeover effort.[34]

In July 1998, Teo controlled 5.25% of Musicland stock and filed accurate disclosures.  Teo then began to rapidly acquire stock through the trust while filing false or incomplete section 13(d) disclosures.  By August 1998, Teo

---

[32]     *Id*.

[33]     *Id*.

[34]     *See, e.g.*, Arthur Fleischer, Jr. and Alexander R. Sussman, Takeover Defense: Mergers and Acquisitions, §§ 5.01-5.11 ("The Poison Pill Defense") (7th ed. 2012).

beneficially owned 17.79% of Musicland shares, and by December 2000, Teo beneficially owned 35.97% of Musicland shares.  Having secretly accumulated well over 17.5% of the stock, "Teo made multiple requests to be placed on Musicland's board of directors," "repeatedly proposed that Musicland become privately held," and worked with several investment banks to take the company private.[35]  Shortly after Teo's efforts, though apparently unrelated to them, Best Buy announced a tender offer and Musicland's stock price rose.  Had Teo disclosed the extent of his beneficial ownership, Musicland's other shareholders could have activated the poison pill provision and diluted the value of his shares and the percentage of his ownership by acquiring a large amount of stock from the company at a lower price.  If this occurred, Teo could not have recognized the same profits because the value of his shares would have been lowered by his reduced ownership share in the company.[36]  Instead, Teo sold a portion of his shares in the open market and the remainder to Best Buy as part of the tender offer at a significant profit.

Teo and the trust were found liable for fraud in violation of section

---

[35]     *Teo*, 746 F.3d at 94.

[36]     *See id*. at 109 ("Teo's flagrant fraud insulated the valuation of [his] Musicland stock holdings from the effects of a poison pill that could have been activated if the extent of [his] holdings in the company had been known.").

10(b), as well as various disclosure violations including section 13(d), and the district court ordered disgorgement of all profits on Teo's stock sales.  Teo challenged the disgorgement award as not causally connected to the violation, arguing that the unrelated tender offer was an independent intervening factor contributing to the profits.  The court rejected defendant's argument, holding that the SEC "presumptively demonstrated a reasonable approximation of the profits arising from transactions tainted by the section 13(d) and section 10(b) violations" because Teo "intentionally misrepresent[ed] [his] beneficial ownership" and "while willfully still failing to correct the false filings . . . sold all of the Musicland shares."[37]  The court concluded that while Teo could have challenged the calculation, "intervening causation is not an element of the SEC's evidentiary burden in setting out an amount to be disgorged that reasonably approximates illegal profits."[38]  "Merely positing the Best Buy tender offer as an intervening cause and pointing to evidence that [Teo] did not bring it about was insufficient to overcome the presumption by the SEC that its approximation of illegal profits was

---

[37]     *Id*. at 107.

[38]     *Id*. at 105-06.  To the extent the Third Circuit has relieved the SEC of its initial burden to establish a causal connection between the profits and the violations when seeking disgorgement, this Court disagrees and declines to follow *Teo*.

not reasonable."[39]

## IV.   DISCUSSION

The court's authority to order disgorgement arises from its "broad equitable power to fashion appropriate remedies" for the violations in the cases before it.[40]  "[A] central, well-established principle in disgorgement law [is] that 'the court may [] exercise its equitable power only over property causally related to the wrongdoing.'"[41] While the disgorgement calculation does not need to be exact, it has to be a "reasonable approximation of profits causally connected to the violation."[42]  It is the SEC's burden to establish *both* a reasonable approximation of profits *and* the causal connection between the approximation and the violations.

According to the SEC, "the reasonable approximation [in this case] is the difference between what the [IOM] trusts paid to exercise the options and purchase stock, and what they received when they sold them unlawfully."[43]  The SEC argues that "[i]n securities fraud cases, courts routinely require defendants to disgorge all profits made on unlawful trades," citing some of the cases discussed

---

[39]   *Id*. at 108.

[40]   *First Jersey*, 101 F.3d at 1474.

[41]   *Contorinis*, 743 F.3d at 305 (quoting *First City*, 890 F. 2d at 1231).

[42]   *Id*. (quotations omitted).

[43]   SEC Opp. at 11.

above applying disgorgement principles to insider trading and market manipulation.[44]  "[T]he requisite causal link [between the profits and the violations] is established by a showing that the Wylys made profits through unlawful trading in a market that they fraudulently distorted, and the integrity of which they increasingly undermined with every additional fraudulent affirmative misrepresentation and omission."[45]  Thus, "there is no reason to treat this fraud case differently, nor is there anything novel in analogizing the unlawful trades at issue here to insider trading violations."[46]

While I am bound by the jury's findings that the Wylys committed fraud in failing to disclose their trading activity in violation of sections 10(b) and 17(a), it is the court's role to determine an appropriate disgorgement amount to remedy those violations.  The context of the violations matters.  I begin my analysis by noting that the type of unlawful conduct here is different from that found in other section 10(b) or section 17(a) cases.  The unlawful conduct here is not insider trading,[47] or the purposeful market manipulation evident in *Lorin*, *First*

---

[44]     *Id*. at 4, 11.

[45]     *Id.* at 13.

[46]     *Id*. at 11.

[47]     With the exception of the October 1999 equity swaps at issue in the insider trading claim, the SEC does not allege that the Wylys "recommended"

*City*, or *Bilzerian*, or the systematic and "serious" misrepresentation as to investment risk in *British American*.  In each of these cases, the market distortion directly caused by defendants' unlawful conduct and the profits flowing to the defendants as a result of the distortion were evident and allowed the court to evaluate the reasonableness of the disgorgement calculation and the causal nexus between the profits and the violation.  Even in *Teo*, which most closely resembles the unlawful conduct at issue here, the defendant's profits were directly linked to his failure to disclose.  Had Teo properly disclosed the extent of his beneficial ownership, Musicland's other shareholders would have activated the poison pill to dilute Teo's shares and Teo *could not* have recognized the profit he made as a result of Best Buy's tender offer.

Here, the SEC cannot satisfy its burden to *reasonably* approximate a disgorgement amount merely by proving the violations and then calculating the total profits on each of the trades during the existence of the unlawful scheme. Unlike each of the cases discussed above, there is no evidence here that the defendants' unlawful conduct – that is, the scheme to hide beneficial ownership by failing to disclose transactions – resulted in any market distortion, price impact, or profit tied to the violation.  Nor is there evidence that the scheme was motivated by

transactions to the IOM trusts based on material, non-public information.

16

the expectation of such profits.[48]  Without proof, a court cannot speculate about the

impact of the Wylys' failure to disclose on share price.[49]

      While the SEC correctly notes that "[t]he disclosure scheme requiring

insiders to report beneficial ownership and any changes in that ownership reflects

Congress's judgment that public disclosures of insiders' ownership of, and trading

in, company stock . . . provides valuable information to investors,"[50] this legislative

assumption cannot, without more, provide proof of the required causal link

between the profits obtained and the violation.  To hold otherwise would create a

*per se* rule requiring disgorgement of *all profits* made by those who fail to properly

disclose their beneficial ownership of securities – regardless of whether that failure

resulted in unlawful trading, market manipulation, or distortion.  Such a rule would

eliminate the requirement that the government provide a reasonable approximation

---

[48]    Recognizing this, the SEC's primary theory of disgorgement has always been "unpaid taxes" because of the ample evidence suggesting that the Wyly's chief motivation in establishing the offshore system was tax avoidance.

[49]    Indeed it is theoretically possible that in some instances, the Wylys' failure to disclose beneficial ownership *harmed* the defendants because the share price for stock they already owned may have risen if the market knew that insiders were buying.

[50]    SEC Opp. at 17.  *Accord First City*, 890 F.2d at 1230 ("[S]ection 13(d) is a crucial requirement in the congressional scheme, and a violator, it is legislatively assumed, improperly benefits by purchasing stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment position.").

of the profits that are causally connected to the violation.  There would be no need

for any approximation – reasonable or otherwise – if the required disgorgement is

always one hundred percent.

Further, while the SEC liberally refers to the trades at issue here as

unlawful or illegal,[51] this characterization lacks support in law or fact.  The SEC

argues that these trades became unlawful or illegal because they "were done

pursuant to a fraudulent scheme."[52]  The jury found that the Wylys engaged in a

scheme to hide their beneficial ownership of a large block of securities in

companies they controlled.  The jury did *not* find that the trading itself was

unlawful and could not have reasonably done so.  There is no authority in any

statute or case law that forbids insiders from trading, unless they do so while in

possession of material, non-public information, or in other limited circumstances

not applicable here.[53]  Sections 13(d) and 16(a) require that insiders report their

---

51      *See, e.g.*, Transcript of 7/22/14 Conference ("7/22/14 Tr.") at 7
(Bridget Fitzpatrick, counsel for the SEC) ("[T]here are several illegal steps
preceding the actual gain on the sold issuer security . . . . The fraudulent transfer of
the options, the exercise of the options in secret, and then . . . the illegal trade that
should have been disclosed.").  *See also id.* at 26 (Martin Zerwitz, counsel for the
SEC) ("From the time those securities are transferred offshore and held offshore,
they are being held illegally.").

52      *Id*. at 26 (Fitzpatrick).

53      For example, section 16(b) of the Exchange Act requires insiders to
disgorge all gains from the purchase or sale of a company security entered into less

trades after the fact.  Most of the trades at issue here resulted from the exercise of

options and warrants that the Wylys lawfully earned as compensation in the 1980s

and 1990s.  Some of these options and warrants were held for several years before

being exercised, with no evidence that the timing of the exercise or the eventual

sale of stock was influenced by material non-public information the Wylys gained

by virtue of their roles as insiders.

The SEC has offered no proof that the trades by the IOM trusts were

unlawful, manipulated the market, distorted the price of the shares (i.e., bought at

an artificially low price or sold at an inflated price), or constituted insider trading.[54]

Nor can the SEC establish those facts by virtue of a legislative assumption and a

defense expert witness's testimony about the general importance of disclosures to

the investing public.[55]  It defies logic to presume that all of the rise in the value of a

---

than six months after the initial transaction.  Companies also commonly restrict
insiders from selling their shares during a lock up period of 90 to 180 days
following an initial public offering.  The securities laws require issuers to disclose
the terms of any lock up in their registration documents.

[54]     Although I recognize that the bulk of the Wylys' trades were made
offshore by the IOM entities, the SEC does not allege that similar trades made by
the Wylys onshore with full disclosures of beneficial ownership resulted in market
manipulation, price distortion, or constituted insider trading.

[55]     *See* 6/19/14 Expert Rep. of John J. McConnell, Ex. 1 to 7/18/14
Declaration of John D. Worland, Jr., counsel for the SEC, at 8-20 (collecting and
reviewing academic studies of market reaction to trading by insiders).  According
to Defendants, the SEC has also put forward "an expert who had looked into the

company's stock price over thirteen years – in the highly charged market of the 90s tech bubble, no less – is reasonably attributable to two directors' failure to disclose their trading.  As a matter of law, the SEC cannot show that all of the profits on all of the sales by the IOM trusts throughout this extensive time period are reasonably connected to the Wylys' continuous failure to disclose beneficial ownership.

The government's burden is especially important in light of the fact that disgorgement is an equitable remedy not available to private litigants, who may only recover damages or restitution.  An order of disgorgement in SEC enforcement cases "forces a defendant to account for all profits reaped through his securities law violations . . . , *even if it exceeds actual damages to victims*."[56]  The purpose of disgorgement is "to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of *deterring* subsequent

---

same studies, and they show less than a one percent price effect when there are insider disclosures of the sort we are talking about."  7/22/14 Tr. at 29 (Harry P. Susman, counsel for defendants).

The SEC has also cited trial testimony of certain lay witnesses describing the perceived importance of disclosures, but such testimony cannot establish causation.  *See* Trial Tr. at 1764 (French) (discussing "insider sales reports that seem to set everybody off"); 1025 (Boucher) (recalling "a lot of negative public backlash" to reports of collars being put on certain shares held by the Wylys' domestically).

[56]     *Cavanaugh*, 445 F.3d at 117 (emphasis added).

fraud."[57]  Disgorgement is thus remedial, not punitive.

Of course, disgorgement of all profits is not *per se* punitive.  In certain circumstances – as in the cases discussed above – such an order can be appropriate and equitable.  But disgorgement is not a one size fits all remedy.  Here, the SEC's proposed disgorgement does not appear to arise from the violations and therefore smacks of punishment, not equity or deterrence.  This calculation is all the more troubling because the SEC is time-barred from seeking a penalty as to many of these transactions.[58]

Nonetheless "'[t]he *deterrent* effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.'"[59]  For this reason, the SEC is entitled to one final opportunity to propose a reasonable approximation of profits causally connected to the violations, if it wishes to pursue disgorgement of trading profits.[60]  The SEC is

---

[57]     *Id.* (emphasis added).

[58]     *See SEC v. Wyly*, 950 F. Supp. 2d 547, 557-58 (S.D.N.Y. 2013).

[59]     *First Jersey*, 101 F.3d at 1474 (quoting *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (emphasis added)).

[60]     *Id.* (quotations omitted).  I reject defendants' argument that the SEC's notice of a disgorgement theory based on profits was untimely.  This trial was bifurcated for purposes of liability and remedies and the disgorgement theory was properly disclosed at the onset of remedies discovery.

not required to produce "data to measure the precise amount of the ill-gotten gains,"[61] or to respond in advance to defendants' expected evidence of intervening factors or other market forces.  However, if it wishes to pursue this theory, the SEC must provide a credible explanation as to how its new figure is a reasonable approximation of the profits causally connected to the violation, in light of this Opinion and Order and the unique facts of this case.  For example, the SEC may well be able to establish a causal link between specific trades and market distortion in response to the failure to disclose those trades.[62]  Another example may be the timing of certain trades to precede, coincide with, or follow specific announcements or important corporate actions.[63]

The remedies hearing will proceed as scheduled on August 4, 2014 regarding the remaining theories of disgorgement.  The SEC must notify the Court by August 12, 2014 if it wishes to pursue disgorgement of trading profits.

---

[61]    *First City*, 890 F.2d at 1231.

[62]    For example, during the July 22 phone conference, counsel for the SEC referred to the Wylys' recommendation to the IOM trusts to place collars on Michaels Stores stock held offshore shortly after the market responded negatively to collars placed on Michaels Stores stock held by the Wylys' domestic entities. *See* 7/22/14 Tr. at 21-22 (Zerwitz).

[63]    Such a temporal link would make the circumstances of those specific trades more closely aligned with those discussed in *First City*, *Bilzerian*, or *Lorin*, which would then warrant disgorgement for the reasons discussed in those cases.

22

Requests to hold the record open for additional expert reports will be granted only after a proffer to the Court as to the scope of any proposed report and its methodology.

## V.   CONCLUSION

For the foregoing reasons, defendants' motion to preclude the SEC's disgorgement theory of total trading profits is GRANTED.  The Clerk of the Court is directed to close this motion (Dkt. No. 403).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          July 29, 2014

23

**- Appearances -**

**For the SEC:**

Bridget Fitzpatrick, Esq.
Hope Augustini, Esq.
Gregory Nelson Miller, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
Daniel Staroselsky, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Defendants:**

Stephen D. Susman, Esq.
Harry P. Susman, Esq.
Susman Godfrey LLP
1000 Louisiana Street, Ste. 5100
Houston, TX 77002
(713) 653-7801

David D. Shank, Esq.
Terrell Wallace Oxford, Esq.
Susman Godfrey LLP
901 Main Street, Ste. 5100
Dallas, TX 75202
(214) 754-1935

Steven M. Shepard, Esq.
Mark Howard Hatch-Miller, Esq.
Susman Godfrey LLP
560 Lexington Avenue
New York, NY 10022
(212) 336-8332