UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

               **Plaintiff,**

   - against -

SAMUEL WYLY, and DONALD R.
MILLER, JR., in his Capacity as the
Independent Executor of the Will and Estate
of Charles J. Wyly, Jr.,

               **Defendants.**

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/14

**OPINION AND ORDER**

**10-cv-5760 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

The Securities and Exchange Commission ("SEC") brought this civil

enforcement action against Samuel Wyly and Donald R. Miller, Jr. as the

Independent Executor of the Will and Estate of Charles J. Wyly Jr. ("Charles

Wyly" and, together with Samuel Wyly, the "Wylys").  The SEC alleged ten

securities violations arising from a scheme in which the Wylys established a group

of offshore trusts and subsidiary entities in the Isle of Man ("IOM"), used those

offshore entities to trade in shares of four public companies (the "Issuers") on

whose boards the Wylys sat, and failed to properly disclose their beneficial

ownership of that stock.

The liabilities and remedies phases of the trial were bifurcated.  I presided over a jury trial on nine of the ten claims from March 31 to May 7, 2014.  On May 12, 2014, the jury returned a verdict against both Sam and Charles Wyly on all nine claims.[1]  Following the jury verdict, I set a discovery and trial schedule for the remedies phase.

The SEC now seeks an order of disgorgement against Sam and Charles Wyly in the total amount of $619,298,512.45.[2]  The SEC also seeks a civil penalty and injunctive relief against Sam Wyly.  From August 4 to August 12,

[1]     *See* Court Exhibit ("Ex.") 3, Special Verdict Form (Dkt. No. 473).  I dismissed the SEC's insider trading claim, which was tried to the bench for purposes of liability.  *See SEC v. Wyly*, No. 10 Civ. 5760, 2014 WL 3401105 (S.D.N.Y. July 10, 2014).

[2]     The proposed order of disgorgement is based on the following calculations:  1) $193,913,017.77 in unpaid taxes for gains on the sale of registered Issuer securities, plus $289,089,876.68 in prejudgment interest,  and 2) $65,395,151 in profits made on the sale of unregistered Michaels Stores stock, plus $70,900,467 in prejudgment interest.  *See* Joint Exhibit ("JX") 9902 ("Calculations Using the Ordinary Tax Rate for All Transactions in Registered Issuer Securities Attributable to Sam and Charles Wyly") and Addendum to the Joint Pre-Trial Order ("Add. Stip. Facts") ¶ 6.  The SEC provides an alternative estimation of unpaid taxes using a capital gains rate.  *See* JX 9904A and JX 9904B ("Calculations Using the Ordinary and Capital Gains Tax Rates for All Transactions in Registered Securities Attributable to Sam and Charles Wyly") (proposing disgorgement of $170,884,904.73 in unpaid taxes and $259,439,440.99 in prejudgment interest).  Because the SEC seeks disgorgement of all profits on the sale of unregistered securities, it is not *also* seeking unpaid taxes on those profits, except as an alternative measure of disgorgement.

2014, I held a bench trial on all remedies issues except the SEC's alternative

disgorgement calculation based on trading profits from the sale of registered

securities.[3]  For the benefit of all parties, I will now render a partial Opinion and

Order addressing the remedies issues tried in August.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make

the following findings of fact and conclusions of law.  In reaching these findings

and conclusions, I considered the testimony admitted during the jury and remedies

trials, examined the documentary evidence, and reviewed the arguments and

submissions of counsel, including a statement of interest filed on behalf of the

United States government on August 9, 2014.

## II.    APPLICABLE LAW

### A.    Disgorgement

"Disgorgement serves to remedy securities law violations by

depriving violators of the fruits of their illegal conduct."[4]  "[D]isgorgement forces a

defendant to account for all profits reaped through his securities law violations and

to transfer all such money to the court."[5]  Because disgorgement is an equitable

---

[3]      *See infra* Section VI.

[4]      *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).

[5]      *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

remedy, "[t]he district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."[6] "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his" violation.[7]

Disgorgement, being an equitable remedy, is not subject to the five year statute of limitations under 28 U.S.C. § 2462.  Under section 2462, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."  While the Second Circuit has not addressed the issue of whether disgorgement constitutes a *civil* forfeiture, it has specifically held that, due to its remedial nature, disgorgement does not constitute a penalty,[8] and is not analogous to *criminal* forfeiture.[9]  Thus, "the great

---

[6]       *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996).

[7]       *SEC v. Universal Exp., Inc.*, 646 F. Supp. 552, 563 (S.D.N.Y. 2009).

[8]       *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013) (rejecting appellant's argument that "that the disgorgement award should be considered a penalty").

[9]       *See Contorinis*, 743 F.3d at 306-07 ("[W]hile both criminal forfeiture and disgorgement serve to deprive wrongdoers of their illicit gain, the two remedies reflect different characteristics and purposes – disgorgement is an equitable remedy that prevents unjust enrichment, and criminal forfeiture a statutory legal penalty imposed as punishment. . . . Moreover, unlike disgorgement, which is a discretionary, equitable remedy, criminal forfeiture is

weight of the case law in this jurisdiction" supports the conclusion that

disgorgement is "exempted from [s]ection 2462's limitations period."[10]

      "Because of the difficulty of determining with certainty the extent to

which a defendant's gains resulted from his frauds . . . the court need not determine

the amount of such gains with exactitude."[11]  Under Second Circuit law, "'[t]he

amount of disgorgement ordered need only be a *reasonable approximation* of

profits causally connected to the violation.'"[12] Disgorgement awards can include

_____

mandatory, and a creature of statute. Thus, unlike the criminal forfeiture case, the
district court's discretion in determining disgorgement is not confined by precise
contours of statutory language, but rather serves the broader purposes of equity.").
In its discussion, the Second Circuit favorably cited a lower court decision in *SEC
v. Lorin*, including that court's conclusion that disgorgement is not "'a fine,
penalty, or forfeiture'" because it "'merely deprives one of wrongfully obtained
proceeds.'"  *See id*. at 307 (quoting *SEC v. Lorin*, 869 F. Supp. 1117, 1121
(S.D.N.Y. 1994)).

[10]     *SEC v. Straub*, No. 11 Civ. 9645, 2013 WL 4399042, at *5 (S.D.N.Y.
Aug. 5, 2013) (citing *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87 (S.D.N.Y. 2009)
(collecting cases)).  Defendants nevertheless contend, citing dictionary definitions
but no case law,  that the SEC's request for disgorgement constitutes "forfeiture"
under section 2462.  *See* Defendants' Memorandum of Law on Remedies ("Def.
Mem."), at 33.  Defendants raised an identical argument prior to the jury trial.  I
rejected it then for the same reasons I do now.  *See* 3/24/14 Pre-Trial Conference
Transcript, at 22-23 ("THE COURT: [I]t seems to me that neither disgorgement,
injunctive relief, [n]or any other requested form of relief is subject to the
limitations of 2462.").

[11]     *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013).

[12]     *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1474-
75) (emphasis added).

both "direct pecuniary benefit[s]" and "illicit benefits . . . that are indirect or intangible."[13]   However, because "disgorgement does not serve a punitive function, the disgorgement amount may not exceed the amount obtained through the wrongdoing."[14]

The SEC does not need to establish that the securities violations were the proximate cause of gains in order to satisfy the "causal connection" requirement.  Unlike private plaintiffs, who must demonstrate that the defendants' misstatements or omissions were a proximate cause of their injury at the liability stage,[15] the SEC has no such burden.[16]  Thus, the Second Circuit has held that "'[p]roximate cause' is the language of *private* tort actions[.] [I]t derives from the need of a private plaintiff, seeking compensation, to show that his injury was

---

[13]    *Id*. at 307.

[14]    *Id.* at 301.

[15]    *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (holding that private plaintiffs must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss" in securities actions).

[16]    *See SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006) ("The SEC, unlike a private plaintiff, is not required to prove reliance when it brings enforcement actions under the securities laws.").  *See also SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) ("The SEC does not need to prove investor reliance, loss causation, or damages" in enforcement actions).

proximately caused by the defendants' actions.  But, in an enforcement action . . . there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation."[17]

The same principles that led the Second Circuit to conclude that proximate cause is irrelevant in SEC enforcement actions at the liability phase apply to disgorgement.  Disgorgement is "a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions."[18]  "[T]he primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched."[19]  Courts can compel defendants to disgorge all unlawful gains "even if [that figure] exceeds actual damages to victims."[20]  Imposing a proximate cause requirement on the SEC at this stage of an

---

[17]    *SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012) (emphasis added).

[18]    *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011).

[19]    *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978).

[20]    *Cavanagh*, 445 F.3d at 118.  Defendants' reliance on the Supreme Court's recent decision in *Paroline v. United States*, 134 S. Ct. 1710, 1720 (2014), is unavailing in light of this distinction.  In that case, the Court concluded that the mandatory restitution provision of the criminal laws governing child pornography laws can only require restitution "to the extent the defendant's offense proximately caused a victim's losses."  *Id.* at 1722.  But as explained above, the Second Circuit has already distinguished between disgorgement, a discretionary equitable remedy,

7

enforcement proceeding and in light of this remedial framework would be inappropriate.

Nevertheless, because disgorgement is not punitive, the securities violations and the allegedly unlawful gains must be causally connected.[21]  This does not mean that a court is required to order disgorgement of *all* gains causally connected to the violations.  For example, the Second Circuit has rejected disgorgement of income earned on unlawful proceeds, as unduly punitive.[22]  But the Second Circuit has held that district courts are not required to "trace specific funds" to specific violations when ordering disgorgement.[23]  Rather, the appropriate inquiry is whether, and by how much, defendants "were unjustly

---

and criminal restitution, which is mandatory and focuses on redressing actual losses suffered by actual victims.  *See Contorinis*, 743 F.3d at 307.

[21]     *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property that is causally related to the wrongdoing. The remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively.").

[22]     *See SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1104 (2d Cir. 1972).

[23]     *SEC v. Rosenthal*, 426 Fed. App'x 1, 3 (2d Cir. 2011) ("Imposing such a tracing requirement would allow a[] . . . defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits.").

enriched" by their securities law violations.[24]

A recent Second Circuit case, *SEC v. DiBella,* is illustrative.  Paul Silvester, the Connecticut State Treasurer, agreed to invest the state pension fund's money with an asset management firm in return for that firm agreeing to pay a "finder's fee" to Thomas DiBella, a former State Senator, who started his own consulting practice.  "Silvester thought that allowing DiBella to be part of the . . . investment would . . . solidify[] a future business and political relationship."[25] After Silvester pled guilty to federal racketeering charges, the SEC brought an enforcement action against DiBella and his consulting company for aiding and abetting Silvester's securities fraud violations and the investment firm's violation of the Investment Advisers Act.  The theory of liability for the primary violations was that Silvester and the investment firm defrauded the pension fund by failing to disclose the finder's fee arrangement.

A jury found DiBella and his company liable for aiding and abetting all violations, and the district court ordered disgorgement of the finder's fees.  On appeal, defendants argued that disgorgement was inappropriate because the finder's fee did not result directly from the securities laws violations.  That is,

---

[24]     *SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009).

[25]     *Id*. at 559 (quotations omitted).

because the finder's fee was paid by the investment firm, and did not come from the pension fund itself, it could not have been "reaped *through* [the] securities laws violations."[26]  The Second Circuit rejected defendants' theory, finding that DiBella was "unjustly enriched by aiding and abetting the [securities] violations," because "the fraud . . . was the linchpin necessary to ensure that [he] w[as] compensated."[27] Absent the fraud, DiBella "would not have been paid the fee at issue."[28]

In other words, *DiBella* endorses a "but for" standard of causation. This method is consistent with the district court's analysis in *Razmilovic*, which was approved by the Second Circuit.  In that case, the defendant perpetrated a massive accounting fraud in his company while he served as Chief Operating Officer and Chief Executive Officer.  The district court ordered disgorgement of the defendant's bonuses because payment of bonuses was tied to the financial performance of the company.  The court found that disgorgement of Razmilovic's bonuses was appropriate because the company's "restated earnings would not have met the target earnings amounts for performance-related bonuses in either year that

---

[26]   *Id*. at 572 (emphasis added).

[27]   *Id*.

[28]   *Id*.

10

he received those bonuses."[29]   That is – but for the defendant's fraud, the company would not have paid out bonuses.   The court declined to award disgorgement of Razmilovic's entire salary based on similar reasoning.   Because Razmilovic also provided legitimate services to the company, his fraud was not a "but for" cause of the receipt of his *entire* compensation package.   In declining to order disgorgement of the entire salary, the court distinguished other cases where "the fraud committed by th[e] defendants extended the life of the employer-company and, therefore, the defendants would not have received *any* compensation from a company that would not have existed *but for* their fraud."[30]

"Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[31]   Defendants are "entitled to prove that the [] measure is inaccurate,"[32] but the "'risk of

---

[29]     *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 257 (E.D.N.Y. 2011), *aff'd in relevant part by Razmilovic*, 738 F.3d at 32-33.

[30]     *Id*. at 255 (emphasis added).

[31]     *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).

[32]     *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) ("Bilzerian, however, bears the burden of establishing that the price increases that occurred during his ownership of the stocks were attributable to market forces rather than to his violations.")).

uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty.'"[33]  Ultimately, however, the final decision as to the amount of disgorgement rests with the district court.[34]

"For purposes of calculating disgorgement, financial hardship does not preclude the imposition of an order of disgorgement."[35]  "[W]hether or not the defendant may have squandered and/or hidden ill-gotten profits should not determine the amount disgorged; similarly, the likelihood that the SEC will in fact be repaid is unrelated to the amount by which a wrongdoer was improperly enriched."[36]

"Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement."[37] "In such situations, the joint tortfeasors bear the burden of demonstrating that their

---

[33]     *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

[34]     *See First Jersey*, 101 F.3d at 1474-75.

[35]     *SEC v. Taber*, No. 13 Misc. 282, 2013 WL 6334375, at *2 (S.D.N.Y. Dec. 4, 2013) (quotations omitted).

[36]     *Id*. (quotations omitted).

[37]     *Universal Exp.*, 646 F. Supp. 2d at 563 (citing *First Jersey*, 101 F.3d at 1475).

liability can be reasonably apportioned."[38]

## B.    Prejudgment Interest

The court also has discretion to order payment of prejudgment interest on any disgorged gains.  Requiring the payment of interest prevents a defendant from obtaining the benefit of "'what amounts to an interest free loan procured as a result of illegal activity.'"[39]  "In deciding whether an award of prejudgment interest is warranted, a court should [take into account] . . . considerations of fairness and the relative equities of the award, [] the remedial purpose of the statute involved, and/or [] such other general principles as are deemed relevant by the court."[40]

## C.    Civil Penalty

The Securities Act and the Exchange Act authorize three tiers of civil penalties.[41]  The parties agree that tier two penalties are appropriate because the violations found by the jury "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."[42]  "The amount of the penalty for

---

[38]    *Id.*

[39]    *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2011 WL 666158, at *3 (S.D.N.Y. Feb. 14, 2011).

[40]    *First Jersey*, 101 F.3d at 1476 (quotations omitted).

[41]    *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

[42]    15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii).

each such violation shall not exceed the greater of [$60,000] or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation."[43] "[C]ourts in this [d]istrict have calculated the number of violations based upon the number of acts taken that violate the securities laws, and the Second Circuit has endorsed that analysis."[44]

For purposes of calculating a defendant's "gross pecuniary gain," the court "may consider gains only from frauds occurring within the five-year statute of limitations for civil penalties."[45] Otherwise, the calculation of "gross pecuniary gain" is similar to the calculation of disgorgement. "Beyond setting maximum penalties, the statutes leave 'the actual amount of the penalty . . . up to the

---

[43]     15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii).  Pursuant to the Debt Collection Improvement Act of 1996, the SEC has adopted rules that adjust the maximum penalty pursuant to these provisions for inflation.  *See* 17 C.F.R. § 201.1002, Subpt. E, Tbl. II (setting out maximum penalty during 2001-2005, the time period applicable here).

[44]     *SEC v. Tourre*, No. 10 Civ. 3229, 2014 WL 969442, at *11 (S.D.N.Y. Mar. 12, 2014) (quotations omitted) (citing *Pentagon Capital*, 725 F.3d at 288 n.7 ("Although we vacate the civil penalty award, we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation.")).

[45]     *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05 Civ. 5231, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014) (citing *Gabelli v. SEC*, 133 S. Ct. 1216, 1220-21 (2013)).

discretion of the district court.'"[46]

"[T]he civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'"[47]

> In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.[48]

## D.    Injunction

The Securities Act and the Exchange Act authorize courts to permanently enjoin defendants from future violations of securities laws.[49] "An injunction prohibiting a party from violating statutory provisions is appropriate

---

[46]    *Razmilovic*, 738 F.3d at 38 (quoting *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)).

[47]    *SEC v. Opulentica*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (quoting *SEC v. Moran*, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996)).

[48]    *Id*.

[49]    *See* 15 U.S.C. § 77t(b); 15 U.S.C. §§ 78u(d)(e), 78u–1.

where 'there is a likelihood that, unless enjoined, the violations will continue.'"[50]

Courts consider the following factors in determining whether a permanent injunction is appropriate relief:

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an isolated occurrence; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.[51]

### E.   Grantor Trust Rules and Common Law Doctrines

"A grantor trust is created when a person contributes cash or property to a trust but retains certain interests such that he is treated as the owner of the trust."[52] "In determining the settlors of a trust, [a court] look[s] beyond the named grantors to the economic realities to determine the true grantor."[53] "Assets held in a grantor trust are considered the property of the grantor . . . . thus making the trust assets taxable to the grantor, until those trust assets are distributed" to a

---

[50]   *First Jersey*, 101 F.3d at 1477 (quoting *CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986)).

[51]   *Commonwealth Chem. Sec.*, 574 F.2d at 100.

[52]   *Kaplan v. C.I.R.*, 107 T.C.M. (CCH) 1226, 2014 WL 988465, at *7 (Mar. 13, 2014).

[53]   *Gould v. C.I.R.*, 139 T.C. 418, 437 (2012) (quotations omitted).

16

beneficiary.[54]

Sections 671-679 of Title 26 of the United States Code (the "Tax Code") govern the circumstances under which a grantor trust is created and taxed. "The main thrust of the grantor trust provisions is that the trust will be ignored and the grantor treated as the appropriate taxpayer whenever the grantor has substantially unfettered powers of disposition."[55]  A trust does not become taxable "solely on the grounds of [the grantor's] dominion and control over the trust . . . except as specified in" these provisions.[56]

### 1.    Section 674

Under section 674(a), a grantor is "treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the [trust's] corpus or [] income . . . is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party."[57]

---

[54]    *Resolution Trust Corp. v. MacKenzie*, 60 F.3d 972, 976-77 (2d Cir. 1995).

[55]    *Schulz v. C.I.R.*, 686 F.2d 490, 495 (7th Cir. 1982).

[56]    26 U.S.C. § 671.

[57]    *Id*. § 674(a).  Section 672(a) defines adverse party as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust."

In simpler terms, "the grantor is treated as the owner in every case in which he or a nonadverse party can affect the beneficial enjoyment of a portion of a trust," subject to certain exceptions.[58]

Specifically, section 674(c), titled "Exception for certain powers of independent trustees" states

> [s]ubsection (a) shall not apply to a power solely exercisable (without the approval or consent of any other person) by a trustee or trustees, none of whom is the grantor, and no more than half of whom are related or subordinate parties who are subservient to the wishes of the grantor--
>
> (1) to distribute, apportion, or accumulate income to or for a beneficiary or beneficiaries, or to, for, or within a class of beneficiaries; or
>
> (2) to pay out corpus to or for a beneficiary or beneficiaries or to or for a class of beneficiaries (whether or not income beneficiaries).[59]

Thus, "a grantor is not treated as owning the trust property when his beneficial enjoyment of the trust corpus or income is subject to the control of an independent trustee."[60]   However, "[a] power in the grantor to remove, substitute, or add trustees . . . may prevent a trust from qualifying under section 674(c)," unless that

---

[58]     26 C.F.R. § 1.674(a)-1.

[59]     26 U.S.C. § 674(c).

[60]     *United States v. Ratfield*, No. 01 Civ. 8816, 2004 WL 3174420, at *15 (S.D. Fla. Nov. 30, 2004).

18

power "is limited so that its exercise could not alter the trust in a manner that would disqualify it under section 674(c)."[61]  Further, section 674(c) does not apply "if any person has a power to add to the beneficiary or beneficiaries or to a class of beneficiaries designated to receive the income or corpus, except where such action is to provide for after-born or after-adopted children."[62]

### 2.    Section 679

Under section 679(a), "[a] United States person who directly or indirectly transfers property to a foreign trust . . . shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust," unless the transfer is made for fair market value.[63]  "In general, the term 'fair market value' is understood to mean 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"[64]  "A trust shall be

---

[61]    26 C.F.R § 1.674(d)-2.

[62]    26 U.S.C. § 674(c).

[63]    26 U.S.C § 679(a)(1)-(2).

[64]    *Gudmundsson v. United States*, 634 F.3d 212, 221 (2d Cir. 2011) (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).  *Accord* 26 C.F.R. § 1.679-4(b)(1) ("For purposes of this section, a transfer is for fair market value only to the extent of the value of property received from the trust, services

treated as having a United States beneficiary for the taxable year unless . . . under the terms of the trust, no part of the income or corpus of the trust may be paid *or accumulated* during the taxable year to or for the benefit of a United States person."[65]  In 2010, Congress amended the statute to clarify that "an amount shall be treated as accumulated for the benefit of a United States person even if the United States person's interest in the trust is contingent on a future event."[66]

### 3. Substance Over Form

The "substance over form" doctrine codifies the principle that "even if a transaction's form matches 'the dictionary definitions of each term used in the statutory definition' of the tax provision, 'it does not follow that Congress meant to cover such a transaction' and allow it a tax benefit."[67]  In the context of trusts, courts look to the following facts

---

rendered by the trust, or the right to use property of the trust. For example, rents, royalties, interest, and compensation paid to a trust are transfers for fair market value only to the extent that the payments reflect an arm's length price for the use of the property of, or for the services rendered by, the trust.").  Under the pertinent regulations, the transferor is taxable to the extent the exchange exceeds the fair market value of the property received.  *See id*. at (b)(2).

[65]     26 U.S.C. § 679(c) (emphasis added).

[66]     *Id*.

[67]     *Altria Group, Inc. v. United States*, 658 F.3d 276, 284 (2d Cir. 2011) (quoting *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934)).

20

to determine whether a trust had economic substance: (1) whether the taxpayer's relationship to the transferred property differed materially before and after the trust's creation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer respected restrictions imposed on the trust's operation as set forth in the trust documents or by the law of trusts.[68]

"In applying this doctrine of substance over form, [courts] ha[ve] looked to the objective economic realities of a transaction rather than to the particular form the parties employed. . . . [and] ha[ve] never regarded the simple expedient of drawing up papers, as controlling for tax purposes when the objective economic realities are to the contrary."[69]  Courts are not "bound by a meaningless label (or a mislabel) that the parties to an agreement give to any or all parts of the agreement, but [must] decide the true nature of the agreement by looking to its substance and to the intention of the parties."[70]

The substance over form doctrine is applicable to the entire body of federal tax law, including the grantor trust provisions.[71]  Thus, even when a trust is

---

[68]    *Close v. C.I.R.*, 107 TCM (CCH) 1124, 2014 WL 521039, at *11 (Feb. 10, 2014) (citing *Markosian v. C.I.R.*, 73 T.C. 1235, 1243-44 (1980)).

[69]    *Id*. (quotations omitted).

[70]    *Bruce v. C.I.R.*, T.C.M. (CCH) 2014-178, 2014 WL 4336234, at *14 (Sept. 2, 2014).

[71]    *See, e.g.*, *United States v. Buttorff*, 761 F.2d 1056, 1062 (5th Cir. 1985) (concluding that trusts where the grantor has only "technically" complied

not a "sham" – that is, where it has legitimate economic substance – it may still be taxable as a grantor trust because it satisfies an exception within the grantor trust provisions only in form.[72]

## III.   FINDINGS OF FACT

### A.   Undisputed Facts and Jury Findings

Between 1992 and 1996, Sam and Charles Wyly created a number of IOM trusts, each of which owned several subsidiary companies.[73]  Michael French, the Wylys' family attorney, Sharyl Robertson, the Chief Financial Officer ("CFO") of the Wyly family office, and Michelle Boucher, the CFO of the Irish Trust Company, a Wyly-related entity in the Cayman Islands, served as protectors of the

---

with the statutory provisions have "frequently been recognized [as] mere shams, wholly lacking in any real substance and thus without any effect whatever for federal tax purposes"); *Zmuda v. C.I.R.*, 731 F.3d 1417, 1421 (9th Cir. 1984) ("[T]he economic substance formula may be used to determine whether . . . a trust is a grantor trust for tax purposes") (citing *Hanson v. C.I.R.*, 696 F.2d 1232, 1234 (9th Cir. 1983)); *Schulz*, 686 F.2d at 495 ("[D]espite efforts to skirt the grantor trust provisions by careful draftsmanship, these trusts in substance, if not in form, violate the statute.");  *Close*, 2014 WL 521039, at *12 (finding that the IRS's theory that a grantor trust exists because the taxpayer has "unfettered access" to its assets is "indistinguishable from [a] sham trust theory").

[72]     *See Ratfield*, 2004 WL 3174420, at *15-16 ("If the trusts were not shams, they were grantor trusts. . . . Because the trustees of Ratfield's 'pure' trusts are not really independent, the trusts violated the grantor trust provisions in substance, if not in form.").

[73]     *See* Stipulation of Undisputed Facts ("Stip. Facts") ¶¶ 20-46.

IOM trusts.[74]  French, Robertson, and Boucher conveyed the Wylys' investment recommendations to the trust management companies administering the Wylys' IOM trusts (the "IOM trustees").  All of the IOM trustees' securities transactions were based on the Wylys' recommendations and the IOM trustees never declined to follow a Wyly recommendation.[75]

The Wylys served as directors of Michaels Stores, Sterling Software, Sterling Commerce, and Scottish Annuity and Life Holdings, Ltd. ("Scottish Re").[76]  As part of their compensation, the Wylys received stock options and warrants.  "Between 1992 and 1999, Sam and Charles Wyly sold or transferred to the [IOM] trusts and companies stock options in Michaels Stores, Sterling

---

[74]     *See id.*  ¶¶ 49-51.

[75]     *See* Trial Transcript ("Trial Tr.") at 96 (opening statement of Stephen Susman, counsel for defense) ("We don't dispute that the trustees followed the recommendations.  Yes, indeed, they did, most of the time for sure, and almost always . . . when it came to the four securities that were in companies that the Wylys were more familiar with than anyone in the world.").

[76]     Sam and Charles Wyly were co-founders of Sterling Software and served on its Board of Directors from 1981 and 1984, respectively, until its acquisition by Computer Associates in 2000.  The Wylys served on the board of directors of Michaels Stores from 1984 until its acquisition by a consortium of private equity firms in 2006.  The Wylys served on the board of Sterling Commerce, a spin-off of Sterling Software, from 1985 until its acquisition by SBC Communications in 2000.  Sam and Charles Wyly became directors for Scottish Re in October 1998 and served through March and November 2000, respectively.  *See* Stip. Facts ¶¶ 4-11.

Software and Sterling Commerce" in exchange for private annuities while simultaneously disclaiming beneficial ownership over the securities in public filings with the SEC.[77]   Between 1995 and 2005, the IOM trusts and companies exercised these options and warrants, separately acquired options and stock in all four companies, and sold the shares, without filing disclosures.[78]

The jury found[79] that the Wylys were beneficial owners of the Issuer securities transferred to, held, and sold by the IOM trusts because the Wylys, directly or indirectly, had or shared voting and/or investment power over these securities.   Thus, the jury concluded that the Wylys failed to accurately disclose the extent of their beneficial ownership in the Issuer securities under sections 13(d) and 16(a) of the Securities Exchange Act (the "Exchange Act").   The jury also found that the Wylys caused the Issuers to violate section 14(a) of the Exchange Act, because the Wylys misrepresented the extent of their beneficial ownership to the Issuers in their Director and Officer ("D&O") questionnaires, which were incorporated by the Issuers in proxy statements.   In addition to these disclosure

---

[77]     *Id*. ¶ 59.

[78]     *See* Attachment B to Stip. Facts ("IOM Issuer Transactions") (charts detailing the IOM trusts' transactions in the Issuers' stock during the relevant time period).

[79]     *See* Special Verdict Form.

violations, the Wylys were found liable for securities fraud in violation of section 10(b) of the Exchange Act and section 17(a) of the Securities Act of 1933 (the "Securities Act"), and for aiding and abetting the Issuers' and the IOM trusts' securities law violations.  Finally, the jury found the Wylys liable for selling unregistered securities in violation of section 5 of the Securities Act for certain sales of Michaels Stores stock.

### B.    The Creation of the Offshore System

In early to mid-1991, Sam Wyly asked Robertson to attend a seminar held by lawyer and trust promoter David Tedder on the use of foreign trusts as a method of asset protection and tax deferral.[80]  Shortly thereafter, the Wylys, Robertson, and French attended another Tedder seminar in New Orleans.[81]  Tedder, French, and the Wylys then had a private meeting at Sam Wyly's house in Malibu, California.[82]  At that meeting, Tedder "talked about establishing trusts that would provide tax deferral, and how the Wylys could transfer assets to those trusts and

---

[80]     *See* Trial Tr. at 157-167 (Robertson); Plaintiff's Exhibit ("PX") 8 (6/12/91 memorandum from Robertson to Sam Wyly, Charles Wyly, Evan Wyly, Sam Wyly's son, French, and Ethel Ketter, in-house CPA for the Wyly family office, discussing Tedder's seminar on "asset protection and tax deferral").

[81]     *See* Trial Tr. at 168 (Robertson) and 1717-1718 (French).

[82]     *See id.* at 1718 (French).

get tax deferral on the growth of those assets."[83]  Specifically, Tedder

recommended transferring the Wylys' stock options in Sterling Software and

Michaels Stores to a foreign trust in exchange for a private annuity "in a tax-free

kind of transaction."[84]  Under Tedder's plan, it was "expressly intended that [the

Wylys] . . . irrevocably surrender the enjoyment, control, ownership, and all

economic benefits attributable to the ownership of the [options] which are sold in

exchange for the private annuity."[85]

      The Wylys pursued the offshore program primarily for its tax

advantages.[86]  However, because Tedder suggested transferring stock options in

publicly traded companies – Sterling Software and Michaels Stores – any such

transaction would implicate the securities laws.  French testified that he raised

concerns about whether the Wylys would continue to have filing obligations as

directors of Sterling Software and Michaels Stores, even after the transfers.[87]

Tedder responded that making SEC filings could threaten the Wylys' tax benefits,

---

[83]    *Id*.

[84]    *Id*. at 1719 (French).

[85]    PX 13 (2/28/92 Tedder tax opinion letter), at 10.

[86]    *See, e.g.*, PX 9 (11/11/91 memorandum from French to Sam Wyly)
(discussing tax benefits of foreign trusts, grantor trusts, and non-grantor trusts).

[87]    *See* Trial Tr. at 1720 (French).

because "disclosure of the offshore trusts in SEC filings may lead the IRS to discover and investigate the tax issue, and . . . the IRS might use the Wylys' SEC filings against them if the tax issue was ever litigated."[88]

Defendants argue that French's testimony is not credible because his recollection of Tedder's statements came only after French reached a favorable settlement with the SEC on the eve of this trial.[89]  Standing alone, French's testimony might not be credible.  But Sam Wyly corroborated French's account by testifying that Tedder told him that SEC filings "could trigger tax problems if you had these things on file and [were] reporting the trust shares on [Schedule] 13Ds."[90]  Further, it would be logical to draw an inference that the Wylys would have been concerned about taking inconsistent positions in their SEC and IRS filings when millions of dollars of tax savings were at stake.

The jury found that the Wylys *always* had beneficial ownership over the options, warrants, and securities held by the IOM trusts.  Thus, the Wylys were obligated to disclose, on the filings required by sections 13 and 16, any time they

---

[88]     3/13/14 Admissions of Michael French, Annex A to 3/20/14 Final Consent Judgment as to Defendant Michael French (Dkt. No. 279) ¶ 9.  *Accord* Trial Tr. at 1720 (French).

[89]     *See* Defendants' Proposed Findings of Fact ¶ 2.

[90]     Trial Tr. at 1884 (Sam Wyly).

*or* the trusts transacted in those securities.  Because beneficial ownership under the

securities laws turns on having voting and/or investment power, truthful SEC

filings would have forced the Wylys to admit having some element of control over

the securities held by the trusts.  To the Wylys, this would mean conceding some

element of control over the trustees.  But the Wylys believed – rightly or wrongly –

that it was critical to conceal their control of the trustees in order to maintain the

tax-free status of the trusts, including income from transactions in the Issuer

securities.[91]

Because the Wylys made public filings showing the transfer of

options to foreign trusts, and at other times publicized their relationship to the

foreign trusts,[92] the Wylys also took affirmative steps to minimize the trusts' SEC

filings to conceal the ultimate exercise and sale of those options.  For example, the

Wyly family office tracked the percentage of ownership each trust management

---

[91]     *See id.* at 2185 (Sam Wyly) ("We took steps to avoid control, and
those are steps to create the appearance of avoiding control.  It's reality and it's
appearance.  You want the appearance to match the reality.")  *Accord* PX 890
(11/3/00 email from Robertson to Evan Wyly) ("Remember that it is critical from a
U.S. tax standpoint that there is no appearance that the Wyly's [sic] are in control
of the trusts or the protectors.").

[92]     *See, e.g.*, Defendants' Exhibit ("DX") 156 (12/26/96 Michaels Stores
press release announcing that Michaels sold options to purchase two million
unregistered shares to "separate entities owned by independent trusts of which
Wyly family members are beneficiaries").

company had in a particular Issuer to avoid triggering mandatory SEC reporting.[93]

Thus, as Sam Wyly testified, not making SEC filings was logically "something that

consistently went on" throughout the duration of the offshore system.[94]

        Even when it would have been otherwise helpful to assert beneficial

ownership over the stock held by the foreign trusts, such as during Sam Wyly's

proxy battle for control of Computer Associates (the acquirer of Sterling Software)

in February 2002, the Wylys chose not to do it in fear of inconsistent tax

positions.[95]  From these facts, it is logical to draw the inference that making

---

[93]    *See* Trial Tr. at 246-247 (Robertson) (discussing tracking ownership of stock among trust management companies, transferring stock between companies, and hiring new trust management companies to avoid any single company owning more than five percent of the Issuer which triggers mandatory reporting).  *Accord* PX 241 (2/20/96 file note taken by David Harris, an IOM trustee, memorializing meeting between Harris, French and Robertson) ("One of the reasons they have a variety of offshore trusts is that holdings in Sterling Software or [Sterling Commerce] held by a trust company for various trusts . . . are amalgamated for SEC purposes and any trust company holding an aggregate of more than 5% of any one class of shares in a company then has certain fairly onerous filing requirements with the SEC. [French and Robertson] confirmed that they were always aware of this as far as the various Wyly entities were concerned . . . .").

[94]    Trial Tr. at 1884-1885 (Sam Wyly).

[95]    *See* PX 1101 (2/26/02 email from Keeley Hennington, tax director and, starting in 2000, CFO of the Wyly family office, to Boucher, attaching Hennington's note to Sam Wyly) ("The trusts are record owners of the shares on C[omputer] A[ssociates]' books.  If it is represented [that] there are $2.9 shares [sic], I think it is likely CA may say we show the Wyly's [sic] only own 1.5M options and again the difference would need to be explained. . . . Our friendly IRS

misleading statements in SEC filings, or not making SEC filings at all, was part of the Wylys' plan to maintain the appearance of separation and independence from the foreign trusts.[96]

### 1. The Bulldog Trusts

The Wylys ultimately hired Tedder to help establish the first group of offshore trusts and subsidiary companies in 1992 (together with the Plaquemines Trust, the "Bulldog Trusts").[97]  These trusts were settled by Sam or Charles Wyly and had beneficiaries including the Wylys' wives and children and several charitable organizations.  The trust deeds permitted the protectors to "add[] or

---

agent is still looming around and although he has verbally agreed not to look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.").

[96]    The Wylys, of course, could have had numerous other reasons for wanting to minimize SEC filings, including transaction costs and potentially negative market reaction to insiders selling shares.

[97]    *See* Trial Tr. at 169 (Robertson).  The 1992 Trusts relevant to the remedies phase are: 1) the Bulldog Non-Grantor Trust; 2) Lake Providence International Trust; 3) the Delhi International Trust; 4) the Pitkin Non-Grantor Trust; and 5) the Castle Creek International Trust.  *See* Add. Stip. Facts ¶ 7.  In 1995, the Bulldog Trust settled the Plaquemines Trust, which had a class of beneficiaries including Sam Wyly's children.  These trusts are referred to as the "Bulldog Trusts" for purposes of this Opinion and Order.  The terminology was coined by defendants' expert, Professor Robert Danforth, and has been adopted by the parties in their briefing and argument.

substitut[e]" a charitable organization "by notice in writing to the trustees."[98]

These trusts were explicitly set up as "non-grantor trust[s] rather than [] grantor

trust[s] under Section 671-678 of the Code."[99]  Under the terms of the trusts, no

United States beneficiary could receive a distribution from the trust until two years

after the settlor's death.[100]

### 2.    The Bessie Trusts

In 1993, French approached the law firm of Morgan, Lewis &

Brockius ("Morgan Lewis") to discuss whether the Bulldog Trust was a "grantor or

non-grantor trust."[101]  Morgan Lewis prepared a memorandum concluding 1) that

there was a "significant risk that the [Bulldog] Trust will be characterized as a

grantor trust under § 679 [because] income is being currently accumulated for the

benefit of U.S. beneficiaries," and 2) that "[i]t is also likely that the Trustee's

power to add or substitute other foreign charities (within the class [of

beneficiaries]) causes the Trust to be characterized as a grantor trust under §

---

[98]      *See, e.g.*, DX 257 (Trust Agreement of the Bulldog Non-Grantor Trust) ¶ 1(a)(ii).

[99]      *Id.* ¶ 4.2(b).

[100]      *See id.* ¶ 5.2(a).

[101]      9/3/12 Deposition Testimony of Charles Lubar, partner at Morgan Lewis ("Lubar Dep."), at 13.

674."[102]   Charles Lubar, the partner at Morgan Lewis retained to work on this

matter, gave the memorandum to French and spoke with him about its

conclusions.[103]

The following year, French asked Lubar to advise the Wylys about

whether a trust settled by "a foreign person who had done business with Sam

Wyly" would be treated as a grantor trust.[104]   Lubar advised that "as long as there

wasn't an indirect transfer of assets by the U.S. person and the foreign person put

the money up, and there were certain powers in the trust, then it would be a foreign

grantor trust, and the distributions then would not be taxable."[105]   For the purposes

of rendering his opinion, Lubar assumed that the foreign grantor would be the

"sole transferor of property to the trust[]," unless the taxpayers transferred funds

"on an 'arm's length' basis."[106]

---

[102]   PX 83 (7/29/93 memorandum from Lisa Starczewski, attorney at
Morgan Lewis, to file), at 2-3.

[103]   *See* Lubar Dep. at 18.

[104]   *Id*. at 27.

[105]   *Id*. *Accord* PX 90 at 1 (2/15/94 memorandum from Lubar to French
concluding that such a trust should maintain tax-free status, assuming that the
foreign grantor establishes the trust for the Wylys' benefit "as an entirely
gratuitous act" and "has not previously and will not in the future receive any
consideration, reimbursement, or other benefit for, or in respect of, this act, directly
or indirectly.").

[106]   PX 90 at 2.

In 1994 and 1995, two foreign citizens established several trusts for the benefit of the Wylys and their families (collectively, the "Bessie Trusts").[107] The Bessie Trust and the Tyler Trust were purportedly settled by Keith King, an individual associated with Ronald Buchanan, an IOM trustee selected by the Wylys, with initial contributions of $25,000 each.[108]  However, no such contribution was ever made.  The trusts "were settled with a factual dollar bill . . . plus an indebtedness of $24,999 each on the part of Keith King as settlor."[109]  That indebtedness was immediately forgiven.[110]

The La Fourche Trust and the Red Mountain Trusts were purportedly settled by Shaun Cairns, another individual associated with Buchanan, also with initial contributions of $25,000 each.  Cairns testified that French prepared letters stating that Cairns was establishing the trusts "to show [his] gratitude for [the Wylys'] loyalty to our mutual ventures and [their] personal support and

---

[107]    The 1994/1995 trusts relevant to this Opinion and Order are: 1) the Bessie Trust; 2) the La Fourche Trust; 3) the Red Mountain Trust; and 4) the Tyler Trust.  *See* Add. Stip. Facts ¶ 7.  These trusts will be referred to as the "Bessie Trusts," as per Professor Danforth's grouping.

[108]    *See* DX 271 (deed of settlement for the Bessie Trust); PX 9017 (deed of settlement for the Tyler Trust).

[109]    PX 209 (11/26/95 fax from Buchanan to French).

[110]    *See* PX 208 (11/21/95 fax from Robertson to Boucher).

friendship,"[111] and asked Cairns to sign them.[112]   In truth, Cairns had never met nor

dealt with the Wylys before establishing the trusts, and had provided only $100

towards the trusts.[113]   Shortly after these trusts were settled, Cairns's trust

management company was hired to serve as trustee for some of the Wylys' IOM

trusts.[114]

   These transactions were shams intended to circumvent the grantor

trust rules.  French and Buchanan, acting as the Wylys' agents, recruited King and

Cairns to create a falsified record of a gratuitous foreign grantor trust.  The trust

documents are admittedly false – King and Cairns never contributed $25,000

towards the initial settlement.  Yet defendants argue that King and Cairns can still

be considered grantors with contributions of $1 and $100, respectively, if those

transfers were gratuitous and were never directly reimbursed by the Wylys.[115]

   There were no gratuitous transfers here.  *First*, I am doubtful that

---

[111] PX 157 and 158 (7/18/95 letters from Cairns to Sam and Charles Wyly).

[112] *See* 7/18/12 Deposition of Shaun Cairns, at 43-44.

[113] *See id*. at 46-48, 56-57.

[114] *See* Attachment A to Stip. Facts ("IOM Trustees").  Cairns's company, Wychwood Trust Ltd. served, at various points, as the trustee of the Delhi International, La Fourche, Plaquemines, and Red Mountain Trusts.

[115] *See* Trial Tr. at 4353-4354 (closing statement of Mark Hatch-Miller, counsel for defendants).

King provided even the factual $1 towards the trusts.  In a November 26, 1995 fax to French, Buchanan writes that "Keith never produced the money."[116]  Buchanan explains that the King-related trusts "were settled with a factual dollar bill" only so that "there [was] no question of the[] [trusts] being voidable by reason of the absense of assets" pending the Wylys' transfer of options.[117]  Even if King had contributed the $1, the premise that an unreimbursed dollar bill is sufficient to establish a tax-free foreign grantor trust cannot be taken seriously.  *Second*, Cairns's transfer of $100 cannot be considered gratuitous because shortly after settling these trusts, he received lucrative work from the Wylys as trustee.[118]  Finally, in light of the falsified trust deeds and supporting documentation surrounding these trusts, it would be unjust to consider anyone but the Wylys to be the true grantors of these trusts.

---

[116]    PX 209 (11/26/95 fax from Buchanan to French).

[117]    *Id.*

[118]    Defendants cite *Kanter v. C.I.R.*, 590 F.2d 410, 424 (7th Cir. 2009), in support of their argument that Cairns should be considered the grantor of the La Fourche and Red Mountain Trusts.  In that case, the court found that the taxpayer's mother could be considered the grantor even though she only contributed $100 to trusts established for the benefit of her son and his children that eventually grew to be worth millions of dollars due to other contributions.  But the case here is plainly different.  Cairns is not a friend, relative, or close business associate of the Wylys.  Cairns's transfer at the behest of Buchanan, directly preceding his appointment as trustee of several Wyly trusts, is the definition of non-gratuitous.

### 3. The Trustees

The trusts were administered by professional asset management companies located on the Isle of Man.[119]  The trustees were selected by the Wylys or the protectors.  The protectors, all of whom were Wyly agents, had the authority to remove and replace trustees.  As mentioned earlier, the protectors also transmitted the Wylys' investment recommendations to the trustees.  Defendants have presented no evidence of an investment made by the IOM trusts that did not originate with the Wylys' recommendations.  Nor have defendants presented evidence of an IOM trustee rejecting a Wyly recommendation.

The SEC, on the other hand, has identified several transactions where the Wylys bypassed the trustees altogether.  In October 2001, Keeley Hennington, who replaced Robertson as the head of the Wyly family office in June 2000, called Lehman Brothers and directed it to sell 100,000 shares of Michaels Stores held by Quayle Limited, an IOM company, at Charles Wyly's request.  Neither Wyly nor Hennington contacted the trustees before placing the sell order.[120] On another occasion in June 2002, Sam Wyly contacted a broker directly and instructed him to "hold on" to 100,000 shares of TYCO stock, overriding a previous order from the

---

[119]     *See* Attachment A to Stip. Facts ("Isle of Man Trustees").

[120]     *See* Trial Tr. at 1345-1347 (Hennington); PX 990 (10/3/01 email from Hennington to Boucher).

IOM trustee, based on an earlier Wyly recommendation, to sell all TYCO shares.[121]

The SEC also presented evidence of transactions that no independent trustee would reasonably initiate. For example, on September 26, 1998, Boucher contacted an IOM trust to recommend a ten million dollar investment in the Edinburgh Fund. On September 28, Boucher told the trustee for the first time that the Edinburgh Fund was a fund run by Sam Wyly's son-in-law and that it did not have a prospectus or subscription documents. Despite knowing nothing about the investment beyond its connection to the Wyly family, the trustee agreed to "forward the necessary instructions to Lehman Brothers."[122] One day later, Boucher followed up with the trustee "to ask for an update on progress with regard to making funds available for the proposed investment in the Edinburgh Fund. . . . [Boucher] mentioned that the Fund had already commenced trading and that the funds would therefore be required urgently."[123]

Some of the Wylys' recommendations had nothing to do with securities at all. Among the many personal purchases, loans, and investments the

---

[121]    PX 1152 (6/13/02 email chain between Hennington and Boucher). *Accord* Trial Tr. at 1332 (Hennington).

[122]    PX 544 (9/29/98 file notes of Sue Major, IOM trustee, memorializing telephone conversations with Boucher on 9/28/98 and 9/29/98).

[123]    *Id. Accord* Trial Tr. at 1107-1109 (Boucher).

Wylys directed the IOM trustees to make, were businesses for Wyly children and family members, real estate, artwork, jewelry, collectibles, and furniture.[124]

### 4.    Transfer and Sale of Issuer Options

"In April 1992, Sam and Charles Wyly transferred 960,000 Michaels Stores options and 1,983,588 Sterling Software options to ten Nevada companies indirectly owned by two Isle of Man trusts in exchange for deferred private annuity agreements."[125]  In 1995 and 1996, the Wylys transferred 1,350,000 Michaels Stores options, 2,650,000 Sterling Software options, and 4,600,000 Sterling Commerce options to the IOM trusts, also in exchange for annuities.[126]

In June 1997, French approached Morgan Lewis to discuss the tax

---

[124]    *See, e.g.*, Trial Tr. at 1360-1361 (Hennington) (testifying about the trustees purchasing real estate in Dallas and Aspen  for use by the Wylys); PX 575 (4/21/99 fax from Robertson to Boucher) ("As in the past, the protectorate committee recommends that Tyler Trust consider the purchase of collectibles and artwork.  I am attaching invoices from Marguerite Theresa Green and Associates totalling $224,287.26 . . . . If possible, could these funds be wired AS SOON AS POSSIBLE since vendors need to be paid immediately.").

[125]    Stip. Facts. ¶ 60.

[126]    *See id*. ¶¶ 62-64.  The Wylys also sold options to the trusts.  *See id*. ¶ 61 (one million Sterling Software options sold in December 1992), and ¶ 65 (2,625,000 Sterling Software options and 712,500 Sterling Commerce options sold in September 1999).

consequences of the private annuity transaction.[127]  Lubar remembers that he was

"really concerned about the transaction" and "worried that the transfer of the

options to a company that didn't have any other assets in exchange for a private

annuity raised a question about whether that was an arms-length transfer."[128]

However, Lubar acknowledged that "other tax lawyers would look at a transfer of a

private annuity in different ways."[129]  After studying the issue, Lubar advised

French that the transfers created potential problems under sections 674 and 679,

amongst other provisions.[130]

### C.    Persuading Issuers Not to File Forms 1099 or W2

Ordinarily, a company granting stock options as compensation issues

a Form 1099 or W2 reporting income to the director or officer and takes a

corresponding deduction for the compensation expense when the option is

exercised.  When the Wylys transferred their stock options to the IOM trusts in

exchange for private annuities, the Issuers of the options – that is, Sterling

---

[127]    *See* PX 412 (6/4/97 memo from Lubar to Ellen K. Harrison and B. John Williams, lawyers at Morgan Lewis, discussing upcoming meeting with French to discuss foreign annuities).

[128]    Lubar Dep. at 39.

[129]    *Id.* at 41.

[130]    *See id.* at 56.

Software and Michaels Stores – had to decide whether that transfer was a taxable event that required issuing a Form 1099 or W2 to report income to the Wylys.[131] To address these concerns, Tedder sent an opinion letter to both companies explaining that the Wylys should not have to recognize income because the annuity did not require payment until a date certain in the future.[132]

Jeannette Meier, general counsel of Sterling Software, asked French's law firm, Jackson Walker, to give a "back up" tax opinion to support Tedder's letter. French provided a draft opinion, but never finalized the letter. Nevertheless, based on French and Tedder's representations, Sterling Software decided not to issue a Form 1099 to the Wylys and declined to take a corresponding deduction for compensation expense. But Meier testified that the company was "concerned about . . . whether, not having gotten a backup opinion from Jackson Walker, [it] was on good ground not to have to put [the

---

131    *See* 3/29/11 Deposition of Jeannette Meier, general counsel of Sterling Software ("Meier Dep."), at 85-86.

132    *See* PX 13 (4/9/92 letters from Tedder to Sterling Software and Michaels Stores, attaching 2/28/92 Tedder opinion letter regarding the private annuity transaction), at 5 ("Pursuant to the general federal income tax treatment of property exchanged for a private annuity the sale of property to the corporation in exchange for the receipt of a private annuity is not a taxable event in the year 1992.").

compensation expense] in the [Section] 10-Q [financial statements.]"[133]  The value of the options was "a big number" and "would have affected the accuracy of the public filings" if Sterling Software had decided to report it as compensation.[134]

Michaels Stores treated the transfer of options identically.  In addition, French instructed Mark Beasley, general counsel for Michaels Stores, not to issue Form 1099s for any of the foreign trust entities upon those companies' exercise of stock options.[135]

In March 2000, SBC Communications Inc. ("SBC") acquired Sterling Commerce, which had been spun off from Sterling Software in 1995.  "As part of [the] acquisition . . . all outstanding options to purchase shares of Sterling [Commerce] were canceled.  All option holders received cash . . . based on the excess of the stock purchase price over the option price."[136]  On January 11, 2001, SBC notified the Wylys that it was planning "to issue a Form 1099 to [the respective Wylys]/[their] trusts showing taxable income" in the total amount of

---

[133]    Meier Dep. at 87.

[134]    *Id*. at 95.

[135]    *See* PX 438 (7/18/97 memorandum from Beasley to Michaels Stores); 3/7/11 Deposition of Mark Beasley, at 131-132.

[136]    PX 9022 and PX 9023 (1/11/01 letters from John J. Stephens, vice-president of taxes for SBC, to Sam and Charles Wyly).

$73,912,500.[137]  The Wylys, through Boucher and Robertson, reached out to

Rodney Owens, a partner at the Meadows Owens law firm in Dallas, to write a

memo to SBC explaining why a 1099 should not be issued.[138]  On January 26,

2001, Owens wrote in a letter to SBC that "it is not appropriate for SBC to file a

1099 or any other reporting papers regarding this transaction because [the IOM

entity] is a foreign corporation, and the income from the purchase of the stock is

not subject to U.S. taxation."[139]  After receiving the letter, SBC sought additional

information about the private annuity transaction, including whether the transfer of

options had been recognized as a taxable event at the time of the original

transaction, and if not, what the schedule of annuity payments was.[140]  Although

---

[137]     *Id*.  The total amount represents the cash value of Sam Wyly's options ($46,575,000) and Charles Wyly's options ($27,337,500).

[138]     *See* PX 9001 (1/23/01 email from Robertson to Boucher) ("If it is in opinon [sic] form from an attorney, SBC is more likely to put the document in their tax file and accept the position.  I'd definitely have Rodney issue a memo and I'd consider putting it in opinion form.  There's toooooooo much money at stake here.").  *See also* PX 9024 (1/25/01 email from Boucher to Owens) ("I also told the people at SBC to let them know that something will be coming to explain why no 1099 is necessary. I did not want to run the risk that they go ahead and file a 1099 before the 31st.") (marks omitted).

[139]     PX 9025 (1/26/01 letter from Owens to Stephens).

[140]     *See* PX 9026 (1/29/01 email from Hennington to Robertson and Boucher) ("This is getting to be a bigger project because SBC wants a schedule of the annuity payouts because they are entitled to a deduction at the time payments are made under the annuities.").

French's relationship with the Wylys had broken down by this point, he agreed to write a memorandum supporting the tax treatment of the annuities.[141]

All in all, between 1992 and 2004, the Issuers never reported income related to the exercise of options or warrants transferred to the foreign trusts.[142] Their decision not to report was a result of the Wylys' deceptive behavior and affirmative misrepresentations.  Because the Wylys disclaimed beneficial ownership of the options upon transfer, convinced the Issuers that the private annuity transactions were not taxable events, and did not disclose their beneficial ownership of the securities held by the IOM trusts in their Director and Officer questionnaires, the Issuers did not attribute taxable income to the Wylys.

### D.    Concerns about Taxation of Annuity Payments

The annuity payments for the original option transfers had been due to commence in the late 1990s, but that period was extended to 2004.[143]  In early 2003, Boucher and Hennington approached Lubar to discuss potential issues

---

[141]    *See* PX 9031 (2/07/01 memorandum from French to file regarding Sterling option transfers); PX 9034 (memorandum from Hennington to SBC).

[142]    *See* 7/25/14 Joint Pre-Trial Order ¶ 5(c).

[143]    *See* Trial Tr. at 3403 (Hennington).

arising from the upcoming annuity payments.[144]  Lubar told Hennington and

Boucher that, as he explained to French years before, he believed the trusts were

grantor trusts under either sections 674 or 679 and should have been taxable to the

Wylys all along.  Further, Lubar believed the IRS would challenge the private

annuity transactions.[145]  Lubar and other Morgan Lewis attorneys suggested

approaching the IRS "on a no-name basis" to see "where the negotiations with the

IRS might lead" in the event the Wylys wanted to pursue a voluntary disclosure.[146]

Boucher and Hennington summarized Lubar's advice in a July 2,

2003 memorandum to Sam Wyly, Charles Wyly, Evan Wyly, and Donald Miller.

The memorandum addressed several concerns about the "logistical problems of

paying the annuities."[147]  Hennington and Boucher were concerned that "[i]t is

almost certain given the large amount of these payments that the reporting will

result in an IRS audit. [Further], [t]here is also a high likelihood that as a result of

---

[144]     *See* PX 1224 (2/5/03 email from Boucher to Hennington, attaching draft email to Lubar for a meeting agenda to discuss the IOM trusts and private annuities).

[145]     *See* Lubar Dep. at 65-67.  *Accord* PX 1236 (3/14/03 memorandum from Lubar and Sholom Y. Sittner, lawyer at Morgan Lewis, to File).

[146]     PX 1239 (3/25/03 email from Joan Ingram, lawyer at Morgan Lewis, to Boucher, attaching attorney notes on a 3/17/03 meeting with Boucher, Hennington, Lubar, and Ingram).

[147]     PX 1255 (7/2/03 memorandum from Hennington and Boucher).

Case 1:10-cv-05760-SAS   Document 476   Filed 09/25/14   Page 45 of 83

this audit the entire structure of the foreign system will be audited by the IRS."[148]

Additionally, Hennington and Boucher reported that

> [t]he annuity payments will bankrupt several of the IOM companies, which could bring the validity of the annuity transaction into question. [And] [a]fter a few years of payments, [other] companies will be left with non-liquid assets, which will result in payments being made in kind . . . . [which] may also call into question the validity of the transaction and the 'arms length' nature of the transaction.[149]

On August 13, 2003, several attorneys representing the Wyly family met with Internal Revenue Service ("IRS") officials. Lubar gave the IRS some details about the trusts, and admitted that there was a "serious risk [that] they were grantor trusts from the beginning."[150] Lubar also explained the private annuity transactions, and told the IRS, after questioning, that the options were for stock in publicly traded corporations, that no income was reported upon exercise, and that the corporations claimed no deductions.

According to attorney notes memorializing the meeting, an IRS officer asked if the taxpayers were "significant enough shareholders that their

---

[148]    *Id.*

[149]    *Id.*

[150]    PX 1259 at 1 (8/28/03 fax from Miriam L. Fisher, attorney at Hogan & Hartson, to Hennington, attaching attorney notes from 8/13/03 meeting with the IRS).

holdings would be listed on SEC filings" and asked if the "SEC filings show[ed] beneficial interest in shares."[151]  Lubar said that he believed they were significant enough shareholders for "at least [the] first two [companies]" but did not know if the filings showed beneficial ownership.[152]  Hennington and Boucher reported to the Wylys that the IRS was primarily interested in the structure of the annuity, but added that one of the IRS representatives "seemed very interested in any SEC reporting of the initial transactions [even though] [t]his seems out of their area of expertise or control."[153]

### E.    IRS Audit

The Wylys did not proceed with Morgan Lewis on a voluntary disclosure path.  But by February 2, 2004, Charles Wyly received a notice of audit.[154]  Shortly thereafter, Sam Wyly asked Hennington, Boucher, and Charles Pulman, another attorney at Meadows Owens, "to explore what happens [for purposes of taxation] if he is not a U.S. citizen."[155]  The firm concluded that an

---

[151]    *Id*. at 5.

[152]    *Id*. at 6.

[153]    PX 1260 (8/29/03 memorandum from Boucher and Hennington to Sam Wyly, Charles Wyly, Evan Wyly, and Donald Miller).

[154]    *See* PX 9082 (2/2/04 notice of audit sent to Charles and Caroline Wyly).

[155]    PX 1306 (2/3/04 email from Hennington to Boucher and Pulman).

expatriate U.S. citizen who has a net worth of more than $622,000 "will be treated as having a principal purpose of tax avoidance" and will continue to be taxed pursuant to several special provisions.[156]

From May to August 2004, the IRS sent a number of information document requests ("IDRs") to both Sam and Charles Wyly.[157]  In at least one of the IDRs, the IRS requested additional information about a transfer of Michaels Stores options to an independent trust, such as "the identity of all original and current beneficiaries, including their nationality, place of residence, and current mailing address" as well as the identity of "the grantor(s) of the trust(s)."[158]  At an October 21, 2004 meeting between attorneys representing the Wyly family and the IRS, an IRS agent said that the IDRs regarding the options transfers were based on

---

[156]    PX 1307 (2/4/04 memorandum from Christian G. Newsom, attorney at Meadow Owens, to Pulman), at 1.

[157]    *See*, *e.g.*, PX 9085 (5/18/04 IDR #18 to Charles Wyly), PX 9106 (8/3/04 IDR #39 to Charles Wyly); PX 9003 (8/3/04 IDR #41 to Sam Wyly).

[158]    PX 9003 (8/3/04 IDR #41 to Sam Wyly) ("The Michaels Stores, Inc. 10K filed with the SEC on [May 2, 1997] contained the following statement: 'Subsequent to year end, options to purchase 2,000,000 shares of the Comapny's Common Stock were exercised . . . through private transactions with entities owned by independent trusts of which Wyly family members are beneficiaries. . . .' Please provide the following [information] for the independent trust(s). . . .").

47

information "pulled from SEC filings."[159]  At that meeting, the IRS agents also asked questions about the trusts, including about why Keith King set up the Tyler Trust.[160]

The SEC has not shown that the Wylys' or Issuers' SEC filings *launched* the IRS audit of the Wylys and the offshore system, or even that accurate filings would have been likely to trigger an earlier examination.  However, it is evident from the IDRs and from the October 2004 meeting, that once the IRS investigation was under way, agents and investigators were consulting SEC filings as part of their fact finding process and identified numerous issues and misstatements.

### F.       Purchase and Sale of Unregistered Michaels Stores Stock

### 1.       The Transactions

On March 29, 1996, Michaels Stores announced that it had entered into several private agreements to sell two million shares of unregistered stock, at $12.50 per share, to "independent trusts of which Wyly family members are

---

[159]     PX 1373 (10/22/04 memorandum from David M. Kniffen, attorney at Meadows Owens, to File, memorializing 10/21/04 meeting with IRS).

[160]     *See id.*

beneficiaries."[161]  On April 5, 1996, the trusts actually purchased those shares.[162]

On December 26, 1996, Michaels Stores announced that it had entered into private agreements to sell two million options to purchase shares of unregistered stock to "independent trusts of which Wyly family members are beneficiaries."[163]  On January 7, 1997, the Wall Street Journal reported on the purchase as a positive sign for Michaels Stores.[164]  Between the date of the options purchase and the day after the Wall Street Journal article appeared, share price rose from $10.50 to $13.125.[165]  The options were transferred on February 25, 1997, and exercised on March 10, 1997.[166]  On that date, Michaels Stores closed at

---

[161]    DX 48 (3/29/96 Michaels Stores press release).  *Accord* Stip. Facts ¶¶ 72-74.

[162]    *See* IOM Issuer Transactions, Exs. 12A and 12B.

[163]    DX 56 (12/26/96 Michaels Stores press release).  *Accord* Stip. Facts ¶¶ 75-76.  The options were purchased on December 23, 1996 for $.50 per share, and the exercise price was $10.50 per share.

[164]    *See* DX 53 ("Michaels Stores Turns to Chairman Again for Infusion of Cash," Wall Street Journal (Jan. 7, 1997)) ("Chairman Sam Wyly said his cash infusion is intended to bolster investor confidence in the company and give Michaels more financial flexibility at a troubled time.").

[165]    *See* DX 371 (historical trading data for Michaels Stores from the Center for Research in Security Prices).

[166]    *See* IOM Issuer Transactions, Exs. 12A, 12B, 13A, and 13B.

$17.625.[167]

The IOM trusts sold 1.8 million shares of unregistered stock between June and December 1997, at prices ranging from approximately $21 per share in the summer to approximately $35 per share in the fall.[168]  The trusts sold 200,000 of these shares less than one year after the December 1996 private placement, in violation of the terms of the purchase agreement.[169]  In 1998, the IOM trusts sold a small number of shares at approximately $32 per share.  In 2000 and 2001, the IOM trusts sold approximately 1.2 million shares at prices ranging from approximately $40 per share in September 2000 to approximately $55 per share in November 2001.[170]

### 2.    The Economic Value of Registration

While the IOM trusts filed Forms 144 disclosing the sale of the shares, those forms did not disclose that the trusts were "affiliates" of Michaels Stores by virtue of being commonly controlled by the Wylys.[171]  Nor did the Wylys

---

[167]    *See* DX 371 (historical trading data for Michaels Stores from the Center for Research in Security Prices).

[168]    *See* IOM Issuer Transactions, Exs. 12A, 12B, 13A, and 13B.

[169]    *See* Stip. Facts ¶ 79.

[170]    *See* IOM Issuer Transactions, Exs. 12A, 12B, 13A, and 13B.

[171]    *See* Stip. Facts ¶¶ 77-78.

or the trusts demand that Michaels Stores file a Form S-3 shelf registration statement for these securities prior to the sales.  However, at the time of these transactions, Michaels Stores had effective Form S-1 registration statements, which disclosed the financial background of the company, and other critical information about the value of the investments, including a prospectus.  The Form S-3 shelf registration statements, if completed accurately, would have revealed no additional information about Michaels Stores, but would have disclosed the Wylys' beneficial ownership of these shares.

Defendants argue that the proper measure of disgorgement for sale of unregistered securities in this context should be the economic benefit attributable to the Wylys' failures to 1) cause Michaels Stores to register the securities and 2) file disclosures after the sales.  Defendants attempted to calculate that economic benefit with expert testimony from Professor John J. McConnell, of the Purdue School of Management.

McConnell relied upon three academic studies – a 2000 study by David Aboody and Baruch Lev, a 2001 study by Joseph Lakonishok and Inmoo Lee, and a 2010 study by Francois Brochet – all of which purport to examine the economic impact of trading disclosures by officers and directors.[172]  These studies

---

[172]     *See* Trial Tr. at 4036-4037 (McConnell).

concluded that the adverse effect on share price associated with SEC filings

disclosing insider sales ranges from .17 percent to .61 percent.[173]  McConnell

explained this fairly low price impact by concluding that while

> [t]here is a general recognition that insiders are more likely to
> have additional information that is not available to other market
> participants, . . . . [i]nsiders [also] appear to sell shares for reasons
> having nothing to do with adverse information that's about to be
> released or will be released in the near future.[174]

McConnell applied these studies to the Wyly trades by first assuming

that Michaels Stores filed Form S-3 statements registering the shares, and that such

statements were deemed effective by the SEC.  McConnell then assigned

hypothetical filing dates for the Wylys' required disclosures under sections 13 and

16 based on the actual trade dates.  McConnell applied each study's adverse impact

figure to the profits earned by the Wylys on each transaction to determine the

dollar value of a hypothetical disclosure.  Finally, McConnell calculated the total

economic impact of the hypothetical disclosure by extending the price effect over a

period of 90, 180, and 360 days.[175]  McConnell's estimated economic valuation of

the Wylys' failure to register and disclose the sale of Michaels Stores shares

---

[173]    *See id.* at 4037 (McConnell).

[174]    *Id.* at 4038-4039 (McConnell).

[175]    *See id.* at 4044-4056 (McConnell).

ranged from $1.28 million to $6.44 million, based on the applicable study and the duration of the price effect.[176]

The SEC challenges McConnell's conclusions as speculative because they are based on assumptions about the Wylys' hypothetical compliance with the securities laws.  It is true that, like all experts, McConnell makes certain assumptions of fact.  However, these assumptions – that the Wylys 1) caused Michaels Stores to register the shares, and 2) made appropriate disclosures following the sales – are not offered to speculate about a counter-factual universe.  Rather, McConnell makes these assumptions in order to calculate the economic benefit the Wylys received for *failing* to do those things.

Nevertheless, McConnell's methodology is irredeemably flawed because the underlying studies he relies on are not applicable to the facts of this case.  *First*, the studies evaluate the impact of disclosure by "garden variety" insiders – that is, ordinary officers and directors.  However, the Wylys were anything but "garden variety" insiders.  During this time period, the Wylys owned over forty percent of the common stock in Michaels Stores,[177] and controlled five

---

[176]    *See* DX 1166 ("Total Estimated Economic Benefit Related to the Sale of Unregistered Shares").

[177]    *See* PX 7002 (summary chart showing Sam and Charles Wylys' ownership of common stock in Michaels Stores).  This calculation includes the shares held by the IOM trusts.

of the seven seats on the Board of Directors.[178]  McConnell's statement that he had "no basis to conclude that the market reaction to the sale of the Wylys would have been significantly different than the average reaction identified in the economic literature" is indefensible in light of these facts. [179]

At best, McConnell may argue that there was minimal market reaction to seventeen instances where the Wylys sold Michaels Stores stock domestically between 1993 and 2004 and extrapolate that the Wylys were "garden variety" insiders.[180]  But I cannot draw conclusions from the small number of onshore transactions relative to the large volume of offshore (and undisclosed) transactions at issue here.[181]

---

[178]     *See* PX 4139 (10/23/96 Michaels Stores Schedule 14A Proxy Statement.  Michaels Stores' Board of Directors at this time consisted of Sam Wyly, Charles Wyly, Evan Wyly, French, Miller, Richard Hanlon and Jay Taylor.

[179]     Trial Tr. at 4162 (McConnell).

[180]     *See* DX 1072 (Market-Adjusted Returns Following Onshore Net Sales Disclosures).

[181]     During pre-trial proceedings, I excluded defendants' expert, Erik Sirri, from testifying about the purported non-impact of the Wylys' failures to disclose based on an analysis of onshore disclosures.  I excluded Sirri's testimony because "offshore sales exceeded domestic sales by a ratio of 20 to 1" and "the comparison between a handful of disclosed domestic transactions and the average of far more frequent and sizeable undisclosed offshore transactions does not take into account the potential outlier nature of the domestic transactions and blurs together the characteristics of the much more prolific offshore transactions."  Transcript of 2/3/14 Conference, at 30, 32.  These identical concerns apply here.

Alternatively, McConnell points to the fact that there was minimal market reaction to the February 2005 disclosure that the Wylys were under investigation by the Manhattan District Attorneys' Office, and the April 2005 disclosure that the Wylys intended to amend their Schedule 13D filings to claim beneficial ownership of the shares remaining in the IOM trusts.[182]  But by this time the Wylys' joint holdings constituted only eight percent of the outstanding Michaels Stores common stock, so the impact of any disclosure would likely be lower.[183] More importantly, these disclosures – of a criminal investigation and of an insider's beneficial ownership over additional shares held by foreign trusts – are entirely different from the disclosures that would have been made in 1997-1998. Acknowledging beneficial ownership over common stock *held* by a trust is not comparable to an insider disclosing his sale of millions of shares.

*Second*, McConnell's calculation of price impact does not take into account the significantly discounted price at which the Wylys bought the unregistered securities.[184]  The discount is evident for the April 1996 private placement, and can thus be inferred for the December 1996 option purchase.

---

[182]     *See* Trial Tr. at 4060-4063 (McConnell).

[183]     *See* PX 7002.

[184]     *See* Trial Tr. at 4419 (closing statement of Bridget Fitzpatrick, counsel for the SEC).

Michaels Stores closed trading on March 28, 1996 at $14.25.[185]  The Wylys entered into an agreement to purchase two million shares on March 29, the same day as the press release announcing the cash infusion.  By the time the Wylys actually purchased the shares on April 5, the price had risen to $15.35.[186]  Thus, the Wylys bought the shares at a 22.8% discount,[187] a figure consistent with academic studies finding that "[a]verage discounts on unregistered shares are sizable, ranging from 20% to 35%."[188]  For both of these reasons, I reject McConnell's methodology and valuation.

## IV.   CONCLUSIONS OF LAW

### A.   Disgorgement Based on Unpaid Taxes

The SEC arrives at its proposed measure of disgorgement by 1) calculating the total profits earned on the sale of the Issuer securities by the IOM trusts, and 2) approximating the amount of taxes that would have been paid on

---

[185]    *See* DX 371 (historical trading data for Michaels Stores from the Center for Research in Security Prices).

[186]    *See id.*

[187]    The discount is calculated by taking the difference between the per share price on the close of trading on April 4 ($15.35) and the per share purchase price set by the private placement agreement ($12.50) and dividing it by the purchase price (again, $12.50).

[188]    Mukesh Bajaj et al., *Firm Value and Marketability Discounts*, 27 Journal of Corporate Law 89, 97 (2001) (collecting and summarizing studies).

those profits had the Wylys accurately disclosed beneficial ownership of the securities.  For the following reasons, I conclude that this is an appropriate measure.

### 1.    Using Unpaid Taxes as a Measure of Disgorgement Does Not Violate Section 7401

On June 13, 2013, I held that the SEC was not foreclosed, as a matter of law, from seeking disgorgement in an amount equivalent to the federal income taxes the Wylys would have been required to pay if they properly disclosed beneficial ownership over the Issuer securities.  "There is no explicit prohibition, either in the Tax Code or in the Exchange Act, on using tax benefits as a measure of unjust enrichment in other contexts" and no "express limitation on the SEC's authority to calculate and disgorge any "reasonable approximation of profits causally connected to the violation."[189]  Defendants urge that I revisit this ruling and determine that ordering disgorgement measured by unpaid taxes is not permitted by the Tax Code.

Congress has granted exclusive authority to the Secretary of the Treasury to assess and "collect the taxes imposed by the internal revenue laws,"

---

[189]    *SEC v. Wyly*, No. 10 Civ. 5760, 2013 WL 2951960, at *1 (S.D.N.Y. June 13, 2013) (quotations omitted).

who has, in turn, delegated that authority to the IRS.[190]  Section 7401 of the Tax Code states that "[n]o civil action for the collection or recovery of taxes, or of any fine, penalty or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General [of the United States] or his delegates directs that the action be commenced."[191]

      As I previously held, "this is *not* a civil action for the collection or recovery of taxes . . . . Rather, this is a civil action for securities law violations, the *remedy* for which is measured by the amount of taxes avoided" as a result of the defendants' securities violations.[192]  "[A] tax is an enforced contribution to provide for the support of the government."[193]  Disgorgement is a discretionary and equitable remedy aimed at preventing unjust enrichment.  Measuring unjust enrichment by approximating avoided taxes does not transform an order of disgorgement into an assessment of tax liability.

      Citing *United States v. Helmsley*, defendants argue that any money judgment based on a calculation of unpaid taxes is equivalent to an assessment of

---

[190]    26 U.S.C. § 6301.

[191]    *Id*. § 7401.

[192]    *Wyly*, 2013 WL 2951960, at *1 (emphasis in original).

[193]    *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) (quotation omitted).

tax.[194]  In *Helmsley*, the issue was whether restitution may be imposed in a criminal

tax evasion case.  The Second Circuit concluded that while "[i]t is true that the

government may pursue a tax evader for unpaid taxes, penalties, and interest in a

civil proceeding . . . any amount paid as restitution for taxes owed must be

deducted from any judgment entered for unpaid taxes in such a civil proceeding.

Restitution is in fact and law a payment of unpaid taxes."[195]

　　　　　*Helmsley* merely stands for the proposition that the government

should credit any amount it recovered as restitution in a *criminal tax case* towards

any subsequent tax liability assessed in a civil proceeding.  But this action is not a

civil or criminal tax case.  While it would be equitable to credit the amount

disgorged in this SEC enforcement action towards any tax liability assessed in the

future arising out of the same conduct, treating such amount as an offset does not

transform the disgorged amount into a tax.

　　　　　Defendants contend that "no court has ever before approved the use of

. . . any analogous indirect measure of unjust profits."[196]  But the Second Circuit

---

[194]　　*See* Defendants' Response to the Statement of Interest of the United States of America ("Def. Resp. to U.S."), at 4-5 (citing *United States v. Helmsley,* 941 F.2d 71 (2d Cir. 1991)).

[195]　　*Helmsley*, 941 F.2d at 102.

[196]　　Def. Mem. at 3.

recently held that defendants can be ordered to disgorge "direct pecuniary benefit[s]" *and* "illicit benefits" that happen to be "indirect."[197]  Disgorgement compels defendants to "give up the amount by which [they were] unjustly enriched."[198]  The measure of unjust enrichment for any given securities violation depends on the nature of the violations and the defendants' wrongful conduct. Thus, unlawful gains may be measured in any number of different ways.  For example, courts commonly order defendants to disgorge not only the proceeds of a fraud or the profits of an unlawful trade, but also salary and bonuses earned during the period of a fraud,[199] and amounts equivalent to losses avoided as a result of the securities violations.[200]  Disgorgement "is a remedy that gives courts flexibility" to determine the appropriate remedy "to fit the wrongful conduct."[201]

Defendants raise two other arguments to urge this Court not to apply a tax-based measure of disgorgement.  *First*, defendants argue that the "tax issues raised by the [d]efendants' offshore trusts are novel and complicated" and "even if

---

[197]   *Contorinis*, 743 F.3d at 307.

[198]   *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987).

[199]   *See Razmilovic*, 738 F.3d at 31.

[200]   *See SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995).

[201]   *SEC v. World Gambling Corp.*, 555 F. Supp. 930, 934 (S.D.N.Y. 1983).

section 7401 d[oes] not literally apply, the legislative concerns that [animated]

section 7401 are magnified where someone other [than] the IRS seeks to litigate a

highly complex tax issue."[202]   I disagree.   This case, like many others litigated

before this Court, involves statutory interpretation and application of common law

doctrines.[203]   To be certain, the grantor trust provisions are complicated, but the

issues here are not so complex as to be unresolvable.   Moreover, the remedies

issues can be decided largely by the same evidence introduced to the jury during

the liability phase.[204]

> *Second*, defendants argue that calculating disgorgement based on

unpaid taxes creates the potential for duplicative recovery or conflicting orders

because the Wylys are currently under an IRS audit covering some of the years of

the securities fraud.   As I mentioned earlier, any amounts disgorged in this case

---

[202]   Def. Mem. at 22-23.

[203]   In its Statement of Interest, the United States represented its position that 1) calculating disgorgement by approximating avoided taxes "does not constitute a collection of tax liabilities that the Internal Revenue Code reserves solely to the Department of the Treasury;" and 2) that in awarding such disgorgement, this Court "*should* interpret the relevant [Internal Revenue] Code provisions and regulations concerning trust taxation, as well as the relevant common law tax doctrines. . . ."   Statement of Interest of the United States of America, at 1 (emphasis added).

[204]   *See Wyly*, 2013 WL 2951960, at *4, n.36 ("[I]f the securities fraud at issue significantly overlaps the distinction between grantor and non-grantor trusts in the Tax Code then no complex tax analysis will be required.").

should be credited towards any subsequent tax liability determined in an IRS civil proceeding as a matter of equity.[205]

### 2. Trading Profits Earned by IOM Trusts were Taxable Under Section 674

#### a. Bessie Trusts

Defendants must concede that if I conclude that the Wylys were the real grantors of the Bessie Trusts, then the profits earned on the sale of Issuer securities by those trusts are taxable to the Wylys, not the purported foreign grantors.[206]  Because I conclude that the purported foreign grantors made no gratuitous contributions, "the trusts at issue [are] clearly grantor trusts taxable to

---

[205]   In the event there is a judicial determination that contravenes the legal conclusions of this Opinion and Order – that is, if another court determines that the IOM Trusts are in fact, tax-exempt non-grantor trusts, defendants may pursue all available remedies in this Court, including a motion to vacate the final judgment under Rule 60(b) of the Federal Rules of Civil Procedure.  But no such motion will be considered if the IRS, in exercising its discretion, chooses not to proceed with an administrative or civil action against the Wylys.

[206]   *See* Def. Resp. to U.S. at 22 ("The fact that the purported foreign grantors made no [gratuitous] contributions is decisive in determining who the grantor is under 26 C.F.R. § 1.671-2(e)(1).").  *See also* 21 C.F.R. § 1.671-2(e)(1) ("[A] person who creates a trust but makes no gratuitous transfers to the trust [or] a person who funds a trust with an amount that is directly reimbursed to such person within a reasonable period of time and who makes no other transfers to the trust that constitute gratuitous transfers is not treated as an owner of any portion of the trust under sections 671 through 677 or 679.").

the domestic grantors."[207]

### b.   Bulldog Trusts

Section 674(a) provides that: "[t]he grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is *subject to a power of disposition*, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party."[208]   Quoting a prominent tax treatise, defendants concede that the "power of disposition" includes "powers to 'effect such major changes in the enjoyment of a trust's income and corpus as the addition and elimination of beneficiaries' as well as 'minor and customary power[s]' over income and corpus distribution."[209]   Because a non-beneficiary trustee is considered a non-adverse party under the statute, "[s]ection 674(a) captures virtually every trust, including the [IOM] trusts."[210]   Thus, defendants concede that "[u]ltimate liability under

---

[207]   Def. Resp. to U.S. at 21.

[208]   26 U.S.C. § 674(a) (emphasis added).

[209]   Def. Mem. at 8 (quoting Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts § 80.6.1).

[210]   *Id.*  In his treatise, defendants' expert confirms that the Wylys' had a power of disposition under this statute.  *See* Robert T. Danforth, Norman H. Lane, and Howard M. Zaritsky, Federal Income Taxation of Estates and Trusts §9.04[1] ("A right to use trust funds without adequate compensation also affects beneficial enjoyment, because the holder can reduce the assets from which the named

[s]ection 674[] . . . turns on whether any of the statutory exceptions apply."[211]

According to defendants, the Bulldog Trusts are not grantor trusts because they fall under the section 674(c) exemption.  Under that exemption, section 674(a) does not apply to "certain powers that are exercisable by independent trustees."[212]  According to the corresponding IRS regulation, which summarizes the statute,

> [t]he powers to which section 674(c) apply are powers (a) to distribute, apportion, or accumulate income to or for a beneficiary or beneficiaries, or to, for, or within a class of beneficiaries, or (b) to pay out corpus to or for a beneficiary or beneficiaries or to or for a class of beneficiaries (whether or not income beneficiaries). In order for such a power to fall within the exception of section 674(c) it must be exercisable solely (without the approval or consent of any other person) by a trustee or trustees none of whom is the grantor and no more than half of whom are related or subordinate parties who are subservient to the wishes of the grantor.[213]

To determine whether the Bulldog Trusts are covered by this exception, it is necessary to answer three questions: 1) Did the IOM trustees have the power to "distribute, apportion, or accumulate income" or "pay out corpus" to

---

beneficiaries can benefit. Thus, a grantor's right to live rent-free in a house owned by the trust is a power of disposition under Section 674(a).").

[211]    Def. Mem. at 9.

[212]    26 C.F.R. § 1.674(c)-1.

[213]    *Id*.

or for a beneficiary or beneficiaries?; 2) Were the IOM trustees a) the grantor, or b) a "related or subordinate" party as defined by the statute?; and 3) Were the trustees able to "exercis[e] [those powers] solely (without the approval or consent of any other person)"?

The first two questions are straightforward. *First*, the IOM trustees certainly had the power, as set out in the trust deeds, to "distribute, apportion, or accumulate income" or "pay out corpus" to or for a beneficiary. *Second*, the IOM trustees were neither the grantor, nor one of the individuals on the exclusive list of "related or subordinate" parties defined by the statute.[214]  The only remaining question is whether the IOM trustees were able to exercise those powers "solely" or "without the approval or consent of any other person."

Defendants argue, citing a 1976 Tax Court case, that a grantor may only be taxed on "a power reserved by instrument or contract creating an ascertainable and legally enforceable right, not merely the persuasive control which he might exercise over an independent trustee who is receptive to his

---

[214]   *See* 26 U.S.C. § 672(c) (defining "related or subordinate party" as "the grantor's spouse, if living with grantor," or "the grantor's father, mother, issue, brother or sister; an employee of the grantor; a corporation or any employee of a corporation in which the stock holdings of the grantor and the trust are significant from the viewpoint of voting control; [or] a subordinate employee of a corporation in which the grantor is an executive").

65

wishes."[215]  As such, defendants contend that the Wylys did not share in the power to distribute, apportion, or allocate income, or to pay out corpus, because the trust deeds allocated those powers solely to the IOM trustees.  Thus, the Bulldog Trusts fall within the shelter of 674(c)'s "independent trustees exception."

I disagree.  "Such a rigid construction is unwarranted.  It cannot be squared with the black-letter principle that 'tax law deals in economic realities, not legal abstractions.'"[216]  As Professor Robert Danforth, the defendants' own expert, writes in his treatise, "[i]t would certainly violate the purpose of the independent trustee rule to require an independent trustee to act with the consent of the grantor or a related or subordinate person."[217]  The Wylys, through the trust protectors who were all loyal Wyly agents, retained the ability to terminate and replace trustees. The Wylys expected that the trustees would execute their every order, and that is exactly what the trustees did.

The evidence amply shows that the IOM trustees followed every Wyly recommendation, whether it pertained to transactions in the Issuer securities,

---

[215]     *Estate of Goodwyn v. C.I.R.*, T.C.M. 1976-238, 1976 WL 3423 (July 29, 1976).

[216]     *PPL Corp. v. C.I.R.*, 133 S.Ct. 1897, 1905 (2013) (quoting *CIR v. Southwest Exploration Co.*, 350 U.S. 308, 315 (1956)).

[217]     Danforth, et al., *Federal Income Taxation of Estates and Trusts* § 9.04[3][a].

making unsecured loans to Wyly enterprises, or purchases of real estate, artwork, collectibles, and other personal items for the Wylys and their children.  The trustees made no meaningful decisions about the trust income or corpus other than at the behest of the Wylys.  On certain occasions, such as the establishment of the Bessie Trusts, the IOM trustees actively participated in fraudulent activity along with the Wylys.  The Wylys freely directed the distribution of trust assets for personal purchases and personal use.  Because the Wylys and their family members were beneficiaries, the IOM trustees were thus "distributing" income *for* a beneficiary at the direction of the grantors – the Wylys.[218]

### 3. Unpaid Taxes Were Causally Connected to the Securities Violations

The Wylys engaged in a thirteen year fraud, creating seventeen trusts and forty subsidiary companies, employing numerous IOM trustees, a veritable

---

[218]    Because I conclude that both the Bulldog and Bessie Trusts were grantor trusts under Section 674, I need not reach the issue of whether they were also grantor trusts under Section 679.  Although the SEC contends that the trading profits on sales of Issuer securities should be taxed at the ordinary income rate, I decline to do so.  Rather, I will approximate unpaid taxes by applying the rate the Wylys would have had to pay if they owned the shares personally, which requires applying the ordinary income *or* capital gains rate for the taxable year.  Thus, the "reasonable approximation" of disgorgement is $111,988,622.76 for Sam Wyly and $58,896,281.97 for Charles Wyly when using the lower capital gains rate.  *See* JX 9904A and JX 9904B ("Calculations Using the Ordinary and Capital Gains Tax Rates for All Transactions in Registered Securities Attributable to Sam and Charles Wyly").

"army of lawyers," hiring an offshore accountant to hold records outside the United States, and delegating several domestic employees to handle the administration of the trusts.  Reasonable and savvy businessmen do not engage in such activity unless it is profitable.  Of course it was profitable – by transferring property, including valuable options and warrants, to the trusts, exercising the options and trading in secret, and using the proceed to reinvest in other ventures, the Wylys were able to accumulate tremendous tax-free wealth.

The SEC is not seeking disgorgement equivalent to the unpaid taxes for *all* profits earned by the IOM trusts.  Rather, the SEC's disgorgement amount pertains specifically to the taxes avoided on profits relating to the exercise of options and sale of stock in four companies in which the Wylys were influential insiders.  The jury found that the Wylys were beneficial owners of all of the Issuer securities – from the time the options were transferred to the trusts to the time the trusts exercised the options or otherwise acquired stock to the time they were sold.  The jury also found that the Wylys' pervasive failure to disclose beneficial ownership constituted securities fraud.  There is no evidence in the record that the purpose of this fraud was to manipulate or distort the market.[219]  There *is* ample

---

[219]     That being said, it would be naive to assume that the Wylys did not, at least occasionally, take advantage of their ability to trade, in secret, on the informational advantages they had due to positions of influence in the Issuer companies, even if that trading did not rise to the level of market distortion,

evidence, however, that the driving purpose of the securities fraud was to conceal the Wylys' relationship to the IOM trusts and preserve the preferential tax treatment on secret offshore profits for as long as possible.

Defendants contend that such a motivation "would not establish a causal connection unless the concern had some real basis – *i.e.*, that the SEC disclosures could in fact have triggered a tax liability."[220]  As such, defendants argue that to be causally connected, the misstatements or omissions in the SEC filings would have to reveal a fact that itself triggers taxation under the grantor trust rules.  For example, defendants argue that even if the establishment of foreign grantor trusts by King and Cairns was fraudulent, "that issue has nothing whatsoever to do with any information that the jury found needed to be disclosed under the securities laws."[221]  Thus, any causal connection between the securities fraud and the avoided taxes is broken.

Under defendants' theory of causation, the only amounts than can be disgorged are those linked directly to a particular misstatement in a particular filing.  I disagree.  "The requirement of a causal relationship between a wrongful

---

manipulation, or insider trading.

[220]   Def. Mem. at 20.

[221]   *Id*. at 18-19.

act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained *by means of* his wrongful act.  Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge."[222]

       That causal connection exists here in at least two ways. *First*, defendants' motivation to preserve tax benefits was important to their decision to misrepresent their beneficial ownership.  Admitting beneficial ownership would have forced defendants to take conflicting positions with two separate government agencies.  Even if admission of "beneficial ownership" on a schedule 13D would not immediately reveal a fact that would establish control of an offshore trust, it would at least be facially inconsistent with a tax reporting position that did not include the profits from trades made by that offshore trust.  It would have been reasonable, and in fact, prudent, for the Wylys to be concerned about taking conflicting positions in public SEC filings and on their tax returns because that SEC filing could constitute an admission for purposes of future tax litigation. Given the Wylys' high profile background, tremendous wealth, and history of litigation with the IRS, the possibility of an IRS audit was not remote.  In fact, it was highly likely.  Thus, even if the Wylys had no reason to believe that SEC

---

      [222]    *SEC v. Banner Fund Intern.*, 211 F.3d 602, 617 (D.C. Cir. 2000) (emphasis added).

filings could *trigger* an audit, they certainly had reason to believe and fear that the IRS would consult all public filings in the event of an audit.

　　　　　*Second*, the securities fraud was intimately connected to protecting the tax benefits in other ways.  The Wylys took numerous steps to prevent the Issuers from issuing Forms 1099 to report income to either the Wylys in an individual capacity or to the offshore entities.  The Issuers did not report income to the Wylys after the 1992 private annuity transaction because of the Wylys' misrepresentations about disclaiming beneficial ownership over the options, and French and Tedders' misrepresentations about the economic substance of that transaction.  In 2001, nearly ten years later, the Wylys continued the fraud by convincing SBC not to issue 1099s based on the same misrepresentations.  None of the four Issuers reported income to the Wylys in connection with the options granted as compensation and transferred to the trusts, even though the Wylys certainly enjoyed the benefit of those options once they were exercised and the stock was sold.

　　　　　This measure of disgorgement reflects the unique circumstances of this case.  The Wylys engaged in securities fraud to conceal their relationship to and control of the IOM trusts in order to maintain the secrecy of the offshore system and preserve their tax benefits.  The unlawful gains causally related to the

securities violations found by the jury, is an amount equivalent to the taxes avoided on the profits the Wylys realized on the sale of Issuer securities.[223]

## B.   Disgorgement of Profits Made on Sales of Unregistered Securities

The purpose of the section 5 registration requirement is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."[224]  Because section 5 is a strict liability offense, the typical measure of disgorgement is all profits made on the sale of unregistered securities, minus the direct transaction costs of acquiring the shares.[225]  In many section 5 cases, this is an appropriate disgorgement amount because the sale of unregistered securities is commonly accompanied by misrepresentations about the investment, a lack of publicly available information about the company, and valueless shares.[226]

---

[223]   *See id.* ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset.").

[224]   *SEC v. Ralston Purina*, 346 U.S. 119, 124 (1953).

[225]   *See, e.g.*, *SEC v. Universal Exp., Inc.*, 438 Fed App'x 23, 26 (2d Cir. 2011); *SEC v. Cavanagh*, No. 98 Civ. 1818, 2004 WL 1594818, at *30 (S.D.N.Y. Jul. 16, 2004), *aff'd by Cavanagh*, 445 F.3d at 116-17.

[226]   *See, e.g.*, *SEC v. Rosenfeld*, No. 97 Civ. 1467, 2001 WL 118612, at *1 (S.D.N.Y. Jan. 9, 2001) (defendants engaged "in a fraudulent scheme to falsely inflate the value of common stock and to evade the registration requirements of the federal securities laws"); *SEC v. East Delta Resources Corp.*, No. 10 Civ. 310,

The SEC is correct that the outer bounds of disgorgement for these violations is equivalent to all profits earned on the transactions because the defendants sold unregistered stock illegally and could not have received the profits made on sales of unregistered Michaels Stock *but for* their section 5 violations.[227] However, defendants have a right to rebut that figure by arguing that the nature of their section 5 violations is different from the ordinary section 5 case.

As discussed above, these unregistered shares required a Form S-3 shelf registration statement that would have disclosed no additional information about the investment beyond the Wylys' beneficial ownership of the securities. Michaels Stores was a well-known and long-established company that had filed effective Form S-1 registration statements for millions of registered shares. Thus, "[t]his case involves neither (a) worthless, risky, or lightly traded shares; nor (b) failure to disclose the hundreds of pieces of information required by the regulations."[228] The unregistered shares sold by the Wylys "were identical to all the other, registered shares that were trading in the market at the same time. The

---

2012 WL 3903478 (E.D.N.Y. Aug. 31, 2012) (defendants sold unregistered shares of a "penny stock company that purported to own and/or operate gold and other mineral mining properties in China").

[227]   *See* 8/27/14 Letter from Fitzpatrick to the Court, at 2 n.3 [Dkt. No. 455].

[228]   Def. Mem. at 29.

unregistered shares paid the same dividends[,] gave the same voting rights[,] and could be resold at the same price as the registered shares."[229]

　　　　　While I reject defendants' valuation of the appropriate disgorgement amount, I agree that it would be inequitable, in this case, to order disgorgement of total profits.  Instead, I will calculate disgorgement based on the average discount received on unregistered securities.  The Wylys obtained these shares at a discounted rate but were able to resell them, in secret, at the same price as other registered shares.  As a result, the Wylys should disgorge twenty five percent of their total profits, which is within the range of the average discount received on unregistered securities.[230]  Thus, Sam Wyly is ordered to disgorge $11,848,336 and Charles Wyly is ordered to disgorge $4,985,462 with regards to the section 5 violations.[231]

### C.　Prejudgment Interest

　　　　　The SEC seeks an award of prejudgment interest in addition to

---

[229]　*Id*.

[230]　*See supra* n. 188.

[231]　Because I do not order disgorgement of all profits from the sale of unregistered securities, I also calculate an alternative measure of disgorgement based on the taxes avoided on these gains.  Using the calculations jointly provided by the parties, Sam Wyly would disgorge $10,964,918.64 and Charles Wyly would disgorge $5,158,658.11.  *See* JX 9903A and 9903B.

disgorgement because the Wylys had free use of the unlawful gains during the fraud, and "used their ill-gotten gains to amass even greater wealth."[232]  Defendants argue that prejudgment interest is inappropriate because of "the inherent difficulty of ascertaining a particular amount to be disgorged" and because of the Wylys "financial circumstances and ability to pay."[233]

Defendants' arguments are unavailing.  Ascertaining the amount to be disgorged has indeed been difficult.  But the Second Circuit has been clear that the "'risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty.'"[234]  Furthermore, any difficulty or uncertainty does not weigh in favor of absolving the wrongdoer of his obligation to both disgorge his unlawful gains *and* pay prejudgment interest to reflect that he has otherwise benefitted from "what amounts to an interest free loan procured as the result of illegal activity."[235]

Defendants' inability to pay argument is similarly futile.  The Wylys' securities violations helped them establish the offshore system, conceal their

---

[232]   SEC Mem. at 30.

[233]   Defendants' Proposed Conclusions of Law ¶¶ 96, 98.

[234]   *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

[235]   *Moran*, 944 F. Supp. at 295.

trading profits, and use those trading profits to invest in other ventures and amass tremendous untaxed wealth. That defendants appear to have spent these gains should not preclude the court from requiring the payment of prejudgment interest.[236] Disgorgement, which includes the award of prejudgment interest, would have no deterrent value if defendants could avoid it by spending their unlawful gains before the government discovers the fraud.

Because prejudgment interest is also equitable relief, it is appropriate to consider other issues of fairness. Here, depending on the date of the transaction, the SEC seeks prejudgment interest for a period as long as twenty-two years. The SEC has identified several other cases where courts have awarded prejudgment interest over extended periods of time.[237] I will award prejudgment interest for the entire period of the fraud because the Wylys had use of the unlawful gains during the entire period and should not be permitted to benefit from the protracted nature of this litigation. However, I recognize, as the Supreme Court recently noted in

_____

[236]     *See SEC v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002) ("The fact that swindlers have run through the proceeds of the fraud and are now insolvent should not prevent the imposition of a remedy, since defendants may subsequently acquire the means to satisfy the judgment.") (quotation omitted)).

[237]     *See* Trial Tr. at 4292-4293 (Fitzpatrick) (identifying cases in the Second and Third Circuits upholding prejudgment interest awards for periods longer than ten years).

*Gabelli*, that the SEC is, at least in part, responsible for the delay.[238]  For that

reason, I decline to adopt the SEC's preferred IRS underpayment rate for the entire

period.[239]  Rather, prejudgment interest is to be calculated at the lower of the

average LIBOR or IRS underpayment rate for each year.

### D.    Civil Penalty

The SEC seeks a civil penalty against Sam Wyly equivalent to the

total unlawful gains he received based on conduct after February 1, 2001.  The

SEC argues that "[i]n light of Sam Wyly's extensive fraud, disgorgement alone is

an insufficient remedy, and would provide little deterrent because it would require

only the return of ill-gotten gain."[240]  I disagree.

Courts can consider the other remedies already imposed in

determining whether a penalty would be unduly harsh under the circumstances.[241]

---

238    *See Gabelli*, 133 S. Ct. at 1222 ("Unlike the private party who has no
reason to suspect fraud, the SEC's very purpose is to root it out, and it has many
legal tools at hand to aid in that pursuit.")

239    While the Second Circuit has approved of using the IRS
underpayment rate in SEC disgorgement cases, *see First Jersey*, 101 F.3d at 1476-
77, this Court has the discretion to select the rate it sees fit.  Because this is not an
action for underpayment of taxes, I decline to adopt that rate for the entire period.

240    SEC Mem. at 31.

241    *See, e.g.*, *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391
(S.D.N.Y. 2010) ("[T]he Court finds that the penalties of disgorgement, criminal
restitution, incarceration, and injunction against future violations imposed on

By any reasonable measure, the disgorgement and prejudgment interest awarded in this proceeding will be staggering and among the largest awards ever imposed against individual defendants.[242]  I conclude that disgorgement of this magnitude is more than sufficient to deter future violations and, accordingly, I decline to impose additional penalties.

### E.   Injunction

The SEC also seeks a permanent injunction against future violations of sections 5 and 17(a) of the Securities Act and sections 13(a), 13(d), 14(a), 16(a) and 10(b) of the Exchange Act against Sam Wyly.  The SEC contends that "[i]n the absence of injunctive relief, there is no assurance [Sam Wyly] will not violate the securities laws again"[243] as his "vast wealth gives him the ability to purchase large

---

Rittweger are sufficient to deter future illegal conduct.  A further penalty at this time is inappropriate.").

[242]   Although the SEC must recalculate prejudgment interest, according to my rough estimate, the final disgorgement award, including prejudgment interest will be between $300 and $400 million dollars.  This single award is equivalent to approximately ten percent of the total penalties and disgorgement ordered in SEC enforcement cases nationwide last year.  FY 2013 SEC Financial Report, *available at* http://www.sec.gov/about/secpar/secafr2013.pdf, at 18 ("In the fiscal year, total penalties and disgorgement ordered increased to $3.4 billion, up from $3.1 billion in the prior fiscal year.").

[243]   SEC Proposed Conclusions of Law ¶ 92.

ownership positions in publicly traded companies."[244]  Defendants argue that "[g]iven Sam Wyly's age, health, and current occupation, there is no real need to enjoin him from future violations."[245]

As another court in this district recently said, "the utility of this kind of 'obey-the-law' injunction" is limited because "everyone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual 'little guidance on how to conform his conduct to the terms of the injunction.'"[246] The general toothlessness of permanent injunctions is evident from the facts of this very case.   Sam Wyly engaged in a large securities fraud spanning thirteen years, involving multiple trusts and entities and hundreds, if not thousands, of misstatements, all while being subject to a previous injunction entered in 1979.[247]   Nevertheless, the extensiveness of this scheme, the brazenness of Wyly's conduct, and his position of wealth and importance in the community warrants the imposition of a permanent injunction in this case.

---

[244]     SEC Mem. at 35.

[245]     Def. Mem. at 25.

[246]     *Tourre*, 2014 WL 969442, at *15 (quoting *SEC v. Goble*, 682 F.3d 934, 949-52 (11th Cir. 2012)).

[247]     *See* SEC Mem. at 34-35.  *See* PX 4 (*SEC v. Samuel E. Wyly*, Civ. Action No. 79. 3275, Lit. Rel. No. 8943 (D.D.C., Dec. 6, 1979)).

## V.   CONCLUSION

For the foregoing reasons, Sam Wyly must disgorge $123,836,958.76 and Charles Wyly must disgorge $63,881,743.97.[248]  The Wylys shall also pay prejudgment interest for the entire period of the fraud through December 1, 2014, calculated in accordance with this Opinion and Order.  The SEC is directed to provide a recalculation of prejudgment interest by October 17, 2014.  Any objections by defendants to the SEC's calculations are due within five days of receiving the SEC's submissions.

## VI.   ADDENDUM

Prior to the remedies trial, I granted defendants' motion to preclude the SEC from seeking disgorgement of *all* trading profits on the sale of registered Issuer securities, but permitted the SEC to present a revised calculation based on those trading profits to be used as an alternative measure of disgorgement for the sale of registered securities.[249]  On August 29, 2014, the SEC submitted a proffer of its revised trading profit disgorgement theory.[250]  On September 12, 2014, the SEC

---

[248]    Joint and several liability is unwarranted for both measures of disgorgement because these gains are "reasonably apportioned" between the two defendants.  *Universal Exp.*, 646 F. Supp. 2d at 563.

[249]    *See SEC v. Wyly*, No. 10 Civ. 5760, 2014 WL 3739415 (S.D.N.Y. July 19, 2014).

[250]    *See* Dkt. No. 456.

submitted an expert report of Dr. Chyhe Becker which posits three different calculations of unlawful gains based on the Wylys' profits on the sale of registered Issuer securities.[251]  Defendants oppose the SEC's request to leave the record open for the purpose of addressing this alternative theory of disgorgement.[252]

I have reviewed the parties' submissions and Dr. Becker's report.  The SEC's request to leave the record open for the limited purpose of addressing this theory is granted.  However, the SEC may only present Dr. Becker's first opinion, which approximates unlawful gains by "calculat[ing] the difference between the Wylys' gains from their offshore transactions in the Issuers' securities, and the gains that an ordinary buy and hold equity investor would have earned in those securities."[253]  Although defendants argue that this theory lacks a causal connection

---

[251]     *See* 9/12/14 Expert Report of Dr. Chyhe K. Becker.

[252]     *See* 9/5/14 Defendants' Brief in Opposition to the SEC's Request to Hold the Record Open [Dkt. No. 458]; 9/23/14 Letter from Susman to the Court [Dkt. No. 474].

[253]     Becker Rep. ¶ 2.  Dr. Becker's other two measures are unacceptable for the following reasons.  The first measure approximates the Wylys' gains in excess of an average buy and hold investor assuming that the Wylys exercised their options before transferring the securities to the IOM trusts.  This counterfactual is belied by the facts of the case and would thus be an inaccurate measure of unlawful gains.  The second measure calculates disgorgement based on the economic value of the Wylys' non-disclosure.  This second measure is, in sum and substance, a rebuttal to Professor McConnell's report and methodology, much of which has already been discussed and rejected here.  Furthermore, this attack on Professor McConnell's June 19, 2014 report is untimely, coming a month *after* the

to the Wylys' securities violations, I disagree.  Dr. Becker's "buy and hold" calculation approximates the economic value of the Wylys' securities violations – that is, their ability to trade in secret while having an informational advantage over the investing public.[254]

Defendants' deadline to submit a rebuttal report is October 29, 2014. In lieu of depositions, the Court will hold a one day hearing on November 17, 2014, where the SEC and defendants may each have up to four hours to cross-examine the experts.  Because the record is left open for a limited purpose and time is a significant concern, no further briefing will be accepted.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              September 24, 2014

---

conclusion of the remedies trial at which he testified.  If defendants wish to use McConnell as their rebuttal expert to Dr. Becker, the SEC may elicit its criticisms in cross-examination as it did during the August trial.

[254]    At least one informational advantage the Wylys undisputedly possessed was knowledge of their own large volume transactions in the Issuer securities.  The SEC may also argue that the Wylys' systematic failure to disclose their trading concealed the informational advantages they possessed by virtue of being controlling insiders in the Issuer companies.

**- Appearances -**

**For the SEC:**

Bridget Fitzpatrick, Esq.
Hope Augustini, Esq.
Gregory Nelson Miller, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
Daniel Staroselsky, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Defendants:**

Stephen D. Susman, Esq.
Harry P. Susman, Esq.
Susman Godfrey LLP
1000 Louisiana Street, Ste. 5100
Houston, TX 77002
(713) 653-7801

David D. Shank, Esq.
Terrell Wallace Oxford, Esq.
Susman Godfrey LLP
901 Main Street, Ste. 5100
Dallas, TX 75202
(214) 754-1935

Steven M. Shepard, Esq.
Mark Howard Hatch-Miller, Esq.
Susman Godfrey LLP
560 Lexington Avenue
New York, NY 10022
(212) 336-8332