

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
100 F Street, N.E.
Washington, D.C. 20549

DIVISION OF
ENFORCEMENT

October 16, 2014

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

    Re:    *SEC v. Wyly, et al.* 1:10-cv-5760

Dear Judge Scheindlin:

    The Securities and Exchange Commission ("SEC") writes in further support of its request for a pre-motion conference to address the SEC's intent to file a motion for an asset freeze, financial discovery, and an accounting of defendants' assets to preserve the SEC's ability to enforce a final judgment in this case (ECF No. 479), and in response to letters filed by the defendants (ECF No. 483), and by attorneys representing eleven Wyly family members (collectively, "the family members") (ECF Nos. 484 and 485).

    *First*, the SEC does not believe there should be a collections issue in this case. At the remedies hearing, the defense elicited testimony that Sam and Charles Wyly were collectively worth $556 million (including their offshore assets). Tr. 3612. According to the SEC's calculations, the Court's current disgorgement award will amount to $299,357,243.33 with prejudgment interest. ECF No. 486-1 at 7. If the defense will agree to place this amount in a U.S. escrow account in anticipation of the Court's judgment, the SEC will withdraw its request for a temporary asset freeze and cease all financial discovery efforts upon confirmation that the escrow account holds sufficient assets to satisfy a judgment in this case.

    *Second*, if the defense will not agree to hold sufficient funds in escrow, a temporary asset freeze is imperative given the apparent pace at which the defendants have been dissipating their assets. Based on the defense's own math at the remedies hearing, the defendants' net worth decreased by approximately $450 million dollars over the past ten years. Tr. 3613. That is a burn rate of approximately $3.75 million per month. The head of the Wylys' family office, Keeley Hennington, testified that some of these expenditures were on lavish items such as personal aircraft. Tr. 3614. It is well-recognized that when a defendant is ordered to pay disgorgement, "he must pay what he is capable of paying, even if making the payment results in a diminution of his income or his relatively comfortable standard of living." *SEC v. Musella*, 818 F. Supp. 600, 602 (S.D.N.Y. 1993). If the defendants' current spending pace continues unabated, defendants' net worth would be diminished by more than $10 million while the parties litigate the SEC's remaining disgorgement theory and any Rule 50 Motion filed by the defense.

The SEC merely seeks to preserve the status quo in advance of an anticipated judgment by this Court. It was never the SEC's intent to "prevent Defendants from defending themselves" in this case. In its initial letter, the SEC stated that it "does not object to a carve out for *reasonable ... legal fees*," and characterized the $10,000 monthly allotment as a "placeholder." ECF No. 479. The SEC does not object to a carve out for *reasonable* legal expenses that will be monitored by the Court on a periodic basis. We have attached a revised proposed order that permits for such expenses and for the payment of Sam Wyly's medical expenses. *See* Exhibit 1 (changes are in red line on page 3).

*Third,* the family members' letters seem to misunderstand the scope of the asset freeze sought by the SEC, complaining that the SEC has "no basis for freezing *their* assets, which would leave them unable to buy food or pay other living expenses for themselves or their families." ECF No. 484 at 1. The SEC's proposed order defines "the Wylys" as Sam Wyly and the Estate of Charles Wyly. It does not seek to freeze assets solely held by their children or prevent their children from feeding their families.[1] The proposed order explicitly encompasses the Isle of Man Trusts and companies, but the undisputed evidence at trial was that those entities were funded entirely by the options at the center of the Wylys' securities fraud.[2] The SEC merely seeks to preserve the status quo and prevent the defendants and third parties from dissipating Trust assets until any related collections issues have been fully litigated. This is necessary, in part, because Isle of Man entities associated with Charles Wyly distributed $27 million to three of his children this year. Tr. 3610. And another $10 million was distributed to one of his daughters to create a trust in the Cook Islands during the pendency of this litigation. Tr. 3609-10.

*Fourth,* the family members' complaint that the SEC should have named them as relief defendants in 2010 is meritless. In 2010, the SEC did not believe it was necessary to name any relief defendants because, as the defense averred in its letter, "the SEC ... assumed, at the outset of this case, that it was suing a billionaire." ECF No. 483 at 2. The defense now asserts that this assumption was wrong and implies that the SEC was somehow to blame for this mistake. The defense further complains that the SEC "refuse[s] to listen to any evidence to the contrary," *e.g.*, evidence that Sam Wyly is not a billionaire. *Id.* But the SEC has a right to investigate Mr. Wyly's sudden fall from billionaire status after he (1) produced financial statements in this litigation that showed the Wylys' collective net worth as approximately $1.4 billion in November 2005 and March 2006 (PX-2113), (2) participated, by providing his photograph, in a *Forbes* article that listed him with a $1.0 billion net worth in a March 10, 2010 edition,[3] and (3) titled his September 29, 2009 autobiography "1,000 Dollars and an Idea: Entrepreneur to Billionaire."

---

[1] The threat to the family members' ability to feed and shelter themselves may be somewhat exaggerated. According to Ms. Hennington, the 2004 Wyly family financials reflect $400 million in assets that belonged to other family members from investments that had nothing to do with the Isle of Man. Tr. 3553:9-17.

[2] The SEC's proposed order does seek to enjoin the family members from disposing of or encumbering property under their control titled in the name of Sam Wyly, Charles Wyly, his estate, or the IOM Trusts and companies at issue in this action. The SEC considers this to be property of Sam and Charles Wyly.

[3] The relevant *Forbes* publication is attached as Exhibit 2.

2

The first indication the SEC had that Sam Wyly was not, as he had publicly proclaimed himself to be, a billionaire was at a February 28, 2014 settlement meeting referenced in the defense's letter. This claim of relative poverty was made without supporting documentation in an effort to convince the SEC to accept pennies on the dollar for its securities fraud claims. Prior to this settlement conference, every indication was that the defendants could satisfy any judgment in this case from their collective domestic assets. The disappearance of more than $400 million in the defendants' net worth remains mysterious, and none of the proffered explanations fully explain the situation. Ms. Hennington testified that the holdings of the Isle of Man entities associated with Charles Wyly were approximately $225 million in 2012 (compared to approximately $346 million in assets in November 2005), and that the holdings of Isle of Man entities associated with Sam Wyly were approximately $190-200 million (compared to approximately $640 million in November 2005). Tr. 3525:21-3526:4, PX-2113 at SEC/ITC0137564. One explanation she provided for the decrease in offshore holdings was annuity payments to Sam and Charles Wyly. But such payments should have resulted in more – not less – domestic assets being available to satisfy a judgment. Tr. 3612.

Ms. Hennington also referenced the financial crisis as a reason for the depletion of the Wylys' assets. However, Sam Wyly appeared on the *Forbes* list of billionaires in 2010 – *after* the financial crisis. And the overall market has increased substantially in the years following the financial crisis. There is no reason to believe the defendants fared worse than the average investor during this period. Evan Wyly testified that Green Mountain Energy – one of the family's other large investments – was sold in 2010 for a price that yielded "a better rate of return than the stock or bond market during that same period." Tr. 2681:23-2682:8. Moreover, the Wylys remaining shares in Michaels would have been purchased at a significant premium when Bain Capital and Blackstone bought the company for $6 billion in 2006.[4] The Wylys still had more than $300 million invested in Michaels in March 2006 (a few months before the private sale).[5]

*Fifth,* the only real issue at this juncture is whether the Court has the equitable authority to enjoin third parties from taking actions to dissipate the defendants' assets. Federal courts have previously enjoined nonparties from dissipating the defendant's assets. *See* Asset Freeze Order at 14-15, *SEC v. Inteligentry, Ltd.,* No. 13-cv-00344-GMN-NJK (D. Nev. Mar. 7, 2013) ECF No. 23 (Attached as Exhibit 3) (restraining family members from dissipating frozen assets); Order Granting Ex Parte Temporary Asset Freeze and Other Relief at 2, *SEC v. Bilzerian,* No. 89-1854 SSH (D.D.C. May 11, 2001) ECF No. 279 (Attached as Exhibit 4) (restraining third parties from dissipating assets which were part of the Receivership Estate); *SEC v. Estate of Saviano,* No. 14-cv-13902-MOB-MKN, 2014 WL 5090787 (E.D. Mich. Oct. 9, 2014) (Attached as Exhibit 5) (extending asset freeze to any accounts held by relatives for the benefit of the defendant, or any assets "which are traceable to funds and assets, wherever located, belonging to the victims of the securities law violations alleged in the SEC's complaint."); *see also, SEC v. Byers,* NO. 08-Civ-7104(DC), 2009 WL 33434 at *2-3 (S.D.N.Y. Jan. 7, 2009) (holding that asset freeze entered

---

[4]   The $44 share price represented a 30 percent premium on the value of Michael's stock at the time. *See* http://www.forbes.com/sites/maggiemcgrath/2014/06/16/arts-retailer-michaels-crafts-a-500-million-ipo/.

[5]   Bain Capital and Blackstone entered into the merger transaction to with Michaels on June 30, 2006. *See* http://www.blackstone.com/news-views/press-releases/details/michaels-stores-announces-completion-of-merger-agreement-with-bain-capital-and-blackstone-affiliates.

against intervenors not named as relief defendants was appropriate when the evidence suggested their asset was "inextricably intertwined" with the defendant's fraudulent business dealings); *cf. SEC v. Pinez*, 989 F. Supp. 325, 327 (D. Mass. 1997) (observing that although SEC amended complaint to name asset-holder as relief defendant, even if it had not, the court's ability to freeze the asset emanated from 15 U.S.C. § 78u(d) and (e), which allows freezing the assets of a "wrongdoer in the possession of a non-party"). Here, as in the foregoing cases, a freeze order restraining dissipation of assets is a provisional order designed to "simply assure[] that any funds that may become due can be collected." *SEC v. Unifund Sal*, 910 F.2d 1028, 1041 (2d Cir. 1990).

Sam Wyly testified that he has always paid his debts. Tr. 1610:18. The SEC continues to believe that Sam and the Estate of Charles Wyly have sufficient global assets to pay any judgment ordered by this Court. Appropriate next steps can be addressed when and if they fail to do so. The SEC merely requests that the Court preserve the financial status quo until that time by entering the SEC's proposed order.

Respectfully submitted,

Bridget M. Fitzpatrick
Supervisory Trial Counsel
(202) 551-4678
fitzpatrickbr@sec.gov

cc via e-mail:  all counsel of record
David L. Kornblau, Esq.
Stewart H. Thomas, Esq.