UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                          **Plaintiff,**<br><br>v.<br><br>SAMUEL E. WYLY and DONALD R. MILLER, JR., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., MICHAEL C. FRENCH and LOUIS J. SCHAUFELE III,<br><br>                                          **Defendants,**<br><br>and<br><br>CHERYL WYLY, et al.,<br><br>                                          **Relief Defendants.** | No. 1:10-cv-05760-SAS |

<u>**NOTICE OF JOINT AGREEMENT THAT ADDITIONAL EXHIBITS
ARE ADMITTED AND DISAGREEMENT OVER THE PROPER
MEASURE OF PREJUDGMENT INTEREST**</u>

1.      Plaintiff Securities and Exchange Commission ("SEC") and defendants Sam Wyly and Donald R. Miller, J., in his capacity as the Executor of the Estate of Charles Wyly, hereby notify the Court that the parties agree that the exhibits listed in Attachment A will be treated as admitted evidence with respect to the remedies phase in the above-styled civil enforcement action.

2.      While the parties further agree that all exhibits admitted into evidence during the jury trial and the earlier remedies hearing are part of the record for this proceeding, the

defendants disagree with the SEC's position that all evidence admitted during the insider trading bench trial is also part of the record for this proceeding. The defendants' position is that the current remedies hearing concerns the amount of gains causally connected to the violations that were proven. The insider trading claim was not proven. Therefore, the record of the insider-trading trial is not automatically part of the record of this hearing. No notice was given to the defense to prepare any response to the insider-trading exhibits, if any response were called for. The parties also differ on the appropriate calculation of pre-judgment interest (PJI), and their respective positions are set forth below.

## SEC POSITION ON PRE-JUDGMENT INTEREST (PJI)

3. The Court has already ruled that the defendants must pay PJI on the ill-gotten gains they earned as a result of their securities violations. *See* DKT No. 476, September 25, 2014 Opinion, pp. 74-77. The SEC has recalculated prejudgment interest ("PJI") on the disgorgement amounts included in Dr. Chyhe Becker's first opinion using the 1-year LIBOR rate in accordance with the Court's instructions at the conclusion of closing arguments on December 1, 2014, as follows:

| PJI from All Offshore Issuer Securities | | | | | |
|---|---|---|---|---|---|
| Issuer | | Average Date | Ill-Gotten Gains | PJI | Ill-Gotten Gains with PJI |
| MIKE | Charles | 08-Feb-03 | $80,792,685 | $24,283,841 | $105,076,526 |
| MIKE | Sam | 19-Jul-01 | $93,623,886 | $33,170,607 | $126,794,493 |
| SCOT | Charles | 13-Oct-01 | $0 | $0 | $0 |
| SCOT | Sam | 04-Oct-01 | $0 | $0 | $0 |
| SE | Charles | 15-Jan-99 | $22,948,762 | $12,847,342 | $35,796,105 |
| SE | Sam | 09-Dec-98 | $39,357,171 | $22,320,332 | $61,677,503 |
| SSW | Charles | 22-Nov-96 | $29,800,280 | $22,787,793 | $52,588,073 |
| SSW | Sam | 04-Oct-96 | $62,580,212 | $48,383,388 | $110,963,600 |
| Total | Charles | | $133,541,727 | $59,918,976 | $193,460,704 |
| Total | Sam | | $195,561,269 | $103,874,327 | $299,435,596 |
| **TOTAL** | | | **$329,102,996** | **$163,793,303** | **$492,896,299** |

| PJI from Registered Securities Only | | | | | |
|---|---|---|---|---|---|
| Issuer | | Average Date | Ill-Gotten Gains | PJI | Ill-Gotten Gains with PJI |
| MIKE | Charles | 24-Jul-02 | $24,447,593 | $7,715,685 | $32,163,279 |
| MIKE | Sam | 10-Apr-99 | $13,593,522 | $7,325,321 | $20,918,843 |
| SCOT | Charles | 13-Oct-01 | $0 | $0 | $0 |
| SCOT | Sam | 04-Oct-01 | $0 | $0 | $0 |
| SE | Charles | 15-Jan-99 | $22,948,762 | $12,847,342 | $35,796,105 |
| SE | Sam | 09-Dec-98 | $39,357,171 | $22,320,332 | $61,677,503 |
| SSW | Charles | 22-Nov-96 | $29,800,280 | $22,787,793 | $52,588,073 |
| SSW | Sam | 04-Oct-96 | $62,580,212 | $48,383,388 | $110,963,600 |
| Total | Charles | | $77,196,636 | $43,350,821 | $120,547,456 |
| Total | Sam | | $115,530,905 | $78,029,040 | $193,559,946 |
| **TOTAL** | | | **$192,727,541** | **$121,379,861** | **$314,107,402** |

4.      The SEC's calculations of PJI begin running from the dollar-weighted average date of the proceeds Sam Wyly and Charles Wyly received from their offshore securities. Those dates are provided in the above table in the column titled "Average Date." In order to calculate the Wylys' dollar-weighted average date for their offshore sales, the SEC determined the average date on which Sam Wyly and Charles Wyly received their total gross proceeds from their secret offshore transactions in each Issuer's securities. For example, if Sam Wyly sold 10,000 Michaels shares offshore on May 1, 1992 at $10/share and then sold another 10,000 Michaels

3

shares offshore on May 1, 2002 at $40/share, the dollar-weighted average date for those sales would be May 1, 2000.[1] Because the price in 2002 is four times higher than the price in 1992, the weighted average date is four times closer to 2002 (only two years removed from the selling date) than to 1992 (eight years removed from the selling date).[2]

5. By using an <u>average</u> date, the SEC's calculation both undercounts the PJI for the transactions that occurred before the average date and overcounts the PJI for the transactions that occurred after the average date. With respect to the Wylys' offshore sales of Michaels Stores, the average date used to calculate PJI for Sam Wyly is July 19, 2001 and for Charles Wyly is February 8, 2003. These average dates were used notwithstanding that the Wylys' had the use of ill-gotten gains from their offshore sales of nearly 1 million Michaels shares in 1992 and over 1.6 million Michaels shares between June 1997 and June 1998, because it recognizes that the Wylys held a significant number of shares of Michaels offshore through February 2005, which for purposes of this disgorgement hearing has been considered the end of the fraud period.

6. The SEC contends that this approach captures the average period of time that the defendants had access to their ill-gotten gains and therefore is consistent with the Court's earlier ruling. *See* DKT No. 476, September 25, 2014 Opinion, p. 76 ("I will award prejudgment interest for the entire period of the fraud because the Wylys had use of the unlawful gains during the entire period.")

---

[1] Although defendants, in paragraph 13 below, argue that averaging the proceeds from these two hypothetical dates is incorrect because there is no reason to believe that the May 1992 sale resulted in any "ill-gotten gains," their argument is wrong. As the defendants' expert, Professor Daniel Fischel admitted, there was an improper secrecy benefit to every transaction the Wylys entered into offshore. Thus, even for a hypothetical May 1, 1992 sale (which is earlier than any actual offshore sales), the Wylys' profits from such a sale would include a portion that, by defendants' own admission, is ill-gotten. Under the SEC's PJI methodology, the Wylys wouldn't be assessed any PJI for that portion of their gains until May 1, 2000.

[2] As the SEC disclosed back to defense counsel in September, the dollar-weighted average date is determined by converting the date to a numerical value that gives the number of days elapsed since January 1, 1960. After converting the date, the numerical value of the date is multiplied by the dollar amounts of each sale. The outcome is then summed up over all sales and divided by the total dollar sale amount. The final number, which represents the weighted average number of days elapsed since January 1, 1960, is then converted back to a date.

4

7. Notably, Defendants do not dispute that the above calculations accurately measure PJI on the disgorgement measures contained in Dr. Becker's report using the 1-year LIBOR rate based on the average weighted sale date of the offshore securities sales. Rather the defendants argue below that PJI should only run from the end of the fraud period for each issuer, rather than from the average weighted sale date of the offshore securities sales. This results in the PJI numbers decreasing by approximately $41.9 million for only registered securities and by approximately $50 million for registered and unregistered securities.

8. As an initial matter, the defendants' objections to the SEC's use of the average date for calculating PJI is untimely. Dr. Becker's methodology for calculating PJI was disclosed in her report and the back-up materials were provided to defense counsel in September. Defendants' expert, Professor Fischel did not object to Dr. Becker's methodology and defense counsel failed to question Dr. Becker about it during their cross-examination. More importantly, the defendants do not provide even the slightest explanation why PJI should only start running from the end of the fraud period.[3] In essence, the defendants contend that they are legally entitled to use the ill-gotten gains from their securities fraud interest-free until the end of the fraud period.

9. Moreover, the defendants' criticism of the SEC's use of average dates, on the basis that it "causes PJI to be charged on 'ill-gotten' gains before those gains are even received," see Paragraph 15 below, completely misconstrues Dr. Becker's opinion. Dr. Becker's comparison of the Wylys' offshore rates of returns to the buy-and-hold investor's rates of return is used to provide a reasonable approximation of what portion of the gains derived from all of the Wylys offshore transactions (regardless of whether they occurred in May 1992 or reflect

---

[3] As noted in paragraph 16 below, even Professor Fischel acknowledges that 49% of the Wylys' ill-gotten gains were received before the end of the fraud period, and yet defendants' argue that on these ill-gotten gains no PJI should be charged until the end of the fraud period.

securities held secretly to the end of the fraud period) constitute ill-gotten gains. Since the Wylys' superior annual rates of return (which for Sterling Software was 54%/55% vs. 33%, for Sterling Commerce was 33%/34% vs. 15% and for Michaels Stores was 28%/29% vs. 11%) was applied to all of the transactions, the use of the gross proceeds from all of the offshore transactions rather than the calculating the specific ill-gotten gains all such transactions does not skew the average date either earlier or later.

### DEFENSE POSITION ON PRE-JUDGMENT INTEREST (PJI)

10. Defendants oppose the SEC's request for pre-judgment interest (PJI) on Dr. Becker's measure. Defendants request the Court exercise its discretion to award no PJI on this theory. If the Court were to award PJI, then the only defensible date on which to begin the accrual of interest is the end of the "fraud period."

11. This dispute is timely raised. It has been clear from the outset of this proceeding that, consistent with the last remedies hearing, PJI calculations would be the subject of a separate post-hearing briefing. The SEC acknowledged this at the outset during the SEC's opening statement. Transcript 33:19-22 (Nov. 12, 2014) ("MS. FITZPATRICK: And we can calculate prejudgment interest in accord with your Honor's September 25th opinion once we have the final number from the Court. THE COURT: Okay."). Nor is there any need for expert testimony—it is clear how Dr. Becker calculated her "average dates." Furthermore, there has been ample testimony on Dr. Becker's methods of calculating "ill-gotten gain," which were thoroughly critiqued in Dr. Fischel's report and examined on cross. The defense's PJI argument here involves a straightforward comparison between what Dr. Becker claimed, in her testimony, to have been doing, in measuring "ill-gotten gains," and what she actually did in calculating a PJI

"average date" that (as the SEC all but concedes) has nothing to do with the date of any receipt of "ill-gotten gains."

12. Dr. Becker begins each defendant's PJI on four "average dates"—one for each issuer (e.g., Sterling Software). These "average dates" are, in her words, the "the dollar-weighted average date of the [actual, total] amounts received for each security." Report of Dr. Becker, PX-9230, ¶26. This is the same as what the SEC refers to, above in paragraph 4, as the "total gross proceeds" from the offshore transactions.

   a. These average dates are not based on the dates that ill-gotten gains were received. Instead, these "average dates" are the dollar-weighted average dates of the actual, gross amounts received, regardless of whether those gross amounts represented a return that was above (or below) the "buy and hold benchmark." (The gross amount of proceeds from any given sale may contain some ill-gotten gain, no ill-gotten gain, or even a loss when compared to the buy and hold benchmark—it all depends on the comparison between those gross proceeds and the hypothetical gain from a buy-and-hold benchmark rate of return over the same length of time.)

   b. Dr. Becker's report shows (and the SEC concedes, above) that Dr. Becker did not calculate the amount of "ill-gotten" gain derived from any individual sale by the IOM trusts. Instead, Dr. Becker calculated one average rate of return for each brother, and each issuer, and compared that rate of return to her "benchmark" return calculated over the entire fraud period. This means that Dr. Becker has no dates of specific dollar amounts of "ill-gotten gain," which could be used to begin the PJI calculation.

13. The SEC's example, above, can be used to illustrate this point. In that example, Sam Wyly sold 10,000 Michaels shares offshore on May 1, 1992 at $10/share and then sold another 10,000 Michaels shares offshore on May 1, 2002 at $40/share. Therefore, in calculating

the dollar-weighted "average date," Dr. Becker treats the amounts received in 1992 identically to the amounts received in 2002—with the result that the PJI calculation, in the SEC's example, would begin running on May 1, 2000. That is unfair because there is no reason to believe that any of the earlier 10,000 shares, sold in 1992, resulted in an "ill-gotten" gain to the Wylys under Dr. Becker's own theory of "Gains in Excess of Buy and Hold Benchmark." A glance at the actual stock price data, in PX-9234, and the blue line showing "buy and hold" rates of return, shows that the earlier sales, in May 1, 1992, could not have resulted in any "ill-gotten" gain, for the simple reason that the gross amount received in 1992 would have been **_below_** the buy-and-hold benchmark return between April 1992 (when the shares were transferred) and May 1992. As a result the Wylys must begin paying PJI two years early, in 2000, on the "ill-gotten gains" they received in 2002, simply because they received gross proceeds in 1992 (that contained no "ill-gotten" gain).

14. Dr. Becker's failure to tie PJI to ill-gotten gains runs contrary to the great weight of authority. "Where prejudgment interest is given, it should be assessed upon damages only as they become due." *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 84 (2d Cir. 1994). The Second Circuit recently held that the SEC may not obtain prejudgment interest during the time that ill-gotten gains are frozen. *SEC v. Razmilovic*, 738 F.3d 14, 36-39 (2d Cir. 2013). If PJI may not be awarded on ill-gotten gains actually received but then frozen, it follows that PJI may not start to run before an "ill-gotten" gain is ever received. The SEC's own regulations apply this common-sense principle. 17 C.F.R. § 201.600(a) (2014) (PJI starts accruing on the first of the month following receipt of ill-gotten gain). The SEC's prior PJI calculations, on its tax theory, complied with that regulation—but Dr. Becker's "average dates" do not.

15. As a direct result of Dr. Becker's decision to calculate "average dates" using gross proceeds rather than "ill-gotten" gains, her "average date" occurs too early, which causes PJI to be charged on "ill-gotten" gains before those gains are even received. (This also leads to a higher dollar award for the SEC.) In addition to the SEC's example, discussed above, the SEC's own exhibits show that the "average dates" occur too early.

  a. For instance, PX-9234 (excerpt below) shows that Wyly sales of Sterling Software, until late 1995, would not have yielded "ill-gotten" gains under Dr. Becker's measure, because during the period 1992-1995, the stock price was below the blue "smoothed line" that represents the average returns of the entire fraud period:



Dr. Becker's "average dates" for the Wylys' Sterling Software gains are shown in the red "X," in late 1996, just one year after the stock's returns begin to outperform the buy-and-hold benchmark in late 1995. How can the average date be so early? The reason is apparent from PX-9235 (excerpt below), which shows numerous sales (blue diamonds) during the period of low returns prior to late 1995:

9



Even though Dr. Becker's theory does not consider these earlier gains to be "ill-gotten" (because these earlier gains do not exceed the gains from her buy-and-hold benchmark return), these early gains drag the "average dates" backward in time. Professor Fischel calculated that 51% of Dr. Becker's "ill-gotten" gains came from securities held until the end. If Dr. Becker had based her "average dates" on "ill-gotten" gains, then her "average dates" would be much later in time.

16.   Under Dr. Becker's theory, the amount of "ill-gotten" gain cannot be determined until the end of the fraud period. That is because Dr. Becker's "buy and hold benchmark" requires the use of the average return on stock over the entire fraud period. (Because her "benchmark" rate is the average of all the rates of return up to the final day of the fraud period, this rate is unknowable until the fraud period is over.) It is therefore nonsensical to speak of the Wylys obtaining an "ill-gotten" gain in, say, 1994, when the portion of the gain that is "ill-gotten" cannot be estimated until February 2005, when the fraud period ends and Dr. Becker can at last calculate her "buy and hold benchmark."

a.      The SEC's response, above in paragraph 9, argues that "the Wylys' superior annual rates of return" were "applied to all of the transactions." In other words, the SEC simply assumes that the earlier sales had the same high rates of return as the later sales—an assumption that is obviously untrue, as a glance at PX-9234 demonstrates. The 1992 sales had ***lower*** rates of return than the buy-and-hold benchmark, and therefore ***could not*** have resulted in any "Gain in Excess of Buy and Hold Benchmark."

b.      All this uncertainty serves to highlight the speculative nature of Dr. Becker's theory. She is unable even to identify the dates that her purported "ill-gotten" gains were received. Because of this uncertainty, it would be inequitable to award, on top of Dr. Becker's calculations, any PJI. *See Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 26 (2d Cir. 1982) ("uncertainty as to the extent of the loss" supports award of no PJI in admiralty suit).

c.      If the Court were to award PJI, then the SEC and defense agree that the following amounts represent accurate calculations, based on the 1-year LIBOR rate, compounded annually, which the Court adopted in its September 25 disgorgement opinion:

| PJI (Registered Securities Only) | | |
|---|---|---|
| Starting Dates | Sam Wyly PJI | Charles Wyly PJI |
| Dr. Becker's "Average Dates" | $78,029,040 | $43,350,821 |
| End of Fraud Period | $49,515,428 | $30,006,999 |

| PJI (Registered and Unregistered Securities) | | |
|---|---|---|
| Starting Dates | Sam Wyly PJI | Charles Wyly PJI |
| Dr. Becker's "Average Dates" | $103,874,327 | $59,918,976 |
| End of Fraud Period | $69,572,043 | $44,127,787 |

11

Dated: December 10, 2014

Respectfully submitted

*[signature]*

Bridget M. Fitzpatrick (*pro hac vice*)
Martin L. Zerwitz (MZ-9765)
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4678 (Fitzpatrick)
FitzpatrickBr@sec.gov
*Counsel for Plaintiff*
*U.S. Securities and Exchange Commission*

*[signature]*

Stephen D. Susman (SS8591)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York 10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Samuel E. Wyly and Donald R. Miller, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of December, 2014, copies of the NOTICE OF JOINT AGREEMENT THAT ADDITIONAL EXHIBITS ARE ADMITTED AND DISAGREEMENT OVER THE PROPER MEASURE OF PREJUDGMENT INTEREST was served upon all counsel of record via the ECF filing system.

/s/ Bridget Fitzpatrick
Bridget Fitzpatrick

# ATTACHMENT A

Exhibits

| PX | DX |
|---|---|
| PX-0002 | DX-2000 |
| PX-0009 | DX-2001 |
| PX-0123 | DX-2002 |
| PX-0125 | DX-2003 |
| PX-0131 | DX-2004 |
| PX-0146 | DX-2005 |
| PX-0212 | DX-2006 |
| PX-0356 | DX-2007 |
| PX-0396 | DX-2008 |
| PX-0564 | DX-2009 |
| PX-0755 | DX-2010 |
| PX-0758 | DX-2100 |
| PX-0869 | DX-2101 |
| PX-0871 | DX-2102 |
| PX-0984 | DX-2103 |
| PX-1264 | DX-2104 |
| PX-1491 | DX-2111 |
| PX-4130 | DX-2112 |
| PX-4195 | DX-2113 |
| PX-4222 | DX-2114 |
| PX-4234 | DX-2115 |
| PX-4236 | DX-2116 |
| PX-4312 | DX-2117 |
| PX-7000 | DX-2118 |
| PX-7002 | DX-2119 |
| PX-7011 | DX-2120 |
| PX-9122 | DX-2121 |
| PX-9230 | DX-2122 |
| PX-9231 | DX-2123 |
| PX-9232 | DX-2124 |
| PX-9233 | DX-2125 |
| PX-9234 | DX-2126 |
| PX-9235 | DX-2127 |
| PX-9236 | DX-2128 |
| PX-9237 | DX-2129 |
| PX-9238 | DX-2130 |
| PX-9239 | DX-1001 |
| PX-9240 | DX-654 |
| PX-9241 | |
| PX-9242 | |
| PX-9244 | |
| PX-9245 | |
| PX-9257 | |