UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        - against -

SAMUEL WYLY, and DONALD R.
MILLER, JR., in his Capacity as the
Independent Executor of the Will and Estate
of Charles J. Wyly, Jr.,

                              Defendants,

and

CHERYL WYLY, EVAN ACTON WYLY,
LAURIE WYLY MATTHEWS, DAVID
MATTHEWS, LISA WYLY, JOHN
GRAHAM, KELLY WYLY O'DONOVAN,
ANDREW WYLY, CHRISTIANA WYLY,
CAROLINE D. WYLY, MARTHA WYLY
MILLER, DONALD R. MILLER, JR., in his
individual capacity, CHARLES J. WYLY
III, EMILY WYLY LINDSEY, JENNIFER
WYLY LINCOLN, JAMES W. LINCOLN,
and PERSONS, TRUSTS, LIMITED
PARTNERSHIPS, AND OTHER ENTITIES
KNOWN AND UNKNOWN,

                              Relief Defendants.

-------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/19/14

## OPINION AND ORDER

### 10-cv-5760 (SAS)

1

## I.   INTRODUCTION[1]

The Securities and Exchange Commission ("SEC") brought this civil enforcement action against Samuel Wyly and Donald R. Miller, Jr. as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr. (Charles Wyly and, together with Samuel Wyly, the "Wylys").  The SEC alleged ten securities violations arising from a scheme in which the Wylys established a group of offshore trusts and subsidiary entities in the Isle of Man ("IOM"), used those offshore entities to trade in shares of four public companies (the "Issuers") on whose boards the Wylys sat, and failed to properly disclose their beneficial ownership of that stock.

The liabilities and remedies phases of the trial were bifurcated.  I presided over a jury trial on nine of the ten claims from March 31 to May 7, 2014. On May 12, 2014, the jury returned a verdict against the Wylys on all nine claims, including securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and section 17(a) of the Securities Act of 1933 (the "Securities Act"), and failure to make various disclosures, in violations of

---

[1]      For the purposes of this Opinion, familiarity with the underlying facts detailed in previous Opinions is assumed.

sections 13(d), 14(a), and 16(a) of the Exchange Act.[2]  Following the jury verdict, I

set a discovery and trial schedule for the remedies phase.

On June 6, 2014, the SEC disclosed for the first time that it intended

to seek disgorgement of all trading profits the Wylys earned on offshore Issuer

securities transactions.  On July 29, 2014, I granted the Wylys' motion to preclude

the SEC's "total profit" theory, holding that the SEC had not shown the requisite

causal link between the violations and the amount the SEC sought to disgorge.

However, I allowed the SEC to present a revised calculation based on those trading

profits to be used as an alternative measure of disgorgement for the sale of

registered securities.[3]  On August 29, 2014, the SEC submitted a proffer of its

revised trading profit disgorgement theory.  On September 12, 2014, the SEC

submitted an expert report of Dr. Chyhe Becker, which posited three different

---

[2]    The jury also found the Wylys liable for selling unregistered securities
in violation of section 5 of the Securities Act, and aiding and abetting violations of
sections 13 and 14 by the IOM trusts and the Issuers.  On July 10, 2014, I
dismissed the SEC's insider trading claim, which was tried to the bench for
purposes of liability because the SEC was time barred from seeking civil penalties,
and therefore sought only equitable relief.  *See SEC v. Wyly*, No. 10 Civ. 5760,
2014 WL 3401105, at *1 (S.D.N.Y. July 10, 2014).  Because disgorgement for the
section 5 violation was separately addressed in the first disgorgement order, I do
not include this violation in the alternative calculation of disgorgement discussed
here.  *See SEC v. Wyly*, No. 10 Civ. 5760, 2014 WL 4792229, at *22 (S.D.N.Y.
Sept. 25, 2014) ("September 25 Order").

[3]    *See SEC v. Wyly*, No. 10 Civ. 5760, 2014 WL 3739415 (S.D.N.Y. July
29, 2014) ("July 29 Order").

calculations of unlawful gains based on the Wylys' profits on the sale of registered

Issuer securities.[4]

From August 4 to August 12, 2014, I held a bench trial on all

remedies issues except the SEC's alternative disgorgement calculation based on

trading profits from the sale of registered securities.  On September 25, 2014, I

rendered a partial Opinion and Order, ordering Sam Wyly to disgorge

$123,836,958.76 and Charles Wyly to disgorge $63,396,733.97, plus prejudgment

interest, based on approximating the amount of taxes the Wylys avoided by failing

to accurately disclose beneficial ownership of the securities.[5]

I also granted the SEC's request to leave the record open for the

limited purpose of addressing the alternative theory of disgorgement.  However, I

ruled that the SEC could only present Dr. Becker's first opinion, which

---

[4]     The report also included a calculation of unlawful gains based on the profits from all of the securities.  As stated above, I consider registered shares only in this Opinion and Order, as the September 25 Order addressed disgorgement for violations related to the unregistered shares.

[5]     Prejudgment interest was awarded for the entire period of the Wylys' fraud through December 1, 2014; however, I declined to adopt the SEC's application of the IRS underpayment rate and concluded that using the lower of the average London Interbank Offered Rate ("LIBOR") or the IRS underpayment rate for each year was appropriate.  The SEC separately calculated prejudgment interest and submitted revised figures using the LIBOR rate to the Court, which the Wylys did not contest.  *See* Notice of Plaintiff Securities and Exchange Commission's Recalculations of Pre-Judgment Interest on Ill-Gotten Gains [Dkt. 486].

approximated unlawful gains by "calculat[ing] the difference between the Wylys' gains from their offshore transactions in the Issuers' securities, and the gains that an ordinary buy-and-hold equity investor would have earned in those securities."[6] On October 29, 2014, the Wylys submitted an expert report of Daniel Fischel, responding to Dr. Becker's report and using alternative methods to measure gains.

I held a three-day hearing on November 12, November 17, and December 1, 2014 to address the SEC's alternative theory.  The SEC contends that the offshore system provided the Wylys with three principal, intertwined benefits: secrecy, the ability to use an informational advantage, and liquidity.  The SEC argues that Dr. Becker's calculation, which compares the Wylys' rate of return to that of an average buy-and-hold investor, reasonably approximates the economic value of the Wylys' securities violations—their ability to trade in secret while having an informational advantage over the investing public.  The Wylys contend that the SEC has not established a causal connection between the trading profits and the securities laws violations.  Even if there was a causal connection, the Wylys argue that Dr. Becker's calculation is not a reasonable approximation of those profits.[7]

---

[6]        PX 9230 (expert report of Dr. Chyhe K. Becker) ("Becker Rpt.") ¶ 2.

[7]        The Wylys also contend that the SEC did not timely disclose its theories of the sources of ill-gotten gains, and thus they were unable to adequately

For the following reasons, I conclude that the SEC has established a reasonable approximation of the profits causally connected to the Wylys' securities laws violations, and therefore disgorgement based on trading profits is warranted. Nevertheless, disgorgement based on trading profits may only be imposed in the event that a higher court disagrees with the measure of disgorgement imposed by the September 25 Order, which I conclude represents the best measure of the Wylys' ill-gotten gains.

## II.    APPLICABLE LAW

### A.    Disgorgement

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct."[8]  "[D]isgorgement forces a defendant to account for all profits reaped through his securities law violations

---

prepare.  I reject this argument, as I did when the Wylys raised it in response to the SEC's first notice of a disgorgement theory based on profits.  *See* July 29 Order, 2014 WL 3739415, at *7 n.60.  I allowed the SEC to pursue disgorgement of profits if it could propose a reasonable approximation of profits causally connected to the violations.  *See id.* at *7.  The SEC submitted a proffer outlining its expert's methodology and its theories.  *See* Plaintiff Securities and Exchange Commission's Request to Hold the Record Open for Additional Expert Reports and Proffer in Support Thereof [Dkt. No. 456].  The SEC has not introduced any new theories of ill-gotten gains not included in its proffer.  Therefore, the theories were properly disclosed.

[8]      *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).

and to transfer all such money to the court."[9]  Because disgorgement is an equitable remedy, "[t]he district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."[10] "In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his [violation]."[11]

"Because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude."[12]  Under Second Circuit law, "'[t]he amount of disgorgement ordered need only be a *reasonable approximation* of profits causally connected to the violation.'"[13]  Disgorgement awards can include both "direct pecuniary benefit[s]" and "illicit benefits . . . that are indirect or intangible."[14]  However, because "disgorgement does not serve a punitive function, the disgorgement amount may not exceed the amount obtained through the

---

[9]      *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

[10]     *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996).

[11]     *SEC v. Universal Exp., Inc.*, 646 F. Supp. 552, 563 (S.D.N.Y. 2009).

[12]     *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (*Razmilovic II*).

[13]     *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1474–75) (emphasis added).

[14]     *Id*. at 307.

7

wrongdoing."[15]

The SEC does not need to establish that the securities violations were the proximate cause of gains in order to satisfy the "causal connection" requirement. Unlike private plaintiffs, who must demonstrate that the defendants' misstatements or omissions were a proximate cause of their injury at the liability stage,[16] the SEC has no such burden.[17] Thus, the Second Circuit has held that "'[p]roximate cause' is the language of *private* tort actions[.] [I]t derives from the need of a private plaintiff, seeking compensation, to show that his injury was proximately caused by the defendants' actions. But, in an enforcement action . . . there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation."[18]

---

[15]     *Id.* at 301.

[16]     *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (holding that private plaintiffs must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss" in securities actions).

[17]     *See SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006) ("The SEC, unlike a private plaintiff, is not required to prove reliance when it brings enforcement actions under the securities laws."). *See also SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002) ("The SEC does not need to prove investor reliance, loss causation, or damages" in enforcement actions).

[18]     *SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012) (emphasis added).

The same principles that led the Second Circuit to conclude that proximate cause is irrelevant in SEC enforcement actions at the liability phase apply to disgorgement.  Disgorgement is "a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions."[19]  "[T]he primary purpose of disgorgement is not to compensate investors.  Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched."[20]  Courts can compel defendants to disgorge all unlawful gains "even if [that figure] exceeds actual damages to victims."[21]

Nevertheless, because disgorgement is not punitive, the securities violations and the allegedly unlawful gains must be causally connected.[22]  This does not mean that a court is required to order disgorgement of *all* gains causally connected to the violations.  For example, the Second Circuit has rejected

---

[19]   *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011).

[20]   *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978).

[21]   *Cavanagh*, 445 F.3d at 118.

[22]   *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property that is causally related to the wrongdoing. The remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively.").

disgorgement of income earned on unlawful proceeds, as unduly punitive.[23]  But the Second Circuit has held that district courts are not required to "trace specific funds" to specific violations when ordering disgorgement.[24]  Rather, the appropriate inquiry is whether, and by how much, defendants "were unjustly enriched" by their securities law violations.[25]

       "Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"[26]  Defendants are "entitled to prove that the [] measure is inaccurate,"[27] but the "'risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose

---

[23]    *See SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1104 (2d Cir. 1972).

[24]    *SEC v. Rosenthal*, 426 Fed. App'x 1, 3 (2d Cir. 2011) ("Imposing such a tracing requirement would allow a[] . . . defendant to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits.").

[25]    *SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009).

[26]    *Razmilovic II*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)).

[27]    *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (citing *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) ("Bilzerian, however, bears the burden of establishing that the price increases that occurred during his ownership of the stocks were attributable to market forces rather than to his violations.")).

illegal conduct created that uncertainty.'"[28]  Ultimately, however, the final decision as to the amount of disgorgement rests with the district court.[29]

In *SEC v. DiBella*, the Second Circuit upheld a district court's disgorgement order where the profit did not result directly from the securities laws violations.  A state treasurer agreed to invest the state pension fund's money with an asset management firm in return for that firm agreeing to pay a "finder's fee" to the defendant, a former state senator who had started his own consulting practice.  A jury found the defendant and his company liable for aiding and abetting securities fraud violations, and the judge ordered disgorgement of the finder's fees.  On appeal, the defendants argued that disgorgement was inappropriate because the finder's fee did not result directly from the securities laws violations.  That is, because the finder's fee was paid by the investment firm, and did not come from the pension fund itself, it could not have been "reaped *through* [the] securities laws violations."[30]  The Second Circuit rejected defendants' theory, concluding that the defendant was "unjustly enriched by aiding and abetting the [securities] violations," because "the fraud . . . was the linchpin necessary to ensure that [he]

---

[28]    *Contorinis*, 743 F.3d at 305 (quoting *First Jersey*, 101 F.3d at 1475).

[29]    *See First Jersey*, 101 F.3d at 1474–75.

[30]    *DiBella*, 587 F.3d at 572 (emphasis added).

11

w[as] compensated."[31]  Absent the fraud, the defendant "would not have been paid the fee at issue."[32]  Thus, the court endorsed a "but for" standard of causation.

The Third Circuit recently addressed the issue of causation and reasonable approximation in a detailed opinion.  In *SEC v. Teo*, Teo and a trust that he controlled filed false or incomplete section 13(d) disclosures misrepresenting Teo's true ownership in Musicland in order to avoid that company's poison pill provision, which took effect when an individual or group owned 17.5% or more of the stock, and allowed other shareholders to purchase large amounts of unsold stock directly from the company at a below market price to deter any hostile takeover effort.[33]

In July 1998, Teo controlled 5.25% of Musicland stock and filed accurate disclosures.  Teo then began to rapidly acquire stock through the trust while filing false or incomplete section 13(d) disclosures.  By August 1998, Teo beneficially owned 17.79% of Musicland shares, and by December 2000, Teo beneficially owned 35.97% of Musicland shares.  Having secretly accumulated

---

[31]      *Id.*

[32]      *Id.*

[33]      *See, e.g.*, Arthur Fleischer, Jr. and Alexander R. Sussman, Takeover Defense: Mergers and Acquisitions, §§ 5.01-5.11 ("The Poison Pill Defense") (7th ed. 2012).

well over 17.5% of the stock, "Teo made multiple requests to be placed on Musicland's board of directors," "repeatedly proposed that Musicland become privately held," and worked with several investment banks to take the company private.[34]  Shortly after Teo's efforts, though apparently unrelated to them, Best Buy announced a tender offer and Musicland's stock price rose.  Had Teo disclosed the extent of his beneficial ownership, Musicland's other shareholders could have activated the poison pill provision and diluted the value of his shares and the percentage of his ownership by acquiring a large amount of stock from the company at a lower price.  If this occurred, Teo could not have recognized the profits resulting from the tender offer because the value of his shares would have been diminished by his reduced ownership share in the company.[35]  Instead, Teo sold a portion of his shares in the open market and the remainder to Best Buy as part of the tender offer at a significant profit.

Teo and the trust were found liable for fraud in violation of section 10(b), as well as various disclosure violations including section 13(d), and the district court ordered disgorgement of all profits on Teo's stock sales.  Teo

---

[34]    *SEC v. Teo*, 746 F.3d 90, 94 (3d Cir. 2014), *cert. denied*, 83 U.S.L.W. 3078 (Nov. 17, 2014).

[35]    *See id*. at 109 ("Teo's flagrant fraud insulated the valuation of [his] Musicland stock holdings from the effects of a poison pill that could have been activated if the extent of [his] holdings in the company had been known.").

challenged the disgorgement award as not causally connected to the violation,

arguing that the unrelated tender offer was an independent intervening factor

contributing to the profits.  The court rejected Teo's argument, holding that the

SEC "presumptively demonstrated a reasonable approximation of the profits

arising from transactions tainted by the section 13(d) and section 10(b) violations"

because Teo "intentionally misrepresent[ed] [his] beneficial ownership" and "while

willfully still failing to correct the false filings . . . sold all of the Musicland

shares."[36]  The court discussed the "but for" causation standard, stating "'[t]o say

that a profit is directly attributable to the underlying wrong . . . does not mean that

the defendant's wrong is the exclusive or even the predominant source of the

defendant's profit.'"[37]  Further, "[t]he policies underlying the disgorgement

remedy—deterrence and preventing unjust enrichment—must always weigh

heavily in the court's consideration of whether particular profits are legally

attributable to the wrongdoing, constituting unjust enrichment."[38]

       The court concluded that while Teo could have challenged the

calculation, "[m]erely positing the Best Buy tender offer as an intervening cause

---

[36]    *Id*. at 107.

[37]    *Id.* at 106 (quoting Rest. (Third) Restitution § 51(5)).

[38]    *Id.* at 107.

and pointing to evidence that [Teo] did not bring it about was insufficient to overcome the presumption by the SEC that its approximation of illegal profits was reasonable."[39]  Moreover, even if the defendant had proved that the Best Buy tender offer was the direct cause of the profits, the court would have upheld the disgorgement amount.  "[W]hether the . . . profit resulted directly—from a causal perspective—from the wrongdoing or from the operation of dumb luck is not dispositive on the question of whether it is proper and fair to regard those profits as tainted by the wrongdoing."[40]  The district court must "make this judgment in equity, giving consideration to the elimination of unjust enrichment and the deterrent impact this action might have . . . ."[41]

Finally, the Second Circuit recently concluded, in the context of insider trading, that the amount to be disgorged need not be limited to the defendant's direct pecuniary benefit.  In *SEC v. Contorinis*, the Second Circuit held that an insider who trades illegally on behalf of others, using their funds, can nevertheless be required to disgorge the full amount of illicit profit generated from his actions, even though he personally did not realize any profits.  The defendant

---

[39]     *Id*. at 108.

[40]     *Id.*

[41]     *Id.*

had investment control over a fund, and relied on nonpublic material inside

information to make opportune trades with the fund's assets.  The defendant was

found guilty of criminal securities fraud.  After his conviction, the SEC sought

disgorgement in a civil action of the total unlawful profits obtained by the fund,

and the district court granted the SEC's request.[42]

On appeal, the defendant argued that the disgorgement was

inappropriate because he never personally controlled the profits that accrued to the

Fund.  The Second Circuit disagreed, and upheld the disgorgement award.  In so

doing, the court noted that, although he did not receive direct profit from the illegal

trades, the defendant benefitted by enhancing his reputation and increasing the

likelihood of receiving future benefits as a fund manager.[43]  The court also

concluded that

> limiting disgorgement amounts to the direct pecuniary benefit
> enjoyed by the wrongdoer would run contrary to the equitable
> principle that the wrongdoer should bear the risk of any
> uncertainty affecting the amount of the remedy.  A wrongdoer's
> unlawful action may create illicit benefits for the wrongdoer that
> are indirect or intangible.  Because it would be difficult to
> quantify the advantages of an enhanced reputation or the psychic
> pleasures of enriching a family member, to require precise
> articulation of such rewards in calculating disgorgement amounts

---

[42]   *See SEC v. Contorinis*, No. 09 Civ. 1043, 2012 WL 512626, at *1
(S.D.N.Y. Feb. 3, 2012).

[43]   *See Contorinis*, 743 F.3d at 304.

16

would allow the wrongdoer to benefit from such uncertainty.[44]
Thus, the court declined to "limit the maximum disgorgement amount to the direct
pecuniary benefit to the wrongdoer," as urged by the defendant, and instead
maintained the maximum bound of disgorgement as the "total gain from the illicit
action."[45]

### B.    Prejudgment Interest

This Court also has discretion to order payment of prejudgment interest
on any disgorged gains.  Requiring the payment of interest prevents a defendant
from obtaining the benefit of "'what amounts to an interest free loan procured as a
result of illegal activity.'"[46]  "In deciding whether an award of prejudgment interest
is warranted, a court should [take into account] . . . considerations of fairness and
the relative equities of the award, [] the remedial purpose of the statute involved,
and/or [] such other general principles as are deemed relevant by the court."[47]

### III.   Expert Reports

---

[44]     *Id.* at 306.

[45]     *Id.*

[46]     *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2011 WL 666158, at
*3 (S.D.N.Y. Feb. 14, 2011) (quoting *SEC v. Moran*, 944 F. Supp. 2d 286, 295
(S.D.N.Y. 1996)).

[47]     *First Jersey*, 101 F.3d at 1476 (quotations omitted).

## A.   The SEC's Expert

The SEC's expert witness, Dr. Chyhe Becker, calculated the ill-gotten gains earned by the Wylys from April 13, 1992, when the Wylys first transferred securities to the offshore trusts, to February 23, 2005, when Michaels Stores first reported that it had received subpoenas in connection with government investigations into the Wylys' use of offshore trusts (the "Fraud Period").[48]  She compared the Wylys' gains during this time to the gains that an ordinary buy-and-hold investor would have earned in those same securities.[49]

For the purposes of her calculations, Dr. Becker considered four key dates: the date the options[50] were transferred to the offshore system, the date the options were exercised, the date the stocks were sold, and the end date of the Fraud Period.[51]  She treated the Wylys as "purchasing" the options for the value of the option on the date of the transfer, with an additional "purchase" on the date of exercise for the strike price.[52]  Similarly, she treated the Wylys as "selling" the

---

[48]   *See* Becker Rpt. ¶ 2 n.1.

[49]   *See id.* ¶ 4.

[50]   The Wylys transferred both stock options and warrants.  For the purposes of this Opinion, I will refer to both as options.

[51]   *See* Transcript of Second Remedies Hearing ("Rem. Tr. II") at 136.

[52]   *See id.*

18

securities still held at the end date of the Fraud Period (or, in the case of Sterling Software and Sterling Commerce, until the Issuers were acquired).

Dr. Becker used four steps in her analysis. *First*, Dr. Becker calculated the total gains earned by the Wylys from Issuer securities transactions in the offshore trusts during the Fraud Period. As discussed above, in making this calculation, she excluded any unrealized gains that the Wylys earned from the securities before they were transferred to the offshore system. That is, her calculation gave the Wylys credit for the value of each option on the day it was transferred offshore. But Dr. Becker included any unrealized gains the Wylys earned from the securities at the end of the Fraud Period—*i.e.*, she included the value of the securities that the Wylys held at the end of the Fraud Period that were never sold.[53]

After calculating the total gains, Dr. Becker calculated the Wylys' rates of return and average holding periods. Dr. Becker used the "dollar-weighted rate of return," which takes into consideration the timing and the amounts of the investments.[54]  Dr. Becker found the following rates of return: (1) Sterling Software: 54.5% to 55.4%, (2) Michaels: 37.8% to 41.4%, (3) Sterling Commerce:

---

[53]      *See* Becker Rpt. ¶ 14.

[54]      *Id.* ¶ 16.  *See also* Rem. Tr. II at 136–137.

27.9% to 29.1%, and (4) Scottish Re: -7.8% to -9.9%.[55]  Using these rates of return, Dr. Becker then calculated the Wylys' average holding periods for each Issuer.  The average holding periods allows a comparison of the Wylys' total gains to what they would have earned if they had invested the same amount, for the same length of time, but earned instead the average buy-and-hold equity investor return for each Issuer.[56]  Dr. Becker found that the Wylys' average holding period for the offshore securities ranged from 1.6 years to 4.7 years.[57]

Dr. Becker then calculated the rate of return for a buy-and-hold investor in each of the four securities during the thirteen-year Fraud Period.  A buy-and-hold investor who purchased at the start of the Fraud Period and held until the end of the period (or until the takeover date), would have earned the following rates of return: (1) Sterling Software: 33.2%, (2) Michaels: 15.5%, (3) Sterling Commerce: 11.0%, and (4) Scottish Re: 9.3%.[58]

Finally, Dr. Becker calculated the hypothetical gains that the Wylys would have generated if they earned the same rates of return earned by buy-and-

---

[55]     *See* Becker Rpt. ¶ 17.

[56]     *See id.* ¶ 19.

[57]     *See id.* ¶ 20.

[58]     *See id.* ¶ 22 tbl.4.

hold investors.  Dr. Becker used this calculation to represent what an investor would have earned, had they invested the same amount as the Wylys, over the same average holding period, but earned the annualized rate of return for that specific security.[59]  She then subtracted the buy-and-hold investor's gains from the Wylys' total gains calculated in her first step, to determine the ill-gotten gains.[60]

Using this method, Dr. Becker calculated that the Wylys' gains in excess of those of a buy-and-hold investor—*i.e.*, the gains attributable to the Wylys' securities laws violations—were $115,530,905 for Sam Wyly, and $77,196,636 for Charles Wyly.[61]

## B.    The Wylys' Expert

The Wylys engaged Professor Daniel Fischel both to rebut Dr. Becker's report and to provide an alternative method for measuring ill-gotten gains. Fischel contended that Dr. Becker's analysis is fundamentally flawed for five reasons.  Fischel preliminarily noted that Dr. Becker provided no citation to authority to establish that her method is an accepted methodology to evaluate gains

---

[59]    *See id.* ¶ 23.

[60]    *See id.* ¶ 25.

[61]    *See id.* ¶ 26 tbl.5.

21

related to insider information or nondisclosure.[62]  He stated that an extensive

economic literature exists to analyze "whether the profitability of trades by insiders

results from an informational advantage as compared with uninformed trades," and

noted that this literature suggests that the analysis should be focused solely on the

insiders' sales of securities, and whether the stock had abnormal returns in the

period after the sale.[63]

> Substantively, Fischel argued first that Dr. Becker's calculation of a

holding period lacks meaning because she improperly treats transfers and option

exercises as purchases based on insider information.  Fischel noted that because the

Wylys beneficially owned the options (that were then exercised) both before and

after the transfers were made, the Wylys would have received the same gain on the

securities resulting from the exercise of the options and subsequent sale of the stock

regardless of when the options were transferred offshore.[64]

> Fischel further argued that Dr. Becker should not have included the

increases in the value of the securities that the IOM trusts retained until the end of

the Fraud Period, or in the case of Sterling Commerce and Sterling Software, until

---

[62]     *See* PX 9242 (expert report of Daniel R. Fischel) ("Fischel Rpt.") ¶ 14; Rem. Tr. II at 243.

[63]     *See* Fischel Rpt. ¶¶ 14, 31.

[64]     *See id.* ¶¶ 15–16.

the Issuers were acquired.  He stated that, by definition, there could be no gains attributable to an informational advantage at the time of sale because no sale occurred.  He estimated that 38% of the gains that Dr. Becker calculated are attributable to registered Issuer securities that the IOM trusts held to the end of the Fraud Period or until the Issuers were acquired.[65]

Fischel next argued that Dr. Becker erred by assuming that any gains resulting from the difference between the annualized return of an Issuer's stock during the offshore holding period and the annualized return of the Issuer's stock during the entire Fraud Period can be attributed to the Wylys' informational advantage.  Fischel contended that the difference could arise from any number of factors that have nothing to do with the Wylys or the Issuers, such as different economic conditions affecting the market as a whole during the two different time periods.[66]

Finally, Fischel contended that Dr. Becker's calculation is flawed because it does not account for the difference between the returns from holding options and those from holding the underlying stock.  He noted that the percentage change in the value of an option will generally be larger than the percentage change

---

[65]     *See id.* ¶¶ 19–20 & n.27.

[66]     *See id.* ¶ 21.

in the value of the underlying stock.  Therefore, when a stock price increases, the investor holding an option will have a larger rate of return than an investor holding the underlying stock because the initial value of the investment was lower.[67]

Fischel then used two different methods to analyze whether the Wylys benefitted from their offshore sales.  He first utilized the standard method of analyzing the profitability of insider trading: calculating whether a stock had abnormal returns in the period after an insider's trades.[68]  In this calculation, he focused on whether there was any abnormal performance over the entire fraud period.[69]  Using this method, Fischel found that the Wylys had $47 million in net losses, comprised of a $51.4 million net loss for Sam Wyly and a $4.4 million net gain for Charles Wyly.[70]

Fischel's second method compared the value of the Issuer stock at the end of the Fraud Period to the estimated value of the offshore proceeds from the sale of the stock if the proceeds had been invested either in the Standard & Poor's

---

[67]     *See id.* ¶ 24.

[68]     *See id.* ¶ 31.  Abnormal returns are assessed by comparing the returns the alleged insider received to the returns that would be expected based on market factors.  *See id.*

[69]     *See* Rem. Tr. II at 289.

[70]     *See* Fischel Rpt. ¶ 35.  These figures are solely for registered securities.

500 ("S&P 500") or one-year Treasury bills.[71]  Using this method, Fischel concluded that the Wylys would have earned more if the IOM trusts had not made any sales of Issuer stock, and had instead continued to hold the stock through the end of the Fraud Period.[72]

## IV. DISCUSSION

### A. Causal Connection

The Wylys contend that the SEC has failed to show a causal connection between the securities laws violations and the alleged advantages the Wylys enjoyed from the offshore trading.  The SEC contends that the offshore system benefitted the Wylys by providing them with secrecy, an ability to use their informational advantage, and liquidity.  Though the Wylys concede that there is a causal connection between the disclosure violations and the secrecy advantage, they argue that there is no causal connection between the disclosure violations and any informational advantage or increased liquidity.

With regard to informational advantage, the Wylys concede that an informational advantage existed, but argue that this advantage is independent of the

---

[71]     *See id.* ¶¶ 36, 38.

[72]     *See id.* ¶ 40.

violations.[73]  As insiders of the Issuer companies, the Wylys clearly enjoyed an

informational advantage over the investing public.  However, the Wylys argue that

the offshore system did not given them any *more* of an informational advantage

than they already had.[74]  Though the SEC alleges that the offshore system allowed

the Wylys to use this advantage more aggressively than they would have been able

to had they felt the need to disclose their trading, the Wylys assert that this is

merely an assumption that the SEC makes.  The SEC has not pointed to any

difference between the trading onshore and the trading offshore to prove this causal

connection.[75]

The Wylys further argue that the SEC has not shown a causal

connection between any alleged liquidity and the disclosure violations.  Again, the

Wylys contend that the SEC has not supported this theory because there has been

no attempt to quantify it.[76]  They agree that the sales of offshore stock enabled the

Wylys to invest the assets from the offshore system in new assets, but argue that the

SEC should have presented evidence showing, for example, that the Wylys were

---

[73]     *See* Rem. Tr. II at 60.

[74]     *See id.*

[75]     *See id.* at 437.

[76]     *See id.* at 424.

able to borrow on more favorable terms as a result of using offshore assets, as opposed to onshore assets, as collateral.[77]  Without this comparison, the Wylys contend that no causal connection has been established.

The Wylys suggest that each advantage must be analyzed separately to determine whether a causal connection has been shown.  This is inappropriate because the offshore system allowed the Wylys to have several intertwining advantages.  It does not make sense to analyze these advantages as if they existed in a vacuum, when in fact, each advantage enabled the other to exist.  Because the Wylys felt no disclosure obligations (the secrecy advantage), the offshore system allowed them to trade more than they otherwise would have (the liquidity advantage), and possibly use their informational advantage to a greater extent than they could have onshore.  The SEC alleges that these three advantages together allowed the Wylys to enjoy some amount of trading profits over and above what they would have earned absent the disclosure violations.

The SEC pointed to evidence introduced during the jury trial and the bench trial during the first remedies hearing that supports this theory.  The evidence supports, and the Wylys do not contest, that the ability to trade in secret was a benefit.  The offshore system enabled the Wylys to "cast the appearance of being

---

[77]      *See id.* at 338, 424–425.

traditional buy-and-hold investors to the investing public"[78] while simultaneously being able to trade these securities freely in secret.  For example, an email from Keeley Hennington, the Wylys' agent, to Louis Schaufele, their broker, supports the allegation that the Wylys took the reporting requirement into consideration when deciding whether or not to make a sale.[79]  Further, in an April 1996 proxy, Sam Wyly asked stockholders of Sterling Software to approve a stock option plan for executives to "align the economic interests of the grantees with those of the stockholders."[80]  This proxy statement showed that Sam Wyly beneficially owned only 650 shares and that Charles Wyly beneficially owned no shares.  However, in the period immediately before and after the proxy statement, nine of the Wylys' offshore entities exercised options and then sold over 2.25 million Sterling Software shares.[81]  Thus, based on the Wylys' nondisclosure, shareholders could view the Wylys as executives who needed more options to align their interests with those of

---

[78]    Rem. Tr. II at 11.

[79]    *See* PX 1264 (email from Hennington to Schaufele stating Charles Wyly "does not seem willing to even consider anything that would look like a sale in the proxy").  *See also* 4/17/14 Transcript of Jury Trial ("Jury Tr."at 1323) (testimony of Hennington that public perception of a gift or sale of Michaels stock was a factor Charles Wyly considered in the timing of transactions).

[80]    PX 4130.

[81]    *See* Option Transfers and Open Market Purchases, Exhibits 5A, 5B, 6A and 6B, to Stipulation of Undisputed Facts.

28

the company, though in reality the Wylys held millions of shares offshore and traded them frequently.[82]

The SEC also presented evidence sufficient to support the theory that the Wylys were able to use their informational advantage through the offshore system. For example, there is evidence that the Wylys established new offshore trusts to purchase Sterling Software call options in order to remain under the five percent reporting threshold.[83] Within four months of the Wylys recommending the establishment of these trusts, Sterling Software announced that it might spin off Sterling Commerce.[84] Within a week of the spin off, the Wylys recommended that the trusts sell those call options, initially purchased for $5 million, for $19.5 million.[85] It is reasonable to conclude that the Wylys would not have purchased these call options and subsequently sold them without both the secrecy afforded by the offshore system and their informational advantage as to the spin off of Sterling Commerce. As another example, after attending a board meeting and learning that

---

[82]    *See* PX 9231 (chart showing disclosure and nondisclosure of offshore option exercises).

[83]    *See* PX 146 (fax from Michael French to Ronald Buchanan).

[84]    *See* PX 212 (press release from Sterling Software).

[85]    *See* PX 356 (fax from Shari Robertson and Michael French to Trident Trust and David Bester).

Michaels' earnings per share would be significantly higher than estimates, Sam

Wyly caused the cancellation of a standing order to sell offshore-held Michaels

shares at $30 or better.[86]  Evan Wyly, Sam's son, testified that this nonpublic

information informed the decision to cancel the sale order.[87]  After the news became

public and the stock price increased by $8, the Wylys reinstated the sell order one

month later to sell at $40 or better.[88]

The Wylys counter this evidence with evidence that many of the trades

were performed for reasons divorced from informational advantage, such as a loan

becoming due.[89]  However, the Wylys misconstrue the SEC's burden in establishing

a causal connection.  To establish a causal connection, the SEC must only establish

that the Wylys were unjustly enriched by their securities law violations.[90]  That is,

absent the violations, the Wylys would not have earned some portion of their

trading profits.  As discussed above, the secrecy provided the Wylys with the

opportunity to use their informational advantage, and several examples establish

---

[86]     *See* PX 755 (minutes of Michaels' Board of Directors meeting) at 11;
PX 758 (email from Michelle Boucher to Ken Jones cancelling standing order).

[87]     *See* Jury Tr. at 2766.

[88]     *See id*. at 2768.

[89]     *See* DX 2009, DX 2010 (charts regarding collar sales and loan
maturity dates for Sam and Charles Wyly).

[90]     *See DiBella*, 587 F.3d at 572.

that the Wylys did just that.  It may be true that not all trades were pursued opportunistically, and that some were undertaken with "legitimate" motives.  But *all* trades from the offshore system were undertaken without required and/or accurate disclosures, and thus within the veil of secrecy.[91]  The question then is what *amount* of the profits were ill gotten and beyond what the Wylys would have earned absent the violations.

Finally, the offshore system allowed the Wylys to liquidate their assets to a greater extent than they would have been able to absent the disclosure violations.  As noted above, the Wylys wanted the appearance of being company executives who, for the most part, held stock in their companies and did not trade frequently.  At the same time, the Wylys were able to monetize the assets held through the offshore system by selling shares, obtaining margin loans against the offshore holdings, and using the shares as collateral in collar transactions.  The Wylys then used this money to finance other business ventures, acquire real estate, and make lifestyle purchases.[92]  Additionally, there is evidence to suggest that

---

[91]     *See Teo*, 746 F.3d at 106 (noting that defendant's wrong need not be the exclusive or predominant source of the defendant's profit).  *Accord SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (dismissing defendant's argument that drop in stock price was "not solely attributable to the disclosure").

[92]     *See* DX 1001 (Senate Report).

disclosure requirements informed the Wylys' choices of which assets to liquidate.[93] The Wylys argue that because this advantage has not been quantified, the SEC has not established a causal connection.  But this conflates whether the measure of disgorgement is a *reasonable approximation* of the profits with the distinct question of whether the profits are *causally connected* to the violations.  Though this benefit has not been quantified, there is sufficient evidence to show that the disclosure violations directly enabled increased liquidity—thus establishing a causal connection.

To establish the causal connection, the SEC must show that but for the disclosure violations, the Wylys' trading profits would have been lower.  As I concluded in the July 29 Order, the SEC could not establish that *all* of the Wylys' trading profits from the offshore system were causally connected to the violations. Unlike other cases that awarded total profits as a measure of disgorgement, the violations here were not undertaken for the purpose of market distortion or insider trading—rather, the evidence established that the primary purpose was tax avoidance.[94]  However, it is also evident that, having established the offshore system for that primary purpose, the Wylys were able to enjoy other

---

[93]     *See* Jury Tr. at 1021–1022 (testimony of M. Boucher).

[94]     *See* July 29 Order, 2014 WL 3739415, at *6 n.48.

benefits—namely, secrecy, the ability to use their informational advantage, and liquidity.  The question, therefore, is whether *some portion* of their trading profits is causally connected to the violations.[95]  Based on the evidence presented, I conclude that it is.

Thus, the SEC has established a causal connection between *some* amount of trading profits and the disclosure violations.

## B.   Reasonable Approximation

The crux of the parties' disagreement centers on whether Dr. Becker's method provides a reasonable approximation of the Wylys' profits that is causally connected to the violation.  The Wylys contend that Dr. Becker's method is unreliable because it is not based on accepted methodology.  Further, they argue that the method does not measure the secrecy advantage, which they contend is the only advantage causally connected to the violations.  Additionally, they assert that the method does not measure any alleged informational advantage because it is flawed in the following ways: (1) it uses "irrelevant transfer dates[,] . . . irrelevant

---

[95]     Using a "but for" causation standard, it is, of course, possible to conclude that all profits of the Wylys' trading are causally connected to the disclosure violations—but for the secret offshore system, many, if not most, of the Wylys' trades would not have occurred.  However, for all the reasons stated in the July 29 Order, disgorgement of total profits in this case "smacks of punishment, not equity or deterrence."  *Id.* at *7.

transfer amounts,"[96] and irrelevant exercise dates;[97] (2) it "includes excess gains on securities that were never sold;"[98] (3) it wrongly attributes all differences in returns to Issuer-specific information; and (4) it ignores the differences between options and stock.

The Wylys argue that Professor Fischel's first method more closely approximates the Wylys' gains, or lack thereof, that are causally connected to the violations because he uses a standard methodology for measuring whether trades reflect the use of inside information.  Finally, the Wylys argue that the SEC's method is inaccurate because Fischel's second method shows that the Wylys would have earned more had they never made any sales.

### 1.    Lack of a Generally Accepted Methodology

The Wylys rely on *SEC v. Razmilovic* to argue that Dr. Becker's conclusions should be afforded no weight because she does not use a generally accepted methodology.  In *Razmilovic*, the district court gave no weight to the evidence presented by the defendant's expert because, *inter alia*, "she did not base her opinion upon economic literature . . . and used an earnings response model

---

[96]     Rem. Tr. II at 453.

[97]     *See id.* at 461.

[98]     *Id.* at 464.

unsupported by accepted econometric principles."[99]  This reasoning was approved

by the Second Circuit, which held that "[a]ssessments of relevance are committed to

the sound discretion of the district court, and it was entirely reasonable for the court

to discount [the expert's] opinion" on this basis.[100]

However, *Razmilovic* does not compel the Court to disregard Dr.

Becker's conclusions.  In that case, the court disregarded the defendant's expert

opinion for many reasons beyond the fact that she did not base her opinion upon

economic literature.[101]  There, the defense expert used the same methodology as the

SEC expert, an event study, but "did not apply that methodology reliably to the

facts" of the case.[102]  Furthermore, the court found that the expert was not qualified

to testify because she had no prior experience with the type of case at issue there.[103]

Finally, although the Second Circuit approved the court's reasoning, it did not hold

---

[99]     *SEC v. Razmilovic*, 822 F. Supp. 2d 234, 262 (E.D.N.Y. 2011) (*Razmilovic I*).

[100]     *Razmilovic II*, 738 F.3d at 34.

[101]     As discussed below, it is not clear that Dr. Becker did *not* base her method on economic literature.  Though she does not provide academic citations for the actual method employed, the principles on which her method is based are supported by economic literature.

[102]     *Razmilovic I*, 822 F. Supp. 2d at 263.

[103]     *See id.* at 262.

that courts *must* disregard economic models not supported by academic literature.[104] Instead, the Second Circuit noted that these matters are left to the "sound discretion of the district court."[105]   The Second Circuit's conclusion that the district court did not *abuse* its discretion given the facts in that case says little or nothing about this Court's exercise of discretion in determining the appropriate weight to afford an expert's use of a nonstandard method in this particular case.

Dr. Becker identified no economic literature, either in her report or in her testimony, that discusses a comparison to a buy-and-hold investor to measure the amount of ill-gotten gains relating to informational advantage, secrecy, or liquidity.  When questioned, Dr. Becker responded that she chose this method for several reasons.  Dr. Becker first noted an academic article that concluded that disclosure requirements cause insiders to trade in a fundamentally different way, by adding random trading, and thereby incurring losses and costs, in an effort to keep some information from the investing public.[106]   This article supports Dr. Becker's conclusion that holding a security offshore is more valuable than holding the same security onshore.  She testified further that "economic theory doesn't provide me

---

[104]      *See Razmilovic II*, 738 F.3d at 34.

[105]      *Id.* at 35.

[106]      *See* Rem. Tr. II at 103–104.

36

with any kind of model as to what their pattern of trading would have looked like . . . [i]f [the Wylys] felt they had to disclose."[107]  The Wylys argue that, in fact, there is a well-defined economic literature that discusses measuring the value of secrecy, which looks at the hypothetical negative market reaction if the required disclosures had been made. This market reaction would have then depressed the prices for the Wylys' subsequent sales.[108]  Dr. Becker addressed this issue in her testimony, and stated that this measure "is based on the typical form 4 filer [and] would not be a good representation of how the stock prices would have reacted to the Wylys in this particular situation."[109]

Dr. Becker then addressed why she chose the method of comparison to a buy-and-hold investor.  She stated that her analysis was "based on the academic literature" that looks at the existing trading pattern and compares this to a buy-and-hold benchmark in order to quantify "how much [the Wylys] benefitted from their choice decisions, from their investment decisions."[110]  Further, this method attempts

---

[107]    *Id.* at 106.

[108]    *See id.* at 252.

[109]    *Id.* at 105.

[110]    *Id.* at 124.  Though Dr. Becker stated that this method was based on academic literature, she did not identify any specific articles either in her report or in her testimony that support the use of this method.  She did testify, however, that her method is a "performance analysis, which is well grounded in economics . . .

to measure the benefit the Wylys received from their lack of disclosure.  Dr. Becker stated that "because of this invisibility, the Wylys appeared more like a buy-and-hold investor than what they really were."[111]  Therefore, comparing the Wylys' actual trading to a buy-and-hold benchmark attempts to measure the difference between what the Wylys actually earned and what they would have earned if they really were buy-and-hold investors—the image they projected to the investing public.  Finally, Dr. Becker stated that she chose to compare the Wylys to a "smooth version" of the stock price during the fraud period.[112]  She created this "smooth version" by determining an average annualized rate of return that removes all the "peaks and valleys," *i.e.*, the relative highs and lows within the Fraud Period.[113]  This holds the Wylys' trades "to a standard which permits no informational advantage to give them any gains," because "[i]n this 'but for' world they couldn't have used their informational advantage to get gains from selectively

---

it's a pretty core concept that is pretty widely done."  *Id.* at 176.  The Wylys concede that Dr. Becker used a standard measure, but argue that economic theory does not support the use of that measure to evaluate whether insiders benefitted from an informational advantage.  *See id.* at 452.

[111]     *Id.* at 107.

[112]     *Id.* at 119.

[113]     *Id.*

timing their transfers offshore or their sales . . . ."[114]

I find Dr. Becker's method to be valid and reject the Wylys' contention that is should be afforded no weight.  Although Dr. Becker does not cite academic articles to support her testimony, this fact alone is not dispositive.  The Wylys do not contest that Dr. Becker herself is a qualified expert.  I therefore credit her testimony that the established method for measuring the value of secrecy—that of assuming hypothetical accurate disclosures and then determining those disclosures' market impact—is not appropriate in this case.  This conclusion, moreover, is in line with this Court's previous opinion.  In the September 25 Order, I discussed the Wylys' previous expert, John J. McConnell, who used this method to measure the economic value of registration.  I concluded that the method was flawed because, *inter alia*, "the studies evaluate the impact of disclosure by 'garden variety' insiders," and the Wylys were "anything but 'garden variety' insiders."[115]  Further, I concluded that it was inappropriate to "draw conclusions from the small number of onshore transactions relative to the large volume of offshore (and undisclosed) transactions at issue here."[116]

---

[114]     *Id.*

[115]     September 25 Order, 2014 WL 4792229, at *15.

[116]     *Id.* at *16.  Nor would it be appropriate to compare the onshore trades to the offshore trades to measure the benefit, as the Wylys also suggest.  As I have

Moreover, I do not agree that the SEC should have employed the standard method used for measuring the ill-gotten gains in insider trading cases, *i.e.*, performing an event study for each trade. *First*, this is not an insider trading case. Though the SEC alleges that the Wylys used an informational advantage to trade opportunistically, they did this in the context of the offshore system where the Wylys could choose between securities from four different Issuers where they had an informational advantage. In this context, the Wylys could have information that while one Issuer stock was poised to rise moderately, another Issuer stock would rise more during the same period. In this case, using an event study would not detect any use of informational advantage in a sale of the first stock, even though the decision to sell was motivated by an informational advantage.[117] *Second*, this approach is simply not feasible given the length of the fraud period here—thirteen years—and the hundreds of trades at issue.

Because of the unique facts of this case, I credit Dr. Becker's

already held, because the "offshore sales exceeded domestic sales by a ratio of 20 to 1 and the comparison between a handful of disclosed domestic transactions and the average of far more frequent and sizeable undisclosed offshore transactions does not take into account the potential outlier nature of the domestic transactions and blurs together the characteristics of the much more prolific offshore transactions," using this comparison to measure the Wylys' ill-gotten gains from offshore trading would not be a reasonable approximation. *Id.* at *16 n.181 (internal quotations omitted). *See also* Rem. Tr. II at 174.

[117]     *See id.* at 198, 213, 474.

testimony that the established methodologies for measuring the value of secrecy and informational advantage would not reasonably approximate the Wylys' ill-gotten gains.  Moreover, given the absence of an established methodology, I agree that Dr. Becker's method, that of comparing the Wylys' profits to those of a buy-and-hold investor, could reasonably approximate the profits causally connected to the Wylys' violations.

Based on the unique facts here and the testimony of the experts, I conclude that Dr. Becker's choice of method was reasonable.

### 2.        Application of Dr. Becker's Method

The Wylys contend that Dr. Becker's method is fatally flawed because the dates she employs to calculate the Wylys' holding periods are irrelevant. Therefore, because the holding periods have no meaning, any comparison to a buy-and-hold investor based on these holding periods is similarly meaningless.[118]  The SEC contends that the dates that define the holding period are tied to "false, misleading, and absent disclosure that furthered the Wylys' fraud and constituted securities violations."[119]

---

[118]     The Wylys do not dispute the accuracy of Dr. Becker's calculations or her use of the underlying data, only her choice of *how* the holding periods are calculated.

[119]     Rem. Tr. II at 382.

The Wylys first contend that using the transfer date as the start of the holding period does not make sense, as the Wylys did not purchase anything, and therefore this date cannot represent any informational advantage. The Wylys owned the options onshore, and therefore they argue that the transfer of these options offshore is irrelevant, as no purchase or sale took place.[120] The SEC responds that this is the date that the secrecy began, and therefore an appropriate date to choose for the start of the holding period. On the day the options are transferred offshore, the Wylys have the ability to "do anything they want with these options without disclosure."[121] Further, the SEC provided charts showing the dates of each transfer for each of the Issuers for which Dr. Becker calculates a profit.[122] The SEC argues that these charts show that the Wylys transferred their options when the stock price was at relative lows, and therefore, that the Wylys used their informational advantage when choosing which date to transfer options offshore.

I conclude that using the transfer date as the start of the holding period is appropriate, because the transfer date marks the beginning of the period of time

---

[120]   *See id.* at 453–454.

[121]   *Id.* at 382.

[122]   *See* PX 9235.

the Wylys held the options offshore, and thus the beginning of the time the options became "invisible" to the investing public. In order to calculate the Wylys' gains in excess of a buy-and-hold investor (a method that I have already concluded is reasonable), Dr. Becker necessarily had to choose a beginning date for the Wylys' holding period. The transfer date is appropriate because that date marks the first time the Wylys filed a misleading disclosure—in this case, a disclosure that disclaimed beneficial ownership of the options after transfer.[123]

Similarly, the Wylys argue that the use of the exercise date in calculating the holding period is irrelevant, as the exercise price was set by the Issuer when the options were granted. Further, the Wylys exercised some of the options at the end of the option period, just before they were due to expire.[124] Therefore, they contend this date cannot represent the use of an informational advantage. I disagree. For the same reasons the transfer date is appropriate, the

---

[123]   *See* Rem. Tr. II at 384. It is unclear whether that date also shows a use of informational advantage. The SEC presented evidence that tended to show that the transfers occurred at relative low points in the stock price. The Wylys, however, presented evidence that the transfer dates corresponded to the end of the year, and that options from different Issuers were transferred on the same date. Based on this evidence, I cannot conclude that *all* the transfer dates show the use of an informational advantage, though it certainly appears that some do. However, this conclusion is unnecessary as *every* transfer date involved either no disclosure or a misleading disclosure and began the period where the Wylys' beneficial ownership was masked.

[124]   *See id.* at 463–464.

exercise date is also appropriate—on the date of exercise, there was either no disclosure or a false disclosure.[125]  Further, the exercise date is the date on which the Wylys, in effect, tied up additional capital over and above the value of the option at the date of transfer (*i.e.*, the amount the Wylys paid to exercise the option).[126]  Therefore, using this date as the start of the holding period for the amount of the exercise price accurately tracks the period during which the Wylys' capital was tied up in the offshore system, establishing a weighted average holding period.[127]

Furthermore, Dr. Becker's use of these transfer and exercise dates, along with the corresponding amounts of capital, reflects her solution to one of the Wylys' criticisms.  The Wylys contend that Dr. Becker's method is flawed because it incorrectly compares the rate of return on options with the rate of return on stock.[128]  Dr. Becker's testimony showed, conclusively, that this is not the case.  Dr. Becker compared the Wylys' rate of return to a buy-and-hold investor in the underlying stock.  To do this, however, she used the value of the option and the

---

[125]    *See* PX 9231 (chart of disclosures and nondisclosures of Wyly offshore option exercises).

[126]    Of course, this figure is unrelated to the actual share price, which is likely higher than the total of the option price and the exercise price at the date of exercise.

[127]    *See* Rem. Tr. II at 382–383.

[128]    *See id.* at 74.

exercise price to effectively turn the Wylys' options into stock.  On the date the option is transferred, she treats the Wylys as having "purchased" the underlying stock for the value of the option.  Then, on the date of exercise, she treats the exercise price as an additional "purchase."  In this way, Dr. Becker accurately tracks the amounts of capital that the Wylys had tied up in the offshore system.  Thus, by raising the Wylys' basis to that of an investor who purchased stock, Dr. Becker can accurately compare the Wylys' rate of return with that of a buy-and-hold investor in stock.[129]

The Wylys next contend that Dr. Becker incorrectly included gains for securities that the Wylys held until the end of the Fraud Period (or in the case of Sterling Software and Sterling Commerce, until the Issuers were acquired) and never sold.  They argue that this makes no sense, as the Wylys were, with respect to these options, doing exactly what a buy-and-hold investor would have done—holding the securities to the end of the Fraud Period, and never using an informational advantage to "cash out."[130]  The SEC responds that even for these securities, the Wylys used their informational advantage to hold, knowing that the price of the stock would continue to rise or that the Issuers would be acquired.

---

[129]     *See id.* at 108–118.

[130]     *Id.* at 464.

Further, these securities are connected to the violations, because the investing public was unaware of the extent of the Wylys' holdings, due to the inaccurate disclosure when the options were transferred offshore. The Wylys calculate that 38% of the gains from registered shares calculated by Dr. Becker is attributable to securities that were never sold.

I agree with the Wylys that it is inappropriate to include these securities in a calculation of the Wylys' ill-gotten gains. Though I agree with the SEC that gain from these securities is causally connected to the violations, as they are linked to a false disclosure, I cannot agree that including *unrealized* gains from securities that were never sold is a reasonable approximation of the Wylys' ill-gotten gains. In the case of the Issuers that were acquired, the gains were realized, however, there was no sale. The only benefits that the Wylys received include the ability to use these securities as collateral for a loan, and the ability to hide from the investing public the Wylys' beneficial ownership. Though these benefits are real, and causally connected to the disclosure violations, it is not a reasonable approximation of those benefits to measure gains in excess of a buy-and-hold investor for securities that the Wylys held and never sold. There might have been other ways to measure these benefits, but simply counting all the gain in the securities as ill-gotten profits vastly overstates the benefits the Wylys obtained in

46

the absence of a sale.  Therefore, although the Wylys did profit from these

securities, using Dr. Becker's method does not provide a reasonable approximation

of ill-gotten gains.

        Finally, the Wylys contend that the method is flawed because it

assumes that *every* trade reflected the use of an informational advantage, when

many of the trades were undertaken for unrelated reasons, such as a loan becoming

due.  As discussed above, it is appropriate to consider all offshore trades made

during the Fraud Period as all offshore trades were undertaken without accurate

disclosures.  Further, the fact that a trade was undertaken because the Wylys needed

money could still reflect an informational advantage with regard to other securities

that were *not* sold.  As Dr. Becker stated, it was not "a foregone conclusion that

they would have liquidated those particular securities . . . . [T]hey had actually a

wide variety of ways available to them . . . . So I think it is possible . . . that a

decision to sell particular securities to repay a loan would be motivated by an

informational advantage, in light of the fact that they held a broad portfolio."[131]

Moreover, Dr. Becker's method would account for any trades that were not

opportunistically timed and provided no benefit to the Wylys beyond what a buy-

and-hold investor would have earned.  By comparing the total amount the Wylys

---

[131]    *Id.* at 198.

earned to the total amount a buy-and-hold investor would have earned for the same

holding period, Dr. Becker accounts for any individual trades that provided no

benefit to the Wylys, or resulted in a loss.[132]

It is, of course, possible that some of the gains in excess of the buy-

and-hold benchmark could reflect simply that the Wylys got lucky in their timing,

and not that the trade was opportunistically timed based on an informational

advantage.  However, it is for precisely this reason that the standard the SEC must

meet is a "reasonable approximation" of the profits causally connected to the

violations, and not an exact calculation.  It is impossible to calculate the Wylys' ill-

gotten gains with certitude.  However, "the wrongdoer should bear the risk of any

uncertainty affecting the amount of the remedy."[133]  Thus, though I acknowledge

the risk that Dr. Becker's measure could capture as gains some profits that result

simply from coincidental timing, the Wylys, and not the SEC, should bear this risk.

### 5.    Other Benefits

Finally, I note that in addition to the tangible benefits that the Wylys

received that have been discussed and quantified by Dr. Becker, the Wylys received

other intangible and tangible benefits.  These include reputational benefits discussed

---

[132]    *Id.* at 419, 484.

[133]    *Contorinis*, 743 F.3d at 306.

by the SEC—the appearance of "standing by their company" and not trading opportunistically in companies that they controlled.[134]  This also includes the liquidity advantage that the Wylys allege the SEC has failed to accurately measure. The Wylys are correct that, taking each benefit separately, there are methods established in the economic literature that suggest appropriate ways to measure each benefit.  But here, the advantages were intertwined, and each measurement alone would not have captured the combined benefits that the Wylys enjoyed.[135]  This case is highly unusual—if not *sui generis*—with violations spanning thirteen years. This Court is not bound by methods of calculating disgorgement used in other cases involving facts that do not compare to the lengthy, novel, and complex violations of securities laws at issue here.  "The policies underlying the disgorgement remedy—deterrence and preventing unjust enrichment—must always weigh heavily in the court's consideration" when determining disgorgement awards.[136]  There is, of course, a limit to the amount that may be imposed: "the maximum of the total gain from the illicit action."[137]  Beyond this, "[d]istrict courts must be given wide

---

[134]   Rem. Tr. II at 366, 374.

[135]   *See id.* at 371–372.

[136]   *Teo*, 746 F.3d at 107.

[137]   *Contorinis*, 743 F.3d at 306.

latitude" to reasonably approximate defendants' ill-gotten gains.[138]

While Dr. Becker's method has flaws, it reasonably provides a way to approximate the Wylys' ill-gotten gains. Her method calculates the Wylys' gains using dates tied to disclosure violations. She gives the Wylys credit for any gain that accrued in the securities onshore, before the beginning of the Fraud Period. She ties the Wylys' gains to specific amounts "invested" on the dates that capital was tied up in the offshore system. She accurately accounts for the differences in the rate of return between an investment in options and an investment in stock. Therefore, with the exception of gains from securities that were never sold, her calculation is a reasonable approximation of the gains causally connected to the Wylys' violations.

"Limiting disgorgement amounts to the direct pecuniary benefit enjoyed by the wrongdoer would run contrary to the equitable principle that the wrongdoer should bear the risk of any uncertainty affecting the amount of the remedy."[139] Thus, while the Wylys can point to facts that establish legitimate bases for some of their investment decisions, this does not alter my conclusion that the SEC has made a reasonable approximation. The Wylys bear the risk of any

---

[138]     *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995).

[139]     *Contorinis*, 743 F.3d at 306.

uncertainty.  Further, Dr. Becker's calculation reasonably approximates the intangible benefits the Wylys received that are not capable of "precise determination."[140]

###    C.    Professor Fischel's Methods

After the SEC has made a reasonable approximation of profits causally connected to the violations, the burden shifts to the Wylys to prove that their gains were unaffected by their violations.[141]  As discussed above, the Wylys have failed to do this in their arguments against Dr. Becker's method.  However, the Wylys also contend that Fischel's methods show that Dr. Becker's calculation is unreasonable, because Fischel calculates that the Wylys received, in the aggregate, no ill-gotten gains.  For the following reasons, I disagree.

Fischel's first method calculates whether there are abnormal returns after the Wylys sold securities from the offshore system, the standard method for measuring gains from insider trading.[142]  This method is inappropriate for several reasons.  *First*, this method only addresses whether the Wylys used an informational advantage, and does not attempt to calculate the value of other

---

[140]    *Id.*

[141]    *See Razmilovic II*, 738 F.3d at 31.

[142]    *See* Rem. Tr. II at 288.

benefits the Wylys received.  *Second*, Fischel does not apply the method in a standard way.  Instead of using standard windows to determine whether trades were informed, such as six-month to two-year windows, Fischel used a window of the entire Fraud Period, up to thirteen years.[143]  Thus, if the stock price increased beyond the sale price at any point during the remainder of the Fraud Period, Fischel did not measure the Wylys as benefitting from the sale.  However, simply because a stock price may have increased four years after a sale does *not* indicate that the sale was not based on the use of an informational advantage.  If the stock price dropped a significant amount for a significant time period after the sale, and subsequently increased long after, standard methodology would have captured that sale as one based on informational advantage.[144]  Thus, this method is not a reasonable approximation of the Wylys' profits and does not rebut the SEC's calculation.

Fischel's second method compares what the Wylys would have earned had they simply held the securities until the end of the Fraud Period, with what they hypothetically could have earned if they had invested their sale proceeds either in the S&P 500 or one-year Treasury bills.  Using this method, he concludes that the Wylys would have been better off had they held until the end of the Fraud Period

---

[143]    *See id.* at 322.

[144]    *See id.* at 354.

and never made any sales.  Again, this method fails to capture the numerous

benefits the Wylys received by making sales.  It is a matter of common sense that

any person would be better off if they simply held on to assets and never sold.  But

the Wylys, like anyone else, made use of their profits in a variety of ways during

the Fraud Period—they made other investments, started other businesses, and

bought a variety of personal possessions.  These assets all had value to the

Wylys—indeed, it is likely that many increased in value—and being able to

monetize the assets held offshore and use that money for other purposes was a

benefit to them, regardless of whether they would have made more money from the

securities of the four companies at issue here had they never made any sales.  Thus,

this method also fails to rebut the SEC's calculation.

       To summarize, I conclude that the SEC has established a reasonable

approximation of the Wylys' ill-gotten gains, with the exception of the 38% tied to

securities that were never sold.

### D.   Prejudgment Interest

       The SEC seeks an award of prejudgment interest in addition to

disgorgement, and calculates the amount of prejudgment interest using the "dollar-

weighted average date of the proceeds Sam Wyly and Charles Wyly received from

their offshore securities."[145]   The SEC contends that this approach "captures the average period of time that the defendants had access to their ill-gotten gains."[146] The Wylys request that no prejudgment interest be awarded.  However, the Wylys argue that if prejudgment interest is awarded, it should be calculated beginning at the end of the Fraud Period.

This Court has "broad discretion" when deciding whether, and in what amount, prejudgment interest should be awarded.[147]  Though I agree that the Wylys should not have the benefit of "what amounts to an interest free loan"[148] as a result of securities laws violations, I nevertheless continue to be troubled by the extended time period at issue here—as long as twenty-two years.[149]  While the Wylys had use of their ill-gotten gains throughout that period, the SEC is in part responsible for the delay.[150]  Further, by the SEC's own admission, using the average date overcounts

---

[145]   12/11/14 Notice of Joint Agreement that Additional Exhibits Are Admitted and Disagreement over the Proper Measure of Prejudgment Interest [Dkt. 556] ("PJI Calc.") ¶ 4.

[146]   *Id.* ¶ 6.

[147]   *First Jersey*, 101 F.3d at 1476.

[148]   *Credit Bancorp*, 2011 WL 666158, at *3.

[149]   *See* September 25 Order, 2014 WL 4792229, at *23.

[150]   *See Gabelli v. SEC*, 133 S. Ct. 1216, 1222 (2013) ("Unlike the private party who has no reason to suspect fraud, the SEC's very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit.").

prejudgment interest for any transactions that occurred after the average date and undercounts prejudgment interest for transactions that occurred before the average date.[151]  Given the large amounts at issue here, and that Dr. Becker's method, while reasonable, does not calculate ill-gotten gains with any certainty, considerations of of fairness lead me to conclude that the dates proposed by the Wylys are more appropriate.  Therefore, I award prejudgment interest calculated at the lower of the average LIBOR or IRS underpayment rate for each year, beginning at the end of the Fraud Period for each Issuer.

## V.    CONCLUSION

For the foregoing reasons, the Wylys must disgorge their trading profits causally connected to their securities laws violations.  Because I conclude that the SEC's measure is a reasonable approximation of these ill-gotten gains with the exception of the 38% related to the portion of securities that were never sold, the SEC must review the Wylys' holdings and submit a revised disgorgement amount for Sam Wyly and Charles Wyly, including prejudgment interest, calculated in accordance with this Opinion and Order by January 12, 2015.  Any objections by the Wylys to the SEC's calculations are due within five days of receiving the SEC's submissions.

---

[151]    *See* PJI Calc. ¶ 5.

As stated earlier, I am confident that the remedy already imposed by the September 25 Order is the best measure of the Wylys' ill-gotten gains. I reach this alternative calculation only in the event that a higher court disagrees with the measure of disgorgement calculated in the September 25 Order. In that case, I impose this alternative calculation now, rather than requiring the parties to continue this litigation, further delaying resolution of this already aged matter.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           December 19, 2014

**- Appearances -**

**For the SEC:**

Bridget Fitzpatrick, Esq.
Hope Augustini, Esq.
Gregory Nelson Miller, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
Daniel Staroselsky, Esq.
Angela D. Dodd, Esq.
Marsha C. Massey, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Defendants:**

Stephen D. Susman, Esq.
Harry P. Susman, Esq.
Susman Godfrey LLP
1000 Louisiana Street, Ste. 5100
Houston, TX 77002
(713) 653-7801

David D. Shank, Esq.
Terrell Wallace Oxford, Esq.
Susman Godfrey LLP
901 Main Street, Ste. 5100
Dallas, TX 75202
(214) 754-1935

Steven M. Shepard, Esq.
Mark Howard Hatch-Miller, Esq.
Susman Godfrey LLP
560 Lexington Avenue
New York, NY 10022

(212) 336-8332

**For Samuel Wyly:**
Josiah M. Daniel III, Esq.
Vinson & Elkins LLP
2001 Ross Avenue, Ste. 3700
Dallas, TX 75201
(214) 220-7718

**For Caroline D. Wyly:**
Judith W. Ross, Esq.
Law Offices of Judith W. Ross
700 N. Pearl Street, Ste. 1610
Dallas, TX 75201
(214) 377-7879

**For Cheryl Wyly, Evan Wyly, and Martha Miller:**
David L. Kornblau, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1084

**For Laurie Matthews, Lisa Wyly, Kelly O'Donovan, Andrew Wyly, Christiana Wyly, Emily Wyly, Charles J. Wyly, III, and Jennifer Lincoln:**
Stewart H. Thomas, Esq.
Hallet & Perrin, P.C.
1445 Ross Avenue, Ste. 2400
Dallas, TX 75202
(214) 953-0053

**For Jennifer Lincoln:**
Kostas D. Katsiris, Esq.
Venable LLP
1270 Avenue of the Americas, 25th Floor
New York, NY 10020
(212) 307-5500