UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>SAMUEL WYLY, DONALD R. MILLER, JR., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr.,<br><br>　　　　　　　Defendants. | No. 1:10-cv-5760-SAS<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO RECONSIDER THIS COURT'S OPINION AND ORDER GRANTING
DISGORGEMENT OF "GAINS IN EXCESS OF BUY AND HOLD BENCHMARK"**

The defendants respectfully request that the Court reconsider its order awarding disgorgement based on Dr. Becker's Measure #1, "Gains In Excess of Buy and Hold Benchmark." Opinion and Order (Dec. 19, 2014) [ECF No. 563]. Measure #1 compares the Wylys' rate of return, on <u>options</u>, to the lower rate of return on <u>stocks</u> (which Dr. Becker used as her "benchmark" rate of return). This compares apples to oranges. Options earn a higher rate of return than stocks. <u>Roughly half</u> of Dr. Becker's Measure #1 is due to this difference. Therefore, Measure #1 is not a reasonable approximation of the Wylys' gains from the Isle of Man system.

This Court's Order states that "Dr. Becker's testimony showed, conclusively," that she did not "incorrectly compare[] the rate of return on options with the rate of return on stock." Order, at 44. But Dr. Becker's testimony shows just the opposite. Dr. Becker <u>conceded</u>, on cross, that part of Measure #1 is "due solely to a difference in rate of return between stocks and options":

> **Transcript at 232:20 (Becker Cross)**
>
> Q. Part of the ill gotten gains that you calculated, Measure Number 1, part of that measure is due solely to a difference in *rate of return* between stocks and options, correct?
> A. You could say it that way, sure.

Steve Susman Closing Powerpoint, at 46 [ECF 552-3, at 47] (quoting Transcript, Nov. 17, 2014, at 232:20).

An option is more volatile than a share of stock. An option increases in value at a higher rate than the underlying stock; it also loses value at a higher rate when the stock price declines. *See* Fischel Report ¶¶ 24-26 [PX-9242]. Comparing the two rates of return (which Dr. Becker's Measure #1 does) is comparing apples and oranges.

It appears the Court was misled by Dr. Becker's highly confusing testimony on this point during direct examination on November 12, 2014. The Court's Order cites transcript pages 108 through 118 as authority for the Order's assertion that Dr. Becker "can accurately compare the Wylys' [option-based] rate of return with that of a buy-and-hold investor in stock." Order, at 45 n.129. In this portion of her testimony, however, Dr. Becker's answers focused, not on the different <u>rates of return</u>, but rather on the correct <u>valuation</u> of the options <u>at the time of transfer</u>—which is a different issue:

> THE COURT: If we're now together, how can you compare one to the other when one paid only $3 to obtain her share, the other person paid $20 to obtain her share? One share.
> . . .
> THE WITNESS: In my calculation because I have excluded the pre-fraud run-up, I have also excluded the $17.62 in that example --
> THE COURT: -- as profit.
> THE WITNESS: -- as profit.
> THE COURT: Now I got it. So they both made $30 that day.
> THE WITNESS: That's right.
> THE COURT: When they sold at 50 -- because that became the price two days later -- they both -- you are looking at the difference between 20 and 50 for both of them, not 3 to 50. You are looking only at 20 to 50.
> So, that answers Mr. Susman's argument for the first time. You are not comparing apples to oranges; you are comparing apples to apples, because you are acting as if they were a $20 purchaser just like the stranger is a $20 purchaser.
> THE WITNESS: That's exactly right. I'm calculating the benefit they get from the ability to delay the payment of $3 and to time that whenever.
> THE COURT: Well, you're not doing that; you're just not counting the $17 in your profit calculation. You are assuming they both paid $20 for the single share and therefore they both made $30.
> THE WITNESS: Right.
> THE COURT: They didn't make different amounts. That's the answer to the opening. That's what I heard.

Transcript, Nov. 12, 2014, at 117:6.

All that this exchange establishes is that Dr. Becker accurately <u>valued</u> the options <u>at the time of the transfers</u>. Defendants have separately criticized Dr. Becker's decision to treat the option transfers as though they were cash purchases—but that is not the criticism at issue in this

motion for reconsideration. This motion is directed at Dr. Becker's decision to compare the <u>rates of return</u> these options earned, <u>after the transfers</u>, to the rates of return that <u>stock</u> would have earned. Defendants' point is that the options (because they were options) grew in value at a faster <u>rate</u>, during the period after the transfers, than the stock-based rate of return that Dr. Becker used as her "buy and hold benchmark." Because of Dr. Becker's confusing testimony on this point, the Court's opinion conflated these two distinct issues:

> Dr. Becker compared the Wylys' rate of return to a buy-and-hold investor in the underlying stock. To do this, however, she used the value of the option and the exercise price to effectively turn the Wylys' options into stock. On the date the option is transferred, she treats the Wylys as having "purchased" the underlying stock for the value of the option. Then, on the date of exercise, she treats the exercise price as an additional "purchase." In this way, Dr. Becker accurately tracks the amounts of capital that the Wylys had tied up in the offshore system. <u>Thus, by raising the Wylys' basis to that of an investor who purchased stock, Dr. Becker can accurately compare the Wylys' rate of return with that of a buy-and hold investor in stock.</u>

Order, at 44-45 (emphasis added).

The conclusion does not follow from the premises. Even though Dr. Becker valued the options at the time of transfer correctly (thus "raising the Wylys' basis"), and even though she also included the payment of the exercise price as an additional investment (thus "accurately track[ing] the amount of capital that the Wylys had tied up in the offshore system"), it does not follow that a comparison of the Wylys' option-based "rate of return" to the lower rate of return of a "buy and hold investor in stock" is "accurate." The comparison is inaccurate. The Wylys' options earned much higher rates of return than a stock-based rate of return <u>because they were options</u>. Dr. Becker is comparing apples and oranges.

Professor Fischel described this problem, using the same example the Court discussed with Dr. Becker, during his testimony on direct on November 17, as quoted on Slide 45 of Mr. Susman's closing argument:

3

> Transcript at 286:17 (Fischel Direct)
>
> [W]hat Dr. Becker is calculating is the difference in the ***rate of return*** for the Wylys versus the ***rate of return*** for a buy and hold investor in stock. . . . [T]he buy and hold investor in stock starts with $20, the value of the stock goes up to $50, they have a $30 gain.  The option holder, if you just look at what the value of the option is, what that option could be sold for at the later point in time, that option may also have a $30 gain, but [y]ou [the option-holder] have the $3 for the multiyear period, that means you could invest that money over the multiyear period so your ***rate of return is*** larger than if you had to pay $20 for stock on the first day.

|        | Transfer Date | Ex Price | Sale | Gain | *Rate of Return* |
|--------|---------------|----------|------|------|------------------|
| **Share**  | $20           | ---      | $50  | $30  | 30/20            |
| **Option** | $17           | $3       | $50  | $30  | 30/17            |

Steve Susman Closing Powerpoint, at 45 [ECF 552-3, at 46] (quoting Transcript, Nov. 17, 2014, at 286:17).  In this example, both the option-holder and the stock-holder "put in" a total of $20 and "get out" a gain of $30.  But their rates of return are different because the option-holder delays investing the $3 exercise price until the very end.  Thus, as Professor Fischel testified, the option-holder's "rate of return is larger than" the rate of return of the stock-holder, who "had to pay $20 for stock on the first day."  The option-holder, by contrast, only had $17 invested (until the final day, when the exercise price was paid).  Thus, the option-holder had a higher rate of return than the stock-holder.  But this higher rate of return has nothing to do with secrecy, informational advantage, or any of the SEC disclosure violations at issue in this case.  Instead, this higher rate of return is due to the nature of options, which permit the option-holder to delay payment of the exercise price, and thus permit higher rates of return when the stock price rises.

4

This difference between rates of return drives Dr. Becker's calculations: As the Court recognized, Dr. Becker uses the option-based rate of return to calculate the Wylys' "average holding period," which she then used to compare the Wylys' gains to the gains of a stock-based "buy and hold benchmark" return over the same "average holding period":

> Using these [option-based] rates of return, Dr. Becker then calculated the Wylys' average holding periods for each Issuer. The average holding periods allows a comparison of the Wylys' total gains to what they would have earned if they had invested the same amount, for the same [average] length of time, but earned instead the average buy-and-hold equity [i.e., stock-based] investor return for each Issuer.

Order, at 20 (emphasis added).

Paragraphs 27 and 28 of Professor Fischel's report describe one straightforward illustration of how Dr. Becker's use of the lower, stock-based rate of return for her "benchmark" leads directly to a large part of her Measure #1. On March 7, 1996, Charles Wyly transferred Sterling Commerce options, then worth $8,829,000, to an Isle of Man trust. Dr. Becker's Measure #1 valued those options at $8,829,000 on the transfer date. Four years later, on March 27, 2000, the options were sold to the acquiring company, SBC, without ever having been exercised. (Because these options were never exercised, the arithmetic for this example is particularly straightforward; the same principle would apply, however, to every case in which the Wylys transferred options without immediately exercising them.) By the time these options were sold to SBC in 2000, they were worth $27,337,500—a rate of return of 32.1% per year, and a total gain to Charles of $18,508,500. That rate of return, and that gain, are both greater than Dr. Becker's stock-based "benchmark" rate of return and the corresponding "benchmark" gain that her stock-based rate of return yields. Dr. Becker's stock-based rate of return, over the exact same period, is just 11.0% per year. Her "buy and hold benchmark" assumes that the same amount—$8,829,000—is invested, but invested in stocks rather than options. By March 27,

5

2000, the lower stock-based rate of return means that the "buy and hold" gain from that stock-based "benchmark" investment is just $4,658,231. The difference between those two gains (Charles's option-based gain of $18,508,500, minus the stock-based "buy and hold" gain of $4,658,231) is $13,850,269, and Dr. Becker labels every dollar of that difference as "ill-gotten."

Why is this difference "ill-gotten"? Why is the difference between the gain Charles earned on $8,829,000 in Sterling Commerce options, and the (lower) gain another investor would have earned from a $8,829,000 investment in Sterling Commerce stock, a reasonable approximation of Charles's gain from the Isle of Man system? This difference is not due to the Isle of Man system. It is instead due to the fact that Charles, like many founders of companies, was compensated in options, and options have a higher rate of return than stocks.

When Dr. Becker was cross-examined about this exact example (for which she had weeks to prepare, since the example was disclosed in Professor Fischel's report) her only response was to question the fairness of Sterling Commerce's compensation system. Did Sterling Commerce give Charles too good a deal? Were the exercise prices of his options set unfairly low when they were granted? *See* Transcript, Nov. 17, 2014, at 233:7-236:19. Here's what she said:

> [O]ne piece of the higher rate of return to Charles Wyly on these securities rests on the fact that it's got an exercise price of $24 as opposed to $29 a share. . . . . I did not do the calculation to say what it would have been had the exercise price been $29 as opposed to $24. But one piece of that return of that higher return is due to the fact that -- I mean you got to go back in time, Charles Wyly is an insider at Sterling Software, a founder, I think one of the founders, and they're [spinning off] Sterling Commerce. No one knows really what price Sterling Commerce should be, and they're determining at what price they're going to set the options that used to be -- that these insiders are going to hold in Sterling Commerce.

*Id.* at 235:15. This is an evasive non-answer to the question posed. This case was about many different things, but it most certainly was not about the fairness of the option-based

compensation systems that the Issuers used to reward their founders and directors, Sam and Charles Wyly.

On direct examination, when questioned by the Court, Dr. Becker offered a different defense of her decision to compare the Wylys' option-based rate of return to a stock-based (i.e., equity-based) rate of return:

> The thing about the options is that although it's true that of course the rate of return is higher because they [the Wylys] are investing less up front, because the value of the option is clearly less than the value of the underlying security, at the same time, you know, if the option was worth only $5, the Wylys only had $5 of their capital tied up in the security. ... So I think at some core level, the fact that the Wylys only had the value of the option tied up as opposed to the option -- the [buy and hold investment], the equity amount, is a more -- is clearly a more correct reflection of their investment.

Transcript, Nov. 12, 2014, at 109:1-14. This, too, is an evasive non-answer. It is true, of course, that after transferring an option, but before exercising it (i.e., before paying the exercise price), the "Wylys only had the value of the option tied up" in the Isle of Man, and not the exercise price. But defendants' criticism, on this issue, is not directed at Dr. Becker's accounting of the Wylys' transfers of options and payments of exercise prices. Defendants' criticism, instead, is with Dr. Becker's decision to compare the Wylys' investments to a stock-based rate of return. A stock-based rate of return is not a fair "buy and hold benchmark" with which to compare the Wylys' option-based rate of return. Dr. Becker never gave a direct answer to this criticism. There is no good answer to it; the comparison is unfair. The Wylys' securities (even if accurately accounted for) earned a higher rate of return than Dr. Becker's "buy and hold benchmark" because the Wylys' securities were options, and options earn higher rates of return than stock.

Dr. Becker also defended her methodology on the ground that, by accurately valuing the options on the date of transfer, she "exclude[d] the run-up in the value of the security before [the

7

Wylys] transfer[red] the security offshore." Transcript, Nov. 12, 2014, at 113:5. This defense, too, misses the point of the criticism. By excluding the pre-transfer "run-up in value," Dr. Becker does avoid the problem of including pre-transfer gains in Measure #1. Avoiding that problem, however, does not fix the apples-and-oranges problem after the transfer. Dr. Becker assumes that the Wylys, on the date of transfer, bought the options with cash for their current value on that date. Transcript, Nov. 17, 2014, at 210:21 ("[I]n my calculation [the Wylys] are [parting with cash on the date of transfer] because I'm giving them credit for the value of the security that they transferred offshore"). But this assumption—that the Wylys paid cash, in the amount of the options' value, on the date of transfer—still has the Wylys buying options rather than stock on the date of transfer. Therefore, subsequent rises in the stock price will cause the Wylys to enjoy rates of return (on options) that are much higher than if they had invested by buying an equivalent value of stock on the date of the transfer.

One way Dr. Becker could have solved the apples-and-oranges problem would have been to compare the Wylys' option-based rates of return to a "buy and hold" benchmark built on options rather than stocks. Rather than create an option-based "benchmark," however, Dr. Becker instead chose to address the problem by creating Measure #1A. She conceded, on cross, that Measure #1A was intended to eliminate the difference between the rates of returns on stocks and options:

> Q. And by **_creating Measure 1A, that was one way to try to eliminate out the difference between rate of returns_** on stocks and options, correct?
> A. Measure 1A is a different hypothetical that assumes that the Wylys had exercised before they transferred offshore, and if they had done so, much more of their capital would have been tied up, they would have been subject to more risk than they really were in the real world. **_So that's correct._**

Steve Susman Closing Powerpoint, at 46 [ECF 552-3, at 47] (quoting Transcript, Nov. 17, 2014, at 230:20). The problem with Measure #1A, however, is that in this measure, rather than

8

changing her benchmark to an option-based benchmark, Dr. Becker instead kept her stock-based benchmark but changed the actual facts of the case. In Measure #1A, she assumed that the Wylys had exercised their options (and thus obtained stock) right before each transfer to the Isle of Man. By making this assumption, Dr. Becker was at last able to compare apples to apples: In Measure #1A, the Wylys' rates of returns are not option-based rates of return; they are, instead, the rates of return on the stock that the Wylys are assumed to have acquired by exercising their options right before each transfer. The problem with Measure #1A, of course, is that it is hypothetical and counter-factual—the Wylys did not, in fact, exercise their options immediately prior to each transfer. Because Measure #1A depends on this counter-factual assumption, the Court excluded it from evidence. Opinion and Order, Sep. 24, 2014, at 81 n.253 [ECF 481].

Even though Measure #1A is hypothetical and counterfactual, it does serve one useful purpose: It provides an indication of the magnitude of Dr. Becker's error in comparing option-based rates of return to stock-based rates of return. Compared to Measure #1, which yields a calculation of $192.7 million in "ill-gotten" gains, Measure #1A yields just $95.3 million. Becker Report at 17, tbl.5 [PX-9230]. This means, to a rough estimate, that approximately $100 million of Measure #1 is based on the fact that Dr. Becker compared the rates of return on options to the rates of return on stocks. See Steve Susman Closing Powerpoint, at 47 [ECF 552-3, at 48] (displaying Becker's Table 5).

The Wylys lawfully earned their options as compensation, separate and apart from any of the securities violations in this case. The burden was on the SEC to create an option-based "buy and hold benchmark" that could capture the benefits of the Isle of Man system without also sweeping in all of the lawful benefits the Wylys enjoyed simply by holding options that, by their very nature, earned a higher rate of return than stock. Dr. Becker failed to create such a

benchmark. Instead, she attempted to solve the problem by assuming a counterfactual set of Wyly investments in Measure #1A, which the Court excluded from evidence.

Dr. Becker's failure to account for the different rates of return between options and stocks means that Measure #1 is comparing apples to oranges. Her confusing responses to the Court's questioning appear to have misled the Court into believing that this problem was solved. It was not solved. Dr. Becker <u>conceded</u> that a portion of the gains calculated in Measure #1 is "due solely to a difference in rate of return between stocks and options." Steve Susman Closing Powerpoint, at 46 [ECF 552-3, at 47] (quoting Transcript, Nov. 17, 2014, at 232:20). The portion of Measure #1 caused by this difference in rates of return is very large—Dr. Becker's own Measure #1A suggests the difference accounts for $100 million. Measure #1 is therefore not a reasonable approximation of the Wylys' gains from the securities violations in this case.

Dated: December 22, 2014

Respectfully submitted:

SUSMAN GODFREY, L.L.P.

By: _____
Stephen D. Susman (SS8591)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York 10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Samuel E. Wyly and Donald R. Miller, Jr.*