UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SAMUEL E. WYLY and DONALD R. MILLER, JR., in his capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr., <br><br> Defendants. | No. 1:10-cv-05760-SAS <br><br><br> ECF CASE |

SEC'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
RECONSIDERATION

Defendants Samuel Wyly and Donald R. Miller, Jr., in his capacity as the independent executor of the will and estate of Charles Wyly, Jr., ("Defendants") have moved the Court to reconsider its December 19, 2014 Order ("Order") accepting the SEC's alternative trading profits-based measure of disgorgement.  Defendants argue that the Court was "misled" by the SEC's expert Dr. Chyhe Becker and thus failed to understand the methodology Dr. Becker used to arrive at her disgorgement calculation. Def. Br. at 2.  Defendants' motion is based entirely on a single sentence in the Court's 56-page Order that is both misquoted and taken out of context. The Court should deny this motion because it is abundantly clear from the Order that the Court fully understood Dr. Becker's methodology when it properly held that her calculation was a reasonable approximation of the Wylys' ill-gotten gains from their myriad securities law violations.

I.      The Defendants Have Not Met the Standard for Granting
        a Motion for Reconsideration.

The standard for granting a motion for reconsideration is strict and should be denied

unless "the moving party can point to controlling decisions or data that the court overlooked."
*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  It should not be granted where
the moving party seeks solely to relitigate an issue already decided or to take a "second bite at
the apple."  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).
Reconsideration of a court's previous order is "an extraordinary remedy to be employed
sparingly in the interests of finality and conservation of scarce judicial resources."  *Williams v.*
*King*, __ F. Supp.3d __, 2014 WL 4670866, *1 (S.D.N.Y. September 19, 2014) (Scheindlin, J.)

      In this motion, Defendants do not claim that the Court overlooked data or controlling
case law.  Rather their motion repeats the exact same arguments Defendants already made during
the November 2014 hearing by citing the same demonstrative exhibits defense counsel used
during closing argument and their own expert's discredited testimony.  In short, Defendants'
argument is that the Court simply got it wrong.  As this motion for reconsideration is merely an
attempt to relitigate an issue the Court has already decided, it should be denied.

**II.    The Court Was Neither Misled by Dr. Becker Nor Misunderstood Her**
**Methodology.**

      The Defendants' claim that the Court was misled by Dr. Becker is based on the following
language from the Order:

> Furthermore, Dr. Becker's use of these transfer and exercise dates, along with the
> corresponding amounts of capital, reflects her solution to one of the Wylys'
> criticisms.  The Wylys contend that Dr. Becker's method is flawed because it
> incorrectly compares the rate of return on options with the rate of return on stock.
> <u>Dr. Becker's testimony showed, conclusively, that this is not the case</u>.

Order at 44 (underline added).  Defendants' argue that this sentence in the Order indicates that
the Court failed to understand that Dr. Becker was comparing the Wylys' actual rate of return
from their offshore securities (which largely, although not completely, consisted of

compensatory stock options)[1] to the rate of return of a buy and hold purchaser of stock.

However, it is the Defendants who have misconstrued the meaning of the Court's statement.  The Court understood precisely what rates of return Dr. Becker was comparing and held that her testimony showed conclusively that it was <u>not incorrect</u> to do so.  Indeed, in the very same paragraph, the Court explained why Dr. Becker was not incorrect to compare the Wylys' actual rate of return from their offshore securities to the rate of return of a buy and hold purchaser of stock.  After first correctly noting that Dr. Becker treated the Wylys as having purchased the underlying stock (albeit in two payments: first, when the options were transferred offshore and second, when the options were exercised), the Court held that "<u>by raising the Wylys' basis to that of an investor who purchased stock, Dr. Becker can accurately compare the Wylys' rate of return with that of a buy-and hold investor in stock.</u>"  Order at 44-45.  Later in the Order, the Court held that Dr. Becker "accurately accounts for the differences in the rate of return between an investment in options and an investment in stock."  *Id.* at 50.  Thus, while the Defendants may disagree with the Court's conclusion regarding the accuracy of Dr. Becker's comparison, that disagreement is not a result of the Court being misled by Dr. Becker nor misunderstanding her methodology.

**III.     Dr. Becker's Calculation is a Reasonable Approximation
of the Wylys' Ill-Gotten Gains.**

By asking the Court to reconsider its Order, Defendants effectively claim that it is unreasonable as a matter of law for Dr. Becker to approximate the Wylys' ill-gotten gains by

---

[1] Although Defendants consistently claim that Dr. Becker's calculation of the Wylys' rate of return from their offshore securities is "a rate of return on options," they have conveniently ignored (i) the millions of shares of Sterling Commerce <u>stock</u> that the Wylys' offshore system acquired in October 1996 when Sterling Commerce was spun-off from Sterling Software, and (ii) the millions of shares of Michaels and Sterling Software <u>stock</u> that the Wylys held offshore (in certain instances for several years) after the options were exercised.  *See* ECF 270-1, Stipulation of Facts, Attachment B.

comparing the Wylys' offshore rate of return, which admittedly encompasses the rate of return they earned on compensatory stock options transferred and held offshore, to the rate of return earned by a buy-and-hold purchaser of each Issuer's stock.  Their position is untenable.  As the Court noted in its Order, "under Second Circuit law, the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation" and "the risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty."  Order at 7 and 10-11 (*citing SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014)).

In considering the reasonableness of the Court's disgorgement award, it is important to recognize the significant portions of the Wylys' gains from their offshore securities that were excluded from that award.  First, all of the unrealized gains the Wylys earned from the securities before they were transferred to the offshore system are being excluded.  Dr. Becker excluded those unrealized gains by treating the offshore system as actually having "purchased" the options for cash from the Wylys domestically on the date of the transfer.[2]  Second, based on the Court's Order, all of the Wylys' realized gains from the Michaels securities that were held offshore through the end of the fraud period and from the Sterling Software and Sterling Commerce securities that were held until those companies were acquired are being excluded.[3]  Third, Dr.

---

[2] Dr. Becker's treatment of the transferred options as being "purchased" at the time of the transfer had an extremely conservative effect on her calculation.  Notwithstanding the fact that the offshore system did not actually pay anything for most of the transferred options (except for unsecured promises to make annuity payments to the Wylys years in the future contingent upon their remaining alive), Dr. Becker used those hypothetical payments to calculate the Wylys' offshore rate of return.  In fact, the Wylys tied up practically no capital upon transferring the options and only invested capital when the options were later exercised.

[3] The gains from the offshore Sterling Software and Sterling Commerce securities that were held until those companies were acquired are being excluded from disgorgement even though they were in fact sold, resulting in gains that were both realized and earned during the Wylys' fraud

Becker excluded all of the $31.7 million in gains the Wylys earned from their 2 million Sterling Software share equity swap entered into in October 1999, even though such transaction was entered into secretly and while the Wylys possessed inside information (albeit inside information the Court has held to be non-material).  *See* July 10, 2014 Order, ECF 405, at 17-18.  And <u>fourth</u>, all of the Wylys' offshore gains that can be attributable to the companies' natural stock appreciation over the fraud period (as represented by the average annual rate of return of the buy-and-hold equity investor) are being excluded.  *See* Order at 47 ("Dr. Becker's method would account for any trades that were not opportunistically timed and provided no benefit to the Wylys beyond what a buy-and-hold investor would have earned.")

The Court's disgorgement award is a reasonable approximation of the Wylys' ill-gotten gains because it adequately quantified the "intertwining advantages" of secrecy, inside information, liquidity and reputational benefits that the Wylys received by hiding their holding, exercise and sale of the offshore securities in violation of the law.  *See* Order at 27 and 48-49. That a portion of the Wylys' ill-gotten gains is based on the higher rate of return earned on options than that earned on stock does not change its reasonableness.  Indeed, it is highly likely that the Wylys chose to transfer options offshore instead of stock precisely because the options typically earned higher rates of return.[4]

The Wylys obtained heightened secrecy and liquidity benefits through their securities violations by transferring options instead of stock offshore.  The secrecy benefits are derived from the Wylys' ability to hide their offshore exercise of those options.  In its Order, the Court noted that the Wylys either failed to disclose or falsely disclosed all of their offshore option

period.

---

[4] Moreover, the use of options maximized the tax savings of the Wylys' offshore scheme because the Wylys exercised the options without paying the required ordinary income tax on the difference between the strike price and the value of the stock.

exercises.  Order at 44, n. 125 (*citing* PX-9231).  This secrecy had great value to the Wylys.

First, as Dr. Becker testified, hiding disclosure of their offshore option exercises enabled the

Wylys to avoid a negative market reaction which often followed such disclosures.  *See* Nov. 17,

2014 Transcript at 220:11-222:54.  Second, transferring options offshore enabled the Wylys to

falsely represent to the Issuers that they held fewer options than they actually did.  This was

significant because the Issuers considered the "number of unexercised options held by the

recipient," such as the Wylys, as a factor when deciding how many additional stock options to

grant to them.  *See* ECF 456, SEC's Proffer, p. 7 (*citing* PX-4154); Order at 28-29 ("based on the

Wylys' non-disclosure, shareholders could view the Wylys as executives who needed more

options to align their interests with those of the company.").  Finally, the transfer of options as

opposed to stock allowed the Wylys to maximize the illicit tax benefits of the offshore system.[5]

        As important as the secrecy benefit, the Wylys also obtained a massive liquidity

advantage by transferring options instead of stock offshore.  With options, the Wylys did not

have to tie up the capital necessary to acquire the stock until the time the options were executed.

This enabled the Wylys to invest their offshore capital elsewhere until such time they chose to

exercise the options.  And although this liquidity advantage is inherent with options, the Wylys'

exploited it by transferring the options offshore and thus co-mingling the liquidity advantage

with all of the other benefits of the offshore system.  As the Court held, the SEC was not

obligated to parse out and measure each benefit as "each measurement alone would not have

captured the combined benefits the Wylys enjoyed."  Order at 49.

---

[5] If the Wylys had exercised their options onshore on the date of transfer – the counterfactual
scenario envisioned by Dr. Becker's measure 1A – they would have been taxed on the unrealized
gain earned on the exercise of the options.  Thus the offshore transfer of options resulted in a
level of secrecy that hid the tremendous and improper tax benefits of Defendants' offshore
system.  Order at 32-33.

Defendants illustrate their criticism of Dr. Becker's comparison of the Wylys' offshore rate of return to the buy-and-hold equity investor's rate of return by referring to Sterling Commerce options that Charles Wyly transferred offshore on March 7, 1996 and which remained unexercised through the time Sterling Commerce was acquired, and the options were sold, in March 2000.  Def. Br. at 5-6.  As an initial matter, it is important to note that based on the Court's Order excluding gains earned from securities held through Sterling Commerce's acquisition by SBC, any gains the Wylys earned from these particular options have now been excluded from the disgorgement award.[6]

In their brief, Defendants claim that Dr. Becker provided an "evasive non-answer" when she was asked about this cherry-picked example by discussing "the fairness of Sterling Commerce's compensation system."  Def. Br. at 6.  However, once again Defendants have unfairly mischaracterized Dr. Becker's testimony in order to create the illusion that the Court was misled.  When Dr. Becker was asked about comparing the rate of return Charles Wyly earned from his March 7, 1996 transfer of Sterling Commerce options offshore to the rate of return of a buy-and-hold investor, she testified that Mr. Wyly's rate of return from those options was impacted by the fact that the transfer occurred before Sterling Commerce's initial public offering, and thus before a hypothetical buy-and-hold investor could even purchase shares.  *See*

_____

[6] While Defendants note that Charles Wyly's return from that one particular tranche of offshore Sterling Commerce options was 32.1%, that rate played no role in Dr. Becker's calculation.  As she explained in her report, Dr. Becker calculated and utilized the <u>average</u> rate of return for each issuer based on all of offshore transactions in that issuer.  Therefore, Dr. Becker's rate of return for Charles Wyly's offshore Sterling Commerce securities also incorporates the rate of return from the 250,000 Sterling Commerce options Charles did exercise and sell, as well as the nearly 1 million additional shares of Sterling Commerce stock that Charles Wyly's offshore system obtained and sold.  This produced an average rate of return of 29.1% from Charles Wyly's offshore Sterling Commerce transactions, but as a result of the Court's Order excluding gains from the securities held offshore through the companies' acquisition in March 2000, Charles Wyly's average rate of return from his offshore Sterling Commerce securities has now fallen to only 23.6%.

Nov. 17, 2014 Transcript at 233:21-235:1.  Dr. Becker testified further that whereas the options Charles Wyly transferred offshore on March 7, 1996 had an exercise price of $24 per share, Sterling Commerce's stock closed on March 8, 1996, its very first day of public trading, at $29 per share, over 20% higher than the exercise price.  *Id.*

Displeased with this answer, defense counsel asked Dr. Becker "what the gains would have been if the buy and hold investor in your calculation had bought options like what Charles Wyly was given?"  *Id.* at 234:17-19.  Rather than question the fairness of Sterling Commerce's compensation system, as Defendants mischaracterize, Dr. Becker answered the question directly.  First, she explained that it was not possible to compare Charles Wyly's return to a buy-and-hold option investor because it wasn't "remotely possible" that an investor could purchase an option like what Charles Wyly received, given that the option was already deep in the money at the close of the company's very first day of trading.[7]  *Id.* at 234:24-235:1.  Dr. Becker then went on to explain that the Defendants' example was skewed by the fact that Charles Wyly's return (and therefore his rate of return) from those options was inflated by the fact that he received options with an exercise price $5 below the closing price on the company's first day of trading.  *Id.* at 235:6-9 and 235:15-23.

As the Court properly noted, Dr. Becker's decision to compare the Wylys' weighted average offshore rate of return to a hypothetical buy-and-hold purchaser of stock was correct because it treated both the Wylys and the hypothetical purchaser as paying the same amount for each security.  *Id.* at 45.  In fact, the only difference in Dr. Becker's comparison between the Wylys and the hypothetical purchaser is the timing of their payment for the securities.

---

[7] The Court understood Dr. Becker's point because it correctly noted that "I think she is saying there is no comparison in the real world that can be made.  There's no stranger buyer who could have walked in and gotten an option [with an exercise] price of $24."  *Id.* at 235:11-14.

While the SEC does not dispute that this difference in timing does impact the average rates of return generated by the Wylys and a hypothetical purchaser, the facts at trial proved that it was the Wylys themselves who decided repeatedly to transfer options rather than stock offshore. They made those decisions because they knew that doing so provided them with heightened levels of the very benefits that the SEC now seeks to recover through disgorgement. For all the reasons provided by the Court in its Order, it simply does not follow that Dr. Becker's comparison of the two rates of return is either unfair or unreasonable.

## IV. Defendants' Proposed Alternative Comparison to a Buy-and-Hold Option Purchaser Is Meritless and Too Late.

Defendants argue that "the burden was on the SEC" to compare the Wylys' offshore rate of return to the rate of return of a buy-and-hold *option* purchaser. This argument is meritless and too late. Defendants are unable to cite a single case that holds a plaintiff is required to use the precise methodology proposed by a defendant when calculating disgorgement. Rather, Second Circuit law is clear that once the plaintiff has met its burden of establishing a reasonable approximation of the Defendants' ill-gotten gain, the burden shifts to the defendant to prove that the measure was inaccurate. *See* Order, at 10. If the Defendants thought a comparison to a buy-and-hold *option* purchaser was more reasonable, they could have attempted to meet their burden by having their expert, Professor Fischel, perform that very comparison and present the results in a timely fashion at the hearing. However, they chose not to do so.

A comparison between the Wylys' rate of return and a buy-and-hold option purchaser would be so hypothetical that it would be inherently unreliable. The Wylys didn't transfer the types of options that were traded on exchanges or that reasonably could be acquired by a market participant. The Wylys received and transferred offshore tens of millions of at-the-money or in-the-money compensatory stock options with durations of up to 10 years. As Dr. Becker testified,

there is no market data for the value of such an option.  *See* Nov. 17, 2014 Trans. at 204:2-5.  For example, given the massive size and extended duration of the Wylys' options, it is impossible to determine what it would have cost a market purchaser to acquire a 10-year option for 3 million shares of Sterling Commerce, particularly in March 1996, when Sterling Commerce only had 12 million publicly traded shares.  Given the speculative nature of the price a buy-and-hold option investor would have paid for the transferred options, the Wylys' argument that a comparison of their offshore rate of return to the rate of return of such an investor is somehow more reasonable than Dr. Becker's comparison is absurd.

The requirement is of a reasonable approximation.  *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014).  Although the Defendants would like to strip out from disgorgement the benefits that they received from transferring options offshore instead of stock, the Court rightfully held that those benefits could not even be analyzed separately, much less quantified and omitted from disgorgement, due to the fact that "the offshore system allowed the Wylys to have several intertwining advantages." Order at 27.  For the reasons given in the Order, the Court's approximation of the Defendants' ill-gotten gain is eminently reasonable.

Dated:  January 12, 2015.                    Respectfully submitted,

 /s/  *Martin Zerwitz*
Martin Zerwitz (MZ-9765)
Bridget Fitzpatrick
John D. Worland, Jr. (JDW-1962)
Gregory N. Miller (GM-5922)
Hope Augustini
Daniel Starolselsky
Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5977
Tel.:    (202) 551-4566 (Zerwitz)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 12th day of January 2015, electronic copies of the Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion for Reconsideration were served on the following parties via electronic mail:

Stephen D. Susman
Harry Susman
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096

Terrell W. Oxford
David D. Shank
SUSMAN GODFREY
901 Main Street, Suite 5100
Dallas, Texas  75202-3775

Mark Hatch-Miller
Steven Shepard
Susman Godfrey
560 Lexington Avenue
15th Floor
New York, New York 10022-6828

**Counsel for Defendants Samuel E. Wyly
and Donald R. Miller Jr.**


    __/s/  Martin Zerwitz_____
    Martin Zerwitz
    Counsel for Plaintiff
    Securities & Exchange Commission