UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SAMUEL WYLY, DONALD R. MILLER, JR., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr.,<br><br>Defendants. | No. 1:10-cv-5760-SAS<br><br>ECF Case |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO RECONSIDER THIS COURT'S OPINION AND ORDER GRANTING DISGORGEMENT OF "GAINS IN EXCESS OF BUY AND HOLD BENCHMARK"**

The SEC concedes—either expressly or by silence—the essential points:

- The Wylys' IOM holdings "largely . . . consisted of compensatory stock options." SEC Response, at 2-3.

- "[O]ptions . . . typically earn[] higher rates of return" than the underlying stock. *Id.* at 5; *see* Fischel Report ¶¶ 24-26 [PX-9242].

- Despite that difference, Dr. Becker's "buy and hold benchmark"—against which the options are compared—is built, not on an option's rate of return, but instead on "the rate of return earned by a buy-and-hold purchaser of each Issuer's stock." SEC Response, at 4 (emphasis added).

- Therefore, "[a] portion of the Wylys' ill-gotten gains [as calculated by Dr. Becker in Measure #1] is based on the higher rate of return earned on options than that earned on stock . . . ." *Id.* at 5.

- This "portion" is roughly $100 million. That is more than one-half the total amount of disgorgement calculated by Measure #1. *Compare* Defs' Mem. 9-10 (making this point), *with* SEC Response (silence).

The Court's opinion overlooked the fact that Dr. Becker's Measure #1 compares apples (the stock-based rate of return in the "buy and hold benchmark") to oranges (the option-based rates of return the Wylys lawfully enjoyed). Rather than explain why it was reasonable for Dr. Becker to compare apples to oranges, the Court's opinion instead implied that the comparison never happened at all. Order, at 44-45 [ECF No. 563]. This is exactly the circumstance that calls for reconsideration. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (affirming district court's grant of motion for reconsideration, where motion pointed out significant matters "which the district court had not discussed in its original ruling").

Defendants' motion asked a simple question: Why is it reasonable to disgorge the additional $100 million that is due solely to the fact that the Wylys' options, <u>by their nature</u>, earned a higher rate of return than the underlying stock? The SEC's Response gives seven answers, none of which are persuasive.

First, the SEC leads off with a list of other disgorgement measures that it originally sought, but which the Court rejected or the SEC itself abandoned. SEC Response 3-4. The list includes: the SEC's bid, last June, to disgorge unrealized gains occurring before the options were transferred to the IOM,[1] the SEC's recent request to disgorge profits from securities that were never sold, and the SEC's unsuccessful attempt to prove insider trading. The argument seems to be that the Court should cut the SEC a break, now, because of the SEC's previous difficulties in identifying and defending a plausible theory of disgorgement. The SEC cites no legal authority for that argument. None exists.

Second, the SEC argues—for the first time—that "it is highly likely that the Wylys chose to transfer options offshore instead of stock precisely because the options typically earned higher rates of return [than stock]." *Id.* at 5. This is pure speculation. Numerous documents and witnesses in this case have discussed the various reasons why the Wylys transferred securities to the Isle of Man. None indicate that one of those reasons was the differing rates of return of options compared to stocks. The obvious reason why the Wylys transferred options, rather than stock, is that options were what they had. Options were how the issuers compensated the Wylys.

Third, the SEC argues that by transferring options offshore, rather than first exercising them and then transferring the stock obtained from the exercise, the Wylys thereby obtained an additional secrecy benefit: Not only were the sales of stock hidden; so, too, were the option exercises which preceded those sales (sometimes by a day, sometimes by years). SEC Response at 6. But there is no persuasive expert evidence that option exercises, if disclosed, would cause a "negative market reaction." While it is true (as Dr. McConnell described) that an insider's sale

---

[1] *Compare* ECF 418-2 (SEC's original "total trading profits" theory would include pre-transfer unrealized gains, based on Misuraca's accounting methods), *with* Becker Report ¶14.a (making an "important change[]" to Ms. Misuraca's calculations" by "exclud[ing] the unrealized gains that the Wylys earned from the securities before they were transferred").

of stock is associated with a (small) downward movement in price, the exercise of an option is not a sale. Just the opposite: It is an investment by the insider—which may look like good news to the market. *See* Tr. Transcript 4177:1 (Aug. 12, 2014) (Testimony of Dr. McConnell) ("larger insider holdings" of stock are "often associated" with "increased valuation"). Tellingly, Dr. Becker's report doesn't include "negative price reactions" to option exercises, not even when calculating her "Measure #2" of disgorgement. (Measure #2 was intended to be "similar to the [method] used by Dr. John McConnell, with four primary corrections." Becker Report ¶32. Yet none of those four "corrections" involved adding a "negative market reaction" following option exercises.) Finally, even if there were a slight additional secrecy benefit to the Wylys from masking option exercises, in addition to masking the later stock sales, the value of that incremental benefit was not $100 million. No one, not even Dr. Becker, has suggested that.

Fourth, the SEC argues that transferring the options offshore "enabled the Wylys to falsely represent to the Issuers that they held fewer options than they actually did. This was significant because the Issuers considered the 'number of unexercised options held by the recipient,' such as the Wylys, as a factor when deciding how many additional stock options to grant." SEC Response at 6. This argument is nowhere discussed in Dr. Becker's report or testimony. That's because the SEC abandoned this argument back in September, right after receiving the defense's criticism of it. *See* SEC Reply in Further Support of its Request to Hold the Record Open 1-2 [ECF 460] ("After further evaluation, the SEC determined it is not necessary to pursue . . . the tainted options theory described in its proffer."), *responding to* Defense Response to SEC Request to Hold the Record Open 2-3 [ECF 458] ("[T]here is zero evidence of any causal connection" between the violations "and the granting of options."), *criticizing* SEC Proffer and Request to Hold the Record Open 7-8 [ECF 436]. Even if the SEC

3

hadn't abandoned this argument; even if there were any evidence to support it; still the argument would be irrelevant to the issue here, which is whether comparing option-based rates of return to stock-based rates of return leads to a "reasonable approximation" of the benefit to the Wylys. It does not: Not even the SEC suggests that the companies would have compensated the Wylys in shares of <u>stock</u>, rather than in <u>options</u>, if only the companies had known about the IOM system.

<u>Fifth</u>, the SEC argues that by transferring options, rather than stock, the Wylys "maximized the illicit tax benefits of the offshore system." SEC Response at 6; *see id.* at 5 n.4. But this is an argument for the SEC's "primary theory of disgorgement," namely, "unpaid taxes." Order on Total Profits at 17 n.48 [ECF 436]. Here, we are concerned with an <u>alternative</u> theory, based on <u>trading profits</u>, which will only be imposed "in the event that a higher court disagrees with the [tax-based] measure of disgorgement calculated in the September 25 Order." Order at 56 [ECF 563]. It would defeat the purpose of this alternative theory if it, too, were also to be based on unpaid taxes. Moreover, the SEC cannot answer this question: How does comparing an option-based rate of return to a stock-based rate of return "reasonably approximate" the value of unpaid taxes? To ask that question is to answer it.

<u>Sixth</u>, the SEC argues (for the first time) that the Wylys' options, by delaying the payment of the exercise price, conferred "a massive liquidity advantage." SEC Response at 6. By this, the SEC means something <u>new and different from</u> the "liquidity advantage" discussed at trial. At trial, the SEC claimed the Wylys obtained liquidity from <u>shares of stock</u> held in the IOM: The Wylys could sell those shares (for cash) or could pledge them as collateral (for loans). But this liquidity advantage—the one discussed at trial—was limited to shares of stock. There was no liquidity available from <u>options</u>. The Wylys did not pledge options as collateral, nor sell

4

them,[2] nor do anything else besides (eventually) exercise them. Exercising the options, in short, was the first step to obtaining the old "liquidity advantage." What the SEC is now claiming is a new and different "liquidity advantage," namely, the fact that the options permitted the Wylys to delay paying the exercise price. But, as the SEC concedes, "this [kind of] liquidity advantage is inherent in options." *Id.* The ability to delay payment of the exercise price is what makes an option an option. It's also what causes their rates of return to be higher than those of stocks.

Seventh, the SEC complains that comparing the Wylys' options to anything but a stock-based rate of return would be difficult: "Given the massive size and extended duration of the Wylys' options, it is impossible to determine what it would have cost a market purchaser to acquire" them. SEC Response at 10. This is no answer at all. The whole point of defendants' criticism is that the Wylys lawfully earned exceptional compensation. Options of "massive size and extended duration" are how these companies, like many others in America, compensated the entrepreneurs who founded, financed, and led them.

Last summer, the Court rejected the SEC's attempt to disgorge the Wylys' "total profits." That measure of disgorgement, the Court ruled, "d[id] not appear to arise from the violations and therefore smacks of punishment, not equity or deterrence." Order on SEC Total Profits Theory 21 [ECF 436]. The Court's ruling applies with equal force to the SEC's current attempt to disgorge the $100 million portion of Dr. Becker's Measure #1 that is due solely to the nature of the Wylys' compensatory options. Options earn higher rates of return than stocks do—for reasons that have nothing to do with the violations in this case.

---

[2] The one exception is the Wylys' purchase of Sterling Software options from Lehman Brothers in 1995. The Wylys sold these back to Lehman, unexercised, 15 months later. In every other case but this one, the options were simply held—not pledged, or sold—until exercise (or until the issuer itself was sold).

| | |
|---|---|
| Dated: January 16, 2015 | Respectfully submitted: |

SUSMAN GODFREY, L.L.P.

By: _____
Stephen D. Susman (SS8591)
Mark H. Hatch-Miller (MH4981)
Steven M. Shepard (*pro hac vice*)
560 Lexington Avenue, 15th Floor
New York, New York  10022-6828
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Terrell W. Oxford
David D. Shank
901 Main Street, Suite 5100
Dallas, Texas  75202-3775
Telephone: (214) 754-1900
Facsimile: (214) 754-1933

*Attorneys for Samuel E. Wyly and Donald R. Miller, Jr.*