UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

SECURITIES AND EXCHANGE
COMMISSION,

                 **Plaintiff,**

    - against -

SAMUEL WYLY, and DONALD R.
MILLER, JR., in his Capacity as the
Independent Executor of the Will and Estate
of Charles J. Wyly, Jr.,

                 **Defendants,**

and

CHERYL WYLY, EVAN ACTON WYLY,
LAURIE WYLY MATTHEWS, DAVID
MATTHEWS, LISA WYLY, JOHN
GRAHAM, KELLY WYLY O'DONOVAN,
ANDREW WYLY, CHRISTIANA WYLY,
CAROLINE D. WYLY, MARTHA WYLY
MILLER, DONALD R. MILLER, JR., in his
individual capacity, CHARLES J. WYLY III,
EMILY WYLY LINDSEY, JENNIFER
WYLY LINCOLN, JAMES W. LINCOLN,
and PERSONS, TRUSTS, LIMITED
PARTNERSHIPS, AND OTHER ENTITIES
KNOWN AND UNKNOWN,

                 **Relief Defendants.**

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7|7|15

**OPINION AND ORDER**

**10-cv-5760 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.      INTRODUCTION

The Securities and Exchange Commission ("SEC") sued defendants,
Sam Wyly and the Estate of Charles Wyly ("the Wylys"), alleging violations of
numerous federal securities laws, including Section 10(b) of the Exchange Act, and
SEC Rule 10b-5 thereunder (the "First Claim"); Section 17(a) of the Securities Act
(the "Fourth Claim"); Sections 5(a) and (c) of the Securities Act (the "Fifth
Claim"); Section 13(d) of the Exchange Act, and SEC Rules 13d-1 and 13d-2
thereunder (the "Sixth Claim" and "Eighth Claim"); Section 16(a) of the Exchange
Act, and SEC Rules 16a-2 and 16a-3 thereunder (the "Ninth Claim"); Section 14(a)
of the Exchange Act, and SEC Rules 14a-3 and 14a-9 thereunder (the "Eleventh
Claim" and "Twelfth Claim"); and Section 13(a) of the Exchange Act, and SEC
Rule 13a-1 thereunder (the "Thirteenth Claim").  After a five-week trial, the Wylys
moved for judgment as a matter of law pursuant to Rule 50(a) on eight of the
SEC's nine claims.  This Court granted the motion, in part, with respect to the
Ninth Claim, and reserved judgment on the remaining claims.[1]  On May 12, 2014,
the jury found the Wylys liable on all claims.[2]

---

[1]      *See* Jury Trial Transcript ("Tr.") at 2990–2994.

[2]      The undisputed facts and jury findings are summarized in *SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014).

The Wylys now renew their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. The Wylys argue on various grounds that the SEC's evidence at trial was legally insufficient to support the jury's verdict. For the following reasons, the Wylys' motion is denied.

## II.   APPLICABLE LAW

### A.   Rules 50(b) and 59

A defendant is entitled to judgment as a matter of law if, after a party has been fully heard on an issue during trial, the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."[3] In ruling on a motion for judgment as a matter of law, the trial court is required to

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.[4]

A jury verdict should not be set aside lightly. A court may not grant

---

[3]     Fed. R. Civ. P. 50(a)(1).

[4]     *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation marks and citation omitted). *Accord Caceres v. Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 622 (2d Cir. 2011).

3

judgment as a matter of law unless: (1) there is such a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture'" or (2) there is "'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]."'[5]

Under Federal Rule of Civil Procedure 50(b),

[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59 . . . In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law.

The legal test for granting a new trial under Rule 59 is less stringent than for granting judgment as a matter of law. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."[6]  Nevertheless, "'[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of

---

[5]     *Altria Grp., Inc. v. United States*, 658 F.3d 276, 290 (2d Cir. 2011) (quoting *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79 (2d Cir. 2006)).

[6]     *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (quotation marks and citation omitted).

justice.'"[7]

## B.    Section 10(b)

A section 10(b) claim requires proof by a preponderance of the

evidence that, in connection with the purchase or sale of a security: (1) defendants

made an untrue statement of material fact, or omitted to state a material fact which

made what was said, under the circumstances, misleading; (2) defendants acted

with scienter; (3) plaintiffs justifiably relied on the misstatement or omission; and

(4) plaintiffs suffered an economic loss as a result of the misstatement or

omission.[8]   The required level of scienter under section 10(b) is either "intent to

deceive, manipulate, or defraud"[9] or "reckless disregard for the truth."[10]

## C.    Section 17(a)

Section 17(a) of the Securities Act makes it

---

[7]    *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 51 (2d Cir. 2012) (quoting *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002)).

[8]    *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 n.1 (2d Cir. 2008).

[9]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[10]    *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness — *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" (quoting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000)).

> unlawful for any person in the offer or sale of any securities . . .
> (1) to employ any device, scheme, or artifice to defraud, or (2) to
> obtain money or property by means of any untrue statement of a
> material fact or any omission to state a material fact necessary in
> order to make the statements made, in light of the circumstances
> under which they were made, not misleading; or (3) to engage in
> any transaction, practice, or course of business which operates or
> would operate as a fraud or deceit upon the purchaser.[11]

"The requirements for a violation of Section 17(a) apply only to a sale of securities

but in other respects are the same as Section 10(b) and Rule 10b-5, except that 'no

showing of scienter is required for the SEC to obtain an injunction under [Section

17] (a)(2) or (a)(3).'"[12]

### D.    Section 13(d)

Section 13(d) provides that "[a]ny person who, after acquiring directly

or indirectly the beneficial ownership" of certain securities must fulfill certain

disclosure requirements.[13]  Beneficial ownership is defined by SEC Rule 13d-3(a),

which states that

> a beneficial owner of a security includes any person who, directly
> or indirectly through any contract, arrangement, understanding,
> relationship, or otherwise has or shares: (1) Voting power which
> includes the power to vote, or to direct the voting of, such

---

[11]    15 U.S.C. § 77q(a).

[12]    *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir.
2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

[13]    15 U.S.C. § 78m(d)(1).

security; and/or (2) Investment power which includes the power
to dispose, or to direct the disposition of, such security.[14]

## III.   DISCUSSION

The Wylys offer three arguments for setting aside the jury's verdict
and granting judgment as a matter of law, or in the alternative for a new trial: (1)
the evidence was insufficient to permit the jury to find "beneficial ownership"
under section 13 (multiple claims); (2) the evidence was insufficient to permit the
jury to find scienter as required under section 10(b) (First Claim); and (3) the
evidence was insufficient to permit the jury to find fraud "in the offer or sale of any
securities" as required under section 17(a) (Fourth Claim).

### A.   Beneficial Ownership Under Section 13

The Wylys contend that the evidence was insufficient to show that
they were beneficial owners of offshore securities for the purposes of section 13.
They argue, relying exclusively on Judge Winter's concurrence in *CSX Corp. v.
Children's Investment Fund Management (UK) LLP*,[15] that the evidence
established only that the Wylys exercised influence over the trustees' investment
decisions, but not the power to control these decisions. The Wylys state that the
pertinent question is whether the trustees retained "complete freedom to . . . act in

---

[14]   17 C.F.R. § 240.13d-3(a).

[15]   654 F.3d 276 (2d Cir. 2011).

[their] self-interest with regard to purchases and sales."[16]

      The facts of *CSX Corp.* are readily distinguishable from those arising in this case.  In *CSX Corp.*, the party deemed by the district court to be the beneficial owner (the "long" party) merely "expect[ed]" that the other party (the "short" party) would purchase shares because it was the "only practical alternative" for the short party when pursuing a total-return equity swap.[17]  Judge Winter noted that to "'direct the disposition of' . . . something, or to 'influence' it, even indirectly, one generally must have some measure of active control . . . .  A relationship that leaves . . . parties free to act in whatever way they deem to be in their self-interest with regard to purchases and sales . . . does not fit within the concept of 'beneficial ownership' . . . ."[18]  However, Judge Winter repeatedly stated that had there been "an agreement or understanding," even an informal one, between the parties regarding the purchase of shares, the party would be deemed a

---

[16]    Memorandum of Law in Support of Defendants' Renewed Motion for Judgment as a Matter of Law, or Alternatively for a New Trial ("Def. Mem.") at 13 (quoting *CSX Corp.*, 654 F.3d at 299 (Winter, J., concurring)).

[17]    *CSX Corp.*, 654 F.3d at 296.  "Total-return swaps are contracts in which parties agree to exchange sums equivalent to the income streams produced by specified assets. . . . [B]ecause of the inherent risks in short-equity positions . . . persons holding short positions in total-return equity swaps will usually choose to purchase . . . shares to hedge their short exposure."  *Id.* at 279–80 (majority opinion).

[18]    *Id.* at 298–99 (Winter, J., concurring).

"beneficial owner."[19]

      Assuming that Judge Winter's explanation of "beneficial ownership" is correct, the evidence presented at the Wylys' trial easily meets that test.  The Wylys "conceded that all of the investment decisions made by the Isle of Man trustees, all of them came from suggestions made by the protectors, which originated with the Wylys. . . . [T]he trustees never made a decision on their own, and they never failed to follow a recommendation made by the protectors."[20] These investment decisions comprised hundreds of securities transactions over twelve years.  At least three of these "recommendations" included instructions that the trades should be carried out "immediately."[21]  The Wylys also had the subjective expectation that the trustees would follow their recommendations. Testimony confirmed that Sam Wyly had joked, "[W]e'll just fire the trustees if [they] don't do what [we] tell them."[22]

      The Wylys argue that each piece of evidence, taken alone, indicates nothing more than influence over the trusts, and that no single piece of evidence

---

[19]    *Id.* at 288–89; *see also id.* at 299.

[20]    Tr. at 3081 (defense closing argument).

[21]    PX-255.  *See also* JX-002 at 5–6; PX-556.

[22]    Tr. at 1004 (testimony of Michelle Boucher).

demonstrated the Wylys' control.  But this argument fails to appreciate the applicable standard for judgment as a matter of law under Rule 50 or for a new trial under Rule 59.  Even without a "smoking gun" spelling out an arrangement or understanding between the Wylys and the trustees, given the vast evidence of "influence" that was presented, a reasonable jury could have inferred that the Wylys and the trustees did, in fact, have an understanding that gave them indirect investment power over the securities in the trusts.

Finally, the Wylys note that every trustee witness "testified that they never relinquished their freedom to make investment and voting decisions for the trusts in their own sole discretion . . . ."[23]  Putting aside the question of whether the formal — but never in twelve years exercised — ability to make decisions would be sufficient to overcome overwhelming evidence of de facto control, the jury was free to weigh the credibility of the trustee witnesses and discount their testimony in its entirety.

Considering only the evidence detailed above,[24] a reasonable jury

---

[23]     Def. Mem. at 13.

[24]     Because the trial lasted five weeks, this Opinion discusses only some of the evidence that supports any given finding, as it would be nearly impossible to discuss every document and every line of testimony that the jury may have relied on.  The evidence highlighted here, though not exhaustive, provides a sufficient basis for the challenged findings.

could have inferred that the Wylys indirectly had voting and/or investment power over the shares held by the offshore trusts, and were therefore beneficial owners of the shares for the purposes of section 13.[25]

### B.     Scienter Under Rule 10(b)

The Wylys contend that the SEC presented "no plausible proof . . . that Sam and Charles Wyly actually knew their SEC reporting position — that they did not 'control' offshore entity-held stock for SEC reporting purposes — was false, or that they acted with reckless disregard for the truth with regard to that

---

[25]     In a footnote, the Wylys also contest the jury's finding of liability on the section 13-based aiding and abetting claims.  According to the Wylys, there was no evidence that they had knowledge of the primary violations.  This claim is without merit.  The jury heard evidence that the Wylys knew of inaccurate SEC filings.  *See, e.g.*, DX-3, PX-944.  With regard to the substantial assistance element (which the Wylys raise only in their reply brief), the jury could have reasonably found that the Wylys "in some sort associated [themselves] with the venture, that [they] participated in it as in something that [they] wished to bring about . . . ." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (citing *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).  In the same footnote, the Wylys claim that the SEC provided no evidence that the false representations contained in proxy statements were material, and cite to the fact that the Wylys were reelected to the board of Michaels after making corrective disclosures.  To the contrary, the jury heard evidence regarding the substantial discrepancy between what was disclosed and the Wylys' actual ownership (18 percent versus 40 percent) and that, at a certain point, changes in the board of directors for Michaels were recommended because the Wylys were exercising too much control.  *See* Tr. at 2630 (testimony of Donald Miller).  Thus, the jury reasonably could have inferred that the misrepresentations in the proxy statements were material, notwithstanding the fact that the Wylys were reelected after making corrective disclosures.  Simply because a fact does not change an outcome does not mean the fact is immaterial.

reporting position."[26]  The Wylys argue that the only document that would potentially have shown scienter is a memo (the "Post Memo") that the Wylys never received.  The SEC, in turn, contends that extensive evidence demonstrates the Wylys' scienter — both that they were aware of their reporting obligations if they were beneficial owners, and that they knew their reporting position was false or were at least reckless with regard to the truth of their position.  As detailed below, I conclude that the evidence supports the jury's finding of scienter.

As the Wylys' recognize, the pertinent question is whether the evidence supports a "reasonable jury finding of intentional or reckless reporting failures."[27]  This requires evidence showing that the Wylys knew what their reporting obligations were and either knew that they were beneficial owners and failed to report or were reckless with regard to their reporting position.

As an initial matter, the jury heard substantial evidence regarding the Wylys' knowledge of their reporting obligations.  Sam Wyly testified that he was aware that he had reporting obligations when trading in stock of companies in

---

[26]     Def. Mem. at 5–6.

[27]     Reply Memorandum of Law in Further Support of Defendants' Renewed Motion for Judgment as a Matter of Law, or Alternatively for a New Trial at 8.

which he sat on the board of directors.[28]  Keeley Hennington, who became the head

of the Wyly family office in June 2000, similarly wrote an email to Louis

Schaufele, the Wylys' broker, noting that Charles did not want to pursue a

transaction "solely because of the reporting requirements."[29]  Michael French, the

Wylys' family attorney and a protector of the offshore trusts, also testified that

both Wylys were aware that they would need to report the trades executed by the

trusts if they were beneficial owners of the securities held by the trusts.  Moreover,

there was evidence that the Wylys understood that the issue of control was directly

linked to reporting obligations.  For example, French sent a memo to Sam Wyly on

March 24, 1995, in which he explicitly linked the concepts of control and reporting

obligations: "If the options are transferred . . . and no control is maintained over

the trustee (he's independent) or the shares, **then subsequent exercises of the

options and sales of shares by the trustee are not required to be reported to

the SEC.**"[30]  Finally, Sam and Charles Wyly together signed ninety director and

officer questionnaires, more than seventy of which contained a definition of

---

[28]     Tr. at 2161–2162.

[29]     PX 1264 (9/3/03 Email from Hennington to Schaufele); Tr. at
1324–1328.

[30]     PX 131 (3/24/95 Memo from French to S. Wyly) (emphasis in
original); Tr. at 1772–1773.

beneficial ownership.[31]  This evidence supports the inference that both Sam and Charles Wyly understood the meaning of beneficial ownership, and understood the reporting obligations if they were beneficial owners.

The pertinent question is whether the evidence supports the inference that the Wylys knew that their reporting position was false, or acted with reckless disregard for the truth.  As the Wylys recognize, the Post memo represents the best direct evidence of this knowledge.  This memo, prepared by an associate at the law firm that represented the Wylys' companies, detailed legal research regarding reporting requirements of international trusts, including the meaning of beneficial ownership and the attendant reporting requirements.[32]  The Post memo states that "[i]f . . . Mr. Wyly's 'letter of wishes' is particularly detailed with respect to how he would like transactions in the Shares to be handled, he should consider including them on his Schedule 13D . . . ."[33]  French testified that he was "pretty sure" that he gave the memo to Sharyl Robertson, the head of the Wyly family office and another protector of the offshore trusts.[34]  Robertson testified that it was

---

[31]     *See* PX 7018 (summary chart)

[32]     *See* PX 10 (12/6/10 Memo from Marilyn R. Post to French).

[33]     *Id.* at 3.

[34]     Tr. at 1733.

14

her general practice to place copies of any legal opinions in Sam and Charles Wylys' inboxes.[35]  A reasonable jury could have drawn the inference from French's and Robertson's testimony that the Wylys did, in fact, receive the memo. Assuming, as I must, that the jury made this reasonable inference,[36] the Post memo alone supports the jury's conclusion that the Wylys knew that repeatedly giving detailed "recommendations" to the protectors, which were then passed along to the trustees and executed, made them beneficial owners, contrary to their reporting position.

But even assuming, *arguendo*, that the Wylys never saw the memo, enough circumstantial evidence of the Wylys' knowledge exists to support the jury's verdict.  Both Sam and Charles Wyly "recommended" hundreds of transactions that were *always* carried out by the trustees.[37]  The trustees "never made a decision on their own, and they never failed to follow a recommendation made by the protectors."[38]  Beyond the Wylys' subjective understanding that their

---

[35]     *See id.* at 156.

[36]     *See Townsend*, 679 F.3d at 51 (stating that in deciding a motion for judgment as a matter of law, all inferences must be drawn in favor of the non-moving party).

[37]     *See* PX-7015 (summary chart of the Wylys' transactions).

[38]     Tr. at 3081 (defense closing argument).

15

recommendations would always be carried out, the Wylys took pains to hide the extent of their control.  They hired Michelle Boucher, the CFO of the Irish Trust Company (a Wyly-related entity) who resided in the Caymen Islands, to be one of the protectors of the trusts, "to act as the focus of communications and maintain records etc. which should not be seen in the USA."[39]  They shipped documents to Boucher so that they would be more difficult to obtain in the event of a lawsuit.[40]  Moreover, French testified that he brought certain actions to Sam Wyly's attention and told him that these actions were impermissible and indicated control over the trusts' assets.[41]  After being informed, Sam Wyly showed no reaction, and did not

---

[39]   PX-194 (9/24/95 file note from Francis Webb regarding "Lake Providence International Trust/Sarnia Investments Limited, Castle Creek International Trust/Quayle Limited.")

[40]   *See* Tr. at 1008–1011 (testimony of Boucher); *id.* at 2344 (testimony of S. Wyly).  The Wylys argue that the hiding — alone — cannot prove scienter.  I disagree.  *First*, the jury could have made the reasonable inference that taking efforts to hide their control, without more, was in fact indicative of the Wylys' knowledge that their reporting position was false.  *Second*, the testimony that they shipped the documents offshore so that they would be more difficult to subpoena in the event of a lawsuit — specifically by the U.S. government — further supports this inference.  That the Wylys had concerns that the U.S. government would subpoena documents related to the offshore trusts supports the inference that the Wylys knew they were doing something improper.

[41]   *See id*. at 1744 ("FRENCH: [T]here were situations going along where he had taken it upon himself to do something with trust assets, direct investments.  I know Shari and I told him, both of us did, he shouldn't be doing that.  Q: When you would tell him that he shouldn't be doing that, what would Mr. Wyly's reaction be?  A: Blank stare.  Q: Would the conduct stop?  A: No.").

alter his behavior.  This evidence supports an inference that the Wylys knew or reckelssly disregarded their suspicions that their "influence" over the securities in the offshore trusts rose to the level of beneficial ownership.

Thus, the evidence supports the jury's finding that the Wylys' acted either with the intent to deceive or with reckless disregard for whether their reporting position was true or false.

### C.  Section 17(a) Claim

The Wylys argue the there was insufficient evidence to permit the jury to find for the SEC on the section 17(a) claim because the alleged misconduct — failure to properly report — occurred after completed sales, and was therefore not "in the offer or sale" of securities.  The Wylys contend that the meaning of the language of section 17(a) — "*in* the offer or sale of any securities" —  is meaningfully different from the language of section 10(b) — "*in connection with* the purchase or sale of any security."  The SEC provides several responses.  *First*, the SEC argues that "in" and "in connection with" are used interchangeably by both Congress and the Supreme Court and do not have different meanings. *Second*, even if section 17(a) is narrower than section 10(b), the section 13 violations satisfy the "in the offer or sale" requirement because the Wylys' fraud was ongoing.  *Third*, the Wylys made misstatements not only in post-transaction

Schedule 13Ds, but also in multiple Rule 144 forms that were required to be made on the same day as the sale.

I need not determine whether the "in the offer or sale" language in section 17(a) meaningfully differs from the "in connection with the purchase or sale" language of section 10(b) because I agree with the SEC's second and third arguments, either one of which is sufficient to support the jury's verdict.[42] *First*, the SEC presented substantial evidence of the Wylys' misrepresentations of their ownership and trades in securities of public companies in which they held director positions. Thus, each of the hundreds of transactions in these securities built on previous misrepresentations because the market was unaware of the extent of the Wylys' holdings in these securities. Even assuming, *arguendo*, that the language of section 17(a) does not sweep as broadly as that of section 10(b), the misrepresentations contained in the Wylys' post-transaction filings are "in the offer or sale" of securities, because the market in which they were selling these securities was misled about the extent of the Wylys' holdings and the frequency of

---

[42]     The Supreme Court, while declining to decide the issue, has expressed doubt that there is any difference: "[W]e are not necessarily persuaded that 'in' is narrower than 'in connection with.'  Both Congress and this Court have on occasion used the terms interchangeably." *United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979) (citations omitted).

18

their trading.[43]

      *Second*, the section 5 violations provide another independent basis for fraud liability under section 17(a).  The jury found the Wylys liable for selling unregistered securities in violation of section 5 for certain sales of Michaels Stores stock.  As part of these sales, the offshore trusts filed Rule 144 forms that were required to be completed on the same day as the sale.[44]  Thus, the omissions on the Rule 144 forms were made as part of the "entire selling process."[45]  The Wylys contend, however, that the fraud liability should be limited to the disclosure violations, and may not be premised on the section 5 violations.[46]  They claim that the jury was never told that fraud liability could be imposed for a negligent, reckless, or knowing violation of section 5, and that the non-disclosure fraud claims should be analyzed separately from the strict liability section 5 violations.[47]

---

     43     *See SEC v. Wolfson*, 539 F.3d 1249, 1263 (10th Cir. 2008) ("[W]e need not exhaustively consider the scope of [section 17(a)'s] requirement, nor determine whether it imposes a burden distinct from § 10(b)'s 'in connection with' element.  It suffices to note here that [defendant's] misconduct occurred 'in the offer or sale' of securities because the relevant misstatements were contained in filings available to the public at the time [the company] offered and sold . . . stock to . . . investors.").

     44     *See* Tr. at 482.

     45     *Naftalin*, 441 U.S. at 773.

     46     *See* Def. Mem. at 5 n.4, 9 n.11.

     47     *See id.*

This argument is meritless — the relevant question, when determining whether a jury's verdict is supported by the evidence presented at trial, is whether there is a "complete absence of evidence supporting the verdict."[48]  The jury was instructed that the fraud claims were premised on "false and materially misleading statements and . . . other deceptive conduct with regard to the Isle of Man trusts and entities."[49]  A reasonable jury could have connected the evidence it heard regarding the section 5 violations with the instructions regarding fraud under section 17(a). Nothing more is required.[50]

## III.  CONCLUSION

For the foregoing reasons, the Wylys' renewed motion for judgment as a matter of law or for a new trial is DENIED.  The Clerk of the Court is directed to close this motion (Dkt. No. 596) and this case.

SO ORDERED:

---

[48]     *Altria Grp., Inc.*, 658 F.3d at 290.

[49]     Tr. at 3238.

[50]     The Wylys also argue, in a footnote, that the jury's finding of liability under section 17(a)(2) was impermissible because there was no evidence that the Wylys "obtain[ed] money or property *by means of*" false statements.  *See* Def. Mem. at 11 n.13 (quoting 15 U.S.C. § 77q(a)(2)).  At a minimum, the section 5 violations provide an adequate basis to support the jury's finding under section 17(a)(2).

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 7, 2015

21

**- Appearances -**

**For the SEC:**

Bridget Fitzpatrick, Esq.
Hope Augustini, Esq.
Gregory Nelson Miller, Esq.
John David Worland, Jr., Esq.
Martin Louis Zerwitz, Esq.
Daniel Staroselsky, Esq.
Angela D. Dodd, Esq.
Marsha C. Massey, Esq.
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4474

**For Defendants:**

Stephen D. Susman, Esq.
Harry P. Susman, Esq.
Susman Godfrey LLP
1000 Louisiana Street, Ste. 5100
Houston, TX 77002
(713) 653-7801

David D. Shank, Esq.
Terrell Wallace Oxford, Esq.
Susman Godfrey LLP
901 Main Street, Ste. 5100
Dallas, TX 75202
(214) 754-1935

Steven M. Shepard, Esq.
Mark Howard Hatch-Miller, Esq.
Susman Godfrey LLP
560 Lexington Avenue
New York, NY 10022

(212) 336-8332

**For Samuel Wyly:**

Josiah M. Daniel III, Esq.
Vinson & Elkins LLP
2001 Ross Avenue, Ste. 3700
Dallas, TX 75201
(214) 220-7718

**For Caroline D. Wyly:**

Judith W. Ross, Esq.
Law Offices of Judith W. Ross
700 N. Pearl Street, Ste. 1610
Dallas, TX 75201
(214) 377-7879

**For Donald R. Miller, Jr., John Graham, Cheryl Wyly, Evan Wyly, Martha Miller, David Matthews, Laurie Matthews, Lisa Wyly, Kelly Wyly O'Donovan, Andrew Wyly, Christiana Wyly, Emily Wyly Lindsey, Charles J. Wyly, III, James W. Lincoln, and Jennifer Wyly Lincoln:**

David L. Kornblau, Esq.
Eric Hellerman, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1084

**For Jennifer Wyly Lincoln:**

Chaim Zev Kagedan, Esq.
Venable LLP
1270 Avenue of the Americas, 25th Floor
New York, NY 10020
(212) 307-5598