UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | 10 Civ. 5760 (SAS) |
| v. : | |
| : | ECF Case |
| SAMUEL WYLY and DONALD R. MILLER, JR., in : | |
| his Capacity as the Independent Executor of the Will and : | |
| Estate of Charles J. Wyly, Jr., : | |
| : | |
| Defendants, : | |
| : | |
| CHERYL WYLY, EVAN ACTON WYLY, : | |
| LAURIE WYLY MATTHEWS, DAVID : | |
| MATTHEWS, LISA WYLY, JOHN : | |
| GRAHAM, KELLY WYLY O'DONOVAN, : | |
| ANDREW WYLY, CHRISTIANA WYLY, : | |
| CAROLINE D. WYLY, MARTHA WYLY : | |
| MILLER, DONALD R. MILLER, JR., in his : | |
| individual capacity, CHARLES J. WYLY III, : | |
| EMILY WYLY LINDSEY, JENNIFER : | |
| WYLY LINCOLN, JAMES W. LINCOLN, : | |
| and PERSONS, TRUSTS, LIMITED : | |
| PARTNERSHIPS, AND OTHER ENTITIES : | |
| KNOWN AND UNKNOWN, : | |
| : | |
| Relief Defendants : | |

_____:

# BRIEF IN RESPONSE TO DECEMBER 18, 2015 REMAND ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

PROCEDURAL AND LEGAL BACKGROUND ..................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.   The Operation of the Offshore System Allows The Relief Defendants To Access
     Proceeds Of Defendants' Illegal Conduct ............................................................. 4

     A.   The Wylys Maintained That The Trustees Of The IOM Trusts Had An Obligation
          To Follow The Requests Of The Beneficiaries ................................................ 6

     B.   The Beneficiaries Continue To Exercise Control Of The IOM Trust Assets ......... 8

     C.   Sam Used The IOM Trusts To Transfer At Least $182 Million To His Children
          While The SEC Case Was Pending In This Court ............................................ 10

II.  Ample Evidence Demonstrates That the Asset Freeze is Necessary for the Remanded
     Defendants ........................................................................................................ 13

     A.   John Graham ..................................................................................................... 13

     B.   David Matthews ................................................................................................. 16

     C.   Christiana Wyly ................................................................................................. 18

     D.   Evan Wyly .......................................................................................................... 19

     E.   Andrew Wyly ...................................................................................................... 22

     F.   Donald Miller ..................................................................................................... 23

     G.   Charles J. Wyly, III ("Chip") ............................................................................ 24

CONCLUSION ..................................................................................................................... 27

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*SEC v. Banner Fund Intern*, 211 F.3d 602 (D.C. Cir. 2000) .................................................5

*SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167 (D.D.C. 1998) .............................5

*SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000) ....................................................................2

*S.E.C. v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009) aff'd sub nom...............................6

*SEC v. Donald Miller et al*, 808 F.3d 623 (2nd Cir. 2015)................................................2

*S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010) aff'd sub nom ......................................6

*S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010)..............................................................6

*SEC v. Wyly,* 56 F.Supp.3d 394 (S.D.N.Y. 2014)........................................3, 5, 6, 8, 10, 11

*United States v. Garcia*, 37 F.3d 1359 (9th Cir. 1994).......................................................5

**MISCELANEOUS**

Bankruptcy Code § 362 .......................................................................................................2

## INTRODUCTION

The Securities and Exchange Commission ("SEC") respectfully submits this Brief to assist the Court in making additional factual findings pursuant to the Second Circuit's December 18, 2015 Opinion affirming this Court's November 3, 2014 asset freeze order ("the asset freeze") as to nine Relief Defendants but remanding for additional factual findings with respect to seven Relief Defendants.[1]

## PROCEDURAL AND LEGAL BACKGROUND

On July 29, 2010, the SEC initiated a civil enforcement action against the Wyly Brothers in connection with a decade-plus scheme to use IOM Trusts to secretly trade the stock of companies in which the Wyly Brothers served as high-level insiders.  Following a six week trial, the jury returned a verdict finding the Wyly Brothers liable for multiple violations of the antifraud, registration, and reporting provisions of the federal securities laws ("the illegal conduct").  This Court subsequently found in a September 24, 2014 (the "September disgorgement opinion") that the Wyly Brothers were liable for approximately $300 million in disgorgement and pre-judgment interest as a result of their illegal conduct.

On October 8, 2014, in light of the evidence at trial, the SEC requested an asset freeze against the Wyly Brothers and any family members who possess or control ill-gotten gains.[2] Shortly thereafter, both Sam Wyly and Dee Wyly (Charles Wyly's widow) filed for bankruptcy

---

[1]      Throughout this Brief the term "Relief Defendants" refers to Caroline D. Wyly ("Dee"), David Matthews, Lisa Wyly, Kelly Wyly O'Donovan, Andrew Wyly, Charles J. Wyly, III ("Chip"), Jennifer Wyly Lincoln, James W. Lincoln, Cheryl Wyly, Evan Acton Wyly, Laurie Wyly Matthews, Martha Wyly Miller, Donald R. Miller, Jr., Emily Wyly, Christiana Wyly and John Graham.  "Remanded Defendants" refers to Cristiana Wyly, Evan Wyly, Andrew Wyly, John Graham, David Matthews, Donald Miller, and Chip Wyly.  "The Wyly Brothers" refers to Defendants Sam Wyly and the Estate of Charles J. Wyly Jr., which was substituted as a defendant after Charles Wyly died during the course of the litigation.  Finally, "IOM" refers to the Isle of Man.

[2]      Dkt. 479 (October 8, 2014 letter from the SEC to the Court requesting asset freeze).

and argued that the SEC's request for an asset freeze should be stayed pursuant to Bankruptcy Code § 362.[3]  As the Second Circuit noted, "[t]he timing speaks loudly for itself."[4]  The SEC subsequently filed an amended complaint that brought an unjust enrichment claim against the Relief Defendants.[5]  This Court entered the asset freeze on November 3, 2014 that extended to assets of the Relief Defendants "which were, at any time, the property of the IOM Trusts and Companies" and any other assets received from the Wyly Brothers after January 1, 2005.[6]

With the exception of Dee Wyly, the Relief Defendants challenged the asset freeze in the Second Circuit.[7]  On appeal, the Relief Defendants argued that (1) the asset freeze was issued in violation of the Bankruptcy Code's automatic stay provision as interpreted by the Second Circuit in *SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000), (2) the SEC failed to show that any Relief Defendants received assets that constitute ill-gotten gains because the District Court measured disgorgement by looking at the Wyly Brothers' tax avoidance, and (3) there was no record evidence that the Remanded Defendants received any ill-gotten gains from the Wyly Brothers.[8]

With respect to the Relief Defendants' principal claim, the Second Circuit noted that the asset freeze "tests the scope of this Court's opinion in *SEC v. Brennan*."[9]  However, this Court

---

[3]     Dkt. 497 (October 27, 2014 letter seeking stay of asset freeze); Exhibit ("Exh") 1 at SPA-11 (Final Brief and Special Appendix for Defendants-Appellants, *SEC v. Wyly, et al*, 808 F.3d, 623 (2015) (ECF No. 111).

[4]     *SEC v. Donald Miller et al*, 808 F.3d 623, 634 (2nd Cir. 2015).

[5]     Dkt. 541 (Amended Complaint).

[6]     Dkt. 518 at 3 (Order Temporarily Freezing Assets and Granting Other Relief).

[7]     Dee Wyly did not join in the other Relief Defendants' appeal but asked the bankruptcy court to enjoin the SEC's lawsuit against her as a relief defendant.  The Honorable Barbara J. Houser declined to do so in a January 9, 2015 opinion and order.  *In re Wyly*, 526 B.R. 194 (Bankr. N.D. Tex. 2015).

[8]     *Miller*, 808 F.3d at 630.

[9]     *Id*.

"carefully analyzed [the Second Circuit's] reasons for vacating the deposit order in *Brennan* and found that the asset freeze at issue here was a permissible use of the government's regulatory power under the 'governmental exception.'"[10]  The Second Circuit found that this Court's careful interpretation of *Brennan* was correct and, as a result, this Court "properly concluded that this asset freeze order is exempt from the Bankruptcy Code's automatic stay provision."[11]

With respect to the Relief Defendants' second and third challenges, the Second Circuit reiterated the applicable standard: "[e]quitable relief against a third-party non-wrongdoer may be entered where such an individual (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."[12]  As the Second Circuit noted, "Courts require a 'lesser showing' to enter an asset freeze order than is needed for other forms of equitable relief" and "the SEC 'must establish only that it is likely to succeed on the merits.'"[13]  In applying this standard, the Second Circuit held both that (1) "[i]t is undisputed that [Relief Defendants] have no legitimate claim to the funds in the IOM Trusts," and (2) the Relief Defendants' argument that "tax savings 'are personal to the taxpayers'" and thus cannot be transferred to third parties "misunderstands" this Court's opinion, which "made clear that '[m]easuring unjust enrichment by approximating avoided taxes does not transform an order of disgorgement into an assessment of tax liability.'"[14]

The Second Circuit then focused on the lone remaining issue with respect to validity of the asset freeze: whether there was sufficient evidence to show that seven of the Relief Defendants

---

[10]     *Id*. at 631-632.

[11]     *Id*. at 632.

[12]     *Id*. at 635.

[13]     *Id*.

[14]     *Id*. at 635-636 (quoting *SEC v. Wyly,* 56 F.Supp.3d 394, 431 (S.D.N.Y.2014)).

"received funds from the IOM Trusts or the Wyly brothers directly."[15]  The Second Circuit did not vacate the asset freeze with respect to these Relief Defendants but, rather, remanded given this Court's "greater familiarity with the record evidence and the evidence adduced at trial."[16] In so holding, the Second Circuit noted that four of the Remanded Defendants – Chip Wyly, Donald Miller, John Graham, and David Matthews – "appear to have possessed trust property, including jewelry artwork, furnishings and residences, but [this Court] did not rely on this evidence in fashioning its asset freeze order."[17]

For the seven Remanded Defendants, the Second Circuit requested "specific facts from the record showing receipt of ill-gotten gains by these defendants."[18]  The SEC plans to adduce additional relevant evidence at the February 22, 2016 evidentiary hearing.  However, in this brief, the SEC will show (1) that the Relief Defendants have received proceeds of the illegal conduct, and continue to have access to those proceeds; and (2) examples of the tangible benefits each of the Remanded Defendants have received from the IOM Trusts.

<u>**ARGUMENT**</u>

**I.      The Operation of the Offshore System Allows The Relief Defendants To Access Proceeds Of Defendants' Illegal Conduct.**

The asset freeze applies to assets of the Relief Defendants "which were, at any time, the property of the IOM Trusts and Companies" and any other assets received from the Wyly Brothers after January 1, 2005.[19]  During the remedies hearing, the IOM Trusts were divided into

---

[15]      *Id*. at 636.

[16]      *Id*. at 637.

[17]      *Id*.

[18]      *Id*. at 637.

[19]      Dkt. 518 at 3 (Order Temporarily Freezing Assets and Granting Other Relief).

two categories: the Bulldog Trusts and the Bessie Trusts.[20]  Both categories of trusts were funded by the transfer of options that the Wyly Brothers earned as compensation from the four companies where they served as high level insiders.[21]  The Wyly Brothers are not beneficiaries of the initial Bulldog Trusts but are beneficiaries of the Bessie Trusts.[22]  The following Remanded Defendants are beneficiaries of all of the Sam Wyly IOM Trusts:  Evan Wyly, Christiana Wyly, and Andrew Wyly.  Similarly, Chip Wyly is a beneficiary of all of the Charles Wyly IOM Trusts.  Moreover, David Matthews, John Graham, and Donald Miller are married to beneficiaries ███████████████████████

Between 1992 and 2004, the Wylys made over 700 undisclosed trades in these overseas accounts.[24]  The profits from these illegal trades exceeded $550 million.[25]  This Court's two disgorgement opinions measured what portion of the $550 million constituted illegal gains, resulting in an approximately $300 million judgment against the Wyly Brothers.  Because money is fungible, the comingling of these proceeds with all the money in the IOM Trusts taints the IOM Trusts and subcompanies.[26]

---

[20]     *Wyly,* 56 F.Supp.3d, at 413-416.

[21]     *Id*. at 410-411.

[22]     Dkt. 270-1 at ¶¶ 20-46 (Stipulation of Undisputed Facts).

███████████████████████████████████████████████████

[24]     PX-7015.

[25]     PX-7016; PX-7017.

[26]     *See, e.g., United States v. Garcia*, 37 F.3d 1359, 1365–66 (9th Cir. 1994) (holding, under money laundering statute—18 U.S.C. § 1956—that "presence of some tainted funds in the commingled account is sufficient to taint" legitimately-acquired funds in same account); *SEC v. Banner Fund Intern*, 211 F.3d 602, 616 (D.C. Cir. 2000) (holding that a defendant is not required to return a specific asset because he could argue he spent the proceeds of his illegal scheme and husbanded his untainted assets which would lead to "absurd" results); *SEC v. Better Life Club of*

A.    **The Wylys Maintained That The Trustees Of The IOM Trusts Had An Obligation To Follow The Requests Of The Beneficiaries.**

At trial, the SEC proved the Wyly Brothers' controlled the IOM Trusts, and the trustees followed their directives irrespective of whether the Brothers were named beneficiaries.[27]  Much of that evidence related to the manner in which the Wyly Brothers controlled the trading of securities and investments undertaken in the name of the IOM accounts.  But a great deal of that evidence also related to the use of IOM assets for the personal benefit of Wyly family members.  The Wyly Brothers historically argued that the trustees must follow the desires of various Wyly family members to use IOM assets to buy jewelry, real estate, art, ranches, toothbrushes, and other items for personal use:  the trustees were obligated to acquiesce to these requests unless the trust documents prevented it.[28]  This assertion arose as early as 1996 with the purchase of the painting "Noon Day Rest."  Cheryl Wyly had purchased a painting at Sotheby's for GBP 155,500.[29]  Sam Wyly directed Fugue Limited, a subsidiary of the Bessie Trust, to pay for the

---

*Am., Inc.*, 995 F.Supp. 167, 181 (D.D.C.1998) ("[W]hen legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool.").  *See also S.E.C. v. Byers*, 637 F. Supp. 2d 166, 177-178 (S.D.N.Y. 2009) aff'd sub nom ("some evidence that commingling occurred" is sufficient, as "the law does not appear to require more than that."); *S.E.C. v. Malek*, 397 F. App'x 711, 716 (2d Cir. 2010) aff'd sub nom; *S.E.C. v. Orgel*, 407 F. App'x 504, 505 (2d Cir. 2010).

[27]    *Wyly*, 56 F.Supp.3d at 428-429 ("The evidence amply shows that the IOM trustees followed every Wyly recommendation, whether it pertained to transactions in the Issuer securities, making unsecured loans to Wyly enterprises, or purchases of real estate, artwork, collectibles, and other personal items for the Wylys and their children. The trustees made no meaningful decisions about the trust income or corpus other than at the behest of the Wylys. On certain occasions, such as the establishment of the Bessie Trusts, the IOM trustees actively participated in fraudulent activity along with the Wylys. The Wylys freely directed the distribution of trust assets for personal purchases and personal use.").

[28]    As Sam Wyly noted when questioned about these purchases, "[t]hats what they [the IOM Trusts] were for."  Exh. 60, at 1661:7 (Excerpts from *SEC v. Wyly* Trial Transcript).

[29]    Exh. 8 (PX-320).

purchase.  The so-called Protectors of the trust dutifully "recommended" that Bessie agree to do so.[30]

A problem arose because Cheryl and Sam grossly overpaid for the painting, which required the trust to sell an income-earning asset to finance the purchase.  The trustees felt that this compromised the overall value of the trust:

> [the Protectors] are recommending the substitution of a very safe, income-producing asset by one which might be difficult to sell at a profit at short notice and which generates no income, especially since it is suggested that the Trustees should by it – through Fugue Limited, which is wholly owned by The Bessie Trust – at 222% of the pre-auction estimated price.[31]

Michael French responded, acting as a Protector and Wyly agent, by stating the following:

> Unless there is a clear and unequivocal requirement of IOM law (which I doubt), that any such purchase that is specifically authorized by the trust agreement must nevertheless be weighed against the investment returns that could otherwise be obtained by the funds, then I must assume that this transaction is authorized and lawful.
>
> *          *          *
>
> The Protectors have already recommend [sic] this transaction.  Please advise if you are unwilling to proceed on that basis in light of the <u>explicit</u> authorization for the transaction contained in the Trust Deed.[32]

This position – that the beneficiaries can command the use of trust assets for their own personal use regardless of investment value – explains why little to no due diligence was done on family purchases ranging from horse farms to art to Colorado property.  Indeed, the trustee's concern about the quality of "Noon Day Rest" as a long term investment was well founded.  Whereas the

---

[30]     Exh. 8 (Px-320); Exh. 9 (PX-323); Exh. 10 (PX-325).

[31]     Exh. 10 (PX-325).

[32]     Exh. 11 (PX-326).

Trust paid over $250,000 (£1 = $1.6)  for this painting in 1996, last year in a Bankruptcy Court approved auction, the same painting sold for $30,000.[33]

**B.    The Beneficiaries Continue To Exercise Control Of The IOM Trust Assets.**

Even after this litigation commenced, the Relief Defendants continued to demand control of IOM Trust assets. ███████████████████████████████████████████ ██████████████████████████████████████ The Red Mountain Trust was one of the 1995 Wyly trusts set up with a sham foreign grantor.[35] ███████████████████



---

[33]      Exh. 12 (Notice of Funds Received from Dallas Auction Gallery Sale, In re Samuel Evans Wyly, No. 14-35043 (Bankr. N.D. Tex. Argued Jan. 6, 2016) (ECF No. 921)); Exh. 13 (*Id*. at ECF 921-1, p. 1 of 13).

███ █████████████████████████████

[35]      *Wyly*, 56 F.Supp.3d at 415-416.

███ ████████████████████████████████████

 A clearer

example of dissipation of ill-gotten gains is hard to imagine.

███████████████████████████████████████████████

█████████████████

### C.      Sam Used The IOM Trusts To Transfer At Least $182 Million To His Children Beyond The Reach Of His Creditors While The SEC Case Was Pending In This Court.

As explained during the SEC trial, the IOM Trusts were initially funded with the transfer of valuable stock options issued to Sam and Charles as compensation from the companies for whom they served.[42]  In exchange for the transfer of these unexercised and in-the-money stock options, Sam and Charles received annuity contracts from more than a dozen offshore sub-companies.  Under those contracts, annuity payments would begin once the Wyly Brothers reached the age of 65. However, as the Wyly Brothers approached that age, they amended the annuities to defer the onset of payments for several additional years.[43]  The purported reason for the stock option annuity swaps was to defer income tax ordinarily owed by officers and directors upon exercise of compensatory stock options.[44]  Over the years, the Wyly Brothers caused the trusts to exercise and sell those stock options, and did not pay any income tax until those companies started making annuity payments to them in 2003 (in the case of Charles) and 2004 (in the case of Sam).[45]

But as the SEC litigation progressed, as evidenced by Sam's bankruptcy filings and the recent tax trial before Judge Houser, Sam Wyly has stopped receiving annuity

---

[42]      Exh. 22 (PX-1288); Exh. 60, at 1377:13-19; 1378:5-19 (excerpts from SEC v. Wyly Trial Transcript ("Wyly Trial Tr.").

[43]      Exh. 22 (PX-1288); Exh. 23 (PX-1255 at WYLYSEC01115164 (noting extension of annuities in 1999)).

[44]      *Wyly*, 56 F.Supp.3d at 411-412.

[45]      Dkt. 428 at ¶5(b); Dkt. 445 at ¶5.

payments from many of these annuity-owing IOM sub-companies.  The annuity agreements no longer represent a means to defer taxes, but rather a means to keep assets out of the reach of creditors (such as the SEC and IRS) and place them into the hands of Sam's children.  From at least 1992 to 2004, every securities transaction and/or purchase executed by an IOM entity was at the behest of a Wyly family member.[46]  Whereas the annuity-owing IOM sub-companies were initially funded with all of the proceeds from the exercise and sale of the stock options, by the time Sam filed his Chapter 11 petition, many of those sub-companies had stopped making annuity payments.[47]  ███████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████

    With the specter of a large SEC judgment looming, Sam Wyly repeatedly waived and/or did not enforce payment of annuity obligations, thus preventing the proceeds of his securities fraud from being sent back to the United States where they could more easily be used to satisfy a judgment.  (Coincidentally, these waivers also minimized Sam Wyly's taxes for the relevant calendar years).  During the recent tax trial before Judge Houser, Sam Wyly testified that he has waived approximately $57 million in future

---

[46]    *Wyly,* 56 F.Supp.3d at 429

[47]    *See* Sam Wyly's Amended Schedules of Assets and Liabilities, Amended Exhibit B-16, In re Samuel Evans Wyly, No. 14-35043 (Bankr. N.D. Tex. Argued Jan. 6, 2016) (ECF 472) selected pages of which are attached as Exh. 24.

██ ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

annuity payments from Tensas, East Baton Rouge and East Carroll in a liquidation of those companies in 2013.[49]  Moreover, on questioning from his own counsel, Sam Wyly admitted that he had written off the annuity payments owed by Moberly, Locke, Audubon and Yurta Faf.[50]  In his bankruptcy schedules, Sam Wyly valued these annuity payments at $175 million.[51]  Thus, Sam has "written off" approximately $253 million in annuity payments.



Sam's children are all beneficiaries of the IOM Trusts and sub-companies that now house the money that would have been used to pay Sam his waived annuity payments.[53]

Under the terms of the 1992 Trust agreements, Sam Wyly is not listed as a beneficiary of the Bulldog Trusts.  Sam Wyly did not claim a beneficial interest in any of the Bulldog Trusts on his amended bankruptcy schedule.[54]  Thus, by waiving or writing

---

[49]      Exh. 70, at 2670:1-17 of 1/19/2016 a.m. session (Bankruptcy Trial transcript).

[50]      *Id*. at  2941:1-8 of 1/20/2016 a.m. session ("Q. Are you expecting any more payments? A. No").

[51]      Exh. 24 at B-10 (Sam Wyly assigned the following values to the annuity agreements: Moberly ($55,920,630), Locke ($69,183,748), Audobon ($40,352,520), and Yurta Faf ($7,014,605)).



[53]      Dkt. 270-1 at ¶¶ 20-35 (Stipulation of Undisputed Facts).

[54]      Exh. 24 at B-20, B-20a ("Debtor is not and has never been a beneficiary of the Bulldog Trust, Delhi Trust, Lake Providence Trust or Ginger Trust").

off annuity payments owed by subsidiaries of the Bulldog Trusts, Sam has transferred assets to his children and – nominally at least – diverted that money from his creditors. The $57 million in annuity payments that Sam officially waived were all owed by subsidiaries of the Bulldog Trusts.  Moberly and Locke, which owe annuities valued at approximately $125 million that Sam Wyly has written off, are also subsidiaries of the Bulldog Trusts.[55]  Thus, by failing to enforce his annuity contracts, Sam Wyly has transferred approximately $182 million to his children via the Bulldog Trusts.

II.     **Ample Evidence Demonstrates That the Asset Freeze is Necessary for the Remanded Defendants.**

The general practices of the IOM Trusts are important because they demonstrate that every beneficiary of those trusts can receive tangible benefits on demand.  However, the Second Circuit requested that this Court highlight relevant record evidence that each of the Remanded Defendants received benefits from the IOM Trusts or the Wyly Brothers directly.  Below is a summary of the record evidence applicable to each of the Remanded Defendants (and the SEC will adduce additional evidence at the upcoming  evidentiary hearing).

A.     <u>John Graham</u>

John Graham ("Graham") is Lisa Wyly's husband.  Lisa Wyly is a beneficiary of all of Sam Wyly's IOM Trusts.[56] ██████████████████████████████████████ ███████████████████████████████  During this time, however, Graham has had the use and benefit of art owned by Audubon (whose past due and future annuity payments were written off).

---

[55]     Dkt. 270-1 at ¶ 22.

[56]     Dkt. 270-1 at ¶¶ 20-35.

██ ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

In 2004, Audubon began entering "formal 'Possession Agreements' with Sam Wyly and his family.  The Agreements identify which Wyly family members had possession of which Audubon-owned pieces and state that these persons were holding the items as "an agent" of Audubon."[58]



 The Ranch is a two hundred forty-four (244) acre property situated in the Woody Creek valley in central Colorado.[61]  The Ranch buildings include historic cabins,

---

[58]     Exh. 31 at 309 (Excerpts of DX-1001, Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations, *Tax Haven Abuses: The **Enablers**, the **Tools and Secrecy*** (Aug. 1, 2006)).

[61]     The Ranch is presently listed for sale for $50 million.  The listing is located at: *http://www.sothebysrealty.com/eng/sales/detail/180-l-963-82ynpj/circle-r-ranch-woody-creek-co-81656.*

agricultural structures and barns, storage facilities, and six separate single family homes with a total of 22 bedrooms, 18 baths and 5 half baths.  The Ranch includes homes specifically designated for Kelly and Dennis O'Donovan, Laurie and David Matthews, Lisa and John Graham, Sam Wyly's deceased ex-wife Rosemary Acton, and the ranch manager.[62]

The Ranch was purchased and funded through a tiered set of shell entities.[63]  Sam Wyly initiated the acquisition of the Ranch in 1999 by directing the Trust Protector to recommend the purchase.[64]  Sam Wyly then formed a new IOM shell company, Rosemary's Circle R Ranch, Ltd ("Ranch IOM Corporation"), to act as the funding gateway to purchase and develop the Ranch property.[65]  In turn, the Ranch IOM Corporation and Sam Wyly created a United States management trust, Rosemary's Circle R Management Trust ("Ranch Management Trust"), to funnel funds onshore.[66]  As the final step, the Ranch Management Trust formed two Colorado limited liability corporations to serve as owners of record for the Ranch:  Rosemary's Circle R Ranch East, LLC and Rosemary's Circle R Ranch West, LLC ("Ranch East and West LLCs").[67]

Sam Wyly's share in the Ranch Management Trust was one percent while Ranch IOM Corporation held the remaining ninety-nine percent.[68] ██████████████████
████████████████████████████████████████

---

[62]    Exh. 31, at PSI_ED00013764-66, PSI_ED00015013.

[63]    *Id.* at 286-291.

[64]    *Id*. at 286.

[65]    *Id*. at 288.

[66]    *Id.*

[67]    *Id.* at  288, FN 1098 and chart entitled Rosemary's Circle R Ranch Funding Structure.

[68]    *Id.*



**B.  David Matthews**

David Matthews ("Matthews") is Laurie Wyly's husband.  Laurie Wyly is a beneficiary of

the IOM Trusts.[73]



------

[73]    Dkt. 270-1, at ¶¶ 20-35.





## C. **Christiana Wyly**

Sam Wyly's daughter Christiana Wyly is a beneficiary of all of Sam Wyly's IOM Trusts, including the Bulldog Trust for which Sam Wyly claimed no beneficial interest in his bankruptcy schedules.[86]  She is thus a direct beneficiary of the $182 million in past-due and future annuity payments that were owed by Bulldog entities and either waived or written off by Sam Wyly.



[86]    Dkt. 271-1 at ¶¶20-35.



Sam Wyly has also allowed Christiana the use and benefit of art that he appears to personally own.  Sam Wyly disclosed an interest in two pieces of art located at Christiana Wyly's residence in London, England.[89]  These pieces are Pablo Picasso's "Untitled 1918," and Eugenio Zampighi's painting "Playing with the Baby."  Sam Wyly lent the $320,000 Picasso to Christiana while she was in boarding school in Switzerland.[90]

### D.  Evan Wyly

Evan Wyly is Sam Wyly's eldest son and is a beneficiary of all of Sam Wyly's IOM Trusts, including the Bulldog Trust for which Sam Wyly claimed no beneficial interest in his bankruptcy schedules.[91]  He is thus a direct beneficiary of the $182 million in past-due and future annuity payments that were owed by Bulldog entities and either waived or written off by Sam Wyly.



---

[89]     Exh. 24, at exhibit B4aa.

[90]     Exh. 42 (9/3/2004 *Dallas Business Journal* Article).

[91]     Dkt. 271-1 at ¶¶ 20-35.







██████████████████████████████████████████

███████████████████████████████████████████

### E.  **Andrew Wyly**

Andrew Wyly is Sam Wyly's son and is a beneficiary of all of Sam Wyly's IOM Trusts, including the Bulldog Trust for which Sam Wyly claimed no beneficial interest in his bankruptcy schedules.[114]  He is thus a direct beneficiary of the $182 million in past-due and future annuity payments that were owed by Bulldog entities and either waived or written off by Sam Wyly.



---
██  ████████████████████████████

██  ██████████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████

██  █████████████████

██  █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

### F.  Donald Miller

Donald Miller ("Miller") has been married to Charles Wyly's daughter, Martha, since September 1982.  They have four children together.[122]  Since Charles Wyly's death, Miller has served as the executor of Charles Wyly's estate ██████████████████████████████

███████████ He has received benefits directly and indirectly from Charles Wyly and Charles Wyly's IOM Trusts.





23

██████████████████████████ ██████

███████████████████████████████████████

████████████████████████████Miller also received

significant monetary benefits from Charles Wyly's domestic assets.  After the Wylys sold

Michaels Stores in 2006, Miller was without a job or source of income.  Charles Wyly promptly

put him on the payroll of Highland Stargate where Miller was paid $300,000 per year while

being trained to assist Charles in managing his financial affairs and run the Wyly family

office.[128]  Miller received this salary from 2006 through March 2015, when Judge Houser held

that "it was not appropriate for Mr. Miller's salary to be coming out of the creditors' recoveries

here.  That is just not a reasonable expenditure, particularly in light of the fact that there really is

no business to be managed."[129]

██████████████████████████████████

███████████████████████████████████████

████████████████

**G.  Charles J. Wyly, III ("Chip")**

Chip Wyly is Charles J. Wyly's only son. ███████████████████

███████████████████████████████████████

---

██ ████████████████████████████████████

██ ████████████████████

[128]     Exh. 68, at 103:23-104:8, 109:2-110:1 (excerpts of 3/18/2015 Bankruptcy Hearing
Transcript).

[129]     *Id*. at 136:15-19.

██ █████████████████████████████████





First, Dee Wyly disclosed on her bankruptcy schedules that Chip (presumably via Miller) loaned her $3 million on October 22, 2014, immediately prior to her bankruptcy petition, secured by a purported security agreement.[137]  Although the loan was allegedly made before the bankruptcy, the money was not transferred until after the petition was filed.[138]  Dee Wyly's bankruptcy attorney was equivocal whether this was a loan or a gift.[139]  Judge Houser noted that no application had been made for the debtor to obtain a post-petition loan, no note or security agreement was on file, and ultimately ruled that the $3 million was to be considered property of the estate,[140] and, given Dee Wyly's exorbitant monthly budgetary needs, a gift that will not be repaid.

---

[137]    Exh. 57 (Amended Schedule D of Caroline D. Wyly, filed January 6, 2015).

[138]    Exh. 71, at 102-104 (Excerpts of Bankruptcy Tr.).

[139]    *Id*.

[140]    Exh. 67, at 7-8 (excerpts of 11/25/2014 Bankruptcy Hearing Transcript).

██████████████████████████████████████████

████████████████████████████████████

## **CONCLUSION**

For the reasons set forth above, the SEC respectfully requests that this Court find that

each of the Remanded Defendants received funds from the IOM Trusts or the Wyly Brothers

directly and thus this Court's November 3, 2014 asset freeze should remain in effect as to each of

the Remanded Defendants.

Dated:  Washington, D.C.                Respectfully submitted,
       January 29, 2016

                                           */s/ Bridget M. Fitzpatrick*
                                           Bridget Fitzpatrick
                                           John D. Worland, Jr
                                           Gregory Miller
                                           Michael Roessner
                                           Hope Augustini
                                           Daniel Staroselsky
                                         Attorneys for Plaintiff
                                         Securities and Exchange Commission
                                         100 F Street, N.E.
                                         Washington, D.C. 20549
                                         (202) 551-4678 (Fitzpatrick)
                                         (202) 772-9292 (fax)
                                         fitzpatrickbr@sec.gov

## CERTIFICATE OF SERVICE

I hereby that on January 29, 2016 an un-redacted copy of the **BRIEF IN RESPONSE TO DECEMBER 18, 2015 REMAND ORDER** was served upon counsel listed below via email.

David Kornblau
Eric Hellerman
Covington & Burling
The NY Times Building
620 Eighth Avenue
NY, NY 10018-1405
Phone: (212) 841-1155
Email: EHellerman@cov.com

Judith Ross
Law Office of Judith Ross
700 N. Pearl Street, Suite 1600
Dallas, Texas 75201
Phone: (214) 377-8659
Email: judith.ross@judithwross.com

Mark H. Hatch-Miller
Susman Godfrey LLP
560 Lexington Avenue, 15th Floor
New York, New York 10022-6828
Phone: (212) 336-8332
Email:MHatch-Miller@susmangodfrey.com

Jim Lee
Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Phone: (214) 220-7744
Email: jimlee@velaw.com

Stewart H. Thomas
Hallett & Perrin, P.C.
1445 Ross Ave., Suite 2400
Dallas, Texas 75202
Phone: (214) 922-4114
Email: sthomas@hplawdallas.com

                                        /s/John D. Worland Jr.
                                        John D. Worland Jr.